1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA          }
                                  }
v.                                }      Criminal Case No.:
                                  }      3:21 CR 42
KEITH RODNEY MOORE                }

                                         June 4, 2021

**COMPLETE TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING**
**BEFORE THE HONORABLE ELIZABETH W. HANES**
**UNITED STATES MAGISTRATE COURT JUDGE**

APPEARANCES:

Kevin S. Elliker, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
919 East Main Street
Suite 1900
Richmond, Virginia  23219

     Counsel on behalf of the United States


Robert J. Wagner, Esquire
OFFICE OF THE FEDERAL PUBLIC DEFENDER
701 East Broad Street
Suite 3600
Richmond, Virginia  23219

     Counsel on behalf of the Defendant




                    KRISTA L. HARDING, RMR
                    OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT

**E X A M I N A T I O N S**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Special Agent Valot | 9 | 19 | -- | -- |

**E X H I B I T S**

|  | PAGE |
|---|---|
| Government's Exhibit 1 | 12 |
| Government's Exhibit 2 | 17 |

```
1              (The proceeding commenced at 11:02 a.m.)

2              THE COURT:  Good morning.

3              MR. ELLIKER:  Good morning.

4              MR. WAGNER:  Good morning.

5              THE COURT:  Madam Clerk, can you call this

6   matter, please.

7              THE CLERK:  Yes, ma'am.

8              In the matter of Criminal Case 21 CR 42, United

9   States of America v. Keith Rodney Moore.

10             The United States is represented by Kevin

11  Elliker.

12             The defendant is represented by Robert Wagner.

13             Counsel, are you ready to proceed?

14             MR. ELLIKER:  The United States is ready, Your

15  Honor.

16             Good morning.

17             MR. WAGNER:  Mr. Moore is ready, Judge.

18             Good morning.

19             THE COURT:  Okay.  Great.  Thank you.

20             Mr. Elliker.

21             MR. ELLIKER:  Your Honor, we're here this

22  morning for both an arraignment and a detention hearing

23  for Mr. Moore, who is named in a one-count indictment

24  filed -- or returned by the grand jury on May 4th of this

25  year that charges a single violation of federal law, 18
```

1  U.S.C., Section 922(g)(1), possession of a firearm and

2  ammunition by a convicted felon.

3         The maximum penalties associated with that

4  offense are 10 years incarceration, a $250,000 fine, three

5  years of supervised release and forfeiture of the firearm

6  in question.

7         The government calculates the speedy trial

8  cutoff date as August 10, 2021, and is prepared to go

9  forward today with evidence regarding the detention issue.

10         THE COURT:  Okay.  We'll do the arraignment

11  first, and then we'll proceed to the detention hearing.

12         MR. ELLIKER:  Thank you.

13         THE COURT:  Thank you, Mr. Elliker.

14         Mr. Wagner, if you could -- actually, get you to

15  come forward with Mr. Moore, please.

16         Good morning, Mr. Moore.

17         MR. MOORE:  Good morning.  How are you doing?

18         THE COURT:  I'm good.

19         So, sir, today what we'll do is we're going to

20  functionally have two hearings.  The first is an

21  arraignment where your trial date will be set, and then

22  the second is a detention hearing.  I'm going to do the

23  arraignment first, and so for that purpose I'll ask the

24  clerk to place you under oath.

25         THE CLERK:  Sir, please raise your right hand.

1           Do you affirm under penalty of perjury that the

2   answers to the questions you're about to be asked will be

3   the truth, the whole truth, and nothing but the truth?

4           MR. MOORE:  Yes, ma'am.

5           THE COURT:  Okay.

6           Sir, can you please state your full name for the

7   record.

8           MR. MOORE:  Keith Rodney Moore.

9           THE COURT:  And how old are you?

10          MR. MOORE:  Thirty-three.

11          THE COURT:  And how far did you go in school?

12          MR. MOORE:  I got a G -- to the 11th.

13          THE COURT:  You went to the 11th grade?

14          MR. MOORE:  That's why I got a GED.

15          THE COURT:  And then you got a GED.  Okay.

16          MR. MOORE:  Yes, ma'am.

17          THE COURT:  So based on that, can you read,

18  write, and understand the English language?

19          MR. MOORE:  Yes, ma'am.

20          THE COURT:  Okay.

21          Are you under the influence of any drugs or

22  alcohol today?

23          MR. MOORE:  No, ma'am.

24          THE COURT:  And are -- have you been under the

25  treatment of any doctor for any mental health illness?

1        MR. MOORE:  No, ma'am.

2        THE COURT:  There -- have you received, you

3 should have likely, your attorney has placed it in front

4 of you, a copy of the indictment in this case?  That's the

5 charging document.

6        MR. MOORE:  Oh.  Yes, ma'am.

7        THE COURT:  And it sets forth that there's one

8 charge, possession of a firearm by a convicted felon.  Do

9 you understand the charge against you?

10        MR. MOORE:  Yes, ma'am.

11        THE COURT:  Do you understand the maximum

12 penalties that could apply if you are -- either plead

13 guilty or found guilty of this offense?

