## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 3:21-cr-42 |
| ) | |
| KEITH RODNEY MOORE, ) | |
| ) | |
| Defendant. ) | |

### UNITED STATES' OPPOSITION TO
### MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Keith Moore has been indicted for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). He now asks the Court to suppress evidence found in his car following an attempted traffic stop (a gun) and statements he made after he fled from police (including his admissions that he ran because he had the gun in the car). His motion is premised on both incomplete presentation of the facts and inadequate application of Fourth and Fifth Amendment precedents. The Court should deny the motion in its entirety.

Regarding the purported Fourth Amendment violation, Moore contends that the gun officers found after initiating a traffic stop must be suppressed as the fruit of an "unreasonable seizure." Moore is wrong on this point. Police had a sufficient basis to try to pull Moore over because his car displayed a temporary tag they reasonably believed to be fake. But more important, under *Hodari D.* and binding Fourth Circuit precedent, Moore was not seized until after he sped away, ran three stop signs, crashed his car, abandoned the car, sprinted another two blocks, and finally surrendered to police. By that time, his actual seizure was supported by reasonable suspicion and probable cause that he had committed several crimes. And by then, he had abandoned the gun in plain view, meaning officers could seize it regardless of the original basis for the attempted stop.

Regarding the alleged Fifth Amendment violation, Moore complains that officers violated *Miranda* by interrogating him before giving him warnings, refusing to respect his right to remain silent after *Miranda*, and using a prohibited two-part interrogation before and after he was read his *Miranda* rights. The evidence refutes these suggestions. Moore's pre-*Miranda* interactions with various officers consisted of unanswered questions posed by police, unprompted statements volunteered by Moore, and a 60-second conversation about the purchase of his car. Then, after *Miranda*, Moore told an officer to take him to jail and then immediately re-engaged the officers with conversation by demanding to know why police had tried to stop him. After Moore initiated the post-*Miranda* conversation, he admitted twice to two different officers that he fled because he had the gun in his car—a far cry from the prohibited practice of using pre-*Miranda* conversations to draw out post-*Miranda* admissions

Police did not obtain the gun or Moore's admissions by violating the Constitution. The Court should deny the motion to suppress.

## Facts

**I.     The Attempted Traffic Stop**

When a unit of four Richmond police—Officers Colombo, Williams, Mills, and Sgt. Spinos—saw the temporary tag "11134Y" on Keith Moore's Chrysler 300, it was the third time they had seen that tag number on a different car that night. They knew the tag was likely fictitious. A few hours earlier, around 5:30 p.m., those officers stopped a white Cadillac sedan with a broken headlight and an expired "11134Y" temporary tag. Information from the state vehicle database indicated the tag did not correspond to any known vehicle. They warned the driver to fix the headlight and tag and let him go. About an hour later, around 6:30 p.m., those same four officers stopped a dark Acura sedan. In the minute-long stop, the driver explained she had just broken her own car window after accidentally locking her baby in the car. The officers

saw the "11134Y" temporary tag on the Acura and were perplexed: the tag number matched the previously stopped white Cadillac but it also displayed the Acura's vehicle identification number (VIN). They briefly asked that driver whether she had given that tag to anyone else—she said she had not—and they let her (and the baby) go.

At about 9:45 p.m., those same four officers saw Moore's white Chrysler 300 in the gas station parking lot at the corner of Brookland Park Boulevard and 3rd Avenue. They saw the driver of the Chrysler, Moore, slow down before pulling onto the road and observed him manipulating something in his lap. As the police pulled around the parking lot and came up behind the Chrysler, they saw the same "11134Y" temporary tag. As the Chrysler approached 4th Avenue, officers turned on their lights to stop the vehicle and investigate the tag.

The Chrysler 300 sped away. The car sped south down 4th Avenue, ran a stop sign, and made a sharp right onto Custer Street. As police gave chase, the Chrysler accelerated on Custer, ran the stop signs at 3rd and then 2nd Avenues, then wrecked on the curb at the intersection of Custer and 2nd Avenue. Moore jumped out of the car and sprinted down the street. Officer Colombo and Sgt. Spinos ran after Moore while Officers Williams and Mills continued the pursuit in their police vehicle. After another two blocks of chasing down Custer Street, Moore gave up and was taken into custody. Colombo and Mills stayed with Moore while Sgt. Spinos and Officer Williams returned to the abandoned Chrysler 300. Within seconds, additional police, including Officers Gilbert and Torres, converged on the site of the accident. Through the open door of the Chrysler 300 they saw a handgun on the floorboard in front of the driver's seat.[1]

