IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:21cr42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
|     Defendant | ) | |

**SUPPLEMENT TO MR. MOORE'S MOTION TO SUPPRESS
EVIDENCE AND STATEMENTS**

    Keith Moore, through counsel, has moved the Court to suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent. *See* ECF Nos. 17 and 28. After an evidentiary hearing on that motion on July 26, 2021, he supplements that motion here.

    **I.    The police violated Mr. Moore's Fourth Amendment right to remain free of unreasonable seizures when they pulled Mr. Moore over to investigate a temporary dealer tag.**

    The Fourth Amendment protects the right of people to be secure in their persons against unreasonable searches and seizures. U.S. Const. amend. IV. A police officer may "initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). The "reasonable suspicion" needed to justify a traffic stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325,

330 (1990). Inchoate suspicion or a hunch that an individual is engaging in criminal activity is not sufficient to justify a traffic stop. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

### a. Traffic stops must be valid from their inception.

Traffic stop investigations are akin to *Terry* stops, and just like a *Terry* stop, must be just from the inception. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968) ("And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."); *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (observing that a seizure is justified from its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation."). The Fourth Circuit adopted this standard for evaluating the constitutionality of traffic stops—that traffic stops must be valid from inception—more than a quarter of a century ago. *See, e.g.*, *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) (recognizing that Fourth Circuit sided with Fifth, Seventh, and Eighth Circuits adopting standard "that any traffic stop, which is legally justified at its inception, is constitutionally valid for the purpose of a search later conducted on probable cause").

Such a rule makes sense in the context of traffic stops. Many states, like Virginia, criminalize failing to pull over once a police officer signals to do so by using flashing lights. *See* Va. Code § 46.2-817 (providing that anyone who "having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal" commits a class 2 misdemeanor). It is not a defense to the eluding provision in § 46.2-817 when a person fails to pull over because the police did not

2

have a lawful basis to initiate the traffic stop. Rather, the only way that an individual could try to avoid a conviction for an eluding charge after failing to pull over for an unlawful traffic stop would be to challenge the legality of the stop itself from its inception as violating the Fourth Amendment and argue that the failure to stop was a fruit of the poisonous tree that must be suppressed.

Nothing about *California v. Hodari D.*, 499 U.S. 621 (1991), changes that. In *Hodari D.*, a kid simply ran after seeing a police officer. The police officer had no reasonable, articulable suspicion to believe that the kid was engaging in any criminal activity. The police officer just chased the kid after the kid started to run. Nothing about that series of events was illegal. As the kid ran, he threw what later turned out to be a small bag of drugs. The question was whether the officer had arrested the kid simply by chasing after him. *Id.* (using the word "arrest" at least twenty-four times in the majority opinion to describe the question at hand). The Court answered no. More was required to find that the officer had arrested the kid before the officer tackled the kid.

A traffic stop, on the other hand, is more akin to a *Terry* stop that allows police to conduct a brief investigative detention. It can be based only on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Glover*, 140 S. Ct. at 1187 (internal quotation marks omitted). It thus makes sense then that a traffic stop must be valid from its inception, particularly when state law turns a knowing disregard for a signal to pull over into a crime. If the police are allowed to signal for someone to pull over based only on a particularized and objective basis that the person is engaging in or has engaged in criminal activity, the particularized and objective basis must exist from the beginning of the signal to pull over. To hold otherwise, would mean that the police could turn their lights on at any time behind anyone without

3

cause and just wait for people to disregard the signal—effectively entrapping innocent persons into committing the crime of eluding.

> As the Supreme Court recited nearly a half century ago:
>
> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 228-29 (1973) (internal quotation marks omitted). And so too here. This Court cannot, and should not, look past the inception of the traffic stop for justification for the traffic stop. *See, e.g.*, *United States v. Williams*, 843 F. App'x 111 (10th Cir. 2021) (finding stop unlawful where police followed car they lacked reasonable articulable suspicion to pull over until it committed a traffic infraction); *United States v. $45,000 in United States Currency*, 749 F.3d 709, 715 (8th Cir. 2014) ("the critical inquiry in a probable-cause determination in the traffic-stop context is what the stopping officer observed before pulling over a motorist"); *United States v. Esteban*, 283 F. Supp. 3d 1115 (D. Utah 2017) (finding that cop who followed driver until driver committed traffic infraction of not putting turn signal on for full two seconds violated requirement that traffic stop be valid from inception); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011-13 (D. Kan. 1998) (suppressing evidence after officers followed car they wanted to pull over until the car drifted onto the shoulder of the road, which was not a technical violation of the traffic laws).

