IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                        plaintiff,

          versus                    3:21CR042

KEITH RODNEY MOORE,

                        defendant,



          Before:  HONORABLE JOHN A. GIBNEY, JR.
                United States District Judge




                   Motions hearing


                   July 26, 2021

                Richmond, Virginia




                GILBERT F. HALASZ
                Official Court Reporter
                U. S. Courthouse
                701 East Broad Street
                Richmond, VA 23219

APPEARANCES


Kevin Spencer Elliker, Esq.

Stephan Anthony, Esq.

Assistant United States Attorneys

for the United States



Laura Jill Koenig, Esq.

Assistant Public Defender

for the defendant

The defendant in his own proper person

1   THE CLERK:  Case number 3:21 CR 42.

2   United States of America versus Keith Rodney

3 Moore.

4   Mr. Kevin Elliker and Mr. Stephan Anthony

5 represent the United States of America.

6   Ms Laura Koenig represents the defendant.

7   Are counsel ready to proceed?

8   MR. ELLIKER:  United States is ready, Your

9 Honor.

10   Good morning, Your Honor.

11   MS KOENIG:  Defense is ready.  Good morning.

12   THE COURT:  All right.  Good morning.

13   Mr. Elliker, good to see you, sir.

14   MR. ELLIKER:  Good to see you.

15   THE COURT:  We are here today on the motion to

16 suppress the evidence in this case of essentially a

17 stop, there was a gun in the car, and then some

18 statements that Mr. Moore made before and after his

19 Mirandizing.

20   So, Mr. Elliker, call your first witness.

21   MS KOENIG:  Before we call witnesses --

22   THE COURT:  What?

23   MS KOENIG:  Before The Court calls witnesses,

24 or Mr. Elliker calls them, I ask for a formal order

25 separating the witnesses and telling them not to

1    talk.

2         THE COURT:  All witnesses that are going to

3    testify remain outside, except for the witnesses

4    that are testifying.

5         MR. ELLIKER:  I have -- Ms Koenig was kind

6    enough to give me a heads-up.  I did speak to the

7    officers outside to make sure they knew not --

8         THE COURT:  Okay.

9         MR. ELLIKER:  Before I call the first witness,

10   I want to, if I can, Your Honor, put something on

11   the record to make sure it is clear.  It is in the

12   reply brief that was filed on July 13th at ECF 27.

13   There was a statement that the government had not

14   provided discovery of the two earlier traffic stops

15   that precipitated the third traffic stop of the

16   defendant.  That was not accurate.  And Ms Koenig

17   when I pointed out that the government had produced

18   those videos about a week and a half earlier, it

19   filed a corrected brief and removed that statement,

20   but the pages for the corrected brief wasn't

21   indicated.  And I just wanted to make sure that the

22   record was clear that all of that discovery had

23   actually been provided then, Your Honor.

24        Just to give you a sense of where I intend to

25   go really quick today.  Because of the nature of

1    traffic stop and issues that the defense has raised

2    I have tried to work my way through if I could call

3    fewer than six witnesses.  I couldn't get there.  I

4    wanted to let you know who those six witnesses are.

5         The first two witnesses are Officers Colombo

6    and Mills.  They were involved in all three traffic

7    stops involved in the pursuit of the defendant and

8    detaining him.

9         The third witness is Officer Torres, who was

10   not involved in the earlier traffic stop, but did

11   respond to assist the pursuit, saw the gun, and had

12   a brief conversation with the defendant pre-Miranda.

13        The fourth witness is Officer Williams, who was

14   involved in all three traffic stops, assisted in the

15   search of the defendant's vehicle, is the officer

16   who read the defendant Miranda and heard him make

17   incriminating statements after Miranda.

18        The fifth witness is Michael Spinos, who is

19   retired sergeant from R P D, also involved in all

20   three traffic stops, also involved in the pursuit,

21   and had conversations with the defendant both pre

22   and post Miranda.

23        And then the last witness is Officer Gilbert,

24   who responded to assist the pursuit and was involved

25   in transporting the defendant to lockup, during

Collombo - direct

1  which he made some incriminating statements.

2       So, I will work my way quickly through those,

3  but I wanted to let you know I was intentional about

4  this, but I couldn't work the way around based on

5  the nature the arguments made by defendant.

6       So I would first call Officer Dominic Colombo.

7       THE COURT:  All right.

8                 DOMINIC COLLOMBO

9         AFFIRMED AND TESTIFIED AS FOLLOWS:

10      THE COURT:  All right, thank you, Officer

11  Collombo.  I appreciate you coming today.

12      Go ahead, Mr. Elliker.

13                 DIRECT EXAMINATION

14  BY MR. ELLIKER:

15  Q    Please state your name and spell the name for

16  the record.

17  A    Dominic Collombo.  Dominic, D-O-M-I-N-I-C

18  Collombo, C-O-L-L-O-M-B-O.

19  Q    How are you employed?

20  A    I am a Richmond police officer, Fourth

21  Precinct, part of FMT.

22  Q    You said the Fourth, FMT.  What does that stand

23  for?

24  A    Focus Mission Team.

25  Q    How long have you been employed?

Collombo - direct

1          THE COURT:  Okay.  Let's just get down to it.

2     BY MR. ELLIKER:

3     Q     Were you on patrol with Fourth F M T on

4     December 5, 2020?

5     A     I was.

6     Q     Did you encounter multiple vehicles with the

7     same temporary tag number that evening?

8     A     I did.

9     Q     How many times did you see that tag on

10    different vehicles?

11    A     Two other times.  Three total.

12    Q     Was the first stop involving a white Cadillac

13    sedan?

14    A     Yes.

15    Q     What part of the Fourth Precinct were you?

16    A     Highland Park.

17    Q     Were you wearing your body-worn camera during

18    that encounter?

19    A     I was.

20    Q     Have you had the opportunity to review footage

21    from that incident before today?

22    A     I did.

23    Q     I would like you to -- inside of that redwell

24    folder there is a binder.  If you could take a look

25    actually in the binder.  No, inside.  There you go.

Collombo - direct

1        Behind tab number one is a document marked as
2   exhibit 1.  Do you recognize this?
3   A    I do.
4   Q    What is it?
5   A    That stop on the white Cadillac, my body cam.
6   Q    This is a still shot from your body camera?
7   A    Yes.
8   Q    Is it true and accurate as to the footage that
9   was recorded that evening?
10  A    It is.
11       MR. ELLIKER:  Your Honor, we move exhibit 1
12  into evidence.
13       MS KOENIG:  No objection, Your Honor.
14       THE COURT:  Admitted.
15  BY MR. ELLIKER:
16  Q    Officer Colombo, I believe you said this
17  picture shows the first car that you pulled over
18  that evening; is that right?
19  A    Correct.
20  Q    You see in the top right corner a time code?
21  A    I do.
22  Q    What is the time code?
23  A    22 oh, time code is F8 1314637.
24  Q    The line above that might be the time code.
25  A    22:43:56.

Collombo - direct

1    THE COURT:  So it is 10:43 at night?

2    MR. ELLIKER:  Your Honor, the parties actually

3    stipulate that the time code shown on the body

4    camera is zulu time, Greenwich mean time, five hours

5    ahead of the actual time.

6    THE COURT:  Okay.  So, it is.

7    MR. ELLIKER:  I believe that?

8    THE COURT:  That makes it 5:46.

9    BY MR. ELLIKER:

10   Q    That's right.  So who is standing by the

11   driver's side window in this photograph, Officer?

12   A    That is Sergeant Spinos.

13   Q    Can you make out the tag number?  Maybe we can

14   blow that up for him.

15   A    111 34Y.

16   Q    Did you run that tag number in your computer on

17   the car that you were driving?

18   A    My partner may have.  Made the traffic stop and

19   called out the tag number.  The dispatcher sends it

20   through.

21   Q    You reviewed the computer with respect to the

22   validity of that tag number?

23   A    Correct.

24   Q    Could you look at exhibit two?  Is this a

25   screen shot from your body cam?

Collombo - direct

1   A     It is.

2   Q     Is it true and accurate as to the recording

3   that was made that night?

4   A     It is.

5   Q     Your Honor, we move exhibit two into evidence.

6         DFT COUNSEL:  No objection, Your Honor.

7         THE COURT:  Admitted.

8   BY MR. ELLIKER:

9   Q     If we could blow up the portion that shows the

10  computer screen.

11        THE COURT:  I can actually read that.

12        Go ahead.

13  BY MR. ELLIKER:

14  Q     Does this show the temporary tag number on the

15  Cadillac that you had pulled over?

16  A     It does.

17  Q     What does the computer data base tell you about

18  the validity of that tag?

19  A     That nothing comes back --

20  Q     What?

21  A     -- on the tag.

22  Q     So where it says, "no recovered," what does

23  that mean to you as police officer?

24  A     That the tags are fake.

25  Q     Now, did you ultimately let this driver go with

Collombo - direct

1   a warning?

2   A    I did.

3   Q    Could you have written this up there, given a

4   citation?

5   A    I could have.

6   Q    All right.

7        I would like to talk about the second encounter

8   you said a second time that you saw the same tag?

9   A    Correct.

10  Q    I would like to show you if you look behind tab

11  three.

12       THE COURT:  Is this an hour later?  Go ahead.

13  BY MR. ELLIKER:

14  Q    Is this a screen shot of body camera footage

15  from that second stop?

16  A    It is.

17  Q    Is it a true and accurate as to the recording

18  that was made?

19  A    It is.

20  Q    Your Honor, we move exhibit three into

21  evidence.

22       DFT COUNSEL:  No objection, Your Honor.

23       THE COURT:  Admitted.

24  BY MR. ELLIKER:

25  Q    If we could zoom up the tag on that.

Collombo - direct

1        THE COURT:  I can read it from here,

2    Mr. Elliker, 111 34Y.

3    BY MR. ELLIKER:

4    Q    Is that the same tag as the Cadillac that you

5    had pulled over roughly an hour earlier?

6    A    It is.

7    Q    Were you wearing your body-worn camera during

8    this encounter?

9    A    I was.

10   Q    Have you had opportunity to review that camera

11   footage from this incident?

12   A    I did.

13   Q    I think in front of you you have a stack of

14   CDs.  Is there one marked with government four?

15   A    Yes.

16   Q    Do you recognize that disc?

17   A    I do.

18   Q    What is it?

19   A    It is from that stop.

20   Q    How do you know that your recording from that

21   stop is on the disc?

22   A    Because I reviewed it and signed it.

23   Q    Does it contain a true and accurate recording

24   of your body camera footage from the second stop?

25   A    It is.

Collombo - direct

1          MR. ELLIKER:  Your Honor, we move exhibit four

2     into evidence.

3          DFT COUNSEL:  No objection.

4          MR. ELLIKER:  Admitted.

5     BY MR. ELLIKER:

6     Q    If we can play all of exhibit four.  A little

7     less than two minutes.

8          (Being played).

9          Officer, what was your reaction to seeing the

10    same tag on the second occur an hour later?

11    A    I bit shocked, confused at first.

12    Q    Did you ultimately let the driver go without

13    writing a citation?

14    A    I did.

15    Q    Could you have written a citation?

16    A    I could have.

17    Q    Now, you said that you encountered --

18         THE COURT:  Let me ask you a question.  Was

19    there some dealer who was selling these cars with

20    these fake tags on them, or were people buying tags

21    because they didn't want to register their car?

22         THE WITNESS:  I believe that different, certain

23    dealerships were giving them fake tags.

24         THE COURT:  Did anybody go take down the dealer

25    that was running this nefarious fake dealer tag team

Collombo - direct

1   in Richmond?

2         THE WITNESS:  I know people are looking into

3   it, sir.

4         THE COURT:  Well, I am glad to hear that.

5         Go ahead, Mr. Elliker.  Getting to the bottom

6   of crime in Richmond now.

7   BY MR. ELLIKER:

8   Q     Could you please tell The Court about how you

9   encountered the tags the third time?

10  A     The third time we were driving Brookland Park.

11  Observed a vehicle pulling out from the gas station.

12  When we passed by the driver of the vehicle abruptly

13  stopped, put on his brakes, and looked like he

14  didn't want to pull out.  At that point he reached

15  down in front of him.  Kind of on the floorboard.

16  And my, one of my partners observed a tag, same

17  tags.  We went and parked right across the street in

18  the Dollar Store parking lot.  Eventually he pulled

19  out.  We got behind him and initiated a traffic

20  stop.

21  Q     What happened when you initiated the traffic

22  stop?

23  A     He failed to stop.  Failed to stop.

24  Q     Did he flee from the police?

25  A     He did.

Collombo - direct

1   Q    What was the route of his flight?

2   A    I believe right on Brookland Park on to Forest

3   Ave.  Through a stop sign at -- making a right on to

4   Custer.  And from there it was just straight through

5   Third and Second where he wrecked out.

6   Q    Did he run multiple stop signs as he was

7   fleeing police?

8   A    Yes.

9   Q    When you say he wrecked out, what happened?

10  A    He was going too fast.  He went through the

11  last stop sign and ran straight into the curb.

12  Skidded his tires.  Hit the curb.  Got out of the

13  vehicle and runs.

14  Q    Did you pursue the defendant on foot after

15  that?

16  A    I did.

17  Q    I would like you to look at the disc that is

18  marked exhibit five.  Do you recognize that disc?

19  A    I do.

20  Q    Does that contain your body camera footage from

21  the incident that we are talking about right now?

22  A    It does.

23  Q    Did you initial that disc?

24  A    I did.

25  Q    Does it contain a true and accurate depiction

Collombo - direct

1   of the body camera footage from that stop?

2   A    It does.

3        MR. ELLIKER:  Your Honor, we move five into

4   evidence.

5        MS KOENIG:  I just want to clarify for the

6   record.  This is entitled FA, felon foot chase; is

7   that right?

8        THE COURT:  Called what?

9        MS KOENIG:  FA, felon foot chase.

10       THE COURT:  Okay.

11       MS KOENIG:  Is that correct?

12       THE COURT:  Well, you can't ask him questions.

13       MS KOENIG:  I wanted just want to have it

14   verified to make sure that is, that is the video I

15   understand is his body camera.

16       THE COURT:  Let's look at the video, and she

17   can figure out from that whether it is, that is the

18   one she thinks about, or are we going to listen to

19   the video?

20       MR. ELLIKER:  The witness has identified the

21   disc as containing his body camera footage from that

22   evening.  And verified --

23       THE COURT:  Well, if it is different than the

24   one you have, you let me know and we will take care

25   of it.  Okay, Ms Koenig?

Collombo - direct

1        MS KOENIG:  Thank you, Your Honor.

2        MR. ELLIKER:  Play the first minute and seven

3   seconds of this clip:

4        (Being played).

5        THE COURT:  Is this after the chase starts?

6        THE WITNESS:  Yes.

7        THE COURT:  Going through the stop sign.

8   BY MR. ELLIKER:

9   Q    At first can you just put on the record what

10  the time code is at the top right corner, Officer?

11  A    2004557Z.

12       MR. ELLIKER:  Your Honor, I think with the

13  stipulation that makes it 9:45.

14       THE COURT:  All right.

15  BY MR. ELLIKER:

16  Q    Now, after the officers had the driver in

17  custody, what did you do, Officer?

18  A    I thought I observed something fall from his

19  hand.  I paced back and forth and looked for that.

20  Eventually we obtained Mr. Moore's I D.

21  Q    Did you find anything on the ground?

22  A    No.

23  Q    Did you end up standing near the driver while

24  he was in custody?

25  A    I did.

Collombo - direct

1   Q    Okay.  Can we play from 206, play about a

2   three-minute clip?

3         (Being played).

4         All right.  So during that stretch did you ask

5   the driver of the car some questions, Officer?

6   A    I asked him for his name.

7   Q    Did he give any answer?

8   A    No.

9   Q    Where did you go following this clip we just

10  watched?

11  A    I walked down the street to his car.

12  Q    And when you got back to his car did you see a

13  gun on the floorboard?

14  A    I did.

15  Q    Officer Collombo, to your knowledge do you

16  know --

17        THE COURT:  Is that one gun or two guns?

18        THE WITNESS:  One gun, sir.

19        THE COURT:  What is the long thing?

20        THE WITNESS:  It is like pistol brace adapter.

21  You put a pistol inside of it, and it makes it like

22  a shorter fire brace.

23        THE COURT:  All right.  Thank you.

24  BY MR. ELLIKER:

25  Q    After handling the gun what did you do with it?

Collombo - direct

1    A    I made it safe, and brought it to the police

2    car.

3    Q    If you could, look in the binder behind tab

4    six.  Do you recognize this?

5    A    I do.

6    Q    What is it?

7    A    That is a picture we took while doing property.

8    Q    Is that a true and accurate depiction of the

9    firearm that you took out of the defendant's car?

10   A    It is.

11        MR. ELLIKER:  Your Honor, we move exhibit six

12   into evidence.

13        MS KOENIG:  No objection.

14        THE COURT:  Hold on.

15        What was the one hundred?

16        THE WITNESS:  That would be a hundred guns that

17   my unit and I had gotten that year.

18        THE COURT:  Okay.  Thank you.

19   BY MR. ELLIKER:

20   Q    But I believe you had described earlier the

21   brace mechanism, that is what is shown on the left

22   side of the photograph with the firearm?

23   A    It is.

24   Q    Did you subsequently assist in the search of

25   Mr. -- of the defendant's vehicle?

Collombo - cross

1   A      I did.

2   Q      From that point on did you speak with the

3   defendant at the scene of his arrest?

4   A      No.

5   Q      Your Honor, I don't have any other questions

6   for the officer.

7          THE COURT:  Cross examination?

8                        CROSS EXAMINATION

9   BY DFT COUNSEL:

10  Q      Good morning, Officer.

11  A      Good morning.

12  Q      I want to start with something you said on

13  direct examination, is that when you and the other

14  officers pulled up next to Mr. Moore you saw him

15  fiddling with something on the floorboard of his

16  car.  That is what you said on direct, right?

17  A      Correct.

18  Q      You went to the police academy, right?

19  A      I did.

20  Q      All right.

21         When did you go to the police academy?

22  A      Five and a half years ago.

23  Q      Okay.

24         At the police academy, they taught you how to

25  write police reports?

Collombo - cross

1    A    Right.

2    Q    You write search police reports for a lot of

3    vehicles?

4    A    Yes.

5    Q    Stressed it's very important to make the police

6    report as accurate as possible?

7    A    Correct.

8    Q    And that is because you have a lot of things

9    going on as the police officer, right?

10   A    Sometimes.

11   Q    How many traffic stops have you made since

12   December 5 of 2020?

13   A    I don't have a number.

14   Q    More than a hundred?

15   A    Possibly.

16   Q    More than two hundred?

17   A    I don't know.

18   Q    You have a few things going on in your life,

19   right?

20   A    Yes.

21   Q    One of the reasons that you write a police

22   report is that when you are putting the information

23   in at the time that it happened it is fresh in your

24   mind, right?

25   A    Correct.

Collombo - cross

```
 1   Q     And when it is fresh in your mind it is

 2   accurate, right?

 3   A     Correct.

 4   Q     And the things that you put in your police

 5   report are accurate, right?

 6   A     Correct.

 7   Q     And let's take a look at your police report.

 8   Do you have it in front of you?

 9   A     Yes.

10   Q     Let's look at the third page and you see this

11   is the narrative portion of your statement, right?

12   A     Yes.

13   Q     Look at the third line.  You wrote "The driver

14   slowed up before pulling on to the road and seen

15   manipulating something around his lap," right?

16   A     Yes.

17   Q     Where in the report do you write that you saw

18   him manipulating something on the floorboard?  You

19   can take your time.

20   A     May have been in this general area.

21   Q     Gesturing in your lap area?

22   A     Yes, right here.

23   Q     Let's go back to the Focus Mission Team.  You

24   graduated from the police academy 2015.  How long

25   have you been with the Focus Mission Team?
```

Collombo - cross

1   A      Three and a half years.

2   Q      That is from today's date?

3   A      Yes.

4   Q      Okay.

5          The focus of the Focus Mission Team is not

6   enforcing Virginia traffic laws, right?

7          THE COURT:  Unfortunately may not be, but the

8   Supreme Court has said these kind of pre-textual

9   stops are allowed.

