IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:21-cr-42 |
| | ) | |
| KEITH RODNEY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SUPPLEMENTAL RESPONSE TO MOTION TO SUPPRESS
EVIDENCE AND STATEMENTS**

The defendant has raised Fourth and Fifth Amendment-based arguments to suppress

evidence found in his car and statements he made in the presence of officers.  His supplemental

brief refines some of his suppression contentions following the presentation of evidence at the

suppression hearing.  For the reasons given in the government's opposition and below, the Court

should deny those requests.  The defendant now also raises an equal protection argument to seek

dismissal of the indictment against him.  The Court should reject that argument as untimely.  But

even on the merits, the defendant falls far short of the standard for proving a selective

enforcement claim, so the Court should deny that motion, too.

**Argument**

I.      **Police did not obtain evidence from the defendant's car—abandoned during his
        headlong flight from police—in violation of the Fourth Amendment.**

The defendant insists that police seized the firearm and other evidence from his car in

violation of the Fourth Amendment's protection against unreasonable searches and seizures.  But

the law does not support his arguments.  The simplest analysis here is also the correct one:  The

1

defendant was not seized until he was caught at the end of the foot chase.[1]  By the time he was seized, police had lawful and constitutional bases to do so—not only reasonable suspicion from the fake 11134Y temporary tag, but also probable cause for evading police, running multiple stop signs, and recklessly speeding through a residential neighborhood.  And by that time, the evidence he now seeks to suppress was two blocks away from where he had sprinted during his flight, sitting in his car with the door wide open and the engine still running.

There is no applicable case—from the Supreme Court, the Fourth Circuit, or anywhere else—that requires the suppression of the evidence found in the defendant's car.  Indeed, the defendant's arguments to the contrary tilt against binding precedent.  The Court should reject his motion.

> **A.** **Under *Hodari D.*, the Fourth Amendment analysis hinges on the moment the defendant was seized, not the moment officers commanded him to stop.**

The *Hodari D.* case explains the standard for when a defendant is seized under the Fourth Amendment:  when police apply physical force or, in the absence of physical force, when he submits to the assertion of authority.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (explaining that, in the absence of physical force, seizure requires both a police command to stop and submission to that command).  No doubt, the police made an assertion of their authority in this case by turning on their lights and signaling for the defendant to pull over.  But the defendant was not seized at that moment

---

[1] On this point, the parties appear to agree.  *See* Def. Reply 2 ("The question in this case is not then whether Mr. Moore was seized, but rather whether the events between when the police officers initiated the traffic stop and *when they ultimately seized Mr. Moore* negate the illegality at the inception.") (emphasis added); Def. Supp. Br. 13 ("Here, after the police chased Mr. Moore, tackled him, arrested him, and put him in handcuffs in the back of a police car, *he was certainly seized*.").

because he did not comply.  *See United States v. Smith*, 396 F.3d 579, 586 & n.5 (4th Cir. 2005) (finding no seizure when police activated lights but car continued driving).

The defendant insists that *Hodari D.* is irrelevant here.  By his telling, that case was solely about "whether the officer had arrested the kid"—a defendant who dropped drugs after he saw police approaching—"simply by chasing after him."  Def. Supp. Br. 3.  But the very first sentence of the Supreme Court's analysis shows why that case decides this one:  "As this case comes before us, the only issue presented is whether, at the time he dropped the drugs, [the defendant] had been 'seized' within the meaning of the Fourth Amendment."  *Hodari D.*, 499 U.S. at 623.  "If not," the Court explained, "the drugs were abandoned by [the defendant] and lawfully recovered by the police, and the evidence should have been admitted."  *Id.* at 624.  Ultimately, the Court held that defendant had not been seized because he did not submit to the officers' commands that he stop running, so the evidence he discarded during his flight should not be suppressed under the Fourth Amendment.  *Id.* at 626.  Just so here.

