**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21cr42** |
| | ) | |
| **KEITH RODNEY MOORE,** | ) | |
| **Defendant** | ) | |

**SECOND SUPPLEMENT TO MR. MOORE'S**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, moved the Court to suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore in this case and to suppress statements after interrogating Mr. Moore in violation of his Fifth Amendment right to remain silent. *See* ECF Nos. 17, 28, and 32. After an evidentiary hearing on that motion on July 26, 2021, Mr. Moore supplemented his Fourth and Fifth Amendment challenges with a Fourteenth Amendment challenge because of the Richmond Police Department's selective enforcement of Virginia's traffic laws. *See* ECF No. 32.

Statistical, historical, and contemporary evidence demonstrates that if you are driving while black in the city of Richmond—like Mr. Moore, you are far more likely to pulled over, searched, and arrested. White drivers on the other hand not only are essentially given a pass on traffic stops, but when they get pulled over, they are far more likely than black drivers to receive a summons or citation to come to court. Such discriminatory enforcement of facially neutral laws violates our Constitution's guarantee of equal protection of the laws regardless of the color of one's skin and cannot be tolerated. This Court must suppress all evidence stemming from the traffic stop in this case and dismiss the case against Mr. Moore.

I.      **The Fourteenth Amendment guarantees to all those in the United States the right to equal protection of the laws regardless of the color of their skin.**

The Equal Protection Clause of the "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) ("Racially selective law enforcement violates this nation's constitutional values the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment.").

The "Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997).  An equal protection challenge to police action "does not fit neatly into the various stages of Fourth Amendment search and seizure analysis" because "the central intention behind the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race." *Id.* at 353 (6th Cir. 1997) ("A citizen's right to equal protection of the laws, however, does not magically materialize when he is approached by the police.  Citizens are cloaked at all times with the right to have the laws applied to them in an equal fashion—undeniably, the right not to be exposed to the unfair application of the laws based on their race.").

2

To prove that police officers were selectively enforcing[1] a facially neutral law against a particular race, the defendant must show by a preponderance of the evidence that the challenged police action: 1) was motivated by a discriminatory purpose; and 2) had a discriminatory effect on a racial group to which the defendant belongs.  *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272–74 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–66 (1977); *Washington v. Davis*, 426 U.S. 229, 239–42 (1976); *see also Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021) (observing after thorough analysis that defendant must prove a selective enforcement claim by preponderance of the evidence)[2].

As to the first prong of the selective enforcement test—discriminatory purpose, a defendant must prove that there was a discriminatory purpose behind the course of action.  The defendant need not, however, prove that the "challenged action rested solely on racially discriminatory

---

[1] It is critical to recognize that Mr. Moore's claim is one of selective enforcement, not one of selective prosecution.  "Selective prosecution occurs when, from among the pool of people referred by police, a prosecutor pursues similar cases differently based on race. Selective enforcement occurs when police investigate people of one race but not similarly-situated people of a different race." *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021).

[2] As the *Conley* court noted, the Fourth Circuit has relied on *United States v. Armstrong*, 517 U.S. 456 (1996)—which is a selective prosecution case, to posit that a defendant must "demonstrate 'clear evidence' of racially animated selective law enforcement." *United States v. Mason*, 774 F.3d 824 (7th Cir. 2014) (quoting *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (observing in a selective prosecution case that the Supreme Court required a defendant to "support a selective-prosecution claim with 'clear evidence,'" quoting *Armstrong*).  In *Mason*, the Fourth Circuit evaluated a habeas petition based in part on the defendant alleging that his attorney was ineffective because he failed to raise a racially selective law enforcement argument. 774 F.3d at 826.  In rejecting that argument, the *Mason* court simply observed that proving equal protection challenges are difficult and then simply cited—without analyzing—selective prosecution claims without discussing the difference between that type of claim and a selective enforcement claim. *Id.* at 829-30.

As the *Conley* court recognized, prosecutors enjoy "a powerful privilege" and are "covered by a presumption of constitutional behavior." 5 F.4th at 791.  Police officers, on the other hand, "are regularly called before courts to justify their tactics" and thus, selective enforcement claims do not warrant the heightened evidentiary standard applicable to selective prosecution claims. *Id. Mason*'s passing reference then to the applicable standard of proof is not a binding holding on this Court. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").

purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (stating that "an additional purpose . . . would not render nugatory the purpose to discriminate against all Blacks"); *Feeney*, 442 U.S. at 277 ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not.").  A showing of discriminatory intent need not be made with direct evidence, but can be shown through circumstantial evidence.  *See Avery*, 137 F.3d at 355 ("[o]ften it is difficult to prove directly the invidious use of race," so "'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  In some cases, blunt statistical evidence of a racially disparate impact may be sufficient to prove the discriminatory intent element of an equal protection claim.  *See, e.g., Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination.").

