DEFENDANT'S EXHIBIT C 3/8/2022

# McGuireWoods

# McGuireWoods Consulting
### Public Affairs Solutions

# ZONING AND SEGREGATION IN VIRGINIA: PART 1

## Why Virginia Needs a Study of Zoning Laws and Their Connection to Segregation

By the McGuireWoods Zoning and Segregation Work Group[1]



Source:
https://creativecommons.org/licenses/by-nc-sa/4.0/
https://dsl.richmond.edu/panorama/redlining/#loc=12/37.549/-77.538&city=richmond-va&text=about

## Executive Summary

### THE PROBLEM

Achieving racial justice in Virginia requires overcoming housing segregation. In many localities, neighborhoods are more racially segregated today than they were 50 years ago. Housing segregation affects education, job opportunities, family income, health and access to a quality life.

Elected officials throughout the United States, and Virginia lawmakers in particular, used zoning through most of the 20th century as a governmental tool to segregate African Americans. In combination with other discriminatory laws and governmental actions, zoning segregated Virginia communities. Zoning continues to reinforce patterns of segregation today despite the Fair Housing Act of 1968 prohibiting racial discrimination in housing. This historic and current housing segregation results in unequal access to civic resources.

Zoning laws now segregate communities by wealth and income. Because minority households statistically have less wealth as a direct result of segregationist zoning laws and other racially discriminatory policies, they are excluded from large parts of Virginia counties, cities and towns that are set aside for houses on large lots.

### CALL TO ACTION

Zoning and planning laws in Virginia need to be revised to help address the legacy of 20th-century racism. The primary reform should be to increase housing opportunities for all people throughout Virginia's localities. Most of this can be accomplished by changing zoning and planning laws to allow more housing choices. Appropriate reform can occur without diminishing local governments' power to plan and zone. Decades of experience with mixed-use and mixed-density zoning show that housing opportunities can be increased without reducing property values in established neighborhoods.

### THE STUDY

This paper documents the history of zoning and segregation in Virginia and the legacy of systemic racism preserved by zoning. Part 2 of the study will offer specific reforms to address this legacy.

### ABOUT MCGUIREWOODS' ZONING AND SEGREGATION WORK GROUP

We are a group of real estate and zoning lawyers, land use planners and government relations consultants who are concerned about continuing segregation in our communities. We have come together to bring our collective experience to research zoning and segregation and propose reforms to address the legacy of segregation. McGuireWoods' Zoning and Segregation Work Group, along with the firm's Racial Justice Task Force, strategizes with local leaders on how to work together to make racial equality a reality. The firm focuses on achieving long-lasting positive change in communities across the country where we live and work.

## 1. Introduction

Zoning segregates. Zoning separates into geographic districts the different uses, different building sizes and, indirectly, people with different levels of wealth and income. A primary purpose of zoning and land use regulation is to protect residential property values from perceived threats. These threats range from the intrusion of industrial or commercial uses, to changes in the ethnic, racial or economic status of neighbors. When zoning began in Virginia 110 years ago, the primary perceived threats were from the mixing of races and the presence of African Americans in white neighborhoods. Although explicit racial zoning ended in 1917, the legacy of systemic racism continues today.

In many Virginia jurisdictions, neighborhoods are more racially segregated today than they were 50 years ago. A recent demographic study concluded: "While the overall percent of black Virginians remained constant from 1970 to 2010, in more than 60% of localities the percent of black residents declined across these 40 years."[2] It further stated: "Across Virginia's three metro areas, residential racial segregation endures at moderate to high levels, and the pattern of segregation noted by scholars at the height of segregation — largely black urban centers surrounded by largely white suburbs — persists."[3]



Charles Jones, chairman of ACCESS (Action Coordinating Committee to End Segregation) displays a map of segregated housing found around area service installations May 12, 1967. (Photo by Tom Kelley/The Washington Post via Getty Images)

Other factors such as redlining, private covenants, urban renewal, tax policies, etc., contributed to segregation during the 20th century,[4] but zoning remains one of the few governmental actions that perpetuate segregation today.

