

RICHMOND TRANSPARENCY AND ACCOUNTABILITY PROJECT (RTAP)

# OUR STREETS, OUR SAY:

# POLICING IN RICHMOND

PUBLISHED JUNE 2019

DEFENDANT'S EXHIBIT F 3/8/2022

# Acknowledgements

*RTAP would like to acknowledge the two years of work by its members that led to the public release of the information contained in this report, with special thanks to Dr. Liz Coston and Amanda Hales for the data analysis and visuals that have made it accessible to the broader community. Further thanks to Derek Keaton, Ellie Riegel, and Sean Tenaglia for their assistance in drafting.  Last but not least, RTAP is grateful for all the community members who shared their stories of policing in Richmond because we know institutions of power are not the only keepers of data and truth.*

# Contents

**Acknowledgements**............................................................................................................... **2**

**Executive Summary**............................................................................................................... **3**

**Background** ............................................................................................................................. **4**

**Why RPD's History Demands Transparency & Accountability**........................... **6**

  I. RPD Abuses Create Mistrust in Community............................................................... **6**

  II. Analysis of Publicly Released RPD Data..................................................................... **8**

**Moving Forward: RTAP's Core Demands**.................................................................... **12**

# Executive Summary

*The Richmond Transparency and Accountability Project (RTAP) is a coalition of policy analysts, legal experts, and directly-impacted community members striving to build safer, healthier communities by organizing for a more transparent and accountable police department. Despite priding itself as a model of "community policing," the Richmond Police Department (RPD) has a tense history with the Black and Brown communities it's intended to protect. This fractured relationship has recently been highlighted by several high profile incidents of police hostility and violence towards people of color as well as by an ongoing lack of transparency regarding RPD's internal data.*

*After years of letters, meetings, and public pressure from RTAP, RPD finally began releasing internal data in early 2018 and continuing through 2019 regarding four key areas: citizen complaints, use of force, pedestrian contact, and traffic stops. The data paints a picture of dramatic racial inequality in police contact with civilians, racially disparate use of force, and an ineffective civilian complaint process. To address these issues, increase accountability, and take steps to repair a legacy of mistrust, RTAP demands three core changes to RPD: (1) prioritize the community input needed to capture and share more robust, better quality data; (2) ban predictive policing; and (3) expand civilian oversight.*



# Background

> **RTAP'S MEMBERS**
>
> RTAP's coalition members are the Legal Aid Justice Center (LAJC), New Virginia Majority (NVM), Southerners on New Ground (SONG), Dr. Liz Coston with Virginia Commonwealth University, and concerned community members from neighborhoods directly impacted by disparate policing.

The **Richmond Transparency and Accountability Project (RTAP)** strives to build safer, healthier communities by organizing for a more transparent, accountable, and fair police department. RTAP organizes Black and Brown people, legal experts, and policy analysts to achieve policing practices that reduce physical, economic, and emotional trauma on the most policed neighborhoods in the city.

In 2016, New Virginia Majority (NVM) organizers canvassed residents in Blackwell, asking them what needs to be improved in the neighborhood. After hearing from over 700 residents, improved police-community relations emerged as the top issue; NVM decided to organize for community oversight of the police department. RTAP came together when NVM and Southerners on New Ground realized they shared the same goal of increasing police accountability in Richmond.

At organization-led community meetings, people had the opportunity to share their experiences of policing in Richmond and showed support for civilian oversight. Nevertheless, when these stories were shared with former Richmond Police Chief Alfred Durham and some City Council members, their response was that data was needed to "prove" problems with policing practices.[1] RTAP set out to obtain that data using FOIA and community pressure via letters and petitions (*see Fig. 1*).

---

[1] **Tom Nash**, *Requester's Voice: Richmond Transparency and Accountability Project*, (May 15, 2019), https://www.muckrock.com/news/archives/2019/may/15/rv-Virginia-rtap/?.

### RTAP'S PUSH FOR DATA

The data released between January 2018 and March of 2019 underscores RPD's problematic policing of Richmond in four key areas: civilian complaints, use of force, traffic stops, and pedestrian stops.

