**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>KEITH RODNEY MOORE, )<br>)<br>Defendant. ) | Criminal No. 3:21-cr-42 |

**UNITED STATES' RESPONSE TO DEFENDANT'S SECOND
SUPPLEMENT TO SUPPRESS EVIDENCE AND STATEMENTS**

The defendant does not come close to meeting any legal standard to prevail on his equal protection argument, whether that standard is the heightened standard from multiple Supreme Court and published Fourth Circuit cases, or the standard he substitutes to avoid the strict requirements attendant to *Armstrong*, *Hare*, and *Mason*. The main source of evidence for both discriminatory effect and purpose is Dr. Coston's statistical analysis, but because that analysis is riddled with bad data, deficient data modeling, and fails to consider or control for *any* alternative hypotheses, Dr. Coston's analysis is wholly unreliable and unsuitable for reliance. Because the defendant has utterly failed to meet his high burden, the Court should deny the defendant's late-filed request to dismiss the indictment.

**I. LEGAL AUTHORITY**

To prevail on his selective enforcement claim, the defendant must "show *both* discriminatory effect *and* that the officer's action was motivated by a discriminatory purpose." *United States v. Mason*, 774 F.3d 824, 829 (4th Cir. 2014) (emphasis added) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Generally, that dual showing requires proof (1) "that similarly situated individuals of a different race" were treated differently and (2) that the decision to enforce the law against the defendant "was invidious or in bad faith." *United States v. Hare*, 820

1

F.3d 93, 99 (4th Cir. 2016); *see also Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (party asserting equal protection violation "must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976)). The defendant must prove the two elements of discriminatory purpose and discriminatory effect by "clear evidence"—an intentionally "demanding and rigorous" standard—because "a selective law enforcement claim 'asks a court to exercise judicial power over a special province of the Executive.'" *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464).

The standards from *Armstrong* have long governed selective enforcement claims in the Fourth Circuit. *Hare*, 820 F.3d at 99 ("This Court has adopted *Armstrong's* standard for proving selective prosecution as the standard for proving selective enforcement. *See United States v. Bullock,* 94 F.3d 896, 899 (4th Cir. 1996)"); *Mason*, 774 F.3d at 829 (same); *see also Johnson v. Holmes*, 782 F. App'x 269, 276 (4th Cir. 2019) (same). Hence, the defendant's claims must be proved by "clear evidence." *Mason*, 774 F.3d at 830 (quoting *Armstrong*, 517 U.S. at 464); *Hare*, 820 F.3d at 98.

Likewise, under Fourth Circuit and Supreme Court precedent, a "defendant must show that the law enforcement practice was not enforced against 'similarly situated individuals of a different race.'" *United States v. Suarez*, 321 F. App'x 302, 305 (4th Cir. 2009) (citing *Armstrong*, 517 U.S. at 465; *Bullock,* 94 F.3d at 899); *see also Hare*, 820 F.3d at 99-101 (applying and extensively discussing the similarly situated requirement in selective enforcement case); *Mason*, 774 F.3d at 830 (applying the similarly situated requirement in selective enforcement case) (citing *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996)).

The defendant largely ignores this binding precedent.[1] *Mason* is mostly dismissed as a "passing reference" to the applicable standard of proof. Dkt. 66 at 3. *Olvis* is cited just once, and only because *Mason* quotes it. *Id. Hare, Venable,* and *Bullock*—three published and precedential Fourth Circuit opinions on the burden of proof in selective enforcement or prosecution cases—are ignored completely, not even cited once.

Relying on out-of-circuit authority, *Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021), defendant argues that a selective enforcement case involving the decisions of police officers should be subjected to a less demanding standard of proof than applies to selective prosecution claims addressing charging decisions. *See* Dkt. 66 at 3.[2] But as *Conley* itself notes, the Fourth Circuit has not taken this approach. *Conley*, 5 F.4th at 796 n.4 (citing *Mason*, 774 F.3d at 829–30). This Court is obliged to follow Fourth Circuit precedent. *McMellon v. United States*, 387 F.3d 329, 332–33 (4th Cir. 2004) (published opinions of the Fourth Circuit remain binding "unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court").

Moreover, this is not a case where the differences that the Seventh Circuit invoked between selective prosecution and selective enforcement matter. The distinction defendant draws is academic here. Defendant's claim would readily fail even under Seventh Circuit law.

