IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:21cr42 |
| ) | |
| KEITH RODNEY MOORE, ) | |
| Defendant ) | |

## MR. MOORE'S RESPONSE TO MOTION TO EXCLUDE DEFENSE EXPERT

Keith Moore, through counsel, responds as follows to the government's motion to exclude the defense's expert, Dr. Eli Coston, *see* ECF No. 70:

**I.    The government's motion is essentially a preview of its cross-examination of Dr. Coston rather than a meritorious *Daubert* challenge.**

In responding to the defense's supplemental brief in support of Mr. Moore's equal protection challenge, the government has confused its critiques of Dr. Coston's analysis and conclusions with a *Daubert* challenge. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), reevaluated the prior standard governing admissibility of expert evidence in federal court—the theory of general acceptance. In rejecting that standard, the Supreme Court made several observations relevant to the Court's analysis of the government's motion *in limine* to exclude Dr. Coston's report:

> The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto*." (Emphasis added.) The subject of an expert's testimony must be "scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific

1

> testimony must be "known" to a certainty; arguably, there are no certainties in science. *See, e.g.*, Brief for Nicolaas Bloembergen et al. as *Amici Curiae* ("Indeed, scientists do not assert that they know what is immutably 'true'—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7–8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

509 U.S. at 589-90. An opposing party is certainly not without recourse to challenge expert evidence. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. "To summarize: . . . the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id.* at 597.

As further explained below, Dr. Coston's report is based on the well-founded scientific principles best applicable to the dataset at hand. The government's arguments are, of course, well-suited for cross-examination, and Dr. Coston will be happy to further elucidate their reasons in choosing specific, scientifically validated analytical tools to apply to the dataset available in this case. To be sure, it is expected that the government does not like or agree with Dr. Coston's analysis and conclusions, but the question of evidentiary reliability is not the same as whether the opposing party views the expert evidence as correct. *See, e.g.*, *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (observing that proponents of expert evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their

2

experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness."); *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."); *United States v. Perocier*, 269 F.R.D. 103, 114 (D.P.R. 2009) ("While defendants' arguments raise concerns of 'reliability' as to the underlying data and evidence on which Klein's conclusions are based, those issues are not the ones with which Rule 702 is concerned.  Reliability under Rule 702 is a question concerning the expert's methods, not the method of obtaining the underlying data by non-experts.").

The Court should deny the motion.

**II.     The government's critiques of the quality and accuracy of the data that Dr. Coston relied on ignores the reality that datasets are almost always imperfect.**

The government critiques the data that Dr. Coston relied to generate their expert report in two ways: 1) the quality of the data, and 2) the accuracy of the data.  To review, the data that Dr. Coston analyzed came directly from the law enforcement agency that is a part of the prosecution team in this case, the Richmond Police Department.  On September 30, 2021, the defense sought and the Court ordered the Richmond Police Department to produce police department records associated with each traffic stop that the Richmond Police Department conducted from July 1, 2020, through December 5, 2020.

In response to this subpoena, on October 18, 2021, counsel for the Richmond Police Department contacted undersigned counsel and reported that she estimated that to comply with the subpoena, the Richmond Police Department would have to produce an estimated 9,000 to 15,000 responsive documents and that it was not feasible to produce that information to the defense in any sort of timely fashion.  During subsequent phone calls with counsel for the Richmond Police

Department, counsel for the Richmond Police Department further indicated that the Department would fight compliance with the subpoena if the defense continued to pursue production of all 9,000 to 15,000 responsive documents. But, counsel for the Richmond Police Department reported that the Department could provide the raw data submitted to the Virginia State Police in compliance with Virginia's Community Policing Act, *see* Va. Code § 52-30.2, from the time period of July 1, 2020, through December 5, 2020. On October 21, 2021, counsel for the Richmond Police Department then provided several spreadsheets of data containing the Richmond Police Department's information collected pursuant to the Virginia Community Policing Act from July 1, 2020, through July 31, 2021, to defense counsel. It is this data from the Richmond Police Department (limited to the timeframe of July 1, 2020—the time that the Richmond Police Department began collecting data pursuant to the Virginia Community Policing Act—and December 5, 2020—the date of Mr. Moore's traffic stop) that Dr. Coston analyzed.

