Check for updates

*Article*

# Minority Threat Hypothesis and NYPD Stop and Frisk Policy

Criminal Justice Review
2015, Vol. 40(2) 209-229
© 2014 Georgia State University
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0734016814564989
cjr.sagepub.com



## Joseph Ferrandino[1]

### Abstract
This study analyzes New York Police Department (NYPD) stop and frisk policy using a minority and Black threat framework. Using Blacks in White-dominated neighborhoods as the reference group, this study compares four distinct police actions (frisks, searches, sanctions, and force used) during 481,027 stops in 2012 in 297 geographic information system (GIS)-defined New York City (NYC) neighborhoods. Descriptive analysis reveals the scope of isolation between Whites and Blacks as well as the ratios of police action for each group within each neighborhood type, with Blacks in White-dominated and nondominated high White neighborhoods exceeding their population proportion and crime propensity ratios across all four police actions, consistent with the Black threat hypothesis. Logistic regression results provide further support for the application of Black threat hypothesis to NYPD stops and frisks. When controlling for other factors, race/neighborhood factors remain significant though the odds ratios are far below the population proportion and crime propensity benchmarks. These results are placed in the context of previous research findings and the implications of minority threat hypothesis are discussed in light of the specific Black threat in NYC. In the aggregate, the findings also include limited support for the "out of place" and defended neighborhood perspectives though much less for the criminogenic perspective relative to Blacks in White-dominated and other race/neighborhood categories.

### Keywords
NYPD, stop and frisk, minority threat hypothesis, GIS

## Introduction

The stop and frisk policies of the New York Police Department (NYPD) have been one of the most controversial and debated criminal justice topics in recent years as the NYPD made 4,628,936 stops and conducted 2,400,903 frisks between 2004 and 2012 (NYPD, n.d.). The policy has been researched mainly through arguments of inequity based upon the racial disparities in stops and frisks (Civilian Complaint Review Board, 2001; Gelman, Fagan, & Kiss, 2007; *Floyd v. New York,* 2013; Jones-Brown, Gill, & Trone, 2010; Center for Constitutional Rights, 2009; Office of the

[1] Indiana University-Northwest, Gary, IN, USA

**Corresponding Author:**
Joseph Ferrandino, Indiana University-Northwest, 3400 Broadway, Gary, IN 46408, USA.
Email: joferran@iun.edu

New York State Attorney General, 2013; Ridgeway, 2007; Spitzer, 1999). Largely, this body of research has focused on the race of those stopped or on geographical units of analysis such as census tracts or precincts. The interaction between the race of the offender and racial composition of the neighborhood where the stop takes place has been noted but remains largely understudied.

This study adds to the stop and frisk literature through the first known application of minority threat hypothesis with police actions during stops and frisks. More precisely, an NYC specific Black threat theory is built to guide the analysis. Next, the GIS process utilized to integrate census, stop and frisk, and other data into the creation of 297 distinct NYC neighborhoods, a feature that further distinguishes this study from the previous literature, is discussed. A comprehensive descriptive approach is then undertaken to create benchmarks of police action to inform of relative differences for each category of offender race and neighborhood race structure, focusing specifically on the stops of Blacks in White-dominated neighborhoods. The Black threat framework for four police actions (frisks, sanctions, searches, and use of force) during stops is evaluated through logistic regression modeling. The study concludes with a discussion of Black threat, defended neighborhoods, criminogenic explanations, and the out of place hypothesis, adding to our growing sociological understanding of the racial aspects of stops and frisks in the nation's largest city.

## Literature Review of the Racial/Ethnic Aspects of NYPD Stop and Frisk Policy

Most research into NYPD stop and frisk policies focuses on the racial disparities in aggregate stops and frisks relative to residential population representation at varying units of analysis. This perspective endures and persists due to the historically poor relationship between the NYPD and NYC's communities of color (see Lardner & Reppetto, 2000; Solis, Portillos, & Brunson, 2009) in conjunction with more recent crime control efforts focused on high minority neighborhoods (Bass, 2001). The first major report quantifying this racial disparity analyzed 175,000 stops between January 1998 and March 1999. Blacks and Hispanics comprised 49.3% of the population at that time yet accounted for 83.6% of stops; by contrast, Whites comprised 43.4% of the population but only 12.9% of stops (Spitzer, 1999). While stops of minorities were most abundant in high minority precincts, a disparate number of minority stops were observed in largely White precincts (defined as greater than 50% White population). The report further determined that variability in precinct-level crime rates alone did not account for the racial disparities in these stops (Spitzer, 1999).

A subsequent report focused on fully investigated citizen complaints resulting from a police stop and/or frisk, finding that 51% of fully investigated complaints from January 1997 through March 1999 were filed by Black subjects while 24% were Latino and 11% were White (Civilian Complaint Review Board, 2001). Of these complaints, physical force was alleged in 76% of stops involving Latinos and 74% of stops involving Blacks compared to 48% of stops involving White suspects. Moreover, a significantly higher percentage of Blacks were stopped by an officer brandishing a firearm (29%) than Hispanic (13%) or White suspects (6%). Thus, racial disparities are important in the context of police actions during a stop, not only the initial stop decision.

Gelman, Fagan, and Kiss (2007) also examined whether race-specific stop rates were a function of race-specific arrest rates or precinct-level variability. The results confirmed the assertion in the Spitzer (1999) report that significant racial disparity in stops were not explained by precinct-level crime or prior year race-specific arrest rate variability. The authors concluded that less rigorous constitutional standards were applied to stops of minorities, making these stops less efficient than those of Whites do. Most pertinent to this study is the finding of "racially incongruent stops" or stops of minorities in predominantly White precincts or Whites in predominantly minority precincts, each of which is a sign of "race-based selection of citizens for crime interdiction." Thus, including the stop

location is crucial to understanding the full racial context of stop and frisk of both White and non-White subjects.

New York's Attorney General recently analyzed stop and frisk arrests between 2009 and 2012 through disposition and sentencing (Office of the New York State Attorney General, 2013). The report found that just half of the 6% of stops that result in arrest led to a conviction, and the racial disparities of NYPD stop and frisk policy continue through the court process. The most pronounced finding was for marijuana possession arrests in which Whites were 50% more likely to receive adjournments in contemplation of dismissal[1] than Black or Hispanic defendants. Other research finds the NYPD's application of quality-of-life crime enforcement focuses mainly on marijuana possession, falling heavily on minorities as Blacks and Hispanics were more likely to be detained than Whites (2.7 times and 1.8 times more likely, respectively) and face harsher criminal sanctions accounting for other factors (Johnson, Golub, Dunlap, & Sifaneck, 2008). These findings culminated in a recent court decision in *Floyd v. New York* (2013), in which the stop and frisk practices of the NYPD were ruled racially discriminatory based on the following four key points (1) even with other factors held constant the NYPD stops more Blacks and Hispanics than Whites, (2) these stops are more likely within certain precincts and census tracts, controlling for other factors, (3) more force is used against Blacks and Hispanics than Whites, controlling for other factors, and (4) the stops of Blacks and Hispanics are often undertaken with less justification than stops of Whites (p. 183).

There is some evidence that NYPD stop and frisk racial disparities are not as pronounced as the previously literature suggests. Ridgeway (2007) analyzed over 500,000 stops from 2006 and focused on three separate areas: external benchmarks, internal benchmarks, and outcomes. The three external benchmarks were crime description percentages (comparing suspect descriptions with stopped suspects), arrest percentages (racial distribution of 2006 stops compared to 2005 arrests) and residential census percentages (residential demographics with those of stopped suspects). Residential census benchmarks—the method often used to produce the earlier results of profound disparities—produced the widest racial disparities but were considered the least valid method. Arrest data yielded less disparity, as Blacks were stopped in 2006 in nearly equal proportion to their 2005 arrest percentage while Hispanics had a 6% greater 2006 stop than 2005 arrest percentage. When suspect descriptions are used as the benchmark, the results suggest that Blacks are greatly under-stopped by police (i.e., Blacks accounted for 69% of the crime descriptions received by police but comprised 53% of the stops), while Whites and Hispanics are overstopped using this metric.

Ridgeway's internal benchmark process relied on analyzing stops by officers that had conducted at least 50 stops ($n = 2,756$ officers) through matching their stops to other officers in the same locations, under the same conditions, to detect racial outliers. These officers represented 7% of the department but 54% of stops in 2006, leaving a large amount of stop variability unaccounted for. Just 5 officers significantly overstopped Blacks, 10 overstopped Hispanics, and 9 understopped non-Whites. In terms of outcomes, Ridgeway studied the aggregate difference in post-stop police actions (frisks, searches, use of force, and arrests) of similarly situated suspects, finding similar yet narrower racial disparities. For example, similarly situated Whites were frisked slightly less than non-Whites (29% to 33%, respectively) or Blacks (42% to 46%, respectively). Similarly situated Whites were more likely to possess contraband (6.4% compared to 5.7% of Blacks and 5.4% of Hispanics), more likely to be issued summons, equally likely to be searched but less likely to have force used upon them or be arrested. Though more narrow in scope and depth, the previous findings of racial disparity persisted, a necessary condition for the application of the minority threat hypothesis framework.

