IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Case No. 3:21cr42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
|       Defendant | ) |

**MR. MOORE'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS SECOND SUPPLEMENT TO HIS MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Keith Moore, through counsel, replies as follows to the government's response, *see* ECF No. 71, to his second supplement to his motion to suppress evidence, *see* ECF No. 66:

**I.   The Fourth Circuit has never addressed the argument that Mr. Moore makes here—that selective enforcement claims are materially different than selective prosecution claims, and thus should be reviewed under the traditional preponderance of the evidence standard applicable to equal protection claims.**

In general, a challenger must prove an equal protection claim by a preponderance of the evidence. *See generally Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) (using "more probable than not" standard for equal protection redistricting claim); *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (observing that "plaintiffs must prove by a preponderance of the evidence that racial discrimination was a substantial or motivating factor"). Likewise, in numerous other contexts in criminal law, the court makes relevant determinations by a preponderance of the evidence. *See, e.g., Johnson v. California*, 545 U.S. 162, 170 (2005) (observing at final step of *Batson* inquiry, judge must decide "whether it was more likely than not that the challenge was improperly motivated"); *Franks v. Delaware*, 438 U.S. 154, 156 (1978) (observing that if "perjury or reckless disregard is established by the defendant by a preponderance

1

of the evidence, and . . . the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded. . . .").

While the Supreme Court has made clear that a challenger must prove claims of selective prosecution by "clear evidence," *see United States v. Armstrong*, 517 U.S. 456 (1996), such claims are inherently distinct from selective enforcement claims and thus, not subject to the same standard of proof. *See, e.g.*, *Conley v. United States*, 5 F.4th 781, 789-96 (7th Cir. 2021); *United States v. Washington*, 869 F.3d 193, 219 (3d Cir. 2017) ("[T]he special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *United States v. Armstrong* . . . does not inevitably flow to the actions of law enforcement, or even to prosecutors acting in an investigative capacity."); *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) ("Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.").

While the Fourth Circuit has discussed selective enforcement claims generally in the context of the *Armstrong* standard, it has never held after pointed consideration that a challenger must prove selective enforcement by "clear evidence." *See, e.g.*, *United States v. Mason*, 774 F.3d 824 (4th Cir. 2014). Rather, the Fourth Circuit in passing has cited *Armstrong* in a handful of selective enforcement cases[1] without ever analyzing the argument presented here, *see* ECF No. 71 at 2[2]: that prosecutors enjoy "a powerful privilege" and are "covered by a presumption of

---

[1] Note that the government's reference to *United States v. Venable*, 666 F.3d 893 (4th Cir. 2012), is inapt. That case involved only a selective prosecution claim and not a selective enforcement claim.

[2] The cases the government cites stem entirely from *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996). In that case, the Fourth Circuit mentioned *Armstrong* in passing twice without giving any consideration to any distinction between a selective prosecution claim and a selective enforcement claim. The *Bullock* court neither discussed nor considered whether the "clear evidence" standard in *Armstrong* should govern selective enforcement claims when such claims do not involve the same executive-functioning privileges

constitutional behavior," *Conley*, 5 F.4th at 791; police officers, on the other hand, "are regularly called before courts to justify their tactics" and thus, selective enforcement claims do not warrant the heightened evidentiary standard applicable to selective prosecution claims. *Id.* *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."). Dicta are "statement[s] in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Pittston Co. v. United States*, 199 F.3d 694 (4th Cir.1999). As such, dicta are not binding. *See Bouchat v. Baltimore Ravens*, 241 F.3d 350, 364 n.9 (4th Cir.2001).

Even if, however, this Court finds that it must apply the "clear evidence" standard in *Armstrong*, Mr. Moore's evidence meets that standard.

> II.  **Mr. Moore has clearly demonstrated the Richmond Police Department's selective enforcement of Virginia's traffic laws has a discriminatory effect on black drivers.**

To begin, Dr. Coston and the government's expert, Dr. Smith, have both recognized that evidence demonstrates that black and white drivers commit traffic crimes in roughly equal numbers. *See* ECF No. 66-1 at 1-2 (Coston report in this case); *see also* ECF No. 72-2 at 8. Specifically, in his 2001 study finding that Richmond Police Department officers disproportionately stopped black drivers in 2000, Dr. Smith observed:

> Although it is possible that minorities commit more traffic violations per capita than Whites, thus helping to explain a higher minority stop rate, this possibility appears unlikely. To begin with, Lamberth's (1997) racial profiling studies in New Jersey and Maryland, which used field observation to catalogue driver and violator race on I-95, found that Blacks and Whites violated traffic laws (speeding) at the same rates (Harris, 1999). Furthermore, self-report measures have consistently

---

that selective prosecution claims do. Thus, the Fourth Circuit has never considered the merits of the argument presented here. This Court, however, must.

