IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.               ) | Case No. 3:21cr42 |
| ) | |
| KEITH RODNEY MOORE,  ) | |
| Defendant   ) | |

### MR. MOORE'S RESPONSE TO MOTION TO EXCLUDE SECOND DEFENSE EXPERT

Keith Moore, through counsel, responds as follows to the government's motion to exclude the defense's expert, Dr. Marvin Chiles, *see* ECF No. 82:

**I.   Dr. Chiles's testimony is relevant under Federal Rule of Evidence 401 and admissible under Federal Rule of Evidence 702.**

The government has moved to exclude Dr. Marvin Chiles, an Assistant Professor of African American history at Old Dominion University with specialized knowledge in the history of racialized policing and residential segregation in Richmond, Virginia—*see* Ex. N, from testifying in this case, *see* ECF No. 82. The government first argues that Dr. Chiles's testimony is not admissible under Federal Rule of Evidence 702.

The challenge that Mr. Moore has brought in this case is to the Richmond Police Department's selective enforcement of Virginia's traffic laws against black drivers in Richmond, Virginia—which violates the Equal Protection Clause. *See* ECF Nos. 32, 66, 72, and 73. As the parties and the Court have discussed before, the fact that the first, second, and fourth police precincts line up almost exactly with the black neighborhoods in Richmond, while the third police precinct lines up almost exactly with the white neighborhoods in Richmond is relevant to Mr. Moore's equal protection challenge. *See, e.g.*, ECF No. 72 at 13-14. That the city of Richmond

1

feels it needs to devote three quarters of its police precincts to policing the black neighborhoods of Richmond is highly relevant to the Richmond Police Department's selective enforcement of the traffic laws of Virginia against black drivers. As Mr. Moore set forth in ECF No. 72, "when you send police out to investigate crime, one can expect to see more traffic stops. Thus, deployment of police to high crime areas where minorities live will have the impact of overpolicing racial minorities. *See, e.g.*, Ex. K at 28 ("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.")." ECF No. 72 at 14.

During its work investigating the Richmond Police Department's selective enforcement of the traffic laws in Virginia against black drivers, the defense discovered that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). Thus, on February 1, 2022, the defense submitted a FOIA request to the Richmond Police Department asking for:

"1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;

2) a copy of the Neighborhood Precinct Plan from 1977; and

3) any amendments or modifications of the Neighborhood Precinct Plan from 1977."

*See* Ex. O. It was only when the Richmond Police Department failed to respond to this FOIA request—even to ask for more time to respond to the FOIA request—that the defense sought a

subpoena from the Court for the same materials. *See, e.g.*, Ex. P (ex parte motion to enforce subpoena duces tecum[1]).

On May 27, 2022, in response to the Court's Order that the Richmond Police Department comply with the subpoena and file a document explaining why the Court should not hold Ms. Peters in contempt for failing to comply with the subpoena, the Richmond Police Department's Senior Assistant Attorney wrote a letter to the Court. The defense has provided a copy of this letter to the government. In the letter, the Senior Assistant reported that the Richmond Police Department does not have any documents responsive to the subpoena. *See* Ex. Q. The police department did not maintain a copy of the Neighborhood Precinct Plan from 1977, any amendments or modifications thereto, or any planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department. *Id.* Rather, what the police department had were maps of the current police precincts that the defense has already submitted as evidence in this case, *see* 7/26/21 Exs. X-1, X-2, X-3, and X-4, and a history of the police department that includes a reference to the creation of the police precincts in 1977. The defense has also provided these documents to the government.

It was after learning that the Richmond Police Department had not kept any records that would assist the Court in more directly understanding the relationship between the racial

---

[1] The government's comment implying that the defense did not have the right to seek these public documents through investigative tools at its disposal such as a FOIA request or a subpoena duces tecum simply because it sought to obtain those documents to use in this case is without merit. *See* ECF No. 82 at 4 n.3. The documents that the defense sought in both the FOIA request and the subpoena are documents of public record. They are not the sort of discovery—such as prosecutorial reports or investigative work materials—that require Mr. Moore to demonstrate any sort of heightened threshold to obtain. *See, e.g., United States v. Hare*, 820 F.3d 93, 98 (4th Cir. 2016) (identifying discovery sought as "discovery concerning the methodology employed by ATF in these cases, their selection criteria for targets, their use of informants, and any efforts to ensure law enforcement did not ensnare the otherwise innocent and those lacking predisposition"). To prohibit Mr. Moore from obtaining public documents that happen to be relevant to a selective enforcement claim through compulsory process would directly impinge on Mr. Moore's Sixth Amendment right to compulsory process. *See* U.S. Const. amend.VI.

segregation of Richmond's neighborhoods and the location of the police precincts that the defense contacted Dr. Chiles.