14        MR. MOORE:  Yes, ma'am.

15        THE COURT:  Mr. Wagner, do you agree with the

16 speedy trial cutoff as set forth by the government?

17        MR. WAGNER:  Yes, Your Honor.

18        THE COURT:  And have you had a sufficient

19 opportunity to review the indictment with Mr. Moore prior

20 to appearing before me today?

21        MR. WAGNER:  I've -- I've come in this case with

22 -- I think Ms. Koenig has been on it.  I believe she

23 reviewed it with him.

24        THE COURT:  Okay.

25        Mr. Moore, did you review the indictment with

1   Ms. Koenig?

2        MR. MOORE:  Yes, ma'am.

3        THE COURT:  Okay.

4        Does -- Mr. Wagner, does Mr. Moore waive a

5   formal reading of the indictment in this case?

6        MR. WAGNER:  He does, Your Honor.

7        THE COURT:  And would he request a trial by jury

8   or trial by the Court?

9        MR. WAGNER:  Jury, Your Honor.

10        THE COURT:  Okay.

11        Madam Clerk, can you please arraign Mr. Moore.

12        THE CLERK:  Yes, ma'am.

13        Keith Rodney Moore, you understand the charge

14   against you in the indictment.  I ask you now what is your

15   plea, guilty or not guilty?

16        MR. MOORE:  Not guilty.

17        THE COURT:  Sir, your trial will be set before

18   Judge Gibney for a jury trial on August 5th and 6th.  And

19   I'm going to give some instruction to the counsel, so you

20   can return to your seat.

21        So, for the government, as required by Rule

22   5(f), I'll order that you produce all exculpatory evidence

23   to the defendant pursuant to *Brady v. Maryland*, and its

24   prodigy.  And remind you that failure to do so may result

25   in add -- in sanctions, including the exclusion of

1  evidence, adverse jury instructions, dismissal of charges

2  and contempt proceedings.  Do you understand that,

3  Mr. Elliker?

4          MR. ELLIKER:  Yes, Your Honor, we understand.

5          THE COURT:  Okay.  Thank you.

6          Also, regarding deadlines for Judge Gibney, the

7  deadlines are as follows:  Within 14 days, motions that

8  challenge the sufficiency of the indictment, raise any

9  issues regarding jurisdiction or for discovery to suppress

10 evidence from mental examination, any objections regarding

11 the use of evidence that require pretrial ruling and

12 raising any other pretrial matter, those motions would be

13 due within 14 days.  Responses would be due 14 days

14 thereafter, rebuttal briefs due three days after that.

15         Any other motions would be due 21 days before

16 trial.  Subpoenas are due 14 days before trial.  Proposed

17 voir dire and jury instructions are due seven days before

18 trial, and those should be emailed to chambers.  And if

19 you wish to schedule a motion, you should contact

20 chambers.

21         And it may be that Judge Gibney will also enter

22 an order regarding that information because there was a

23 lot of information.

24         So, okay, Mr. Elliker do you want to -- any

25 other questions regarding that information I just provided

1   you-all?

2            MR. ELLIKER:  No, Your Honor.

3            THE COURT:  Okay.

4            Do you have any evidence related to detention?

5            MR. ELLIKER:  Yes, we do, Your Honor.

6            THE COURT:  Okay.

7            MR. ELLIKER:  Your Honor, the United States

8   calls Special Agent Joshua Valot.

9            THE CLERK:  Do you affirm under penalty of

10  perjury that the testimony you're about to give, in this

11  case, before this Court, shall be the truth, the whole

12  truth, and nothing but the truth, so help you God?

13           SPECIAL AGENT VALOT:  I do.

14           Whereupon, **Special Agent Joshua Valot**, having

15  been duly sworn in, testifies as follows:

16                    **DIRECT EXAMINATION**

17  BY MR. ELLIKER:

18  Q    Good morning.  Could you please state your name, and

19  spell it for the record.

20  A    My name is Joshua Valot.  My last name is spelled V,

21  as in Victor, A-L-O-T.

22  Q    Are you a special agent with the ATF?

23  A    I am.

24  Q    And how long have you been working for the ATF, Agent

25  Valot?

1   A    I've been a special agent since 2005.

2   Q    And are you the lead case agent on the investigation

3   in this case?

4   A    I am.

5   Q    During the course of the investigation, have you

6   reviewed reports written by law enforcement officers

7   investigating this case?

8   A    I have.

9   Q    What kinds of reports have you reviewed?

10  A    The Richmond Police Department generated reports on

11  the -- on this incident, and those are what I've reviewed.

12  Q    Did you also review police body worn camera footage

13  that was related to this investigation?

14  A    I have.

15  Q    And based on the review of those materials, and

16  others, are you familiar with the facts and circumstances

17  underlying the indictment?

18  A    I am.

19  Q    Now, this investigation involves Mr. Moore.  Is he a

20  convicted felon?

21  A    Yes, he is.

22  Q    Now, generally speaking, are you aware of what and

23  when he was convicted?

24  A    I am.

25  Q    Can you tell the Court what that is?

1  A    In 2011 and 2012, Mr. Moore was convicted with

2  possession with intent to distribute narcotics.