---

[1] Police also saw in plain view a baggie containing marijuana in the Chrysler 300. Officers then conducted a search of the vehicle. No additional contraband was located, but officers found documents corroborating that the car belonged to Moore. Because Moore's Fourth Amendment suppression argument hinges solely on the attempted traffic stop, the propriety of the vehicle search (other than as a "fruit" of the traffic stop) is not at issue in this

## II. Moore's Statements

About twenty minutes passed between the moment Moore was taken into custody and when he was read the *Miranda* warning. During the first few minutes, Officers Colombo and Mills asked him basic questions to which he didn't respond, like "What's your name, boss?" and "What's your name, man?" and "You have warrants or something?"

Four minutes after detaining Moore, Officer Colombo advised him that he was under arrest and took Moore's wallet from his pocket. Colombo identified Moore from his driver's license, then walked back two blocks to assist in the search of the Chrysler. Mills stepped away to run Moore's name through his computer and do a criminal records check. For the next six minutes, Officer Gilbert and another officer stood over Moore for long stretches of silence punctuated by Moore's unprompted requests to get items out of his pocket and complaints about being uncomfortable. Gilbert asked Moore at one point, "What you running for, man?" but Moore did not respond. No one mentioned the gun to Moore during this time.

At about 9:55 p.m., Officer Mills advised Moore he was under arrest "because there's a gun in the car." The officers stood Moore up and Mills asked questions related to the pat-down, like whether Moore had anything on him or items hidden in his underwear. Moore told the police he had his girlfriend's wallet on him and asked that he be allowed to keep that in his pocket. Around that time, a woman Moore identified as his cousin walked up. Moore directed the officers to hand everything in his pockets to her, but the officers decided to keep the items with Moore for the time being.

---

case. *See* Mot. at 3 (moving "to suppress all fruits of the poisonous tree flowing from the illegal traffic stop, including the handgun"); *id.* at 4 (focusing on "evidence that police obtained after initiating the traffic stop"); *id.* at 7 (concluding with request to "suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop").

4

Speaking directly to his cousin, Moore told her the police "pulled me over out the gas station." He complained to his cousin, "I know a n****'s tellin' now, that shit's crazy." Officer Mills interjected, "Telling on you about what though?" But Moore responded, "I'm talking to my people" and didn't explain what he meant. Mills did not inquire further. About a minute later, Moore was taken to Officer Gilbert's vehicle. Officer Mills readjusted Moore's handcuffs at Moore's request, and Moore was put in the back seat.

Officer Gilbert then drove Moore back to the site of the accident. Moore asked Gilbert what police intended to do with his car and whether it would be towed. Gilbert said he did not know but suggested it was possible. Then, Moore shouted through his open window to the officers searching the Chrysler to ask what they were going to do with his car. Sgt. Spinos walked over and asked if the car belonged to Moore. Moore said it did and that he had just bought it recently. Spinos went to Officer Williams, who had not been part of any of the questioning or custody of Moore to that point, and suggested she read Moore the *Miranda* rights. As Williams walked over, Officer Torres asked Moore how much he paid for the Chrysler (Moore said $3600) and where he bought it (Moore described a dealership on Chamberlayne across the street from a McDonald's with "A & R" in the name).

At 10:05 p.m., Officer Williams read Moore his *Miranda* rights, pausing after each sentence to confirm Moore understood them. After completing the *Miranda* advisement, Williams asked whether Moore wanted to "have a conversation." Moore just looked at her. Williams asked again if he wanted to answer her questions. Moore responded, "Just get me down to jail man." Williams said "alright" and started to walk away.

Less than thirty seconds later, Moore shouted out to the group of police officers demanding to know why they pulled him over. Sgt. Spinos walked back over to Moore and

5

explained that he had bad tags on the car. Moore argued back that the DMV was closed and that there had been a 90-day extension for expired tags and complained, "Y'all pulled me for nothing." Spinos asked where he had gotten the tags ("The dealer," Moore said). Williams asked who the dealer was ("I just said the dealer's on Chamberlayne," Moore responded). Moore then told the officers he had been pulled over for speeding in Hanover County in the same car and those officers had not said anything to him about the tags. Hearing this, Officer Williams asked him: "If that's the case, then why didn't you just stop, if you knew you had already been through this with another agency?" Moore responded to Williams he didn't stop because he "had that tool"—a reference Williams understood to mean the gun in the car.