### b. The Court cannot ignore the knowledge requirement in Va. Code § 46.2-612(b)(1).

At the evidentiary hearing on July 26, 2021, the Court questioned whether the police officers had to have reason to believe that Mr. Moore knew the temporary tag on his car was fake as opposed to simply having reason to believe that the tag itself was fake. "[W]hen an element of the crime includes a mens rea, there also needs to be probable cause to warrant a belief that the suspect had the requisite mens rea to commit a violation of the law or statute at issue." *Thurston v. Avery County Sheriff's Office*, 2021 WL 1093097, at *7 (W.D.N.C. Mar. 22, 2021) (citing *Stubbs v. Las Vegas Metro. Police Dep't*, 792 F. App'x 441, 442 (9th Cir. 2019); *Kleinschnitz v. Phares*, No. 1:13-cv-0209-MEF, 2013 WL 5797621 (M.D. Ala. 2013); and *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 619-20 (2000)).

Courts must look to the text of the traffic code in question to determine whether it was reasonable for an officer to believe that a traffic violation had been committed. *See, e.g.*, *United States v. Flores*, 798 F.3d 645, 647-50 (7th Cir. 2015) (analyzing text of license plate statute and finding that officer could not have reasonably misunderstood law requiring plate to be "clearly visible" and "clearly legible" when dealer plate holder obscured portion of the outside edge of the plate); *United States v. $45,000 in United States Currency*, 749 F.3d 709, 714-15 (8th Cir. 2014) (finding it unreasonable for officer to believe that license plate was not plainly visible when he could read the plate about 100 feet away and analyzing textual phrase "plainly visible"); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1011-13 (D. Kan. 1998) (analyzing text of statute to find that car that drifted onto shoulder did not constitute lane violation based on plain language of statute).

Virginia Code § 46.2-612(b)(1) provides in relevant part: "No person shall: Display or cause or permit to be displayed any . . . license plate or decal that he knows is fictitious . . . ." The plain text of the statute requires that the person knowingly display a fictitious license plate. The

question here is whether the officers reasonably believed that Mr. Moore was knowingly displaying a fictitious license plate on December 5, 2020[1]. The evidence indicates that they did not.

First, while the police had determined earlier that night that the tag number on Mr. Moore's car did not return to any Virginia DMV record, they developed no evidence that the drivers in the earlier two stops knew that the license plate was fictitious. Both Officers Colombo and Mills testified to this fact at the evidentiary hearing. The Court also has body camera footage of both earlier stops. *See* Gov't Ex. 4, Def. Exs. U-3, U-4, V-3. These four videos indicate that at no time was there any indication that the drivers of the other two cars knew that the license plate was fictitious. The license plate in the second stop in particular had a VIN number that matched the VIN number on the car. Neither car from the earlier stops was reported stolen. Rather, the driver of the first car indicated that he had recently bought the car and just needed to get a permanent license plate for the car.

Second, in both of the earlier stops, the police did not pull over the cars because they suspected that the license plate was fictitious. This absence is notable because Officer Mills ran both plates before the officers pulled over both cars. *See* Def. Exs. U-4, V-3. The officers did not ticket either driver in the earlier stops for having a fictitious license plate. They did not seize the

---

[1] To the extent that the government tries to argue that Officer Colombo's observation that Mr. Moore fiddled with something on his lap provided a reasonable basis to pull Mr. Moore over, that argument will not go far. *See, e.g.*, *United States v Black*, 707 F3d 531, 539 (4th Cir. 2013) ("At least four times in 2011, we admonished against the Government's misuse of innocent facts as indicia of suspicious activity. *See United States v. Powell*, 666 F.3d 180 (4th Cir.2011); *Massenburg*, 654 F.3d 480; *United States v. Digiovanni*, 650 F.3d 498 (4th Cir.2011); and *United States v. Foster*, 634 F.3d 243 (4th Cir.2011). Although factors "susceptible of innocent explanation," when taken together, may "form a particularized and objective basis" for reasonable suspicion for a *Terry* stop, this is not such a case. Instead, we encounter yet another situation where the Government attempts to meet its *Terry* burden by patching together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion.") (internal citation omitted).

6

temporary tags for further investigation. They did not even do a moderately thorough investigation into the origin of the temporary tags in either of the earlier stops. Rather, they did what they set out to do that night—pull over black drivers and search their cars in hopes of finding evidence of more serious crimes.

Thus, by the time that the officers saw Mr. Moore with the same temporary tag number on his car, it was not reasonable for the officers to believe that Mr. Moore was knowingly displaying fictitious temporary tags. All officers had at that time was a hunch that Mr. Moore may have known something about the temporary tag being fake. "The Government bears the burden of articulating facts sufficient to establish reasonable suspicion, and although the standard of proof is obviously less demanding than that for probable cause, the government must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (internal citation and quotation marks omitted). If the officers really wanted to investigate the origin of the temporary tag on Mr. Moore's car, they could simply have followed him to his destination and asked to engage in a consensual encounter.