10         MS KOENIG:  I think it is different than

11  pre-textual.  That is what I am getting at.

12         THE COURT:  All right.

13  BY MS KOENIG:

14  Q      The primary concern of the team is not making

15  sure everybody gets license plates renewed on time,

16  right?

17         THE COURT:  The Focus Mission Team is trying to

18  get guns off the street; is that right?

19         THE WITNESS:  One of many things; but yes, sir.

20         THE COURT:  All right.

21  BY MS KOENIG:

22  Q      And drugs, right?  Guns and drugs is the

23  primary focus?

24  A      Right.

25  Q      Correct.  And as the Judge was indicating, you

Collombo - cross

1   all use traffic violations to pull people over,

2   right?

3   A    Sometimes.

4   Q    You look, you do the traffic violation to pull

5   people over to look for evidence of more serious

6   crime, right?

7   A    Correct.

8   Q    And so in December 5 of 2020 you were working

9   with the Fourth Precinct Focus Mission Team, right?

10   A    Correct.

11   Q    And that night you guys were out making a bunch

12   of traffic stops right?

13   A    A few, correct.

14   Q    And around 9:45 that night you were in a marked

15   police car, and you were the driver, right?

16   A    Correct.

17   Q    Officer Mills was in the front passenger seat,

18   right?

19   A    I don't recall who was sitting where.

20   Q    We will look at your body cam in just a minute.

21   Sergeant Spinos was behind you, right?  Officer

22   Williams behind Officer Mills, right?

23   A    Yes.

24   Q    And you guys were parked at the Family Dollar

25   Store in the Six Points Commercial area off of Lady

Collombo - cross

1    Street, right?

2    A    It's right across from the Exxon.

3    Q    And so I am going to bring your attention,

4    there is a thicker folder in front of you.  If you

5    look at exhibit C for me.

6         THE COURT:  C?

7         MS KOENIG:  C as in cat or Charlie.

8         THE COURT:  All right.

9    BY MS KOENIG:

10   Q    Do you recognize the area depicted in this map?

11   A    Yes.

12   Q    Is this the general vicinity of where you all

13   were parked at 9:45 p.m. on December 5 of 2020?

14   A    Yes.

15        MS KOENIG:  Your Honor, I move admission of

16   this, exhibit C.

17        THE COURT:  Admitted.

18   BY MS KOENIG:

19   Q    It is dark outside, right?

20   A    Correct.

21   Q    Family Dollar Store is right across the street

22   from a Sunoco gas station, right?

23   A    Correct.

24   Q    You see Mr. Moore coming out of the gas

25   station; is that right?

Collombo - cross

1   A    Correct.

2   Q    And he is a very tall black man, right?

3   A    I mean he is tall -- I can't recall.  I think I

4   just saw him in the car.

5   Q    Okay.  Any way, he gets in his car, right?

6   A    In the car.

7   Q    And he pulls out of the parking lot at the gas

8   station, right?

9   A    Correct.

10  Q    And that's at Brookland Park and Third Avenue,

11  right, where he pulled out, right?

12  A    Yes.

13  Q    And you see him making this movement near his

14  lap, right?

15  A    Correct.

16  Q    And you immediately get behind him, right?

17  A    I think then we pull into the Dollar Store.

18  Q    You think you pulled in to the Dollar Store?

19       Go back to your report, Officer Colombo.  Maybe

20  that will help refresh your recollection.  Look at

21  third and fourth line of page three of your report.

22  Do you see that it says officers pulled around in

23  the parking lot, observed the vehicle pull on to the

24  street, and then pulled behind it?

25  A    Yes.

Collombo - cross

1    Q    You didn't detour back into the Family Store,

2    right?

3    A    No, I was saying I saw it -- I was thinking we

4    passed by him, pulled in the parking lot, he pulled

5    out and we pulled out.

6    Q    Pulled out behind him after he have pulled out?

7    A    Correct.

8    Q    All right.

9         And you notice that the temporary tag is 111

10   34Y, right?

11   A    Correct.

12   Q    Which, as you have indicated, is the same

13   number as the two other temporary tags you pulled?

14   A    Correct.

15   Q    That is when you turn the flashing lights on,

16   right?

17   A    Correct.

18   Q    Flashing lights indicate to the person that you

19   are signaling to, they are supposed to pull over,

20   right?

21   A    Correct.

22   Q    All right.

23        One of the things from your time at the police

24   academy, you had to learn the criminal laws of

25   Virginia so you know what elements of crime people

Collombo - cross

1   could be charged with, right?

2   A    Right.

3   Q    You had to learn punishments that Virginia law

4   allows for crimes, right?

5   A    Yes.

6   Q    And you have to learn types of traffic laws

7   that Virginia has, so, again you know the elements

8   of those traffic laws, right?

9   A    Yes.

10  Q    Again the punishment, right?

11  A    Yes.

12  Q    And you had to learn about the procedural laws

13  of Virginia so you know what your obligations are

14  under those laws, right?

15  A    Yes.

16  Q    As well as the Federal Constitutional

17  obligations that you have to use, right?

18  A    Yes.

19  Q    In Virginia it is a crime to disregard a signal

20  from a law enforcement officer to stop, right?

21  A    Yes.

22  Q    That is what we call eluding, right?

23       THE COURT:  Called what?

24       MS KOENIG:  Eluding.

25       THE COURT:  All right.

Collombo - cross

```
 1   BY MS KOENIG:

 2   Q    And that Virginia code section is 46.2-87?

 3   Does that sound right?

 4   A    I don't know right off the top of my head.

 5   Q    All right.

 6        But any way, that code section criminalizes

 7   anybody who is made aware that there is a police

 8   officer trying to pull them over and they don't

 9   stop, right?

10   A    Yes.

11   Q    And that is a class two misdemeanor?

12   A    I would have to read it.

13   Q    Okay.  All right.

14        But any time, the point is, that any time you

15   turn your flashing lights on in a police car and

16   person you are signaling doesn't pull over, they

17   committed a crime, right?

18   A    Correct.

19   Q    All right.

20        Go back to the other two stops that you made

21   that night, was the same temporary tag.  Again, you

22   are in a parked police car that night, same sitting

23   position we have already gone over, right?

24   A    Yes.

25   Q    And at the time of the first stop of the driver
```

Collombo - cross

```
 1   with same temporary tags you are in the driver seat,

 2   right?

 3   A     Yes.

 4   Q     And you have got body-worn camera on, right?

 5   A     Correct.

 6   Q     And you didn't -- if we can pull up what has

 7   been marked as exhibit U 3.

 8         THE COURT:  "U?"

 9         MS KOENIG:  "U" as in umbrella.  Your Honor.

10         THE COURT:  Not on mine.

11         MS KOENIG:  It is a disc, and we have the -- if

12   I could hand this to the witness, please.

13         If we can pull up exhibit 3.  We may need to

14   switch over to the defense computer.  All right.

15         So, Officer Collombo, from this body camera we

16   see that this person is in the driver seat, right?

17   A     Yes.

18   Q     And you are in the driver's seat?

19   A     Yes.

20   Q     All right.

21         So, did you also know that other officers had

22   body camera footage at the same traffic stop?

23   A     If they were with me, we all turned them on --

24   most of the time.

25   Q     Did you write a report of this traffic stop?
```

Collombo - cross

1   A     No.

2   Q     All right.

3         Do you have any independent recollection of

4   this particular traffic stop?

5   A     I reviewed the body cam.

6   Q     So if -- what is in the body cam is what you

7   remember, right?

8   A     Yes.

9   Q     All right.

10        Your Honor, I move to admit exhibit U 3.

11        THE COURT:  Objection?

12        MR. ELLIKER:  No objection, Your Honor.

13        THE COURT:  Admitted.

14  BY MS KOENIG:

15  Q     All right.

16        Let's pull it up to 54 seconds into the video,

17  which is based on the time stamp on the bottom left

18  screen.

19  A     All right.

20  Q     So once the car is pulled over you approached

21  the driver, right?

22  A     Yes.

23  Q     And the driver is a young black man, right?

24  A     Yes.

25  Q     And you tell him --

Collombo - cross

 1      THE COURT:  Involved the Cadillac; is that

 2  right?

 3      THE WITNESS:  Say what, sir?

 4      THE COURT:  This is the stop of the Cadillac?

 5      THE WITNESS:  Yes, sir.

 6      THE COURT:  Okay.

 7  BY MS KOENIG:

 8  Q    You say, "okay, listen, your tags, you can't

 9  read them at all."  Is that what you tell him?

10  A    I believe so.

11  Q    All right.

12      At that time were you aware that Officer Mills

13  had already typed in the license plate number while

14  you all were driving before you pulled him over?

15  A    There is a --

16      THE COURT:  The question is, did you know the

17  other officers had typed in the license plate

18  number?

19      THE WITNESS:  I wasn't sure if he did that or

20  dispatch did.

21  BY MS KOENIG:

22  Q    Did you have like a license plates reader on

23  the car?

24  A    No.

25  Q    Somebody has to have provided that information,

Collombo - cross

1    right?  Dispatch is not out on the scene, right?

2    A    Correct.  When you make a traffic stop and call

3    Virginia tag 111 34Y we are at this location,

4    eventually when they generate a call or report

5    number and it comes on the computer, that

6    information that we gave will come up.

7    Q    Okay.

8         So, the reason that you pulled this man over

9    was that he didn't have headlights on, right?

10   A    I don't recall.

11   Q    All right.  We will get it through somebody

12   else.

13        Go to one minute and ten seconds on the bottom

14   left time frame.  Let's play this.  Until 116.

15        (Being played).

16        Let's stop it just a minute.

17        Does the audio come off the microphone?

18        THE COURT:  I can barely hear it.  Go ahead.

19   BY MS KOENIG:

20   Q    Let's go back again to one minute and ten

21   seconds in.  And play it until I say "stop."

22        See if this helps.

23        (Being played).

24        Let's stop.

25        Could you hear that, Officer Collombo?

                        Collombo - cross

1    A     Yes.

2    Q     You asked the gentleman if he had any drugs or

3    weapons, right?

4          THE COURT:  I thought he asked what his name

5    was.

6    BY MS KOENIG:

7    Q     Okay.  Let's keep playing.

8          (Being played).

9          Let's go back to 105.

10         Let's go back to one minute.

11         Let's play from here.

12         (Being played)

13         Stop.

14         So you asked him if he had any weapons in the

15   car, right?

16   A     Correct.

17   Q     He said, "No, hell no."  Right?

18   A     Correct.

19   Q     You said, it is just something that I like to

20   ask.  It is not illegal, right?

21   A     Yes.

22   Q     And then you will get his name and social

23   security number, right?

24   A     I believe so, yes.

25   Q     And then let's play again at 140 to 150.

Collombo - cross

1      (Being played)

2      What we just looked at was your flashlight,

3   right?

4   A    I would have to watch again.

5   Q    Let's go back.

6      THE COURT:  It was his flash light.  I can see

7   that.

8   BY MS KOENIG:

9   Q    You are using your flashlight to look in the

10   other interior parts of the car, right?

11   A    Yes.

12   Q    After you that you go back to your police car,

13   right?

14   A    Yes.

15   Q    You type the driver's information into the

16   computer in the car, right?

17   A    Yes.

18   Q    And you start looking up various data bases you

19   all have access to, right?

20   A    I believe it just one data base, but yes.

21   Q    And you find out that the driver has been

22   charged with driving on suspended at least three

23   times before, right?

24   A    I don't know if I saw that.

25   Q    Go to two minutes and 58 seconds in to the

Collombo - cross

1   video.

2           (Being played).

3           All right.

4           In the lower right hand side do you see where

5   it says right there, right where you marked it.  It

6   says third offense within ten years.

7   A     Okay.

8   Q     Right?  That means that is what your computer

9   told you, right?

10  A     Okay.

11  Q     Is that -- obviously been driving on suspended

12  a few times, is that fair?

13  A     Yes.

14  Q     All right.

15          So, you also know that in the State of Virginia

16  it is a crime to drive while your license is

17  suspended, right?

18  A     Yes.

19  Q     While you are in the car you also put the car

20  VIN number into the car, right?

21  A     I believe so.

22  Q     You see that the VIN comes back to the right

23  car, right, it is listed as a white Cadillac, right?

24  A     Yes.

25  Q     You saw the car has been sold, right?

Collombo - cross

1    A    Yes.

2    Q    You go back up and talk to the driver, right?

3    A    Yes.

4    Q    And he asked you if you can just park the car

5    and find a ride home, right?

6    A    Yes.

7    Q    And you tell him he is good to go, right?

8    A    I believe so.

9    Q    You didn't get any evidence that the driver

10   knew that the tags didn't come back to his car,

11   right?

12   A    I think he said something like he just got it.

13   Q    Sure.  But he doesn't indicate to you in any

14   way that he knows the tags doesn't come back to his

15   car, right?

16   A    Yes.

17   Q    And you don't give him a ticket?

18   A    Right?

19   Q    Don't give him a summons?

20   A    Correct.

21   Q    You let him go?

22   A    Yes.

23   Q    So the guy has been driving on a suspended, no

24   ticket, right?

25   A    Yes.

Collombo - cross

```
 1   Q    No headlight, right?

 2   A    Correct.

 3   Q    And he has got expired tag, too, right?

 4   A    Yes.

 5   Q    Nothing.  No ticket, right?

 6   A    Correct.

 7   Q    All right.

 8        Let's turn to the second stop that you all made

 9   with the temporary tag that same night.

10        So, again, you are in a marked police car that

11   night with Officer Mills, Sergeant Spinos and

12   Officer Williams, right?

13   A    Yes.

14   Q    The time of the second stop you are again in

15   the driver seat, right?

16   A    Yes.

17   Q    And did you know that other officers also had

18   body cam of that same stop?

19   A    Yes.

20   Q    Did you write a report for this traffic stop?

21   A    I don't believe so.

22   Q    You all pulled her over because you thought the

23   tags were expired, right?

24        Or you don't remember?

25   A    I don't remember like what the actual reason
```

Collombo - cross

1    was at the time.

2    Q    Fair enough.

3         So let's go back to the stop itself.  When you

4    first talk to the driver of car she told you she had

5    to break her window out because she lost her keys in

6    the car, right?

7    A    Yes.

8    Q    At the time you are talking to the driver you

9    saw, I think this is Government's exhibit 4 --

10        THE COURT:  On the other side looking in the

11   car vigorously with his flashlight.  I saw that.

12        MS KOENIG:  Thank you, Your Honor.

13   BY MS KOENIG:

14   Q    Sergeant Spinos is out looking at the VIN

15   number on the license plate tag, right?

16   A    Yes.

17   Q    And he goes up to the front of the car and

18   checks the VIN number on the front windshield of the

19   car, right?

20   A    Yes.

21   Q    And they match, right?

22   A    Yes.

23   Q    And you tell her, this is weird.  And you let

24   her go saying, all right, ma'am, you just have a

25   good safe night, right?

Collombo - cross

1    A    Yes.

2    Q    Again, there is no evidence that this driver

3    knew that the tags did not come back to her car,

4    right?

5    A    No.

6    Q    And you didn't give her a ticket, right?

7    A    No.

8    Q    No summons?

9    A    No.

10   Q    No nothing?

11   A    Nope.

12   Q    So let's get back to you all pulling behind

13   Mr. Moore.  Again, just left the station parking

14   lot, right?

15   A    Yes.

16   Q    You turn your flashing lights on and pull him

17   over within one block, right?

18   A    Yes.

19   Q    You didn't run the tags this time, right?

20   A    I don't know if myself or if Officer Mills did.

21   I don't know.

22   Q    You are relying on the other two times that you

23   all had run the tags that night right?

24   A    Yes.

25   Q    And at the time that you turn on the emergency

Collombo - cross

```
 1   lights to pull over the driver of the white Chrysler

 2   300 you all had no evidence that that driver knew

 3   that his tags were on the wrong car?

 4   A    Correct.

 5   Q    Okay.

 6        Before the night of December 5, 2020 have you

 7   ever seen Keith Moore before?

 8   A    I don't believe so.

 9   Q    Did you know anything about him that night?

10   A    No.

11   Q    You just knew he was a black man driving a car

12   fiddling with something in his lap, right?

13   A    I just knew he was operating the vehicle with

14   the wrong tag.

15   Q    No further questions.

16        THE COURT:  That is it?

17        MS KOENIG:  That is it.

18        THE COURT:  So can you tell me where we are

19   going with all this?  I would like to know what the

20   strategy is.

21        MS KOENIG:  What we have, Your Honor, is we

22   have gotten quite a bit of evidence that what the

23   Focus Mission Team does is pull people over for

24   purportedly minor violations and they search the

25   car.
```

Collombo - cross

1        THE COURT:  And they what?

2        MS KOENIG:  Search the car every time.

3        THE COURT:  Right.

4        MS KOENIG:  When they do that they either find

5    something or they don't.

6        THE COURT:  Right?

7        MS KOENIG:  And so they prolong the stop,

8    actually commit a number of other Constitutional

9    violations in the process -- we will see a few of

10   those -- but what happens is there is nothing that

11   they develop that indicates before they pull

12   Mr. Moore over that they would have known that he or

13   they had probable cause to know that he knew the

14   tags were violated.  They let the other two people

15   with the same number go that night with no warning,

16   no ticket, no nothing --

17       THE COURT:  Wait a second.  How much probable

18   cause do they need?  They have got three identical

19   tags.  You know something is afoot.

20       MS KOENIG:  Well, that is a hunch, Your Honor.

21       THE COURT:  No, it is not a hunch.  I don't

22   think -- I will take judicial notice D M V doesn't

23   issue the same tags in triplicate.

24       MS KOENIG:  Your Honor, what happens is the

25   statute that is, that requires -- let me get back to

Collombo - cross

1   my desk and get the right folder -- the statute that

2   requires, that criminalizes, makes it a traffic

3   violation for somebody to pull somebody over for

4   having a tag is Virginia code 46.2-612.  And that

5   criminalizes someone who knowingly is displaying a

6   false tag.  Simply displaying a false tag is not a

7   crime.

8       THE COURT:  Well, okay.  So -- all right.  And

9   so, the guy is driving along with false tag.  Aren't

10  they allowed to stop him to see if he -- and say, is

11  that, did you know that a false tag, or to say -- or

12  to investigate it?

13      MS KOENIG:  Well, the law requires that they

14  have to have probable cause that someone has

15  committed a traffic violation.  You don't have some

16  pieces of an element of a crime.  You have to have

17  probable cause on all the pieces.  The key word

18  here --

19      THE COURT:  You have to have probable cause to

20  think somebody -- not that they are guilty, but that

21  they essentially might have committed a traffic

22  violation.

23      MS KOENIG:  Well, sure, but that is not what we

24  have here.  We have got the -- we have the --

25      THE COURT:  I understand your point.  All

Collombo - cross

1   right.

2        MS KOENIG:  Thank you, Your Honor.

3        THE COURT:  Thank you.

4        Ms Brightwell, will you do me a favor, please,

5   and go get me the file on the Interior Molded Doors

6   case off the window in my office and bring it back.

7        Never mind, he has got it.  Thank.

8        All right.

9        Let's pause for a second.  Is everybody here on

10  the Interior Molded Doors case?

11       Mr. Shumadine.

12       MR. SHUMADINE:  I am here.

13       THE COURT:  You are here, but anybody else on

14  the other side?

15       AUDIENCE MEMBER:  Good morning, Your Honor,

16  Bill Reiss.  Two of my colleagues are supposed to be

17  here as well.

18       THE COURT:  Why not see if they are here.  I

19  will take you up.  Here come a bunch of folks.

20       AUDIENCE MEMBER:  One is coming.

21       MR. SHUMADINE:  Mr. Williams is here, too, Your

22  Honor.

23       THE COURT:  All right.  Get up here.

24       MR. ELLIKER:  I have maybe two questions for

25  redirect before we could release Officer Collombo.

Collombo - redirect

1       THE COURT:  Go ahead and ask the questions.

2                       REDIRECT EXAMINATION

3    BY MR. ELLIKER:

4    Q    Officer Collombo, in the video where you had

5    told the driver of the Cadillac, we can't see your

6    tags at all, do you recall what you meant by that?

7    A    I said that something is probably covering it,

8    or if they have something like a, one of the plate

9    covers or sometimes they put it in something

10   glossy-like film.  I don't recall.