While ignoring *Hodari D.*, the defendant places great weight on cases explaining "that traffic stops must be valid from inception."  Def. Supp. Br. 2.  But to be clear, *there was no traffic stop* here.  At most, police *attempted* to stop the defendant, "and the Supreme Court has held that the Fourth Amendment does not protect attempted seizures."  *Stover*, 808 F.3d at 997.  The defendant's reliance on "inception" precedent is thus misplaced.  Those cases examined the constitutionality of traffic stops where drivers complied with the command to pull over—and were thus seized—and police subsequently identified additional bases for suspicion.  Those cases did not involve drivers eluding police.[2]

---

[2] *See United States v. Bernard*, 927 F.3d 799, 802 (4th Cir. 2019) (describing police basis for conducting the traffic stop and additional behavior observed after the driver pulled over);

Throughout his briefing, the defendant has conflated the initiation of a traffic stop with the "inception" of a Fourth Amendment seizure, thereby treating as identical the moment the police turn on their lights to signal the driver to pull over and the moment the driver pulls over. Indeed, in his reply brief the defendant claimed, "there is no principled basis for prohibiting" "unreasonable stops" but not "unreasonable orders to stop." Def. Reply 2. But *Hodari D.* makes that principled distinction:  the Fourth Amendment "does not remotely apply … to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. *That is no seizure.*"  *Hodari D.*, 499 U.S. at 626 (emphasis added).  The defendant's request to treat "stops" and "orders to stop" as the same is thus foreclosed by *Hodari D*—precedent that the Supreme Court just reaffirmed.  *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (reaffirming that under *Hodari D.*, where police make a show of authority and there is no compliance, there is no seizure).

To be sure, police had sufficient justification to signal the defendant here to pull over and, had he complied, to briefly detain him to investigate the temporary tag.  *See infra* Part I-C. In that hypothetical situation, as in most traffic stops, the moment of "initiation" by police and "inception" of the seizure would be essentially identical.  But because the defendant refused to

---

*United States v. Jeffus*, 22 F.3d 554, 556 (4th Cir. 1994) (same); *United States v. $45,000 in U.S. Currency*, 749 F.3d 709, 711 (8th Cir. 2014) (same in civil in rem forfeiture proceeding). Additionally, several cases cited by the defendant for his "inception" argument do not actually stand for the points he touts them for.  *Compare United States v. Williams*, 843 F. App'x 111, 112 (10th Cir. 2021) (reversing suppression determination that government conceded hinged on whether officers had reasonable suspicion that a specific murder suspect was in the vehicle), *with* Def. Supp. Br. 4 (claiming *Williams* was about an unlawful stop "where police followed a car they lacked reasonable articulable suspicion to pull over until it committed a traffic infraction"); *compare United States v. Esteban*, 283 F. Supp. 3d 1115, 1129 (D. Utah 2017) (holding that an officer "provoked to two-second traffic violation" by quickly driving up behind the defendant, which reasonably led the defendant to believe the officer "wanted his vehicle to move out of the way as soon as possible"), *with* Def. Supp. Br. 4 (claiming *Esteban* was about an officer "who followed the driver until driver committed traffic infraction").

4

pull over, he was not seized.  Accordingly, the basis for initiating the *attempted* traffic stop does not dictate whether the seizure of evidence he discarded while fleeing was constitutional.  To hold otherwise would fly in the face of *Hodari D.*, where the collection of discarded evidence was upheld even when police conceded they lacked reasonable suspicion to command the defendant to stop.  *Hodari D.*, 499 U.S. at 623 n.1.[3]

### B.   By the time police seized the defendant, he had abandoned his car and the property within it—including his gun.

During his brief, reckless flight from police, the defendant crashed his car into a curb, jumped out while the engine stayed running, left the door wide open, and ran two blocks down the street to try to get away.  As explained in the government's opposition brief, the defendant abandoned his car to elude the police and left the gun in plain view.  *See* Opp'n Br. 7–8.  There is therefore no basis to suppress the evidence he left behind.  *See, e.g.*, *United States v. Hopkins*, 568 F. App'x 214, 216 (4th Cir. 2014) ("When Hopkins fled from the police, he abandoned his

---

[3] The defendant raises a suggestion, both fanciful and unburdened by legal authority, that a driver must be allowed to raise a Fourth Amendment challenge to an attempted traffic stop even when he refuses to pull over so that he can claim his flight was the fruit of unconstitutional police conduct. Def. Supp. Br. 2–3.  But *Hodari D.* answers this concern, too, within the framework of the exclusionary rule's focus on deterrence:

> Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged.  Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

*Hodari D.*, 499 U.S. at 627.  In other words, the defendant would create an incentive for drivers to elude police based on their own personal beliefs that attempted stops are unlawful, but that regime would be both dangerous to public safety and pointless as a matter of Fourth Amendment jurisprudence.

car, thereby forfeiting any privacy interest in the car or its contents."); *United States v. Kirlew*, 291 F. App'x 536, 538 (4th Cir. 2008) ("[A]bandonment may be found where a fleeing defendant relinquishes an object to make his flight easier.").