As to the second prong of the selective enforcement test—discriminatory effect, police action has a racially discriminatory effect when members of a protected racial group—here, black citizens in Richmond—receive less favorable treatment than nonmembers.  The Supreme Court has long relied on statistical analysis to show a discriminatory effect.  *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese launderers where the city denied the petitions of some two hundred Chinese applicants who applied for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who

4

applied); *see also Hunter*, 471 U.S. at 227 (finding that the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was "indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites").  In selective enforcement claims, statistical evidence of racial disparity can be sufficient[3] to show a discriminatory effect.  *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 661 (S.D.N.Y. 2013) (finding that evidence showed that the New York Police Department stopped more black and Hispanic residents, were more likely to stop blacks and Hispanics than whites within defined geographical areas, were more likely to use force against blacks and Hispanics than whites, and stopped blacks and Hispanics with less justification than whites).

---

[3] In an unpublished, per curiam opinion that is not binding on this Court, the Fourth Circuit reviewed a Fourth Amendment challenge to a traffic stop.  *See United States v. Suarez*, 321 F. App'x 302 (4th Cir. Jan. 30, 2009).  The defendants argued that the traffic stop was pretextual and therefore violated the Fourth Amendment.  *Id.* at 304.  In dicta, the *Suarez* court observed that "[a]llegations of racially motivated law enforcement implicate the Equal Protection Clause rather than the Fourth Amendment."  *Id.* at 305.  And again, like the *Mason* court, the *Suarez* court simply observed that proving equal protection challenges are difficult and then cited—without analyzing—*Armstrong* (a selective prosecution case) for the proposition that a "defendant must show that the law enforcement practice was not enforced against "similarly situated individuals of a different race."  321 F. App'x at 305 (internal quotation marks omitted).  Again, *Suarez*'s passing reference then to the applicable standard of proof is not a binding holding on this Court.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").

As the Second Circuit observed in *Pyke v. Cuomo*, 258 F.3d 107, 108-09 (2d Cir. 2001), "[a] plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals."  It is in the special case of selective prosecution rather than selective enforcement, where the "exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute" is at issue, *Armstrong*, 517 U.S. at 457, that a challenger must point to a similarly situated individual who could have been prosecuted but was not.  "[T]hat is because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute."  *Pyke*, 258 F.3d at 109.  With a claim that a facially neutral law or policy has been applied in a discriminatory manner, there is no justification for requiring proof of a specific similarly situated individual who was not stopped for a traffic offense.  *Id.* at 110 ("a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21; *see also Hunter*, 471 U.S. at 228 (1985). "If the [government] comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established." *Floyd*, 959 F. Supp. 2d at 572 (internal quotation marks omitted).

## II.    The data on the Richmond Police Department's traffic stops paints a bleak picture: black drivers are far more likely to be stopped, searched, and arrested than white drivers no matter where they are driving in Richmond.

In this case, the evidence is stark. If you are a black driver in Richmond, you are far more likely to be stopped, searched, and arrested than if you are a white driver. The Richmond Police Department has divided its patrol functions into four distinct police precincts. *See* Def. Ex. X (1-4). According to the police department itself, the department "decentralized all of its patrol functions and instituted a Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). Three of those precincts correspond to the nearly entirely black neighborhoods in Richmond. *Compare* Def. Ex. X (1-4) *with* Def. Ex. R (1-2). The third precinct—the west end of Richmond—is the only precinct made up of primarily white neighborhoods. *Id.*

The ratio of traffic stops that the Richmond Police Department conducts of black drivers to white drivers is appalling. Black people make up just less than half of the population of Richmond. *See* 7/26/21 Tr. at 169-70 (reporting that black population of Richmond as of 2019 was about 47-48% of the city's entire population). White people also make up less than half of the population of Richmond. *Id.* (reporting that white population of Richmond as of 2019 was

about 42-46% of the city's entire population).  Yet, seventy-six percent of the Richmond Police Department's traffic stops are of black persons.  *See* Def. Ex. Y-1.  White people make up only fifteen percent of the Richmond Police Department's traffic stops.  *Id.*  The Richmond Police Department has not reported the race of another eight percent of people stopped, *id.*, in violation of the Virginia Community Policing Act, *see* Va. Code § 52-30.2.  At least in this case, none of the officers on the Fourth Precinct Focus Mission Team complied formally with the Virginia Community Policing Act.  *See* 7/26/21 Tr. at 118-19.  Yet, because Officer Mills kept at least some of the required data in his body camera video titles, *see id.* at 66-68, we know that every individual that the Fourth Precinct Focus Mission Team stopped the night of Mr. Moore's arrest was black, *see* Def. Exs. J, K, L, N, O, P, Q, U-3, U-4, V-3, W; Gov't Ex. 4.  We also know that the Fourth Precinct Focus Mission Team searched every car that they stopped that night.  *Id.*