Comprehensive plans and zoning ordinances throughout Virginia reinforce the division of residential areas by wealth and income. This reinforces racial segregation because of the wealth gap between white and minority populations. More importantly, this results in unequal access to civic resources including schools, parks, libraries, sanitation, transportation and other government services. Numerous studies have shown that, more than other factors, a child's residential ZIP code determines his or her educational and health outcomes.[5] However, the postal code is just a label for a geographic area. The zoning districts largely determine the characteristics of a zip code by defining who can afford to live there.

Comprehensive plans and zoning ordinances can be changed to help remedy the legacy of racial and economic segregation without disrupting existing neighborhoods, mandating integration or spending public money. Many zoning districts have already evolved to allow mixed uses without harming property values or creating conflicts. The primary remedy for residential segregation is to allow more housing choices. This requires leadership at the state level to encourage and guide localities to make the needed revisions to their comprehensive plans and zoning ordinances.

---

[1] Scott Adams, Sheri Akin, Tracy Baynard, Grace Chae, James Dyke, Lori Greenlief, George Martin, Steven Mikulic, Greg Riegle, Jonathan Rak, Matthew Weinstein, Michael Van Atta.
[2] Michele Claibourn, Blacks in Virginia: Demographic Trends in Historical Context, Weldon Cooper Center for Public Service at p. 4 (2012).
[3] Id. at 6.
[4] Richard Rothstein, The Color of Law: A Forgotten History of How our Government Segregated America (2017).
[5] See Daniel W. Belsky et al., Genetics and the Geography of Health, Behaviour and Attainment (2019).

## 2. History of Zoning in Virginia

Zoning in Virginia began with racial segregation. The city of Richmond, using its charter powers, adopted the first ordinance dividing the city into separate blocks for white and "colored" in April 1911. Eleven months later, the General Assembly approved legislation enabling all cities and towns in Virginia to adopt segregation districts dividing blocks between white persons and "colored" persons.[6] Norfolk, Ashland, Roanoke, Portsmouth[7] and Falls Church[8] adopted similar residential segregation statutes following Richmond. The Supreme Court of Virginia upheld these segregation districts in *Hopkins v. City of Richmond*, 117 Va. 692, 86 S.E. 139 (1915). Two years later, the U.S. Supreme Court ruled in *Buchanan v. Warley*, 245 U.S. 60 (1917), that explicit racial segregation zoning was unconstitutional.

In the wake of the *Buchanan* decision, racial zoning gave way to the broader notion of a race-based comprehensive planning process and racially informed zoning districts. The first zoning enabling statute, following the 1912 racial zoning statute, passed in 1922 and allowed cities to divide their land into districts to regulate the use of land and of buildings.[9] This power was extended to towns (1926) and counties with higher population densities (1927).[10] The Buchanan decision undermined the use of zoning to segregate explicitly by race but not the use of the planning process in the service of segregation. After 1917, cities preferred to engage professional planners to prepare racial zoning plans and to marshal the entire planning process to create the completely separate Black community.[11] Some early comprehensive plans, such as the 1928 comprehensive city plan for Roanoke, specifically called out "Areas for Colored Population."[12]

Many of the first zoning maps in Virginia applied industrial zoning categories to areas of African American homes while applying residential protections to areas of white homes.[13]  The first zoning map of Alexandria applied industrial zoning to approximately 100 residential structures, the majority of which were occupied by "Negroes,"[14] even though only 20 percent of the population was African American.[15] Residential districts were also divided by minimum lot size and prohibitions on row houses[16] or apartments. The majority of land in most localities was zoned exclusively for "single family" housing. In most cases, a minority household could not afford to purchase a house on a large lot and was forced to live in a concentrated neighborhood of higher density.