**2017**

- Community led meetings were held to let people share their experiences of policing in Richmond
- Feedback from the community held meeting was presented to former Richmond Police Chief and City Council Members
- LAJC sends Freedom of Information Act FOIA request to RPD on September 5, 2017 for the Department's Use of Force and Civilian Complaint policies and Data.
- On September 25th RPD initially refused to release internal data requested by RTAP.

**2018**

- February 2018, After months of pressure from RTAP, RPD began releasing its data on Use of Force and Civilian Complaints.
- June 2018 RTAP continues to push for more information. Coalition members request additional data on pedestrian and traffic stops which RPD refused to release
- September 2018 RTAP began to publicly pressure Mayor Stoney by attending town halls and maintaining persistent correspondence with his office.
- December 2018 Mayor Stoney joins the conversation by meeting with RTAP and exerting political pressure on RPD. He agrees to release the data without fees.

**2019**

- Between January and March the requested pedestrian contact and traffic stop data was released.

FIGURE 1

# Why RPD's History Demands Transparency & Accountability

## I. RPD Abuses Create Mistrust in Community

**RPD'S TROUBLING TRACK RECORD**

While RPD touts community policing, the negative experiences reported by communities of color, as well as the lack of transparency from the Department, do not align with the goals of a community policing model.

The Richmond Police Department has, for years, prided itself as a model for "community policing," "making use of photo ops, carefully crafting press statements, and stressing the racial diversity of their officers,"[2] but its history tells a different story. Negative experiences reported by communities of color, as well as the lack of transparency from the Department, undermine RPD's claim to be a model of community policing. RPD's fractured relationship with the community, and in turn the community's distrust of those intended to protect them, has come to the forefront in recent years with several high-profile incidents.

### WHEN RPD FAILS, THE COMMUNITY SUFFERS



MARCUS-DAVID PETERS
SOURCE: LEGACY.COM //
2018

Marcus-David Peters - On May 14, 2018, Marcus-David Peters, a 24-year old beloved teacher and honors graduate of VCU, was shot by a Richmond police officer while he was clearly in the middle of a mental health crisis, which the officer acknowledged before shooting Mr. Peters. This incident exposed the failure of police training in responding to mental health emergencies, and highlights the need for a non-law enforcement response to such incidents.

---

[2] *Poverty, Crisis, and Police Murder in Richmond*, It's Going Down (June 5, 2018), https://itsgoingdown.org/poverty-crisis-and-police-murder-in-richmond-virginia/



MCKHYL DICKERSON
SOURCE: RVA MAG // 2018



MARKIYA SIMONE DICKSON
SOURCE: NBC12; FAMILY PHOTO // 2019



ALBERT HILL MIDDLE SCHOOL FRONT SIGN
SOURCE: WTVR // 2019

McKhyl Dickerson- On May 9, 2018, Dickerson, a 14 year old Black boy with autism and an auditory processing disorder, was playing with his uncle outside when a hit and run in which they were not involved unfolded. Officers followed McKhyl home, slamming him into his own wall, and then beating and handcuffing him in front of his grandmother. All of this occurred as she begged them to stop, desperately explaining her grandson's inability to comprehend why he was being followed and assaulted.

Markiya Simone Dickson- On Sunday May 26, 2019, 9 year old Markiya Dickson was killed by an outbreak of gunfire at a large community cookout in South Richmond's Carter Jones Park. An 11 year old boy was also shot in the incident. When bringing her to the hospital, Dickson's father and another man were unjustly handcuffed by police. Residents expressed their frustration after the shooting, noting how members of the Black community are treated with suspicion by the police, even when trying to save a life in the midst of a senseless tragedy.

Albert Hill Middle School- On March 28, 2019, a Richmond police officer drove up to three Albert Hill students outside of the school building to question them about a comment he thought one of them made. In response to the students' denials the officer replied: "Just wait 'til your asses turn 18. Then it's mine." His remarks were met with backlash from parents and residents concerned about police relations with Black residents, particularly children. The officer apologized in a meeting with the students involved and was removed from his Museum District patrol, but backed out of a planned school assembly to address the Albert Hill student body.