Mirroring Fourth Circuit law, *Conley* explains that, "[a]s equal protection claims, both selective prosecution and selective enforcement require proof 'that the defendants' actions had a

---

[1] One of the main reasons the defendant offers for sidestepping and distinguishing precedent is that prosecution is one of the "core powers of the Executive Branch." Dkt. 66 at 5. This argument is belied by the defendant's own arguments and requests in this case. The defendant has repeatedly criticized the drawing of RPD precincts and RPD patrolling patterns. *See, e.g.*, Dkt. 66 at 8. Drawing police precincts and allocating scarce law enforcement resources is also a core executive function that the defendant encourages the Court to implicitly overtake.

[2] The defendant also claims there is a burden-shifting component to the analysis, citing three inapposite civil cases. Dkt. 66 at 6. This burden-shifting framework is not part of the *Armstrong* test and has no place in the proper analysis.

discriminatory effect and were motivated by a discriminatory purpose.'" 5 F.4th at 789 (citations omitted). And a party bringing an equal protection claim "must show discriminatory purpose 'in *his* case.'" *Id*. (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)). "[T]he decisionmaker" must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*. (quoting *McCleskey*, 481 U.S. at 298; *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Even where Seventh and Fourth Circuit precedent departs, the Seventh Circuit continued that, under the preponderance standard that it applies, statistical evidence must still establish that "race can be isolated from other confounding variables." 5 F.4th at 796. "When program-wide statistics are [a party's] sole source of evidence, it can be difficult to infer discrimination in a particular case—especially when there is another legitimate explanation for the government's conduct." *Id*. at 979. "[O]nly in 'rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation.'" *Id*. (quoting *McCleskey*, 481 U.S. at 293 n.12). In keeping with these points, *Conley* rejected a statistical analysis of stash-house stings when that analysis was "based on two assumptions that simply do not apply to Conley's case." *Id*. at 798. The professor who conducted the analysis "acknowledged that correcting for those assumptions would reduce the data to 'such a small sample' that it would be nearly 'impossible to conduct a reliable statistical analysis' that could support an inference of racial discrimination." *Id*. (citation omitted). Defendant's statistical evidence suffers from far greater flaws than those in *Conley*, and defendant does not come close to satisfying even the Seventh Circuit's standards.

4

**Argument**

I. **The defendant cannot meet the high *Armstrong* standard**

   A. **The defendant has failed to show discriminatory effect, or that he was treated differently than similarly situated individuals of a different race.**

To show discriminatory effect under *Armstrong*, the defendant "*must* make a credible showing that similarly situated individuals of a different race" were treated differently by police. 517 U.S. at 465 (emphasis added). The defendant fails to meet this threshold requirement.

The circumstances of defendant's arrest undercut that his case involved a discriminatory effect and that a person with a different race would not have been stopped and arrested. When officers sought to stop the vehicle in which the defendant was riding, the officers had seen the same counterfeit temporary vehicle tag that was on defendant's vehicle on two other vehicles in the same shift. The defendant points to no other non-black citizen who was not stopped when the police faced circumstances that were similarly suspicious. To posit that the reason for the stop was the defendant's race and not the extremely suspicious fake tag that kept popping up like a Whac-a-mole is unpersuasive. To support his claim, defendant relies on a disproved assertion that the Fourth Precinct Focus Mission Team (FMT) searched every car it stopped that night and an extremely flawed statistical analysis. The United States has previously demonstrated the falsity of the defendant's claim that the Fourth FMT searched every car stopped for minor traffic violations on December 5, 2020. Dkt. 36 at 17-18.

With the point disproven that the Fourth FMT searched every car that night, the only evidence that remains to show discriminatory effect is the defendant's flawed statistical analysis, but the United States demonstrates in its companion filing that the statistical analysis is unreliable and unworthy of consideration. *See generally* Dkt. 70. In a nutshell, Dr. Coston's analysis uses a unreliable measure of the race of those stopped and an unreliable measure of the race of drivers in

the relevant area to run a simplistic analysis ill-suited to providing any firm conclusions, let alone answering any questions about causation. Defendant's expert evidence is unreliable and should be discounted entirely, and defendant is still in effectively the same place as he was before he retained the expert: "'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'" *Hare*, 820 F.3d at 99 (quoting *Olvis*, 97 F.3d at 745). The defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus." *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (internal quotation marks omitted) ("Notably, there is *not* 'a presumption that unexplained statistical evidence of racial disparity proves racial animus.'") (quoting *Olvis*, 97 F.3d at 745); *Johnson*, 782 F. App'x at 281 ("Crucially, in [*Armstrong*, *Hare*, and *Olvis*], the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably").