  *a. The quality of the data analyzed is limited to the quality of the data provided.*

One of the government's critiques of Dr. Coston's analysis is that Dr. Coston did not collect additional data to perform a veil of darkness survey or a "Richmond-specific traffic accident estimate[]." *See* ECF No. 70 at 14. It is true that information that would enable the defense to perform a veil of darkness survey or a Richmond-specific traffic accident estimate would be of great interest to the defense in this case. As described above, however, the Richmond Police Department refused to provide the individual reports of the individual traffic stops showing when these traffic stops occurred. Thus, the defense could not conduct a veil of darkness survey on the data provided. Similarly, no Richmond-specific traffic accident data exists that defense counsel are aware of.

4

Another of the government's critiques is of the Richmond Police Department's apparently poor compliance with Virginia's Community Policing Act from July 1, 2020, to December 5, 2020. The express purpose of the Community Policing Act is to collect and analyze data "to determine the existence and prevalence of the practice of bias-based profiling and the prevalence of complaints alleging the use of excessive force." *See* Virginia's Legislative Information System, *2020 Session: HB 1250 Virginia Community Policing Act; data collection and reporting requirement*, https://lis.virginia.gov/cgi-bin/legp604.exe?201+sum+HB1250 (last visited Apr. 22, 2022); *see also* Va. Code § 9.1-191(A).  In addition to requiring community police departments to collect the required data, Virginia's Community Policing Act also requires Virginia's Department of Criminal Justice Services to produce periodic reports analyzing the data collected.  *See* Va. Code § 9.1-191.

In the Department of Criminal Justice Services's first report[1] analyzing the first batch of Community Policing Data reports that Dr. Coston's analysis is not only correct as it relates to the data that the Richmond Police Department submitted, but also displays the racial profiling law enforcement agencies throughout Virginia are conducting on black drivers in Virginia.  Figure 14 of that report paints a stark picture showing that Richmond (and nearly every other jurisdiction in Virginia) police officers do not disproportionately stop white drivers.  But, Richmond (and nearly every other jurisdiction in Virginia) police officers do disproportionately stop black drivers.

---

[1] The government's motion in ECF No. 70 mentions but does not link or attach this report.  The defense does both here.  *See* Virginia Dep't Crim. Just. Servs., *Report on Analysis of Traffic Stop Data Collected Under Virginia's Community Policing Act* (July 1, 2021), https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/research/report-analysis-traffic-stop-data.pdf ; *see also* Ex. G.  To remain consistent with exhibit labeling in the supplemental briefing stage, the defense has continued its alphabetical labeling here where it left off in ECF No. 66.



See Ex. A at 61.  As Dr. Coston found, the Department of Criminal Justice Services report the government argues constitutes a better analysis finds that Richmond police officers disproportionately search and arrest black drivers but do not disproportionately search and arrest white drivers.  Id. at 62-63; see also United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996) (finding persuasive in evaluating Daubert challenge government's own actions in the case; "Indeed, common sense suggests that the Government would not have gone to the expense of taking private property and erecting a levee for the purpose of 'flood control in Yazoo River Basin' were the possibility of flooding in the area

6

mere 'speculation and conjecture.'"). One can presume that Virginia would not have enacted the Community Policing Act but for a valid concern regarding racial profiling in Virginia.