## Minority Threat Hypothesis, Policing and NYC

Minority threat hypothesis derives from Hubert Blalock's *Toward a Theory of Minority-Group Relations* (1967) which focuses almost exclusively on the macro and micro power differential

between Whites and Blacks and how that power is enforced, perpetuated, challenged, and/or changed. Blalock proffers two branches of the minority threat theory, which is essentially Black threat theory from the onset: economic and power theory. Succinctly, the economic branch is instrumental and is a means to an end of mobility amid competition, while the power branch focuses more on the social aspects of attaining and retaining power as an end in itself. Both spring from an inevitable competition that result from a minority population growing, seeking more resources and mobilizing to attain those resources and power from the dominant group in society, which is the White population in America. In turn, Whites react along a continuum of behaviors to maintain their power, fracture mobilization, and consolidate resources. Relative to the power theory branch, Blalock proposed that minority discrimination would increase with threat-oriented beliefs and control mechanisms (#88c, p. 188) that are more likely when a high degree of the White population endorses stereotypes stressing threatening minority characteristics (#89a, p. 188), resulting in punishment power being applied. Over time, the view of minority criminality and its threat has become more institutionalized, widespread, and reinforced through a variety of media (see, e.g., Chiricos & Eschholz, 2002; Kooistra, Mahoney, & Westervelt, 1998; B. W. Smith & Holmes, 2014), perpetuating the minority threat belief and justifying targeted police policies such as stop and frisk designed to control minorities, especially Blacks.

Minority threat theory has recently emerged in the criminal justice literature as the country heads toward having a minority–majority and racial disparities in the system become more exacerbated, both at the enforcement and punishment points. As a branch of conflict criminology, the theory helps to understand and explain criminal justice institutional responses to crime, mainly through a focus on minorities and minority communities, as part of a struggle to retain the status quo of dominant groups in society. This perspective views minorities, especially emerging populations in urban environments, as a threat to existing White power structures, leading to disparities in policing and unequal, inequitable law enforcement (Cureton, 2000; Holmes, 2000; Kent & Jacobs, 2005; King, 2007; King & Wheelock, 2007; Ruddell & Urbina, 2004; Sampson & Lauritsen, 1997; B. W. Smith & Holmes, 2003; Stults & Baumer, 2007; Wang & Mears, 2010). In the policing literature, minority threat theory has largely been applied to the allocation of police resources based on Black and/or Hispanic populations (see Bernard, Snipes, & Gerould, 2010; Jackson, 1989; Kane, 2003; Kent & Jacobs, 2005; Stucky, 2005; Stults & Baumer, 2007), cross-racial arrest differences (Cureton, 2000; Eitle, D'Alessio, & Stolzenberg, 2002; Parker, Stults, & Rice, 2005; Stolzenberg, D'Alessio, & Eitle, 2004), and use of force (Holmes, 2000; B. W. Smith & Holmes, 2014). To date, the theory has not been applied to the study of NYPD stop and frisk policy, despite the focus on racial disparities in most previous research.

Police represent the concentration and monopoly of state power (Bittner, 1970) and the profession has been White male dominated throughout its history (Sklansky, 2006). Congruent with the time period in which Blalock introduced his theory, the White police power structure was challenged as the notion of having police forces comprised of similar racial/ethnic proportions, as the communities they served began to take hold (Fridell, Lunney, Diamond, & Kubu, 2001; Lasley, 1994; Walker & Shelley, 1999). This policy perspective, or goal, coincided with deep mistrust of the police and race riots that occurred in many major cities during the same time period (Deslippe, 2004; Perez, Berg, & Myers, 2003), conflating the growing divide between White police forces, as agents of state power, and increasingly isolated minority communities in many cities that were largely Black. Bass (2001) posits that police bias against Blacks is not a by-product of overt individual officer racism, but rather the result of institutional bias as policing developed within discriminatory social and political environments that shaped the fundamental fabric of the organizational field, that is, its culture and history (see Bittner, 1970; Wilson, 1968 as foundations). While White officers are expected to use more force and make more arrests against minorities until White cities or neighborhoods transition to a minority tipping point (Deslippe, 2004; B. W. Smith & Holmes, 2014; Stults & Baumer,

2007), non-White officers also experience systemic influences that impact their behaviors toward minorities. In theory, as departments diversify, newer non-White officers would assimilate to the wider institutional system biases shaped by White power structures, and racially disparate police actions would persist rather than lessen.

Some evidence from NYC supports this perspective. The NYPD has become more diverse in recent years. In 2010, the NYPD was 53% White and 47% minority but for the first time in its history became majority–minority on patrol with 53% of patrolmen minorities and 47% White (El Ghobashy, 2011). However, the upper levels of the police command structure are still largely White, and Whites remain overrepresented on the force relative to the White city population (53% to 33%, respectively). Despite increased diversity and the passage of 15 years since the Spitzer (1999) report, 84.3% of stopped subjects in 2012 were Black or Hispanic with their population percentage increasing to 50% (they were 83.6% of stops and 49.3% of the population in 1999); Whites comprised 9.4% of stops while accounting for 33% of the population (they were 12.9% of stops and 43.4% of the population in 1999). Thus, a more diverse police department and city made little impact on stop and frisk demographics, consistent with institutional bias being a critical driver of police action that perpetuates the general minority and specific Black threat frameworks despite diversification.

Differential police treatment also impacts how minorities view police compared to Whites. Research has established that minorities hold less positive views of the police than Whites (Hurwitz & Peffley, 2005; Rice & Piquero, 2005; Solis et al., 2009; Weitzer & Tuch, 2005) and Blacks are less likely than Whites to view the criminal justice system as fair (Hurwitz & Peffley, 2005). However, research also suggests that Hispanics hold views of police that are less favorable than Whites but more favorable than Blacks, making minority views nonmonolithic (Tuch & Weitzer, 1997). Blacks in NYC are 3 times more likely than non-Blacks to believe that racially based policing was pervasive, not justified, and experienced more often personally (Rice & Piquero, 2005). Other research finds Hispanic youths in NYC believe aggressive police tactics are aimed at restricting their presence in public spaces (Solis et al., 2009), bridging the views of the two races relative to police action in the city.

NYC is also highly segregated (Flores & Lobo, 2013). Over the past four decades, Flores and Lobo (2013) found that White-dominated neighborhoods (those with more than 70% White population with other groups comprising less than 10% each) declined significantly with the integration that followed the decline in the White population including Asians and Hispanics but not Blacks. As such, Whites and Blacks are even more isolated in NYC with Whites more integrated with Asians and Hispanics and Blacks less integrated with the other groups (Flores & Lobo, 2013). The data calculated in Table 1 for this study support this view as well as a specific focus on Black threat in NYC.

A micro-level theory that emerged from the macro minority threat framework in conjunction with the tenets of human ecology (invasion, domination, and succession) is the defended neighborhood hypothesis, or "White fight" before "White flight." The minority threat in NYC, especially the Black threat, is firmly established. As a result, Whites further isolate themselves from Blacks and defend the remaining neighborhoods they dominate, as the overall White population in the city dwindles. Rather than resources, they are fighting for space, distance, and to keep power within their neighborhood. Recent research has found support for the defended neighborhood hypothesis as a greater motivator than economic threat (see Eitle et al., 2002; Green, Strolovitch, & Wong, 1998). Even if the motivation is more economical than public safety related, King and Wheelock (2007) report that Whites hold more punitive views toward Blacks when faced with growing rather than static Black populations. These results, when aggregated, suggest that Whites, especially those defending their neighborhoods from real or perceived in-migration of non-Whites, are more supportive of the police and police action against minorities in general and Blacks specifically.

The population trends and lack of Black integration with Whites is a critical element of defended neighborhood hypothesis in NYC and could theoretically lead to fierce neighborhood defense of

**Table 1.** The Percentage of Population Within and Between Each Race Group in Each Neighborhood Type.

| Type | Population | White Population | Percentage White WG | Percentage White BG | Black Population | Percentage Black WG | Percentage Black BG | Hispanic Population | Percentage Hispanic WG | Percentage Hispanic BG |
|---|---|---|---|---|---|---|---|---|---|---|
| DB | 1,433,817 | 98,670 | 0.04 | .07 | 1,050,727 | 0.56 | 0.73 | 213,234 | 0.09 | 0.15 |
| DH | 1,607,813 | 133,868 | 0.05 | .08 | 276,891 | 0.15 | 0.17 | 1,014,208 | 0.44 | 0.63 |
| DW | 2,678,857 | 1,858,037 | 0.68 | .69 | 99,100 | 0.05 | 0.04 | 340,994 | 0.15 | 0.13 |
| NDHW | 1,523,579 | 547,358 | 0.20 | .36 | 190,014 | 0.10 | 0.12 | 419,625 | 0.18 | 0.28 |
| NDLW | 869,118 | 78,100 | 0.03 | .09 | 254,488 | 0.14 | 0.29 | 319,012 | 0.14 | 0.37 |

*Note.* DB = dominant Black; DH = dominant Hispanic; DW = dominant White; NDHW = nondominant high White neighborhoods; NDLW = nondominant low White neighborhoods; WG = within-group population distribution for each race by each neighborhood category. For example, 68% of the White population in New York City lives in White-dominated neighborhoods. BG = between-group population distribution for the total population of each race that lives within each neighborhood category. For example, 69% of the population in White-dominated neighborhoods is White.