> shown that minorities commit minor crimes and delinquent acts at approximately the same rates as Whites (McNeely & Pope, 1981; Snyder & Sickmund, 1999). Given that traffic violations are perhaps the most minor of offenses, the available evidence suggests that total traffic infractions will be distributed among minorities and Whites in approximately the same proportions as these racial groups are constituted within a given population.

*See* ECF No. 72-2 at 8. Both experts thus agree using similar evidence that white drivers are equally as likely to commit traffic infractions as black drivers.

Yet, blunt evidence shows that Richmond Police Department officers disproportionately pull over black drivers in Richmond. In 2000, Richmond Police Department officers reported pulling over black drivers 64.2% of the time and white drivers 32.1% of the time. *Id.* at 9. At that time, black people in Richmond comprised 51% of the drivers in Richmond. *Id.* at 9. In 2020, Richmond Police Department officers reported pulling over black drivers 77% of the time and white drivers 14.5% of the time. *See* ECF No. 66 at 5. Hence, not only have Richmond Police Department officers continued to disproportionately pull over black drivers in Richmond, they have increasingly done so.

Such findings mirror what the Department of Criminal Justice Services has found analyzing the same data for the Richmond Police Department that Dr. Coston reviewed. *See* ECF No. 72-1. Statewide, the Department of Criminal Justice Services found:

***Driver Racial/Ethnicity Analysis of Statewide Traffic Stops***

- Black drivers were stopped at higher rates than White drivers. Although only 19.6% of Virginia's driving-age population in the dataset was Black, 31% of drivers stopped were Black. Black drivers were overrepresented among stopped drivers regardless of the reason that a traffic stop was initiated.
- Black drivers who were stopped were searched at higher rates than White drivers. 5.2% of stopped Black drivers had a search of their person, a passenger, or vehicle conducted, compared to 3.1% of White drivers.
- Black drivers who were stopped were arrested at higher rates than White drivers. 2.4% of Black drivers stopped were arrested, compared to 1.6% of White drivers.

*Id.* at 3. For the Richmond Police Department specifically, the Department of Criminal Justice Services found that the Richmond Police Department disproportionately stopped black drivers as opposed to white drivers. *Id.* at 40. Richmond Police Department officers also disproportionately searched black drivers as opposed to white drivers:



*Id.* at 59. And Richmond Police Department officers disproportionately arrested black drivers as opposed to white drivers:

5



*Id.* at 60. That the Department of Criminal Justice Services produces the same statistical analysis as Dr. Coston on these points is not a fluke. Rather, it is statistically significant evidence demonstrating that race is a significant factor that Richmond Police Department officers consider in conducting traffic stops.

Unlike some other cases where courts have faulted small data samples, *see, e.g.*, *United States v. Hare*, 820 F.3d 93, 97, 99-101 (2016) (reporting that sample size of eight prosecutions involving thirty-two defendants and with no comparisons to non-minority population insufficient to show evidence of selective prosecution), and *Conley*, 5 F.4th at 798 (finding that total of 32 defendants prosecuted in stash-house sting operations was "such a small sample" that it would be nearly "impossible to conduct a reliable statistical analysis" that could support an inference of

racial discrimination), Dr. Coston analyzed a total of 2,279 traffic stops of black and white drivers after controlling for traffic stops that either mapped well outside of the Richmond Police Department's jurisdiction or involved other minorities, none of whom were stopped, searched, or arrested at statistically significant rates. *See* ECF No. 66-1 at 3-4. Based on the data presented, just at the Department of Criminal Justice Services was able to do, Dr. Coston was able to run bivariate analyses to determine relevant information about proportionality.