Undersigned counsel first spoke substantively with Dr. Chiles on Monday, June 6, 2022. At that time, undersigned counsel talked briefly with Dr. Chiles about his knowledge of the history of policing in Richmond and the history of segregation—particularly residential segregation in Richmond—and to determine whether Dr. Chiles was willing to be engaged by the defense to testify in this case. Dr. Chiles then underwent the process to be retained by the defense in this case. Undersigned counsel next spoke substantively with Dr. Chiles on June 15, 2022, to discuss more details of his knowledge regarding the history of policing in Richmond and the history of segregation—particularly residential segregation in Richmond. The defense then provided notice of Dr. Chiles' anticipated testimony, Dr. Chiles's prior published articles, and relevant background materials to the government on June 16, 2022. *See* ECF No. 82-1; *see also* Exs. R-V.

The defense has engaged Dr. Chiles specifically because of his specialized knowledge about the history of policing in Richmond and the history of residential segregation in Richmond. The defense has not engaged Dr. Chiles to offer opinion testimony on any ultimate issue in the case. *See, e.g.*, Fed. R. Evid. 704. Rather, as the defense notified the government pursuant to Federal Rule of Criminal Procedure 16, the defense has engaged Dr. Chiles to share with the Court his specialized knowledge of the history of policing in Richmond—particularly Richmond's history of policing black persons—and the history of residential segregation in Richmond. The defense is in a position to have to call Dr. Chiles as an expert historian precisely because the Richmond Police Department has not kept the relevant source documents that the defense tried to obtain via FOIA and then subpoena. Thus, rather than present direct evidence of why the police precincts in Richmond line up directly with the white and black parts of town, because the

Richmond Police Department did not maintain the relevant documents, the defense must present more circumstantial evidence of the same.

As to the legal relevance of Dr. Chiles's testimony, as the defense has stated before and as the Supreme Court has made quite clear, because discriminatory intent is rarely explicit, evaluating whether discriminatory intent exists requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68; *United States v. Fordice*, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation."); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (discussing historical cases involving laws enacted with the purpose of racial discrimination); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1400-01 (2020) (discussing broader history of racially discriminatory law in constitutional challenge). Dr. Chiles's testimony is thus relevant.

The Court is, of course, free to determine what weight to assign to Dr. Chiles's testimony[2]. But, the Court should do so keeping in mind that the reason that we do not have the most direct evidence of how the police precincts came to be how they currently are is because the Richmond Police Department did not keep that information. Thus, the defense has to present more circumstantial evidence to demonstrate its point. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."); *Arlington Heights*, 429 U.S. at 266 (observing that determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent **as may be available**") (emphasis added).

**II.     The defense has complied with its disclosure obligations under Federal Rule of Criminal Procedure 16.**

The government next argues that the defense has not complied with Federal Rule of Criminal Procedure 16. As set forth above, the defense provided disclosure of a summary of Dr. Chiles's testimony, prior published articles, and relevant background materials to the government as soon as it could have. Further, as set forth above, the government's complaint that the defense has withheld information about what ultimate opinions Dr. Chiles will share with the Court is unfounded. Dr. Chiles is an historian. As such, the specialized knowledge that he has to share with the Court about racialized policing in Richmond and the history of residential segregation in

---

[2] The government has tried to make much of a footnote in *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987). In that footnote, the Supreme Court observed: "Of course, the 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S., at 267, 97 S.Ct., at 564. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." What the government appears perhaps to not appreciate is that the evidence Dr. Chiles has through his careful study of the history of the Richmond Police Department and the history of residential segregation in Richmond is the only evidence undersigned counsel is aware of since the police department did not keep the relevant records. This loss of evidence thus makes Dr. Chiles's circumstantial evidence much more probative than it might otherwise be.

Richmond comes from his careful study of source materials, interviews, and other historical investigation. *See* Fed. R. Evid. 702 (providing that a qualified expert may testify about "other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). The defense does not expect to elicit opinion testimony from Dr. Chiles. Rather, as the defense notified the government, the defense intends to elicit the following:

> Dr. Chiles will testify about the history of policing in Richmond, and specifically the history of the Richmond Police Department. Dr. Chiles will testify about the political history of Richmond and how that history influenced policing in Richmond. Dr. Chiles will also testify about the history of racial segregation and racial politics in Richmond and how that history has shaped the current racial segregation of residents in Richmond.

*See* ECF No. 82. The defense notice and the materials the defense provided to the government suffice to satisfy the requirements of Rule 16.

To the extent that the government's complaint under Rule 16 is the timing of the disclosure to the government, as set forth above, the timing of the disclosure is directly connected with the Richmond Police Department's extremely delayed notice to the defense that it did not have any materials responsive to the defense's subpoena. Additionally, the Court's continuance of the hearing to allow the parties to brief the government's motion in ECF No. 82 has minimized any prejudice the government could have suffered due to the timing of the defense disclosure.

## Conclusion

The Court should deny the government's motion. Dr. Chiles's testimony is the best evidence available, albeit circumstantial, of the relationship between the city of Richmond's history of racialized policing and the existing police precinct locations. It is relevant and must be considered by the Court in evaluating Mr. Moore's selective enforcement challenge.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org