3  Q    And each of those were felony convictions?

4  A    That's correct.

5  Q    Now flash forward to December 5th, 2020, did Richmond

6  police officers encounter Mr. Moore during an attempted

7  traffic stop?

8  A    They did.

9  Q    Can you please describe to the Court what prompted

10  the officers to attempt that traffic stop?

11  A    The officers observed Mr. Moore driving a vehicle

12  getting ready to leave a gas station.  They observed

13  Mr. Moore appeared to manipulate something on his -- in

14  his lap area.  They then observed that the license plate

15  on the vehicle, which was a 30-day temporary tag, was

16  identical to two other vehicles that they had pulled over

17  earlier that evening and they knew did not come back as a

18  legitimate registration.  So they then proceeded to

19  initiate a traffic stop with Mr. Moore.

20       At that point, Mr. Moore fled from the officers.

21  He fled -- drove through three stop signs, and then

22  eventually crashed his vehicle into a curb.  He then got

23  out of the vehicle and ran approximately one block before

24  being detained by the officers.

25  Q    Now, you mentioned that they identified Mr. Moore as

1  the driver.  Is it true that they identified him after

2  they caught up to him in the -- when -- after he had fled

3  on foot?

4  A    That's correct.

5  Q    Now, when the officers observed the car that he had

6  fled from, what did they see on the floorboard of the car?

7  A    They observed a firearm on the floorboard in plain

8  view.

9  Q    I'd like for you -- I think you walked up there with

10  a couple of premarked exhibits.  Could you look at what's

11  been marked as Government's Exhibit 1?

12  A    Yes, sir.

13  Q    What is that?

14  A    This is the firearm that was recovered from Mr. Moore

15  or from the vehicle.

16         MR. ELLIKER:  Your Honor, I'd move to enter

17  Government's Exhibit 1 into evidence.

18         THE COURT:  Any objection?

19         MR. WAGNER:  No, Your Honor.

20         THE COURT:  Okay.  It will be admitted.

21         (Government's Exhibit 1 is received.)

22         MR. ELLIKER:  Here.  I'll send you up with this

23  one, too.

24         That's for later.  That -- that's the next one,

25  Your Honor.

1          THE COURT:  Thank you.

2  BY MR. ELLIKER:

3  Q     Special Agent Valot, through your training and

4  experience, are you familiar with firearms and accessories

5  and attachments that can be used with firearms?

6  A     Yes, I am.

7  Q     Now, this photograph in Government's Exhibit 1, what

8  kind of firearm is that?

9  A     There's a Taurus semi-auto -- semi-automatic handgun

10  in that photograph, along with a pistol stabilizing brace.

11  Q     Could you describe more about the -- are the

12  pistol -- you just said pistol and stabilizing brace.  Is

13  that an attachment to the gun?

14  A     That is an attachment.

15  Q     And could you describe for the Court what the

16  features are of that attachment?

17  A     So, within this -- within this photograph, there is

18  the semi-automatic handgun that I mentioned.  And then

19  basically that firearm is -- has been placed inside what

20  we -- what is called a stabilizing brace, which the long

21  part at the end is used to actually -- to fire the

22  firearm, you stick your hand through the -- the brace on

23  the left side of the photograph, and then that helps you

24  hold the firearm and it helps to reduce recoil for

25  shooting the firearm.

1  Q    Are there other features on the brace itself that

2  assist in the use of the firearm?

3  A    There's a red -- there's a holographic sight on the

4  top to be able to sight into a target.  There's also a

5  laser sight and a flashlight there attached to the side of

6  the brace.

7  Q    Is it fair to say then that these features assist a

8  shooter in aiming at the intended target?

9  A    Yes, sir.

10 Q    And that the -- the feature of the brace, I think I

11 heard you describe, was that it helps to reduce the recoil

12 in the -- in the course of firing the weapon?

13 A    That's correct.

14 Q    Now, in your training and experience, do you know --

15 you mentioned, I think, the brace fitting your hand

16 through it.  Do you know other ways that users of these

17 kinds of accessories might fire the weapon with a brace?

18         MR. WAGNER:  Objection to the speculative nature

19 unless it applies to this defendant in this case or he has

20 personal experience.

21         THE COURT:  I'll overrule it.  I mean, to the

22 extent that it's -- he has -- his expertise bears on how

23 this device can be used.

24         MR. ELLIKER:  Well, and I -- Your Honor, I think

25 I may have poorly framed the question.

1  BY MR. ELLIKER:

2  Q    You described the designed -- I understood you to

3  design -- to describe the designed method of use of the

4  brace by fitting your arm through.  Is my -- is my

5  understanding correct on that?

6  A    That's correct.

7  Q    Are there other ways, in your training and

8  experience, that you know people who have these kinds of

9  braces would use that brace without fitting their hand

10 through the brace?

11 A    Yes, sir.

12 Q    How is that?

13 A    It could be used to stick the -- the brace part that

14 goes -- your hand goes through up -- up against your

15 shoulder to use it -- to be able to use your shoulder as

16 helping you to assist firing the weapon.

17 Q    And would that also reduce the recoil and assist in

18 aiming?