A few minutes later, around 10:14 p.m., Officer Gilbert was preparing to transport Moore to the jail. Moore demanded to know who had his girlfriend's wallet, and Gilbert reminded him that Officer Mills had put it back in Moore's pocket. Moore realized his mistake and apologized to Gilbert. "You're good," Gilbert responded, then asked "What you run for today, man?" Moore replied, "Y'all know the deal man, I got a gun in the car. Y'all know the deal." On the way to the jail, Moore confirmed to Gilbert he was a convicted felon and admitted he knew he could not have a gun.

## Legal Argument

I. **The Court should not suppress Moore's gun because the traffic stop that led to its discovery was neither a "seizure" nor "unreasonable."**

Under the Fourth Amendment, officers may not conduct "unreasonable searches and seizures," U.S. Const. amend. IV, but "not every police-citizen encounter" constitutes a seizure. *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021). Instead, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). When "physical force is

6

absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Assuming a driver complies with police commands, a traditional traffic stop is "a 'seizure' within the meaning of the Fourth Amendment and must be reasonable under the circumstances." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). "Without question," police can conduct such a stop for "failure to comply with traffic safety laws." *Id.* at 649.

Moore's suppression motion misses a threshold issue that undermines his Fourth Amendment contention: whatever the reason for the attempted stop, Moore failed to submit to that show of authority. He took off and led police on a short but reckless chase by car and then on foot. "That is no seizure." *Hodari D.*, 499 U.S. at 626. That kind of "headlong flight" demonstrates "at most an attempted seizure," which does not implicate any Fourth Amendment protections. *Stover*, 808 F.3d at 997, 998 (internal quotation marks omitted); *see also United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) ("A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated.").

During his headlong flight, Moore left behind his car with the gun sitting in plain view through the open driver-side door. By abandoning the car and the gun, Moore lost "any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995); *see also Stover*, 808 F.3d at 1001 (recognizing that "under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not

apply"). And apart from Moore's flight and abandonment, the propriety of seizing the gun is not a close question under the plain-view doctrine. *See United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009) (upholding as lawful the seizure of a pistol that came into plain view during a traffic stop).

Taking Moore's argument on its own terms, the police had a sufficient justification to try to pull him over. Moore rightly concedes that the knowing display of a fake license plate is a violation of Virginia's traffic safety laws.[2] Even so, he complains police should not have attempted to pull him over because the bad actor must have been a car dealership employee, not Moore. *See* Mot. at 4. But Moore cannot deny he was displaying the "11134Y" tag on his Chrysler 300, and he does not contest that police reasonably believed the "11134Y" temporary tag was fake after having seen it on two other cars that same night. Nor can Moore seriously argue that police may never pull over the driver of a car with bad plates just because it may be possible someone else put them there. Officers had the reasonable and articulable suspicion to attempt the stop of Moore for traffic violations related to the bad temporary tag.

Finally, Moore does not contest that officers had a sufficient basis to seize him after police caught up to him following the foot chase. After police attempted to pull him over, Moore evaded the officers, ran through three stop signs, and drove recklessly. The sum of this conduct gave officers both reasonable suspicion and probable cause to seize Moore for various violations of Virginia law, by which point he had already abandoned the evidence he now seeks to suppress.

---

[2] *See* Mot. at 4 (citing Va. Code § 46.2-612(2)(B)(1)); *see also, e.g.*, Va. Code § 46.2-722 (prohibiting the fraudulent alteration, forgery, or counterfeiting of license plates or decals as well as the use of "any license plate or decal knowing it to have been altered, forged, or falsified" and making the violation of such prohibitions a Class 1 misdemeanor).

There was no Fourth Amendment violation in this encounter. The Court should reject Moore's argument to the contrary and deny his request to suppress the firearm.

## II. The Court should not suppress Moore's voluntary pre-*Miranda* statements or any of his post-*Miranda* statements.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), police must give the familiar warnings to a subject who is interrogated while in custody. The government does not dispute that Moore was in custody when officers put him in handcuffs and that he made incriminating statements following that moment. The Fifth Amendment issues raised by Moore's suppression motion, therefore, focus on whether and how the right to remain silent under *Miranda* applies to those statements.[3]

Without specifically identifying any particular statements, Moore argues that everything he said, whether pre- or post-*Miranda*, must be supressed. A charitable interpretation of Moore's arguments draws out three distinct theories: (1) everything Moore said pre-*Miranda* must be suppressed because officers had not read him his rights; (2) everything Moore said post-*Miranda* must be suppressed because police continued to interrogate him after he invoked his right to remain silent; and (3) everything Moore said post-*Miranda* must be suppressed because officers engaged in a prohibited two-part interrogation technique that effectively rendered his post-*Miranda* statements involuntary. None of these theories accounts for the actual facts in this case. The government addresses these contentions in turn.