But, consensual encounters were not the mission of the Fourth Precinct Focus Mission Team on December 5, 2020. To the contrary, the blatant mission of the Fourth Precinct Focus Mission Team was to use minor traffic violations as a pretext to pull over black drivers and look for evidence of more serious drug and gun crimes. On each minor traffic violation stop the Fourth Precinct Focus Mission Team conducted that night, the officers pulled over a black driver and searched the car or area involved. *See* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4. Racial profiling can in no way save a questionable traffic stop. *See, e.g., United States v. Johnson*, 874 F.3d 571, 581 (7th Cir. 2017) (Hamilton, J., dissenting) (observing in scathing dissent: "What made the officers decide so fast to swoop in to seize this car? On this record, the

only explanation is the neighborhood, and the correlation with race is obvious. It is true that Johnson has not made an issue of race, but we should not close our eyes to the fact that this seizure and these tactics would never be tolerated in other communities and neighborhoods. If we tolerate these heavy-handed tactics here, we enable tactics that breed anger and resentment, and perhaps worse, toward the police."); *United States v. Warfield*, 727 F. App'x 182, 188 (6th Cir. 2018) ("While the law allows pretextual stops based on minor traffic violations, no traffic law prohibits driving while black. The protections of the Fourth Amendment are not so weak as to give officers the power to over-police people of color under a broad definition of suspicious behavior.").

Under the totality of the circumstances, the Court must consider Mr. Moore's race and the Fourth Precinct Focus Mission Team's practice and tactics to find that this stop was not justified from its inception. Rather, the Fourth Precinct Focus Mission Team did what they had been doing all night—finding a black person to pull over on a purported minor traffic violation. Only this time, they ignored the plain language of the traffic law they said they were attempting to enforce, which cannot be used now to justify the stop.

### c. *The government's theory of abandonment does not apply here because of the nexus between the police officers' lawless conduct and the discovery of the gun here.*

The government has argued that Mr. Moore abandoned his car and its contents when he parked it and ran. In so arguing, the government has ignored that abandonment cannot save a traffic stop invalid from its inception. If there is a nexus between the alleged abandoned property and illegal police conduct, the evidence must be suppressed. *See United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973) ("If there is a 'nexus between . . . lawless police conduct and the discovery of the challenged evidence' which has not 'become so attenuated as to dissipate the taint,' then the evidence should be suppressed. The nexus between the arrest and the discovery of the evidence is strong in this case, for the arrest obviously motivated appellant to attempt to conceal

8

the bills in the police vehicle.") (internal citation omitted); *see also United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995) ("An abandonment must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary. Consequently, even if the district court correctly concluded that defendant abandoned the bag at the security office, we must determine whether that abandonment was the result of an earlier Fourth Amendment violation."); *Com. of Mass. v. Painten*, 368 F.2d 142 (1st Cir. 1966); *United States v. Merritt*, 293 F.2d 742 (3d Cir. 1961); *Hobson v. United States*, 226 F.2d 890 (8th Cir. 1955).

As Mr. Moore set forth above, the traffic stop was invalid from its inception. But for the invalid traffic stop, Mr. Moore would not have left his car with the door wide open. He was gone from the car for a matter of minutes. When police officers brought Mr. Moore back to the area of his car (and the numerous police cars surrounding it), he clearly indicated that it was his car and demonstrated his intent to retain his interest in that property. To the extent the Court finds that Mr. Moore abandoned his car and its contents, that doctrine is inapplicable once the Court first finds that the traffic stop itself was illegal from its inception.

> **II. The police violated Mr. Moore's Fourteenth Amendment right to equal protection of the laws by targeting him and other black residents of the Fourth Police Precinct in Richmond, Virginia for enforcement of minor traffic violations in order to search their cars.**

The Equal Protection Clause of the "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996); see *also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167

9

(10th Cir. 2003) ("Racially selective law enforcement violates this nation's constitutional values the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.").

The "Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). "The Fourth Circuit has adopted the standard the Supreme Court set forth in *United States v. Armstrong*, 517 U.S. 456 (1996), for cases of racially animated law enforcement." *See United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (citing *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir.1996)). The defendant must show both "discriminatory effect and that [the officer's action] was motivated by a discriminatory purpose." *Id.* (citing *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Although discriminatory effect can be established by showing that similarly situated individuals of a different race were not prosecuted, *see id.*, proving the existence of such a class is not required when there is direct evidence of racially motivated decision-making. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 n.4 (6th Cir. 2002); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) ("[I]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification."); *Avery*, 137 F.3d at 355 ("discrimination can be proved through direct evidence, which seldom exists, or inferences can be drawn from valid relevant statistical evidence of disparate impact or other circumstantial evidence.").