11   Q    Then when you say that you let him go, did you

12   actually let the driver of the Cadillac drive away

13   from the scene?

14   A    No.  He said he would park it.  Had a bunch of

15   kids' gifts in there.

16       THE COURT:  Had a bunch of what?

17       THE DEFENDANT:  His kids' gifts.  They went

18   shopping.  So I wasn't going to do anything with the

19   car.

20   BY MR. ELLIKER:

21   Q    Second driver who you did let drive away, I

22   believe you said, and you could hear there is a baby

23   in the car at that time?

24   A    Yes.

25   Q    Did either of the first two drivers evade

Collombo - redirect

 1   police?

 2   A     No.

 3   Q     That is all I have.

 4         THE COURT:  Thank you.

 5         Let's take a recess on this case.  You can

 6   stand aside.

 7                   (Witness stood aside)

 8                   (A recess was taken)

 9         THE COURT:  All right, Mr. Elliker, let's go,

10   buddy.  Where is your opponent, the other side?

11         MS KOENIG:  My client had to go to the

12   bathroom, Your Honor.  And the one on this floor is

13   closed.  He is coming right back.

14         MR. ELLIKER:  I wanted to confirm that Officer

15   Collombo could be released.

16         THE COURT:  Yes, he may.  Unless you need him

17   to stay, ma'am.

18         MS KOENIG:  I don't.

19         MR. ELLIKER:  Okay.  Thank you.

20         THE COURT:  Is this going to take all day,

21   ma'am?

22         MS KOENIG:  Your Honor, the next witness is my

23   longest.  Unless there is questioning -- the other

24   three government witnesses -- I don't know about the

25   fourth one -- are probably fairly short.  And I have

Mills- direct

1    one relatively short witness.

2         THE COURT:  Okay.  Thank you.

3         MS KOENIG:  We are ready, Your Honor.

4         THE COURT:  Call your next witness.

5         MR. ELLIKER:  Officer Keegan Mills.

6         If you don't mind switching us back over.

7         THE CLERK:  Oh, yes.

8         THE COURT:  The name of the witness?

9         MR. ELLIKER:  Officer Mills.  M-I-L-L-S.

10                   KEEGAN MILLS

11        AFFIRMED AND TESTIFIED AS FOLLOWS:

12        THE COURT:  Thank you for coming today, Officer

13   Mills.  I appreciate it.

14                 DIRECT EXAMINATION

15   BY MR. ELLIKER:

16   Q    Sir, please state your name for the record.

17   A    Officer Keegan Mills, Richmond Police.

18   Q    Officer Mills, are you assigned to the Fourth

19   Precinct Focus Mission Team?

20   A    Yes.

21   Q    Were you so assigned on December 5 of 2020?

22   A    Yes.

23   Q    That evening did you see the same temporary tag

24   on three different vehicles?

25   A    Yes.

Mills- direct

1   Q    There is a skinny binder in front of you.  I
2   think under the one that is opened.
3        If you could you flip to tab one, which has
4   already been admitted as exhibit 1.
5        Does this image show the first car that your
6   team pulled over that night with the temporary tag?
7   A    Yes, sir.
8   Q    If you could flip to tab three.  This is
9   already admitted as exhibit 3.  Does this show the
10  second car that you pulled over that evening with
11  that temporary tag?
12  A    Yes, sir.
13  Q    Now, what happened when you tried to pull over
14  the third car with the temporary tag?
15  A    It didn't stop.  It continued driving until the
16  intersection of Second and Custer, it ran into the
17  curb there.  And the driver then took off on foot.
18  Q    Did you activate body-worn camera during that
19  event?
20  A    Yes, sir.
21  Q    Have you had an opportunity to review the
22  footage of your recording before today?
23  A    I have.
24  Q    There should be a disk in front of you marked
25  exhibit Government exhibit 7.

Mills- direct

1   A    Yes, sir.

2   Q    You recognize that disc?

3   A    Yes.

4   Q    Does that contain the recording of your

5   body-worn camera footage from that incident?

6   A    Yes.

7        MR. ELLIKER:  Your Honor, we would move 7 into

8   evidence.

9        MS KOENIG:  No objection.

10       THE COURT:  Admitted.

11  BY MR. ELLIKER:

12  Q    If we could please play from the beginning of

13  exhibit 7 until the 225 marker on the video.

14       (Being played).

15       Who was the officer that was standing with you

16  at the end of that video?

17  A    Office Collombo.

18  Q    During the clip we just watched did you ask the

19  driver some questions?

20  A    Yes.

21  Q    Did he give you any answers?

22  A    No.

23  Q    Now, what did you do following where we just

24  paused?

25  A    I made contact with officers who were at the

Mills- direct

1   vehicle scene, the crash, to find out specifically

2   what they had seen in the vehicle.

3   Q    What did you learn they found in the car?

4   A    A firearm.

5   Q    Let's pick up at 326 on this video and play

6   until 425.

7        (Being played).

8        All right.  Officer Mills, what did Officer

9   Collombo hand you at the end of that clip?

10  A    Identification card for Mr. Keith Moore.

11  Q    What did you do with the identification card?

12  A    I went back to the police vehicle, ran that

13  information on the computer that we have there.  I

14  also called teletype so they could run a check of

15  his record to see if he was a convicted felon or

16  not.

17  Q    During those checks did you learn the defendant

18  is in fact a convicted felon?

19  A    Yes, I did.

20  Q    Let's pick up at 1020 and play until 1112.

21       (Being played).

22       What are you doing at this point, Officer?

23  A    He is going to be transported to Richmond City

24  Jail.  I had to perform a search of his person

25  incident to that arrest.

Mills- direct

1    Q    Was he being cooperative?

2    A    Yes.

3    Q    Was he speaking with you?

4    A    Yes.

5    Q    Did you ask him any questions about the gun?

6    A    No.

7    Q    Did you ask him any questions about the car?

8    A    No.

9    Q    Let's pick up and play at 1215 for about 20

10   seconds to 1236.

11        (Being played).

12        So what is the defendant asking you to do in

13   this clip, Officer?

14   A    He wanted me to give his wallet to someone

15   else.  So I had to look through it before I did

16   anything like that.

17        He asked me to look through it in front of him.

18   Q    Whose wallet did he say it was you were

19   holding?

20   A    His girl's.

21   Q    Did you do as he asked?

22   A    Yes.

23   Q    All right.

24        Let's play again for another ten or 15 seconds.

25        (Being played).

Mills- direct

1       So who is this individual that the defendant

2    identified who just walked up?

3    A    His cousin.

4    Q    And at this point did you overhear the

5    defendant speaking to his cousin?

6    A    Yes.

7    Q    Let's play until 1320, please.

8       (Being played)

9       While the cousin -- while the defendant was

10    talking to his cousin did you hear him tell his

11    cousin that someone must have been telling on him?

12    A    Yes.

13    Q    Let's go ahead and play until 1343.

14       (Being played)

15       Did you hear him say someone was telling on

16    him?

17    A    Yes, sir.

18    Q    And do recall what you did with the defendant's

19    Girlfriend's wallet?

20    A    I believe I put it back on his person.

21    Q    Let's play until 1404, please.

22       (Being played)

23       All right.  So after this interaction did you

24    assist in loading the defendant into the transport

25    vehicle?

Mills- direct

1    A    Yes.

2    Q    During all of your interactions with the

3    defendant here at the stop where he was apprehended,

4    did you ask him any questions about the gun?

5    A    I don't believe so.

6    Q    Did you ask him any questions about his car?

7    A    No, sir.

8    Q    From the time that you stopped the defendant --

9    well, I just asked you that -- let's move forward in

10   time a little.  Did you encounter the defendant at

11   lockup?

12   A    Yes.

13   Q    While at lockup did you overhear the defendant

14   make statements about the gun?

15   A    Yes.

16   Q    At any time during the conversation did that,

17   did the defendant tell you he did not want to answer

18   any questions?

19   A    I don't believe he did.

20   Q    Did he tell you I want to remain silent?

21   A    No.

22   Q    Was the defendant talkative with police at

23   lockup?

24   A    Yes.

25   Q    Did you have your body-worn camera activated

Mills- direct

1   during a portion of this interaction?

2   A    Yes.

3   Q    Have you reviewed that recording before today's

4   hearing?

5   A    Yes.

6   Q    There should be a disk marked Government's

7   exhibit 8.

8   A    Yes, sir.

9   Q    Do you recognize this disc?

10  A    Yes.

11  Q    Does that contain the recording of your body

12  camera from the interaction with the defendant at

13  lockup?

14  A    Yes, it does.

15      MR. ELLIKER:  Your Honor, we move exhibit 8

16  into evidence.

17      MS KOENIG:  Your Honor, again asking for the

18  title.  I don't believe I have that.

19      MR. ELLIKER:  You do.  It's called "lockup."

20      MS KOENIG:  I don't.

21      THE COURT:  All right.  Let's take a

22  three-minute break while you sort this out.

23                      (recess)

24      THE COURT:  Have you figured out what the

25  problem was with the exhibit?

Mills- direct

1      MS KOENIG:  We have.

2      No objection to exhibit 8.

3      THE COURT:  Sorry.  What?

4      MS KOENIG:  No objection to exhibit 8.

5      THE COURT:  Okay.  Let's go ahead.

6      MR. ELLIKER:  Again just to --

7      THE COURT:  So we are down at the lockup now.

8  BY MR. ELLIKER:

9  Q    All right.

10      Can we play from the marker 533 until marker

11  630.

12      (Being played).

13      Officer, during this clip did the defendant

14  tell you and the other officers that the gun didn't

15  shoot?

16  A    Yes.  It hasn't been shot.

17  Q    Why did officers ask Mr. -- ask the defendant

18  if the gun had been, if they could swab his hands

19  for gun powder residue?

20  A    I think to see what he would say, but it is in

21  reference to a reported earlier incident in the same

22  area around the 3100 block of Meadowbridge, I

23  believe, involving a Chrysler that was involved in a

24  random gunfire, we call it.  A shooting, basically.

25      MR. ELLIKER:  No other questions for Officer

Mills - cross

1   Mills.

2        THE COURT:  All right.

3        Was this car a Chrysler?

4        THE WITNESS:  Yes, sir.

5        THE COURT:  Okay.  All right.

6        Ms Koenig.

7                  CROSS EXAMINATION

8   BY MS KOENIG:

9   Q    Good morning, Officer Mills.

10  A    Good morning.

11  Q    You all at the police department have the

12  ability to do -- well, you have access to a forensic

13  lab, right?

14  A    Yes.

15  Q    And so the shooting that you are referring to,

16  there were ballistics that were sent off from the

17  gun that was found in the white Chrysler Mr. Moore

18  was pulled over in, right?

19  A    Correct.

20  Q    And the gun, the evidence of the bullets that

21  were collected from the Meadowbridge area did not

22  match up to the gun that was found in Mr. Moore's

23  car, right.

24  A    I don't know.

25  Q    Okay.

Mills - cross

1       THE COURT:  Well, are you saying that at the

2  time they were asking this question they knew about

3  this gun, about the bullets from the Meadowbridge

4  shooting?

5       MS KOENIG:  I was just asking that there is no

6  factual evidence that links the two together.

7       THE COURT:  All right.  Okay.

8  BY MS KOENIG:

9  Q    All right, Officers Mills.

10      So, on December 5 of 2020 you were working on

11 Fourth Precinct Focus Mission Team, right?

12 A    Yes.

13 Q    And the Fourth Precinct is one of four

14 precincts in Richmond, right?

15 A    Correct.

16 Q    And I want you to look in the bigger black

17 binder in front of you at the tab that is marked X.

18      THE COURT:  Say what?

19      MS KOENIG:  X.

20      THE COURT:  X.

21      MS KOENIG:  X as in as Xylophone.

22      THE COURT:  X marks the spot.

23 BY MS KOENIG:

24 Q    That's right.

25      If you could look at the four images that are

Mills - cross

```
 1   in there.  That's 1, X 2, and X 3 and X 4.
 2   A     All right.
 3   Q     Do you recognize those images as the rough map
 4   of the Fourth Precinct, the four police precincts in
 5   Richmond?
 6   A     Yes.
 7   Q     X 1 is first precinct; is that right?
 8   A     I believe so.
 9   Q     X 2 is second precinct?
10   A     Yes.
11   Q     X 3 is the third precinct.
12   A     Yes, ma'am.
13   Q     X 4 is the fourth Precinct?
14   A     Yes.
15   Q     I move for admission of X 1 through 4.
16         THE COURT:  Admitted.
17   BY MS KOENIG:
18   Q     Look again at Fourth Precinct.  So that was
19   your area that night, right?
20   A     Yes.
21   Q     And the Fourth Precinct is essentially bounded
22   on the left hand side by where 95 runs through
23   downtown Richmond?
24   A     I guess so, ma'am.
25         THE COURT:  What are we looking at.  Four?
```

Mills - cross

1  BY MS KOENIG:

2  Q    That thick blue line that runs across Belvedere

3  Street, where 95 guess through?

4       THE COURT:  Yes.

5  A    You are asking?

6  Q    Yes.

7  A    Yes.

8  Q    On the right hand side, the area where the

9  yellow and the, sort of each meet, that is the Six

10  Points Commercial, right?

11  A    I don't believe so.

12  Q    Sorry.  Above there.  Where Brookland and Dill

13  meet up?

14  A    Right around there.

15  Q    And then on the north hand side the Fourth

16  Precinct boarded by Henrico County?

17  A    Yes, ma'am.

18  Q    South side of the precinct goes a little bit

19  below Broad Street downtown, right?

20  A    Yes.

21  Q    On December 5 of 2020 you are working with the

22  Fourth Precinct Focus Mission Team, and you guys

23  were making traffic stops, right?

24  A    Yes, ma'am.

25  Q    And when you make a traffic stop you are

Mills - cross

1    calling in on your radio in the car to let the

2    dispatchers know what you all are doing, right?

3    A    Yes, ma'am.

4    Q    And that information that you call in gets put

5    into a data base, right?

6    A    There is a record of it, I believe.

7    Q    A record is made?

8    A    Yes.

9    Q    And the record that you all keep at the

10   Richmond Police Department are called the I-Net

11   Viewer, right?

12   A    I am not familiar with that.  I have heard that

13   name before.

14   Q    The police car you were in that night had a

15   police department computer in it, right?

16   A    Yes.

17   Q    Information that you type into the police

18   department computer ends up in the incident report,

19   right?

20   A    Yes.

21   Q    Okay.

22        Let's look at exhibit J.  A few pages, so go

23   ahead and scan, especially page, the third page.

24   You recognize your name on the third page?

25        THE COURT:  Wait a second.  This is -- it

Mills - cross

1   says --

2        MS KOENIG:  At the top, Your Honor, it says

3   202012050485 dash TS, and then it indicates traffic

4   stop that was officer-initiated.

5        THE COURT:  At Letcher and Highland.

6        MS KOENIG:  That's correct.

7        THE COURT:  All right.  Where does it say his

8   name?

9        MS KOENIG:  In the --

10       THE COURT:  Okay.

11       MS KOENIG:  -- seventh column over, Your

12  Honor --

13       THE COURT:  Okay.

14       MS KOENIG:  -- part of the way down.

15  BY MS KOENIG:

16  Q    Officer Mills, do you see that this is a record

17  that reflects a stop that you and Officer Williams

18  had made that night?

19  A    Yes, ma'am.  Yes, ma'am.

20  Q    Okay.  Sorry.  Didn't hear what you said.

21       So, in this stop where it says 20201205 and

22  then 0485, that indicates that this is the 485th

23  incident from December 5 of 2020; right?

24       MR. ELLIKER:  Your Hoor, this exhibit has not

25  been admitted.

Mills - cross

 1        THE COURT:  What?

 2        MR. ELLIKER:  This exhibit has not been

 3   admitted.

 4        MS KOENIG:  I move its admission.

 5        MR. ELLIKER:  The witness said he is not

 6   familiar with the --

 7        THE COURT:  I think she is laying a foundation

 8   for it.

 9        Go ahead.  Finish the foundation and tell us

10   what thing is.

11        MS KOENIG:  Thank you, Your Honor.

12        So, this, the number at the top reflects the

13   date that the stop happened as well as incident

14   number, right?

15   A    Yes.

16   Q    Okay.

17        And then indicates it is a traffic stop that

18   was initiated by officers, right?

19   A    Yes.

20   Q    And it happened at Letccher Avenue and Highland

21   Avenue in Richmond, right?

22   A    Yes.

23        THE COURT:  This is a record kept by the police

24   department, right?

25        MS KOENIG:  That's correct, Your Honor.  It's a

Mills - cross

```
 1   certified copy from Richmond Police Department.

 2        Move for admission, Your Honor.

 3        THE COURT:  Well, sir, this is a record kept by

 4   the police department, right?

 5        THE WITNESS:  As far as I know, Your Honor.

 6        THE COURT:  All right.

 7        It is admitted.

 8        Did you want to object to that, Mr. Elliker?

 9        MR. ELLIKER:  I may save my powder for

10   relevance, Judge.

11        MS KOENIG:  Let's look now at exhibit Q.

12        THE COURT:  Exhibit what?

13        MS KOENIG:  "Q" as in quick.

14   BY MS KOENIG:

15   Q    So Officer Mills, when you are on duty with the

16   Richmond Police Department you are required to have

17   a body-worn camera, right?

18   A    Yes.

19   Q    You all use the Axon body-worn camera, right?

20   A    Yes.

21   Q    When you get back to the police department at

22   the end of the shift you download the videos that

23   were, that you made on your shift that night, right?

24   A    Yes, ma'am.

25   Q    When you are downloading them, you have type in
```

Mills - cross

1   a title, right?

2   A    Yes, ma'am.

3   Q    And that way you can then later pull them up if

4   you need to, right?

5   A    Yes.

6   Q    Will you look at exhibit Q for me.

7        Is this the record of the videos that you

8   downloaded on December 5 in early morning hours of

9   December 6 of 2020?

10  A    Looking at the wrong one.

11       Yes, ma'am.

12  Q    Okay.

13       So let's look at the last event on page 1 of

14  exhibit Q.  It indicate that the ID number is

15  20201205 dash 0485, right?

16  A    Yes, ma'am.

17  Q    That Is the same number when we look back

18  through to exhibit J, right?  That's the same number

19  as listed on the top of that exhibit, right?

20  A    Yes, ma'am.

21  Q    Okay.

22       And then it indicate that you downloaded the

23  video, right?

24  A    Yes, ma'am.

25  Q    And you titled video TS, and then it has a

Mills - cross

1   number, right?

2   A    Yes, ma'am.

3   Q    And then it has BM, right?

4   A    Yes.

5   Q    No lights.  Right?

6   A    Yes, ma'am.

7   Q    3000 Meadowbridge?

8   A    Correct.

9   Q    So, let's go back to exhibit J.  Do you see at

10  the top it indicate it is a traffic stop?  Is there

11  anywhere in this document exhibit J that tells you

12  what the basis of the traffic stop is?

13  A    I don't think so, ma'am.

14       THE COURT:  Talking about page 3.  You are

15  asking him whether that has anything on it?

16       MS KOENIG:  Anywhere in exhibit J, Your Honor.

17       THE COURT:  Well, that is four pages long.  It

18  has a map, it has got something on the back of it,

19  and it has a whole bunch of writing on page 4.  And

20  I don't have any idea what it is all is.

21       MS KOENIG:  Your Honor, I looked at exhibit J

22  Quite closely.

23       THE COURT:  Well, you are asking him to do that

24  from the witness stand.

25       Are you familiar with exhibit J before today?

Mills - cross

```
 1        THE DEFENDANT:  No, Your Honor.
 2        THE COURT:  All right.
 3        Well, take your time and allow him to go ahead
 4   and look at it --
 5        MS KOENIG:  That Is fine.
 6        THE COURT:  -- as opposed to having the exhibit
 7   speak for itself.
 8        All right.  This is just gamesmanship here.
 9        MS KOENIG:  Your Honor, actually --
10        THE COURT:  It is a document -- if it doesn't
11   have it in it, it doesn't have it in it.  You don't
12   need him to look through and say, I read it and it
13   doesn't have it in it.
14        MS KOENIG:  I want to ask the next question.
15        THE DEFENDANT:  Go to the next question.
16   BY MS KOENIG:
17   Q    Officer Mills, you are familiar that in July of
18   2020 the General Assembly in Virginia passed what is
19   called the Community Policing Act, right?
20   A    Yes, ma'am.
21   Q    And the Community Policing Act requires that
22   officers, every officer in Virginia that initiates a
23   traffic stop has to make a record of the stop,
24   right?
25   A    Yes.
```

Mills - cross

1   Q     And it requires that they document the basis

2   for the stop, right?