The defendant's only response to this line of authority hinges on the assumption that the police officers engaged in "lawless conduct." Def. Supp. Br. 8–9 ("But for the invalid traffic stop, Mr. Moore would not have left his car with the door wide open."). As explained below, police did not engage in any lawless conduct by attempting to pull the defendant over. What's more, the defendant's characterization of the events suggesting he hadn't abandoned his property—he "left his car and its contents parked by the side of the road," Def. Reply 5, and "was gone from the car for a matter of minutes," Def. Supp. Br. 9—is belied by the evidence shown to the Court. This was not a driver who briefly double-parked his car to run a quick errand. He jumped out of a still-running car after it crashed because he wanted to get away from the police.[4] He abandoned that property to make his flight easier. He cannot now claim he'd just left it behind for a moment because he was unsuccessful in eluding capture. *See Stover*, 808 F.3d at 1001 (recognizing that "under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply").

### C.    In all events, the defendant is wrong that police lacked reasonable suspicion to initiate the traffic stop based on the fake temporary tag.

Although this case calls for a faithful application of *Hodari D.*, there is an important distinction here that makes the case for denying suppression even stronger: unlike the officers in

---

[4] Evidence before the Court reveals the defendant admitting as much. *See* Ex. 12 at 30:14–30:37 (telling Officer Gilbert that if he had seen the curve he crashed into, he would have escaped the police).

*Hodari D.*, Richmond police had a sufficient justification to command the defendant to stop.  As the evidence at the suppression hearing made clear, the police officers from the Fourth Precinct FMT saw the same temporary tag number—11134Y—on two other cars (a Cadillac, then an Acura) in the same neighborhood during the same shift just a few hours before seeing it on the defendant's car (a Chrysler).  By the time they saw the 11134Y tag on the defendant's car, they knew the tag was not valid and even suspected it was a fake.

The display of a fake or fraudulent license plate gives rise to several violations of Virginia's traffic laws.  The defendant has highlighted one such provision—Va. Code § 46.2-612(B)(1), which focuses on "fictious" plates or decals[5]—but there are others.  *See, e.g.*, Va. Code § 46.2-722 (targeting the use of forged, altered, or counterfeit plates or decals).[6]  Homing in on the "fictitious" plate statute, the defendant argues officers lacked authority to pull him over because that statute requires the defendant to know the plate is fictitious to sustain a conviction, and he claims police lacked evidence suggesting he knew the plates were not real.  Def. Supp. Br. 5.  In support of this argument, he cites a series of civil-rights cases in which courts

---

[5] "No person shall … [d]isplay or cause or permit to be displayed any registration card, certificate of title, or license plate or decal that he knows is fictitious or that he knows has been canceled, revoked, suspended, or altered; or display or cause or permit to be displayed on any motor vehicle, trailer, or semitrailer any license plate or decal that he knows is currently issued for another vehicle. Violation of this subdivision shall constitute a Class 2 misdemeanor."  Va. Code § 46.2-612(B)(1).

[6] "Any person who, with fraudulent intent, alters any license plate or decal issued by the Department or by any other state, forges or counterfeits any license plate or decal purporting to have been issued by the Department under the provisions of this title or by any other state under a similar law or who, with fraudulent intent, alters, falsifies, or forges any assignment thereof, or who holds or uses any license plate or decal knowing it to have been altered, forged, or falsified, shall be guilty of a Class 1 misdemeanor.  The owner of a vehicle who operates it while it displays altered or forged license plates or decals shall be presumed to have knowledge of the alteration or forgery."  Va. Code § 46.2-722.

examined civil claims that law enforcement officers lacked probable cause to arrest individuals for offenses with mens rea elements.  *See* Def. Supp. Br. 5.