Eli Coston, an expert statistician who teaches at Virginia Commonwealth University and has studied the discriminatory effect of the Richmond Police Department's traffic enforcement over time, has found this data to represent a statistically significant effect on black drivers.  *See* Ex. A 3/8/22.  In comparison with white drivers, black drivers in the city of Richmond were 5.15 times more likely to be stopped by the Richmond Police Department.  *Id.* at 5.  In comparison with white drivers, black drivers in the city of Richmond were 12.67 times more likely to be arrested as a result of the stop.  *Id.* at 6.  In comparison with white drivers, black drivers were more likely to be searched during the stop.  *Id.* at 7.  In comparison with white drivers, black drivers were far more likely to have their cars searched during the stop.  *Id.*  White drivers were also far more likely to receive a summons or citation than black drivers.  *Id.*  Black drivers were also far more likely to be arrested than white drivers when the basis for the stop was an equipment violation.  *Id.* at 8.

These findings are particularly important when we consider that black drivers do not commit traffic offenses more often than white drivers.  *See* Ex. A 3/8/22 at 1-2; *see* Ex. B 3/8/22 at 2-3.  Yet, in Richmond, local police officers are stopping black drivers for alleged traffic offenses at a rate that is five times higher than they are stopping white drivers.  This evidence—this stark evidence of discriminatory effect—paints a powerful picture of racial discrimination in traffic enforcement in Richmond.  *See, e.g., United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir. 1977) ("Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation.  . . . In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." (internal citations omitted); *see also Int'l Bhd. of Teamsters*, 431 U.S. at 339 n.20 ("absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired.  Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant . . . .").

The racially discriminatory impact of the Richmond Police Department's selective enforcement of the traffic laws is even more blunt when we consider the location of the traffic stops.  Setting aside for the time being that the lines of the police precincts in Richmond line up perfectly with the lines of racial segregation in the city, if police officers were not selectively enforcing the laws based on race, we could perhaps expect to see more white people than black people stopped for traffic and equipment offenses in the white part of town—the third precinct.  That is not at all, however, what the data shows.  Rather, the data reveals that even in the third police precinct, the Richmond Police Department stops far more black people than white people.

*See* Ex. A 3/8/2022 at 9-11.  We also see a significant number of black drivers that are stopped in or near the third precinct are stopped near the boundaries of the third precinct.  *Id.* at 9, Fig. 2.  Such a pattern is indicative of the Richmond Police Department effectively patrolling the boundaries of the white neighborhoods in the third precinct.

Lastly, the mission of the Fourth Precinct Focus Mission Team is not traffic enforcement.  Rather, it is to get guns and drugs off the street.  *See* 7/26/21 Tr. at 23-24.  The Fourth Precinct Focus Mission Team simply uses minor traffic infractions to pull black people over to search for evidence of more serious criminal activity.  *Id.* at 24.  That evidence is consistent with the overall picture of what the Community Policing Act data shows: if you are driving while black in the city of Richmond, you should expect to have less than equal protection of the laws because of the color of your skin.  The evidence demonstrates that the Fourth Precinct Focus Mission Team's racial profiling was actively having a discriminatory effect on black drivers in Richmond.  *See, e.g.*, *Maryland State Conference of NAACP Branches v. Maryland State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) ("if the stop was 'not really' for speeding, then the basis for it is unclear. And, this unclear basis for the stop exists against a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police—and the senior officer corps' conclusions based upon those statistics, i.e., that 'a remarkable deviation' in regard to the percentage of African–Americans stopped and searched existed in the JFK Barrack area—which shows, at least, discriminatory effect from the practices afoot in the JFK Barrack patrol area").

In evaluating discriminatory intent, the Court must take account of the totality of the circumstances.  Here, the totality of the circumstances shows that the Fourth Precinct Focus Mission Team pulls black people over for minor traffic violations, surrounds the driver's car with

four police officers, and blatantly searches the entire interior of the car before letting anyone of color not suspected of more serious crimes go.  As Judge Hamilton observed in his dissent regarding similar tactics in Milwaukee: "Imagine that the police tried these tactics in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so.  No police officer could expect to keep his job if he treated a car standing in front of a store as worthy of such an intrusive *Terry* stop." *United States v. Johnson*, 874 F.3d 571, 581 (7th Cir. 2017).  The stark numbers and heavy-handed policing tactics of minority neighborhoods in Richmond—a city that feels it needs to devote three of its four police precincts to policing the sections of town made up almost entirely of black citizens—warrant an inference of discriminatory intent. *See, e.g.*, *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Mr. Moore, and other black citizens in Richmond, are entitled to and deserve equal protection of the laws.  Because the Richmond Police Department, and the Fourth Precinct Focus Mission Team in particular, has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