Much of the new housing built after World War II was located in large suburban developments funded by federally insured loans. Even after the U.S. Supreme Court banned enforcement of racial clauses in deeds and mutual agreements in 1948, the Federal Housing Administration and other federal agencies continued to deny federal insurance for developments open to racial minorities. Even when a minority household could afford to buy a new suburban home, it was denied that opportunity due to governmental participation in systemic racism.



---

[6] 1912 Va. Acts Chapter 157.
[7] Roger L. Rice, *Residential Segregation by Law: 1910-1917*, 34 J. of Southern Hist., 179 (1968).
[8] https://www.tinnerhill.org/educational-resources/2018/2/15/civil-rights-history-tinner-hill
[9] 1922 Va. Acts Chapter 43.
[10] 1926 Va. Acts Chapter. 197; and 1927 Va. Acts Chapter. 15.
[11] Christopher Silver, *The Racial Origins of Zoning in American Cities*, in Urban Planning and the African American Community: In the Shadows (June Manning Thomas, Marsha Ritzdorf ed., 1997).
[12] Id. at 10.
[13] See West Brothers Brick Company, Inc. v. Alexandria (1937) 169 Va. 271, 278.
[14] Compare 1931 Alexandria Zoning Map and Real Property Survey and Low Income Housing Area Survey, Alexandria, Virginia, U.S. Works Progress Administration (1939).
[15] Krystyn R. Moon, *The African American Housing Crisis in Alexandria, Virginia, 1930s-1960s*, 124 Va. Mag. of Hist. and Biography, 28 (2016).
[16] Arlington's Land Use Policy and Zoning p. 3, Bulletin 4 Missing Middle Housing Study (2020).



By the early 1970s, many of the struggles of earlier decades persisted throughout Alexandria and the Washington, D.C., metropolitan region. A 1970 report generated by the Washington Suburban Institute on nearby Fairfax County argued that "institutional racism and land development are tied tightly together. So far they have resulted in excluding blacks from residence in the suburbs, in denying them adequate services when they do already live there, in denying them access to suburban employment centers and in their being feared and ostracized in the neighborhoods where they do live or attempt to live."[17]

Although overt racism has been eliminated from zoning ordinances and comprehensive plans, the legacy of 20th-century racism remains.

## 3. How Zoning Segregates Economically

Zoning separates people geographically by wealth and income. Although zoning does not directly set the price of housing, it determines the size and characteristics of housing that may be built in a particular area. Zoning is a regulatory tool that defines the permitted use of property and the permitted types and sizes of buildings for specific geographic zones. Most localities have a range of residential zoning districts, each with a maximum permitted housing density expressed as dwelling units per acre and floor area ratio.[18] Residential zoning districts also determine what types of housing are permitted, such as standalone homes (described as "single-family dwellings"), townhouses or apartment and condominium buildings. They prescribe maximum building heights, minimum yard sizes and minimum open space.

The amount of land needed for each house and cost of construction, in turn, largely determine the price. For example, here are the 2020 assessed average home prices in Fairfax County by housing type[19]:

Single-family detached homes – $692,409
Townhouse/duplex properties – $437,346
Condominiums – $288,246

Hall's Hill was one of at least eleven black neighborhoods created in the Civil War era. Hall's Hill is one of only three able to survive as an African American community into the twenty-first century.
Source: http://arlingtonhistoricalsociety.org/wp-content/uploads/2020/02/2015-3-Halls.pdf

Virginia's counties zone most of their land for low-density residential use. Fairfax County, the most populous county, sets aside approximately 79 percent of its land area for single-family housing.[20] Neighborhoods zoned exclusively for single-family detached housing are reserved for large lots and large homes, often with requirements for large yards. These restrictions limit the overall housing stock for large swaths of land, typically in an effort to preserve a rural or suburban character associated with low-density housing. Restricting the density of housing on large portions of a locality drives up housing prices by constraining supply. Consequently, zoning creates regulatory barriers to housing affordability and ultimately separates people by levels of wealth and income through the establishment of low-density residential zoning districts, often referred to as "exclusionary zoning." Exclusionary zoning greatly exacerbates economic segregation by lowering overall housing production and by lowering the percentage of multifamily units in many suburbs.[21]