Why RPD's History Demands Transparency & Accountability     7

These incidents, along with clashes with protesters and an increasingly militarized force, have only served to heighten a sense of mistrust among community members.[3][4]

## II. Analysis of Publicly Released RPD Data

Furthermore, RPD's resistance to making its data publicly available (*see Fig. 1*) and the flawed data it has released in the face of community pressure, are causes for alarm. Data released by RPD between January 2018 and March 2019 underscores RPD's problematic policing of the Richmond community in four key areas: citizen complaints, use of force, pedestrian contacts, and traffic stops.

### CIVILIAN COMPLAINT DATA

**Findings on Complaints Against Officers:** While RPD policy states that complaints against officers should be resolved within 30 days, less than 20% of all complaints are handled in this timeframe. In 2018, it was common for investigations of complaints to take 4 months or more.



Time to Close Complaints Jan-Aug 2018

FIGURE 2

[3] Mark Bowes, *Police or Soldiers? Agencies Locally and Across Virginia have Weapons of War*, Richmond Times-Dispatch (Aug. 23, 2014), https://www.richmond.com/news/local/police-or-soldiers-agencies-locally-and-across-virginia-have-weapons/article_0d063dce-2b48-11e4-a2ee-0017a43b2370.html

[4] Graham Moomaw & Michael Martz, *Police Detain Five, Charge One Outside Trump's Richmond Rally Friday*, Richmond Times-Dispatch (June 11, 2016), https://www.richmond.com/news/local/city-of-richmond/police-detain-five-charge-one-outside-trump-s-richmond-rally/article_9bb7219a-ab25-5b12-a2b4-94f2298abb2f.html

# USE OF FORCE DATA

**Findings on Use of Force Data:** Data from 2017 and 2018 demonstrates that RPD officers are more likely to use force against Black civilians. While the City of Richmond is 48% Black, more than 75% of all use of force cases involve Black civilians.



FIGURE 3

# PEDESTRIAN CONTACT DATA



FIGURE 4

**Total FIRS:** 65% of the 27,432 police contacts documented in RPD's Field Interview Reports (FIRs) between January 2017 and October 2018 involved Black people. That equates to roughly *1 out of every 6 Black people* in Richmond getting stopped during this timeframe.



FIGURE 5



FIGURE 6

**Suspicious Activities:** There was a total of 3,539 "Suspicious Activities" Field Interview Reports (FIRs) in the pedestrian stop data sets released by RPD. Black people comprised **66%** of all Suspicious Activities FIRs, while white people only accounted for 25%. In other words, Black people were perceived as allegedly engaging in "Suspicious Activities" at a rate that is *2.7x higher* than white people.

Why RPD's History Demands Transparency & Accountability        9

# PEDESTRIAN CONTACT DATA



FIGURE 7

**Suspicious Persons:** There was a total of 4,605 "Suspicious Persons" Field Interview Reports (FIRs) in the pedestrian stop data sets released by the Richmond Police Department. Black people comprised 71% of all Suspicious Persons FIRs, while white people only accounted for 29%. This means Black people were perceived as "Suspicious Persons" at a rate that is *2.7x higher* than white people.



FIGURE 8

**Curfew Violations:** *98%* of all curfew violation Field Interview Reports involved Black youth -- particularly young Black boys. By comparison - according to the National League of Cities: "In 2014, black youth made up around 15 percent of the under 18 population, yet represented almost 50 percent of the curfew arrests in cities across the country."



FIGURE 9

**Truancy Violations:** *82%* of the alleged truancy violation reports involved Black people, particularly young Black boys. Comparatively, white people made up only 12% of the reports in this category. Based on the data, Black people were stopped for alleged truancy violations at a rate *7x higher* higher than white people.

# TRAFFIC STOP DATA



**Traffic Arrests:** Black people accounted for *75%* of all traffic arrests from January 2017 - October 2018, meaning Black people were *30.7% more likely* to be arrested during a traffic stop than white people. This racial imbalance is on par with national trends which show that Black people are *31% more likely* to be pulled over than white people.

FIGURE 10

## DISPARITIES IN POLICING

An overwhelming majority of community members who come in contact with RPD are Black, even though only 48% of Richmond's population is Black.