Demonstrating some "unexplained evidence of racial disparity," or some indeterminate correlation between two variables, is the most he has done—and the deficiencies in the data he uses undercuts his claims to have demonstrated even that much. *See, e.g.*, *United States v. Raynor*, No. CRIM. 3:13MJ215, 2013 WL 5770529, at *8 (E.D. Va. Oct. 24, 2013) (Novak, M.J.) (rejecting an equal protection challenge in part due to faulty data). Moreover, by choosing to rely on general population census data from the entire city of Richmond to show racial discrimination, defendant lacks a credible showing that a similarly situated individual in the Fourth Precinct was treated differently than him because the census data is an inappropriate benchmark for drivers in the Fourth Precinct committing similar crimes. *Hare*, 820 F.3d at 99 ("Without an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants prove[d] nothing.") (quoting *Olvis*, 97 F.3d at 745).

Further, at best, all the defendant has done is demonstrate some kind of disparity, consistent with analyses in Richmond going back at least 20 years,[3] but the defendant does nothing to control for confounding variables or alternative explanations besides racial discrimination, like the severity of the violation that led to the stop, underlying crime rates, or low discretion stops, arrests, and searches. Indeed, the rudimentary analysis performed by the United States shows that traffic stops correlate closely to crime rates in Richmond's precincts, Dkt. 70 at 16-17, but Dr. Coston never even tried to consider alternatives. The flaws in the statistical analysis extensively detailed in the companion motion result in a failure to show "an appropriate basis for comparison" pursuant to Fourth Circuit precedent, and dooms the defendant's ability to demonstrate discriminatory effect by clear evidence and that similarly situated individuals of a different race were treated differently.

### B. The defendant has no evidence to show discriminatory purpose.

The defendant has also completely failed to show discriminatory purpose, either generally or in his own case. "As a general matter, in cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer . . . a discriminatory purpose." *Hare*, 820 F.3d at 100 (quoting *Olvis,* 97 F.3d at 746; *McCleskey,* 481 U.S. at 297) (internal quotations omitted)); *McCleskey*, 481 U.S. at 292 ("to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose"). The defendant repeatedly and wrongly conflates disparity with discrimination.

As an initial matter, the Fourth FMT had abundant cause to pull the defendant over after seeing the identical fake tag on three different vehicles in the same shift. The abundant probable

---

[3] Smith, M. R. & Petrocelli, M. (2001). Racial Profiling?: A Multivariate Analysis of Police Traffic Stop Data. *Police Quarterly*, 4, 4-27.

7

cause for the stop dispels doubt that there was a secret discriminatory purpose. Indeed, officers in their position could hardly have *not* stopped the defendant.

As with discriminatory effect, the backbone of the defendant's discriminatory purpose argument is the flawed statistical analysis performed by Dr. Coston. Again, for the reasons described extensively in the United States' companion *Daubert* motion, Dr. Coston's analysis is wholly unreliable. The Department for Criminal Justice Services ran similar analyses on data from the same sources and it readily admits the numerous shortcomings both of the data and the resulting analyses. Simply put, Dr. Coston's report and the defendant's claimed evidence cannot and does not say nearly as much as the defendant claims.

For example, despite the defendant's strained claims about "the Richmond Police Department effectively patrolling the boundaries of the white neighborhoods," Dkt. 66 at 9, the defendant's and Dr. Coston's whole analysis merely assumes that drivers are only stopped in their own neighborhoods. This is flatly contradicted by the literature, even the literature on which the defendant relies. Dkt. 66-2 at 2 ("Moreover, drivers may not live in the jurisdictions where they were stopped, further complicating the interpretation of population benchmarks."); Dkt. 70-1 at 2 ("[T]he population of persons who *live* in an area often serves as a poor representation of persons who *drive* in an area or who are *at risk* for being stopped by the police. . . . While all benchmarks suffer from certain limitations, census-based benchmarks are so far off the mark as valid estimates of the actual driving and/or traffic violating populations that informed social scientists should no longer use them.") (citations omitted). There is no basis for the defendant's assumptions under *Daubert* or under *Armstrong*, and the defendant's statistics do nothing to further his argument that the Fourth FMT discriminated against him.

At bottom, because defendant offers no evidence of discriminatory purpose in his case, and the facts of his stop do not even suggest a discriminatory animus behind the officers' actions in his case, defendant would have great difficulty establishing that the criminal charges against him should be dismissed simply because of statistical evidence of a racial disparity in traffic stops in Richmond. But defendant's statistical evidence is so deficient that he does not approach proving that anything more than differences in local crime rates, racially neutral decisions on how to deploy police resources, and similar constitutionally permissible factors explain the evidence that he has amassed.