Another critique that the government levels at the quality of the data Dr. Coston relied on is that the data was collected during the early phases of the COVID-19 pandemic, when "law enforcement agencies were losing personnel, addressing civil unrest, and navigating surges in infections." *See* ECF No. 70 at 5. That is all true. But, what the government does not address is that evidence shows a long history of racial profiling by the Richmond Police Department. From January 2017 to October 2018, seventy-five percent of all of the people the Richmond Police Department arrested during traffic stops were black. *See* ECF No. 66-6 (Ex. F) at 11. That percentage indicated that black drivers in Richmond were 30.7% more likely to be arrested during a traffic stop than white drivers. *Id.* In six weeks of data from February 14, 2000, to March 31, 2000, that the government's expert analyzed, Dr. Smith found that 64.2% of all of the drivers that the Richmond Police Department stopped for traffic offenses were black. At the time, black drivers comprised 50.6% of the driving population in Richmond. *See* Ex. H.

Interestingly, Dr. Smith's 2001 study analyzed data captured by all Richmond Police Department officers entering required information into mobile data computers in their police cars. *Id.* at 5. During the timeframe that Dr. Smith studied, officers with the Richmond Police Department made 110 traffic stops using motorcycles or rental cars or some other car that could not be fitted with a mobile data computer. *Id.* at 6. Also during that timeframe, officers complied with entering the requested data in only 64% of the traffic stops the officers conducted. *Id.* Dr. Smith noted that "[g]iven the sensitive nature[2] of the study and the number of traffic stops made daily, a 64% response rate was somewhat higher than expected." *Id.* Rather than rendering his

---

[2] The purpose of the study was specifically to determine whether Richmond Police Department officers were disproportionately stopping, searching, and arresting minority citizens.

7

analysis unreliable, Dr. Smith simply cautioned that his analysis must be viewed with the understanding that the data did not represent every traffic stop that the Richmond Police Department conducted. *Id*. Of note, the Richmond Police Department Chief "was less than pleased with [Dr. Smith's] results. [The police chief] viewed the study as flawed and based on incomplete data," *see* ECF No. 66-5 at 2—a position identical to that which the government takes here.

As Dr. Smith did in 2001, the Court should conclude that while the data does in this case does not represent all aspects of every traffic stop the Richmond Police Department conducted, the data itself is reliable. Likely never will there be a perfect data set to analyze in any given situation. As Dr. Coston noted in their report, additional data would of course allow for additional analysis. Because this is a criminal case that the government brought in this Court six months after the traffic stop in this case, the defense could not create its own dataset that could possibly have been more illuminating and yet also relevant in time to the traffic stop at hand. Rather, the best data available for this analysis is the data that the state of Virginia requires all police departments to keep under the Virginia Community Policing Act. But just because a data set is imperfect—as most are—does not mean that the analysis itself is unreliable.

> **b. The accuracy of the data is in large part determined by the Richmond Police Department officers who recorded the data.**

One of the government's critiques of the accuracy of the data is that the officers had no guidance from the Virginia State Police in how to determine an individual's race. *See* ECF No. 70 at 6. As a purely human-created social construct, race is, of course, subject to some interpretation. But, the idea that a police officer's visual assessment of the race of another individual renders the data in this case so inaccurate that it is unreliable does not comport with the law or commonsense. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 287 (2004) ("But a person's

8

politics is rarely as readily discernible—and never as permanently discernible—as a person's race."); *compare* ECF No. 70 at 6 (arguing that officers cannot make reliable determinations of another individual's race) *with* ECF No. 70 at 14 and ECF No. 70-1 at 2 (advocating that better method is to collect data to use "veil of darkness" technique so as to limit officer's visual determination of race in decision to conduct traffic stop).

That critique borders on resemblance of Virginia's historical "one-drop rule," enacted in the Racial Integrity Act of 1924. The Racial Integrity Act of 1924 classified people as white only if they had "no trace whatsoever of any blood other than Caucasian" or one-sixteenth or less of Native American blood and "no other non-Caucasic blood . . . ." *See* Ex. I. It did not matter then whether the person appeared white. Rather, what mattered was whether the person had any non-Caucasian (or Native American) ancestor. That mode of thinking belies the purpose of colleting racial profiling statistics. If a person's race is so indistinguishable from that of "white," presumably an officer would report the person's race as white. Thus, there would be no racial profiling.

Another of the government's critiques of Dr. Coston's report is their use of mapping tools. First, the government takes issue with Dr. Coston and the defense's use of the geocoding program Geocodio. Geocodio is:

> a geocoding service that has been used to obtain geographic coordinates in other point pattern analyses. Geocodio's forward geocoding matches addresses provided by the user with data from over 1600 data sources, including the US Census Bureau, the US Postal Service, and city, county, and state datasets.

*See* Ex. J. Geocodio has been used by other academics in published articles who conduct geospatial analyses. *Id.* at 3, 13. Geocodio reports that results indicating a less than .6 accuracy warrant further review and potential correction. *See* Geocodio, *Accuracy Types and Scores*, https://www.geocod.io/guides/accuracy-types-scores/ (last visited Apr. 22, 2022). And like the

researcher in Exhibit J, the defense individually reviewed and corrected all locations with an accuracy score of less than .6. *See* ECF No. 66-1 at 4.

The government has pointed to three out of 2,582 traffic stops in which Geocodio incorrectly[3] mapped the location of the traffic stop. *See* ECF No. 70 at 11. Dr. Coston excluded each[4] of these stops from the analysis because the mapping information indicated that they were clearly outside of the Richmond Police Department's jurisdiction. *See* ECF No. 66-1 at 3. It is important to note (and the government appears to be unaware) that whether a particular location is outside of the Richmond Police Department's jurisdiction is a different question than whether a stop occurs outside the city limits of Richmond. Richmond Police Department officers, as well as other police officers in Virginia, are allowed to make traffic stops and arrests for defined distances beyond the boundaries of Richmond or to continue a pursuit begun in city limits. *See, e.g.*, Va. Code §§ 19.2-249; 19.2-250; 19.2-77; *see also Breitbach v. Commonwealth*, 546 S.E.2d 764 (Va. Ct. App. 2001) (applying Va. Code § 19.2-250's extension of officer's jurisdiction to Virginia's traffic laws). The government has not provided any control numbers in its briefing or attachments to identify the stops it believes Dr. Coston wrongfully included in their analysis, but without more, it is reasonable to assume that the stops it has identified beyond the city limits are ones conducted within these authorized extensions of the Richmond Police Department's jurisdiction. Otherwise,

---

[3] The dataset the Richmond Police Department provided often reported locations in a very general manner, such as an intersection or general vicinity of an area rather than an exact address.

[4] Before performing any geocoding, the defense assigned each traffic stop a "control number" so as to help facilitate later comparisons. The government has not identified the relevant control numbers it takes issue with, but the control numbers for the three stops the government discusses appear to be 376 (black male stopped for driving with a suspended license and given a citation), 1703 (black female stopped for having an altered or forged license plate and given a warning), and 2116 (white male stopped for making a faulty turn and given a warning). Had the government found other discrepancies in the remaining 2,579 stops, one anticipates it would have pointed those out in its motion.

such stops would evidence Richmond Police Department officers routinely disregarding the law governing their jurisdiction.

Ultimately, there is nothing about the government's critiques of the accuracy or quality of the data the Richmond Police Department captured and supplied to the defense that undermines Dr. Coston's findings that race plays a statistically significant role in the Richmond Police Department's traffic stops, searches, and arrests. Rather, Dr. Coston's findings comport with the findings of the Department of Criminal Justice Services, which analyzed the same data.

### III. The government's critique of the analytical tools Dr. Coston used is misplaced.

#### a. *Dr. Coston's use of United States Census Bureau data as the benchmark for the racial composition of the city of Richmond is accepted within the academic field and scientifically reliable.*

The government has faulted Dr. Coston for using United States Census Bureau data (Dr. Coston refers to this data in specifically referencing the American Community Survey data from 2015-2019) as the benchmark for the racial composition of the city of Richmond. *See* ECF No. 70 at 13-18. The government's expert reported that "census-based benchmarking is no longer accepted as a scientifically valid technique for comparing against police traffic stop data." *See* ECF No. 70-1 at 2. The government asserts that "the improper use of census data alone is sufficient to strike Dr. Coston's report because using census data as a benchmark falls far outside scientific norms." *See* ECF No. 70 at 13.

As the Virginia Department of Criminal Justice Services has observed:

> The overriding challenge to empirically determining to what extent bias-based profiling may be contributing to these disparities is what is referred to as the "benchmark problem." To help determine if bias is a factor in driver stops, one would need to be able to compare the proportion of stops made for each racial/ethnic group to the appropriate benchmark: the number of drivers in each racial/ethnic group who are actually driving on the road and subject to being stopped. No one has yet found an accurate way to do this.

*See* Ex. G at 65. And so, just as discussed above with regard to the quality of the data available, there is no perfect benchmark. Rather, there are various benchmarks that can be used. But, the only benchmark available here given the data available is a census-based benchmark. The government's expert points to the "veil of darkness" technique, which:

> makes use of the natural variation in daylight that occurs across the year and with changes in daylight savings time to compare the proportion of drivers stopped at night to those stopped during the day by racial group. Theoretically, if more minority drivers are stopped during daylight hours when police can more easily ascertain their race, then this provides evidence of possible racial bias, particularly if there are no differences in the rates at which White drivers are stopped during the day compared to at night.

*See* ECF No. 70-1 at 2. As explained above, the defense sought data that would have allowed the defense to conduct a "veil of darkness" analysis. The Richmond Police Department, however, refused to provide such information because of the amount of time it would take the Department to provide the responsive documents. As the government notes, there is no Richmond-specific traffic crash benchmark data available. *See* ECF No. 70 at 14. And so, the only choice of benchmark given the available data is a census-based benchmark.

That is exactly what the Department of Criminal Justice Services used to conduct its own analysis of the Virginia Community Policing Act data. *See* Ex. G at 22 ("Population figures used in this report are from The National Center for Health Statistics (NCHS) vintage 2019 post-Census estimates of the resident population of the United States (April 1, 2010, July 1, 2010–July 1, 2019)"). Other scientific studies of racial profiling have done the same. For example, in addition to Dr. Smith's report in Exhibit H which relied on census benchmarks in 2001, in Exhibit K, three researchers used census benchmarks to study the likelihood of racial profiling in Houston, Texas in 2009 based on data collected in 2003. *See* Ex. K at 13-14. In 2015, a researcher reviewed hundreds of thousands of stops in New York City for racial profiling using a census benchmark.

12

*See* Ex. J at 1-3.  Thus, it is inaccurate to say that the "use of census data alone is sufficient to strike Dr. Coston's report because using census data as a benchmark falls far outside scientific norms."  *See* ECF No. 70 at 13.

The government cannot have it both ways by condoning the Richmond Police Department's refusal to provide more detailed information on the traffic stops at issue while criticizing the defense for using the only benchmark available.  That the Department of Criminal Justice Services relied on census benchmarks too in its analysis of the Virginia Community Policing Act data, which yielded **the same results** as Dr. Coston's analysis, is not only telling but should end the Court's entertainment of the government's motion to exclude Dr. Coston's report.

> ***b. The statistical methods that Dr. Coston used to analyze the data were the most appropriate given the data available.***

Lastly, the government has critiqued the statistical tools that Dr. Coston used in analyzing the data.  First, the government attacks Dr. Coston's report because it does not use a regression analysis.  "Selection of appropriate statistical method depends on the following three things: Aim and objective of the study, Type and distribution of the data used, and Nature of the observations (paired/unpaired)."  *See* Ex. L[5] at 1.  A regression analysis is one that involves multiple independent variables.  And it can be used in appropriate circumstances to infer—by itself—causation.  The data available here, however, does not lend itself to regression analysis.  Rather, the data here is subject to proportional analysis, which is why Dr. Coston chose to analyze the data using chi-square tests, Cramer's V, and Kendall's Tau.

Similarly, the government critiques Dr. Coston for using geospatial information and heat clusters.  That information clearly shows that the Richmond Police Department is stopping black

---

[5] While Exhibit L discusses biomedical research, it correctly and succinctly illustrates how the analysis conducted must be consistent with the data provided.

13

drivers disproportionately to white drivers in not only the black parts of Richmond, but the racially segregated white section of Richmond falling neatly within the third precinct. *See* ECF No. 66-1 at 8-11. Academics have used such geospatial analysis and heatmapping numerous times in studying racial profiling. *See, e.g.*, Ex. K; *see also* Ex. M. In Exhibit M, the researchers tested a "deployment hypothesis":

> The deployment hypothesis proposes that racial disparities in searches result from departments responding to concentrated offending by focusing traffic stops and searches in and around hot spots of crime. While this clustering of interactions increases the risk that drivers in and around crime hot spots will be stopped and searched, this risk is expected to be race neutral where drivers of various racial groups are treated similarly. In other words, traffic stops occurring in similar proximities to hot spots of crime should contain similar levels of officer assertiveness regardless of the characteristics of the stopped drivers. Racial disparities are an expected product of uneven risk for proactive, investigatory contacts driven by spatial variation in the distribution of reported offending rather than variation in the exercise of discretionary authority across drivers of varying demographic characteristics.

*See* Ex. M at 4 (internal citations omitted). In other words, when you send police out to investigate crime, one can expect to see more traffic stops. Thus, deployment of police to high crime areas where minorities live will have the impact of overpolicing racial minorities. *See, e.g.*, Ex. K at 28 ("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.").

Thus, it is critical to understand that the history of racial segregation in a place contributes to the overpolicing of minority neighborhoods. In a city like Richmond that has a history inextricably intertwined with racial segregation, the Richmond Police Department's decision to have three police precincts devoted to the black parts of town is expected to generate overpolicing of black neighborhoods. But, what is particularly disturbing is how the deployment hypothesis may be playing out in Richmond. Not only were black drivers pulled over disproportionately in

14

black neighborhoods, black drivers were also disproportionately stopped in the white part of Richmond, particularly along the borders of the white parts of town. *See* ECF No. 66-1 at 10-11. The government would like very much to ignore the role that the long history of racial segregation plays in the Court's analysis in this case, but the law does not so allow. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279-80 (1979) (discussing statutory history); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 (1977) ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."). The government's avoidance of this history makes it even more critical for the Court to hear evidence regarding the creation and maintenance of the police precincts in Richmond.

The main issue with the government's argument is that the government perhaps misunderstands that Dr. Coston's report itself does not and does not purport to determine "whether a specific traffic stop was the result of racial bias or racial profiling[. Rather] this report does conclude that race is a significant factor in the decision to stop a driver, whether a person or vehicle is searched, the outcome of a stop, and the location where stops occur." *See* ECF No. 66-1 at 12. What Dr. Coston has found is that there is statistical significance to the role that race plays in traffic stops that the Richmond Police Department conducts. And that is exactly what the Court ordered the defense to determine by hiring a statistician. *See* ECF No. 44 (directing the defense to "consult with an expert regarding the statistical significance of the evidence presented in support of the defendant's motion to dismiss the indictment and to consider additional evidence in support of the motion").

## Conclusion

The Court should deny the government's motion. Dr. Coston's report aligns with the Department of Criminal Justice Service's own report, which found that "statewide, Black and Hispanic drivers in Virginia were disproportionately stopped by law enforcement when compared to other drivers between July 1, 2020, and March 31, 2021, based on the number of drivers stopped relative to their numbers in Virginia's driving-age population. This type of disparity was seen among traffic stops made by many individual law-enforcement agencies for which disparity measures could be calculated. Stops of Black and Hispanic drivers were also more likely to result in a search or an arrest than stops of drivers from other racial groups. This finding is consistent with traffic stop research conducted in other states." *See* Ex. G at 8.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org