214

remaining White-dominated neighborhoods. Skogan (1995) found that Whites living in closer proximity to Blacks, especially in urban areas, were more fearful of crime despite registering lower prejudice scores than more distant Whites. As Whites are more likely to separate themselves from Blacks, this Black isolation may lead to an increase in the fear of Black crime by Whites (Parker et al., 2005), thus exacerbating rather than relieving the racial threat. As a result, the most threatening person would be Black in a White-dominated or high White population neighborhood as a result of either the larger macro minority threat or the more immediate micro-level defended neighborhood hypothesis, requiring police actions such as liberal stop and frisk policies toward Blacks in these neighborhoods.

There are two theoretical frameworks that potentially mitigate the minority threat hypothesis relative to stop and frisk policy in NYC: the criminogenic perspective and the out of place hypothesis. Weitzer and Tuch (2005), using a national sample, found that many Whites find face validity in police targeting minorities or minority neighborhoods as areas of high crime and criminality. Consistent with this finding, Harris (2003) posits that many people support "racial profiling" not based on race, but since Blacks and Latinos are more likely to be criminals they should legitimately receive disproportionate police attention and action. This view, focused mainly on Blacks, dates back well over a 100 years (Bass, 2001) and includes law-abiding Black citizens, as Wilson (1968, p. 412) noted almost 50 years ago:

> Violent crime and disorder are pre dominantly (though not exclusively) lower class phenomena; Negroes are disproportionally (though far from exclusively) lower class; a black skin, therefore, will continue to be a statistically defensible (though individually unjust) cue that triggers an officer's suspi cion. Among the consequences of this generalization will be continued police suspicion of blacks and continued Negro antagonism toward the police.

Consistent with the dominant social view of crime and criminality as emanating from minorities, former NYPD Commissioner Howard Safir responded to the Spitzer report by claiming that any racial disparity in stops and frisks was reflective of the racial makeup of crime offender descriptions and arrestees in the city, not racial bias (Cooper, 1999). Complementing this view is data from the U.S. Census Bureau (American Community Survey, 2007–2011) which include Riker's Island, the city's main jail, as a distinct census block group. The Riker's census block group had the largest population of any in the city (10,453) and was 93% non-White (56% Black and 35% Hispanic). Comparatively, of the 532,881 stops recorded by the NYPD in 2012, 53% were Black while 31% were Hispanic, representing similar proportions to their Riker's Island population. From this perspective, stop and frisk is not racially biased but based on criminogenic factors that are more greatly exhibited by Blacks and Hispanics, potentially negating and/or countering the population-based perspective assuming equal crime propensity and police focus. However, Jones-Brown, Gill, and Trone (2010), using data from 2008, found that while minorities are more frequently stopped and frisked, Whites are as likely to be arrested (5.5% to 6.1%) and were more likely to have contraband or weapons except guns. These results suggest the criminogenic argument for overstopping minorities may be weaker than believed.

Finally, the segregated populations of NYC provide for citizens to be "out of place" and thus suspicious. As Bass (2001) notes, Blacks have historically been segregated to their neighborhoods within cities and policed differently, often "subject to harassment for having the temerity to circulate out of their place." However, more dated research found the opposite: More coercion is used against Black suspects in Black neighborhoods (D. A. Smith, 1986) which belies the tenets of the defended neighborhood hypothesis. The out of place hypothesis can also be gleaned from Gelman et al. (2007) observations of "racial incongruities" in which a certain percentage of minority stops occurred in predominantly White districts as well as a number of identifiable stops of Whites occurring in

largely Black/Hispanic areas. Thus, one driver of stop and frisk is simply being "out of place," regardless of race or criminality.

## Data, Variables, and Methods

The data derive from several separate sources integrated through ArcGIS software. First, all stop and frisk data are taken directly from the NYPD 2012 Stop, Question, and Frisk Database (NYPD, n.d.), a publicly available aggregated database of all recorded stop and frisk encounters for the NYPD for each calendar year. Each officer who initiates a stop and/or frisk that meets departmental guidelines is required to submit a completed UF-250 form that is about four pages in length. The form has detailed information about the stop, including, but not limited to, time, date, location (in both street and XY coordinates), and reason for stop, whether a frisk or search was conducted, whether force was used and what type, the crime suspected, whether a sanction was given, whether the officers was in uniform, whether the call was proactive or from a radio run, whether a weapon was recovered and what type and characteristics about the offender (race, age, gender, and physical attributes). The public version is unfortunately "scrubbed" of officer characteristics such as race.

Race, social, and economic data were compiled through the American Community Survey (2007–2011) population characteristics shapefile that was entered into ArcGIS to create neighborhood-level data from census block group centroids. To create neighborhoods, multiple shapefiles from the Bytes of the Big Apple (n.d.) website were utilized. The neighborhood centroid file was used to aggregate census block groups into the 297 distinct neighborhoods identified by the city through joining the census block group polygon to the nearest neighborhood centroid. To match each stop in the NYPD Stop Question Frisk (SQF) data set with its respective neighborhood, stops were mapped using their XY coordinates, and this point file was joined by the census block group in which it occurred, which was previously joined to the neighborhood file. The resulting point file had the neighborhood and census block group identifier added to each stop to aggregate stops by the type of neighborhood in which they occurred. Neighborhood data were aggregated by census block group when the two files were joined in ArcGIS. Finally, each joined file was exported as .txt files and opened in SPSS that was used to conduct the analyses that follow.

There are four dependent variables in the analysis. Frisks (0 = *not frisked*, 1 = *frisked*) and searches are measured dichotomously (0 = *not searched*, 1 = *searched*). Sanctions are measured as to whether a summons was issued or an arrest was made or if no sanction was enforced and is measured dichotomously (0 = *neither occurred*, 1 = *one of the two sanctions was applied*). The UF-250 form lists nine types of force: hands, placing a suspect on the ground, placing a suspect against a wall, drawing a weapon, pointing a weapon, using a baton, using handcuffs, using pepper spray, and other force. Of the 481,031 final stops from 2012 included in the analysis, 17.5% (84,070) involved at least one level of force of which 76.5% (64,353) were hands. When a frisk was performed, force was used in 34% of the incidents. In the stop data set, more than one level of force was reported in just 2.6% of the stops while 4.4% of the frisk stops resulted in more than one level of force being utilized. Based on the fact that so many incidents involved no use of force, the force variable was measured dichotomously (0 = *no level of force used*, 1 = *at least one level of force used*). The search and sanctions models include only stops in which a frisk occurred while the frisk and force models use all stops.[2]

The independent variable utilized for each model is categorical and created through combining a stopped person's race with the type of neighborhood in which the stop occurred. Race is operationalized in a similar fashion as previous NYPD stop and frisk research, despite the limitations inherent in this approach. White and Black subjects are identified as such in the NYPD SQF database. Hispanic subjects are operationalized by combining White Hispanics and Black Hispanics into one category. Other races/ethnicities are excluded from the analysis. The analysis employs

five categorical neighborhood measures, consistent conceptually with Flores and Lobo (2013) while using a different statistical approach. Neighborhoods are operationalized as dominant if their White (W), Black (B), or Hispanic (H) population exceeds 58% and neither of the other two groups exceeds 30%, making dominance more conservative at a 2:1 ratio where Flores and Lobo used a ratio of 7:1 in deciding group dominance at the tract level. These three categories are operationalized as DW (dominant White), DB (dominant Black), and DH (dominant Hispanic). Non-dominant neighborhoods are operationalized relative to their overall and White populations. Nondominant low White neighborhoods (NDLW) are those in which no population dominates (<55%), there is not more than a 20% difference between Blacks and Hispanics and Whites comprise less than 20% of the population. Nondominant high White neighborhoods (NDHW) have non-White populations of at least 47% and White populations between 21% and 53% of the total population. These categories are combined to create nine blended categories to specifically test minority threat relative to NYC. The first six categories are race and neighborhood exclusive: B/DW, W/DW, H/DW, W/NDHW, B/NDHW, and H/NDHW. The remaining three categories combine either race or neighborhood based upon the theoretical framework: W/NDLW, DH, DB (all three neighborhood types combined); NW/NDLW (non-White combines Black and Hispanics together); and NW/DB, DH.

There are several control variables utilized to normalize the stop based upon external characteristics. Ridgeway (2007) used several variables to "match" stops by officers to compare them directly against one another, including whether or not the officer was in uniform, the borough where the stop occurred, whether the stop was inside or outside, and whether the stop was a result of a radio run or initiated by the officer. This approach "normalized" available external factors to allow direct comparison of racial differences in stops between officers based on similar situations. All of these variables could impact the actions taken by the officer and are controlled for to better isolate the offender and neighborhood from other factors.

The first control variable, whether or not the stop occurred inside or outside ($1 = inside$, $2 = outside$), is used to control for the physical space an officer has during the stop. Stops in more confined areas such as hallways of an apartment building may impact officer decision making as opposed to a stop in a public park, which may be a less threatening environment. A second control variable is whether the officer was in uniform ($1 = no$, $2 = yes$), as many past abuses of stop and frisk decisions were made by the Street Crimes Unit, which was plainclothed. Furthermore, these two officer types have different missions that could impact their application of stops, frisks, and searches and decisions during an encounter and they could be responded to differently by citizens as well. For example, subjects may be more likely to run from or resist someone in plainclothes than they would an officer in full uniform, a possibility that could change the overall behaviors and outcomes of a stop encounter. A third control is whether the call originated from a radio run ($1 = no$, $2 = yes$) which is a measure of proactivity that could impact officer decision making. A call from a radio run implies reaction to an incident or suspect description while a nonradio run stop would be more proactive in nature based upon officer observation or intuition. It is conceivable that calls from a radio run could result in different behavior on the part of the police (more formal justification) than a stop originating from a suspect they see without provocation that may have a "bulge," be wearing clothing that are out of season or exhibit "furtive movements" all of which are far more subjective criteria and stop reason choices on the UF-250 form.

Another situational factor that is controlled for is whether others were present during the stop ($1 = no$, $2 = yes$), as this could impact both officer decision making and suspect behavior during the stop. A citizen that is alone may be less likely to be frisked for the purposes of officer safety than if there are three or more subjects stopped at once, where a frisk could be justified simply for officer safety apart from other accepted or stated reasons. A contextual factor controlled for is whether or not the stop occurred in a high crime area ($1 = no$, $2 = yes$), as this distinction could

also impact the decision making of the officer prior to or during a stop. It would be expected that stops in known high crime areas would be more likely to result in a frisk and perhaps more use of force by police in that area.

Organizationally and environmentally, the borough in which the stop occurred (1 = *Bronx*, 2 = *Brooklyn*, 3 = *Queens*, 4 = *Manhattan*, and 5 = *Staten Island*) controls for command and environmental differences during a stop which could also impact officer decision making. Ridgeway (2007) did find discrepancies in by borough, further supporting the inclusion of this variable. Finally, the age category of the person stopped (1 = *lower risk* [0–14, 26, or older], 2 = *higher risk* [15–25]) is controlled for, as police officers may approach higher risk-aged offenders differently than they would older or younger suspects. Thus, these control variables provide a range of environmental, situational, organizational, and offender characteristics to help isolate race/neighborhood variables from these factors relative to the four police actions.

Several descriptive analyses are included to place the race/neighborhood relationship in context. First, racial disparities across four police actions (frisks, searches, sanctions, and the use of force) are explored relative to population proportion. To create these scores, the total number of police actions for each group within each neighborhood type is divided by the total number of police actions that occurred within that neighborhood type and then divided by the group's population proportion within the neighborhood type. This statistic provides a ratio of the police action relative to the population of the group within this neighborhood type for all three racial groups. A score of 1 indicates that the group faces that event in equal proportion to its population within that neighborhood type; a score of less than 1 indicates a group is less likely to face that police action relative to its population; and a ratio greater than 1 signifies a specific racial group is more likely to face a police action in a proportion greater than its population representation. This statistic represents the equity view of racial disparity that many have used in prior NYPD stop and frisk research that have found racial disparities.

Weighted crime propensity for each group is also calculated to compare to both the population proportions and logistic regression results. The racial makeup of Rikers Island was used as a proxy measure to weight crime propensity between the three groups. As Ridgeway (2007) noted, each comparative measure of racial benchmarking (census data, arrestees, or crime suspect descriptions) has pitfalls relative to the stops and frisks of citizens. The demographic composition of the Riker's Island population extends beyond the arrest rate, which is a largely crime-driven measure, to account for other parts of the criminal justice system including the courts. While this measure may be skewed for a number of established reasons, it serves as an available population proxy for criminality proportion and is used descriptively here to create a racial benchmark that reflects those being officially sanctioned within the NYC correctional system as of the 2010 census. Whites comprise 7% of the Riker's population, with Blacks comprising 58% and Hispanics comprising 35%, which is similar to the crime suspect percentages used by the NYPD to justify stop and frisk disparities fifteen years ago. The Black to White crime propensity ratio is 8.79, the Hispanic to White ratio is 5.37, and the Black to Hispanic ratio is 1.64. To create this measure, the ratio between the two earlier disparity percentages is taken (Black/White, Hispanic/White, and Black/Hispanic) and compared to the Riker's benchmark. For example, based upon this weighted crime propensity measure, the Black ratio for being stopped should be 8.79 times the White ratio in a White-dominated neighborhood and the Hispanic ratio should be 5.37 times greater.

Logistic regression is utilized to determine the relative difference in odds ratios (OR) of frisks, searches, sanctions applied, and the use of force between Blacks in White-dominated areas and the other combinations of suspect/neighborhood types. This approach is consistent with the dichotomous data reported by the NYPD, minority threat hypothesis, and the descriptive benchmarks created. Each model controls for the same variables in sequential modeling to isolate the impacts of race/neighborhood type on the four police actions.

## Results

As expected (see Table 2), Blacks were the racial group most stopped ($n = 284,229$ or 53.3% of stops), frisked ($n = 163,281$ or 55% of frisks), searched ($n = 22,683$ or 51.3% of searches), sanctioned ($n = 29,957$ or 50.1% of incidents with at least one sanction), and likely to have some level of force used against them during a stop ($n = 49,018$ or 53.2% of force used incidents). The most stops occurred in DB neighborhoods (29%), followed by DH (23%), DW (17%), NDLW (16%), and NDHW (15%). While frisks were nearly even within DB and DH neighborhoods, more searches, sanctions, and incidents where forced was used occurred in DH neighborhoods. With the exception of DH neighborhoods, Blacks were the most stopped, frisked, searched, sanctioned, and forcefully treated group in each remaining neighborhood (DW, DB, NDHW, and NDLW), consistent with the Black crime threat hypothesis.

Interesting results emerge when weighted relative population/crime propensity ratios are included to analyze stop, frisk, sanctioning, and use of force incidents (see Table 2). For example, Blacks comprise 4% of the population in DW neighborhoods yet comprise 35.7% of the stops, which is a ratio of 8.94, showing a clear disparity. Conversely, Blacks comprise 73% of the DB neighborhood population and account for 83.7% of the stops in those neighborhood for a ratio of 1.15. Using this approach, Blacks had ratios greater than 1 in every neighborhood type (DW = 8.94, DB = 1.15, DH = 2.01, NDHW = 3.64, and NDLW = 1.94) with their ratios greatest, as expected by the minority threat hypothesis, in both DW and NDHW neighborhoods. By contrast, Whites had ratios less than 1 in every neighborhood type for every type of police action (stops, frisks, searches, sanctions, and use of force). Hispanics, as expected based upon their greater social integration across the city and the minority threat hypothesis, only had ratios greater than 1 for all five police action measures in DW neighborhoods (all ratios > 2) and NDHW areas (all ratios greater than 1 but less than 1.3). These findings are consistent with Blacks and Hispanics being more of a threat in White-dominated or NDHW areas, and hold true across all three racial groups in all five neighborhood types.

To include the criminogenic viewpoint, the previous statistic was enhanced to account for and weight crime differences across the three groups. While Blacks are 8.94 times more likely to be stopped relative to their population in White-dominated areas, Whites are only .44 likely to be stopped relative to their population. The ratio (8.94/.44) creates a weighted score of 20.34, which exceeds the criminogenic threshold. In White-dominated areas, Hispanics also exceed their proportional stop benchmark (2.06) but do not exceed their weighted crime propensity relative to Whites (4.06, which is lower than 5.37). When compared with Hispanics in White-dominated neighborhoods, Blacks exceed the weighted crime propensity (4.33, which is greater than 1.64) as well. These findings suggest that Blacks are seen as a greater threat in White-dominated areas than Whites or Hispanics, especially when accounting for their weighted criminal propensities, making Black stop totals even more disparate. For Blacks, these findings are consistent across all four police action categories in White-dominated (frisks = 22.3, searches = 21.6, sanctions = 21.2, and force used = 32.2) and NDHW neighborhoods (frisks = 11.5, searches = 9.2, sanctions = 9, and force used = 12.6). Thus, while still disparate beyond weighted crime propensity score, the disparity lessens between White-dominate and NDHW neighborhoods and then decreases below expected levels in the other three neighborhood types. By contrast, Hispanics are below their expected weighted crime propensity in all neighborhood types and all police actions except for force used in White-dominated neighborhoods which is slightly elevated (6.00). These results all follow the NYC-specific Black threat framework: Blacks are treated differently by police in White-dominated and NDHW neighborhoods, beyond their population proportion and weighted crime propensities, while Hispanics are generally treated differently by police in regard to their population proportion but in lesser volume than their weighted crime propensities.

**Table 2.** Stop, Po?ce Act?on, and Outcome Informat?on, 2012, By Race/Ne?ghborhood Type, and Race.

| Category | Stops | Population Ratio | Crime Propensity Ratio | Frisks | Population Ratio | Crime Propensity Ratio | Searches | Population Ratio | Crime Propensity Ratio | Sanctions | Population Ratio | Crime Propensity Ratio | Force Used | Population Ratio | Crime Propensity Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| White/DW | 26,700 | 0.44 | | 0.920 | 0.42 | | 2,285 | 0.42 | | 2,890 | 0.4 | | 3,225 | 0.34 | |
| Back/DW | 3,477 | 8.94 | **20.34** | 4.09 | 9.30 | **22.26** | 2,862 | 9.02 | **21.61** | 3,547 | 8.77 | **21.2** | 6,007 | .02 | **32.1** |
| Hispanic/DW | 23,6?8 | 2.06 | 4.70 | 0.6?4 | 2.?5 | 5.?6 | 2,307 | 2.24 | 5.36 | 2,923 | 2.22 | 5.37 | 3,644 | 2.06 | **6.00** |
| White/DB | 3,344 | 0.32 | | .336 | 0.23 | | 206 | 0.54 | | 348 | 0.37 | | 355 | 0.25 | |
| Back/DB | 23,266 | .5? | 3.53 | 69,657 | .7 | 5.00 | 8,006 | .6 | 2.?3 | .20 | .3 | 3.09 | 7,?80 | .7 | 4.64 |
| Hispanic/DB | 5,5?0 | 0.70 | 2.?6 | 7,673 | 0.63 | 2.68 | 92 | 0.65 | .9 | .543 | 0.76 | 2.07 | .978 | 0.66 | 2.60 |
| White/DH | 4,004 | 0.42 | | 2,?35 | 0.33 | | 329 | 0.39 | | 496 | 0.43 | | 698 | 0.28 | |
| Back/DH | 4?,06 | 2.0 | 4.83 | 28,676 | 2.0 | 6.32 | 3,83? | 2.?4 | 5.48 | 4,828 | .98 | 4.58 | .503 | 2.?8 | 7.76 |
| Hispanic/DH | 68,645 | 0.9 | 2.?8 | 45,75 | 0.90 | 2.72 | 5,868 | 0.88 | 2.26 | 8,324 | 0.92 | 2.?3 | 7,500 | 0.89 | 3.?8 |
| White/NDHW | 0,635 | 0.38 | | 5,?39 | 0.33 | | .047 | 0.39 | | .36 | 0.40 | | .262 | 0.32 | |
| Back/NDHW | 33,82 | 3.64 | **9.54** | 9,77 | 3.85 | **11.54** | 3,?93 | 3.6 | **9.15** | 4,063 | 3.59 | **8.96** | 5,302 | 4.08 | **12.6** |
| Hispanic/NDHW | 26,562 | .23 | 3.2 | 4,820 | .24 | 3.7 | 2,585 | .25 | 3.?7 | 3,243 | .23 | 3.06 | 3,463 | .4 | 3.53 |
| White/NDLW | 2,987 | 0.4 | | .398 | 0.35 | | 303 | 0.46 | | .468 | 0.52 | | 445 | 0.37 | |
| Back/NDLW | 45,?04 | .94 | 4.69 | 25,786 | 2.00 | 5.72 | 4,038 | .89 | 4.07 | 5,3?4 | .83 | 3.52 | 7,430 | .94 | 5.?8 |
| Hispanic/NDLW | 24,293 | 0.82 | .98 | 3,394 | 0.82 | 2.33 | 2,?89 | 0.82 | .76 | 3,?86 | 0.86 | .66 | 4,078 | 0.83 | 2.23 |
| DW | 88,028 | | | 37,896 | | | 7,93? | | | 0,?4 | | | 3,63? | | |
| DB | 47,268 | | | 8?,285 | | | 9,482 | | | 3,576 | | | 20,?0 | | |
| DH | 20,008 | | | 80,359 | | | 0,536 | | | 4,336 | | | 3,048 | | |
| NDHW | 77,332 | | | 42,79 | | | 7,378 | | | 9,42 | | | 0,823 | | |
| NDLW | 80,?59 | | | 44,4?3 | | | 7,252 | | | 0,006 | | | 3,237 | | |
| BLACK | 284,229 | | | 63.28 | | | 22,683 | | | 29,957 | | | 49,0?8 | | |
| Hispanic | 65,?40 | | | 95,67 | | | 4,432 | | | 20,026 | | | 3,?77 | | |
| Other | 33,?76 | | | 6,207 | | | 2,?70 | | | 3,879 | | | 4,976 | | |
| White | 50,366 | | | 22,085 | | | 4,423 | | | 5,892 | | | 6,308 | | |

*Note.* B = B?ack; DB = dominant B?ack; DH = dominant Hispanic; W = White; DW = dominant White; LL = ?og?inear; NDHW = nondominant high White neighborhoods; NDLW = nondominant ?ow White neighborhoods; Bo?dface indicates va?ues that exceed the weighted crime propensity for that group re?ative to the White propensity.

The logistic regression models look at the same relationships—four police actions across specific offender race within distinct neighborhood types—through a different lens. The first level of police action during a stop is the decision to frisk (see Table 3). This model improved on its ability to properly classify frisk decisions from Block 0 (56.4%) to Block 2 (63.7%), but the race/neighborhood categories contributed just 0.4% of this improvement. The Cox/Snell and Nagelkerke $R^2$ values increased from 8.7% and 11.7%, respectively, in Block 1 to 9.9% and 13.3%, respectively, meaning the race/neighborhood categories explained between 1.2% and 1.6% of the variance in the frisk decision. After controlling for other factors, Whites (OR = .73, $p < .001$) and Hispanics (OR = .95, $p < .01$) in DW neighborhoods were significantly less likely to be frisked than Blacks. In NDHW areas, Whites were also significantly less likely to be frisked (OR = .90, $p < .001$) than Blacks in DW neighborhoods. However, Blacks (OR = 1.5, $p < .001$) and Hispanics (OR = 1.2, $p < .001$) were significantly more likely to be frisked in NDHW than Blacks in DW neighborhoods. Moreover, Whites in NDLW, DH, or DB neighborhoods are as likely (OR = 1.0, $p > .05$) as Blacks in DW neighborhoods to be frisked. Rather than level the racial equity playing field, this finding shows support for the idea of "out of place" stops in which Whites in these areas are seen as suspicious as Blacks in White-dominated areas. Only 12% of Whites live in these three neighborhood types, but 26% of White stops occur in these neighborhoods. In contrast to Blacks in DW neighborhoods, non-Whites (OR = 1.76, $p < .001$) in their own dominant neighborhoods (DB or DH) are significantly more likely to be frisked, as are non-Whites in NDLW neighborhoods (OR = 1.46, $p > .001$), supporting the criminogenic perspective.

The search model (see Table 3) adds to these findings. Whites (OR = 1.2, $p < .001$) and Hispanics (OR = 1.2, $p < .001$) in DW neighborhoods are significantly more likely than Blacks in the same neighborhoods to be searched, despite being significantly less likely to be frisked. Whites in NDHW neighborhoods were also significantly more likely than Blacks in DW neighborhoods to be searched (OR = 1.21, $p < .001$). By contrast, Blacks in NDHW neighborhoods were significantly less likely (OR = .93, $p < .05$) to be searched than Blacks in DW neighborhoods, while Hispanics in these areas were equally likely to be searched (OR = .99, $p > .05$). As in the frisk model, Whites in NDLW, DB, or DH neighborhoods are as likely as Blacks in DW neighborhoods to be searched (OR = .95, $p > .05$), once again raising questions as to whether this is crime related or contextual. Finally, non-Whites in DB or DH (OR = .70, $p < .001$) and NDLW (OR = .83, $p < .001$) are significantly less likely than Blacks in DW neighborhoods to be searched during a stop that includes a frisk. This model was able to successfully predict 85.9% of searches, but this percentage was not improved by the inclusion of the control variables nor the race/neighborhood categories. Furthermore, the race/neighborhood categories only helped to explain between .3% and .7% of the decision to search (full model $R^2$ 1.9–2.6%).

The sanction model analyzes the relative likelihood that a frisk ended in either an arrest or a summons to place the frisk and search decisions in context of the outcomes produced (see Table 4). Compared to Blacks in DW neighborhoods, Whites (OR = 1.23, $p < .001$) and Hispanics (OR = 1.26, $p < .001$) in these neighborhoods are significantly more likely to be sanctioned, as are Whites (OR = 1.38, $p < .001$) and Hispanics (OR = 1.1, $p < .01$) in NDHW neighborhoods. Blacks in NDHW neighborhoods are statistically as likely to be sanctioned as those in DW neighborhoods (OR = .98, $p > .05$). Consistent with previous research (Gelman et al., 2007) Whites in DB, DH, and NDLW neighborhoods are more likely to be sanctioned (OR = 1.21, $p < .01$) than Blacks frisked in DW neighborhoods. Further, compared to Blacks in DW neighborhoods, non-Whites in DB or DH (OR = .83, $p < .001$) and NDLW (OR = .91, $p < .01$) neighborhoods are significantly less likely to be sanctioned during a frisk. This suggests that although Blacks in DW neighborhoods are less likely than Whites or Hispanics to be sanctioned, they are more likely than their non-White counterparts in DH, DB, or NDLW neighborhoods to face sanction during a frisk. As with the search model, the race/neighborhood categories explain very little of the variance in sanction decision (.2% to .4%,

**Table 3.** Logistic Regression Final Model Results for Frisk and Search Decisions.

| Final model | Frisk Decision (N = 481,027) | | | | Search Decision (N = 271,161) | | | |
|---|---|---|---|---|---|---|---|---|
| | b | SE | Wald | Exp(B) | b | SE | Wald | Exp(B) |
| Stop outside | .625 | .008 | 6835.281 | 1.868*** | −.332 | .014 | 535.683 | .718*** |
| Others present—Yes | .103 | .008 | 159.025 | 1.108*** | .036 | .014 | 6.459 | 1.037* |
| Officer in uniform | −1.001 | .008 | 15413.131 | .368*** | −.172 | .013 | 187.732 | .842*** |
| Radio run—Yes | −.185 | .007 | 612.773 | .831*** | −.001 | .015 | .009 | .999 |
| High crime area—Yes | −.052 | .006 | 66.582 | .950*** | −.152 | .011 | 177.931 | .859** |
| Borough | | | | | | | | |
| Brooklyn | −.614 | .009 | 4694.030 | .541*** | −.322 | .016 | 396.288 | .724*** |
| Queens | −.120 | .011 | 124.865 | .887*** | .030 | .018 | 2.933 | 1.030 |
| Manhattan | −.651 | .011 | 3588.356 | .522*** | .004 | .019 | .052 | 1.004 |
| Staten Island | −.692 | .018 | 1450.656 | .500*** | −.060 | .033 | 3.295 | .942 |
| High risk age | .364 | .006 | 3452.109 | 1.439*** | −.224 | .011 | 391.496 | .800*** |
| Race/neighborhood | | | | | | | | |
| W/DW | −.310 | .018 | 292.222 | .733*** | .200 | .033 | 35.783 | 1.222*** |
| H/DW | −.055 | .018 | 8.996 | .947* | .196 | .033 | 35.965 | 1.216*** |
| W/NDHW | −.111 | .024 | 21.179 | .895*** | .187 | .043 | 19.242 | 1.205*** |
| B/NDHW | .402 | .017 | 538.760 | 1.495*** | −.075 | .031 | 5.888 | .928* |
| H/NDHW | .188 | .018 | 105.014 | 1.207*** | −.009 | .033 | .070 | .991 |
| W/NDLW, DH, DB | −.005 | .024 | .044 | .995 | −.050 | .045 | 1.228 | .951 |
| NW/DB, DH | .565 | .014 | 1676.863 | 1.760*** | −.362 | .025 | 203.675 | .696*** |
| NW/NDLW | .380 | .015 | 660.372 | 1.462*** | −.183 | .027 | 46.700 | .833*** |
| Constant | .468 | .017 | 753.662 | 1.598*** | −.921 | .030 | 938.826 | .398*** |
| FULL model | Block 0 | Block 1 | Block 2 | | Block 0 | Block 1 | Block 2 | |
| −2LL | 659013.2 | 615072.2 | 608712.6 | | 225348.3 | 217492.8 | 216513.5 | |
| Hosmer and Lemeshow $\chi^2$ | | 547.8*** | 663.4*** | | | 65.6*** | 31.2*** | |
| Cox/Snell $R^2$ | | .087 | .099 | | | .011 | .014 | |
| Nagelkerke $R^2$ | | .117 | .133 | | | .019 | .026 | |
| Percentage correct | 56.4 | 63.3 | 63.7 | | 85.9 | 85.9 | 85.9 | |

Note. B = Black; DB = dominant Black; DH = dominant Hispanic; W = White; DW = dominant White; LL = log linear; NDHW = nondominant high White neighborhoods; NDLW = nondominant low White neighborhoods; Reference groups: stop inside; others present—no; officer not in uniform; radio run—no; high crime area—no; Bronx; low risk age (0–4, 26, or older); B black in White-dominated neighborhood (B/DW).

***$p < .001$. **$p < .01$. *$p < .05$.

**Table 4.** Logistic Regression Final Model Results for Sanction and Use of Force Outcomes.

| Final model | Sanction Given (N = 271,161) | | | | Was Any Force Used (N = 481,027) | | | |
|---|---|---|---|---|---|---|---|---|
| | b | SE | Wald | Exp(B) | b | SE | Wald | Exp(B) |
| Stop outside | −.395 | .014 | 808.285 | .674*** | .154 | .010 | 244.928 | 1.167*** |
| Others present—Yes | .007 | .014 | .257 | 1.007 | .228 | .010 | 546.642 | 1.257*** |
| Officer in uniform | .384 | .013 | 820.719 | 1.468*** | −.382 | .009 | 1,717.637 | .683*** |
| Radio run—Yes | −.004 | .014 | .085 | .996 | .093 | .010 | 88.910 | 1.097*** |
| High crime area—Yes | −.193 | .011 | 292.284 | .824*** | −.156 | .008 | 390.979 | .855*** |
| Borough | | | 1,443.007 | | | | 11,435.198 | |
| Brooklyn | −.382 | .016 | 567.482 | .683*** | −1.140 | .011 | 10,845.616 | .320*** |
| Queens | −.007 | .017 | .155 | .993 | −.390 | .012 | 1,074.536 | .677*** |
| Manhattan | .232 | .018 | 159.237 | 1.261*** | −.403 | .013 | 1,022.918 | .668*** |
| Staten Island | .120 | .033 | 13.074 | 1.127*** | −.738 | .025 | 882.449 | .478*** |
| High risk age | −.312 | .011 | 775.829 | .732*** | .110 | .008 | 194.266 | 1.116*** |
| Race/neighborhood | | | 580.579 | | | | 2,036.732 | |
| W/DW | .207 | .035 | 35.550 | 1.230*** | −.445 | .024 | 330.261 | .641*** |
| H/DW | .230 | .034 | 46.907 | 1.259*** | −.230 | .023 | 97.131 | .794*** |
| W/NDHW | .319 | .044 | 53.323 | 1.376*** | −.522 | .034 | 230.139 | .593*** |
| B/NDHW | −.019 | .032 | .345 | .982 | −.114 | .022 | 26.855 | .892*** |
| H/NDHW | .092 | .033 | 7.479 | 1.096** | −.429 | .025 | 303.876 | .651*** |
| W/NDLW, DH, DB | .189 | .044 | 18.110 | 1.208* | −.293 | .032 | 81.596 | .746*** |
| NW/DB, DH | −.182 | .026 | 49.480 | .834*** | .085 | .017 | 24.583 | 1.089*** |
| NW/NDLW | −.091 | .027 | 11.337 | .913** | −.261 | .018 | 200.739 | .770*** |
| Constant | −1.313 | .030 | 1,859.161 | .269*** | −.813 | .021 | 1,552.410 | .443*** |
| Fit model | Block 0 | Block 1 | Block 2 | | Block 0 | Block 1 | Block 2 | |
| −2LL | 227,971.9 | 218,021.9 | 217,459.2 | | 450,410.6 | 430,115.3 | 428,001.2 | |
| Hosmer and Lemeshow χ² | | 60.16*** | 120.53*** | | | 886.44*** | 505.25*** | |
| Cox/Snell R² | | .019 | .021 | | | .032 | .036 | |
| Nagelkerke R² | | .034 | .038 | | | .053 | .060 | |
| Percentage Correct | 85.6 | 85.6 | 85.6 | | 82.5 | 82.5 | 82.5 | |

Note. B = Black; DB = dominant Black; DH = dominant Hispanic; W = White; DW = dominant White; LL = log linear; NDHW = nondominant high White neighborhoods; NDLW = nondominant low White neighborhoods; Reference groups: Stop inside; Others present—No; Officer not in uniform; Radio run—No; High crime area—No; Bronx; low risk age (0–4, 26, or older); Black in White-Dominated neighborhood (B/DW).
***p < .001. **p < .01. *p < .05.

respectively) and do not improve the overall prediction ability of the model that remained at 85.6% from Block 0 through Block 1.

The final model analyzes differences in the use of any type of force used during a stop. As expected, when compared to Blacks in DW neighborhoods, Whites (OR = .64, $p < .001$) and Hispanics (OR = .79, $p < .001$) were significantly less likely to have force used on them during a police stop, as were Whites (OR = .59, $p < .001$) and Hispanics (OR = .65, $p < .001$) in NDHW neighborhoods (see Table 4). Blacks in NDHW areas were significantly less likely (OR = .89) than Blacks in DW neighborhoods to have force used, but this OR exceeded the lower odds for similarly situated Whites and Hispanics. Whites in NDLW, DB, or DH neighborhoods (OR = .75, $p < .001$) were significantly less likely to have force used despite being equally likely to be frisked and significantly more likely to be searched and sanctioned. Non-Whites were significantly more likely to have force used during a stop (OR = 1.09, $p < .001$) in their own dominant neighborhoods than Blacks in DW neighborhoods, but were less likely to have this occur in NDLW areas (OR = .77, $p < .001$). As with the sanction model, the variables added to the model did not improve the ability to correctly classify use of force and the race/neighborhood categories explain just .4–.7% of the variance in force being used during a police stop.

## Limitations

There are several limitations to address before the results are discussed in the context of minority threat hypothesis. The first is the integrated methods used to geographically create neighborhoods, integrate census data, and combine them with the stop and frisk data in order to test the specific hypothesis. This analytical approach resulted in the loss of 51,854 stops from the data set (9.7% of the 532,881 recorded stops) but was essential to combine the stop with its social context at the neighborhood level in a manner that included census data at the block group level. Some stops were removed because they did not have XY coordinates to be able to map and join them accurately to a neighborhood. Other stops occurred in places that were not populated or assigned to a specific neighborhood (e.g., a large park). Others were eliminated due to the fact that the offender did not align with the three major racial or ethnic categories being studied. These stops were removed as part of the analytical process, and no single stop was chosen for elimination. Still, it is a limitation that needs to be conveyed.

Another limitation is conceptual and operational and that is the measure of neighborhood dominance and/or the high White/low White designation. The measures used here are less conservative than that of Flores and Lobo (2013) who used 70% majority of one group concurrent with other groups comprising 10% or less of the population. As with any categorical classification, the cut points used can impact the results. This limitation is mitigated by the segregation of NYC's population and future research can clarify or improve on these measures, which were objectively determined prior to any analysis being conducted. Furthermore, the collapsing of White and Black Hispanics into one category is a limitation but one that follows prior analyses on the same topic. It is impossible to discern what race the officers thought a suspect was when they decided to make the stop, and it is plausible that White Hispanics could be viewed as White and Black Hispanics could be viewed as Black.

Another limitation is the availability of wider data beyond the stop and frisk data set, such as the inclusion of crime suspect descriptions. As such, a proxy measure for racial crime propensity was used here—the relative demographic composition of Riker's Island inmates—which may be skewed against minorities as well. This statistic is used descriptively to create comparative racial benchmarks and not inferentially, mitigating this limitation. It would not have been possible to create a recent crime propensity measure without these data, but it is an important limitation to note. Relative to the control variables, there were far more available within the SQF data set than were selected in the current models. These were selected prior to the analysis based upon the Ridgeway (2007) study as well as variables that could be categorized properly.

The inferential methods employed also have limitations. Logistic regression modeling was utilized based upon the theoretical framework of Black threat in dominant and high White neighborhoods and to create OR that compare directly to the population proportion and crime propensity ratios created. This approach is taken at the expense of a wider inquiry into the main effects of each racial group and neighborhood type or their potential interactions that are extremely important but beyond the scope of the present inquiry.

## Discussion and Conclusion

NYC provides an environment of diminishing, segregated White populations amid a minority–majority city with a major police policy described as racially motivated, characteristics particularly suited to a specific test of the minority threat hypothesis. Population distributions by race and neighborhood type revealed Whites to be very isolated from Blacks and Hispanics to be more integrated throughout the city, consistent with prior research and supportive of the theoretical framework that predicts unequal police action against Blacks and, to a lesser degree, Hispanics. Descriptive analyses revealed differences in stop, frisk, search, sanction, and use of force disparities between Blacks and Hispanics consistent with prior research in general and in NYC specifically. When taking crime propensity into account, disparities across all five measures exceeded the benchmark for Blacks in just two types of neighborhoods—White dominated and NDHW—consistent with the Black crime threat hypothesis as well as the defended neighborhood hypothesis (see Eitle et al., 2002). The fact that Hispanics did not exceed their crime propensity figures in these two neighborhood types suggests that a more general minority threat framework is less applicable in NYC. Descriptively, these results reveal differential treatment of Blacks relative to White dominance, consistent with prior research that posits these disparities are driven more by race than other factors (*Floyd v. New York,* 2013; Gelman et al., 2007; Spitzer, 1999).

The four logistic regression models, when integrated, provide support for the minority and Black threat hypotheses and to a lesser degree the "out of place," defended neighborhoods and criminogenic perspectives. However, none of the OR, when controlling for other factors, reach the disparity levels found in the descriptive analyses that have driven many of the studies which have been critical of the racial equity of NYPD stop and frisk policy. However, even significant results between the reference group (Blacks in dominant White neighborhoods) and the other categories must be discussed with the caveat that the race/neighborhood categories explain a small portion of the overall variance in any of the four police actions.

The Black threat hypothesis is more salient in NYC than a general minority threat framework. Blacks in dominant White neighborhoods are significantly more likely to experience some level of police use of force than in any other neighborhood type except those dominated by Blacks or Hispanics in which they are more likely to experience policing using some level of force. As Bittner (1970) notes, this is the single greatest measure of the coercive power of police, and the more general minority threat framework is mitigated by the fact that Hispanics in dominant White and NDHW neighborhoods are less likely to have force used against them than Blacks in dominant White neighborhoods (though the OR are closer to 1 than for Whites). Blacks in dominant White neighborhoods are also more likely to be frisked than either Whites or Hispanics, but less likely to be searched or sanctioned, greatly minimizing the criminogenic theory as an explanation for the frisk and use of force differences. Blacks are handled as a threat on the lowest end (frisk) and highest end (use of force) of the four police actions and seen as more of a perceived threat than Hispanics in the same neighborhood type.

The comparative results in NDHW neighborhoods provide some support for the defended neighborhood hypothesis within the context of minority threat. Compared to Blacks in dominant White neighborhoods, Blacks and Hispanics in these neighborhoods are more likely to be frisked

*Criminal Justice Review 40(2)*

while Whites are less likely. Once again, Whites are more likely to be searched and sanctioned, suggesting the Black threat in NDHW neighborhoods is more perceived than real. Despite being as likely to be searched and less likely to experience use of police force, Hispanics are again more likely in this type neighborhood to be sanctioned than Blacks in dominant White neighborhoods. In the aggregate, these findings reveal disparities in police actions against Blacks depending on the type of neighborhood in which the stop occurs, and the evidence suggests many Black stops are not criminally related in White-dominated or high White neighborhoods, consistent with the Black threat hypothesis. Thus, Blacks are significantly more likely to be frisked and treated more forcefully, but less likely to be searched or sanctioned, casting doubt on purely criminogenic arguments. However, it must be cautioned that defended neighborhoods need to be studied more in depth from a longitudinal perspective, so the support found here is limited.

These models also find support for "out of place" stops (Bass, 2001; Gelman et al., 2007) that somewhat mitigate the minority and Black threat hypotheses. The frisk model suggests that Blacks in dominant White neighborhoods are seen as more threatening than other groups, but Blacks and Hispanics are more likely to be frisked in NDLW and dominant Black/Hispanic neighborhoods, suggesting that many Black stops in dominant White areas may not be related to criminal behavior or even a wider power struggle for dominance but simply because they are "out of place." This view is supported by the finding that Whites in NDLW and dominant Black/Hispanic neighborhoods are equally likely than Blacks in dominant White neighborhoods to be frisked despite their likelihood of criminality being far less and the racial threat not being applicable: They are also "out of place." Once again, the search model found no significant difference in Whites in non-White neighborhoods and Blacks in high White neighborhoods, supporting the "out of place" theory as an equal indicator of searches, consistent with a "race based selection of citizens for crime interdiction" (Gelman et al., 2007) being applicable to both Whites and Blacks. However, the "out of place" results apply to Whites relative to frisks and searches, but not sanctions. In fact, Whites in NDLW and dominant Black/Hispanic neighborhoods were more likely to be sanctioned but treated less forcefully than Blacks in dominant White neighborhoods, at odds with the criminogenic perspective but somewhat supportive of the differences expected by minority threat relative to the treatment of Blacks. As opposed to the segregation and concentration of the Black and White populations, the integration throughout the city of Hispanics means they are less apt to be "out of place" in many neighborhoods.

Less support was found for the criminogenic perspective, which is the main supporting argument from the NYPD. Descriptive statistics revealed that Blacks face all four police actions in dominant White and NDHW neighborhoods that greatly exceed their criminogenic ratios. When controlling for other factors, Blacks in dominant White neighborhoods were less likely to be frisked than non-Whites in NDLW and dominant Black/Hispanic neighborhoods, which supports the criminality argument in those areas. Furthermore, the only group that experienced more uses of police force than Blacks in White-dominated neighborhoods were non-Whites in minority-dominated neighborhoods, consistent with more dated research (D. A. Smith, 1986). However, non-Whites were significantly less likely to be searched or sanctioned in these minority-dominated neighborhoods and in NDLW they were less likely to experience the use of force. In essence, Black search and sanction outcomes in dominant White neighborhoods were significantly lower than those of Whites and Hispanics, casting doubt on the Black criminogenic argument for which weak support was found.

Though the findings of this study generally support the Black threat, defended neighborhood and out of place hypotheses more than the criminogenic perspective, it must be noted that the findings are similar to Ridgeway (2007) who found that racial disparities were greatly reduced when control variables were introduced. The descriptive approach here found ratios for Blacks in dominant White and NDHW neighborhoods which greatly exceeded the criminogenic expectations. However, the regression models, when controlling for other factors, found no coefficients that exceeded the Riker's Island crime propensity weights or the general population proportionalities. This suggests the minority

threat hypothesis, which is clearly more pertinent to Blacks than Hispanics in NYC, is tepidly supported but not at exceedingly high levels based on OR and low pseudo $R^2$ contributions in Block 2 of both models. In the aggregate, this framework is found to be valid in the examination of police stop and frisks in NYC but clearly more research is needed to supplement and enhance the results presented here, to more fully reflect the many complexities of threat theories as they continue to emerge in the policing and criminal justice literature.

## Declaration of Conflicting Interests

The author declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author received no financial support for the research, authorship, and/or publication of this article.

## Notes

1. An adjournment in contemplation of dismissal is a legal sanction used in lieu of formal probation or super vision mechanisms relative to minor crimes. Similar conceptually to pretrial diversion, the offender has adjudication withheld and as long as they are not arrested for new crimes within a specified time frame, the original charges are dismissed.
2. The search and sanctions model uses frisks only as they are more likely to precede a search or sanction than a mere stop. It must be noted that the New York Police Department makes far more arrests, searches and sanctions each year than are represented in the Stop Question Frisk (SQF) data, so the smaller sample was used for specificity relative to SQF incidents. A search or sanction is seen here as more likely when a frisk has been performed than a stop in which no frisk occurred.

## References

American Community Survey. (2007 2011). *US census bureau block group shapefiles*. New York, NY. Retrieved from http://www.census.gov/geo/maps data/data/tiger data.html

Bass, S. (2001). Policing space, policing race: Social control imperatives and police discretionary decisions. *Social Justice*, *28*, 156 176.

Bernard, T. J., Snipes, J. B., & Gerould, A. L. (2010). *Vold's theoretical criminology* (6th ed.). New York, NY: Oxford University Press.

Bittner, E. (1970). *The functions of the police in modern society: A review of background factors, current practices and possible role models*. Washington, DC: U.S. Department of Justice.

Blalock, H. (1967). *Toward a theory of minority group relations*. New York, NY: John Wiley.

Bytes of the Big Apple. (n.d.). New York city department of city planning. Retrieved from http://www.nyc.gov/html/dcp/html/bytes/applbyte.shtml

Center for Constitutional Rights. (2009). Racial disparities in NYPD stop and frisks: The center for constitutional rights preliminary report on UF 250 data from 2005 through June 2008. Retrieved from http://ccrjustice.org/files/Report CCR NYPD Stop and Frisk.pdf

Chiricos, T., & Eschholz, S. (2002). The racial and ethnic typification of crime and the criminal typification of race and ethnicity in local television news. *Journal of Research in Crime and Delinquency*, *39*, 400 420.

Civilian Complaint Review Board. (2001). Street stop encounter report: Analysis of CCRB complaints resulting from the New York police department "Stop & Frisk" practices. Retrieved from http://www.nyc.gov/html/ccrb/pdf/stop.pdf

Cooper, M. (1999). Safir may use data on frisks to back unit. *New York Times Archive*. Retrieved from http://www.nytimes.com/1999/04/19/nyregion/safir may use data on frisks to back unit.html

Cureton, S. R. (2000). Justifiable arrests or discretionary justice: Predictors of racial arrest differentials. *Journal of Black Studies*, *30*, 703 719.

Deslippe, D. A. (2004). "Do whites have rights?": White Detroit policemen and "reverse discrimination" protests in the 1970's. *The Journal of American History*, *91*, 932 960.

Eitle, D., D'Alessio, S., & Stolzenberg, L. (2002). Racial threat and social control: A test of the political, economic, and threat of black crime hypotheses. *Social Forces*, *81*, 557 576.

El Ghobashy, T. (2011). Minorities gain in NYPD ranks. *Wall Street Journal*. Retrieved from http://online. wsj.com/news/articles/SB10001424052748704415104576066302323002420?mg=reno64wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052748704415104576066302323002420.html

Flores, R. J. O., & Lobo, A. P. (2013). The reassertion of a black/non black color line: The rise in integrated neighborhoods without blacks in New York City, 1970 2010. *Journal of Urban Affairs*, *35*, 255 282.

*Floyd v. New York*. (2013). Decision. 08 Civ. 1034 (SAS).

Fridell, L., Lunney, R., Diamond, D., & Kubu, B. (2001). *Racially biased policing: A principled response*. US Department of Justice and Police Executive Research Forum. Retrieved from http://www.cops.usdoj.gov/Publications/RaciallyBiasedPolicing.pdf

Gelman, A., Fagan, J., & Kiss, A. (2007). An analysis of the New York city police department's "Stop and frisk" policy in the context of claims of racial bias. *Journal of the American Statistical Association*, *102*, 813 823.

Green, D. P., Strolovich, D. Z., & Wong, J. S. (1998). Defended neighborhoods, integration and racially motivated crime. *American Journal of Sociology*, *104*, 372 403.

Harris, D. A. (2003). The reality of racial disparity in criminal justice: The significance of data collection. *Law and Contemporary Problems*, *66*, 71 98.

Holmes, M. D. (2000). Minority threat and police brutality: Determinants of civil rights criminal complaints in U.S. municipalities. *Criminology*, *38*, 343 367.

Hurwitz, J., & Peffley, M. (2005). Explaining the great racial divide: Perceptions of fairness in the US criminal justice system. *The Journal of Politics*, *67*, 762 783.

Jackson, P. I. (1989). *Minority group threat, crime and policing: Social context and social control*. New York, NY: Praeger.

Johnson, B. D., Golub, A., Dunlap, E., & Sifaneck, S. J. (2008). An analysis of alternatives to New York City's current marijuana arrest and detention policy. *Policing: An International Journal of Police Strategies and Management*, *31*, 226 250.

Jones Brown, D., Gill, J., & Trone, J. (2010). *Stop, question and frisk policing practices in New York city: A primer*. New York, NY: Center on Race, Crime and Justice, John J. College of Criminal Justice. Retrieved from http://www.jjay.cuny.edu/web images/PRIMER electronic version.pdf

Kane, R. J. (2003). Social control in the metropolis: A community level examination of the minority group threat hypothesis. *Justice Quarterly*, *20*, 265 295.

Kent, S. L., & Jacobs, D. (2005). Minority threat and police strength from 1980 2000: A fixed effects analysis of non linear and interactive effects in large U.S. cities. *Criminology*, *43*, 731 760.

King, R. D. (2007). The context of minority group threat: Race, institutions and complying with hate crime law. *Law and Society Review*, *41*, 189 224.

King, R. D., & Wheelock, D. (2007). Group threat and social control: Race, perceptions of minorities and the desire to punish. *Social Forces*, *85*, 1255 1280.

Kooistra, Paul G., Mahoney, John S., & Westervelt, Saundra D. (1998). The world of crime according to cops. In Mark Fishman & Gray Cavender (Eds.), *Entertaining crime: Television reality programs* (Chap. 8, pp. 141 158). New York, NY: Aldine de Gruyter.

Lardner, J., & Reppetto, T. (2000). *NYPD: A city and its police*. New York, NY: Henry Holt.

Lasley, J. R. (1994). Ethnicity, gender and police community relations. *Social Science Quarterly*, *75*, 85 97.

New York Police Department. (n.d.). 2012 stop, question and frisk database. Retrieved from http://www.nyc.gov/html/nypd/html/analysis and planning/stop question and frisk report.shtml

Office of the New York State Attorney General. (2013). *A report on arrests arising from the New York City Police Department's stop and frisk practices*. Retrieved from http://www.ag.ny.gov/pdfs/OAG REPORT ON SQF PRACTICES NOV 2013.pdf

Parker, K. F., Stults, B. J., & Rice, S. K. (2005). Racially threat, concentrated disadvantage and social control: Considering the macro level sources of variation in arrest. *Criminology*, *43*, 1111 1134.

Perez, A. D., Berg, K. M., & Myers, D. J. (2003). Police and riots, 1967 1969. *Journal of Black Studies*, *34*, 153 182.

Rice, S. K., & Piquero, A. R. (2005). Perceptions of discrimination and justice in New York City. *Policing: An International Journal of Police Strategies and Management*, *28*, 98 117.

Ridgeway, G. (2007). *Analysis of racial disparities in the New York police department's stop, question and frisk practices*. Santa Monica, CA: RAND Corporation. Retrieved from http://www.rand.org/content/dam/rand/pubs/technical reports/2007/RAND TR534.pdf

Ruddell, R., & Urbina, M. G. (2004). Minority threat and punishment: A cross national analysis. *Justice Quarterly*, *21*, 903 931.

Sampson, R. J., & Lauritsen, J. L. (1997). Racial and ethnic disparities in crime and criminal justice in the United States. *Crime and Justice*, *21*, 311 374.

Sklansky, D. A. (2006). Not your father's police department: Making sense of the new demographics of law enforcement. *The Journal of Criminal Law and Criminology*, *96*, 1209 1243.

Skogan, W. G. (1995). Crime and racial fears of white Americans. *Annals of the American Academy of Political and Social Science*, *539*, 59 71.

Smith, B. W., & Holmes, M. D. (2003). Community accountability, minority threat and police brutality: An analysis of civil right criminal complaints. *Criminology*, *41*, 1035 1063.

Smith, B. W., & Holmes, M. D. (2014). Police use of force in minority communities: A test of minority threat, place and community accountability hypotheses. *Social Problems*, *61*, 83 104.

Smith, D. A. (1986). The neighborhood context of police behavior. *Crime and Justice*, *8*, 313 341.

Solis, C., Portillos, E. L., & Brunson, R. K. (2009). Latino youths' experiences with and perceptions of involuntary police encounters. *Annals of the American Academy of Political and Social Science*, *623*, 39 51.

Spitzer, E. (1999). *The New York City police department's stop and frisk practices: A report to the people of the state of New York from the office of the attorney general*. New York, NY: Civil Rights Bureau. Retrieved from http://nysl.nysed.gov/uhtbin/cgisirsi/NuH44D7DA0/NYSL/19730017/523/14695

Stolzenberg, L., D'Alessio, S. J., & Eitle, D. (2004). A multilevel test of racial threat theory. *Criminology*, *42*, 673 698.

Stucky, T. D. (2005). Local politics and police strength. *Justice Quarterly*, *22*, 139 169.

Stults, B. J., & Baumer, E. P. (2007). Racial context and police force size: Evaluating the empirical validity of the minority threat perspective. *American Journal of Sociology*, *113*, 507 546.

Tuch, S. A., & Weitzer, R. (1997). Trends, racial differences in attitudes toward the police. *The Public Opinion Quarterly*, *61*, 642 663.

Walker, S., & Shelley, T. O. (1999). Affirmative action, diversity and law enforcement. In D. J. Kenney & R. P. McNamara (Eds.), *Police and policing: Contemporary issues* (2nd ed., pp. 187 199). Westport, CT: Praeger.

Wang, X., & Mears, D. P. (2010). A multilevel test of minority threat effects on sentencing. *Journal of Quantitative Criminology*, *26*, 191 215.

Weitzer, R., & Tuch, S. A. (2005). Racially biased policing: Determinants of citizen perceptions. *Social Forces*, *83*, 1009 1030.

Wilson, J, Q. (1968). Dilemmas of police administration. *Public Administration Review*, *28*, 407 417.

## Author Biography

**Joseph Ferrandino**, Ph.D. is an Assistant Professor of Criminal Justice in the School of Public and Environmental Affairs (SPEA) at Indiana University Northwest. His research interests include the efficiency and performance of police departments and the intersection of new governance with criminal justice systems.