That disproportionality is crucial here. Unlike cases that point only to evidence of one race being targeted, the evidence here indicates that white and black drivers commit traffic offenses at even rates. Both races are roughly equally represented in the city of Richmond. And yet, the Richmond Police Department officers pull over, search, and arrest black drivers at statistically significant rates compared to white drivers who are known to commit the same types of traffic offenses at the same rates. Such comparative evidence establishes a stark discriminatory effect. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding that a San Francisco ordinance banning the operation of laundries in wooden buildings was discriminatorily applied to Chinese launderers where the city denied the petitions of some two hundred Chinese applicants who applied for exemption from the ordinance, but granted all but one of the eighty petitions of the non-Chinese launderers who applied); *see also Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding that the fact that a section of the Alabama Constitution made disenfranchisement of blacks at least 1.7 times more likely than disenfranchisement of whites was "indisputable evidence that the state law had a discriminatory effect on blacks as compared to similarly situated whites"). In selective enforcement claims, statistical evidence of racial disparity can be sufficient to show a discriminatory effect. *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 661 (S.D.N.Y. 2013) (finding that evidence showed that the New York Police Department stopped more black

and Hispanic residents, were more likely to stop blacks and Hispanics than whites within defined geographical areas, were more likely to use force against blacks and Hispanics than whites, and stopped blacks and Hispanics with less justification than whites).

### III. Mr. Moore has submitted clear evidence demonstrating discriminatory intent.

As to the first prong of the selective enforcement test—discriminatory purpose, a defendant must prove that there was a discriminatory purpose behind the course of action. The defendant need not, however, prove that the "challenged action rested solely on racially discriminatory purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (stating that "an additional purpose . . . would not render nugatory the purpose to discriminate against all Blacks"); *Feeney*, 442 U.S. at 277 ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not."). A showing of discriminatory intent need not be made with direct evidence, but can be shown through circumstantial evidence. *See Avery*, 137 F.3d at 355 ("[o]ften it is difficult to prove directly the invidious use of race," so "'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). In some cases, blunt statistical evidence of a racially disparate impact may be sufficient to prove the discriminatory intent element of an equal protection claim. *See, e.g., Arlington Heights*, 429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination."); *United States*

*v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006) (recognizing that, if severe enough, statistical evidence of discriminatory effect can raise an inference of discriminatory intent).

Recognizing that discriminatory intent is rarely explicit, the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68. Thus, contrary to the government's assertion in ECF No. 71 at 9-10, the historical evidence that Mr. Moore has presented is relevant to this Court's analysis.

**IV. The government's parade of horribles regarding a defense win in this case is not worthy of this Court's consideration.**

Lastly, the government resorts to a parade of horribles in an attempt to persuade the Court to ignore what the evidence in this case clearly indicates—that the Richmond Police Department selectively enforces Virginia's traffic laws against black drivers in the city of Richmond. *See* ECF No. 71 at 11. The government fears that it will never be able to enforce traffic laws against anyone in Richmond or respond to victim requests for help (which is presumably **not** what police officers are doing when they are pulling someone over for having a false temporary tag) if the Court grants Mr. Moore's motion. *Id.* And yet, the government shows no concern for the thousands of citizens

9

in the city of Richmond who are routinely pulled over, harassed, searched, and sometimes arrested because the city's police officers target them because of their race. The government shows no concern for black fathers and mothers who feel an obligation to teach their children that they will likely not have any benefit of the doubt during a traffic stop simply because of the color of their skin. The government shows no concern for the severe erosion of trust that black citizens in Richmond have in the Richmond Police Department. Black citizens in Richmond **are the victims** of decades of racial discrimination by the Richmond Police Department. They have the right to be recognized and treated as such. Moreover, the Constitution of the United States of America says that they are entitled to and deserving of equal protection of the laws. Because the Richmond Police Department, and the Fourth Precinct Focus Mission Team in particular, has ignored this protection, the Court must suppress the evidence seized and dismiss the indictment in this case.

## CONCLUSION

As explained above and in ECF Nos. 17, 28, 32, and 66, the Court must suppress evidence of a handgun that police found after initiating an unconstitutional traffic stop of Mr. Moore and dismiss this case.

                                              Respectfully submitted,
                                              KEITH RODNEY MOORE

By:           /s/
       Laura Koenig
       Va. Bar No. 86840
       Counsel for Defendant
       Office of the Federal Public Defender
       701 E Broad Street, Suite 3600
       Richmond, VA 23219-1884
       Ph. (804) 565-0881
       Fax (804) 648-5033
       laura_koenig@fd.org

Amy L. Austin  
Va. Bar No. 46579  
Assistant Federal Public Defender  
Office of the Federal Public Defender  
701 E. Broad St., Ste. 3600  
Richmond, VA 23219  
(804) 565-0880  
amy_austin@fd.org

11