19 A    Yes, it could.

20 Q    Now, you said you reviewed the body worn camera

21 footage in this case, is that correct?

22 A    That's correct.

23 Q    And in those recordings, did the defendant admit to

24 officers the reason he fled the traffic stop was because

25 he had this firearm?

1  A    He did.

2  Q    Now, in addition have you reviewed records from

3  Henrico County regarding Mr. Moore's acknowledgment of

4  prohibition on the possession of firearms?

5  A    I believe that was from -- I'm not sure if that was

6  Henrico County or that was from probation -- it was from a

7  probation and parole office.  I'm not sure if it was based

8  out of Henrico.

9  Q    But you have reviewed records that show Mr. Moore

10 signing acknowledgment that he is a prohibited person, not

11 allowed to use -- to possess a firearm?

12 A    That's correct.

13 Q    Okay.  And was the defendant taken into custody on

14 the evening of December 5th, 2020?

15 A    Yes, he was.

16 Q    And, subsequently, was he later released and placed

17 on home electronic monitoring by the City of Richmond?

18 A    Yes, sir.

19 Q    Have you reviewed records related to his compliance

20 with home electronic monitoring?

21 A    I have.

22 Q    I ask you to take a look at what's been marked as

23 Government's Exhibit 2.  Can you say what that exhibit is?

24 A    This is a report from -- from the pretrial services

25 from -- relating Mr. Moore's home electronic monitoring.

1  Q    And is this the report that you reviewed related to

2  his home electronic monitoring?

3  A    It is.

4          MR. ELLIKER:  Your Honor, we'd move to enter

5  Exhibit 2 into evidence.

6          THE COURT:  Any objection?

7          MR. WAGNER:  No objection.

8          THE COURT:  It will be admitted.

9          (Government's Exhibit 2 is received.)

10         MR. ELLIKER:  Thank you.

11 BY MR. ELLIKER:

12 Q    I'd ask you to flip to the fourth page, which is --

13 has the number 34 in the bottom right corner.  The second

14 paragraph, a few lines down, could you -- it starts on

15 12/31/2020.  Could you please read that.

16 A    "On 12-31-2020 the client left his resident

17 unauthorized on or about 4:09 pm without authorization.

18 On 12-28-2020 the client was told he cannot attend a

19 family's New Year's Eve Festivities.  On 12-31-2020 the

20 client was in and out of his residence unauthorized.  I

21 alerted the client several times.  I called the client's

22 phone number on file, but he did not respond.  The client

23 was out of the local community" -- "was out of the local

24 community unauthorized until 2:57 a.m. on 1-1-2021.  He

25 did not respond to his alerts or phone calls while making

1  unauthorized moves.  He did not" -- "he did not filling

2  out his weekly itinerary to reflect his movements for two

3  or more hours while being tracked.  This is the client's

4  2nd violation.  The client's action constitute a **Major**

5  **Violation** of his HEM program agreement.  Despite the

6  programs best effort this client has demonstrated a

7  blatant disregard of the court order and the HEM

8  requirements."

9  Q    And if you could flip forward to the page marked 41,

10 and read the second paragraph that starts "1-2-2021."

11 A    "On 1-2-2021 the client left his assigned resident

12 at:  XXX Xxxxxx Street, Richmond, VA XXXXX.  The client

13 left his resident unauthorized on or about 9:38 p.m.  He

14 did not return to his resident until 10:38 p.m.  The

15 client was tracked to the unauthorized location listed

16 below.  The client was buzzed/vibrated, but he did not

17 respond to his alerts.  The client is aware of the

18 consequences he is subject to if he continue to violate

19 HEM program rules.  This rep -- "this reprimand is the

20 client's **3rd** write-up concerning his" violation --

21 "concerning him violating his HEM program agreement.  The

22 Client's actions constitute his **2nd Major Violation** of the

23 HEM program rules for unauthorized movements and not

24 filling out his Weekly Itinerary to reflect his movements.

25 Q    Now, based on the violations of the HEM conditions,

1  was the defendant arrested by Richmond police on or about

2  January 21st, 2021?

3  A     Yes, he was.

4  Q     And was he later released about a month later?

5  A     Yes, he was.

6          MR. ELLIKER:  Those are all the questions I

7  have, Your Honor.

8          THE COURT:  Okay.

9          Mr. Wagner.  And, Mr. Wagner, I would note, I

10 think it's clear from the documents related to his state

11 supervision that following his release, the last page sets

12 forth his conduct after that date.  So, I've read it.  I

13 understand if you-all want to argue it, that's fine.  I

14 don't know that we need to have cross-examination of Agent

15 Valot on that point, so I just would clarify that I've

16 read this last page.

17         MR. WAGNER:  Okay.

18                    **CROSS-EXAMINATION**

19 BY MR. WAGNER:

20 Q     So you know that he's been successful on pretrial

21 release since his release.  And I believe that release, if

22 you know, was February 15th, is that right?

23 A     It was around that time frame.  Yes, sir.

24 Q     And so he's been out for approximately four months

25 since then?

1   A     That's correct.

2   Q     Okay.  Are you aware of his employment situation?

3   A     He had explained the employment situation when I took

4   him into custody.

5   Q     Two full-time jobs, right?

6   A     That's what he told me.

7   Q     All right.  And did he tell you that he's taking care

8   of his mother who has some health problems?

9   A     He did not explain that part to me.

10  Q     Okay.  Are you aware of that from any other source?

11  A     No, sir, I'm not.

12  Q     All right.  The -- you talked about the firearm in

13  this case, and the -- the extra equipment that was added

14  to the firearm.  Do you know if there was a bullet in the

15  chambers when the gun was found?

16  A     There was not.

17  Q     Okay.  And this equipment that was added to the

18  firearm, it doesn't expand the capacity of -- of bullets

19  that the gun can fire, correct?

20  A     That's correct.

21  Q     Okay.  So solely the cartridge that was in the gun.

22  I think it had six bullets in it, is that right?

23  A     The magazine had eight -- eight rounds in it.

24  Q     Eight rounds.  Okay.

25          And that was all that it could fire, correct?

1   A    That's correct.

2   Q    All right.  You talked about his offenses.  I believe

3   one conviction was in 2010 for a drug violation, right?

4   A    I believe it was 2011, but I could be wrong.

5   Q    And there was one in 2012 as well, right?

6   A    That's correct.

7   Q    Do you know how much drugs were involved in those

8   cases?

9   A    I do not.

10  Q    Do you know that there are no firearms involved in

11  those cases?

12  A    I do not.

13  Q    And since his release on the 2012 drug violation,

14  he's had no felony charges since then until December of

15  2020, correct?

16  A    That's correct.

17           MR. WAGNER:  Thank you.

18           No further questions, Judge.

19           THE COURT:  Okay.

20           Any redirect?

21           MR. ELLIKER:  No, Your Honor.

22           THE COURT:  Okay.

23           Thank you, Agent Valot.  You can step down.

24                    **WITNESS STOOD ASIDE**

25           Mr. Elliker, do you have additional evidence

1    you'd like to present?

2              MR. ELLIKER:  No evidence, Your Honor.  Thank

3    you.

4              THE COURT:  Mr. Wagner, do you have evidence?

5              MR. WAGNER:  No evidence, Judge.

6              I just want to point out that Mr. Moore's mother

7    is here, and she would serve as a third-party custodian.

8    If the Court has any concerns or any questions for her,

9    she's available for examination.

10             THE COURT:  Okay.  Thank you.

11             MR. WAGNER:  Thank you.

12             THE COURT:  Mr. Elliker, I'll hear from you.

13             MR. ELLIKER:  Your Honor, acknowledged in this

14   case is the government's burden to prove either --

15   either/or, and danger to the community, or risk of flight.

16   I think both are present here, but perhaps more -- more

17   towards the danger to the community, the weight of the

18   evidence in this case is very strong.

19             Obviously -- just to note for the record,

20   obviously, there's already been a finding of probable

21   cause by the grand jury and the return of the indictment,

22   but the underlying incident involved flight from officers

23   during a simple traffic stop, running multiple stop signs,

24   crashing a car, fleeing on foot.  By definition itself,

25   the -- the method -- or the -- the inciting incident here

1   was a dangerous flight.

2              He possessed a firearm knowing that he was not

3   supposed to, and that firearm had attachments that make it

4   easier to aim and shoot and -- which make it a

5   particularly dangerous weapon in the hands of someone

6   who's not supposed to have it or may be using it for an

7   illegal purpose.

8              And in terms of his criminal history, I'm aware

9   that it was a little while ago, but I still think it's of

10  relevance, his felony convictions, particularly given how

11  it relates to a history of noncompliance with the law.  We

12  have a defendant who knew he was a felon who was not

13  supposed to posses a firearm, and broke that law.  Knew he

14  was being pulled over the night of December 5th, and fled

15  from police.  Knew he was being monitored in this very

16  case before it was indicted federally, and violated that

17  program.  That the people overseeing that in Richmond

18  called it a flagrant violation of that program's

19  requirements.

20             And I also think -- and I think this is right

21  from reviewing the criminal history, that this offense is

22  actually committed while a suspended sentence is still in

23  effect from the most recent Henrico felony conviction

24  because there was a -- that sentence imposed was suspended

25  for a period of 10 years less than 10 years ago.  So, that

1  is -- that's -- that's our position on detention - the

2  need to protect the community.

3         At the same time while I'm here, I will

4  recognize that the evidence that cuts in the defendant's

5  favor, to the extent the Court is considering imposing --

6  allowing the defendant's release, we would strongly urge

7  the Court to appoint a third-party custodian with location

8  monitoring to assure continued compliance with any

9  conditions that the Court and the probation office would

10  seek.

11         THE COURT:  Okay.

12         MR. ELLIKER:  Thank you.

13         THE COURT:  Mr. Wagner.

14         MR. WAGNER:  May I have just one moment, Judge?

15         THE COURT:  Okay.

16         MR. WAGNER:  Your Honor, we ask that Mr. Moore

17  be released for pretrial detention purposes.  He is not a

18  danger.  He does not pose a danger to the community.  He

19  is not a risk of flight.

20         And the best indicators for that, Judge, are the

21  fact that he has complied with his conditions of state

22  pretrial release for the past four months, and he has a

23  stable job and a stable residence.  Actually, two stable

24  jobs.  Two full-time jobs, and a stable residence.

25         THE COURT:  What are his jobs?

1          MR. WAGNER:  So, he works with GRTC.

2          THE COURT:  And what does he do for them, do you

3    know?

4          MR. WAGNER:  He works as a -- cleaning and

5    sanitizing the buses for Covid purposes.  7:00 p.m. to

6    3:00 a.m.

7          We have an email also from his job with Family

8    Enterprises.  He acts with -- they're a moving company.

9    He works from 9:00 to 5:00 Monday through Friday for the

10   moving company.  They install appliances.  He's been doing

11   this job for about two to three years, Your Honor.

12         The GRTC job he's had for the past four months

13   since he was -- since he was released.  And he carries

14   these two jobs, Your Honor, because he has a young child

15   to take care of.  Actually, two children to take care of.

16   And he indicates he has a child on the way.

17         And, also, so he can help take care of his

18   mother.  His mother has some medical problems, Your Honor.

19   She has heart problems.  Two stints in her heart.  She has

20   leg problems, hip replacements, gout, and she needs help

21   getting to -- to medical appointments.  And Mr. Moore

22   provides that assistance for his mother.  Lives with his

23   mother.

24         And she would be a suitable third-party

25   custodian in this case if this Court is considering his

1  release.

2         Judge, I would suggest to the Court that the

3  best indicator of success on pretrial release is

4  employment.  As the Court well knows, people who have

5  jobs, people who are employed, they tend to be much more

6  compliant with a -- with rules of supervised release.

7         And this is not a presumption case, Judge.

8  Actually, I think if you read the Bail Reform Act, there

9  appears to be a presumption in favor of release.  18

10 U.S.C. 3142 directs that the Court shall order the

11 pretrial release of the defendant subject to the least

12 restrictive conditions, or combination of conditions, as

13 long as the Court is reasonably assured that he will not

14 pose a danger to the community or a risk of flight.  And

15 so this -- this is the foundation for our request that the

16 Court allow Mr. Moore to be released on pretrial pending

17 the trial of this matter.

18        Judge, he has support in the community.  A

19 stable residence.  His mother, again, is here to support

20 him.

21        I think it's also important to understand the

22 difference between state court and federal court.  And,

23 yes, there was a violation, or maybe two violations, in

24 state court for his pretrial release there.  He would tell

25 the Court that there were two pretrial services officers.

1  One of the officers said it was okay for him to -- to go

2  for the -- the -- it was a New Year's Eve celebration.   To

3  go out for the New Year's Eve celebration.   And he admits

4  there was another officer that told him not to.   He went

5  ahead and did it, and he was punished for that, and

6  punished for what happened on the 2nd of January.

7       But since then, Judge, he's been completely

8  compliant for four months with the conditions of his

9  pretrial release in state court.

10      THE COURT:  And it's -- it appears -- let me

11  just ask this.  I'm very concerned with -- to me, the

12  conducted alleged in the pretrial violation report is

13  flagrant and entirely unacceptable, but it does appear to

14  me that he remained on home electronic monitoring during

15  -- after his release.  Is that your understanding as well?

16      MR. WAGNER:  I can't answer that, Judge.  I

17  don't know the answer to that question.  Let me ask him,

18  if I could?

19      THE COURT:  Okay.  I mean, it says "per HEM,"

20  which would be home electronic monitoring.

21      MR. WAGNER:  Right.

22      MR. ELLIKER:  Your Honor, I can say he was on

23  electronic monitoring until he was arrested last week.

24      MR. WAGNER:  Yeah, he was arrested at his job,

25  and he did have home electronic -- that's how they found

1  him, evidentially, through the home electronic monitoring.

2  So, yes, I guess the answer to that question would be,

3  yes, he was on home electronic monitoring at the time, but

4  now he's been taken into federal court, Judge.  And that's

5  kind of raised the stakes for him.  And he understands

6  that.

7          I mean, you know the impact that having a

8  federal indictment on an individual, on a defendant.  You

9  know the impact that has on the defendant and has on -- on

10 Mr. Moore.  So he will take this even more seriously than

11 he took the state situation.

12          But as I said, he has -- he has children to look

13 out for out there.  He has his mother to look out for.  So

14 he's going to be extra careful that he does not violate

15 any of the conditions of his supervised release.

16          Judge, in these times of criminal justice

17 reform, courts should be looking for alternatives to

18 incarceration and not expend resources unnecessarily

19 incarcerating individuals like Mr. Moore who can otherwise

20 be law-abiding, productive citizens, someone with two

21 full-time jobs, someone who has got to take care of his

22 mother.

23          So I ask that the Court look at the situation

24 with Mr. Moore, look at the last four months.  If the

25 government felt that Mr. Moore was a danger to the

1  community over this past four months, well, they could

2  have issued a criminal complaint and brought him into

3  custody.  They could have brought the indictment sooner

4  rather than allow him to be out for the last four months.

5  So it's somewhat inconsistent for the government to argue

6  that he's a danger now but wasn't for the past four months

7  when they could have bought him into custody.

8          I think he's proven to the Court that he can be

9  successful on pretrial release, as he has been for the

10  past four months.  And if this Court is inclined to take a

11  chance on him, there can be conditions put in place that

12  would assure his return to the Court, assure that he's a

13  -- that he's safe out there, and that's home electronic

14  monitoring.

15          We have good people in pre -- with out pretrial

16  release program who can monitor him, who can keep tabs on

17  him, and will let the Court know as soon as there are any

18  kind of issues of noncompliance.  So we -- we ask that the

19  Court allow Mr. Moore to be released on conditions.

20          THE COURT:  All right.  Thank you.

21          Mr. Moore, can you please stand where you are.

22          So, sir, the question in a detention hearing is

23  whether or not I can impose conditions, or a combination

24  of conditions, to avoid a risk of flight or danger to the

25  community.  It's the government's burden to show either by

1   clear and convincing evidence that there's a danger to the

2   community or by a preponderance of the evidence that

3   there's a risk of flight.  I'll start first with whether I

4   think there's a risk of flight.

5           As -- you know, you are a lifetime resident of

6   Richmond, you have a child here, it appears you have a

7   child on the way.  Your family is here willing to serve as

8   a third-party custodian.  I don't see -- you do have some

9   criminal history, which I want to talk about.  There's no

10  evidence of significant failure to appear of not going to

11  court when you're required to do so, and so I weigh that

12  as well.  And so I -- based on the record here, I don't

13  think you're a risk of -- of flight.

14          I think then the other concern is the danger to

15  the community, and we'll talk about that.  So, regarding

16  danger to the community, you know, I do -- I think this is

17  a very close case.  In part it is a close case because

18  there's not a presumption.  I listened very carefully to

19  the alleged criminal conduct, which is serious, and

20  does -- the presence of a loaded firearm in a vehicle,

21  especially this type of device, presents a danger to the

22  community in and of itself.  And I think that the weight

23  of that evidence is strong.  Those would favor detention,

24  and I weigh them.

25          I also consider the fact that there is some

1    history of use of marijuana, but not more significant

2    substance abuse problems.  There is a history of some

3    violation of the pretrial.

4           Your failure to comply with home electronic

5    monitoring is very serious.  That type of conduct is not

6    tolerated, and would not be tolerated in this Court.  The

7    first instance of it would result in incarceration.  And

8    so it's not just the failure to comply with home

9    electronic monitoring, but it's the repetitive nature of

10   that that I find absolutely concerning because it

11   demonstrates a willingness to abide by conditions that

12   attorney -- Judges may impose upon you.  And so I do

13   consider that, and the fact that there are -- there were

14   some new charges while on supervision.

15          But I have to weigh that against what conditions

16   I can impose, as well as the fact that your mother is

17   here.  She's going to serve as a third-party custodian.

18   She would be available to supervise you basically

19   continuously.

20          You have two jobs.  I agree with Mr. Wagner.  I

21   think that is an indicator of willingness to comply.  And

22   then more recently there is an ability to comply while on

23   pretrial, and at least the recommendation from apparently

24   pretrial and then the Court's order that you remain on

25   pretrial, which you did so until your arrest, without any

1  new criminal conduct or violations.  And so I consider

2  that on balance.

3         I think I can impose conditions, very strict

4  conditions, to assure that that prior conduct which would

5  raise a concern of dangerousness can be addressed.  And so

6  I'll order that once the home electronic monitoring can be

7  put in place that you be released, but it will be on very

8  strict conditions.

9         And I want to be absolutely as clear as I can

10  with you that it is your obligation – not your mother's

11  obligation, not your attorney's obligation, or the

12  probation officer's obligation – to understand the

13  conditions of pretrial release.  And if you violate those

14  conditions, the impact to you is very significant.  One,

15  you can be incarcerated.  You can face additional terms of

16  incarceration.

17         The district court can consider that conduct

18  when considering your case once it's resolved.  And so the

19  effect of you during this period of time is very

20  significant, and I want to make sure you understand that.

21  Do you understand that?

22         MR. MOORE:  Yes, ma'am.

23         THE COURT:  Okay.

24         So, I'll find then release is appropriate.  I'll

25  go through those conditions with you.

1    You will be under the supervision of the

2    pretrial services officer.  You will be placed on home

3    detention with electronic monitoring.  You -- at the

4    discretion of the pretrial services officer, can be

5    approved for scheduled absences for employment, any

6    treatment, attorney visits, court appearances, any court

7    ordered obligations or other activities as approved by the

8    probation officer.

9        And what that means is you have to get the

10   probation officer's approval.  And so if you have a work

11   schedule, that has to be preapproved before you leave.  If

12   you need 22 minutes to get from your home to your work,

13   you cannot leave.  You need to schedule that travel time,

14   and you cannot leave your residence until the time in

15   which you are permitted to leave.  And you must return at

16   the time you are scheduled to return.

17       If you need to deviate from that schedule, you

18   can only deviate if you have the prior approval of your

19   pretrial services officer, do you understand that?

20       MR. MOORE:  Yes, ma'am.

21       THE COURT:  Okay.

22       You cannot possess a firearm, destructive device

23   or other weapons.  You may not violate any other state or

24   federal law.  You may not use or possess any narcotic drug

25   or controlled substance.  You will be drug tested.  I will

1   know immediately if those drug tests come back positive,

2   and so you are prohibited from using or possessing any

3   controlled substances, do you understand that?

4           MR. MOORE:  Yes, ma'am.

5           THE COURT:  Okay.

6           Any testing or treatment at the discretion of

7   the pretrial services officer for substance abuse.

8           Mr. Elliker, are there any other conditions that

9   you would ask for that you think I may have missed?

10          MR. ELLIKER:  Well, Your Honor, we had

11  mentioned -- and forgive my lack of knowledge on this, but

12  we had mentioned a third-party custodian.  I don't know if

13  that's -- if you're considering not doing that?

14          THE COURT:  I -- no, I -- thank you.

15          MR. ELLIKER:  Okay.

16          THE COURT:  Is there anything else other than a

17  third-party custodian?

18          MR. ELLIKER:  No.  No, Your Honor.

19          THE COURT:  Okay.

20          I will place you then into the third-party

21  custodian.  Your mother will be your third-party

22  custodian.

23          Ma'am, if you can stand where you are, please.

24  I'd like to address you.

25          Thank you for being here today.  I want to make

35

1   sure you understand, I know Mr. Wagner and the pretrial

2   services officer have talked to you, about I want to

3   ensure that you understand your obligations.  And what

4   that means is you've just heard me place your son on a

5   number of conditions which require him to do certain

6   things and not do certain things.  As the third-party

7   custodian, I'm relying on you to call the probation

8   officer if he doesn't do -- if, you know, he violates

9   those conditions in any way.

10           Is that -- are you willing to serve in that

11   role?

12           MS. MOORE:  Yes.  Yes, ma'am.

13           THE COURT:  And you think you can call me if he

14   steps outside those lines?

15           MS. MOORE:  Yes, ma'am.

16           THE COURT:  Okay.  And the reason that's

17   important is because if you fail to do that, what your son

18   has done, effectively, is to bring you into our criminal

19   justice system, and if you don't do that, that then falls

20   back not just on you, but on him, do you understand that?

21           MS. MOORE:  Yes, ma'am.

22           THE COURT:  Okay.  Thank you, ma'am.

23           So you'll have paperwork to sign, and then the

24   pretrial services officer will tell you how to get the

25   home electronic monitoring installed.  And once that's

1   done, then your son will be released, okay?

2            Thank you for your presence here.

3            Sir, do you have any questions about the

4   conditions as I placed you on?

5            MR. MOORE:  Yes, ma'am.

6            THE COURT:  Do you have any questions?

7            MR. MOORE:  Yes.

8            THE COURT:  Okay.  Ask your attorney real quick,

9   and then I'll clarify.

10           Any questions, Mr. Wagner?

11           MR. WAGNER:  He wanted to know if he could go to

12   work.

13           THE COURT:  Yeah, you can as approved by your

14   probation officer.

15           MR. WAGNER:  Can he also take his mother to her

16   medical appointments?

17           THE COURT:  Well, Mr. Moore, do you have a valid

18   license?

19           MR. MOORE:  I'm supposed to go to DMV coming up.

20           MR. WAGNER:  He has a restricted license.

21           THE COURT:  You have a restricted license.

22   Okay.

23           What I -- for med -- if you have preapproval for

24   medial appointments, your medical appointments, your

25   unborn child's medical appointments, or your mother's

1  medical appointments, those would be appropriate reasons

2  to ask the pretrial services officer.  But those have to

3  be preapproved.

4           And exceeding the bounds of what you're

5  permitted to -- your driving privileges would be a

6  violation of a state law.  That would be a violation of

7  your conditions of pretrial.  So, I don't know what the

8  status of your license is, but I would advise you of that.

9  And you should talk to your attorney regarding when and

10 how you're able to drive, do you understand that?

11          MR. MOORE:  Yes, sir.

12          THE COURT:  Okay.

13          Mr. Wagner, are there any other conditions that

14 you think may be necessary here?

15          MR. WAGNER:  No.  Thank you, Judge.

16          THE COURT:  Okay.

17          So, Mr. Moore, I wish you the best of luck.  You

18 will be remanded until the home electronic monitoring is

19 put in place, okay?

20          Madam Clerk, anything further?  No?

21          Thank you all.  We'll stand in recess.

22          (The proceeding concluded at 11:43 a.m.)

23                REPORTER'S CERTIFICATE

24          I, Krista Liscio Harding, OCR, RMR,
   Notary Public in and for the Commonwealth of
25 Virginia at large, and whose commission expires

38

1

2  March 31, 2024, Notary Registration Number 149462, do
   hereby certify that the pages contained herein accurately
3  reflect the recording transcribed by me, to the best of my
   ability, in the above styled action.
4       Given under my hand this 22nd day of June, 2021.

5                              /s/
                     Krista Liscio Harding, RMR
6                    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25