---

[3] Moore focuses solely on the right to remain silent and does not challenge any statements given as a violation of the right to have an attorney present under *Miranda*. *See* Mot. at 5 ("Mr. Moore invoked his right not to speak with the officers.").

### A.     Moore's voluntary pre-*Miranda* statements do not implicate *Miranda*.

Moore claims "all statements" given pre-*Miranda* must be suppressed without making any distinction between things Moore said voluntarily and Moore's response to police questions. In all events, the government has reviewed the evidence in this case and determined that it would seek admission of only two sets of Moore's pre-*Miranda* utterances: his statements to his cousin who arrived on the scene, including "I know a n****'s tellin' now, that shit's crazy," and his statements and questions to the officers regarding what would happen to his Chrysler 300.[4]

Voluntary statements made outside an interrogation context do not implicate *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (explaining *Miranda*'s safeguards "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation"). Put differently, suppression of custodial statements under *Miranda* focuses on the questioning officers' words or actions and whether they "are designed to illicit an incriminating response." *United States v. Hanes*, 26 F. App'x 123, 133 (4th Cir. 2001) (citing *Innis*, 446 U.S. at 301). When a suspect in custody says something unprompted by police conduct, he speaks at his own peril. *See, e.g.*, *Arizona v. Mauro*, 481 U.S. 520, 523–29 (1987) (rejecting *Miranda*-based suppression argument over a conversation between an arrested defendant and his wife that took place in the presence of police officers).

The two pre-*Miranda* statements identified above were not the product of interrogation. No one was interrogating Moore when he made the unprompted musing to his cousin that

---

[4] Most of Moore's pre-*Miranda* statements have no bearing on this case, like his focus on the girlfriend's wallet, his requests to get up or readjust handcuffs, and his responses to police about whether he had any items on him during the pat-down. None of those would be suppressible under *Miranda* anyhow, as they were voluntary statements by Moore or given in response to questions focused on officer safety. Separately, as explained below in Part II-C, Moore responded to a couple of questions about where he purchased the car before he was read *Miranda*, but the United States does not intend to use Moore's answers to those questions at trial.

someone must have said something to tip police off to him. And Moore was the one doing the interrogating when he demanded to know from Officer Gilbert and then other police what would happen to his car. Under *Innis*, those words are not suppressible simply because Moore said them before he was read his *Miranda* rights. The Court should thus deny the motion to suppress as to those voluntary statements.

      **B.**      **Moore did not unambiguously and unequivocally invoke his right to remain silent, but even if he did, he waived that right by immediately re-engaging with officers following the *Miranda* warnings.**

Invocation of the right to remain silent must be unequivocal and unambiguous. *See Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). In this context, ambiguity turns on whether "reasonable police officer under the circumstances would have understood the suspect intended to invoke his Fifth Amendment rights." *United States v. Abdallah*, 911 F.3d 201, 210 (4th Cir. 2018) (internal quotation marks). Such circumstances include the events preceding the *Miranda* warning. *See id.* at 211. Yet even when a defendant invokes the right to remain silent, he may waive that right at any time and thus render post-*Miranda* statements admissible at trial. *See Berghuis*, 560 U.S. at 382. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 385; *see also United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) ("A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions.").

Moore acknowledges Officer Williams advised him of his *Miranda* rights. He does not contend, and there is no basis to conclude, that he did not understand his rights. Officer Williams read Moore each component of *Miranda*, one-by-one, stopping to confirm Moore understood each right. Although Moore did not loudly say "yes" following each right—he

interrupted Officer Williams asking if she was done yet—context makes clear that he did understand his rights. Moore spoke and understood English. When Williams began reading Moore his rights, he claimed another officer had already done so. And as Williams continued to go through the list of *Miranda* rights, Moore acknowledged what she was doing and told her "just do your thing." Moore understood his right to remain silent.

At the conclusion of the *Miranda* warnings, Moore told Officer Williams, "just get me down to jail." That was not an unequivocal and unambiguous invocation of the right to remain silent. Although Moore did not need to speak any magic words to invoke that right, *see Abdallah*, 911 F.3d at 210, his request to be taken to jail did not clearly indicate a refusal to speak with the officers. *See, e.g. id.* at 210 (finding defendant invoked right to remain silent by stating he "wasn't going to say anything at all"); *id.* (listing other examples of unambiguous invocations, such as "I have decided not to say any more"; "I don't want to talk no more"; and "I don't want nothing to say to anyone"). Moore engaged with the officers before *Miranda*, and then, after receiving the warning, he said nothing suggesting he wished to remain silent.

Even if Moore's request to be taken to jail was an unequivocal invocation of his right to remain silent, he almost immediately waived that right by voluntarily re-engaging with police. In *Berghuis*, the Supreme Court held that a suspect's uncoerced statements given "about three hours after receiving a *Miranda* warning" indicated "a course of conduct indicating waiver of the right to remain silent." 560 U.S. at 386 (internal quotation marks omitted). Here, Moore spoke up *thirty seconds* after the warning by asking the police questions and then getting into the back-and-forth over his temporary tag. And yelling out to police post-*Miranda,* then continuing to talk with them when they respond, does not show any coercion, much less the kind that might otherwise render a waiver of the right to remain silent invalid.

12

Just as in *Berghuis*, "[t]here is no basis to conclude that [Moore] did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak." *Id.* at 385. Police did not violate *Miranda* when they asked Moore why he ran, and his responses to questions post-*Miranda*, including that he fled because of the gun and his admission that he knew he was not allowed to have the gun, are admissible.

### C. Officers did not coerce Moore's post-*Miranda* statements through a prohibited two-part interrogation.

Finally, Moore contends that his post-*Miranda* admissions were the product of a "deliberate" bifurcated interrogation where police used his pre-*Miranda* responses "to elicit the same information" after the warning. Mot. at 6. Under those kinds of facts, the Court would need to consider whether police had engaged in a "deliberate 'question-first' strategy" to skirt *Miranda*. *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (citing *Missouri v. Seibert*, 542 U.S. 600, 615–16 (Kennedy, J., concurring)). But that is not the case here.

According to Moore, "the officers asked detailed questions during the first interrogation about what they found in the car and why Mr. Moore ran from the police." Mot. at 6. In fact, no one asked Moore about the contents of the car during the entire encounter. Indeed, the only mention of the gun—other than Moore's admissions—came when Officer Mills told Moore he was under arrest because they found the gun in the car. And, pre-*Miranda*, only one officer asked Moore why he ran. Moore gave no response and there was no follow-up.

Moore also claims "the contents of the two interrogations overlapped nearly completely." But the only pre-*Miranda* questioning resembling an "interrogation" to which Moore responded focused on where Moore bought his car. Then, after Moore implicitly waived *Miranda*, officers engaged with him about the legality of his temporary tag (the first time Moore learned why he was pulled over), what happened when he got pulled over in Hanover County (information

13

offered by Moore only post-*Miranda*), and then why Moore ran from police (the first time Moore ever gave an explanation). The "two interrogations" overlapped only insofar as police wanted to know about the origin of Moore's car and Moore wanted to know why he was pulled over. But Moore's admission that he ran because the gun was in the car bore no relation to the officers' pre-*Miranda* inquiries.

Finally, Moore says he "was interrogated for several minutes before the *Miranda* warnings were given" and "the same officers conducted significant portions of both interrogations in the span of about thirty minutes." Mot. at 6–7. Around thirty minutes passed from when police attempted the traffic stop until Officer Gilbert drove off to take Moore to jail. The relevant window of questioning lasts from around 60 seconds before the *Miranda* warnings to about 90 seconds after Moore re-engaged with the officers post-*Miranda*—a span of about four minutes. During that time, Moore voluntarily asked officers about the fate of his car, spoke with Spinos and Torres about the purchase of the Chrysler (without Williams present), was read *Miranda* by Williams, told Williams "just get me down to jail," then invited a dispute over the validity of his tags, before he finally admitted to Williams that he ran because he had the gun. Seven minutes later, Moore made his incriminating admissions to Officer Gilbert, who was not with Spinos or Williams during their earlier questioning of Moore. These facts refute Moore's suggestion of a prohibited two-part interrogation.

At bottom, "by any objective measure," there are no facts suggesting a coordinated or deliberate effort by police to use Moore's pre-warning statements to coerce post-warning admissions. The Court should reject Moore's argument to the contrary.

**Conclusion**

The facts show police did not violate Moore's Fourth or Fifth Amendment rights. The prohibited gun was lawfully found in Moore's Chrysler 300. His subsequent voluntary statements and his admissions that he ran because of the gun were not obtained in violation of *Miranda*. The Court should deny the motion to suppress in its entirety.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: _____/s/_____
Kevin S. Elliker
Assistant United States Attorney
Virginia Bar Number 87498
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Kevin.Elliker@usdoj.gov