Here, the evidence shows that the City of Richmond is made up of four distinct police precincts.  Three of those precincts correspond to nearly entirely black neighborhoods in

Richmond.  *Compare* Def. Ex. X (1-4) *with* Def. Ex. R (1-2).  Virginia's Community Policing Act, which the Fourth Precinct Focus Mission Team is not complying with aside from Officer Mills's attempt to capture some of the required data in his body worn camera video titles, has compiled additional data for the Richmond Police Department.  First, seventy-six percent of the Richmond Police Department's traffic stops are of black persons.  *See* Def. Ex. Y-1.  Yet, as Mr. Hush testified regarding 2019 census date, black people make up less than half of the population of Richmond.  White people also make up just less than half of the population of Richmond.  Yet, white people make up only fifteen percent of the Richmond Police Department's traffic stops.  Second, eighty-four percent of all of the cars the Richmond Police Department stops for traffic violations are not searched.  *See* Def. Ex. Y-2.  And yet, the Fourth Precinct Focus Mission Team searched every single car stopped for minor traffic violations on December 5, 2020.  *See* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4.  And every single car that they stopped that night had a black driver.  *Id.*

This evidence demonstrates that the Fourth Precinct Focus Mission Team's racial profiling was actively having a discriminatory effect on black drivers in Richmond.  *See, e.g.*, *Maryland State Conference of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) ("if the stop was 'not really' for speeding, then the basis for it is unclear. And, this unclear basis for the stop exists against a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police—and the senior officer corps' conclusions based upon those statistics, i.e., that 'a remarkable deviation' in regard to the percentage of African–Americans stopped and searched existed in the JFK Barrack area—which shows, at least, discriminatory effect from the practices afoot in the JFK Barrack patrol area").

"Discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of its adverse effects upon an identifiable group." *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001) (quoting *McClesky v. Kemp*, 481 U.S. 279, 298 (1987)). In evaluating discriminatory intent, the Court must take account of the totality of the circumstances. Here, the totality of the circumstances shows that the Fourth Precinct Focus Mission Team is pulling over black people for minor traffic violations, surrounding the cars with four police officers, conducting at least one unwarranted pat-down of a passenger, and having multiple police officers blatantly search the entire interior of the car before letting anyone not suspected of more serious crimes go. As Judge Hamilton observed regarding similar tactics in Milwaukee: "Imagine that the police tried these tactics in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so. No police officer could expect to keep his job if he treated a car standing in front of a store as worthy of such an intrusive *Terry* stop." *Johnson*, 874 F.3d at 581. The stark numbers and heavy-handed policing tactics of minority neighborhoods in Richmond—a city that feels it needs to devote three of its four police precincts to policing the sections of town made up almost entirely of black citizens—warrant an inference of discriminatory intent. *See, e.g.*, *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Mr. Moore, and other black citizens in Richmond, are entitled to and deserve equal protection of the laws. Because the Fourth Precinct Focus Mission Team has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

**III. The police violated Mr. Moore's Fifth Amendment right to remain silent by interrogating him both before and after *Miranda* warnings and after he invoked his right to remain silent.**

*Miranda* warnings are required when a defendant is in custody. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) ("[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt."). Whether a person is in custody for *Miranda* purposes "is an objective inquiry, and essentially asks "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017). Here, after the police chased Mr. Moore, tackled him, arrested him, and put him in handcuffs in the back of a police car, he was certainly seized. By that point, the police told him repeatedly that he was under arrest. No reasonable person would have felt that he was free to leave at that point.

Officer Williams was the only officer that night that gave Mr. Moore the required *Miranda* advisements. Before making any further statements and shortly after the advisements, Mr. Moore invoked his right not to speak with the officers. He blatantly told Officer Williams, "I'm not talking to you. I'm done." After that, Officer Williams did not tell anyone that Mr. Moore had clearly invoked his right to remain silent. Officer Gilbert testified that if any other officer had told him that Mr. Moore had invoked his right to remain silent, he certainly would not have questioned Mr. Moore about why he ran away from police that night. And Officer Williams herself participated in further questioning Mr. Moore at the police precinct that same night about the gun. But, again, she never told the other two officers she was with that Mr. Moore had invoked his right to remain silent. She also never read Mr. Moore his Miranda rights again. This Court must

suppress statements that Mr. Moore in response to continued police interrogation after a blatant disregard of his exercising his right to remain silent.

## CONCLUSION

As explained above and in ECF Nos. 17 and 28, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and suppress statements the police obtained after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent.

                                                Respectfully submitted,
                                                KEITH RODNEY MOORE

By:            /s/            
                                                Laura Koenig
                                                Va. Bar No. 86840
                                                Counsel for Defendant
                                                Office of the Federal Public Defender
                                                701 E Broad Street, Suite 3600
                                                Richmond, VA 23219-1884
                                                Ph. (804) 565-0881
                                                Fax (804) 648-5033
                                                laura_koenig@fd.org