3   A     Yes, ma'am.

4   Q     And the race of the individual stopped?

5   A     Yes.

6   Q     And the age, the gender, right?

7   A     Yes.

8   Q     And then whether or not the individual also was

9   given a ticket or a summons or a warning, or what

10  the outcome of the stop was, right?

11  A     Yes.

12  Q     And then whether or not the vehicle was

13  searched, right?

14  A     Yes.

15  Q     And that law was effective July 1st of 2020,

16  right?

17  A     Yes.

18  Q     So when you are making your body camera title

19  you are doing your best to comply with some aspects

20  of that law, right?

21  A     Yes.

22  Q     Because you are putting in there, for instance,

23  the last entry on exhibit Q, you put in the "TS,"

24  which stands for traffic stop, right?

25  A     Yes.

Mills - cross

1    Q    You put in a number.  That number is the
2    individual's birth date that you stopped, right?
3    A    Yes.
4    Q    And then you put "B M," which stands for black
5    male, right?
6    A    Yes.
7    Q    No lights means the basis for the stop with no
8    headlights?
9    A    Yes.
10   Q    Then you put the location of the stop was 3000
11   Meadowbridge, right?
12   A    Yes.
13   Q    So although the I-Net does not reflect the
14   information that the Community Policing Act
15   requires, your body camera titles at least attempts
16   to do so, right?
17   A    Yes.
18   Q    All right.
19        Let's go to exhibit L.
20        I'm sorry.  I have one question about exhibit J
21   that I have not asked.  On exhibit J on the last
22   page -- so this is the fourth page of that
23   exhibit -- you see a little above the halfway mark
24   of the page there is an event remark that says
25   vehicle search completed at 182509, right?

Mills - cross

1    THE COURT:  Wait.  Date component is 18:43:3,

2  right?

3    MS KOENIG:  18:25:09.

4    THE COURT:  Well, the --

5    MS KOENIG:  Tenth -- well, no, it's the

6  eleventh item entry down.

7    THE COURT:  Well, on mine it says on the left

8  hand column it says 18:40:32.

9    MS KOENIG:  Exhibit J, Your Honor.

10    THE COURT:  Yes, ma'am.  No.  I'm sorry.  That

11  is exhibit K.

12    All right.  Got you 18:25:09.  All right.  The

13  vehicle search completed.  All right.

14    MS KOENIG:  Which means that in some fashion

15  that car was searched, right?

16    THE WITNESS:  I don't know why that remark is

17  there.

18  BY MS KOENIG:

19  Q    It is there, right?

20  A    It is there.

21  Q    Presumably the dispatcher is not making stuff

22  up to put in the report, right?

23  A    Yes, ma'am.  But I have never advised the

24  dispatcher whether or not I have searched a vehicle

25  on the radio.

Mills - cross

1   Q     Okay.

2         You don't know where that information comes

3   from?

4   A     Correct.

5   Q     But it there -- right?

6   A     Yes.

7   Q     So now let's look at exhibit L.

8         And let's look at the top part of exhibit L

9   where it says 202012050502, right?

10  A     Yes, ma'am.

11  Q     Look back to the exhibit Q, which is your Axon

12  report.

13        Do you see that the fifth entry down indicates

14  that you made a body camera video for that same

15  incident?

16  A     Yes, ma'am.

17  Q     You titled that video "TXEM with a number,

18  expired tag, Magnolia?"

19  A     Yes, ma'am.

20  Q     Which means that there was a traffic stop for

21  expired tags of a black male with that birth date on

22  Magnolia?

23  A     Yes.

24  Q     Let's go back to exhibit L.

25        And, again, this has the same incident number

Mills - cross

1   at the top, right?

2   A    Yes.

3   Q    It indicates that it was a traffic stop, right?

4   A    Yes.

5   Q    And it indicates, again, on -- this is the

6   fifth page that you and Officer Williams had

7   conducted this traffic stop, right?

8        THE COURT:  On the fifth page?

9        MS KOENIG:  The last page of this exhibit, Your

10  Honor.

11       THE COURT:  All right.

12       MS KOENIG:  On the seventh column of the fifth

13  down is where I see Mr. Mills' name the first time.

14       THE COURT:  Okay.

15       MS KOENIG:  On the third page -- so, move for

16  admission of exhibit L.

17       THE COURT:  Okay.  Admitted.

18  BY MS KOENIG:

19  Q    On the third page, the third event up from the

20  bottom where the time stamp is 18:56:46, it again

21  says, event remark, vehicle search completed, right?

22       THE COURT:  That is what it says.

23       Go ahead.

24  BY MS KOENIG:

25  Q    All right.

Mills - cross

1      THE COURT:  I don't know why you can't

2  acknowledge, Officer, is that what it says?

3      THE WITNESS:  I had trouble finding it, Your

4  Honor.  All right.  Well, it is the third one up

5  from the bottom.  It says 18:56:46.

6      THE DEFENDANT:  Yes, Your Honor.

7      THE COURT:  It says in that remark "vehicle

8  search completed at 1205."

9      Is that what it says?

10      THE WITNESS:  Yes, Your Honor.

11      THE COURT:  All right.  So let's --

12  BY MS KOENIG:

13  Q     Go to exhibit N, Your Honor.

14  A     "N?"

15  Q     "N" as in Nancy.

16      THE COURT:  All right.

17      So, Officer Mills, at the top of exhibit N on

18  left the hand corner you see the number that says

19  202012050571, right?

20  A     Yes, ma'am.

21  Q     Put on to the Axon camera in exhibit Q, you see

22  that the sixth entry down indicates that you made a

23  body camera video for that same incident number?

24  A     Yes, ma'am.

25  Q     And the title on exhibit Q is TSES, and number,

Mills - cross

1    and expired tag, right?

2    A    Yes, ma'am.

3    Q    Which indicates it was a traffic stop with

4    black female with that birth date for expired tag,

5    right?

6    A    Yes.

7    Q    So going back to exhibit N.  Look on the third

8    page of exhibit N and seventh column, you see that

9    this report indicates that you and Officer Collombo

10   had conducted this traffic stop, right?

11   A    Yes, ma'am.

12   Q    And on the last page with the event remark that

13   says, at 21:04:55 the event remark says LOI search

14   completed?

15   A    Do you see that yes?

16       THE COURT:  You lost me.  What page?

17       MS KOENIG:  Last page of exhibit N., Your

18   Honor.

19       THE COURT:  Which exhibit?  Which line is it?

20       MS KOENIG:  The last page in.  It's the

21   eleventh entry down, which is 21:04:55.

22       THE COURT:  All right.

23   BY MS KOENIG:

24   Q    LOI search completed.  Does L O I stand for

25   location of incident?

Mills - cross

1    A     I don't know.

2    Q     Okay.

3          But some search was completed is what it

4    indicates?

5          Let's look at exhibit P.

6          THE COURT:  Exhibit what?

7          MS KOENIG:  P as in Paul.

8    BY MS KOENIG:

9    Q     And in the upper left hand corner it says

10   202012050579, right?

11   A     Yes.

12   Q     And then flipping to exhibit Q, which is your

13   Axon body camera report, we have got a third

14   incident down which indicates that you made a body

15   camera video for that same incident number, right?

16   A     Yes.

17   Q     And the title was TSBM number, failure to stop

18   Peggy and Meadowbridge, right?

19   A     Yes.

20   Q     Traffic stop of black male with that birth

21   date, failing to stop, right?

22   A     Yes.

23   Q     All right.

24         Going back to exhibit P.

25         THE COURT:  Exhibit what?

Mills - cross

```
1         MS KOENIG:  Sorry.  Let me go to W.  This is
2    the one that doesn't --
3         Let's go to exhibit W.
4         Do you see on the top left hand side of exhibit
5    W it says 202012050579, which is the same incident
6    number we have been talking about.  Exhibit N.  I'm
7    sorry, exhibit P and exhibit Q.
8         And in the seventh column it indicates that you
9    and Officer Williams had conducted this traffic
10   stop, right?
11   A    Yes, ma'am.
12   Q    And on the fourth page of exhibit W, third
13   event down, it indicates that there was a vehicle
14   search completed at 21:17:40, right?
15   A    That's what it says, yes.
16   Q    Okay.
17        Your Honor, I move for admission of exhibit P,
18   W and N, which I think I had not done before.
19        THE COURT:  All right.
20        They are admitted.
21        MR. ELLIKER:  Your Honor --
22        MS KOENIG:  If I haven't already.
23        THE COURT:  Hold on.
24        MR. ELLIKER:  Your Honor, object on the
25   relevance of the exhibit and the line of
```

Mills - cross

1    questioning.

2         THE COURT:  Okay.  But I think what she is

3    doing is trying to establish that these folks are

4    just driving around stopping people and then

5    searching their cars.

6         Is that fair to say, Ms Koenig?

7         MS KOENIG:  That's correct, Your Honor.

8         THE COURT:  Well, you know, it may not carry

9    the day if there is some sort of an offense, or

10   ostensible offense that they are observing, but I

11   think she is allowed to put that in.

12        Go ahead, Mr. Elliker, did you want to say

13   something?

14        MR. ELLIKER:  I just would say that I still

15   don't think it is relevant as to the issues at hand

16   in the court, and particularly because I don't think

17   that Officer Mills has any independent recollection

18   of these stops, and no one can talk about anything

19   other than what document that he himself has not

20   seen before today, actually.

21        THE COURT:  Well, you know that they are

22   records of the police defendant, and what they show

23   is, so far, that these gentlemen in this unit drive

24   around and stop people, and then search their cars.

25        Now, whether that carries the day is another

Mills - cross

1    question.  But, I am sure Ms Koenig will have

2    something to say about that.

3          MS KOENIG:  I may, Your Honor.

4          THE COURT:  So I am going to admit it.  And see

5    where it goes.  Thank you.

6    BY MS KOENIG:

7    Q    Officer Mills, I am going to to go back to the

8    other two stops.

9          You can take this folder now, thank you.

10         I want to go back to the other two stops that

11   you have participated in that night with temporary

12   tags with the same number.

13         The first stop of the driver -- are you aware

14   that you made a body camera video?

15   A    Yes.

16   Q    If we can pull up exhibit U-4.

17         In this incident that night on December 5th you

18   were the front passenger in this marked police car,

19   right?

20   A    Right.

21   Q    It appears that way, yes.

22         And when you make the body camera video, you

23   downloaded it, right?

24   A    Yes.

25   Q    If we look at exhibit Q, you titled this

Mills - cross

1    incident -- this is the last incident on the page --

2    traffic stop, black male, no lights, 3000

3    Meadowbridge, right?

4    A    Yes.

5    Q    Okay.  And move to admit exhibit 4, Your Honor.

6    U-4, Your Honor.

7         THE COURT:  All right.  Admitted subject to

8    Mr. Elliker's --

9         MR. ELLIKER:  No objection.

10        THE COURT:  -- objection.  All right.  Or not

11   objection.

12   BY MS KOENIG:

13   Q    All right.

14        So, let's go to -- well, at the -- in the

15   police car that you all are driving around that

16   night, there is a computer, right, that is mounted

17   on the front, or somehow affixed to part of the

18   police car, right?

19   A    Yes.

20   Q    And that computer has access to different data

21   bases right?

22   A    Yes.

23   Q    One of them is vehicle inquiry, right?

24   A    Correct.

25   Q    You can also access someone's criminal record,

Mills - cross

1    right?

2    A      No, you cannot.

3    Q      You cannot access criminal records?

4           THE COURT:  You are going to have have to get

5    up closer to the mic.

6           THE WITNESS:  No, you can't.

7    BY MS KOENIG:

8    Q      So if Officer Collombo was able to access

9    earlier, you don't know how he was able to do that?

10   A      You can look at past incidents with Richmond

11   Police Department, and you can see if they have

12   warrants, but the official criminal history you can

13   not do.

14          THE COURT:  You can't get into VCIN on that?

15          THE WITNESS:  Correct, sir.

16   BY MS KOENIG:

17   Q      But if the person had stopped, or incident with

18   Richmond Police Department, that is what you can

19   access?

20   A      Yes.

21   Q      Okay.

22          And so on this particular night -- let's go to

23   ten seconds into this video.

24          (Being played).

25          Pause it.

Mills - cross

 1       You had access to the vehicle inquiry, right?

 2    A    Yes, ma'am.

 3    Q    In the upper left hand portion it indicates

 4    that it is the LIC.  Does that stand for the license

 5    number?

 6    A    Yes.

 7    Q    License plate number?

 8    A    Yes.

 9    Q    All right.  Let's play it for the 20 seconds,

10    21 seconds in.

11       (Being played).

12       Okay.  So are you typing that information in,

13    or is dispatch doing that?  Who is doing that?

14    A    I believe I am.

15    Q    So if you are typing information in, that means

16    you are able to see what the license plate says,

17    right?

18    A    Yes.

19    Q    Okay.  Let's keep playing until we get to 27

20    seconds.

21       (Being played).

22       Okay.

23       Stop.

24       Now, your hand was blocking it for a minute,

25    but if we look very closely it says LIC, and then

Mills - cross

 1   the next, the middle bit of text, can you make out

 2   the license plate number that you typed in?

 3   A    I can't, no.

 4   Q    You can not.  Okay.

 5   A    No.

 6   Q    The license plate that you all pulled over that

 7   night was 111-34Y right?

 8   A    Yes.

 9   Q    Okay.  It makes sense that is what you typed in

10   to the record, right?

11   A    Yes.

12   Q    And it indicates that there is no record

13   received for that license plate, right?

14   A    Yes.

15   Q    Now, you all did not pull that car over because

16   the license plate wasn't coming back, right?

17   A    Correct.

18   Q    You pulled him over because he didn't have his

19   headlights on, right?

20   A    Correct.

21   Q    Okay.  All right.

22        Go forward to one minute in.  And for the

23   record, the time stamp is on the bottom screen as

24   you play the video.  One minute in.

25        THE COURT:  Okay.  Thank you.

Mills - cross

1        (Being played)

2    BY MS KOENIG:

3    Q    All right.

4        Let's look at this scene here.  So we have on

5    the driver side of the car the first person, is that

6    Officer Collombo?

7    A    Yes.

8    Q    And behind you is Sergeant Spinos, right?

9    A    Yes.

10   Q    And we can see Officer Williams who is on the

11   passenger side of the car the rear passenger side?

12   A    Yes.

13   Q    And then the woman on the right hand side with

14   the mask pulled down under her chin is the passenger

15   of the car, right?

16   A    Yes.

17   Q    All right.  Play it until we get to 122.

18       (Being played)

19       She indicates, the passenger indicates that she

20   had just purchased the car?

21   A    Yes.

22   Q    All right.  Keep playing.

23       (Being played).

24       Keep playing.

25       (Being played).

Mills - cross

1       Pause.

2       Officer Williams then asked the passenger, the

3   passenger, do you have any weapons on you, right?

4   A    Yes.

5   Q    All right.  Go ahead.

6       (Being played).

7       All right.  Pause.

8       Then Officer Williams again patting the

9   passenger down, right?

10  A    After she says "go ahead," yes.

11  Q    And you all had no reason to believe that the

12  passenger was armed and dangerous, right?

13  A    I don't remember.

14  Q    Did you hear Officer Williams tell her that she

15  had to pat her down?  You can go back and play it

16  again.

17  A    She said, "I am going to pat you down."

18  Q    So she tells you, I am going to at you down,

19  right?

20  A    Yes.

21  Q    And then she does, right?

22  A    After she says "go ahead," yes.

23  A    All right.

24      THE COURT:  Just answer the question.  You

25  don't need to argue your case.  Okay?

Mills - cross

 1       THE WITNESS:  Yes, Your Honor.

 2       THE COURT:  Okay.

 3   BY MS KOENIG:

 4   Q    All right.  Let's go to 146.

 5       Go ahead and play it.

 6       (Being played)

 7       All right.  Pause here.

 8       So we see Officer Collombo had his flashlight,

 9   right?

10   A    Yes.

11   Q    He is aiming it in the back seat of the car,

12   right?

13   A    Yes.

14   Q    And go to about 206 in the video.

15       We just saw a light.  Go back for one second.

16   Play it again.

17       All right.  We just saw a light.  That was your

18   flashlight, right?

19       THE COURT:  Reflecting off the window; is that

20   right?

21       THE WITNESS:  Yes.

22   BY MS KOENIG:

23   Q    And that indicating, because your are also

24   looking at the interior of the car, right?

25   A    Yes.

Mills - cross

1   Q    All right.

2        Let's go to four minutes and 50 seconds into

3   the video.

4        THE COURT:  So is the point here that although

5   they stopped this fellow for not having his lights

6   on, they used this as an occasion to scope out his

7   car from the outside?

8        MS KOENIG:  Yes.

9        THE COURT:  All right.  I have got that point.

10       MS KOENIG:  Okay.

11  BY MS KOENIG:

12  Q    Let's go to the second point.  Before I leave

13  this incident.  At any point in time did you ever

14  develop any evidence that the driver knew that the

15  tags had not come back to his car?

16  A    Not to my knowledge.

17  Q    You -- he was given no ticket, no summons, no

18  arrest, right?

19  A    Correct.

20  Q    All right.  Let's go to the second incident.

21       So, again, you made a body camera video of

22  this, right?

23  A    Yes.

24  Q    Let's look at your Axon report at the sixth

25  incident down, right?  You titled this video PSTX

Mills - cross

1   number, expired tag, right?

2   A    Sorry.  That is ins Q?

3   Q    Q, and it's the sixth incident down, the one

4   that ends in 0571.

5   A    Yes, ma'am.

6   Q    All right.

7        So, this means that exhibit V-3 that has that

8   same title, that means that is your clip, right?

9   A    Yes, ma'am.

10  Q    Move to add might V-3, Your Honor.

11       THE COURT:  Admitted.

12  BY MS KOENIG:

13  Q    All right.

14       So down at the beginning of this video we see

15  the computer again, right --

16  A    Yes.

17  Q    -- in the car?

18       Let's go to 20 seconds in.

19       (Being played)

20       All right.  So again you typed in a number into

21  the -- let's go back to that about one second -- you

22  have typed a number again into the vehicle inquiry

23  license portion of the computer, right?

24  A    Yes.

25  Q    Go to 27 seconds, please.

Mills - cross

1        (Being played).

2        All right.

3        Maybe scroll back a little bit clearer.

4        Let's play it from here and then pause it

5    quickly.

6        (Being played)

7        Pause.

8        Go back one second.

9        (Being played)

10       Okay.

11       Can you make out that it says, "no record" for

12   that license plate, or could you make out when I

13   played it?

14   A    I didn't.

15   Q    Do you see it before you turn the page?

16   A    I believe that is what it says, ma'am.

17   Q    Okay.  All right.

18       And so you all pulled that car over not because

19   of anything to do with the plate, although you had

20   run the plate before you pulled her over, right?

21   A    I don't recall to this one.

22   Q    You pulled her over.  You indicated in your

23   body camera titling it was for expired tag, right?

24   A    Yes.

25   Q    Okay.

Mills - cross

1      THE COURT:  So, are you going to establish

2  through all of this that while they said they were

3  pulling it over for expired tag, what they did once

4  they pulled it over was to do a thorough search of

5  the vehicle as they could from outside the car?

6      MS KOENIG:  Yes.

7      THE COURT:  All right.

8      So is that what happened?  You pulled the guy

9  over for expired tag, and then you went in, looked

10  in the car with your flashlight, and found whatever

11  you found or didn't find; is that right?

12      THE WITNESS:  During the course of a traffic

13  stop we look inside the vehicle as much as we can.

14      THE COURT:  Okay.  And do you do that on all of

15  the traffic stops you do?

16      THE WITNESS:  Yes.

17      THE COURT:  All right.

18  BY MS KOENIG:

19  Q    All right.

20      So at this second stop you all saw no evidence

21  that the driver knew that the tags would not come

22  back to the car, right?

23  A    That's correct.

24  Q    Again, no ticket, no summons, no arrest.

25  Right?

Mills - cross

1   A    Correct.

2   Q    All right.

3        Let's turn back to you guys pulling over behind

4   Mr. Moore.  This time you had not run the tag ahead

5   of time, right?

6        THE COURT:  They hadn't not run the tag?

7        MS KOENIG:  When they -- when you get behind

8   Mr. Moore you didn't, like these other two

9   incidents, type the license plate into the vehicle

10  inquiry, right?

11       THE COURT:  Well, they didn't have to.  They

12  knew what it is going to be.

13       MS KOENIG:  I was using that question --

14       THE COURT:  So you knew that the tag was going

15  to come back not good, right?

16  A    Yes, sir.

17       THE COURT:  All right.

18  BY MS KOENIG:

19  Q    All right.

20       So at that time you had no additional evidence

21  that the driver of the white Chrysler 300 knew that

22  the tags had not come back to his car, right?

23  A    Correct.

24  Q    And before the December 5 of 2020 had you ever

25  seen Mr. Moore before?

Mills - redirect

1   A     No.

2   Q     Did you know anything about him before that

3   night?

4   A     No.

5   Q     No further questions, Your Honor.

6         THE COURT:  All right.

7         Thank you.

8         Mr. Elliker, do you have any redirect?

9         MR. ELLIKER:  Very briefly.

10        THE COURT:  All right.  Thank you.

11                    REDIRECT EXAMINATION

12  BY MR. ELLIKER:

13  Q     Officer Mills, after you pulled over the first

14  car did you search it?

15  A     I did not.

16  Q     After you pulled over the second car did you

17  search it?

18  A     No.

19  Q     Did the third car stop when the police

20  commanded dollars it to stop?

21  A     No, it did not.

22  Q     No further questions, Your Honor.

23        THE COURT:  Weil, did he search it?  I don't

24  know.  Looking at the car, isn't that a search?

25        MR. ELLIKER:  Well, did you engage in a vehicle

Mills - redirect

1   search of either of the first two cars where the --

2       THE COURT:  Vehicle search.  You mean a car

3   search?

4       MR. ELLIKER:  Well --

5       THE COURT:  You mean where they open the doors

6   and look inside, is that what a vehicle search is?

7   BY MR. ELLIKER:

8   Q   Did you physically search beyond just looking

9   in through the windows with your flashlight the

10  first two cars?

11  A   No.

12      THE COURT:  Okay.

13      MR. ELLIKER:  Thank you.

14      THE COURT:  Okay.

15      May this officer go?

16      MS KOENIG:  Yes, Your Honor.

17      THE COURT:  All right.

18      Officer, thank you very much for coming.  I

19  appreciate it.

20      THE WITNESS:  Yes, sir.

21              (Witness stood aside)

22      THE COURT:  All right.

23      Call the next witness.

24      Mr. Elliker, do you have a short one?

25      MR. ELLIKER:  Yes, Your Honor.

Torres - direct

```
 1        THE COURT:  I have a phone conference at 11:30

 2   I have to take.

 3        MR. ELLIKER:  We call Officer Jacob Torres.

 4        THE COURT:  What is Torres' role in this thing?

 5   Did he give him the Miranda?

 6        MR. ELLIKER:  He responds to the scene with the

 7   first officer who saw the gun in plain view.

 8        THE COURT:  Okay.  Of the car.

 9        Well, does the fact that Officer Torres -- I

10   have seen a picture of the gun on the floor of the

11   car.

12        MR. ELLIKER:  He also engaged in the

13   pre-Miranda conversation that lasts about 30

14   seconds.  I would be happy to stipulate that the gun

15   was not in plain view, Your Honor.

16        THE COURT:  The old plain view exception.

17                    JAKOB TORRES

18          AFFIRMED AND TESTIFIED AS FOLLOWS:

19                  DIRECT EXAMINATION

20   BY MR. ELLIKER:

21   Q    Officer, could you please state --

22        THE COURT:  Let him sit down.

23        MS KOENIG:  Please state and spell your name

24   for the record.

25        THE WITNESS:  Jakob Torres, J-A-K-O-B Torres,
```

Torres - direct

1   T-O-R-R-E-S.

2   BY MR. ELLIKER:

3   Q     Are you employed by the Richmond Police

4   Department?

5   A     I am.

6   Q     Are you assigned to the Fourth Precinct Focus

7   Mission Team?

8   A     Yes.

9   Q     Were you so assigned on December 5 of 2020?

10  A     I was.

11  Q     On that evening did you respond to a call for

12  assistance in the Highland Park area?

13  A     I did.

14  Q     What was the call that went out?

15  A     Call for back up.  My partner unit tried to

16  stop a vehicle that took off running.

17  Q     In other words, you were not in the vehicle

18  that tried to pull the vehicle, pull the defendant's

19  vehicle over?

20  A     That's correct.  Just backing up that unit.

21  Q     Were you wearing a body-worn camera during this

22  incident?

23  A     Yes.

24  Q     Have you had an opportunity to review the

25  footage from that recording before today?

Torres - direct

1   A    I did.

2   Q    There should be a disc in front of you labeled

3   Government's exhibit 9.  Do you recognize that disc?

4   A    I do.

5   Q    Does it contain the recording footage from that

6   incident that night from your camera?

7   A    Yes.

8        MR. ELLIKER:  Your Honor, we move exhibit 9

9   into evidence.

10       MS KOENIG:  No objection.

11       THE COURT:  Admitted.

12  BY MR. ELLIKER:

13  Q    If we can -- I think we need to switch over to

14  the government's evidence, Ms Tuck.

15       If we could play exhibit 9, the first 34

16  seconds.

17       (Being played).

18       Officer Torres, were you one of the first

19  officers to respond to this vehicle?

20  A    I was.

21  Q    Was the door open when you arrived?

22  A    Yes.

23  Q    Was the car running?

24  A    Yes.

25  Q    On the left do you see some flashing lights in

Torres - direct

1   the distance?  What is that?

2   A    That is the other unit that initiated the

3   traffic stop.

4   Q    When you came upon the vehicle was the door

5   opened?  Did you see anything on the floorboard of

6   the car?

7   A    I saw a firearm.

8   Q    Let's play from minute 131 to 150, please.

9        (Being played).

10       Now, I think you heard you say PDW.

11  A    Personal defense weapon.

12  Q    I think I also heard you say you weren't going

13  to touch the gun.

14       Did anyone touch the gun as far as you saw

15  while it was still sitting in the car?

16  A    No.

17  Q    And moving forward, did you assist in this

18  incident by investigating the temporary tag?

19  A    I did.

20  Q    Did you pull the temporary tag off the car?

21  A    Yes.

22  Q    Let's go to 527, and play for ten seconds.

23       (Being played)

24       There is a skinny binder there in front of you

25  under the larger one.  If you look behind tab ten

Torres - direct

1   there is an exhibit marked exhibit ten.

2        Do you recognize that?

3   A    I do.

4   Q    What is it?

5   A    The tag from the vehicle.

6   Q    Is that a true and accurate copy of the tags

7   you pulled off the Chrysler that night?

8   A    It is.

9        MR. ELLIKER:  Your Honor, we move exhibit ten

10  into evidence.

11       MS KOENIG:  No objection.

12       THE COURT:  Admitted.

13  BY MR. ELLIKER:

14  Q    Officer Torres, did you compare the VIN on the

15  vehicle that was at the curb with the VIN listed on

16  this temporary tag?

17  A    Yes.

18  Q    Did that match?

19  A    It did.

20  Q    Did you run the VIN in your computer system to

21  identify the owner of the vehicle?

22  A    Yes.

23  Q    Do you recall the owner of the vehicle

24  according to your computer system?

25  A    It was like a bank or a leasing company.

Torres - direct

```
 1   Q    Now, after you ran the vehicle VIN did you have

 2   conversation with the defendant?

 3   A    Yes.

 4   Q    How did that conversation come about?

 5   A    I approached him and asked him about the tag,

 6   or where he got his car.

 7   Q    We have already admitted your body camera

 8   footage as exhibit 9.  We can go back and play from

 9   1802 to 1919, please.

10        (Being played).

11        Officer Torres, after this point did you have

12   any further conversation with the defendant?

13   A    No.

14   Q    In the conversation that we just watched did

15   you ask him anything about the firearm you found in

16   his car?

17   A    No.

18   Q    Did he tell you anything about the firearm he

19   found in his car?

20   A    No.

21        THE COURT:  What exactly did he tell you?

22   Because I couldn't quite understand.

23        THE WITNESS:  He told me where he bought the

24   car from, and how much for.

25        THE COURT:  Where did he get it?
```

Torres - direct

1          THE WITNESS:  From ANR, I think that is what he

2     was trying to say.  A place across from our

3     precinct.

4          THE COURT:  Okay.

5          MR. ELLIKER:  If we can play here the next

6     little clip.

7          THE COURT:  All right.  We can't right now

8     because I have a conference call.

9          We are going to take a recess.  I will be back

10    as soon as the conference call is done.

11               (A recess was taken)

12         THE COURT:  All right.

13         Sorry.  I had to conference call in order to

14    set a criminal case for trial in Norfolk.  All

15    right.

16         Mr. Elliker, we were going through with Officer

17    Torres.  And we had just introduced the false tag.

18         MR. ELLIKER:  That is right, Your Honor.  And I

19    think we had just watched a clip of the conversation

20    that Officer Torres had with the defendant through

21    the rear of a police vehicle.

22         THE COURT:  Or something to that effect.

23         MR. ELLIKER:  That is what the officer

24    testified to.

25    BY MR. ELLIKER:

Torres - cross

1   Q    If we could play just the next few seconds on

2   the body cam video.

3        (Being played).

4        Officer Torres, what did we just see happen on

5   that last part of your body camera video?

6   A    I turned my camera off.

7   Q    Immediately before that.

8   A    Officer reading Miranda.

9   Q    Who was the officer reading the defendant

10  Miranda?

11  A    Officer Williams.

12  Q    Did you coordinate with her so she would be

13  informed about the information the defendant had

14  just told you?

15  A    No.

16       THE COURT:  So, Mr. Moore told you that he

17  owned the car in your conversation with him, and

18  then he was Mirandized; is that right?

19  A    Yes.

20  Q    Thank you.

21       THE COURT:  All right.  Thank you.

22                    CROSS EXAMINATION

23  BY MS KOENIG:

24  Q    At any point did you ever Mirandize Mr. Moore

25  that evening?

Williams - direct

1   A      No.

2   Q      Are you aware of any other officer that was on

3   the scene aside from Officer Williams ever reading

4   any Miranda rights to Mr. Moore?

5   A      No.

6   Q      No further questions.

7          THE COURT:  Thank you.

8          Any redirect?

9          MR. ELLIKER:  No, Your Honor.

10         THE COURT:  All right.

11         Officer Torres, thank you very much for coming,

12  sir.  I appreciate it.

13                   (Witness stood aside)

14         May he be excused?

15         MR. ELLIKER:  Yes, Your Honor.

16         MS KOENIG:  He can, Your Honor.

17         THE COURT:  Thank you, sir.  Have a good rest

18  of the day.

19         THE WITNESS:  Thank you.

20         THE COURT:  All right.

21         Who is next.

22         MR. ELLIKER:  United States calls Officer Nakia

23  Williams, Judge.

24                   NAKIA WILLIAMS

25            AFFIRMED AND TESTIFIED AS FOLLOWS:

Williams - direct

```
 1                    DIRECT EXAMINATION

 2   BY MR. ELLIKER:

 3   Q     Good morning.

 4         Please state and spell your name for the

 5   record.

 6   A     Nakia, first name N-A-K-I-A.  Last name

 7   Williams, W-I-L-L-I-A-M-S.

 8   Q     Are you employed by the Richmond Police

 9   Department as a police officer?

10   A     I am.

11   Q     Officer Williams, are you assigned to the

12   Fourth Precinct Focus Mission Team?

13   A     I am.

14   Q     Were you so assigned on the evening of

15   December 5 of 2020?

16   A     Yes.

17   Q     That evening were you involved in a series of

18   traffic stops having to do with a fake temporary

19   tag?

20   A     Yes.

21   Q     How many times did you see that temporary tag

22   on different vehicles that evening?

23   A     Three times.

24         THE COURT:  Was she in the same car with the

25   other gentleman we heard from?
```

Williams - direct

```
 1   BY MR. ELLIKER:

 2   Q    Officer Williams, were you in the same car as

 3   officer Mills and Collombo that evening?

 4   A    Yes.

 5   Q    What happened when you attempted to pull over

 6   the third car?

 7   A    When we attempted to pull over the third car,

 8   after we initiated our lights, the car pulled away

 9   and ended up crashing at Second and Custer.

10   Q    What did you do during the pursuit of the car?

11   A    I got into the -- I was passenger originally,

12   and then I got into the driver's seat and attempted

13   to drive behind them just in case he kept running.

14   Q    Why did you have to get into the driver's seat?

15   A    Officer Collombo got out and ran.

16   Q    Now, after the driver was detained, where did

17   you go?

18   A    Back to the vehicle.

19   Q    When you say "vehicle," you are referring to

20   the defendant's vehicle?

21   A    Yes.

22   Q    Now, and then when you went back to the

23   vehicle, did you observe the temporary tag on the

24   back of the Chrysler 300?

25   A    Yes.
```

Williams - direct

```
1    Q      There should be skinny binder in front of you.

2    A      Is that it?

3    Q      That has a tag -- yes, that is the one.

4           Are you looking at something marked exhibit 10?

5    A      Yes.

6    Q      Is that the tag that you saw?

7    A      Yes.

8    Q      Did participate in a search of the vehicle?

9    A      I did.

10   Q      What prompted Officers to search the Chrysler?

11   A      Marijuana baggy on the floorboard of the

12   vehicle.

13          THE COURT:  Marijuana where?

14          THE WITNESS:  On the floor board of the

15   vehicle.

16   BY MR. ELLIKER:

17   Q      Were you wearing your body worn camera during

18   this incident?

19   A      Yes.

20   Q      Have you had an opportunity to review that

21   footage before today?

22   A      Yes.

23   Q      There should be a disc in front of you that is

24   marked Government's exhibit 12.

25          Do you recognize that disc?
```

Williams - direct

1    A      Yes.

2    Q      What is it?

3    A      Stop number three, which would be Chrysler,

4    which has my initials and the date when I viewed it.

5    Q      Does that indicate that the disc contains a

6    true and accurate copy of your recording from that

7    stop?

8    A      Yes.

9           MR. ELLIKER:  The united States would seek to

10   admit exhibit 12 into evidence, Your Honor.

11          MS KOENIG:  No objection, Your Honor.

12          THE COURT:  Admitted.

13   BY MR. ELLIKER:

14   Q      Let's go to minute marker.  228.  And play

15   until 240.

16          (Being played).

17          So, does that memorialize your observation of

18   marijuana in the car?

19   A      Yes.

20   Q      During your search of the vehicle did you find

21   anything inside with the name Keith Moore on it?

22   A      Yes.

23   Q      If you flip in that binder to tab 13, there is

24   a series of pages.  Do you recognize those

25   documents?

Williams - direct

1   A    Yes.

2   Q    What are they?

3   A    Documents with Keith Moore's name in it.  On

4   it.  I'm sorry.

5   Q    Are those documents, photocopies of documents

6   you found in the vehicle?

7   A    Yes.

8   Q    All right.

9        Your Honor, we would seek to admit exhibit 13

10  into evidence.

11       MS KOENIG:  No objection.

12       THE COURT:  Admitted.

13  BY MR. ELLIKER:

14  Q    Look at the first page of exhibit 13.  Does

15  this have Keith Moore's name on it?

16  A    It does.

17  Q    Do you remember where you found this document?

18  A    Inside the glove compartment.

19  Q    If we go to exhibit 12 at 1130, and play until

20  1153, please.

21       THE COURT:  Well, wait a second.  Before she

22  gets to that, what -- the fourth document on that,

23  the fourth, the last page of that document says

24  something about a 2001 Infinity.  Was that found in

25  the Chrysler?

Williams - direct

1   A     Yes.

2         THE COURT:  Okay.  Go ahead.

3   BY MR. ELLIKER:

4   Q     If we play at 1130 to 1153, please.

5         (Being played)

6         So when you look at page one of exhibit 13 it

7   said, Keith Moore -- I think I overheard an Officer

8   say Keith More, activate now.  Is that in reference

9   to this document?

10  A     Yes.

11  Q     And then I believe we also heard Officer say,

12  "American Freight?"

13  A     Yes.

14  Q     Flip to the fourth page.  Is that in reference

15  to this document?

16  A     Yes.

17  Q     The Judge already got to where I was going,

18  ultimately going.  If you look at page five of

19  exhibit 13, where was this document found?

20  A     Inside of the arm rest.

21  Q     If we can go to marker 1030 and play until

22  1050.

23        (being played)?

24        THE COURT:  I didn't hear what she said.  Could

25  you tell me what you just said?

Williams - direct

 1      THE WITNESS:  I said that they are getting

 2  people to print the fake tags.

 3      THE COURT:  You said -- who is it?

 4      THE WITNESS:  Someone is getting someone to

 5  print fake tags based off the paper.

 6      THE COURT:  Somebody is getting someone to

 7  print fake tags.  And how does that come from the

 8  Infinity thing?

 9      THE WITNESS:  I mean it is rare that you see

10  people with make and model of a car and a VIN number

11  and the color.

12      THE COURT:  So you think this is somehow

13  affiliated with --

14      THE WITNESS:  Yes.

15      THE COURT:  -- the temporary tag crime spree in

16  Richmond?

17      THE WITNESS:  Yes.

18      THE COURT:  Okay.

19  BY MR. ELLIKER:

20  Q    Officer Williams, if you look behind tab ten,

21  which we just looked at, and compare that with the

22  information on the last page of tab 13, does the

23  sheet from the end of tab 13 contain the information

24  that one would put on a temporary tag?

25  A    Yes.

Williams - direct

1   Q     Now, after searching of the vehicle did you

2   read the defendant his Miranda rights?

3   A     I did.

4   Q     Let's go ahead to 1728 and play until 1804.

5         (Being played).

6         At the beginning of this clip who was speaking

7   to you?

8   A     Sergeant Spinos.

9   Q     Do you recall him telling you to go and read

10  the defendant Miranda?

11  A     Yes.

12  Q     Did he tell you anything about what Moore had

13  said previous to being read Miranda?

14  A     He may have gotten the vehicle from the same

15  place, or the tag from the same place.

16  Q     Did Sergeant Spinos tell you anything the gun?

17  A     I don't recall, no.

18  Q     Now, as you approached the car was the

19  defendant already talking with an Officer?

20  A     No.

21  Q     Let's go back a few seconds before you read

22  Miranda.

23        (Being played).

24        Walking up to read the defendant Miranda were

25  you aware he had been speaking with other officers?

Williams - direct

1   A    I see now that he has been.

2   Q    Play this now until 1932.

3        (Being played)

4        Now, after you -- as you were reading the

5   defendant his rights, did he do or say anything that

6   make you think he did not understand what you were

7   saying to him?

8   A    No.

9   Q    And after you finished and asked if you wanted

10  to have a conversation, what did he say to you?

11  A    He said, "Take me on to jail."

12  Q    Did he say, I will not answer any questions?

13  A    No.

14  Q    Did he say, I would like to remain silent?

15  A    No.

16  Q    After you walked away did the defendant then

17  engage other officers in a conversation?

18  A    Yes.

19  Q    Let's pick up right where we left off.

20       (Being played).

21       Now, what was this post-Miranda conversation

22  about, Officer Williams?

23  A    Him getting his tags put on the car like it

24  came with the car.  Tags came with the car.

25  Q    Who was the defendant speaking with?

Williams - direct

1   A     Sergeant Spinos.

2   Q     Did he tell you that he previously had been

3   pulled over?

4   A     Yes.

5   Q     Where?

6   A     He told Sergeant Spinos that.

7   Q     Sorry?

8   A     He told Sergeant Spinos that.

9   Q     Where did the defendant indicate he had

10  previously been pulled over?

11  A     Hanover.

12  Q     After this point in the conversation did the

13  defendant make a statement to you about the gun that

14  was found in his car?

15  A     Yes.

16  Q     What did he tell you?

17  A     I asked him, why didn't he stop.  And he

18  already had encountered with another agency.  He

19  told me that I had, but I had a whole iron in the

20  car.

21        THE COURT:  Had a what?

22        THE WITNESS:  A whole iron in the car.

23        THE COURT:  I don't know what that means.

24  BY MR. ELLIKER:

25  Q     Is that conversation captured on the camera

Williams - direct

1    footage?

2    A    Yes.

3    Q    Let's go ahead and play until 2157.

4         (Being played).

5         Pause right there.

6         Did he just say, "I had a whole iron" in the

7    car?

8    A    Yes.

9    Q    Now, through your training and experience are

10   you familiar slang with guns?

11   A    Yes.

12   Q    Is "iron" a slang term for a gun?

13   A    Yes.

14   Q    Do you know other terms for guns?

15   A    Tool.

16   Q    Tool is another slang term for a gun.

17        After this conversation did you go and tell

18   your fellow officers that the defendant had admitted

19   there was a gun in the car?

20   A    Yes.

21   Q    What term did you tell your other officers the

22   defendant had used?

23   A    Tool.

24   Q    If we can look at Government's exhibit seven,

25   which has already been admitted.

```
 1          At 2730 until the very end of this clip.

 2          (Being played).

 3          Do "tool" and "iron" mean the same thing?

 4     A    Yes.

 5     Q    Did you get the two words mixed up?

 6     A    Yes.

 7     Q    Did you write the police report that got filed

 8     with the police department in this case?

 9     A    No.

10     Q    Those are all the questions I have, Your Honor.

11          THE COURT:  All right.

12          Cross examination.

13                    CROSS EXAMINATION

14     BY MS KOENIG:

15     Q    Good almost-afternoon, Officer Williams.

16     A    Good afternoon.

17     Q    Let's talk about --

18          THE COURT:  How long do you think your cross

19     examination will take?

20          MS KOENIG:  Five minutes.  Ten minutes at the

21     most.

22     BY MS KOENIG:

23     Q    Let's talk about the other stops that you had

24     made that night on December 5 of 2020.  On

25     December 5 of 2020 you were working with the Fourth
```

```
1    Precinct Focus Mission Team, right?

2    A     Yes.

3    Q     Okay.

4          You were with Sergeant Spinos, Officer Mills,

5    and Officer Collombo, right?

6    A     Yes.

7    Q     Because you all are riding around in the same

8    police car, right?

9    A     Yes.

10   Q     Making a bunch of traffic stops, right?

11   A     Yes.

12   Q     When you were making those traffic stops you

13   weren't really trying to get traffic violations, you

14   were looking for evidence of, evidence of more

15   serious crimes, right?

16   A     Yes.

17   Q     Okay.

18         And so, one stop you made, there was that

19   before the stop of Mr. Moore, there were two other

20   stops where you all had found the same license plate

21   number, right?

22   A     Correct.

23   Q     And the second stop was a stop of a young black

24   woman who was driving a blue car, right?

25   A     Correct.
```

1    Q    And in that stop you got out of the car and you

2    watched what happened, right?

3    A    Correct.

4    Q    And you actually have a body camera video of

5    that, right?

6    A    I do.

7    Q    And during that stop, Officer Collombo was

8    questioning the lawyer -- the woman, right?

9    A    Correct.

10   Q    Whatever?

11   A    Yes.

12   Q    And Officer Mills doing a visual inspection of

13   the interior of the car with his flashlight, right?

14   A    Correct.

15   Q    And Sergeant Spinos was looking at the VIN

16   number that was on the temporary tag on the back of

17   that woman's car, right?

18   A    Correct.

19   Q    And he matched it up to the VIN number that was

20   on the plate of the car in the front windshield,

21   right?

22   A    Correct.

23   Q    Okay.

24        When you go to make stops you have to put in

25   information -- when you make a traffic stop you have

```
 1   to call it in over the radio, right?

 2   A    Yes.

 3   Q    Or you can do it on your computer, too.

 4   A    Right.

 5   Q    Either way, there is a record that is made,

 6   right?

 7   A    Right.

 8   Q    Records are important in police work right?

 9   A    Yes.

10   Q    Because you guys have lot of work you have to

11   do, right?

12   A    Correct.

13   Q    How many traffic stops do you think you have

14   made since December 5 of 2020?

15   A    I don't have an exact number.

16   Q    A hundred?  More than a hundred?

17   A    I mean a lot.

18   Q    More than two hundred?

19   A    I don't know.

20   Q    More or less than 500?

21   A    Approximately --

22        THE COURT:  She doesn't know how many, but it

23   is a lot.

24   BY MS KOENIG:

25   Q    Okay.
```

```
1          When you are going back and thinking about

2     these traffic stops you probably don't remember each

3     individual one, right?

4     A     No, not really.

5     Q     And having things like body camera footage is

6     helpful to refresh your recollection, right?

7     A     Correct.

8     Q     Also the report that dispatch makes of the

9     information that is input about the traffic stop,

10    right?

11    A     Correct.

12    Q     Okay.

13         I want to show you what has been marked as

14    exhibit K.  You can look in the big binder in front

15    of you, the bigger black binder, and look at exhibit

16    K.  On the top left corner do you see something that

17    says 202012050497?

18    A     Yes.

19    Q     Go to the third, I'm sorry, the third page of

20    this exhibit.

21         Look in the seventh column.  Do you see your

22    name there, right?

23         It says Nakia Williams.  Do you see that?  You

24    might have flipped too far.  I have this doubled

25    sided.  That is a trick question.  The third actual
```

1   page going right back to where your right hand is

2   now.  Go back some more.  There you go.

3   A     Yes, I see my name.

4   Q     You also see Michael Spinos, which is Sergeant

5   Spinos' name?

6   A     Correct.

7   Q     And so at the top it says that there is a

8   traffic stop that was officer-initiated in the 1200

9   block of Highland Avenue, right?

10  A     Correct.

11  Q     Does this record reflect the police information

12  of the stop that you and Officer or Sergeant Spinos

13  made that night, right?

14  A     Correct.

15  Q     Move to admit exhibit K.

16        THE COURT:  Admitted.

17  BY MS KOENIG:

18  Q     So, let's look at the last physical page.  This

19  is the actual page of the exhibit.

20        It says, there are some time stamps on the left

21  hand side.  Do you see those under the date of

22  December 5 of 2020?

23  A     Yes.

24  Q     Do you see that the eleventh one down at

25  18:40:32?

1    A     Okay.

2    Q     Do you see where it says event remark?

3    A     Yes.

4    Q     Vehicle search completed.  And it has the time?

5    A     Yes.

6    Q     Okay.

7          Officer Williams, are you aware of the

8    Community Policing Act?

9    A     No.

10   Q     Okay.

11         As part of your -- when did you go through

12   police academy?

13   A     2017.

14   Q     When did you become a member of the Fourth

15   Precinct Focus Mission Team?

16   A     January of 2020 I believe.

17   Q     So, 12 months before this stop?

18   A     Correct.

19   Q     Eleven months really.  Okay.

20         And so you are not aware of the obligation that

21   you all have under Virginia law to keep certain

22   statistics and information about all traffic stops

23   in the State of Virginia?

24   A     It may have been taught to me in a different

25   way.  I mean a different, like if I was telling you

1  right now.  It doesn't ring a bell.

2  Q    For every traffic stop you make do you keep a

3  race, age and gender of the person that you stopped?

4  A    We don't.  We had started it, but like it is

5  just, I guess --

6  Q    Fell off?

7  A    Yes.

8  Q    Let's go to the search of Mr. Moore's car on

9  December 5 of 2020.  When you went to the police

10  academy they taught you it was very important to

11  preserve evidence, right?

12  A    Correct.

13  Q    Probably spent days or weeks at a time

14  practicing and how you are supposed to preserve

15  evidence, right?

16  A    Correct.

17  Q    And you were taught that there are many reasons

18  why it is important to preserve evidence, right?

19  A    Correct.

20  Q    Important to preserve evidence so it can be

21  tested later, right?

22  A    Correct.

23  Q    And important to preserve evidence so it could

24  be used in court later, right?

25  A    Correct.

1    Q    Important to preserve evidence so if you have

2    question about why you took a particular action you

3    can point to the evidence to justify your action,

4    right?

5    A    Correct.

6    Q    And so on December 5 of 2020 you wanted to

7    search Mr. Moore's car, right?

8    A    Correct.

9    Q    If we could pull up exhibit 12, please, at 205.

10        205 in the video.

11        (Being played).

12        Okay.  Stop.

13        Did you see that light shining?  Let's go back

14   a minute.  We can do that again, Ms Dandridge.

15        Do you see that light reflecting -- on the car?

16   A    Yes.

17   Q    Let's play the again.

18        (Being played).

19        Is that our voice?

20   A    Yes.

21   Q    Keep playing for me.

22        (Being played).

23        Stop.

24        Do you just see your right hand come up and it

25   has what appears to be flashlight?

1   A     Yes.

2   Q     You are looking in the interior of the car

3   right?

4   A     Yes.

5   Q     Let's just keep playing.

6         (Being played).

7         All right.  Pop.

8         You say, what is in that book bag, right?

9   A     Right.

10  Q     Meaning you would like to know if there is any

11  evidence in that book bag, right?

12  A     To see if there are any firearms, correct.

13  Q     All right.

14        Let's go to two minutes and 33 seconds into the

15  video, please, Ms Dandridge.

16        (Being played).

17        Okay, pause right there.

18        All right.  So that is where you say, "Oh weed.

19  And you say, "Camera weed.  Weed camera," right?

20  A     Yes.

21  Q     What is the thing that you think is the weed in

22  this picture?  Can you circle it?  You can touch the

23  screen?

24  A     This right here.

25  Q     Okay.  Did you collect that?

```
 1   A     I did.

 2   Q     Oh, you did.  What happens when you collect

 3   evidence?  What do you do with it at the police

 4   department?

 5   A     You collect the evidence.  You put it into

 6   property.

 7   Q     Property keeps a log of those things, right?

 8   A     Correct.

 9   Q     Okay.  And when you have a log of evidence you

10   end up having a property list, right, of things that

11   were seized from that, from that stop?

12   A     Correct.

13   Q     So, things are really important to make sure

14   that those property lists are accurate, right?

15   A     Correct.

16   Q     When you have to go back and pull evidence from

17   the evidence department, you have to know, hey, I

18   need this bag from this instance, right?

19   A     Right.

20   Q     You can go and say this is the incident report,

21   here is where I have logged this in, please give me

22   this piece of item or this piece of evidence,

23   correct?

24   A     Correct.

25   Q     Let me hand you the report that Officer
```

1   Collombo made in this case that has the evidence

2   attached to it.

3        Do you recognize that as Officer Collombo's

4   report from this incident?

5   A    Correct.

6   Q    You didn't write a separate report, right?

7   A    I did not.

8   Q    Okay.

9        Do you see the evidence sheet that's listed

10  there on the last page?

11  A    I do.

12  Q    Where does it indicate that there was any

13  marijuana seized as evidence in this case?

14  A    This -- it does not, but this is not -- this is

15  from the report.  This is not the evidence that we

16  put in.  This is two different reports.

17  Q    So you have a separate report?

18  A    So, normally is that evidence page for the

19  evidence that we log into evidence, and then this as

20  our report.

21  Q    Do you have that?

22  A    I don't.

23  Q    Okay.  I don't have it.

24       All right.  Let's go to 18 minutes and ten

25  seconds into this video, please, Ms Dandridge.

1       Officer Williams, as far as you know you are

2   the only person who read Mr. Moore his Miranda

3   rights that evening, right?

4   A     As far as I know, yes.

5   Q     When you read them to him he is already in

6   handcuffs, right?

7   A     Correct.

8   Q     And he is sitting in the back of a police car,

9   right?

10  A     Correct.

11  Q     There are bars on those windows that would

12  prevent him from escaping from the car, right?

13  A     Correct.

14  Q     Definitely not free to leave, right?

15  A     Correct.

16  Q     Okay.

17      So, once you read the rights, you ask Mr. Moore

18  specifically, "With these rights in mind do you wish

19  to have a conversation with me," right?

20  A     Correct.

21  Q     And he says, "Aren't you reading the card,"

22  right?

23  A     Yes.

24  Q     And you said, "I am done."

25  A     Correct.

```
1   Q    And then he says, "Oh, all right, so you are

2   done now," right?

3   A    Correct.

4   Q    And you say, "So no, you don't want to answer

5   none of my questions," right?

6   A    Correct.

7   Q    Did you see him tilt his head, "No?"

8   A    No.  He said, he said "Take me to jail."

9   Q    You say, "Okay," right?

10  A    And I walked away.

11  Q    Because he doesn't want to talk, correct?

12  A    Right.

13  Q    So you come back after Sergeant Spinos is

14  questioning him, right?

15  A    Yes, I came back.

16  Q    All right.

17       You say, "If that is the case, then why didn't

18  you just stop if you knew that you had already been

19  through this with another agency," right?

20  A    Correct.

21  Q    And then you said that he said, "But I have --

22  because I had a whole iron in the car," right?

23  A    Correct.

24  Q    And what you said in response to that, "So,"

25  is, "So that is why you didn't want to stop?  That
```

```
 1   could have been dealt with in a different way."
 2   Right?
 3   A    Correct.
 4   Q    Okay.  So your response to him telling you, I
 5   have a gun in the car is "That is reason for the
 6   stop?  That could have been held, treated
 7   differently.  That could have been handled in a
 8   different way?"
 9   A    Meaning he didn't have to run, and it could
10   have been dealt with in a different way, correct.
11   Q    So then he says, "I am not talking to you,"
12   right?
13   A    Correct.
14   Q    And then he says, "I am done," right?
15   A    Correct.
16   Q    All right.
17        And so after that you know that then he is
18   taken into -- he is taken by Officers Gilbert and
19   another officer down to the police station, right?
20   Or the jail.
21   A    Correct.
22   Q    You are there when he is booked in, right?
23   A    Correct.
24   Q    And did you ever tell Officer Gilbert that he
25   had told you, "I am not talking to you, I am done?"
```

1   A     No.

2   Q     So did you ever tell at the police station, or

3   the jail, when you and Officer Collombo and Officer

4   Mills are questioning him about putting, testing the

5   gun for fingerprints, did you ever tell him, oh, by

6   way he told me he didn't want to talk to us any

7   more?

8   A     No.

9   Q     All right.

10        So going back to this note on the fifth page of

11   Government's exhibit 13, which is the skinny page.

12        You just found this handwritten note somewhere

13   in the car, right, in the glove -- in the armrest?

14        What else was in the armrest?

15   A     A bunch of miscellaneous stuff of, I guess,

16   like personal items.

17   Q     Just a handwritten note, right?

18   A     Yes.

19   Q     Could have been from a car that Mr. Moore --

20        THE COURT:  All right.  I have a meeting at

21   noon.  You said five minutes.

22        Recess.

23        You may not discuss your testimony with anyone.

24        MS KOENIG:  What time are you do you want us

25   back?

Williams - redirect

 1        THE COURT:  Come back at ten after 1:00.

 2                  (A recess was taken)

 3        All right.  Let's go back to cross examination.

 4   Oh, there you are.  You came back.  Thank you,

 5   ma'am.

 6        Go ahead.

 7        MS KOENIG:  No further questions of Officer

 8   Williams.

 9        THE COURT:  Well, I am glad we took a recess.

10        Mr. Elliker?

11                  REDIRECT EXAMINATION

12   BY MR. ELLIKER:

13   Q    I do have some redirect.

14        Officer Williams, do you recall before the

15   break Ms Koenig asked you if the defendant at one

16   point during this post Miranda conversation

17   indicated that he didn't want to speak to you?

18        Do you remember that?

19   A    I don't recall.  I just remember him saying,

20   "Take me to jail."

21   Q    Okay.

22        If --

23        THE COURT:  Well, I think that is what she

24   said.  He was sitting there in the car and you would

25   talk with him for a while and finally, according to

Williams - redirect

1   your testimony, what he said was, "I am not talking

2   to you.  I am done."

3        THE WITNESS:  Okay.

4        THE COURT:  Do you remember that.

5        THE WITNESS:  Yes.

6        THE COURT:  And then he didn't talk to you any

7   more?

8        THE WITNESS:  Um hum.

9        THE COURT:  And then he went to the police

10  station and they started -- there was some

11  conversation.

12       MR. ELLIKER:  In fact, Your Honor, if we could

13  show Officer Williams' body-camera footage, which is

14  exhibit 12, and start that at, at lest cue it up at

15  2346.

16  BY MR. ELLIKER:

17  Q    Officer Williams, do you recall the defendant

18  asking you what was going to happen to personal

19  effects that had been on him when he was arrested?

20  A    I don't recall.

21  Q    Okay.  Why don't we go ahead and play at 2346.

22       (Being played).

23       Pause it.

24       What was it that he said to you at that moment?

25  A    Just now?

Williams -  redirect

```
 1   Q     Yes.

 2   A     "Remember my face."

 3   Q     Let's play it again.

 4         (Being played).

 5         Let's pause?

 6         THE COURT:  You and he were talking about what

 7   happens to his wallet?

 8         THE WITNESS:  He had a wallet on his person,

 9   yes.

10         THE COURT:  On his person, you mean like in his

11   pocket?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.

14         And you told him that after he made his first

15   phone call the property people at the jail would

16   take it; is that right?

17         THE WITNESS:  I said he could ask them if the

18   person whose wallet it belonged to could come get it

19   from the jail.

20         THE COURT:  Okay.

21         Did you give it back -- did he have it -- he

22   had it back by that time?

23         THE WITNESS:  He had it on his person in the

24   car, yes.

25         THE COURT:  On his person.
```

Williams - redirect

1        THE WITNESS:  In his pocket.

2        THE COURT:  Does that means like in his pocket?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  Thank you.

5    BY MR. ELLIKER:

6    Q    At the tail end of that did the defendant tell

7    you he might see you again?

8    A    Yes.

9    Q    Did he say it might be on a date?

10   A    Yes.

11   Q    Did he say he might try to get pulled over on

12   purpose to see you again?

13   A    Yes.

14   Q    Was the defendant threatening you?

15        THE COURT:  No, I think it was a proposal of

16   marriage, Mr. Elliker.  Of course he was flirting

17   with her.

18   BY MR. ELLIKER:

19   Q    Was all this after Miranda?

20   A    Yes.

21   Q    Thank you.

22        THE COURT:  Well, that opened the door.

23        Does that cross examination raise any further

24   questions by you?

25        MS KOENIG:  No, Your Honor.

Spinos - direct

1      THE COURT:  Okay.  Thank you.

2      May this officer, Officer Williams, be excused?

3      MR. ELLIKER:  Yes, Your Honor.

4      MS KOENIG:  Yes.

5      THE COURT:  Do you have any need for her?

6      Officer Williams, thank you very much for

7   coming.

8      THE WITNESS:  Thank you.

9      THE COURT:  I appreciate you being here today.

10             (Witness stood aside)

11     MR. ELLIKER:  The United States calls Michael

12   Spinos.

13     THE COURT:  How do you spell that?

14     MR. ELLIKER:  S-P-I-N-O-S.

15                  MICHAEL SPINOS

16          AFFIRMED AND TESTIFIED AS FOLLOWS:

17                 DIRECT EXAMINATION

18   BY MR. ELLIKER:

19   Q    Sir, please state your name and spell it for

20   the record.

21   A    It is Michael Spinos.  M-I-C-H-A-E-L.  Last

22   name S-P-I-N-O-S.

23   Q    Are you retired from Richmond Police dis --

24   excuse me, retired from the Richmond Police

25   Department?

Spinos - direct

1   A    Yes, I am.

2   Q    When did you retire?

3   A    June first of this year.

4   Q    After how many years of service?

5   A    Twenty-two years.

6   Q    Were you employed by Richmond Police on

7   December 5, 2020?

8   A    Yes, I was.

9   Q    What was your rank on that date?

10  A    I was sergeant in charge of the Fourth

11  Precinct.

12  Q    Were you on patrol with the Fourth Precinct on

13  of December 5, of 2020?

14  A    Yes, I was.

15  Q    Were you in a vehicle with Officers Collombo,

16  Mills and Williams?

17  A    Yes, I was.

18  Q    And during that shift did you encounter

19  multiple cars with the same temporary tag number on?

20  A    I did.

21  Q    If you could take a look at -- there is skinny

22  notebook in front of you that has a tab 1.

23       It has already been admitted Government's

24  exhibit 1.

25       Does that show the first car that your group of

Spinos - direct

1   officers pulled over with the temporary tag that

2   night?

3   A     Yes, it does.

4   Q     If you look behind --

5         THE COURT:  I was paying attention to the prior

6   witnesses, so I think I know what cars they pulled

7   over in what order and the license plate number.

8   BY MR. ELLIKER:

9   Q     I will skip ahead.  Did the third car attempt

10  to elude police?

11  A     Yes, it did.

12        THE COURT:  I paid attention to that, too.

13  BY MR. ELLIKER:

14  Q     Were you wearing a body-worn camera during that

15  incident?

16  A     Yes, I was.

17  Q     And have you reviewed the footage from that

18  body-worn camera before your testimony today?

19  A     Yes.

20  Q     There should be a disc in front of marked

21  Government's exhibit 11.  Do you recognize that

22  disc?

23  A     Yes.

24  Q     Does that have your body camera footage from

25  the attempted stop of the third vehicle that

Spinos - direct

1    evening?

2    A    Yes, it does.

3    Q    Did you initial it because it is a true and

4    accurate recording of your body camera footage?

5    A    Yes, it is.

6         MR. ELLIKER:  Your Honor, we move exhibit

7    eleven into evidence.

8         MS KOENIG:  No objection.

9         THE COURT:  Admitted.

10        Let me ask you a question.

11        How come when these body camera things video

12   start there is no sound for a while and then there

13   is sound?

14        THE WITNESS:  The way they are designed, when

15   you hit -- so they are on continuously during your

16   whole shift.  When you actually hit the button to

17   start recording it loops back 30 seconds, so it will

18   catch something just prior to you turning it on, but

19   those 30 seconds that loops back doesn't have sound.

20        THE COURT:  And what is it that -- you activate

21   it yourself of does it turn on when you turn on the

22   blue lights?

23        THE WITNESS:  It will activate itself.  Tasers,

24   if someone turns on their Taser, anyone within a

25   close proximity of the Taser will turn on the

Spinos - direct

 1  camera.

 2       THE COURT:  Thank you.

 3  BY MR. ELLIKER:

 4  Q    Now, are you the officer who first detained the

 5  defendant at the end of the pursuit?

 6  A    Yes.

 7  Q    Following the apprehension of the defendant

 8  where did you go?

 9  A    Once other officers got there I turned over

10  custody to them, and I walked back towards the

11  vehicle.

12  Q    Did you observe the temporary tag on the back

13  of the vehicle?

14  A    Yes, I did.

15  Q    If we could show the still of minute marker

16  621.

17       Is this the tag that you observed on the back

18  of the defendant's vehicle?

19  A    Yes, it is.

20  Q    Is it the same tag number you saw on the two

21  cars previously that evening?

22  A    Yes, it is.

23  Q    Now, after observing the tag did you have a

24  conversation with the defendant about his car?

25  A    Yes.

Spinos - direct

1   Q    How did that conversation come about?

2   A    He started asking if there was something wrong

3   with the vehicle.  Because it was resting up against

4   the curb.  And started talking to him about the

5   vehicle.

6   Q    During that conversation did you talk to him

7   about the gun that was found in the car?

8   A    No, I didn't.

9   Q    After you spoke with the defendant did you

10  suggest that another officer read him Miranda?

11  A    Yes, I did.

12  Q    Why did you suggest a different officer read

13  him Miranda rather than doing it yourself?

14  A    Because I am the sergeant in charge of the

15  unit, so I try to stay out of the way of the

16  investigation for the officers.  And at that point

17  just be more of a supportive and, you know, guide

18  with the case instead of getting involved.

19  Q    After the defendant was Mirandaed did he talk

20  with you more about his car?

21  A    He might have made a couple statements about

22  the license plates and the registration, and things

23  like that, yes.

24  Q    Did the defendant ever tell you that he did not

25  want to talk to you or answer your questions?

Spinos- cross

1    A     No.

2    Q     I don't have any other questions for this

3    witness, Your Honor.

4          THE COURT:  All right.

5                     CROSS EXAMINATION

6    BY MS KOENIG:

7    Q     Good afternoon, sir, Sergeant.

8    A     Good afternoon.

9    Q     Sergeant, when you were -- start at the

10   beginning of the encounter with Mr. Moore,

11   December 5 of 2020.  You were riding in a police car

12   with Officer Collombo, Officer Mills and Officer

13   Williams, right?

14   A     Yes.

15   Q     You were in that passenger seat behind the

16   driver, right?

17   A     Back passenger, yes.

18   Q     And when Mr. Moore stopped his car Officer

19   Collombo stopped the car long enough that you and

20   Officer Collombo peeled out, right, and started

21   running?

22   A     Yes.

23   Q     Okay.  You both chased Mr. Moore on foot?

24   A     Yes.

25   Q     And you both had your guns out while you were

Spinos- cross

1  chasing him?

2  A    Not out when I was chasing him, but when I got

3  up to him I did pull a weapon, yes.

4  Q    So not while you were running?

5  A    No.

6  Q    So if your body-worn camera suggests otherwise

7  do you have any reason to refute that?

8  A    No.

9  Q    But if your body-worn camera indicates you had

10 your gun out before you get to him, that is

11 accurate?

12 A    Well, before, yes.  But, I mean, we are kind of

13 splitting hairs.  Initially running, once he started

14 to basically stopped running, and that is when I

15 pulled the weapon to challenge him.

16 Q    Fair enough.  And Officer Collombo had his gun

17 out at that point, too, right?

18 A    I can't say if he did or not.  I was focused

19 more on Mr. Moore.

20 Q    Collombo definitely yells at Mr. Moore, "Get on

21 the ground," right?

22 A    Yes.

23 Q    And you are yelling the same thing, right?

24 A    Yes.

25 Q    You actually grabbed his shirt, run up to him

Spinos- cross

1   and grabbed his shirt and pull him to the ground,

2   right?

3   A    I didn't pull him to the ground, but I was

4   motioning to the ground.  He got down on the ground.

5   He is a pretty tall guy.  I couldn't have pulled him

6   down with one hand.

7   Q    Let's look at Government exhibit 2.

8        Ms Dandridge, if you could pull it up to 5

9   seconds, then, please.

10       I'm sorry.  Government's exhibit 11.

11       (Being played).

12       Okay.  Wait a second.

13       So this -- there is a car that is in front of

14   you at this point, right?

15   A    Yes.

16   Q    Officer Collombo is in front of you at this

17   point, too?

18   A    Yes.

19   Q    The car is being driven by Officer Williams and

20   Officer Mills is in the back seat, right?

21   A    Yes.

22   Q    You are coming around on the left side of this

23   car, right?

24   A    Yes.

25   Q    Keep playing, please.

Spinos- cross

```
 1       (Being played)

 2       Pause.

 3       So we see that you have got your gun out in

 4  your left hand, right?

 5  A    Yes.

 6  Q    You see Mr. Moore has stopped right here.  He

 7  is this individual in the black, white and red

 8  shirt, right?

 9  A    Yes.

10  Q    Keep playing.

11       (Being played).

12       Okay.

13       Pause.

14       To me that looks like you pulled him down,

15  right?

16  A    Okay.

17  Q    Okay.

18  A    But he willingly cooperated what I was saying.

19  Like I said, if he was resisting I couldn't have

20  pulled him by one arm.

21  Q    I'm not trying to get to resisting.

22  A    All right.

23  Q    I'm just --

24  A    No, I just --

25       THE COURT:  All right.
```

Spinos- cross

1      What is pull him down for one person is

2   signaling to get down to another.

3      MS KOENIG:  All right.

4      THE COURT:  In any event, it doesn't appear

5   that Mr. Moore was injured, and it seems to me there

6   are exchanges after that are relatively polite.

7      MS KOENIG:  Sure.

8   BY MS KOENIG:

9   Q   At that point someone else puts Mr. Moore in

10  handcuffs, right?

11  A   Yes.

12  Q   He remains in handcuffs the rest of the evening

13  while he is on that scene, right?

14  A   Yes.

15  Q   He gets immediately from the ground where he's

16  taken down.  When he gets up he is put in a patrol

17  car, right?

18  A   At some point, yes.

19  Q   Then taken to the jail, right?

20  A   Yes.

21  Q   And not a free person at any point after you

22  pull him down to the ground, right?

23  A   Correct.

24  Q   You never read Mr. Moore his Miranda rights

25  that night, right?

Spinos- cross

1    A    No.

2    Q    And you didn't read him Miranda before you

3    pulled him down on the ground, right?

4    A    No.

5    Q    And you didn't read him Miranda after he is put

6    in handcuffs?

7         MR. ELLIKER:  Your Honor, asked and answered.

8         THE COURT:  Well, I don't know whether it was

9    asked and answered, but it is pretty clear he didn't

10   get his Miranda warnings until Officer Williams gave

11   them to him back at the paddy wagon.

12   BY MS KOENIG:

13   Q    And as far as you know, Officer Williams is the

14   only individual who raid Miranda rights that night,

15   right?

16   A    Yes.

17   Q    No further questions.

18        THE COURT:  Thank you.

19        May he be excused?  Mr. Elliker, do you have

20   another question?

21        MR. ELLIKER:  No more questions.

22        MS KOENIG:  He can be excused.

23        THE COURT:  He can leave.

24        Thank you very much.  I hope you are enjoying

25   retirement.

Gilbert - direct

1       THE DEFENDANT:  Yes, sir.

2                  (Witness stood aside)

3       THE COURT:  Call your next witness.

4       MR. ELLIKER:  Your Honor, Government's last

5  witness is Officer John Gilbert.

6       THE COURT:  All right.

7                  JOHN GILBERT

8         AFFIRMED AND TESTIFIED AS FOLLOWS:

9                  DIRECT EXAMINATION

10      THE COURT:  Thank you for coming today, Officer

11  Gilbert. I appreciate it.

12      THE WITNESS:  Yes, sir.

13  BY MR. ELLIKER:

14  Q    Please state your name and spell it for the

15  record.

16  A    John Wheler Gilbert.  J-O-H-N  W-H-E-L-E-R

17  G-I-L-B-E-R-T.

18  Q    And you are you employed by the Richmond Police

19  Department?

20  A    I am, yes, sir.

21  Q    Are you assigned to the Fourth Precinct?

22  A    I am, yes, sir.

23  Q    Were you on patrol on the evening of

24  December 5th of 2020?

25  A    Yes, sir, that is correct.

Gilbert - direct

1    Q    Did you respond to a call for assistance that

2    evening in the Highland Park area of Fourth

3    Precinct?

4    A    I did, yes, sir.

5    Q    What was the call that went out?

6    A    The F. M. T. Tac Unit ended up getting on to a

7    call with a traffic stop, I believe, and I was

8    called to assist for transportation.

9    Q    Were you wearing your body-worn camera during

10   this incident?

11   A    I was.

12   Q    Have you had an opportunity to review that

13   footage before today?

14   A    I have, yes, sir.

15   Q    There should be in front of you a disc that is

16   marked Government's exhibit 14.

17   A    Yes, sir.

18   Q    Do you recognize that disc?

19   A    I do, yes, sir.

20   Q    Does that contain a recording of your body

21   camera footage from this incident that evening?

22   A    It does, yes, sir.

23   Q    Did you initial it because it contains a true

24   and accurate recording of your body-camera footage?

25   A    I did, yes, sir.

Gilbert - direct

1      MR. ELLIKER:  Your Honor, we move Government's

2  exhibit 14 into evidence.

3      MS KOENIG:  No objection.

4      THE COURT:  Admitted.

5  BY MR. ELLIKER:

6  Q    All right.  If we could play the first minute

7  and 20 seconds of Officer Gilbert's footage, please.

8      (Being played).

9      What were you saying "hot dog" in response to,

10 Officer?

11 A    There was a weapon in plain view on the

12 floorboard of the driver's seat, or on the floor

13 board of the driver's side.

14 Q    I think you said earlier that you arrived to

15 provide transportation for the other officers?

16 A    Yes, sir, that's correct.

17 Q    So after this, did you go down to meet the

18 other officers with your vehicle to transport the

19 suspect?

20 A    I did, yes, sir.

21 Q    When you arrived were you asked to stay with

22 the suspect by the officers who were currently

23 holding him in custody?

24 A    Yes, sir, that is correct.

25 Q    If we could go to the three minute 55 second

Gilbert - direct

1    mark, please.

2          THE COURT:  Do you have some kind of special

3    car that is equipped to transport inmates?

4          THE WITNESS:  Yes, Judge, that is correct.  It

5    is a cage-equipped vehicle that allows safe

6    transportation.

7          THE COURT:  Do they still have paddy wagons?

8          THE WITNESS:  We do, yes.

9          THE COURT:  Thank you.

10   BY MR. ELLIKER:

11   Q    Play until four minutes 35 seconds, please.

12         (Being played).

13         All right.  At the very beginning of that did I

14   hear you ask him, "What you running for, man?"

15   A    Yes, sir, that's correct.

16   Q    Did he give you a response to that question?

17   A    He did not, no, sir.

18   Q    Did you question him about his car?

19   A    No, sir, I did not.

20   Q    Who is the other officer who is standing there

21   with you?

22   A    Officer Michael Triano.

23   Q    Did you hear Officer Triano question this

24   defendant about the car?

25   A    He did not, no, sir.

Gilbert - direct

1   Q    As the suspect was on the ground did you or

2   Officer Triano question him about the gun?

3   A    We did not, no, sir.

4   Q    Let's play at six -- six minutes until 645,

5   please.

6        (Being played).

7        Again, during this period any questions posed

8   by officers to the defendant?

9   A    No, sir.

10   Q    Let's go ahead to nine minutes 20 seconds and

11   play for a minute.

12        (Being played).

13        So at this point who comes back into the

14   picture, Officer?

15   A    Officer Keegan Mills.

16   Q    Did you assist Officer Mills as he patted the

17   defendant down?

18   A    I did.

19   Q    As this happening during another civilian

20   arrive on the scene?

21   A    That is correct.

22   Q    Go to eleven minutes and 35 seconds, please.

23        (Being played).

24        So the defendant identified this woman?

25   A    I believe he said it was his cousin.

Gilbert - direct

```
 1   Q     Did your body-worn camera capture statements
 2   the defendant made to his cousin?
 3   A     Yes, sir, it did.
 4   Q     Let's play 1255 until 1315.
 5         (Being played).
 6         THE COURT:  Is this when he told the cousin
 7   "Someone must we telling me?"
 8         MR. ELLIKER:  Yes.
 9         THE COURT:  I remember that.  Move on.
10         MR. ELLIKER:  I will move on.
11   BY MR. ELLIKER:
12   Q     Did you subsequently assist putting the
13   defendant in the back of your vehicle?
14   A     I did, yes, sir.
15   Q     During that time did he make requests that
16   Officers reset the handcuffs?
17   A     He did, yes, sir.
18   Q     Did officers reset those handcuffs?
19   A     Yes, sir, that is correct.
20   Q     Did officers during that entire stretch ask him
21   any questions about the gun in the car?
22   A     No, sir.
23   Q     If we go to -- as you -- and then once he was
24   in the back of your vehicle where did you take him?
25   A     Once he was back in the rear of the vehicle we
```

Gilbert - direct

1  brought him back out to where his vehicle was

2  located.

3  Q    Let's play 1620 until about 1640.

4       (Being played).

5       What is the defendant asking you about here?

6  A    He asked me if his car was going to be towed.

7  Q    After this did you step out of the vehicle?

8  A    I did, yes, sir.

9  Q    Where did you stand?

10 A    To the front of the vehicle on the right side.

11 Q    Did you observe other officers in conversation

12 with the defendant?

13 A    I did, yes, sir.

14 Q    Play 1735.

15      THE COURT:  Before you get to that, is there an

16 exception that allows law enforcement officers to

17 use their cell phones while they are driving?  An

18 exception to the law?

19 A    I find a way, Judge, on that.

20      THE COURT:  Thank you.

21 BY MR. ELLIKER:

22 Q    1735 and play that until 1804, please.

23      (Being played).

24      Who was it you were referring to as "sergeant"

25 in this clip?

Gilbert - direct

1    A    Sergeant Spinos.

2    Q    At the end of this clip who is it that Sergeant

3    Spinos is talking?

4    A    To the defendant.

5    Q    Why did he start talking to the defendant?

6    A    It appeared that the defendant engaged Sergeant

7    Spinos as we were talking.

8    Q    And were you close enough for your body-worn

9    camera to see some of this conversation?

10   A    Yes, sir.

11   Q    If we can play 1804 until 1949.

12        (Being played).

13        Now, during this time period were you

14   participating in any conversations with the

15   defendant?

16   A    I was not, no, sir.

17   Q    At the very end here, who is standing next to

18   the car window with the flashlight?

19   A    Officer Williams.

20   Q    What is Officer Williams doing?

21   A    Reading him Miranda.

22   Q    Now, at that point going forward you are aware

23   the defendant has been read his Miranda rights?

24   A    That is correct, yes, sir.

25   Q    Did anyone tell you the defendant refused to

Gilbert - direct

1  answer questions?

2  A     No, sir.

3  Q     Did you observe the defendant talking with

4  other officers after he had been read his Miranda

5  rights?

6  A     I did, yes, sir.

7  Q     If we can go to 2129, please.

8        (Being played).

9        So is this conversation happening post Miranda,

10 Officer Gilbert?

11 A     It is, yes, sir.

12 Q     Now, after this did you take the defendant to

13 lockup?

14 A     I did, yes, sir.

15 Q     While he was in the back of your car did the

16 defendant engage you in a conversation?

17 A     He did, yes, sir.

18 Q     Let's go to 2838 and play until 2916.

19       (Being played).

20       So, here, what was he asking about, Officer

21 Gilbert?

22 A     He first asked if his phone was in his car, if

23 somebody had his phone.

24 Q     What did he ask you after that?

25 A     Afterwards he asked where his wallet was.

Gilbert - direct

1  Q    Did you ask him any questions during this?

2  A    No, sir.

3  Q    After this did you ask him a question?

4  A    After this, yes, sir, I did.

5  Q    Let's just pick up and play.

6       (Being played).

7       What did you ask him?

8  A    I asked why he ran.

9  Q    What did he say in response?

10 A    He stated, "You know how it is when you have a

11 gun in the car."

12 Q    Now, let's play on from this point 2926 until

13 3008.

14      (Being played).

15      Did the defendant admit that he is a convicted

16 felon?

17 A    He did, yes, sir.

18 Q    Did he admit to you that he knew he could not

19 have a gun?

20 A    He did, yes, sir.

21 Q    Did all of these admissions happen after you

22 saw the defendant had been read his Miranda rights?

23 A    Yes, sir.

24 Q    Did any officer ever tell you the defendant did

25 not want to answer questions?

Gilbert - cross

1    A    No, sir.

2    Q    Did the defendant ever tell you he did not want

3    to answer questions?

4    A    No, sir.

5         MR. ELLIKER:  I have no further questions, Your

6    Honor.

7         THE COURT:  All right.

8                   CROSS EXAMINATION

9    BY MS KOENIG:

10   Q    Good afternoon, Officer Gilbert.

11   A    Good evening, ma'am.

12   Q    When did you graduate from the police academy?

13   A    July of 2020, ma'am.

14   Q    Oh, last summer?

15   A    Yes, ma'am.

16   Q    You were freshly minted.

17   A    Yes, ma'am.

18   Q    And at the police academy they spent quite a

19   bit of time talking to you about Constitutional

20   rights?

21   A    Yes, ma'am.

22   Q    One of those rights is the right for a criminal

23   defendant to remain silent, right?

24   A    Yes, ma'am.

25   Q    And you know that when we are talking about

Gilbert - cross

1    Miranda, Miranda warnings are that somebody has the

2    right to remain silent, they have the right to have

3    counsel, and if they can't -- with them during

4    questioning, and if they can't afford a lawyer then

5    one will be appointed for them, right?

6    A    Yes, ma'am.

7    Q    You are taught those, right?

8    A    Yes, ma'am.

9    Q    And you know that when someone says they want

10   to remain silent, you have to honor that right?

11   A    Yes, ma'am.

12   Q    And if someone had told you that after being

13   read his Miranda rights that Mr. Moore said, "I am

14   not talking to you, I am done," you wouldn't have

15   asked him that question about why he was running,

16   right?

17   A    If I was told that he didn't want to speak

18   further, no, ma'am.

19   Q    Okay.  And you never read Mr. Moore his Miranda

20   rights?

21   A    I did not, no, ma'am.

22   Q    No further questions.

23        THE COURT:  Thank you.

24        Any redirect?

25        MR. ELLIKER:  No, Your Honor.

Hush - direct

1          THE COURT:  All right.

2      May he excused?

3          MR. ELLIKER:  Yes.

4          THE COURT:  Ms Koenig, do you need him?

5          MS KOENIG:  I don't.

6          THE COURT:  All right, sir, thank you very much

7      for coming.  Very nice to see you.  And have a good

8      rest of the day.

9          THE WITNESS:  Thank you, sir.

10                  (Witness stood aside)

11         THE COURT:  All right.  That is it for you?

12         MR. ELLIKER:  Yes, sir.  I would like to

13     confirm that Government's exhibit one through 14

14     have been admitted.

15         THE COURT:  Are they all in?

16         THE CLERK:  Only question was about five.

17         MS KOENIG:  I had no objection to five, Your

18     Honor.

19         THE COURT:  They are all in.

20         MR. ELLIKER:  Thank you.

21         THE COURT:  All right.

22     Do you have witnesses?

23         MS KOENIG:  One witness.  Lee Hush.

24                   LEE HUSH

25              AFFIRMED AND TESTIFIED AS FOLLOWS:

Hush - direct

```
 1                    DIRECT EXAMINATION
 2    BY MS KOENIG:
 3    Q    Good afternoon, Mr. Hush.
 4    A    Good afternoon.
 5    Q    Can you state your name for the record, please?
 6    A    Lee Hush.
 7    Q    How do you spell the last?
 8    A    H-U-S-H.
 9    Q    Where do you work, Mr. Hush?
10    A    Investigator with the Federal Public Defender
11    Office here in Richmond.
12    Q    How long have you been with that office?
13    A    I have been with this particular office, which
14    opened in October of 2001.
15    Q    And before you that other investigative
16    experience?
17    A    Correct.
18    Q    As part of your work with the Federal Public
19    Defender Office have you been investigating this
20    case against Mr. Moore?
21    A    Yes.
22    Q    As part of the investigation into Mr. Moore's
23    case did you collect a copy of a speeding ticket
24    that Mr. Moore got in Hanover County on October 9th
25    of 2020?
```

Hush - direct

1   A     Yes.

2   Q     Let's look at what has been marked as exhibit

3   A.  It is in the bigger binder in front of you.

4         Do you recognize what is in exhibit A?

5   A     Excuse me.

6   Q     We have a few things up there.

7   A     Did you ask if I recognize it?

8   Q     Yes.  Do you recognize what is in exhibit A?

9   A     Yes, ma'am.

10  Q     What is in exhibit A?

11  A     It is scanned copies of two summonses out of

12  Hanover County; one for reckless or speeding

13  violation, and one for driving on a suspended

14  license or revoked license.

15  Q     Is this the scanned copy of the copy of there

16  ticket Mr. Moore had given you?

17  A     That's correct.

18  Q     I move for admission, Your Honor, of exhibit A.

19        THE COURT:  Admitted.

20  BY MS KOENIG:

21  Q     I want to look closely at the first page of

22  exhibit A.  Do you see on the right hand side where

23  it has in pre-printed letters, license number?

24  A     Yes.

25  Q     What is that license plate number listed?

Hush - direct

1    A    111-34Y.

2    Q    What is the make of the car that is listed off

3    to the left there of those letters?

4    A    Chrysler.

5    Q    What is the year as far as we can tell?

6    A    2006.

7    Q    Okay.

8         What is the date of that offense below that

9    area?

10   A    It is hard for me to tell.  Looks like

11   October 8.  October 9 of 2020.

12   Q    Going to the third page of exhibit A, is that a

13   second summons that was issued at that time?

14   A    That's correct.

15   Q    Does that contain the same license and make and

16   year information?

17   A    Yes, it does.

18   Q    Did you review the on-line charges filed

19   against Mr. Moore in Hanover County based on that

20   same traffic stop?

21   A    Yes, I did.

22   Q    Did Hanover ticket Mr. Moore for anything

23   related to the temporary tag on his car?

24   A    No, there is just these two corresponding

25   charges.

Hush - direct

```
 1    Q    I want to turn your attention now to the Fourth

 2    Precinct Focus Mission Team.  As part of the

 3    investigation in this case where we interested in

 4    the racial make up of the area that the Fourth

 5    Precinct, Four Police Precinct was working in on

 6    December 5 of 2020?

 7    A    Yes, we were.

 8    Q    And did we subpoena records relating to all

 9    citizen encounters from the Richmond Police

10    Department Fourth Focus Mission Team from that day

11    up until 9:45 p.m.

12    A    We did.

13    Q    In response to that did we get some materials

14    from Richmond Police Department?

15    A    Yes, we did.

16    Q    And I want to turn your attention to what has

17    been marked as exhibit I.

18         Exhibit I.  Do you recognize exhibit I?

19    A    Yes, I do.

20    Q    Are those materials we received in response to

21    the subpoena from the Fourth Precinct Focus Mission

22    Team activities on December 5?

23    A    Yes, they are.

24         MS KOENIG:  I move admission of exhibit I.

25         THE COURT:  Admitted.
```

Hush - direct

1   BY MS KOENIG:

2   Q     Does exhibit I, which has -- look at the top,

3   first page of exhibit I, do you see that in the

4   upper right hand side it says case number?

5   A     Yes.

6   Q     What is the last four digits of that case

7   number?

8   A     0464.

9   Q     Does this incident report reflect an incident

10  that began with a traffic stop?

11  A     It appears to, yes.

12  Q     Does it indicate where the stop happened?

13  A     It does.

14  Q     Does the report indicate what the basis of the

15  traffic stop was?

16  A     Yes, it does.

17  Q     What was the basis?

18  A     Officers observed vehicle driving with no

19  headlights on.

20        THE COURT:  Where does it say that?

21  BY MS KOENIG:

22  Q     I believe, Mr. Hush, are you looking at the

23  third page under officer narrative?

24        THE COURT:  Okay.

25        THE WITNESS:  That's correct.

Hush - direct

1    BY MS KOENIG:

2    Q    Does officer -- does exhibit I indicate in

3    anyplace the race, gender, and age of the driver of

4    the car?

5    A    Not that I am aware of.  Not that I saw.

6    Q    All right.

7         On the next, on the page five of the report

8    where it says incident report suspect list, does it

9    indicate, exhibit I indicate the age, race and sex

10   of the passenger of the car?

11   A    Yes, it does.

12   Q    Okay.  That Is a 33 year old black man?

13   A    Correct.

14   Q    Did the officers end up searching this car?

15   A    Yes, they did.

16   Q    I am going to turn your attention now to what

17   has been marked exhibit 0.

18   A    Okay.

19   Q    Do you recognize what is in exhibit O?

20   A    This is more of the documentation we received

21   to our subpoena.

22   Q    From the Richmond Police Department?

23   A    Correct.

24        MS KOENIG:  I move admission of exhibit O.

25        THE COURT:  Admitted.

Hush - direct

 1  BY MS KOENIG:

 2  Q    Mr. Hush, at the top of the first page of

 3  exhibit O do you see where it says 202012050574?

 4  A    Yes.

 5  Q    Is that -- does this record indicate that that

 6  incident number that ends in 0574, did that begin

 7  with a traffic stop?

 8       Do you see at the top it says TSOI, traffic

 9  stop?

10  A    Yes, just after that says traffic stop, yes.

11  Q    Does anywhere in this exhibit indicate the

12  basis for the traffic stop?

13  A    Not that I would be able to determine.

14  Q    Does it indicate race, gender or age of the

15  driver?

16  A    No.

17  Q    Okay.  I want to turn your attention now to the

18  University of Virginia racial dot map.  What is the

19  University of Virginia racial dot map?

20  A    There is a center at University of Virginia

21  called the Weldon Copper School for Public Services.

22  Q    What did they do with the 2010 census data?

23  A    They took a bunch of different demographic data

24  and did various things, one of which was pinpoint by

25  race each individual who answered the census in the

Hush - direct

1    United States.

2    Q    I want to show you what has been marked as

3    exhibit R 1.

4         Do you recognize what is in exhibit R 1?

5    A    Yes, I do.

6    Q    What Is it?

7    A    This is a drill down to a specific area in

8    Richmond from that census block data map.

9    Q    From the UVA racial dot map?

10   A    That's correct.

11        MS KOENIG:  Your Honor, I move to admit R 1?

12        MR. ELLIKER:  Your Honor, I think this is

13   irrelevant.

14        THE COURT:  Well, I think what -- okay.  I am

15   not sure that it is going to get her too far in this

16   case, but I have a sense, sneaky suspicion that she

17   is creating a record for me, or perhaps a higher

18   court to judge the legitimacy of the tactics by the

19   police.

20        Is that fair to say?

21        MS KOENIG:  That's correct, Your Honor.

22        THE COURT:  Let it go.  It's not like we are in

23   front of a jury.

24   BY MS KOENIG:

25   Q    Mr. Hush, in the census, in the UVA racial dot

Hush - direct

1   map, did UVA plot racial people who were living in

2   certain areas according to different colors based on

3   their race?

4   A    Yes, they did.

5   Q    What color did green depict?

6        THE COURT:  I can read the key on the map.  I

7   went to William and Mary.  I can understand that.

8   BY MS KOENIG:

9   Q    Mr. Hush, have you reviewed the location of all

10  of the stops that we received information for in

11  response to our 16 F from the Richmond Police

12  Department?

13  A    Yes, I have.

14  Q    Did all of the stops fall within what we see is

15  the predominantly green area in R 1?

16  A    Yes, they did.

17  Q    I want you to take a look at what has been

18  marked as our defense exhibit R 2.  What do you see

19  in defense exhibit R 2?

20  A    Just a broader picture of the Richmond area

21  with that same dot census map.

22  Q    From the UVA Racial dot map?

23  A    Yes.

24       MS KOENIG:  I move to admit R 2.

25       THE COURT:  All right.  It's admitted.

Hush - direct

1      MR. ELLIKER:  Subject to the same objection.

2 Thank you.

3      THE COURT:  I understand.

4 BY MS KOENIG:

5 Q    Mr. Hush, I am going to turn your attention now

6 to what is in exhibit X, which is --

7 A    F or X?

8 Q    X as in xylophone, which has been previously

9 admitted.

10 A    Okay.

11 Q    Do you recognize these as the four precincts,

12 police precincts from Richmond Police Department?

13 A    Yes, ma'am.

14 Q    If you were to overlay precincts two, four

15 and -- four, two and one; four, one, and two, I

16 guess, do those precincts, four, one and two,

17 correspond to what we see as the green areas of the

18 map on R 2?

19 A    Sorry.  Four, one and two?

20 Q    Yes.

21 A    They would fall into what is predominantly the

22 green areas.

23 Q    The blue area on the map, which is to the left

24 of where we see Richmond, that would be Precinct

25 Three?

Hush - direct

1   A      Roughly, yes.

2   Q      Okay.

3          Also through your investigation in this case

4   did you become aware of Community Policing Act of

5   2020?

6   A      Yes.

7   Q      What is that?

8   A      A law that was passed in 2020 by the Virginia

9   legislature to compile various data in traffic

10  stops.

11  Q      Was that law effective January 1st of 2020?

12  A      Yes, it was.

13  Q      Did part of the Community Policing Act require

14  the creation of an open source data base?

15  A      It did.

16  Q      To hold the data collected in response to the

17  law?

18  A      That is my understanding, yes.

19  Q      And did you access that data base to determine

20  information about the traffic stops that Richmond

21  Police Department is collecting?

22  A      Yes, that data base is maintained by Virginia

23  State Police, and it is on line if --

24  Q      And I want to show you what has been marked, or

25  what has been marked as exhibit Y 1.

Hush - direct

1   A    Okay.

2   Q    Do you recognize what is in this exhibit?

3   A    Yes.

4   Q    Is this a screen shot that is taken from that

5   open source data that is in response to the

6   Community Policing Act?

7   A    Yes, it is.

8   Q    And the filter at top indicates that the

9   filters for this data are Richmond Police Department

10  from dates July 1st of 2020 to December 5 of 2020?

11  A    It is cut off.  It says December 5, but that is

12  December 5 of 2020.

13  Q    Okay.  And that indicates that stops by race by

14  the Richmond Police Department from those dates was

15  76 percent people of the African-American race?

16  A    Yes.

17       MS KOENIG:  Judge, I move to admit defendant's

18  exhibit Y 1.

19       MR. ELLIKER:  Subject to the objection that it

20  is irrelevant to the Constitutional issues before

21  The Court.

22       THE COURT:  Admitted.

23  BY MS KOENIG:

24  Q    Mr. Hush, I want to turn your attention to Y 2.

25  A    Okay.

Hush - direct

```
 1   Q    Do you also recognize this as a screen shot
 2   from the open source data base that you had accessed
 3   before?
 4   A    Yes, the same incident date with the 2020 cut
 5   off on the December date.
 6   Q    With the same filter that we were just talking
 7   about?
 8   A    Yes.
 9   Q    Does that indicate that 84 percent of the cars
10   that were stopped were not searched?
11   A    Yes, that is what it indicates.
12   Q    Meaning only 16 percent are searched?
13   A    Yes.
14   Q    And have you also reviewed as part of your
15   investigation into this case the census data from
16   the United States census Bureau Quick Facts in 2019?
17   A    I did.
18   Q    Did that indicate what percentage of Richmond
19   is composed of white people and black people?
20   A    It does.
21   Q    What did those rough percentages?
22   A    Depending on how you define white, it could be
23   as low as 42 percent or as high as 46 depending on
24   if you include Hispanic population or not.
25   Q    What is the black population of Richmond?
```

Hush - direct

1   A      Roughly 47 to 48 percent.

2          MS KOENIG:  No further questions, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Mr. Elliker, do you have any questions?

5          MR. ELLIKER:  No questions, Your Honor.

6          THE COURT:  All right.

7          Thank you, Mr. Hush.  Thank you very much.

8   Have a good rest of the day.

9          And he may be excused?

10         MS KOENIG:  He can, Your Honor.

11         MR. ELLIKER:  Yes, Your Honor.

12         THE COURT:  Thank very much, sir.  Have a good

13  rest of the afternoon.

14                  (Witness stood aside)

15         THE COURT:  All right.

16         Do you have any other witnesses?

17         MS KOENIG:  No other witnesses, Your Honor.

18         THE COURT:  All right.

19         Well, I have a sentencing at 2:00 o'clock.

20         Let's sort of figure out where we are going to

21  go from here.

22         Do you have additional argument, Ms Koenig,

23  beyond what is in the written motion?

24         MS KOENIG:  Your Honor, I will be frank that

25  most of the evidence that I have presented to The

 1    Court today I got within the last few days, and so I

 2    do believe I may have some additional arguments that

 3    may merit additional briefing that could be helpful

 4    for The Court.

 5        THE COURT:  All right.

 6        MS KOENIG:  So I guess I am asking for an

 7    opportunity to submit a supplemental motion to

 8    suppress evidence based on the evidence as was

 9    given, and I would appreciate being able to have --

10        THE COURT:  You may file a supplemental brief

11    in support each of those.

12        MS KOENIG:  It may be helpful to have the

13    transcript to be able to cite --

14        THE COURT:  As part of a gift to my law clerk I

15    will allow you to file a brief within seven days.

16        Okay.

17        Mr. Elliker, you can file a response brief

18    three days after that.

19        MR. ELLIKER:  Four days?

20        THE CLERK:  Seven and four, that's 11.

21        MS KOENIG:  Your Honor, I do see Mr. Halasz is

22    shaking his --

23        THE COURT:  What?

24        MS KOENIG:  -- I do see that Mr. Halasz is

25    shaking his head at me that we wouldn't be able to

1   get a transcript within that time frame, so it would

2   have to be relying on my notes.

3        THE COURT:  You have to rely on your memory.

4        MS KOENIG:  Thank you.

5        THE COURT:  Don't worry about it.

6        I am sure your memory will be pretty good in

7   that short period of time.

8        Anything else?

9        MR. ELLIKER:  No, Your Honor.  Thank you.

10       THE COURT:  Let me just say, Ms Koenig, I

11  understand what the law to be, that if the police

12  can come up with evidence that some kind of crime or

13  offense, they can stop somebody, and then they can

14  certainly look in their car from the outside.

15       Do you disagree with that?  That is pretty much

16  what the Supreme Court has said, isn't it?

17       MS KOENIG:  So, I think this is little bit more

18  of a complicated question.

19       THE COURT:  Start with that proposition.  If

20  that proposition is true.

21       MS KOENIG:  So, I will agree with The Court

22  that Wren versus United States allows the government

23  to, the police officers to stop cars under what we

24  would call pre-textual circumstances.

25       THE COURT:  All right.

```
 1        MS KOENIG:  Wren versus United States also had

 2   a stop that was committed based on probable cause

 3   that some traffic violation had actually been

 4   committed.  I will also submit to The Court that the

 5   evidence before this Court, and the evidence that is

 6   growing before other courts, is significantly

 7   different than what was before those courts at that

 8   time.  And so the government has made, you know,

 9   arguments about Hodari D., which I just don't think

10   applies in this circumstance.  And I have some cases

11   that will make clear to The Court why that is.

12        But law has evolved over time to denigrate the

13   rights of minority citizens, and it is done so in

14   such a way that it is often lawyers like myself

15   coming up and making those arguments but without

16   evidence that shows that.  I think I have it in this

17   case.  So, I want to be able to present to The Court

18   a more complete picture about what I think the law

19   is, and potentially where it needs to go.

20        THE COURT:  Well, so your point in this case is

21   that while, yes, they can search anybody's car they

22   want to, they can't go around picking

23   African-American people, or picking on people in the

24   African-American community because, you know, I must

25   say, I looked at those charts from the Weldon Cooper
```

1    Institute and I was pretty well shocked there are

2    absolutely no Caucasians that live in Highland Park,

3    and very few African-Americans that live over there

4    on the other side of Broad Street, but --

5         MS KOENIG:  I think, Your Honor -- so, I am not

6    in a position where I am at a case where there is

7    like clearly, you know there is something that would

8    be just unquestionable, like a stop.  My position

9    is, and I think the evidence will show, has shown,

10   that this is a questionable stop at best.  In that

11   circumstance what we have is we do have to look at

12   both pieces of this.  The cases that have come

13   before The Court so far have not had that

14   circumstance when it is resolved against the

15   defendant.  We are talking about pre-textual stops,

16   something that is a clear violation of the law.  I

17   don't think that that is what we have here.

18        THE COURT:  Okay.  Well, you know, as I

19   understand the law that has been given to me by the

20   Supreme Court and the Court of Appeals, it looks

21   like you don't win this motion.  But, I hope you do.

22        If not here, in the Fourth Circuit or the

23   Supreme Court.

24        MS KOENIG:  I appreciate that, Your Honor.

25        THE COURT:  All right.

1          Mr. Elliker.  Thank you all very much.

2          Let's recess court.

3

4                       HEARING ADJOURNED

5     THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

6                  GILBERT FRANK HALASZ, RMR

7                   Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

index

| Witness - event        | pg  | ln  |
|------------------------|-----|-----|
| Collombo - direct      | 7   | 8   |
| Collombo - cross       | 21  | 8   |
| Collombo - redirect    | 46  | 2   |
| Mills - direct         | 48  | 10  |
| Mills - cross          | 57  | 8   |
| Mills - redirect       | 91  | 11  |
| Torres - direct        | 93  | 17  |
| Torres - cross         | 100 | 22  |
| Williams - direct      | 101 | 22  |
| Williams - cross       | 113 | 14  |
| Williams - redirect    | 129 | 12  |
| Spinos - direct        | 133 | 6   |
| Spinos - cross         | 139 | 6k  |
| Gilbert - direct       | 145 | 7   |
| Gilbert - cross        | 155 | 8   |
| Hush - direct          | 157 | 24  |