The defendant's citations are misplaced.  The standard for evaluating an investigatory traffic top—assuming the driver complies with the command—is "reasonable suspicion," not probable cause.  *See United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020).  This "commonsense, nontechnical standard" focuses on an officer's articulation of "why a particular behavior is suspicious" or "likely to be indicative of some more sinister activity than may appear at first glance."  *Id.* at 523 (internal quotation marks omitted).  Reasonable suspicion "is a less demanding standard than probable cause and requires showing considerably less than preponderance of the evidence," but it still "requires at least a minimal level of objective justification for making the stop."  *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000).  That standard does not require officers "to rule out the possibility of innocent conduct."  *Feliciana*, 974 F.3d at 524.  At bottom, the officer must have "a reasonable, articulable suspicion that criminal activity is afoot."  *Wardlaw*, 528 U.S. at 124.  Indeed, even under the standards for probable cause, an officer need not accept an arrestee's denial of the requisite intent.  *See, e.g., Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) ("Given the requirements that arrests be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.").  Officers are "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  *Amobi v. District of Columbia Dept. of Corrections*, 755 F.3d 980, 990 (D.C. Cir. 2014) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

But especially under the minimum level of objective justification needed for reasonable suspicion, the defendant's arguments fall short.  Police knew the temporary tag 11134Y was no good after pulling over the Cadillac.  They began to suspect something strange was afoot when they saw it on the Acura.[7]  Within two hours, they saw the tag on the defendant's Chrysler.  It is objectively reasonable for police to believe that drivers know the provenance of their license plates.  *Cf. Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (officer who conducted *Terry* stop of vehicle reasonably drew inference that registered owner of vehicle, whose license was suspended, would be the vehicle's driver).  And besides that, the officers were entitled to rely on the legal presumption outlined in Va. Code § 46.2-722:  "The owner of a vehicle who operates it while it displays altered or forged license plates or decals shall be presumed to have knowledge of the alteration or forgery."  Even so, it is not necessary that officers had reasonable suspicion of every element of a particular traffic violation to conduct the stop.  All that was necessary was a totality of facts suggesting some criminal activity that "eliminate[d] a substantial portion of innocent travelers."  *Feliciana*, 974 F.3d at 523.  That was present here.

Because the defendant defied the police command to pull over, the issue of reasonable suspicion based solely on the 11134Y temporary tag is beside the point.  By the time they seized the defendant, police had myriad other bases to hold him.  But the Court should not be troubled by the basis for the attempted traffic stop.  All four officers who rode in that police car that night testified that the basis for the attempted stop was a temporary tag that they all knew was no good

---

[7] In his body camera recording, Sgt. Spinos explained to other officers his theory of the fake temporary tag:  after seeing the temporary tag on the Acura (and that the VIN on that tag matched the Acura), he hypothesized that perhaps the driver of the Cadillac had taken one of the Acura's tags and put it on his own car.  It was only after seeing the tag on the Chrysler that Sgt. Spinos started to believe that the tags were counterfeits being unlawfully produced by someone. *See* Ex. 11 at 12:40.

and were surprised to see for the third time in one shift.  That was enough to justify the attempted stop.  *See United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (observing "without question" that police can conduct traffic stops for "failure to comply with traffic safety laws").  And as the Supreme Court has repeatedly held, Fourth Amendment analysis turns on whether "the circumstances, viewed objectively, justify [the challenged] action."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (citations omitted).

## II.      Police did not obtain the defendant's incriminating statements following his arrest in violation of the Fifth Amendment.

There are two sets of incriminating statements made by the defendant following his arrest that should not be suppressed:  (1) his unprompted pre-*Miranda* voluntary statements, including to his cousin that he suspected someone had been "telling on" him and to police expressing ownership of the abandoned car; and (2) his various post-*Miranda* admissions revealing that he knew he had a prohibited gun in the car.  In his reply brief, the defendant did not address any of the government's arguments against suppression, claiming them "to be factual in nature" and thus left them to be addressed at the evidentiary hearing.  Def. Reply 1 n.1.

Now, in his supplemental brief, the defendant relies on a single Fifth Amendment argument:  He insists he invoked his right to remain silent when he told Officer Williams, "I'm not talking to you, I'm done," so any interrogation that followed violated *Miranda*.  Def. Supp. Br. 13.  But even assuming that those words were an unambiguous and unequivocal invocation of the right to remain silent, they came twenty seconds *after* he'd made his post-*Miranda* confession to Williams that he ran because he had "a whole iron in the car."  *Compare* Gov. Ex. 12 at 21:23 ( "I got a whole iron in the car"), with *id.* at 21:45 ("I'm not talking to you, I'm done").  Under the defendant's own argument, therefore, the "iron" statement was not obtained in violation of *Miranda*.

10

What's more, the defendant's reliance on his "I'm done" statement ignores his subsequent conduct indicating a waiver of the right to remain silent.  After he told Officer Williams "I'm done," the defendant voluntarily shouted out to other officers and continued to engage Officer Williams in a conversation.  A couple of minutes later, the defendant began asking unprompted questions to Officer Gilbert, who was preparing to take the defendant to jail—"Where's my cell phone?" and "Who has my girl's wallet?"  *See* Gov. Ex. 14 at 28:34–29:15.  It was in the context of that defendant-initiated conversation that Gilbert asked why the defendant ran, the defendant admitted "I got a gun in the car," and the defendant acknowledged that he knew he couldn't have the gun as a convicted felon.  *Id.* at 29:19–30:08.  Similarly, at the jail, the defendant did not sit in silence, but continued to question officers regarding why he was pulled over.  During that conversation, the defendant acknowledged the gun in his car.  *See* Gov. Ex. 8 at 5:33–6:30.

All these incriminating statements came shortly after *Miranda*, and the defendant does not contend, nor is there any reason to believe, that he did not understand those warnings.  Thus, even if he did invoke the right to remain silent by telling Williams he didn't want to talk to her at that moment, "on these facts it follows that he chose not to invoke or rely on those rights when he did speak." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).[8]

---

[8] The defendant does not address his contention that *all* his pre-*Miranda* statements, including the voluntary utterances unprompted by police questioning, must be suppressed.  He also no longer forwards the contention that police engaged in an intentional two-part interrogation by using pre-*Miranda* admissions to secure post-*Miranda* statements.  The government is satisfied to rely on its opposition brief to explain why those theories fail.  *See* Opp'n Br. 9–14.

**III.    Police did not violate the defendant's right to equal protection under the law.**

Finally, the defendant raises in his supplemental brief—for the first time—that Richmond police violated his right to equal protection "by targeting him and other black residents of the Fourth Police Precinct in Richmond, Virginia for enforcement of minor violations in order to search their cars." Def. Supp. Br. 9.  Based on that supposition, the defendant asks the Court to dismiss the indictment against him. *Id.* at 12.  The Court should not even consider this new argument, which the defendant has shoehorned into a supplemental brief filed more than six weeks after the deadline imposed by the Court for pretrial motions.  But even on its merits, the defendant's equal protection argument falls far short of the high standard imposed by the Supreme Court and recognized by the Fourth Circuit for finding selective enforcement of the laws.  Simply put, there is no basis to argue police targeted the defendant due to his race, and the Court should reject his argument to the contrary.

**A.    The defendant's motion to dismiss the indictment on equal protection grounds is untimely and there is no good cause for the delay.**

Rule 12 requires a defendant to file most motions before trial, including those concerning a defect in the prosecution related to "selective or vindictive prosecution" and "suppression of evidence." Fed. R. Crim. P. 12(b)(3)(A)(iv), (C).   If the defendant does not file a pretrial motion within the time set by the trial court, "the motion is untimely" and the trial court may consider it only "if the party shows good cause" for the delay.  Fed. R. Crim. P. 12(c)(3).  In this case, the deadline for pretrial motions fell on June 21, 2021, the day the defendant filed his motion to suppress.  *See* ECF No. 15 (June 7, 2021 scheduling order requiring pretrial motions to be filed within 14 days).  The defendant's motion raised only Fourth and Fifth Amendment arguments for suppression of evidence found in his vehicle and statements he made to police.  It did not

mention equal protection rights or unconstitutionally selective enforcement of the law. The defendant withheld that line of attack until he filed his supplemental brief on August 2, 2021.

In retrospect, it now seems clear the defendant intended to pursue the undisclosed equal protection claim by the July 23, 2021 evidentiary hearing. During that proceeding, the defendant, through counsel, adduced evidence regarding the racial makeup of the City of Richmond, statistics regarding the racial demographics of drivers pulled over by Richmond police in the latter half of 2020, and records regarding traffic stops completely unrelated to the defendant's save for the fact that they also occurred in the Fourth Precinct on December 5, 2020. The United States objected to the relevance of this evidence given that it bore no relation to whether police lawfully seized the gun from the defendant's car or to the propriety of the circumstances surrounding his incriminating statements. *See, e.g.*, Tr. 75:24–76:1. The Court overruled those objections.

At no point during the hearing did the defendant acknowledge or allege a theory of attack on the constitutionality of the indictment separate from the existing Fourth and Fifth Amendment suppression requests. Indeed, at the conclusion of the hearing, defense counsel asked the Court "for an opportunity to submit a *supplemental motion to suppress evidence* based on the evidence as was given." Tr. 171:6–9. The Court granted that request and required the supplemental brief to be filed within seven days with the government's response due four days after that. *See id.* at 171:14–20.[9]

---

[9] Presumably the Court intended a relatively quick turnaround on both the defendant's supplemental brief and the government's response because it appeared the defendant's briefing would remain focused on the Fourth and Fifth Amendment issues posed and preserved by the original motion to suppress. After receiving the defendant's supplemental filing that raised a request to dismiss the indictment on equal protection grounds, the government obtained a seven-day extension to file its supplemental response. *See* ECF No. 35.

The Court should not excuse fidelity to the procedures outlined in the Federal Criminal Rule 12, Local Criminal Rule 12, or the Court's scheduling orders. The defendant's failure to abide by those deadlines goes beyond a technical mishap in this case. To the contrary, the defendant set out to create a factual record at the suppression hearing based on an undisclosed legal theory (an equal protection violation) with an unmentioned goal (dismissal of the indictment) and now asks the Court to consider those arguments alongside the original timely suppression motion. The defendant has not acknowledged the tardiness of the dismissal request, much less offered the "good cause" required to excuse that delay. *See* Fed. R. Crim. P. 12(c)(3). More than that, the defendant's strategic silence prejudiced the government's ability to prepare for and counter that line of inquiry at the suppression hearing, when the defendant flooded the record with evidence aimed at purported racial disparities that remain irrelevant to the Fourth and Fifth Amendment issues raised in the suppression motion. *See, e.g.*, Def. Supp Br. 7 (citing eleven defense exhibits in support of contention that police officers were racially profiling black drivers on December 5, 2020); *id.* at 11 (citing the same exhibits in support of argument that police discriminated against drivers based on race). On these facts, the Court should deny the defendant's equal protection argument for dismissal of the indictment as untimely.

   **B.     In the alternative, the Court should deny the equal protection argument because the defendant has failed to show police acted with discriminatory effect or intent during their December 5, 2020 interactions with him.**

Setting aside its untimeliness, the defendant's equal protection argument falls far short of high standard for proving racially animated selective law enforcement. That standard, articulated by the Supreme Court in *United States v. Armstrong*, requires the defendant to "show *both* discriminatory effect *and* that the officer's action was motivated by a discriminatory purpose." *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (emphasis added) (citing *Armstrong*, 517 U.S. 456, 465 (1996)). Generally, that dual showing requires proof (1) "that similarly

14

situated individuals of a different race" were treated differently and (2) that the decision to enforce the law against the defendant "was invidious or in bad faith." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016). The defendant must prove those elements by "clear evidence"—an intentionally "demanding and rigorous" standard—because "a selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464).

The defendant has not brought forward any cognizable evidence of discriminatory effect or purpose. At most, the defendant's effort to marshal such proof boils down to the following:

- Data compiled between July 1 and December 5, 2020, indicates that 76% and 15% of *all* RPD traffic stops were of black and white drivers, respectively.

- Census data from 2019 indicates that Richmond's population is less than 50% black and less than 50% white.

- "[T]he Fourth Precinct Focus Mission Team searched every single car stopped for minor traffic violations on December 5, 2020."

*See* Def. Supp. Br. 10–11.[10] The defendant rests his entire equal protection argument on those factual contentions, but they cannot bear the weight of that heavy accusation.

### 1. The defendant has failed to show that he was treated differently than similarly situated individuals of a different race.

To show discriminatory effect under *Armstrong*, the defendant "*must* make a credible showing that similarly situated individuals of a different race" were treated differently by police. 517 U.S. at 465 (emphasis added); *see also Hare*, 820 F.3d at 99 (recognizing the *Armstrong* standard applies to prove selective enforcement). The defendant fails to meet this threshold requirement.

---

[10] The defendant also complains that three of the four police precincts in Richmond "correspond to nearly entirely black neighborhoods in Richmond," but does not explain how that observation relates to his contention that police selectively enforced the law against him.

15

The thrust of the defendant's argument is that police in the Fourth Precinct have targeted black drivers for minor traffic violations to then search their cars. *See* Def. Supp. Br. 9. Under *Armstrong*, therefore, he must credibly show that similarly situated non-black drivers were treated differently. Notably, the defendant doesn't attempt to identify any "similarly situated" non-black peers. Perhaps they would be all non-black drivers who commit minor traffic violations in the Fourth Precinct but are not pulled over, or maybe they are all non-black drivers who are pulled over for minor violations in the Fourth Precinct but not subjected to a search of their vehicle. The defendant doesn't say. And without identifying any class of similarly situated comparators, he cannot begin to satisfy the first part of the stringent *Armstrong* standard. In all events, the defendant presents no evidence at all that similarly situated non-black drivers who commit minor traffic violations were treated differently than the defendant.

To be sure, the defendant points to high-level statistics regarding the overall racial demographics of traffic stops city-wide in late 2020 and compares those numbers to the overall racial makeup of Richmond in 2019. Those statistics are silent on police interactions within the Fourth Precinct, where the defendant claims police targeted him based on his race, and he does not say whether the data encompasses all traffic stops or only the "minor" violations. These general figures reinforce the Fourth Circuit's instructions that, "'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'" *Hare*, 820 F.3d at 99 (quoting *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996)). Put differently, the defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus." *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (internal quotation marks omitted). But that is all the defendant has done.

Finally, it is worth noting that the last piece of "evidence" forwarded by the defendant is demonstrably untrue:  the Fourth Precinct FMT did *not* "search[] every single car stopped" on December 5, 2020.  As the Court saw in body camera footage and the FMT officers testified, the first two cars stopped with the fake 11134Y temporary tag were *not* searched.  Officers stopped the driver of the Cadillac and briefly questioned him, but they gave him a warning and they did not search his car.  *See* Def. Ex. U-3 at 6:30.  Similarly, officers stopped the driver of the Acura for less than two minutes before letting her go.  *See* Gov't Ex. 4 at 1:30.   There was no search of either car.  *See Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (explaining that looking through the window of a car, even with a flashlight, does not constitute a search under the Fourth Amendment).

Beyond that, the Court should not rely on the defendant's contention that dispatch records show that Fourth Precinct FMT officers searched "every single car stopped."  One of the dispatch records containing the notation "VEH search completed" relates to the traffic stop (and non-search) of the Cadillac.  *See* Def. Ex. J.[11]  Another dispatch record containing the notation "LOI search completed" relates to the traffic stop (and non-search) of the Acura.  *See* Def. Ex. N.[12]  Yet the defendant relies on both records and others using "search" notations from the dispatcher as proof that police searched those vehicles.  *See, e.g.*, Def. Supp. Br. 11.  Because the

---

[11] The Court can corroborate this connection by comparing Defense Exhibit J (the I-Net Viewer record for incident 0485), Defense Exhibit Q (the Axon body camera list for Officer Mills, which shows a recording titled "TS 102993 BM No Lights 3000 Meadowbridge" for incident 0485), and Defense Exhibit U-4 (Officer Mills' body camera recording of the Cadillac stop, titled "TS_102993_BM_No_Lights_3000_Meadowbridge").

[12] Again, the Court can corroborate this connection by comparing Defense Exhibit N (the I-Net Viewer record for incident 0571), Defense Exhibit Q (the Axon body camera list for Officer Mills, which shows a recording titled "TS BF 030481 Expired Tags" for incident 0571), and Defense Exhibit V-3 (Officer Mills' body camera recording of the Acura stop, titled "TS_BF_030481_Expired_Tags").

defense failed to call any witness that could explain what those notations meant, and the notations appear for stops where no Fourth Amendment searches were conducted, the Court should not give them the meaning assigned by the defendant.[13]

At bottom, the Court cannot credit the defendant's assertion that the FMT searched every car they pulled over on December 5, 2020. Video evidence disproves it, and the defendant's interpretation of dispatch records is not supported by the record. Thus, at best, the defendant can only contend that every stop (fewer than 10, by the defendant's own evidence) conducted by the FMT in the Fourth Precinct that evening (a predominately black precinct, according to the defendant's evidence, *see* Tr. 166:14–22), involved a black driver. This "statistical evidence, with its relatively small sample size and weak basis for comparison, is clearly insufficient." *Hare*, 820 F.3d at 100.

> **2.    The defendant has failed to show that police acted with a discriminatory purpose when they attempted to pull him over for having a bad temporary tag.**

Even if the defendant had presented sufficient evidence showing that similarly situated non-black drivers were treated differently than him, he would also have to prove that the police decision to target him for an attempted traffic stop "was invidious or in bad faith." *Venable*, 666 F.3d at 903. There is simply nothing in the record that bears out such purpose. To the contrary,

---

[13] It is worth emphasizing that it is the solely defense's own unsupported contention that the notation "VEH search completed" refers to a physical search of the vehicle. None of the witnesses claimed to know what that notation meant. Indeed, Officer Mills told the Court he was not familiar with the dispatch records before being shown them on the witness stand. *See* Tr. 65:25–66:1. He also testified that he did not know why dispatch records would note a vehicle search at all, because he has "never advised the dispatcher whether or not" he had searched a car. Tr. 69:23–25. Perhaps "VEH search completed" refers to the dispatcher's completion of a vehicle records check after a license plate is radioed in from the officer. *See, e.g.*, Tr. 33:2–6. It seems clear, however, that "VEH search completed" is not a reliable indicator that police conducted a Fourth Amendment search of the car.

the evidence is overwhelming that police targeted the defendant for a defensible and reasonable

enforcement purpose:  to investigate his display of a temporary tag they suspected was fake.

Notably, the defendant does not even argue that the police decision to target *him* was

based on an invidious purpose.  Instead, he invokes "[t]he stark numbers and heavy-handed

policing tactics of minority neighborhoods in Richmond" to suggest that every traffic stop of a

black driver in the Fourth Precinct betrays a discriminatory purpose.  Def. Supp. Br. 12.  But that

argument is foreclosed by binding precedent:

> In order for a decision to [enforce the law] to be "invidious or in
> bad faith," thereby reflecting discriminatory intent, the government
> must be more than aware that a [law enforcement] policy may
> result in the prosecution of one group more than another because
> discriminatory intent implies that the government "selected or
> reaffirmed a particular course of action at least in part 'because of,'
> not merely 'in spite of,' its adverse effects upon an identifiable
> group."

*Venable*, 666 F.3d at 903 (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)).  In this

case, there is no evidence whatsoever that the Richmond Police Department or its Fourth

Precinct FMT has selected a course of action in conducting traffic stops to specifically target

black citizens.  The best the defendant can muster is a weak "inference" based on generalized

statistics—figures that, as explained above, do not show any meaningful proof of discrimination.

And in this context, those statistics are not enough.  *See Hare*, 820 F.3d at 100 ("As a general

matter, in cases involving discretionary judgments essential to the criminal justice process,

statistical evidence of racial disparity is insufficient to infer discriminatory purpose.") (internal

quotation marks and ellipses omitted).

## **Conclusion**

The evidence presented at the suppression hearing shows that police acted within constitutional bounds throughout their interactions with the defendant.  Evidence was not obtained in violation of the Fourth Amendment, the defendant's incriminating statements were not obtained in violation of the Fifth Amendment, and there is no evidence that police targeted the defendant (or anyone else) for selective enforcement of the law in violation of the Constitution's guarantee of equal protection.  The Court should deny both the defendant's motion to suppress and the late-filed request to dismiss the indictment.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:        _____/s/_____
Kevin S. Elliker
Assistant United States Attorney
Virginia Bar Number 87498
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Kevin.Elliker@usdoj.gov