III.     **Circumstantial and historical evidence indicate that the Richmond Police Department has a long history of discriminatorily enforcing traffic laws against black people in Richmond.**

In addition to the severe statistical evidence of the discriminatory effect that the Richmond Police Department's selective enforcement of traffic laws has had on black drivers in Richmond, circumstantial evidence indicates a long history of the Richmond Police Department selectively enforcing traffic and criminal laws against black citizens.  The history of the Richmond Police Department is inseparably entangled with racial discrimination.  In 1861 when Virginia seceded from the United States, Richmond Police Department officers wore confederate badges and were

considered part of the confederate militia.  *See* City of Richmond, *History of the Richmond Police Department: 1807-1899*,  https://www.rva.gov/police/department-history (last visited Mar. 8, 2022).   After the civil war ended and the federal government had established martial law in Richmond, the Richmond Police Department was abolished.  *Id.*   It was only when Virginia rejoined the United States in 1870 that Richmond was allowed to reestablish a police department. *Id.*

   At the turn of the twentieth century, Richmond used a variety of tactics to racially segregate the city.   In 1911, the "city of Richmond, using its charter powers, adopted the first ordinance dividing the city into separate blocks for white and 'colored'."  *See* Ex. C 3/8/22 at 4.   When explicit racialized zoning was outlawed in 1917, "racial zoning gave way to the broader notion of a race-based comprehensive planning process and racially informed zoning districts."  *Id.*   The city then used Virginia's law against interracial marriage as a basis to continue prohibiting black citizens from living in white neighborhoods.  *See* Ex. D 3/8/22 at 2.   When restrictive covenants based on race were banned in 1948, Richmond relied on redlining—or the process by which banks drew red lines around predominantly black neighborhoods to prevent financial investment in those areas—to continue racial residential segregation.  *Id.* at 2-4.

   By the 1970s, whites in Richmond had resorted to leaving the city in droves for the surrounding counties.  *Id.* at 4.   The city of Richmond responded in 1970 by annexing a large portion of Chesterfield County—to increase its white population.   *See* Roberto Roldan, *Richmond's Controversial Chesterfield County Annexation, 50 Years Later*, VPM (May 20, 2020), https://vpm.org/news/articles/13596/richmonds-controversial-chesterfield-annexation-50-years-later ("This particular case though is interesting because of how the white leaders decided to suppress the black vote. What the Richmond oligarchy decided to do was to simply reduce the

black population. And the way to do that was to annex thousands, tens of thousands of white people from the adjoining County, Chesterfield County.").  It was against this backdrop that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977.  *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022).  That the third police precinct aligns exactly with the boundaries of the white section of Richmond is not a coincidence.

For at least twenty years, data has shown that Richmond Police Officers stop far more black drivers than white drivers for traffic offenses.  *See* Ex. E 3/8/22 at 2.  In 2000, a study of all traffic stops in Richmond during a six-week period showed that sixty-four percent of the drivers stopped were black, while thirty-two percent of the drivers were white.  *Id.*  Comparable data of the counties surrounding Richmond—Henrico and Chesterfield—much more closely aligned the ratio of the race of drivers stopped with the racial make-up of those counties.  *Id.*  In 2017 and 2018, Richmond Police Officers were 30.7% more likely to pull over a black driver than a white driver.  *See* Ex. F 3/8/22 at 11.  The 2017 and 2018 data reflected racial discrimination in not only traffic stops, but also the Richmond Police Department's use of force, pedestrian contacts, reports of "suspicious activities," curfew violations, and truancy violations.  *See* Ex. F 3/8/22.

Mr. Moore has shown at least a prima facie case that the Richmond Police Department selectively enforces traffic laws against black drivers in Richmond.  He anticipates presenting additional evidence of discriminatory intent at the evidentiary hearing this Court intends to schedule at the conclusion of this supplemental briefing.

**CONCLUSION**

As explained above and in ECF Nos. 17, 28, and 32, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and dismiss this case.

Respectfully submitted,
KEITH RODNEY MOORE

By:           /s/
               Laura Koenig
               Va. Bar No. 86840
               Counsel for Defendant
               Office of the Federal Public Defender
               701 E Broad Street, Suite 3600
               Richmond, VA 23219-1884
               Ph. (804) 565-0881
               Fax (804) 648-5033
               laura_koenig@fd.org

               Amy L. Austin
               Va. Bar No. 46579
               Assistant Federal Public Defender
               Office of the Federal Public Defender
               701 E. Broad St., Ste. 3600
               Richmond, VA 23219
               (804) 565-0880
               amy_austin@fd.org