---

[17] C. Cunningham, Land Development and Racism in Fairfax County (1970).
[18] Floor area ratio equals building floor area divided by land area.
[19] 2020 Real Estate Assessments Now Available; Average Residential Increase of 2.65%
[20] Fairfax County Geographic Information System (2020).
[21] Arnab Chakraborty et al., The Effects of High-density Zoning on Multifamily Housing Construction in the Suburbs of Six US Metropolitan Areas, 47 Urb. Studs., 43 (2010).

Segregation of housing by wealth and income perpetuates itself from generation to generation. Especially for lower- and middle-income Americans, home ownership was a primary means of building wealth in the 20th century and remains so today.[22] Families who own their homes through mortgages subsidized by federal tax policy build wealth, which they pass on from generation to generation. Children raised in neighborhoods with high housing prices attend better schools and generally receive disproportionate benefits of "public goods."[23]

Adequate housing is fundamental for individual success, including employment, schooling, childcare and health.[24] At the same time, the extremely high cost of housing is a well-documented issue in Virginia.[25] Most families and individuals spend more on housing than anything else, with average households devoting one-quarter to one-third of income to housing expenditures, while lower-income households commonly devote up to half of their incomes to housing.[26]

The high cost of single-family housing and related effects on certain lower-income populations is further exacerbated by the geography of sprawling suburban neighborhoods.[27] The prevalence in suburbs of large, single-family detached homes that are too expensive and spatially removed for lower-income households to consider not only propagates urban fringe development and sprawl, but also perpetuates disenfranchisement.[28] The potential for accessible employment opportunities, quality education, safety and access to public services are ultimately affected by a home's geography.[29]

## 4. How Zoning Segregates Racially

Zoning also contributes to racial segregation. As discussed above, zoning was one of the tools of explicit segregation in the 20th century. Today, zoning does not explicitly segregate; however, the legacy of segregation is perpetuated by the preservation of wealth and income segregation discussed above. Richard Rothstein's important book — "The Color of Law: A Forgotten History of How Our Government Segregated America" — provides a comprehensive history of how segregation enforced by federal, state and local laws created a wealth gap. In 2016, the net worth of a typical white family was *nearly 10 times greater* than that of a Black family.[30]

Simply stated, the wealth gap between white and minority populations perpetuates racial segregation. The previously described disparities in generational wealth have disproportionate impacts based on race. Underrepresented households initially precluded from living in single-family neighborhoods were deprived of opportunities to build generational wealth. The legacies of this deprivation of generational wealth continue to impair the ability of marginalized populations to pursue single-family housing as housing prices continue to rise. Single-family zoning districts include the same single-family neighborhoods with restrictive covenants specifically preventing minority residents from moving into the area. It can be said that there is a resulting dual housing market, reinforcing the racial disparities in the free housing market.[31]



---

[22] Is Homeownership Still an Effective Means of Building Wealth for Low-Income and Minority Households? Joint Center for Housing Studies, Harvard University (2013).
[23] Jessica Trounstine, Segregation By Design: Local Politics and Inequality in American Cities (2018).
[24] Sheila Crowley, The Affordable Housing Crisis: Residential Mobility of Poor Families and School Mobility of Poor Children, 72 J. of Negro Educ., 22 (2003).
[25] Wyatt Gordon, Debate around statewide definition of affordable housing belies larger crisis, Virginia Mercury (Sep. 28, 2020), https://www.virginiamercury.com/2020/09/28/debate-around-statewide-definition-of-affordable-housing-belies-larger-crisis/
[26] John M. Quigley and Steven Raphael, Is Housing Unaffordable? Why Isn't It More Affordable? 18 J. of Econ. Perspectives, 191 (2004).
[27] Robert Lang and Paul K. Knox, The New Metropolis: Rethinking Megalopolis, 43 Regional Stud., 789 (2009). David R. Morgan, and Patrice Mareshcal, Central-City / Suburban Inequality and Metropolitan Political Fragmentation, 34 Urb. Aff. Rev, 578 (1999).
[28] Rachel Garshick Kleit and Martha Galvez, The Location Choices of Public Housing Residents Displaced by Redevelopment: Market Constraints, Personal Preferences, or Social Information? 33 J. of Urb. Aff., 375 (2011).
[30] Examining the Black-white wealth gap, Brookings Institution (2020).
[31] Fairfax County, Virginia Analysis of Impediments to Fair Housing Choice 2016-2020, September 2017.



Minority households are confined to poorer neighborhoods as a result of exclusionary zoning, furthering racial segregation and disparities.[33] Simultaneously, aging, ethnic and low-income suburbs often lose the battle for investment resources, generating poor employment access, lower educational achievement and other spatial disparities. These issues perpetuate the wealth gap and restrict the ability of minority households to pursue other housing options.

Conversely, offering a range of housing types, including "missing middle" housing types, provides options to meet demographic changes and promote diversity in communities. Numerous localities across the United States have acknowledged the direct relationship between zoning and racial inequity, and have made legislative and policy changes to provide additional housing options for a broader range of residents, particularly in single-family neighborhoods.[34] Incentivizing missing middle housing in single-family zoning districts in particular can create more affordable housing options, address segregation and inequality, and moderate overall housing costs.[35] Ultimately, housing is a racial justice issue, and exclusionary zoning practices have had a significant impact on wealth and racial inequity. Expanding housing choices is a crucial step to addressing these ingrained inequities.

## 5. Remedies for Segregation

As noted above, comprehensive plans and zoning ordinances throughout Virginia reinforce the division of residential areas by wealth and income. This type of economic segregation places limits and boundaries on transportation, employment opportunities, decent healthcare and schools. In Part 2 of this report, McGuireWoods' Zoning and Segregation Work Group will offer recommendations to change comprehensive planning and zoning laws to help remedy the legacy of segregation.

## 6. Conclusion

Zoning and planning laws in Virginia need to be revised to address the legacy of 20th-century racism. The primary reform should be to increase housing opportunities for all people throughout Virginia's localities. Most of this can be accomplished by changing zoning and planning laws to allow private sector developers to finance and construct new housing. Appropriate reform can occur without diminishing local governments' power to plan and zone. Decades of experience with mixed-use and mixed-density zoning show that increased housing opportunities can be provided without reducing property values in established neighborhoods.

*McGuireWoods' Zoning and Segregation Work Group, along with the firm's Racial Justice Task Force, strategizes with local leaders on how to work together to make racial equality a reality. The firm focuses on achieving long-lasting positive change in communities across the country where we live and work.*

---

[33] John Rennie Short, Bernadette Hanlon, and Thomas Vicino, *The Decline of Inner Suburbs: The New Suburban Gothic in the United States*, 3 Geography Compass, 641 (2007).
[34] The Missing Middle Housing Study, The Montgomery County Planning Department, The Maryland-National Capital Park and Planning Commission, September 2018.
[35] Single-family Zoning in the District of Columbia, District of Columbia Office of Planning, April 2020.

### Key Contacts

**JONATHAN P. RAK**
PARTNER
Real Estate & Land Use
jrak@mcguirewoods.com
+1 703 712 5411
Tysons

**JAMES W. DYKE, JR.**
SENIOR ADVISOR, MWC
State Government Relations
jdyke@mwcllc.com
+1 703 712 5449
Tysons

# McGuireWoods

# McGuireWoods
# Consulting
Public Affairs Solutions