This data—analyzed by Dr. Coston and their team at VCU—paints a troubling picture of racially disparate policing in terms of RPD's use of force and pedestrian and traffic stops, as well as and an ineffective civilian complaint process.[5] An overwhelming majority of community members who come in contact with RPD are Black, even though only 48% of Richmond's population is Black.

## CIVILIAN TAX DOLLARS DESERVE CIVILIAN OVERSIGHT!

RPD receives the second largest portion of the city's budget of any agency; increased attention and accountability is imperative in the face of well-documented policing failures. Providing for greater civilian oversight and data transparency between RPD and the residents it serves is overdue.

---

[5] Critically, Field Interview Reports do not indicate that any crime has been committed. For example, multiple curfew violation FIRs were for youth actually 18 or over and therefore not subject to the curfew ordinance.

# Moving Forward: RTAP's Core Demands

**THE PROCESS TOWARDS PROGRESS**

RTAP's demands represent important first steps the city can make toward the ultimate goal of promoting racial justice and the safety, health, and well-being of Richmond's Black and Brown residents.

Considering RPD's role in the community, its lack of transparency and no shortage of high profile policing failures, further action is necessary to increase police accountability and take steps to heal feelings of mistrust within the Richmond community. The below RTAP demands represent the first steps the city can take in the long process toward promoting racial justice and the safety, health, and well-being of Richmond's Black and Brown residents. Policing abuses have lasting emotional and economic impacts on community members. This is evident in the lives of those who have shared their stories with RTAP coalition members. The city must act swiftly to end these abuses and implement policies to protect individuals in Richmond from legal violations and racially disparate policing.

RTAP understands that creating healthy and thriving Black and Brown communities requires a solution that combines reforming law enforcement practices with increased investment in community-based solutions that eliminate the need for law enforcement intervention in the first place. This approach is supported by research showing that communities of color favor solutions that "reduce the police role and replace it with empowered communities working to solve their own problems"[6] through public health, educational, employment and affordable housing-focused remedies.[7]

---

[6] Alex S. Vitale, *We Don't Just Need Nicer Cops. We Need Fewer Cops.*, The Nation (Dec. 4, 2014), https://www.thenation.com/article/we-dont-just-need-nicer-cops-we-need-fewer-cops/.

[7] *More Black than Blue: Politics and Power in the 2019 Black Census*, Black Futures Lab, https://blackfutureslab.org/wp-content/uploads/2019/05/More-Black-than-Blue.pdf.

**IMPROVE DATA CAPTURE**

We can only ensure a data system that provides robust, better quality, and publicly available data if the community is involved in shaping that system on the front end.

**1. Prioritize Community Input In Order To Capture & Share More Robust, Better Quality Data -** While RPD's recent data releases serve as a starting point for transparency, they also raise many questions about the methodology and quality of data collection.[8] Questions, such as "How many incidents lead to a search?" or "How many searches lead to an arrest?", remain difficult to answer based on the current data capture practices. RPD's decision to revise its records management system for the first time in over a decade provides an opportunity for a step in the right direction, increasing accountability and transparency. However, we can only ensure a data system that provides robust, better quality, and publicly available data if the community is involved in shaping that system on the front end.

**2. Ban Predictive Policing -** While RTAP advocates for better data, changes should not result in the collection of certain kinds of information that can be harmful and/or biased. RPD's contract with SOMA Global to provide the new records management system raises concern; SOMA Global markets itself as a leading provider of technologies, such as predictive policing and invasive tracking practices, that have proven harmful to minority communities.[9] Predictive policing uses software analysis of data from past police activity to predict potential crime hot spots and offenders. That data frequently reflects biased, and sometimes unconstitutional, policing practices, making it unreliable.[10]

---

[8] For instance, Dr. Coston's review of Use of Force data identified discrepancies in RPD's reporting of officer uses of force, to include the initial omission of Officer Michael Nyantaki's deployment of a taser and discharge of a firearm during his confrontation with Marcus-David Peters.

[9] *The City of Richmond Enters Into an Agreement with SOMA Global to Provide Public Safety Solutions in Virginia*, CISION PRWeb (Jan. 29, 2019), https://bit.ly/2wFlt86

[10] Rashida Richardson, Jason M. Schultz & Kate Crawford, *Dirty Data, Bad Predictions: How Civil Rights Violations Impact Police Data, Predictive Policing Systems, and Justice*, N.Y.U. L.Rev. (May 2019), https://www.nyulawreview.org/wp-content/uploads/2019/04/NYULawReview-94-Richardson-Schultz-Crawford.pdf.

> **BIAS IN, BIAS OUT: SAY NO TO PREDICTIVE POLICING**
>
> Predictive policing uses data reflecting biased, and sometimes unconstitutional, policing practices, making it unreliable. Moreover, predictive policing is known to perpetuate systems of racially biased and inaccurate data collection.

Predictive policing can be racially biased and inaccurate, as demonstrated by discrepancies between predictive targets and actual estimated users of illicit drugs in Oakland, CA (see Fig. 11).[11] Black residents of Oakland were targeted at a significantly higher rate than whites based on predictive data analysis, but estimates reflect the opposite reality- whites were significantly more likely to be users.



**Predictive policing in Oakland vs. actual drug use**
The chart on the left shows the demographic breakdown of people targeted for policing based on a simulation of PredPol in Oakland. The chart on the right shows actual estimated use of illicit drugs.

source: National Survey on Drug Use and Health, Human Rights Data Analysis Group — Mic

FIGURE 11

At a local town hall meeting, Richmond citizens overwhelmingly stated that they do not want RPD to use this technology to police the community.[12] While RPD should work to gather and analyze more robust data, they must avoid predictive policing to continue to build positive relations and foster transparency with civilians.

---

[11] Jack Smith IV, *(Exclusive) Crime-Prediction Tool PredPol Amplifies Racially Biased Policing, Study Shows*, (Oct. 9, 2016), https://www.mic.com/articles/156286/crime-prediction-tool-pred-pol-only-amplifies-racially-biased-policing-study-shows.

[12] Information drawn from RTAP's Townhall Feedback survey

**ESTABLISH ACCOUNTABILITY MEASURES**

Meaningful civilian oversight would enhance public safety by providing transparency and accountability over RPD.

**QUESTIONS ABOUT THE REPORT?**

Please send all inquires about the report and any information herein to richmondvatap@gmail.com.



***3. Establish Civilian Oversight*** - Civilian oversight remains of paramount importance in Richmond, without which RPD will continue to police itself without any meaningful accountability. According to the New York Times, 7 of the 9 cities most similar to Richmond (based on population, employment opportunities, and geographic metrics) have some form of civilian oversight for their police departments.[13] Although there is no one-size-fits-all type of civilian oversight, RTAP advocates for a system which helps to enhance public safety, broadly understood; provides meaningful responses to civilian complaints; and promotes trust through continued transparency and open communication between RPD and the Richmond community.

Civilian oversight would help to hold leaders and officers accountable for their actions and keep community members informed of decisions and policies that affect their neighborhoods. Oversight can be accomplished in multiple ways, from civilian review boards engaging in review of civilian complaints about alleged misconduct to independent auditing offices that have access to the full scope of police data and can solicit community input to make recommendations for improving police practices.[14]

---

[13] Jed Kolko & Josh Katz, *What is your City's Twin?*, **New York Times: The Upshot** (Apr. 3, 2018), https://www.nytimes.com/interactive/2018/04/03/upshot/what-is-your-citys-twin.html. See also, *National Association for Civilian Oversight of Law Enforcement*, www.nacole.org (last visited Jun. 2019) (Various community oversight models have been put in place across the nation, with Fairfax County, Virginia Beach, and Charlottesville representing three local examples within the Commonwealth).

[14] *Chapter 4: Alternative Models for Police Disciplinary Procedure, Coping with Police Misconduct: Citizen Involvement in Officer Disciplinary Procedures*, https://www.usccr.gov/pubs/sac/wv0104/ch4.htm; Peter Flinn, *Citizen Review of Police: Approaches and Implementation*, **National Institute of Justice** (March 2001), https://www.ncjrs.gov/pdffiles1/nij/184430.pdf.