The Supreme Court has clearly stated that it is insufficient to establish an equal protection violation for a government to be aware of a disparate impact. To qualify as "invidious or in bad faith" the government must "select[] or reaffirm[] a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States,* 470 U.S. 598, 610 (1985). This is a burden the defendant cannot meet because he must show not just that the Fourth FMT's job is "to get guns and drugs off the street," Dkt. 66 at 9, or even that the Fourth FMT's actions pulling people over in the overwhelmingly black Fourth Precinct have a significant impact on African Americans. Instead, the defendant must show that the Fourth FMT specifically chose to target him because of his race. There is simply no evidence of that, and without such evidence the defendant cannot show discriminatory purpose. *Wayte,* 470 U.S. at 610.

    **C.**    **The defendant's arguments about historical discrimination are irrelevant.**

The defendant goes all the way back to 1861 to argue that the Richmond Police Department practices racial discrimination in one form or another. To resolve the defendant's case, this Court need not attempt to adjudicate the propriety of more than a century and a half of law enforcement in Richmond, Virginia. *See, e.g., McCleskey*, 481 U.S. at 298 n.20 ("McCleskey relies on

9

'historical evidence' to support his claim of purposeful discrimination by the State. This evidence focuses on Georgia laws in force during and just after the Civil War. . . . [U]nless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent.").

The only evidence that is even plausibly relevant would be evidence of some unexplained disparity in traffic stops in the last 20 years. Ironically, the defendant cites as evidence of discrimination the exact study performed by the retained expert for the United States, Dr. Michael Smith. Dr. Smith clearly explains in his report the flaw in the defendant's thinking. Many studies, including the 2001 Richmond study conducted by Dr. Smith, have shown some racial disparity in traffic stops using methods that "far exceeded the explanatory power of the rudimentary statistical techniques used by Dr. Coston." Dkt. 70-1 at 6. "Yet, even in those studies, the authors were careful not to infer *racial bias* as the cause of any observed disparities because of their inability to rule out the influence of other variables unavailable to them in their analyses." *Id*. This criticism is particularly apt to Dr. Coston's analysis because Dr. Coston failed to rule out the influence of *any* variable besides race. Simply put, disparity is not discrimination or bias, and the defendant is wrong every time he conflates the two. For the reasons well explained by Dr. Smith, researchers struggle to make causal claims with analyses and models far more accurate than Dr. Coston's, and there is nothing in Dr. Coston's analysis that allows the broad and bold claims that defendant repeatedly makes.

**D.    The Court should not allow the defendant any further "supplements"**

The defendant first raised this equal protection claim after the motions deadline, in a supplemental brief, and shoehorned a motion to dismiss into a motion to suppress. The first evidence of an equal protection claim was presented by surprise at the July 26, 2021 suppression

10

hearing. The defendant's pattern of litigation surprises continues, with the defendant now claiming he "anticipates presenting additional evidence of discriminatory intent at the evidentiary hearing this Court intends to schedule at the conclusion of this supplemental briefing." Dkt. 66 at 12. The Court should stop the defendant from dragging on the proceedings and constantly surprising opposing counsel and the Court with new evidence. The defendant was indicted on May 4, 2021, Dkt. 3, and the suppression hearing was held nine months ago on July 26, 2021. Dkt. 30. These proceedings have been prolonged, moreover, for defendant to submit thoroughly deficient expert evidence. The Court should prohibit the defendant from providing "additional evidence" at the eleventh hour, nearly a year after the motion deadline.

### E. Granting the motion to suppress/dismiss could have far-reaching consequences.

The Court should consider the practical consequences of potentially granting the defendant's motion to dismiss the indictment if the Court were to do so on grounds that there is an unexplained racial disparity in deeply flawed traffic stop data with absolutely no connection to the stop at issue in this case. If such unexplained disparity alone were sufficient cause to dismiss an indictment without evidence of discrimination, law enforcement would be unable to enforce the law at all against anyone unless each type of police action closely matched the racial demographics of the jurisdiction. Such racial quotas for traffic stops, searches, and arrests would be far more violative of equal protection principles. Further, because an increased police presence and thus an increased number of traffic stops is related to crime rates and calls for service, if law enforcement is unable to act unless their action accords with racial demographics, it would deny victims the very police protection they are seeking out in making calls for service.

### Conclusion

The defendant's motion does not come close to meeting *Armstrong*'s high bar. In fact, it

is telling that at every turn the defendant seeks to lower the bar he must clear by ignoring and mischaracterizing precedent. Because the defendant has not met his burden, the Court should deny the defendant's late-filed request to dismiss the indictment.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:   _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov