**James Madison University**
**JMU Scholarly Commons**

Masters Theses                                                    The Graduate School

Spring 2016

# Richmond's urban crisis: Racial transition during the Civil Rights Era, 1960-1977

Marvin T. Chiles
*James Madison University*

Follow this and additional works at: https://commons.lib.jmu.edu/master201019

 Part of the Political History Commons, and the United States History Commons

**Recommended Citation**

Chiles, Marvin T., "Richmond's urban crisis: Racial transition during the Civil Rights Era, 1960-1977" (2016). *Masters Theses*. 122.
https://commons.lib.jmu.edu/master201019/122

This Thesis is brought to you for free and open access by the The Graduate School at JMU Scholarly Commons. It has been accepted for inclusion in Masters Theses by an authorized administrator of JMU Scholarly Commons. For more information, please contact dc_admin@jmu.edu.

Richmond's Urban Crisis: Racial Transition during the Civil Rights Era

1960-1977

M.T. Chiles

A thesis submitted to the Graduate Faculty of

JAMES MADISON UNIVERSITY

In

Partial Fulfillment of the Requirements

for the degree of

Master of Arts

American History

May 2016

FACULTY COMMITTEE:

Committee Chair: Dr. Steven Reich

Committee Members/ Readers:

Dr. Evan Friss

Dr. Lamont King

Dr. Steven Guerrier

# Acknowledgments

In no particular order, I give thanks to my entire Thesis Committee, as well as my Graduate Advisor. While serving as my Thesis Director, mentor, and friend, Dr. Steven Reich continuously challenged my analytical thinking by helping me make historical connections that my sources illuminated, but my narrow focus ignored. It is under his tutelage that my thesis transformed from a collection of facts into an analytical work with historical value. As for Dr. Evan Friss, our personal interactions helped me understand what it means to be a historian. Historians are critically thinking storytellers who give meaning to the world once removed. No one understands this dynamic better than Dr. Friss. Dr. Steven Guerrier's contribution to this work is much appreciated because he not only supported my topic choice, but he reassured me that a compelling story could explain how majority white cities turned black. Last, but certainly not least, Dr. P. David Dillard was the anchor that kept my ship afloat from day one. My first semester not only convinced me that I did not deserve admission into James Madison University, but that a masters thesis was far removed from my intellectual capabilities. While I gave up on myself, Dr. Dillard never gave up on me. His words of encouragement helped me grow into the thinker I am today. This thesis is a result of the last two years of encouragement and belief Dr. Dillard invested into me as an M.A. Candidate and as a person. Without one of the four men listed above, I can honestly admit that this work would not have come to fruition.

# Table of Contents

Acknowledgments………………………………………………………………………........ii

Abstract……………………………………………………………………………………....iv

I.  Introduction ……………………………………………………………………………1

II. Chapter I…………………………………………………………………………………15

       Electoral Politics…………………………………………………………………....16

       School Desegregation……………………………………………………………....33

       Annexation Crisis…………………………………………………………….......43

       Conclusion………………………………………………………………….......53

III. Chapter II…………………………………………………………………………………55

       Urban Redevelopment………………………………………………………………55

       1968 Election……………………………………………………………………….61

       1969 Annexation…………………………………………………………………....66

       1970 Election……………………………………………………………………….74

       Busing………………………………………………………………………….......78

       Conclusion………………………………………………………………………….86

IV. Chapter III………………………………………………………………………………88

       Bradley………………………………………………………………………….89

       Holt……………………………………………………….................……………... 98

       Conclusion……………………………………………………….........………...109

Epilogue…………………………………………………………………………………….111

Bibliography………………………………………………………………………………121

# Abstract

Between 1960 and 1977, Richmond, Virginia, experienced a tremendous racial shift in its overall population. The shift from majority white to majority black brought about the city's first black majority city council, black mayor, and majority black school district with a black superintendent. How and why this racial transition happened is the focus of this work. Richmond's racial transition was a part of Civil Rights legislation destabilizing the sociopolitical landscape. As federal Civil Rights legislation was intended to create a post-racial America, in Richmond, blacks and whites ensured the opposite. Both races combined class interest, past racial norms, and future racial aspirations to recreate a Richmond that suited their interest. This complicated political, racial, and class-centered drama broke a perceived racial solidarity and created interracial political agents that would have never existed under Jim Crow. For example, working-class whites and blacks politically aligned against their racial elite's efforts to desegregate public school and annex suburban counties. Likewise, the same middle-class black elite who politically opposed affluent whites in the early 1960s supported affluent white desegregation and annexation efforts. In all, Richmond's urban crisis was a story encompassing how politics, race, class, and space cosmically shifted the racial dynamics of the former Confederate capital. As Richmond looked drastically different in 1977 than in 1960, Civil Rights Era racial, political, educational, and spatial changes best explain Richmond's racial transition.

## Introduction

On the eve of the Civil Rights Movement, Richmond's white elite dominated the city council while maintaining segregated public schools. Yet, by 1977, the once capital of the Confederacy, became had a black majority city council, black mayor, and integrated public school system. This racial shift in the city's power structure was the culmination of several events that destabilized the urban political arena. Through urban elections, school desegregation, and annexation, Richmond transitioned out of Jim Crow Era and into the Civil Rights Era. As Jim Crow laws were removed by Civil Rights legislation, urban blacks exercised their political power through urban elections and school desegregation. While blacks garnered municipal control, through internal class conflict, middle-class whites fled Richmond for the neighboring suburbs of Chesterfield and Henrico. Black political gains and white flight slowly removed white elites from municipal power. So, affluent whites combatted urban blacks and suburban whites with annexation, hoping to maintain their political control over Richmond. While race appeared to be the cause of Richmond's urban crisis, it was because of various political agendas that class centered racial groups all vied for political power during the Civil Rights Era.

In this thesis, I explore how the Civil Rights Era did not inspire a post-racial Richmond; rather, Civil Rights legislation, annexation, school desegregation, and destabilized urban politics and caused Richmond's political power to shift from affluent whites to black professionals. Before 1960, Richmond was a majority white segregated city. Residentially, whites dominated three of the city's four corridors: Northside, Southside, and West End. Blacks primarily lived in the city's core and East End. Jim Crow Era white elites used their racial majority to control the channels of municipal power by creating white privilege while simultaneously disenfranchising black political and

educational development. After the removal of Jim Crow laws, various white and black political groups vied for control of the city. After 1960, the apparent white-black dichotomy diversified into four major groups, all looking to recreate Richmond in their own image. Civil Rights Era Richmond was unique because it allowed self-serving class-centered groups to make alliances, sometimes across racial lines, to control the city that Civil Rights created in the Confederate capital.

There were two racial divides and four social classes that sought to control Civil Rights Era Richmond. Richmond's two biggest racial castes were whites and blacks. Although mixed-race people, Jews, and Asians lived within the city, this is a story about the sociopolitical conflict between Richmond's largest racial groups. Therefore, the black-white dichotomy resonates throughout my analysis. As for social classes, each race had upper-class, middle-class, and working-class poor. The class monoliths I use for white Richmonders are the wealthy and middle-class. Although poor whites were politically active, they were not as instrumental in white efforts to deter black political gains. The black professional class and working class politically defined black Richmond. Despite being labeled middle-class, black professionals were their race's elite. Therefore, terms like black middle-class or middle class blacks refers to Richmond's black elite.

Primary sources opened my analysis to the nuances of Civil Rights Richmond. My two primary source categories were the "official" and the "unofficial" record. Official records, which consisted of newspapers, official correspondences, and federal court cases, retold the story from an archival perspective. Racial breakdowns in archival sources, through the repeated use of words like *Negro* and *white*, led me to believe that race dominated the story. Although race rose to the surface of the official record, the events, as

well as the ways they unfolded with strange interracial political alliances, convinced me that the former Confederate capital's Civil Rights history could not be explained exclusively in terms of racially motivated white economic, political, and residential flight.

The unofficial record addressed my suspicions about the complexity surrounding Civil Rights Era Richmond. The unofficial record consisted of multiple face-to-face conversations with black and white Richmonders who declined to be formally interviewed, as well as seven oral histories. The interviewees, either lived in Richmond during the seventeen years that framed this study, or knew important figures intimately enough to provide context for their past actions. Not one interviewee adhered to the monolithic concept of black and white. Instead, they referred to class differences between the races by where they lived within the city. After cross examining personal letters from citizens and city officials with my oral histories, it became clear that race was the outward appearance of what was a class-centered racial conflict between different factions vying for political control of a destabilized Richmond. Overall, the primary sources introduced how seemingly simplified racial conflicts were complicated political struggles for supremacy during the death of Jim Crow.

Four secondary works examined Civil Rights Era Richmond. Robert Pratt's *The Color of Their Skin: Education and Race in Richmond, Virginia, 1954-89* racially examined Richmond after the *Brown* decision. It was Richmond's Jim Crow society, according to Pratt, that brought about "a shameful legacy" of token school integration in 1960 and re-segregation by 1977. Christopher Silver and John V. Moeser's *The Separate City: Black Communities in the Urban South, 1940-1968* discussed how white elites used Jim Crow laws to create racial segregation that was physically, politically, and socially evident. It was this almost 100-year tradition of physical, economic, and politically racial separation that created a Civil Rights Era racial battle over municipal power. Christopher Silver's *Twentieth-Century Richmond: Planning Politics' and Race* used spatial analysis to uncover Richmond's long history of structural racism. Urban planning was nothing short of elite white attempts to maintain control over Richmond's changing racial dynamics by limiting black residential and economic mobility. John V. Moeser and Rutledge M. Dennis's *The Politics of Annexation: Oligarchic Power in a Southern City* analyzed how Richmond's annexation drama exposed how race and space became ground zero for urban and suburban white political conflict. Through state and federal intervention, urban and suburban whites brokered a land deal that suited both interests. Although these four works defined Civil Rights Era Richmond as a racial conflict, my thesis will explain why race alone limits  the understanding of this era. Although whites and blacks had racial division, class interest and political uncertainty combined with race to define Civil Rights Era Richmond by its revolutionary shift from majority white to majority black.[1]

---

[1] Robert A. Pratt, *The Color Of Their Skin: Education And Race In Richmond, Virginia, 1954-89* (Charlottesville: University Press of Virginia, 1992), 5-15; Christopher Silver and John V. Moeser, *The Separate City: Black Communities In The Urban South, 1940-1968* (Lexington, Ky: University Press of Kentucky, 1995), 32; John V. Moeser and Rutledge M. Dennis, *The Politics Of Annexation: Oligarchic*

My thesis examines Richmond through a lens each of the four secondary works did not. While Pratt, Silver, Dennis, and Moeser separated school desegregation, councilmanic politics, and annexation, I combine the three to cultivate a better understanding of Civil Rights Era Richmond. One cannot fully assess the revolutionary impact of Civil Rights Era Richmond without studying school desegregation, urban politics, and annexation together. Each of the three issues intimately connected in ways that were not understood by Pratt, Silver, Dennis, and Moeser. The racial migration, political discourse, and social conflict that defined Civil Rights Era Richmond were caused by the complex social climate school desegregation, urban politics, and annexation created simultaneously. Separating the three categories hides the nuanced sociopolitical tension Richmond residents and power brokers engaged in between 1960 and 1977. Furthermore, this thesis is but a step into using these three categories to understand how the former Confederate capital experienced its first ever municipal power shift from white to black in just seventeen years.

Post-World War II urban crises have been linked to economic decline, racist agendas, and suburban class consciousness. Civil Rights Richmond fits within post-World War II urban historiography, more specifically, the distinctiveness of the non-northern urban centers. The three most influential works dealing with post-World War II non-northern urban centers were done by Robert Self, Kevin Kruse, and Matthew Lassiter. Each historian used different lenses to examine the complex social realities of postwar America. Economically, post-war urban racial shifts resulted from deindustrialization and economic flight to the suburbs. Racially, post-war white flight covertly reinstituted Jim Crow-style segregation. From a class perspective, post-war society cultivated a new white collar

---

*Power In A Southern City* (Cambridge, MA: Schenkman Pub. Co., 1982), 17; and Virginius Dabney, *Richmond: The Story Of A City* (Charlottesville: University of Virginia, 1990), 105.

middle-class class, who opposed overt racism and radical integrationalist policies. Nevertheless, all three interpretations uniquely tied class, race, and economics into an overall understanding of how the suburban-urban dichotomy facilitated post-war urban race relations.

Robert Self understood post-World War II urban crises as the result of economic decline. In *American Babylon: Race and the Struggle for Post-War Oakland*, Robert Self tied the origins of black grassroots politics to industrial flight from inner cities. Many high salaried middle-class white industrial and white collar workers followed economic flight to the suburbs. Industrial flight was economically driven, yet it had racist overtones. This mass migration was known as white flight because of the disproportionate amount of whites who were able to relocate to the suburbs when blacks were not economically able to do so. The Federal Housing Authority did not insure private mortgages to many well-qualified blacks, leaving them in poverty-stricken inner-city neighborhoods. Despite the racist actions of the FHA, Self argued that white flight was the product of homeownership's lure on middle-class whites, not a need to re-segregate from urban blacks. Educational and workplace discrimination created the white middle class, making middle-class suburban flight appear racially motivated.[2]

The allocation of resources heightened the racially charged climate between urban blacks and the newly suburban white middle class. Self identified that black grassroots politics gained traction when urban tax revenue was redistributed to suburban business interest. New highways, property tax breaks and suburban land development resulted from urban blacks having little-to-no influence over the use of public funds. This prevented

---

[2] Robert O. Self, *American Babylon: Race And The Struggle For Postwar Oakland* (Princeton, N.J. Princeton University Press, 2003).

blacks from obtaining high-paying municipal jobs and receiving quality public services such as transportation, welfare, and public schooling.[3]

Kevin M. Kruse described post-World War II urban crises as the byproduct of racist whites seeking protection from the Civil Rights movement. Kruse's *White Flight: Atlanta and the Making of Modern Conservatism* illuminated that white flight, consumer rights platforms, and economic relocation systematically reinstituted Jim Crow Era white supremacy in Atlanta. White capitalists and city planners put their disdain into action by using social class, space, and municipal politics to create geographic separation from liberal minded blacks wishing to use Civil Rights legislation to establish municipal control over their built environment. Because white Atlantans resisted Civil Rights change, they challenged federal authority by creating "modern conservatism." This conservatism protected their race-centered agendas under the guise of economic rights. These economic rights allowed whites to separate from integration through financial exclusion. Instead of integrating public schools, for example, white Atlantans would relocate to newly developed areas where housing markets prevented most blacks from infiltrating. Since Jim Crow laws legislated blacks to poverty, modern conservatives reinstituted Jim Crow by setting financial limitations on newly enfranchised black Atlantans.[4]

In Kruse's Atlanta, white racial solidarity was shattered when one social faction secured enough political currency to avoid federal Civil Rights legislation. The white working class, who supported Jim Crow Era white supremacy in the workplace, public schools, and civil society, were betrayed by their elites who used housing markets,

---

[3] Self, *American Babylon,* 136.
[4] Kevin Michael Kruse, *White Flight: Atlanta And The Making Of Modern Conservatism* (Princeton, N.J: Princeton University Press, 2005).

preparatory schools, and zoning ordinances to separate from federal integration policies. As blacks filled the urban arena, Jim Crow policies and procedures waned, forcing whites who could not relocate to deal with integration by sharing municipal power and resources with black residents. Kruse's political and racial analysis lacked perspective on one of the most important municipal services white and black Atlantans had to share: public education. Matthew Lassiter came along three years later and used class to analyze Atlanta's racial strife over public education.[5]

Matthew Lassiter described post-World War II urban crises as class-centered movements resulting from the deindustrialized economy creating middle-class, white racial innocence. *The Silent Majority: Suburban Politics in the Sunbelt South* distanced the field from Kruse's racial view of the post-war urban South. Rather, Lassiter used school desegregation to highlight how the white-collar economy created the "silent majority;" or moderate whites who used suburbia to escape the economic and racial problems of the inner city. To Lassiter, the silent majority chose the middle ground between black activists and racist white elites. The middle ground correlated with their position in the emerging deindustrialized white-collar economy. Middle-class whites were not blue collar workers; neither were they corporate elites. They were their own separate social class who wished to keep their economic and social rights at the expense of the blacks that the New Deal liberalism forgot. White middle-class economic development created a class identity that required a matching political platform. This economic and identifiably white social class

---

[5] Kruse, *White Flight,* 8.

resisted the radicalism of liberal reformers and staunch racism from conservatives, as both threatened the stability of the white, middle-class silent majority.[6]

Middle-class moderates believed in both economic segregation and racial integration. Although Lassiter alluded to this position being disingenuous, suburban whites wished to see the end of racial segregation. Instead, they believed economics should have been the standard to achieve the liberal policies of integration. This position ignored that structural racism prevented many blacks from ever becoming middle class. Nevertheless, school desegregation violated the economic protection that they believed was colorblind. However, moderates disapproved of legalized racial segregation. The overt racism of the past pushed them to the center, as many suburbanites were New Deal liberals who disagreed with conservative opposition to liberal economic policies that created middle-class suburbia. Middle-class whites believed economics to be the determining factor in social policy, not extremism on both sides of the aisle.[7]

My thesis contributes to post-World War II urban historiography because it illuminates how both race and class created the urban crisis in Richmond, Virginia. While economics played a pivotal role in the federal court proceedings that facilitated the urban crisis, ultimately, race and class conflict dominated the racial shift. Similar to Kruse's Atlanta, white oligarchs used space and politics to maintain their Jim Crow-style racial order over Richmond. Similar to Lassiter's Charlotte, class consciousness divided segregation era elites and suburban moderates over how the post-war urban political arena should operate. However, Richmond's race and class structures add complexity to Kruse

---

[6] Matthew D. Lassiter, *The Silent Majority: Suburban Politics In The Sunbelt South* (Princeton, N.J: Princeton University Press, 2006).
[7] Lassiter, *The Silent Majority,* 120.

and Lassiter's examples because whites and blacks were not united on racial or class interests. Rather, Richmond had four factions, segregation era white elites, black professionals, working-class blacks, and suburban whites, all vying to remake the post-Jim Crow Richmond according to their class interests. Civil Rights legislation forced each side to make allies with the other race out of convenience, refuting the narrative of urban politics having stanched racial division.

Chapter 1 focuses on the origins of Richmond's black political emergence between 1960 and 1966. In just six years, Richmond's public school system and population shifted from majority white to majority black, with three black councilmen serving at once. This shift resulted from two NAACP lawsuits against the Richmond City School Board and the mobilization of black voters in city council elections. The two school desegregation lawsuits forced city officials to begin integration in 1960. Political mobilization came from black professionals engaging working-class blacks into municipal politics. This created racial solidarity at the polls, as working-class blacks politically empower their professional leadership. Black voting power increased in stages. Black voters went from controling the political careers of white politicians to voting segregation-era black elites into office. Injust four elections, black Richmonders quickly ascended from an underrepresented voting constituency to one of the most important voting constituencies in city elections.

Chapter 2, the Middle Years (1967-1970), details how white class division, and the changing nature of black politics, complicated Richmond's racial transition. By 1967, young energetic black politican Henry Marsh III used urban redevelopment to remove segregation era black leadership from power, all while heading black Richmond's liberal regime. As black politics reached new heights under Marsh, white politics experienced

class breakdowns. Urban and suburban whites disagreed on how to deal with black political advancement. Suburban whites wanted exclusion from Civil Rights Richmond, as they recreated racial segregation in surrounding counties. Since white flight and black politics loosened elite white political control, annexation surfaced as a central issue. Urban and suburban whites clashed because neither side wished to compromise its original position. Although a land deal was eventually brokered, annexation conflict weakened white racial solidarity. Disagreements over the minutia, political impact, and aftermath of the 1969 annexation set up two federal Civil Rights cases that captivated the city throughout the 1970s.

Both urban and suburban whites worked to create their differing visions of the metropolitan area. Councilmen Phil Bagley, James Wheat, and City Manager Alan Kiepper worked with suburban officials Irvin Horner, Frederick F. Dietsch, and Melvin Burnet to broker an annexation that served both parties' interests. The land deal maintained a white majority city council and urban population while furthering the geographic gap between the suburbs and the city. This deal not only created Civil Rights issues within urban voting, it sparked controversy within school desegregation. As federal forces, under Judge Robert Merhige, progressively desegregated city schools by 1970, suburbanites confronted the same Civil Rights education reform that white flight and municipal borders previously excluded them from.

Chapter 3 uses two landmark federal cases to complete this study. First, the aftermath of grassroots suburban resistance to busing and annexation inspired the *Bradley v. Richmond School Board* case. The goal was to place black professionals in charge of a fully integrated public school system. However, *Bradley* evolved into a complete

consolidation of urban and suburban public schools. This put middle-class blacks in opposition to suburban whites. Strange political alliances arose as urban whites and black elites favored consolidation. School consolidation allowed white elites to politically control suburbia while black elites controlled the public school system. Suburban white and working-class black opposition united them against the consolidation. Both sides had little to no interest in racially mixing their schools across municipal boundaries. In the end, suburban whites and working-class blacks victoriously prevented the school consolidation, but Richmond's public schools experienced full city-wide busing in 1974.

Second, the *Holt v City of Richmond, Virginia* case, exposed how class identity broke previously perceived racial solidarity. Working-class black leader Curtis Holt Sr., sued the city council for violating the Voting Rights Act of 1965 through the 1969 annexation. The Civil Rights movement caused dissent among black Richmonders over which class should control the city's power structure. To Holt, the annexation, which was supported by black professionals, prevented him and working-class blacks from infiltrating the city's power structure. Black elites and white elites partnered to bring about the demise of the *Holt* case. Stopping Holt removed federal attention from elite white efforts to control the city council. To black professionals, Holt was a tool of the working-class who overstepped his bounds by trying to usurp the politically powerful black elite.

The strange alliances did not stop with white and black elites siding against Curtis Holt. Holt received financial support from suburban white organizations like the Broad Rock Council of Civil Associations and lawyer Cabell Venable. Both suburbanites and Venable wished to de-annex the 44,000 white suburbanites back into the class-centered white suburbs of Chesterfield County. In the end, Richmond kept the annexed land, but the

case facilitated white flight. *Bradley* and *Holt* finished the racial transition started in 1960. Richmond's population, public school system, and municipal power structure shifted from white to black. The diversity of black political interest changed greatly, as the Civil Rights Era presented blacks with the political opportunity to break ranks with each other. However, what remained unchanged was that black elites retained control of black politics in Richmond, despite Holt's lawsuit being one of two major events to complete the white transition out of the city. As black elites gained control of the power structure, they became less responsive to the constituency that ignited their political ascendancy in 1960.

Today, Richmond residents' intertwine race and class because Civil Rights legislation did not remove race from Richmond's political fabric. Geographic titles or defined space carry race and class connotations, more now than they ever have throughout the Richmond metropolitan area. Growing up in Chesterfield County, I noticed how black and white suburban parents used race and class epitaphs to make sense of their racial uncertainties. Terms like *ghetto*, *urban*, *inner-city*, *unsafe*, and *sketchy* were used to classify urban spaces as black. When my friends and I heard these words from adults, we understood the race and class connotations they alluded to. If the area, such as Richmond city, was majority black, it was usually poor and unsafe; thus, it should be avoided by children of privilege.

Conversely, my parents conditioned me to never classify or be classified with majority black spaces, while always identifying with white identified space. In modern-day Richmond, both races understand black as poverty stricken, violent, and uneducated, while seeing white as wealthy, safe, and pleasant to be around. Ideas about race and class being intimately connected through defined space resulted from the Civil Rights

movement's failure to create a post-racial Richmond. Richmonders found new ways to express their deepest insecurities about racial differences. My thesis describes how the Richmond metropolitan area I grew up in during the 1990s and early 2000s, came directly from the racial uncertainties of the 1960s and 1970s. My childhood interaction with suburban race and class concepts was not abnormal, as my friends from college, who came from metropolitan areas throughout the South, shared with me their similar interactions with race and class being staunchly defined by space. Thus, our experiences should be studied, through Richmond's urban crisis, to understand how the connection between race, class, and space came about and is still prevalent in post-Civil Rights America.

## Chapter 1: 1960-1966

In the Civil Rights Era, the former Confederate capital experienced a cosmic racial shift in its power structure: city council and public schools. Starting with *Brown v. Board of Education of Topeka, Kansas* and ending with the Fair Housing Act of 1968, Civil Rights was not just a movement, but as Gavin Wright said, it was a revolution because it radically changed how Americans understood and dealt with the political implications of race. Although the Civil Rights legislation should have created a post-racial Richmond, whites and blacks ensured the opposite. As race transitioned from overtly codified to covert political currency, both whites and blacks continuously used racial politics to achieve their vision for Civil Rights Richmond. The three categories that best explain Civil Rights Era Richmond are electoral politics, school desegregation, and annexation attempts. Between 1960 and 1966, the city transitioned from a 68% white populated city, with an all-white city council and majority white public school system, to a 50/50 white-black population, three black city councilmen, and a majority black public school student population. This racial shift came at the helm of urban blacks using Civil Rights Era electoral advances and school desegregation to rebuild their political and educational landscape while whites saw Civil Rights changes as the means to either retain urban power or reinstitute racial separation via white flight.[8]

---

[8] Gavin Wright, *Sharing the Prize*: *The Economics of the Civil Rights Revolution in the American South* (Harvard University Press, 2013), 4; Benjamin Campbell, *Richmond's Unhealed History* (Brandylane Publishers, Inc, 2012), 159-169; and Peter K. Eisinger, *The Politics of Displacement: Racial and Ethnic Transition in Three American Cities*, (Academic Press, London, 1980), 5. I am defining Richmond's Civil Rights Era as the years between 1960 and 1977.

**Electoral Politics**

Why electoral politics and what does it tell us about Civil Rights Era Richmond? The racial shift in Richmond's city council campaigns illuminate, more than the administrations that were elected, the social impact of black electoral increases, as well as the class complexities that only post-Jim Crow America could expose. Pre-1960 elections centered on white voters electing prominent conservative white businessmen to the city council every two years. Post-1960 Richmond consisted of black voters helping elect blacks and liberal whites to the city council. This happened at the behest of middle and working-class blacks creating a new political landscape. However, this race-based partnership had limits, as Civil Rights change meant different things to both sides. As blacks carved their niche in electoral politics, professional and working-class black racial ties were tested by internal and external forces, culminating in black professionals changing their leadership methods to maintain their racialized voting bloc, which gave them political power.

Civil Rights changes in Richmond began, not with *Brown*, but with local electoral politics. The most evident aspect of Richmond's power shift was the city council elections between 1960 and 1966. Prior to 1960, affluent whites dominated the city council. Blacks had minimal impact on the city council as well as council elections. There had been only one post-Reconstruction black city councilman elected prior to 1960. This was in large part due to state-sponsored measures and the Byrd Machine keeping black voting below thirty percent. However, in 1960, this trend changed. As Virginia's Jim Crow Era conservative power structure was challenged by the liberal-minded Young Turks in the early 1960s, Richmond's white power structure came under attack as well. The black population and its

voter participation rose above thrity percent between 1960 and 1966, enabling blacks to use citywide voting to help elect three black councilmen, with one becoming the Vice Mayor.[9]

Racial solidarity, through urban redevelopment, politically mobilized black Richmond by 1960. The first issue was housing displacement. In 1955 and 1957, Richmond experienced physical redevelopment through the construction of the Richmond-Petersburg Turnpike and Interstate 95. These projects were purposefully and masterfully designed to displace over 30,000 citizens, transforming downtown Richmond into a major shopping district. Black homeowners made up 20,000 of the 30,000 displaced residents, most coming from Jackson Ward, Richmond's oldest and most prominent black neighborhood. There was a vacant valley located four blocks north of Jackson Ward that could have "better" supported the highway. However, the 1955 city council led by future Mayor Phil Bagley and the City Planning Commission built the interstate and turnpike through Jackson Ward. Despite opposition from the Carver Displacement League, headed by black Mortician Oliver P. Chiles, the construction was approved by the Richmond Redevelopment and Housing Authority. Since most blacks could not purchase new homes in the city's highly

---

[9] J. Harvey Wilkerson III, *Harry Byrd and the Changing Face of Virginia Politics* (University of Virginia Press, 1968), 20-61. Harry Byrd was a Winchester aristocrat who owned a majority of Virginia's media outlets, including the *Richmond News Leader*. Byrd used political ties called "The Byrd Machine," which was a collection of local, state, and national politicians, to maintain conservative white supremacist control over Virginia politics. His influence was felt more in Virginia's Southside and Valley regions, controlling who ran and won local, statewide, and national offices. However, as urban areas like Richmond gained more importance through economic expansion and federal investment, Byrd suppressed attempts to remove power from affluent whites within his circle. The Young Turks were college educated liberal politicians who challenged the conservative Byrd Machine for political supremacy in Virginia during the 1950s and 60s. Most were University of Virginia trained lawyers and politicians from the Richmond and Roanoke area. See Wilkerson 263-97, for more information on the statewide power struggle and how it resonated during Civil Rights Era Richmond.

racist and competitive real estate market, many became public housing residents in the city's East End corridor.

Segregation became an issue that united black Richmonders. Urban blacks were dissatisfied with white-owned downtown businesses charging similar prices for dissimilar services. This frustration resulted in the Thalhimer's Department store boycott from April until Christmas of 1960. To Virginia Union professor Dr. Raymond Pierre Hylton, the boycott was meant to economically and socially "send repercussions throughout the South." Black Richmonders were not as concerned with bankrupting downtown business, as they were about establishing "human dignity" in their changing environment. Residential displacement and segregation stripped blacks of their dignity because it perpetuated generational black disenfranchisement. Housing displacement and segregation not only inspired Richmond blacks to become politically active on the local level, it gave them a cause to politically mobilize around.[10]

The partnership between black religious and political leadership created the foundation for a political coalition between the professional and working classes. Although men like Dr. Hylton and the Thalhimers' boycott foot soldiers shared the same race, class separated them. Black electoral ascendancy came when blacks worked together across class boundaries; however, this was done by the only other commonality black

---

[10] Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, and Race* (Knoxville: University of Tennessee Press, 1984), 217-230; Curt Aurty, "Civil Rights Movement Hits Richmond Room at Thalhimers;" *World Now*, (February 22, 2010); and Zack Brown, "The Sit-In Effect." Mapping American History, Seminar at the University of Richmond. Silver charted the beginning of white flight to Chesterfield and Henrico Counties during the urban redevelopment late 1950's. Middle-class white residents were displaced in large numbers, as the council organized Richmond to fit industrial flight to Southern cities. Most of Jackson Ward was labeled a *slum* by the Richmond Redevelopment Housing Authority, thus it was fair game for redevelopment. John V. Moeser suggested that local banks refused to extend redevelopment loans to Jackson Ward residents. This led to exterior deterioration, giving city officials the ammunition to demolish it for Interstate 95, which is still there today.

Richmonders collectively shared: religion. Virginia Union professor William Thornton began the Richmond Civic Council in 1958 later renamed the Crusade for Voters in 1960. This voter organization operated under the leadership of lawyers, businessmen, academics, and doctors like George A. Pannell and Milton Randolph. The Crusade connected with the working-class majority through the Baptist Ministers Conference of Greater Richmond and Vicinity. The "black Baptist leadership," under Dr. Robert Taylor, worked side-by-side with the Crusade to electorally mobilize working-class black voters. For black Richmonders, the Baptist church was "dominant in the community." Any political agenda or leader who wished to capitalize on black numerical strength did so through the church. Organized funding through First Baptist Church, Fourth Baptist Church, Sixth Baptist Church, Baker PTA, and the Fairmount Teachers Club helped the Crusade pay voter registration fees. Collectively, the church cemented the bonds that class separated. Both sides did not necessarily like each other, however, in the face of racial discrimination, politicians and church leadership partnered to control the outlook of Civil Rights Richmond through city council elections. For professional blacks, this meant being political leaders, and for working-class blacks, this meant supporting black leadership in the face of urban redevelopment and economic inequality.[11]

The Crusade increased black electoral strength by changing the nature of black voting. Crusade leadership switched black voting from the single-shot method to a full-slate approach. Single-shot allowed voting organizations to allocate all its votes to just one candidate. This ensured the candidacy of one councilman while neglecting other

---

[11] *Crusade for Voters Papers*, list of "Individual Contributors" and "Contributors from Organizations;" "Open Letter" 1960-1961 *Richmond Crusade for Voters Archives*, M 306 Box 1, James Branch Cabell Library, Virginia Commonwealth University; and Interview with Reverend Benjamin Campbell, January 6, 2016.

candidates. Full-slate voting allowed the organization to nominate up to nine candidates at once. Utilizing the full-slate method gave the Crusade the best chance at controlling the overall outcome of the election. Instead of electing one councilman, the organization could elect as many councilmen as its voting numbers allowed. The full-slate approach showed that the Crusade was priming to impact all nine available seats, not just one.[12]

The Crusade's work did not go unnoticed by white politicians. By June of 1960, the Crusade registered over 14,000 black voters for the upcoming election. This was the most black voters Richmond had for a municipal election to date, not to mention it represented over half of the overall voting population. The Crusade's success in registering 14,000 black voters allowed them to issue all twenty-two white candidates a questionnaire about how each of them would serve the expanded black voting bloc. Normally, white candidates hesitated to solicit black support in fear of losing white voters. However, the Crusade's 14,000 voters could potentially swing the election in any candidate's favor. All but one candidate responded to the questionnaire by supporting open communication between the burgeoning black electorate and its councilmanic candidates. Biracial partnership over city affairs was to be "fairly and intelligently" split between the black

---

[12] *Richmond News Leader*, May 13, 1960; *Richmond Times Dispatch*, April 27, 1964; *Richmond African American*, June 11, 1960; and John V. Moeser and Rutledge B. Dennis, *The Politics of Annexation*: *Oligarchic Power in a Southern City* (Boston: Schenkman Publishing Co., 1982), 17. The city council consisted of nine members who were elected in an at-large format, serving a two-year term. The mayor was elected by the nine council members from amongst themselves. The pre-1948 city charter had ward-style council voting and a separate at-large mayoral election. I speculate the charter was changed for a few reasons. First being the election of black councilman Oliver Hill in 1948. Second, the city's black population grew every year after 1945. With ward-style voting, blacks could grow to control various urban wards and elect more black councilmen and even a black mayor. However, the black voting population never exceeded the white voting population because urban whites lived in the West End and Southside, two areas that were constantly expanding, while black communities were confined within redline downtown and East End real estate borders. Because of residential restrictions, red-lining, poll taxes and literacy test, blacks voting was minimized by at-large voting. Changing councilmanic elections to at-large voting, while maintaining a white voting majority that had no Jim Crow voting restrictions, allowed white Richmonders to control the city council elections. This white controlled council had the power to elect the mayor from amongst themselves, establishing what Moeser called an oligarchical white power structure over municipal politics.

community and the white city council, said one candidate. This open line of communication illuminated how the twilight of Jim Crow caused a shift in urban affairs. Black Richmonders removed whites from the center of local politics. Although it was not an even playing field, blacks had more electoral influence than ever before.[13]

The Crusade's 14,000 black voters impacted the outcome of the election. On June 14, 1960, Crusade voters helped elect seven candidates to the city council. With only 27,853 Richmond voters, blacks comprised 50.2% of the overall electorate. This allowed black voters, for the first time since 1948, to make a significant impact in at-large urban elections. Black voter turnout was at an all-time high, as it coincided with a 20% Southern urban black voter increase since 1950. Black voter increase was more visible because more than 90,000 white citizens had fled to surrounding suburban counties between 1950 and 1960. From this moment on, white Richmonders would not have a monopoly on who ran city government. Again, Civil Rights Richmond did not begin with *Brown* in 1954, but it began in 1960 when blacks broke the white monopoly over city council elections.[14]

Crusade leaders were well aware of the social implications resulting from the recent election. Crusade president George A. Pannell mentioned, in an open letter, that electoral politics made black voters a "potent force" in Richmond's post-Jim Crow landscape. Increased black voter presence was not "a step in the direction of harmony," as Pannell

---

[13] *Richmond Times Dispatch*, April 27, 1964; Donna Cooper Hamilton and Charles Hamilton, *The Duel Agenda: Race and Social Welfare Policies of Civil Rights Organizations* (Columbia University Press), 1997; Virginius Dabney, *Richmond: The Story of a City* (Charlottesville: University Press of Virginia) 1990, 335; and Timothy Van Schaick, *The Sun Do Move, But Who Moves The Highway? : Urban Renewal, Community Activism, and The Preservation Of Richmond's Sixth Mount Zion Baptist Church* (MA Thesis, James Madison University, 2008), 85-88.  The name was changed to Crusade for Voters by middle-class blacks who sought to add school desegregation to the voting platform after the seventeen Massive Resistance bills voted into law by the Virginia General Assembly.

[14] *Richmond Afro American*, June 25, 1960; and David R. Goldfield, *Black, White and Southern Race Relations and Southern Culture 1940 to Present* (Lousiana State University Press), 47.

suggested. Rather, it was a step towards remaking urban politics fit within the middle-class led black community paradigm. The Crusade furthered its Civil Rights platform by mentioning that blacks of both professional and working classes were not "divided in our aims for first-class citizenship." Both groups sought social equality through electoral politics however, it was the goal of professionals like Pannell to ensure working-class blacks were content with middle-class leadership. In closing, Pannell issued a warning to future white candidates. "The colored voters of today will not be long fooled by anyone" into thinking that dividing black leadership best serves the entire race. This open letter was a clear message to white Richmonders that the black electoral influence was united along racial lines and would not be divided by class differences.[15]

Black Richmonders used their strong 1960 performance to establish a controversial 1962 electoral platform. The Crusade registered 11,000 more black voters than in the 1960 election. To gain the Crusade's endorsement, candidates had to support the removal of the city's Pupil Assignment Plan, a school attendance ordinance, a wage increase for municipal workers to $1.15 per hour, and a proposal for ward-style voting. All of these issues were Civil Rights measures designed to destabilize Jim Crow. School attendance ordinances and removal of Harry Byrd's Pupil Assignment Plan targeted the city's refusal to racially desegregate public schools. Support for ward-style voting increased black voting strength, given that blacks had the most populated ward districts throughout the city. The municipal workers salary increase placed more purchasing power in the hands of black city workers

---

[15] *Richmond Afro American*, June 25, 1960.

and the black community. This platform, which benefitted working and middle-class blacks, resulted from the newfound political agency the 1960 election provided them.[16]

The Crusade platform exposed Richmond's racial rigidity. The city was for all intents and purposes racially segregated in 1962. Whites and blacks lived in separate neighborhoods, shopped at separate malls, and worked in separate venues. Segregation was not as much forced as it was accepted. Despite the black voter increase, whites still held a 56% majority. It was not until 1964 that Richmond got its second post-Reconstruction black councilman. Richmond's white majority was, like most white Virginians, largely conservative and wanted nothing to do with liberal or black leadership. Any white candidate who openly supported the Crusade platform risked losing a council seat. Since the Crusade had to allocate its votes to white candidates, as historians John V. Moeser and Rutledge M. Dennis suggested, white politicians secretly negotiated with Crusade leaders for black votes. Crusade support came in the form of an endorsement and news articles about the white candidate being a friend to the black community. Since many white candidates engaged in this activity, they would often accuse "the other of making secret deals with Negro political leaders" to secure the dwindling white voter base in the upcoming election.[17]

---

[16] *Richmond News Leader*, May 24, 1962." Removing Pupil Placement and implementing mandatory school attendance would grease the wheels of school integration, causing further white flight to the suburbs. Senator Byrd implemented this following the *Brown* decision to ensure that Virginia's public schools remained segregated in what was called "Massive Resistance." For more, see Wilkerson's *Harry Byrd and the Changing Face of Virginia Politics,* 113 and see Robert Pratt's *The Color of Their Skin*, 1-21. Also, increasing municipal workers wages, which was a national NAACP goal, would put more purchasing power in the pockets of Richmond blacks. This wage increase would help to create more middle-class blacks who would again continue to disrupt the city's already shifting social order. For more information on NAACP labor activity, see Paul Frymer's *Black and Blue: African Americans, and the Labor Movement, and the Decline of the Democratic Party,* 46-60.
[17] *Richmond Times Dispatch*, May 18, 1962, May 6, 1962, and April 16, 1962; and Moeser and Dennis, *The Politics of Annexation*, 47-49.

The Fair Employment Practices Ordinance, passed just weeks before the election, provides a possible example of secret Crusade deals with white candidates. The Crusade's platform included a measure that not only increased municipal workers salaries, but removed racial discrimination from salaried city employment. According to historian and attorney Dwight Carter Holton, grandson of eventual Virginia Governor Linwood Holton, seventy-five percent of black municipal workers were non-salaried and had less job security than their white counterparts. This ordinance was passed during the election season and at the height of speculation about secret deals between incumbent councilmen like Robert C. Throckmorton, Eleanor P. Sheppard, and Crusade leaders. Although no foul play was ever proven, Throckmorton, Sheppard, and three other councilmen gained Crusade support immediately following the passage of the ordinance in May of 1962.[18]

The outcome of the 1962 election confirmed what the 1960 election suggested. Seven of nine Crusade supported candidates won council seats. Despite five of the seven Crusade sponsored candidates being endorsed by the wealthy white voter organization, Richmond Civic Association (RCA), two councilmen were solely endorsed by the Crusade, while only one councilman was elected with a lone RCA endorsement. The one RCA endorsed councilman, future mayor Phil Bagley, finished fifth, receiving only 9,772 votes. Whereas, the two Crusade sponsored candidates finished first and eighth, one receiving 9,200 votes and the other receiving 11,348 votes. Even with a radical platform and endorsing two losing black candidates against a white majority, the Crusade repeated its results from the 1960 election. These results read not of plateauing, but of growth between

---

[18] Dwight Carter Holton, "The Richmond Black Community Prior to 1956 and the Birth of the Richmond Crusade for Voters" (M.A. Thesis, Virginia Commonwealth University) *Richmond Crusade for Voters Archives*, M 306 Box 1, James Branch Cabell Library, Virginia Commonwealth University.

the two elections. In 1960, the Crusade had no organized platform and competed with two white voter organizations. In 1962, the Crusade had a solidified platform and rivaled a unified white voter organization. As the Crusade increased its difficulty, the results remained the same. This clearly illustrates that the further Richmond moved into the Civil Rights Era, the more influence its blacks exerted in city council elections.[19]

White voter organizations solidified themselves against the Crusade in the 1964 election. The RCA, along with other white voter organizations, formed Richmond Forward which comprised of old money conservatives like James Wheat, as well as new money liberals like Henry Miller. Their agenda was to secure and further Richmond's white business interest during the Civil Rights Era and white economic flight. Richmond Forward's candidates supported urban redevelopment and annexation, both of which extended Jim Crow Era politics by disenfranchising black electoral, economic, and residential potential. Richmond Forward garnered a reputation for "political manipulation" because its candidates were all Crusade rivals who set aside their differences for what appeared to be a continuation of white councilmanic control. They are a bunch of "string pullers who think Richmond begins and ends at Sixth and Broad," exclaimed Phil Bagley in a *Times-Dispatch* interview. This coalition stopped at nothing to ensure that Richmond's councilmanic control did not slip into Crusade hands in 1964 and future elections.[20]

The Crusade faced problems of its own in this election. One of the problems came in the form of a white liberal named Howard Carwile. The son of a wealthy Charlotte County tobacco farmer, Carwile, was a lifelong liberal politician who championed "poor

---

[19] *Richmond Afro American*, June 16, 1962; and "Councilmanic Election Results" June 12, 1962. The candidates with the most votes were co-sponsored by the RCA and Crusade. However, the top candidate was solely sponsored by the Crusade.
[20] *Richmond Times Dispatch*, April 7, 1964.

white people and the poor negro people, the small white businessman and the small negro businessman [to] abandon their prejudice, work together and vote together" in urban politics. Despite his popularity with working-class blacks, Carwile lost every state and local election he competed in for the last eighteen years. His recent councilmanic failures, according to him, came largely from the absence of the "heavy colored vote" controlled by the Crusade. Black Richmonders rarely broke rank in urban elections during the 1960s, even for Carwile who helped save the historically black Fulton and Idlewood neighborhoods from redevelopment.[21]

Carwile's open criticism of the Crusade exposed the class-centered flaws in black electoral leadership. Carwile criticized the Crusade's tendency to "consistently endorse those candidates who apparently are sure winners." More specifically, Carwile targeted the Crusade's support for B.A. Cephas (a black conservative) and Phil Bagley (a white conservative), both of whom were highly favored to win council seats. The nominations of Bagley and "Mr. Cephas indicates conclusively a working alliance between the aristocracy of far West End and Negro intelligencia around [Virginia] Union University." Carwile's criticism suggested that black professionals worked alongside elite whites to control the councilmanic outcome. This is why a man like Carwile, who fancied himself a champion of racial equality and political pragmatism, could lose black support to "a rabid segregationist" and supporter of gentrification, whom the Crusade did not endorse just two years prior. Despite his open criticism, Carwile lost again as an independent candidate in

---

[21] "Letters To The Forum: Mr. Carwile Comments on Councilmanic Election," *Richmond News Leader*, June 18, 1964.

1964. However, garnering twenty-six percent of the urban vote as an independent forced the Crusade to endorse Carwile in 1966.[22]

As blacks gained a foothold in electoral politics, they became less solidified than in previous elections. The 1960 and 1962 racial solidarity was in danger by 1964, due to working-class blacks wanting their own political leadership. Only three black candidates ran in 1964, but two, Ronald Charity and Neverett Eggleston Jr., were endorsed by the working-class organization The Voter's Voice. Other dissenting black voter organizations included the West End Council of Leagues, Leagues of the 19th and 24th precincts, and the West End Improvement League. Reasons varied for the rise of multiple black voter organizations. Some blacks believed Howard Carwile and were convinced the Crusade was "working hand-in-glove with the R[ichmond] F[orward]." Working-class blacks suspected that Crusade leadership developed more than just "a corresponding relationship with white elites." Rather, black elites exchanged political favors that benefited only the black middle-class. The Crusade rarely endorsed black candidates, but the most notable one, B.A. Cephas, served on the pro-redevelopment City Housing Committee following the 1962 election. That was the same election that featured public speculation about white councilmen disbursing municipal appointments to Crusade professionals for electoral support. Coincidentally, Richmond Forward supported Cephas' 1964 campaign. Nevertheless, black electoral growth allowed urban blacks to be less electorally united than in years past.[23]

---

[22] *Richmond News Leader*, June 18, 1964. Phil Bagley was on the City Planning Commission, along with B.A. Cephas. Both men supported what Bagley called the "white elephant" in the room. That elephant tearing down black slum housing for new highways, upscale apartments, and new office buildings. For more information on urban redevelopment's impact on urban elections, see Silver, *Twentieth-Century Richmond,* 275-283.

[23] *Richmond News Leader*, June 12, 1964; and *Richmond Afro American*, June 13, 1964.

The Crusade reminded black Richmonders that electoral camaraderie, not internal division, fully utilized the black vote. The Crusade pled with black Richmonders to "keep our vote solid" because "this is the only way we can have political influence." Crusade leaders used terms like "we" and "our" to place race above the seemingly obvious class differences between themselves and its working-class voting bloc. To the Jim Crow Era Crusade leadership, a diversified black vote ensured political suicide. Political survival came through unitary support for black leaders, who were coincidentally middle-class Crusade professionals. Crusade leaders wanted to maintain their monopoly on Civil Rights Era electoral change. Racial "solidarity is more important than one election or any candidate." With a solid black vote "we can always vote out a bad candidate, but we cannot do this if we don't keep our solidarity."[24]

Black electoral influence reached historic heights in the 1964 election. The Crusade's appeal paid off as eight of its nine candidates won council seats. This was the most candidates that blacks helped elect into office in city history. One of the eight was affluent black real estate broker B.A. Cephas Jr., making him the second post-Reconstruction black councilman elected since Oliver Hill in 1948. With Richmond Forward and the Crusade combining to elect seven of the nine councilmen, the local media recognized that "better to do white business community centered in the West End and the Negro Leadership "controlled the electoral "balance of power." In just four years, black Richmonders had a considerable share of electoral influence. This was during the era of poll taxes and literacy tests, which significantly hindered black voting potential. As America received a shift in codified racial norms with the 1964 Civil Rights Act, Richmond

---

[24] *Richmond Afro American*, June 6, 1964.

experienced a clear transition in the racial makeup of its urban elections councilmanic leadership.[25]

Special circumstances dictated the terms of the 1966 election. For the first time in city history, Richmond's population was forty-eight percent black, an increase from forty-six percent in 1964. Black voter registration increased by sixty-five percent from 1964, making the grand total of 29,970. Increased black voter registration came from the Voting Rights Act (VRA) being signed into law on August 6, 1965. The VRA prohibited state and local mandated tactics, such as literacy tests, from registering black voters in local, regional, and national elections. As black voter registration increased, white registration increased also, but their increase was only 13% going from 52,172 to 58,827. This was Richmond's first election in which the black voting numbers closely resembled their actual growing population. The numerical increase, and the passage of the VRA, forced the Crusade to change the way it handled the black vote going forward, in that it took on more of a working-class black image. [26]

Both the Crusade and Richmond Forward chose black candidates who could secure the expanded working-class black vote. According to historian James Oliver Perry, previous electoral success, increased black population, and the VRA, caused trouble for middle-class run black voter organizations. Before the VRA, the Crusade was the sole avenue for many working-class blacks to enter electoral politics. By 1966, the VRA allowed blacks to enter electoral politics on their own terms. With the removal of racial

---

[25] *Richmond Afro American*, June 13, 1964; *Richmond News Leader*, June 5, 1964; and *Richmond News Leader*, June 12, 1964.

[26] *The Advocate* 1 (July 1973) 1; *Harper v. Virginia State Board of Electors*, 383 U.S. (1966); *City of Richmond v. United States of America*, No. 74-201, U.S. Supreme Court (1974) Appendix, volume I, p.61; and Allan Statton Hammock, "The Leadership Factor in Black Politics: The Case of Richmond, Virginia" (Ph.D. diss., University of Virginia), 1972.

discrimination from voting, which black professionals used to consolidate political power, the Crusade nominated black candidates, hoping that white liberals and black faces would keep the expanded working-class black vote. The Crusade supported NAACP lawyer Henry Marsh III, black realtor B.A. Cephas, Howard Carwile, and affluent black businessman, Winfred Mundle. Similarly, Richmond Forward endorsed B.A. Cephas and Winfred Mundle, both of whom supported annexation and urban redevelopment. Nominating black candidates, in the face of a near 50% black population and electorate, meant securing the important working-class black vote for both sides.[27]

The Crusade's selection process caused internal rift within its leadership. In June of 1965, George Pannell resigned as Crusade president. Although white and black media outlets reported the event with no significant details, Howard Carwile saw it differently. Pannell's resignation, according to the Crusade, exposed inherent racial and political flaws within the Crusade's nomination process. It was rumored that Pannell did not support William Thornton's nomination of Cephas and Mundle because they did not fit the "Crusade agenda" against annexation and urban redevelopment. The resignation only confirmed that the Crusade was a "color-based organization" that used race to consolidate electoral power from blacks whom racism actually affected. This resignation led some, mainly critics like Carwile, to speculate that the Crusade was nominating black candidates to maintain control over the open voter registration process created by the VRA.[28]

---

[27] James Oliver Perry, "An Analysis of the Negro Influence in Richmond's 1966 Councilmanic Election" (M.A. Thesis, University of Richmond, 1968) 13. The two main issues were annexation and changes to the city charter that increased the term years for councilmen with majority votes. For more information, see *Richmond Times Dispatch* May-July 1966.
[28] Letters To The Forum: "Pannell's Quitting Confirms Suspicions, Carwile Says;" *Richmond News Leader* July, 2, 1965.

Richmond Forward aggressively campaigned to the expanded black voter base and used the *Richmond Times-Dispatch* to portray the Crusade as race hustlers using working-class black votes to further their political careers. On June 9, 1966, the *Times-Dispatch* produced the editorial "A Message to the Negro Voters of Richmond." The *Times-Dispatch* praised the "public-spirited, responsible leadership of Richmond Forward" candidates against the "private-regarding, autocratically controlled Crusade for Voters." The editorial implied that black electoral power unjustly belonged to the Crusade. Black leadership wants "[you] not to use your own intelligence in deciding how to vote…not to give any thought to the subject. Simply vote as they tell you to." As an alternative to racially autocratic voting, Richmond Forward was "publically identified… [and] work for the best interest of the community… people who give time…people who provide significant support for the Urban League and other community agencies…they are the people to whom leaders in your community turn when they want assistance in raising funds for predominantly negro institutions of higher learning."[29]

The Crusade went on the offensive to secure working-class black votes from conservative white politicians. The Crusade responded to Richmond Forward and the *Times-Dispatch* with an open letter titled "Who are the Richmond Newspapers?" "They are the champions of segregation," said the Crusade. "They cried No, No, Never to the U.S. Supreme Court Decision of 1954. They banned a Pogo Comic strip that ridiculed segregation…[they] have repeatedly attacked every organization that has fought for and gained Negro rights…They attacked the NAACP; They attacked Martin Luther King…now they are attacking the Richmond Crusade for Voters… Long before any other

---

[29] Editorial, "A Message to the Negro Voters of Richmond," *Richmond Times Dispatch*, June 9, 1966.

group cared, the Crusade fought alone for Negro political rights in Richmond." Since the media and white politicians saw the potential of working-class black votes by 1966, the Crusade adamantly reminded the 48% minority that whites wanted not to serve the black constituency, but use them "because you have gained a measure of political power" from past elections and the VRA.[30]

The Crusade survived the impact of the VRA and George Pannell's resignation. On June 14, 1966, the Crusade helped elect five councilmen to office. Although three fewer Crusade candidates won in 1966 than in 1964, this election featured a post-Reconstruction high three black councilmen. The Crusade achieved a new level of independence, in that the election proved the Crusade could get unpopular candidates elected. This was applied to no other than Henry Marsh III and Howard Carwile. Marsh III headed local school desegregation cases and was a thorn in the side of many white conservatives. Carwile, while finishing last amongst his colleagues, made very few friends in opposing urban redevelopment. The VRA altered Richmond's electoral landscape by removing Jim Crow Era politicians, like the Crusade, from gatekeeping black votes. The election results clearly shows how the landscape change forced the Crusade to expand its measures of maintaining the working-class vote by nominating black and white liberals.[31]

White Richmonders understood the implications of the black electoral evolution in just seven years. The *Norfolk Virginia-Pilot* article predicted that "June 1968 deadline is…the point, according to computations by experts on population shifts, when Richmond comes face to face with the possibility that Negroes could take over control of the City Council." White fears were amplified with the possibility of a black city council in

---

[30] Milton Randolph and Franklin Gayles, "*Letter to the Richmond Times Dispatch*," April 12, 1966.
[31] Peter K Eisinger, *The Politics of Displacement*, 71; and *Richmond News Leader* July, 2, 1965.

Richmond. This white fear stemmed from population growth, the VRA, and voter steering from the black professional class. Although electoral gains were important, by no means did it alone cause Richmond's racial transition. School desegregation and the annexation crisis combined with electoral changes to racially transition the city from its 70% pre-1960 white population to its 50/50 racial split by December of 1966.[32]

**School Desegregation**

The black middle-class used school desegregation, similar to electoral politics, as a tool to capture urban power from white elites in the midst of nationwide Civil Rights changes. On May 17, 1954, the U.S. Supreme Court gave black politicians the political currency to remake public education with the *Brown* decision. This judicial mandate attacked racially segregated public education, a white supremacist and oligarchical foundation of power. Segregated education allowed whites to disenfranchise blacks through limited access to social mobility. Segregated and inferior education ensured that color and condition remained fixed. Poverty, economically, socially, and legally, remained black. Like most southern cities, Richmond City Public Schools remained segregated after *Brown*. Through various court battles between 1960 and 1966, black professionals thrusted the city into the Civil Rights Era by constantly redefining how the school board complied with *Brown*. Equal access to public schools removed black education from the periphery and placed it at the core of political and social life. This reinvention of how black education operated, like electoral politics, pushed Richmond into the national Civil Rights movement, and more specifically, into racial transition.[33]

---

[32] *The Norfolk Virginia-Pilot*, November 1966.
[33] Campbell, *Richmond's Unhealed History.*

Richmond's educational segregation reflected a deeper legacy of physical separation, or as historian Christopher Silver suggest, a "Separate City." Blacks and whites lived separate lives in the same city. There were few places that blacks and whites had intimate interaction. Public schools reinforced societal segegration. According to Silver, state and local white elites used Jim Crow laws to ensure both whites and blacks to live separated by racialized class-defined spaces. On a national level, Federal Housing Authority lending practices, urban redevelopment, white flight, and redlining, strengthened racial segregation by placing it within the economy through real estate practices. Public schools did not develop into racially segregated entities, they were created as racialy segregated institutions, used to indoctrinate young whites and blacks that racial separation was not only normal, but an essential facet of life. Although many places began destabilizing segregationist school systems in the late 1950s, it was not until 1960 that Richmonders broke their societal legacy of limited black-white adolescent interaction.[34]

The desegregation snowball began in 1958, with middle-class blacks challenging the limits of Massive Resistance. Local blacks began Richmond's educational reform through the *Warden v. Richmond School Board* case in 1958. The suit was filed by the parents of Lorna R. Warden. The Pupil Placement Board, a Massive Resistance agency put into place by Senator Harry Byrd to ensure that Virginia schools remained segregated,

---

[34] Robert Pratt, The *Color of Their Skin: Education and Race in Richmon, Virginia. 1954-89* (Charlottesville: University of Virginia Press, 1992); Lizabeth Cohen, *A Consumers' Republic: The Politics of Massive Consumption in Postwar Americ*a (New York: Vintage Books, 2004), 224; Silver and Moser, *Separate City, 12*; and Matthew Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* (Princeton University Press, 2006), 8. Author Benjamin Campbell discussed how Richmond's separate city mentality came from generational white fears of personal interactions with blacks without codified rules of engagement. As long as local, state, and national law dictated the terms of white-black engagement, with blacks being socially and economically inferior, whites embraced close interracial interaction. Jim Crow recreated plantation-style rules of engagement, yet it was through forced unequal separation. For more about how this culture resonated throughout Richmond well into the twenty-first century, see Benjamin Campbell's *Richmond's Unhealed History*, 100-52.

rejected six black children from admission into an all-white neighborhood school. Realizing that every white child in their neighborhood was assigned to the all-white school, Warden's attorneys sued the city for violating *Brown*. This suit, like others that followed, was a part of a larger movement to remove racial disenfranchisement from public education. The plaintiffs asked the court to include all black Richmond children in the lawsuit, given that they fell victim to the Pupil Placement Board's purposeful design to illegally maintain racial segregation. In an effort of temporary appeasement, in 1961, the Virginia Supreme Court and the Placement Board allowed Lorna Renee Warden to attend the all-white neighborhood school; however, the other five plaintiffs, as well as black Richmond students en masse were not admitted into any white public school. Nevertheless, local middle-class black pressure forced Richmond's public school officials to do what *Brown* itself could not: integrate.[35]

Immediately after the *Warden* case hit the docket in 1960, Richmond's white power structure attempted to control the imminent desegregation process. If handled incorrectly, school desegregation could place political power in the hands of local black professionals, who were eager to garner political power in the middle of the Civil Rights Era power vacuum. Many urban whites, like Attorney General J. Lindsay, lamented that "integration of the races in the school system will set education back" because "[Richmond] will close schools rather than permit them to be operated with Negro and white pupils in the same classroom." Although some felt that Richmond's racial divide was so deep that school closures would replace segregated schools, state and local legislators knew better. The fact that Richmond was the financial and cultural center of Virginia made its public school

---

[35] Memorandum, *Warden v. Richmond School Board*, 6 Race Relations Law Reporter 1025 (ED Va. 1961).

system vital to the regional and national image of the state. Despite Charlottesville, Norfolk, Warren County, and Prince Edward County schools closing, for Richmond, closure was not an option. [36]

After cleaning house, white officials tokenly desegregated public schools, to keep their control over urban affairs. On February 24, 1960, Richmond Pupil Placement Board's Andrew A. Fairley, Beverly H. Randolph Jr., and Hugh V. White issued their letters of resignation. All three agreed that the threat of federal closure would legislators to integrate Richmond Public Schools, something their collective conscience did not permit them to do. One of the three men issued his disappointment with city officials not "fight[ing] with every legal and honorable means of mixing the races in the public schools." The newly appointed Pupil Placement Board members, University of Virginia Professor Earnest J. Oglesby, State Department Coordinator Alfred L. Wingo, and Department of Education Assistant Supervisor of Rehabilitation Edward T. Justis, met on August 15, 1960, to begin Richmond's in-house desegregation. This effort resulted in only two black children being placed into white schools. However, on September 6, 1960, Richmond's public schools were officially integrated. Richmond's token integration coincided with a statewide effort to place enough black students into white schools to prevent any major NAACP lawsuit forcing federal judges to desegregate public schools. By September of 1960, there were

---

[36] *Richmond Times Dispatch*, May 18, 1954; and *Southern School News*, July 1960. Norfolk, Charlottesville, Warren County, and Prince Edward schools closed as a refusal to integrate. The Pupil Placement Board was a department that every public school system was assigned by the state during the Massive Resistance years of the late 1950s. The goal was to ensure public school system did not integrate by creating a state body in each locality that handled school assignments. For more, see Sara K Eskridge "Virginia's Pupil Placement Board and the Practical Applications of Massive Resistance, 1956-1966" *Virginia Magazine Of History & Biography* 118, no. 3 (June 2010), 246.

over 200,000 black students throughout the state and less than 170 of them were enrolled in traditional white schools.[37]

Professional blacks pushed harder for desegregation by testing the limits of token integration. In 1961, Wallace Reid Calloway, son of prominent black physician and local Civil Rights advocates William C. and Alice Calloway, was denied placement into a white neighborhood school (Chandler Middle School). The Calloways lived in one of Richmond's few interracial neighborhoods, in which black and white children were placed in racially identifiable schools. The Calloways challenge the Placement Board's placement, forcing the board to review its initial placement. The Calloway controversy, like the *Warden* case, was strategic because the Calloways understood Richmond's school desegregation was a part of an elaborate token regime. In fact, Calloways later argued, in court, that the Placement Board allegedly reached its unofficial black quota for the city's white public schools, thus their son was denied. Although the local NAACP threatened to file a class action lawsuit against the city, Richmond's Pupil Placement Board reaffirmed the original decision. The board had a legal leg to stand on because a black school was geographically closer (only by twelve feet) to the Calloways' home.[38]

Despite the unfavorable ruling, the Calloway case brought unwanted attention to the Richmond's Pupil Placement Board practices. The Calloway controversy allowed Civil Rights attorneys and local NAACP members Henry Marsh III and Oliver Hill to expose the Placement Board's usage of racial criteria in public school placements, as well as the

---

[37] *Southern School News,* September 1960; Pratt, *Color of Their Skin*, 25.
[38] Pratt, *Color of Their Skin*, 26-27. The Calloway's living arrangement was a byproduct of white flight leaving previously all-white neighborhoods open to black middle-class settlement. For context on how white flight created interracial middle-class neighborhoods, see Andrew Wiese, "The House I Live In: Race, Class, and African American Suburban Dreams in the Post-WWII United States," *African American Urban History Since WWII*, Kenneth L. Kusmer and Joe W. Trotter, ed. (University of Chicago Press 2009), 160-78.

lengths white city officials went to maintain racial segregation. Despite the Calloway loss, the public attention it drew, according to school desegregation historian Robert Pratt, allowed the local NAACP to openly "demand speedier compliance with *Brown*." The demand was followed by the placement of thirty-seven black students into white schools in the 1961-1962 school year. The Pupil Placement Board's segregationist placements caused the Crusade for Voters to run their 1962 campaign on the abolishment of the Placement Board and a mandatory school attendance ordinance, forcing white children in black dominated areas to attend similar schools. Not receiving any reprisal from city councilmen about placement practices, NAACP member Minerva Bradley, her attorneys Samuel Tucker and Henry Marsh III, and ten other black parents filed the *Bradley v. Richmond School Board* lawsuit. This suit, like the *Warden* case, was a part of a concerted effort to completely desegregate city schools and use Civil Rights legislation to remove educational disenfranchisement from Richmond's public schools. [39]

*Bradley* attorneys furthered *Warden*'s cause by turning school desegregation into political power for the black middle class. "Virginia has the largest and most effective token integration plan in the county," however Virginian blacks were not satisfied "with even the best tokenism," said Roy Wilkins at the NAACP's Virginia Convention. Wilkins foreshadowed his NAACP colleagues attempt to use *Brown* for political influence through education reform. While asking the court to "[require] the defendants to transfer the pupils from Negro public schools to white public schools," attorneys Henry Marsh III and Samuel Tucker requested the city "be enjoined from operating racially segregated schools and be required to submit to the District Court a plan of desegregation." To better their chances

---

[39] *Bradley v. Richmond School Board,* 416 U.S. 696-99 (1962); and  Pratt, *Color of Their Skin*, 31.

for a dismissal, the Pupil Placement Board assigned "90 additional Negro pupils" to white schools the following school year. The increase of black placements to white schools, in the midst of *Bradley*, illuminated how middle-class blacks used *Brown* to renegotiate urban power. Just as white elites controlled Richmond through segregating public schools, black professionals used desegregation to relinquish power from white elites. Segregated schooling was built on white leaders not sharing power with black leadership; therefore the black elites ensured that desegregated schooling came with white elites negotiating power with them in a way that Jim Crow prevented, through integration.[40]

*Bradley* put Richmond public schools in a state of disarray. On March 10, 1963, the Fourth Circuit Court of Appeals ruled in favor of the *Bradley* plaintiffs, finding Richmond City Public Schools in violation of *Brown* for maintaining racially segregated schools. The sociopolitical implications were astounding. The court ruled that Richmond had to work with the *Bradley* attorneys to construct "adequate" desegregation plans. This was the first time the federal government required white city officials to share power with black leaders. This, also, marked the first time blacks inspired actual white concern over how Richmond's public education should racially function. If public schools were to continue their existence, it would be at the discretion of federal compliance to white and black leaders negotiating the racial makeup of public schools.[41]

The *Bradley* ruling illuminated how white supremacy forged the connection between school segregation and city politics. "Had we attempted to integrate the schools in the early years," said School Board President and eventual Supreme Court Justice Lewis

---

[40] Roy Wilkins Interview, *Southern School News*, 1963; and *Bradley v. The School Board of Richmond City, Virginia*. U.S. Court of Appeals, Forth Circuit 317 F 2d 429.
[41] *Bradley*, F. 2d 438, March 10, 1963.

F. Powell Jr., it "would have resulted in closing the schools." Many knew that the city council "provided funds to operate the public schools," however, many councilmen were "stridently opposed to any integration," personally and professionally. Court ordered biracial cooperation seemed impossible because "both Richmond newspapers opposed integration, as did Virginia governors, and the majority of the Virginia Assembly." The original Pupil Placement Board members who resigned on June 1, 1960 were not outliers in their personal and professional opposition to integrated schools. Rather, they were a part of generational obstruction to any level of educational equality between blacks and whites.[42]

Biracial cooperation pushed Richmond's school desegregation crisis away from tokenism and towards its second stage: Freedom of Choice. On March 19, 1963, the Richmond School Board formulated, the city council agreed, and the court approved the Freedom of Choice Plan. Freedom of Choice allowed families of both races to choose their children's schools system. However, the Placement Board approved or denied the request based on factors such as "adequate" transportation, competency compared to his or her peers, and overall fit. Federal Judge John Butzner, NAACP lawyers Henry Marsh III and Samuel Tucker, Superintendent Henry I. Willet, and School Board Vice-Chairman Frank S. Calkins felt considerably "happy" with the Freedom of Choice Plan. Although Marsh and Tucker had reservations about Pupil Placement remaining the gatekeepers of integration, the biracial coalition made history by slowly removing Jim Crow from

---

[42] Lewis Powell Jr., "*Reflections*," *The Virginia Magazine of History and Biography* 96 (1988): 332; and *Bradley*, 317 F. 2d 438 (1963). Powell's interview was recorded in 1988, in which Justice Powell recounted his days as the President of Richmond School Board. Although he did not clarify his position on desegregation in the early 1960s, he ensured that opposition to desegregation was very strong amongst white local, state and national politicians. The only issue was how to navigate around it.

Richmond public schools. Marsh later challenged Freedom of Choice in the Supreme Court he discovered that the color-blind driving factor of personal choice perpetuated racial segregation in public schools.[43]

Freedom of Choice's inability to desegregate schools forced federal authorities to investigate Richmond's public school system. In 1964, the U.S. Department of Health, Education, and Welfare (HEW) placed Richmond Public School System under investigation. HEW's investigation began after Henry Marsh's request to remove the Pupil Placement Board from Richmond Public Schools was denied. Richmond bureaucrats were not alone in opposing school desegregation, as school systems across Virginia refused to adhere to *Brown*. The General Assembly's most effective measure was releasing state funds to school systems refusing to integrate, while cutting off state funds to any integrated school system. The Civil Rights Act of 1964 gave HEW authority to remove federal funds from any school system found in violation of *Brown*, regardless of state and local law. Therefore, the U.S. Commissioner of Education Dr. Woodrow Wilkerson charged Virginia's State Board of Education Deputy Superintendent Harry R. Elmore with ensuring Virginia's public school systems adhered to both *Brown* and the Civil Rights Act. Any school system refusing to comply with Elmore's regional meetings and interracial consolidation plans were barred from receiving federal funds and would be sued by the Justice Department in federal court.[44]

With federal attention on Virginia's public schools, black professionals used *Brown* to test the limits of their political power. "Federal control was very evident" as on January

---

[43] *Richmond Times Dispatch*, March 19, 1963; *Bradley*, 416, U.S. 696-99 (1962); *Bradley*, 345 F. 2d 310 (1965); and Lassiter, *The Silent Majority*, 123.

[44] *Memorandum* to the *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 9, Muse Law Library, University of Richmond; and Civil Rights Act of 1964, Title I-IV, Section 407(a).

22, 1965, U.S. Commissioner of Education Dr. Woodrow Wilkerson assured Superintendent Willet, School Board President Powell and Mayor Phil Bagley that federal funds would be removed if they did not create a desegregation plan that conformed to Title VI of the Civil Rights Act. This threat came on the heels of Henry Marsh III's and Samuel Tucker's victory in the U.S. Supreme Court. Marsh and Tucker won an appeal overruling Judge Butzner's Freedom of Choice Plan for Richmond. Freedom of Choice was used in many desegregating southern school districts; however, Richmond's Freedom of Choice plan maintained de facto segregation. Not one white child attended a black school, and few black children attended white schools. "You could feel a political change," as black professionals, for the second time, used Civil Rights law to gain more authority in the outlook of public education.[45]

By 1966, professional black political gains in education inspired negative racial tension. During the 1965-66 academic school year, Richmond's white population fell three percent from the previous year, putting it at about fifty percent. As the white population dwindled, the white student population followed. Richmond hosted a 64% black student majority, with whites being at a staggering 36% and declining. While many white families fled to suburban public and private schools, urban race relations worsened. In Richmond, both blacks and whites used Freedom of Choice to stay in segregated schools. White families refused to send their children to schools that were "identifiably black in any way," according to Pratt. Black families were haunted with stories about persecution by white students "when there was no teacher supervision." This behavior only reassured black

---

[45] *Bradley v. Richmond School Board*, 152-170; and *Richmond Times Dispatch*, January 21, 1965. Majority of Virginia's urban school systems did not receive federal funds in 1965. Hampton City was the only Virginia school system in compliance with Brown in 1965. For more information regarding Virginia school desegregation, see Memorandum to *Bradley v. Richmond School Board*.

families not to send their children "where they were not welcomed." Using Freedom of Choice to attend white schools had economic implications on the black household. "Blacks were threatened and were actually fired for expressing their support for desegregation." "Rather courageous" were the blacks who sent their children to white schools, a risk many refused to take. These challenges rendered Richmond's Freedom of Choice useless in achieving integration. However, Richmond continued this program until it was federally removed in 1968.[46]

Between 1960 and 1966, Civil Rights Era Richmond was bolstered by school desegregation. Alone, electoral politics did not shift municipal power to the black elite. Education reform, through the removal of racial segregation and the political uncertainty that followed, forced white politicians to negotiate political power with the black professional class. The shift of overt segregation into more covert means retaining Jim Crow, via tokenism and Freedom of Choice, and black electoral gains caused white city council members to reach across the aisle to suburban leadership for help maintaining a white majority in the heart of the former Confederacy. Racial solidarity had its class-centered limits. For whites, racial limits were tested when class interests collided over the economic and racial importance of Richmond during the Civil Rights Era.

**Annexation Crisis**

For white leadership, electoral politics and school desegregation demolished their Jim Crow-style power structure over Richmond. The shifting electoral demographic and school desegregation greased the wheels of Richmond's racial transition from a majority white to majority black city. "Whites wanted to maintain control of the city of Richmond,"

---

[46] *School Desegregation in Southern and Border States*, September 1966; Pratt, *Color of Their Skin*, 42-43; and *Richmond Times Dispatch*, November 16, 1966.

amidst Civil Rights Era changes. "So how do you do it, that was the question" white city and state officials were obsessed with according to historian John V. Moeser. The answer was annexation. However, as suburban leaders gained political power through industrial and white middle-class migration, they became enemies to urban white officials. Suburbanites saw the fall of Jim Crow as the means to segregate themselves from Civil Rights changes in Richmond. Between 1960 and 1966, suburban whites gained and used their political identity to prevent their affluent white neighbors from annexing their Chesterfield and Henrico County suburbs. As city officials endlessly searched for solutions, they were repeatedly blocked by the middle-class whites, ultimately forcing the General Assembly to intervene as the city went from 70% to 50% white between 1950 and 1966.[47]

Before annexation, Richmond's white politicians wished to offset white flight by maintaining Richmond's white majority through a simple merger. The Richmond City Council's six member Richmond-Henrico Consolidation Committee proposed a merger that would consolidate Henrico County with Richmond City. The merger would make over 105,000 middle-class white suburbanites Richmond residents by January 1, 1962. The consolidated city would have five boroughs, four in the old Henrico borders and one in "the old city." Although white city officials were willing to share territory with suburban leaders, they were not so willing to share political power. The merger would include eleven councilmen with four coming from Richmond, one from the four boroughs in Henrico, and three being elected at-large from the consolidated city. Richmond outnumbered Henrico by over 100,000 people and by more than 22,000 white voters. Therefore, the three at-large

---

[47] Interview with John V. Moeser, January 5, 2016; and *Charter of the City of Richmond, Virginia*, Section 7.02.

council seats would undoubtedly have been inhabited by Richmond politicians, giving the city a regular seven-to-four councilmanic advantage over their suburban neighbors.[48]

The reasons for the merger were, as Moeser and Silver alluded too, racially coded. White flight and its economic implications led to the 1961 city council proposing the Henrico merger. The 1960 election, which mobilized 14,000 black voters, and the *Warren* case, forcing school officials to desegregate public schools, signaled the beginning of the end of what many saw coming up to ten years prior. Richmond was getting blacker. The breakdown of segregation between the forty-two percent black population and over sixty percent black public school population sent white residents to surrounding suburban counties. Although recuperating the lost tax base financially incentivized the merger, what that tax base socially represented remained racially coded. "Race remained at the heart of the controversy over the merger," said Silver. The civility from which white Richmonders spoke about white flight illuminated racial fears about the former capital of the Confederacy hosting a black majority. Metropolitan residents understood "the city tax base is automatically lowered when the black population increases." However, the reasons behind this well-known fact remained undiscussed publicly. Metropolitan whites "feared being in the minority" because blacks reminded them of the inequality Jim Crow produced and the economic and social privilege white Richmonders enjoyed at the expense of black residents.[49]

---

[48] David R Goldfield, *Black, White and Southern Race Relations and Southern Culture 1940 to Present*, 75; "Annexation Suit Time Predicted," *Richmond Times Dispatch*, December 15, 1961; U.S. Bureau of the Census, Henrico County, Virginia 1960; Code of Virginia, Section 10-145.1; and *Merger Opposition Reporter*, Henrico County Periodical December 1960, *Richmond Annexation Files*, M 183 Box 7 James Cabell Library, Virginia Commonwealth University.
[49] Moeser and Dennis, *Politics of Annexation*, 36-40; Interview with John V. Moeser, January 5, 2016; and Interview with Reverend Benjamin Campbell, January 6, 2016.

Henrico suburbanites made it clear that they would not voluntarily cede their land and white citizenry to the council. Henrico residents voted against the merger on December 12, 1961, with a sixty-five percent majority. Voters in one Henrico District (Tuckahoe) supported the merger. Despite Henrico's Board of Supervisors president S.A. Burnette noting that the county was "wide open so far as any cooperation in support of the metropolitan area is concerned," it was clear that Henrico residents were unwilling to help the city council keep Richmond majority white. Richmond City Manager Horace H. Edwards felt suburbanites voted "with their hearts instead of their heads." Their hearts were consumed with the racially identifiable class-centered suburban lifestyle. Yet, their heads represented the "one mind" or prejudice they shared with urban whites about "a black takeover of Richmond." Desperation forced city officials to become politically aggressive; therefore, on December 26, 1961, the council announced its intentions to file an annexation ordinance with the Commonwealth of Virginia against Henrico and Chesterfield Counties.[50]

The city council began its hostile takeover of the suburban white majority in 1962. On January 1, the council officially filed an annexation suit against Henrico and Chesterfield Counties within each respective circuit courts. The council, along with City

---

[50] *Richmond Times-Dispatch*, December 14, 1961; "Annexation Will Meet Resistance," *Richmond Times Dispatch*, December 14, 1961; Cohen, *Consumers' Republic*, 222; David G. Temple *Merger Politics: Local Government Consolidation in Tidewater Virginia* (Charlottesville: University of Virginia 1972), 1; Christopher Silver, "Impediment to Greatness: The Failure of City County Consolidation in the 1960s" (Ph.D. diss, University of North Carolina at Chapel Hill, 1981), 8; and Chester W. Bain, *A Body Incorporate: The Evolution of City-County Separation in Virginia* (Charlottesville: University of Virginia, 1967), 26. On that same day, Richmond voted in favor of the merger by a count of 15,051 to 6,700. Both black and mixed voting districts rejected the merger, while ninety-six percent of white districts supported the merger. The voting tallies show that neither urban blacks nor suburban whites wanted the merger. The history of Virginia's political conflict between cities and counties dates farther back into the late nineteenth century. City and county leadership have a long history of not working together in mergers and annexations. Both black and mixed voting districts rejected the merger, while ninety-six percent of white districts supported the merger. The voting tallies show that neither urban blacks nor suburban whites wanted the merger.

Manager Edwards, requested 152 square miles and 115,000 residents from Henrico, as well as 51 square miles from Chesterfield, which included more than 40,000 residents. Both Henrico and Chesterfield populations were majority middle-class and at least 92% white. Annexations were powerful. They had the potential to give Virginian cities larger economies. However, they sparked long political battles between urban white elites and suburban residents over the vitality of cities in metropolitian areas. Uniquely, Virginia was and is the only state to have independent cities and counties. So cooperation between urban and suburban leaders was key to achieve any mutually beneficial end. However, Henrico and Chesterfield inspired Matthew Lassiter's "Silent Majority" suburban analysis, in that they used their social class to create an identity that separated them from politically allying with elite whites on exclusively racial terms.[51]

Richmond newspapers promoted the annexations as a shared interest between urban and suburban whites. The annexations were supposed to save, not just Richmond, but the entire metropolitan area from the physical and economic urban decay seen in Detroit, Newark, and Washington D.C. The *Times-Dispatch* warned county residents that "Richmond must either expand or decline." Only a "political union" between urban and suburban whites will keep black leaders from the city council. "New opportunities for community progress" only came if Richmond remained majority white. Although suburban

---

[51] "Annexation Suit Time Predicted," *Richmond Times Dispatch*, December 15, 1961; "Last City-County Annexation," *Richmond News Leader*, June 10, 1959; Population of Richmond, Henrico, and Chesterfield, Virginia 1930-1975, *U.S. Census Bureau*; *Richmond News Leader*, January 1, 1962; and Lassiter, *Silent Majority*, 120. Virginia is the only state with independent cities and counties. This was put into place after the Civil War to ensure that shared municipal services did not cause political corruption or tie the economic fate of one locality to its failing or thriving neighbor. Multiple ammendments were proposed to reverse this system, yet the Byrd Machine ensured counties and cities maintained their independence. This city-county structure is a staple of Virginia's long history of conservative "pay as you go" politics, reducing the reliance on federal or state financial aid. For more information, see Wilkerson, 285 and Andrew W. Sorrell and Bruce A. Vlk, "Virginia's Never-Ending Moratorium on City-County Annexations," *The Virgninia News Letter* (Vol 88 no.1) January 2012.

residents lived outside the city, most of their daily lives were spent downtown. The media wished Henrico/Chesterfield leadership and residents understood that rejecting annexation meant rendering Richmond to a dilapidated slum. Saving Richmond was as much economic, as it was racial. In the eyes of the media and urban white leaders, class interest should not render race and its economic implications useless.[52]

Media propaganda favoring annexation was as realistic as it was ideologically driven. The *Times-Dispatch* contended that both counties could not provide municipal services fitting a growing metropolitan area. Both counties could not provide ample sewage, local employment, recreational services, postal services, public libraries, museums, hospitals, electricity, and public schools to the spread out towns and sprawling subdivisions located with their borders. The *Times-Dispatch* insisted that if suburbanites reconnected with the city, public services would improve. Increased citizenry would "make no substantial contribution to the cost of providing the municipal services and the management and administrative function." Although the Richmond media advertised how the metropolitan area benefited from the annexation, county leaders and suburban residents risked losing their political power. Independent counties were not politically tied to cities, thus annexation permanently removed land and tax revenue from suburbna counties, with little chance of future return. Therefore, suburban leadership were hesitant to negotiate annexations with city officials.[53]

The Virginia Assembly's legislative support ensured that Richmond's annexation suits would be heard. Both Henrico and Chesterfield Boards of Supervisors filed appeals

---

[52] "Precedent Challenged by Annexation Move," *Richmond Times Dispatch*, December 24, 1961.
[53] *Richmond Times Dispatch*, December 27, 1961. Richmond leaders also discussed the issue of unused county land that the city could use to further incorporate into expanding the city.

for dismissal to the Virginia Supreme Court. State support for the city council ran deep, as the Assembly passed legislation ensuring that any anti-annexation bill passed would not impact the current suits with either county, regardless of the length of the outcome. "The General Assembly was obsessed with maintaining racial segregation. In fact, that's all they did" during the 1960s according to Moeser. The Assembly's pro-annexation sentiment caused both appeals to be denied almost immediately. As black Richmonders gained political power in urban politics, keeping black leadership out of the city council became a state interest. Blacks gaining political control of the capital city could bring about a regime change to Virginia's affluent white oligarchical power structure. Therefore, if Henrico and Chesterfield's leadership wished to end annexation talks, they had to defeat city leaders in court.[54]

Despite state support, the annexation court limited Richmond's territorial growth. On the eve of the 1964 councilmanic election, the city council lost its annexation battle against Henrico. Richmond's land proposals were "insufficient" and did not justify the request for over fifty-one square miles from Henrico according to the annexation court. Instead, the court awarded the city seventeen square miles and 45,000 residents, of which 99% were white. The seventeen square miles was the closest parcel of land to the city; however, it was undeveloped and would cost 55 million dollars to purchase and even more to develop for residential and commercial use. The rejection had political implications. According to state law, a lost annexation suit prevented Richmond from attempting to annex Henrico for the next five years. Adversely, accepting or deny the reward legitimized

---

[54] *Richmond Times Dispatch*, February 25, 1962; *Richmond Times Dispatch*, June 10, 1962; *Richmond Times Dispatch*, June 12, 1962; and Interview with Reverend Benjamin Campbell, January 6, 2016.

the annexation court's ruling, closing the door on any future annexation of Henrico County.[55]

The council used the Henrico misfortune to double-down on Chesterfield. After the failed annexation appeal in Henrico, the Virginia Supreme Court upheld the annexation ruling on January 20, 1965. This forced city officials to either accept or decline the award. Either way, Henrico could not be annexed for five years. Although former city councilmen Wayland Rennie lamented that city officials made the wrong decision, the city council declined the award. The decline was a gamble. Thinking that a 55 million dollar bill for just seventeen square miles significantly hindered potential gains in the Chesterfield suit, the council temporarily saved the city budget to fight Chesterfield officials in court. It was clear that Richmond had to expand, yet the council's refusal to take peanuts from Henrico signified that Chesterfield suburbanites were facing an even hungrier and more aggressive giant, who would not rest until its suburban neighbors cooperated.[56]

Both Richmond and Chesterfield County officials understood the racial implications of the annexation suit. White flight, the failed 1961 merger, and the rejected 1964 Henrico annexation left Richmond with a fifty one percent white majority by January 1, 1965. Between February and October of 1965, Richmond lawyer Andrew J. Bent, Mayor Morrill M. Crowe, and City Manager Horace Edwards conducted secret meetings with

---

[55] *Richmond News Leader*, April 27, 1964; *City of Richmond, Virginia v. United States of America*, No. 74-201; U.S. Supreme Court (1974) Appendix 1, p.16; and *Richmond News Leader*, November 2, 1964.

[56] *Richmond Times Dispatch*, January 21, 1965; *Richmond Times Dispatch*, January 23, 1965; *Code of Virginia Section* 15.1-1044; *Richmond Times Dispatch*, February 16, 1965; and *Charter of the City of Richmond, Virginia*, Section 7.02. The city council had to decide whether to accept, deny, or appeal the Henrico decision. Accepting the reward meant that Richmond could not annex or attempt to annex Henrico for five years. The council was not pressed to accept the seventeen square miles given that it wanted one-hundred and fifty one sqaure miles, and not the seventeen square miles of land was undeveloped. City officials admitted, during the *Holt* trial, that racially diluting the city was number one on the city's list in 1965. Another issue was the Richmond City Charter, which prohibited the city from borrowing money to annex adjacent land.

Chesterfield Board of Supervisors Chairman Irving G. Horner, and Chesterfield Board Executive Secretary Melvin W. Burnett. The topic was Richmond's territorial expansion, however, the category was race. "It was common knowledge that the City of Richmond was going black...we realized it... They claimed they had to have people from Chesterfield to offset the growing black race in the city... This was the basis of their negotiations," according to Burnett. Richmond officials had a different perspective on the negotiations. "You would have a right to say that race entered into it," said Mayor Crowe during the Curtis Holt Sr. City of Richmond case six years later. However, evidence suggest race never entered a discussion because it was the discussion. Since both sides understood that "the General Assembly will not allow the Capital City to be eternally thwarted in its efforts to procure room to grow," both urban and suburban leadership willingly negotiated a land and citizen settlement according to *News-Leader* reporter Charles Houston. Suburban leadership's willingness to negotiate was not a willingness to settle because city officials had a track record of losing annexation suits.[57]

City officials went 0 for 2 against its suburban neighbors. Although both sides understood the racial implications of not annexing, constituency interest prevented an out-of-court settlement. Chesterfield leadership, headed by Board Supervisor Irvin Horner, refused to relinquish 45,000 white citizens and ¾ of Northern Chesterfield to Mayor Crowe and City Manager Edwards. Suburban leadership was only willing to help Richmond's white elite if the suburbs were not annexed in the near future. Because city officials refused to relinquish future annexation rights against Chesterfield, the case went to trial. On

---

[57] *Bradley v. Richmond School Board*, 152; Charles Houston, "9 Members Unanimous in Decision," *Richmond News Leader*, February 11, 1965; *Curtis Holt, Sr. v. City of Richmond*, No. 151-71 R, U.S. District Court of the Eastern District of Virginia, September 20, 1971, 94; and Moeser and Dennis, *Politics of Annexation*, 81.

November 27, 1965, Judge William Old of Chesterfield County and Judge Vincent L. Sexton Jr. of Bluefield County voted to dismiss the case 2 to 1 over Judge Elliot Marshall of Front Royal. This time, there was no award from the court. This left Richmond at the mercy of the state, so Richmond officials appealed, leaving the city's racial fate up to the 1966 General Assembly.[58]

Richmond officials' inability to racially dilute the state capital ignited the General Assembly to intervene in the annexation crisis. Because, as Virginia Delegate T. Coleman Andrews Jr. stated, "antiquated annexation laws," deterred "the logical expansion of Virginia's cities,"  the Virginia Supreme Court dismissed the annexation case and ensured it was "stricken from the court docket." Since Richmond never officially lost the annexation case, city officials could resume the suit the following year. Maintaining Richmond's white majority was just as much a state interest, as it was an urban interest. Richmond's racial transition "worried the General Assembly," as they became as obsessed with annexation as Richmond's white leadership according to author Benjamin Campbell. The General Assembly issued a Blue Ribbon Commission, on April 4, 1966, that provided Assembly members with a "feasible" plan for annexation. Although the Commission did not report its findings until 1967, the state made it clear that city officials' inability to control Civil Rights changes threatened more than the metropolitan area. Never before had the former Confederate capital been unable to control the population and political growth of its black residents. If Civil Rights changes allowed blacks to politically control the state

---

[58] *Richmond Times Dispatch*, November 28, 1965.

capital, this trend could spread to other majority black Virginian cities. White fear of racial uncertainty was very real and it penetrated even the highest forms of political power.[59]

White fears surrounding annexation heightened after the 1966 election. Only a week after three black councilmen won city council seats, the six white councilmen secretly negotiated with Chesterfield's Board of Supervisors over territorial expansion. If "present political trends continue in Richmond," forwarned the Norfolk-Virginia Pilot, "[black] voters will grow steadily stronger, and within a very few years they may be able to elect a majority of Richmond's nine councilmen." Councilman James Wheat asked Chesterfield Board Member Irvin Horner for "44,000 affluent white people," to offset the city's 50% black population. These fears even penetrated the protected Henrico County. "There's no sense in kidding ourselves," said one anonymous Henrico official in the *Times-Dispatch* article "Vote May Spur Merger Attempt." Annexation talks between Chesterfield and Richmond officials "would indicate to anyone that it is the result of the large Negro vote." Although neither side ceded to the other on their terms for annexation, it became blatantly obvious that Richmond's six-year racial transition from a majority white to a racially split city destabilized metropolitan politics going into 1967.[60]

**Conclusion**

Richmond was not the same city in 1966 as it was in 1960. The city went from a white majority city with a segregated school system and all-white city council to a racially split population, integrated schools, and three black councilmen. This rapid change brought Richmond closer to a racial shift in the city's power structure. The question is "what

---

[59] *Richmond News Leader*, November 7, 1965; *Richmond Times Dispatch*, January 5, 1966; and Interview with Reverend Benjamin Campbell, January 6, 2016.
[60] *Richmond Times-Dispatch*, June 19, 1966; and *Holt v. City of Richmond*, 1140.

inspired this drastic racial transition?" Civil Rights Era advances and the destabilization of Jim Crow brought about the beginning of this complicated saga. Councilmanic politics, school desegregation, and annexation only amplified the foreign political terrain urban blacks, affluent whites, and suburbanites had to navigate. Just as urban blacks used unfamiliar (Civil Rights legislation) tactics to alter the political landscape of a Jim Crow city, affluent whites reciprocated with an annexation deal with suburban leadership. This, along with Henry Marsh III's campaign against urban redevelopment and Judge Robert Merhige's school consolidation, added to Richmond's Civil Rights Era political instability. Furthermore, as 1967 approached, race and class differences heightened, further complicating Richmond's shift from a white to a black majority city.

## Chapter 2: 1967-1970 The Middle Years

The years between 1960 and 1966 characterized black Civil Rights Era gains; however, the four years between 1967 and 1970 highlight the repeal of those gains. The city began 1967 with a 50/50 white-black population, however, it ended 1970 with a 58% white majority. The reversal in Richmond's racial shift came from five major events: Henry Marsh III's fight against urban redevelopment, the 1968 city council election, the 1969 annexation, the 1970 city council election, and the 1970 busing scheme. These five events prevented the former Confederate capital and its city council from becoming majority black at the twilight of the Civil Rights Era. However, the annexation quick-fix set the stage for black and white class conflict ultimately resulting in federal involvement through two landmark lawsuits: *Bradley v. Richmond School Board* and *Holt v. City of Richmond, Virginia*. The results of these post-1970 cases completed Richmond's power shift as the city received its majority black councilmanic leadership.

**Urban Redevelopment**

Previous electoral gains allowed black leadership to challenge white leaders on the Richmond's most controversial issue: urban redevelopment. White city councilmen, headed by Phil Bagley, devised urban redevelopment strategies that replaced almost 10,000 black residents from the city's core with new expressways to the suburbs. Councilman Henry Marsh III, along with the black working-class, fought the redevelopment strategy throughout Marsh's first two terms. White city leaders sequestered support from suburban leadership; however, suburban class interest prevented any urban-suburban white coalition sidestepping Marsh's anti-redevelopment agenda. Marsh successful opposition prevented working-class neighborhoods from turning into mall parking lots. Without Marsh's

successful opposition, the 1967 redevelopment strategy would have mirrored the I-95 project. White leadership's inability to redevelop Richmond not only made the 1968 election the most important election in city history, it ensured annexation as the only measure to continue white leadership over a white majority Richmond.

Between 1967 and 1970, urban white leadership attempted to physically redevelop Richmond for the second time. Like the I-95 project, this slum clearance plan would "take poor people, Negro people from their homes and property and let them vegetate for the rest of their lives in cinder block [public] housing," according Councilman Howard Carwile. With physical decay and decreased tax revenue, the city council assigned the Richmond Redevelopment Housing Authority (RRHA) and the Richmond Metropolitan Authority (RMA) to "construct a downtown expressway linking the city's core with mushrooming suburbs to the southwest." This strategy provided Chesterfield residents with immediate access to the inner city, while creating physical barriers between East End housing projects and "middle-class white neighborhoods to the West" End. Later called "The City's Biggest Disgrace" by historian Christopher Silver, this plan would have alleviated the housing displacement that I-95 started in 1957. Blacks would have been residentially relocated from the city's core, leaving it open for white businesses and Virginia Commonwealth University expansion.[61]

---

[61] Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, And Race*, (The University of Tennessee Press, 1984), 286-312; and *Richmond Times Dispatch* February 26, 1968**.** Five of the six RMA members were Richmond Forward councilmen, and a part of Richmond's affluent white leadership. Civil Rights Era Richmond included its core being physically transitioned into major shopping, business, and school district (Virginia Commonwealth University). This redevelopment agenda targeted old black and working-class white neighborhoods throughout the city's core. Local banks refused to invest into core neighborhoods like Oregon Hill, Idlewood, Jackson Ward, and Navy Hill, creating physical decay and "dilapidated" housing. More than a war on black housing, it was a war on the lower-class. City leader's inability to expand city boundaries in the 1940's began the middle-class flight to the suburbs, bankrupting the city's tax budget. For more information on the financial aspect of urban redevelopment, and how race took the face of what was a complex class-race dynamic, see Silver, 256-265.

Henry Marsh III allied with white liberal Howard Carwile to challenge urban redevelopment. The first RMA and RRHA plans were to demolish Idlewood and Fulton. Both neighborhoods had "cracked and crumbling houses," and many within white leadership thought these were "the worst section[s] of the city;" making both "sites for light industry" and redevelopment said former Councilwoman Eleanor P. Sheppard in *Times-Dispatch* interview. Fulton's redevelopment would have displaced more than 2,400 homeowners from "their humble hovels" and threw them into "racial ghettoes… [for] the remainder of their natural lives." So Carwile mobilized Fulton residents, into the Fulton Improvement Association (FIA), which drew its own rehabilitation plans that "allow[ed] homeowners to keep their homes." After two years of FIA and city council negotiations, the Fulton neighborhood was partial rehabilitated and not completely redeveloped. As for Marsh and Idlewood, redevelopment would have displaced over 900 black working-class families. Marsh wanted to "delay the execution…on the Idlewood corridor," so he asked and received a stay on the project. This delay along with Carwile's Fulton situation not only froze over two million dollars' worth of federal and local funding, it created tensions within the city council.[62]

Marsh's opposition to urban redevelopment created a rivalry between himself and Councilman Phil Bagley. During council meetings about redevelopment, both Marsh and Bagley headed their respective constituencies. Bagley represented urban white business elites while Marsh represented potentially displaced blacks. Marsh went on record saying

---

[62] *Richmond Times Dispatch*, November 12, 1966, January 8, 1967, December 19, 1967, February 24, 1968, and March 1, 1969. FIA infighting began when the Fulton resident William O. Henderson started a splinter group of residents who were dissatisfied with FIA leadership negotiating redevelopment and relocation into lower-income housing. This three-way political battle between the council, FIA, and Henderson resulted in an approved "Fulton Plan" to redevelope half of Fulton, while commercially developing the other.

that Bagley and Richmond Forward's (RF) support of redevelopment "jeopardize[ed] efforts to provide more housing in the city." There were "human problems involved in the displacement of persons." To Bagley, Marsh was turning redevelopment into "political capital," using it to exploit the displacement aspect of redevelopment to maintain working-class constituency throughout the city. Black political gains allowed Marsh III to oppose white leadership in ways former black councilmen Oliver Hill and B.A. Cephas could not. His opposition to Bagley, the face of urban redevelopment, encouraged working-class black residents voicing their dissatisfaction with white leaders.[63]

Black Richmonders resisted redevelopment plans for Jackson Ward. Marsh's Idlewood opposition was defeated in the council 5-4 in late November 1966. With this slim victory, white councilmen proposed another expressway plan through Jackson Ward, as the residential rate suffered from the aftermath of I-95. Members of the City Housing Committee Winfred Mundle, B.A. Cephas, and James Wheat were tasked with consolidating displaced blacks in the city's East End housing projects. Harold H. Bradley, head of Jackson Ward's voting district, organized sixty residents in a "boycott of downtown merchants as a means of forcing a rerouting of the downtown corridor…the $95 million expressway is being built for downtown [business] interest" at the expense of working-class black homeowners said, Bradley. Since downtown businesses benefited from the expressway, according to Bradley, "we are going to leave downtown Richmond alone for a little while…and see how they get along." Likewise, Reverend E.E. Smith encouraged blacks to boycott downtown businesses and "battle Richmond Forward at the polls" if Jackson Ward was to be redeveloped. [64]

---

[63] *Richmond Times Dispatch*, November 26, 1966.
[64] *Richmond Times Dispatch*, May 24, 1967.

Black Richmonders increased their mobilized efforts to save Jackson Ward. Black residents "packed the council chambers" on the warm spring night of April 25, 1967, hoping to convince the five pro-redevelopment council members to reconsider the urban renewal plans. "Do not displace our neighborhood; do not put the people out of their houses who have no place to go…do not displace our people," exclaimed neighborhood representative Henry Clarke. Councilman Howard Carwile supported the cause by criticizing what he called "Jim Crow housing proposals." After the emotional pleas convinced the pro-redevelopment sector of the council to reject the expressway plan, Carwile congratulated black residents "for initiating demonstrations against the expressway." Black neighborhood activism, electoral gains, and councilmanic leadership, prevented white leadership from displacing black residents. Black redevelopment opposition forced white leaders to sequester support from suburban leadership to relocate blacks from the city's core by investing "more than $1 million in South Richmond" for public housing.[65]

White leadership ran into suburban opposition while trying to relocate blacks from the city's core to South Richmond. With core redevelopment temporarily suspended, the city council proposed public housing construction near the Richmond-Chesterfield border. Support from suburban leadership would have ensured the project, given that Chesterfield property values were directly affected by the construction taking place on its border. However, suburban leader Chesterfield Board of Supervisors Member Frederick T. Grey opposed the construction when city councilmen approached the Board during January of 1968. According to Grey, suburbanites only supported "luxury-type apartment buildings"

---

[65] *Richmond Times Dispatch*, February 13, 1968.

near their border, not low-income housing projects. Grey made it very clear that urban political problems should stay within city borders. Housing projects, according to Grey, caused a huge "disturbance of a stable community…let's not overcrowd South Richmond, let us not build ourselves a ghetto;" was the sentiment Grey represented in his objection. Grey's objection caused the city council to veto its own proposed measure. The fear of black neighbors, along with Richmond's political drama sitting on suburban borders, prevented suburban leadership from helping the city council with the redevelopment problem that Marsh, Carwile, and the working-class blacks created within the city.[66]

As redevelopment woes intensified, black leadership, headed by Marsh, rehabilitated Richmond's East End. The city was, by 1969, forty square miles, yet it had the sixth most concentrated public housing tract in America. East End was five percent of Richmond's land mass and held more than fifty percent of its poverty. "When I think of Church Hill," a black East End neighborhood, "I think of the people who need many more services from the city than they are getting," said Marsh. As he pushed for housing codes that protected black neighborhoods from dilapidation and redevelopment, black councilmen B.A. Cephas and Vice Mayor Winfred Mundle supported Marsh's campaign. "The level of frustration and hopelessness is growing rapidly in the city," as white leaders opposed Marsh III in every way. To Councilman Bagley, Richmond was a "77 million dollar cooperation." The only problem was that Marsh's rehabilitation plan ensured "this corporation spends 77 million," guaranteeing "it doesn't earn it" back. Black leaders fought redevelopment plans until the council applied for and received a $450,000 federal housing grant. The grant went exclusively to "making Church Hill a model neighborhood" for

---

[66] "City Council Vetoes Two Big Projects for Apartments," *Richmond News Leader* January 23, 1968.

rehabilitation, not redevelopment. This plan, along with their collective support against urban renewal, allowed Richmond blacks "to participate in planning their own future," one that excluded white leadership from disenfranchising blacks through urban space.[67]

Before Marsh's rookie term, black Richmonders never successfully opposed urban redevelopment. The black working class, led by Henry Marsh, had more say in urban politics. Marsh was the third post-Reconstruction black councilman, yet he was the most aggressive in shaping urban policy. Oliver Hill in 1948 and B.A. Cephas in 1964 had neither the Civil Rights Era circumstances nor the electorate to become serious forces in urban affairs. The mobilization against urban redevelopment and black increases in electoral politics allowed Marsh to aggressively battle white leadership, whereas Oliver Hill and B.A. Cephas could not. Marsh's first two terms illuminated the transition from urban blacks having electoral power to possessing councilmanic power. Richmond's racial dynamic, and Marsh's ability to capitalize on it, set the stage for Richmond's most important election in city history.

### 1968 Election

The 1968 election was the most polarized election of Richmond's seventeen-year power shift. White leaders used the local media to secure the city council in the 1968 election. White leadership used racial fears to remind whites of the possibility of black leadership controlling the city. The same white leadership used race to convince working-class blacks that their professionals were no more than slum lords, using race to secure

---

[67] *Richmond News Leader*, May 15, 1968; *Richmond News Leader* May 23, 1968; Nathaniel Bacon School PTA, President Ralph W. Palmer to Virginia Crockford, March 16, 1970 (*Virginia Crockford Papers*, Box 1-4 Folder 3 James Cabell Branch Library, Virginia Commonwealth University); *Richmond Times-Dispatch*, April 11, 1968; *Richmond News Leader,* May 5, 1967; and Interview with Reverend Benjamin Campbell, January 6, 2016.

political power through racialized voting solidarity. The results of this election reassured white leadership that annexation was the only solution to prevent black leadership from controlling City Hall. In the end, the election results not only produced the 1969 annexation, it became the lynchpin of the 1970 busing crisis.

This election experienced more voter participation and media attention than ever before. By late May, the Crusade helped increase black voter registration by ten percent from 1966, increasing the black vote to forty-four percent of the anticipated turnout. These numbers confirmed white fears that this election was going to deliver a black majority city council. In response, the affluent white voter organization Richmond Forward revitalized voting registration in white districts. Using public schools and community centers, Richmond Forward helped intensify white voter registration. The goal was to increase white voter turnout from thrity percenty to eighty percent of the overall white population. The *News Leader* tracked Richmond Forward's campaigning and noted that "the R[ichmond] F[orward] efforts have been intensified…since the circulation began in the Negro community two weeks ago" that blacks could take the city council. Richmond Forward and Crusade efforts were so visible that they reached "proportions seldom, if ever, undertaken in a Richmond political campaign" Both white and black leaders understood that whichever side best mobilized its base would win a majority on the council.[68]

The white media used coded race language to secure biracial support against black Crusade candidates. Election Day was "one of the most important days in the history of Richmond," according to the *Times-Dispatch*. If Richmond was to remain an "All-American City," its voters would have to ensure the "irresponsible and inexperienced"

---

[68] *Richmond News Leader*, May 30, 1968.

Crusade candidates were not elected. To the *News-Leader*, if Crusade candidates won, "Richmond will become a permanent black ghetto, a happy hunting ground for ambitious political opportunists." Both media outlets portrayed Crusade leaders as urban slum lords, using social change to place themselves at the helm of urban politics. The Crusade was running a "cruel hoax on the disadvantaged citizens of" Richmond," using race leadership to garner political power in the increasingly black city. To hide the racial coding with economics, the *News Leader* concluded by alarming white and black voters that "the normal exodus to the suburbs will accelerate…leav[ing] a lower tax base for the disadvantaged in a time of increased need," if black leaders becomes the councilmanic majority.[69]

The black media used race and class to combat the white media's criticism of black leadership. The *Richmond Afro-American*, a known Crusade mouthpiece, responded to the *News Leader* slum lord claims by reminding Richmonders that the Crusade represented the poor it did not exploit them. While adopting Martin Luther King's Poor Peoples Ticket, championing economic rights through jobs and housing for working-class blacks, the *Afro-American* illuminated Richmonf Forward's ties with white business interest. "Richmond Forward [is] backed and controlled by the city's big money czars."

The *Afro-American* went on to say that Richmond Forward:

"Has been so devoted to pushing its individual and corporate pursuits that it has grossly neglected the needs of the people, particularly the city's working man and disadvantaged. RF record would have been impressive in the 40's. But this is 1968 when identity with 'safe' colored folk, interracial cocktail parties and mushy smiles by the mayor

---

[69] *Richmond News Leader*, June 7, 1968; and *Richmond Times Dispatch*, June 11, 1968. All American City comment reminded citizens of the All American City award Richmond won from the National Civic League in 1966. Cities won this award by having the best community cooperation between citizens and councilmanic leadership. The aesthetic beauty of the city was also a standard for the award. The assumption was that black leadership was incapable of maintaining the communal or physical interest of the city. This was another, of many, instances of coded race language used by the Richmond media.

don't get it. Today, what is needed is men with guts to take effective action to eradicate racism and injustices which are about to destroy not only Richmond but the country…Richmond Forward has been unwilling to act against oppression…the record shows that it has sometimes tended to promote it. All one needs to do is recall Richmond Forward's race baiting tactics on open housing and annexation."[70]

Richmond Forward selected its candidates with the growing black working-class voting base in mind. While supporting eight candidates, Richmond Forward left one spot open for Richmond's favorite councilman: Henry Marsh. Richmond Forward implemented the eight-man nomination strategy to ensure the two voting blocs they needed to win: whites and working-class blacks. Richmond Forward could not endorse Marsh because conservative and business friendly whites hated his opposition to urban redevelopment. However, Marsh had a strong white liberal following in the city's Southside. This was in part to Marsh being the "the only black guy they heard of," as well as his strong ties to the liberal faction of the Democratic Party. Marsh's rookie term provided him much support city-wide, making a direct campaign for or against him political suicide for Richmond Forward.[71]

The Crusade's candidate selection process reflected its stance against white business interests, along with fears of white voter backlash. The Crusade shifted away from a heavy black slate, in favor of a bi-racial slate. Questions about supporting blacks who did not fit the agenda led to the Crusade removing support from incumbent black councilmen B.A. Cephas and Winfred Mundle. Both Cephas and Mundle not only supported urban redevelopment, they served on housing committees that refused to provide adequate housing for black residents. Traditionally seen as go-betweens for white and black leaders, Cephas and Mundle's fates were sealed without Crusade support. Their political success

---

[70] *Richmond African American*, June 8, 1968.
[71] *Richmond News Leader*, May 30, 1968; and Interview with John V. Moeser, January 5, 2016.

centered on being the black faces of white politicians. Without black support, white politicians had no use for Cephas and Mundle in the council.  For the Crusade, rejecting Cephas and Mundle, as historian Allan Hammock suggested, proved "blacks could reject black candidates who were well-known incumbents and vote for Crusade endorsed white candidates," two being Reverend James Carpenter and Howard Carwile. Moreover, it legitimized their claim to work for the poor, given that white and black poverty plagued Richmond. Black professionals ensured that their political ascension appeared as socially centered ideals involving race and not race based social change. Therefore, liberal whites replaced conservative blacks on the Crusade ticket.[72]

The highly anticipated 1968 election did not bring about the results the white media predicted. On Election Day, July 14, 1968, Richmond did not have anything close to a majority black city council. Henry Marsh was the only one of the three incumbent black councilmen to win reelection. This had much to do with Richmond Forward not campaigning against him, Crusade support for him, and his increased popularity amongst white liberals. The white liberal presence was felt more by the return of Howard Carwile to the council, winning first place with over fifty-six percent of the electorate. Marsh and Carwile were accompanied by a white Reverend of a black church James Carpenter.[73]

The white media wrongly assessed the implications of the election results. The *News Leader* assured white residents that Crusade electoral advances were coming to an end because two of the three black incumbents lost their reelection bids. While focusing on race, the *News Leader* neglected to mention that Cephas and Mundle were elected out

---

[72] Allan Staton Hammock, "The Leadership Factor in Black Politics: The Case of Richmond, Virginia," (Dissertation, University of Virginia, 1972) 66.
[73] "Crusade Shows Power, But Is It a Victory?" *Richmond News Leader*, June 12, 1968; and Councilmanic Election Results, June 10, 1968.

of office by the same urban blacks who elected them in 1966. Even the *Times-Dispatch* post-election report suggested that Cephas and Mundle's support of urban redevelopment cost them black support. Rather, Marsh had two allies, Carwile and Carpenter, who were going to vote his way on almost every measure. This was actually the Crusade's strongest election to date. Black leadership secured three seats for councilmen, guaranteed white liberal voters, and had three councilmen who were solely interested in opposing elite white councilmanic interests.[74]

While the 1968 election featured less black councilmen than the 1966 election, urban blacks possessed more electoral power than in years past. Black leadership, through its bi-racial slate, helped elect enough councilmen to stop proposals by Richmond Forward councilmen, giving black leadership its first ever veto power in the city council. Although the *Times-Dispatch* reported the removal of two black incumbents as "the death of the Richmond Crusade for Voters as a major power in the city political structure," black leadership once again increased its political power through electoral gains. The realization of what the Crusade accomplished in the 1968 election forced white leaders to broker a land and citizen deal with suburban leadership, hoping to thwart the increasing professional black influence in city politics.[75]

### 1969 Annexation

The 1969 annexation culminated the efforts of urban and suburban white leaders using their various political agendas to ensure Richmond and its city council remained

---

[74] *Richmond News Leader*, June 12, 1968. The city charter allows three dissenting votes to veto any councilmanic proposed measure. Instead of getting a majority, all the dissenting councilman needed was two supporting votes. This did not apply to non-councilmanic proposed measures, which needed only a majority to pass.
[75] *Richmond Times-Dispatch*, June 11, 1968; *Richmond Times Dispatch*, June 14, 1968; John Ritchie, Jr. "An Analysis of the Voting in the Councilmanic Election, June 11, 1968;" and *Richmond Times Dispatch*, June 12, 1968.

white. Once completed, the annexation made 44,000 white Chesterfield suburbanites Richmond residents at the stroke of midnight on January 1, 1970. This acquisition had social and political ramifications. Socially, the annexation sparked suburban unrest, as newly-made Richmond residents opposed their new residential status through petitions to the Virginia Supreme Court. Suburban unrest was followed by urban unrest between law enforcement and black residents, who were the new voting minority. Politically, annexation reduced Richmond's black citizenry from fifty-two percent  to forty-two percent , ensuring a white majority city council in the 1970 election. Disdain over the racial results of the 1969 annexation, as well as the city council it created afterward, played out in education reform, leading to the final stage of Richmond's racial shift in 1977.

Urban white leaders made efforts to work with suburban leaders on annexation. City Manager Alan Kiepper and Chesterfield Board Member Melvin Burnett met eight times between July 16 and September 12, 1968. Despite Kiepper asking for "50,000 affluent white" people to offset the growing black populace, the subject of the meeting was not as important as the places they met. Burnett and Kiepper met in donut shops, houses of mutual friends, and small diners, all located in what would be the annexed territory. These locations suggest a shifting class relationship between urban and suburban white leadership. Traditionally, urban white leadership conducted business in venues like the Country Club of Virginia, which excluded blacks and non-elite whites. However, urban leaders stepping away from the traditional haven for racial politics illuminated how important it was that suburban leadership worked with them to make, according to John

Moeser, the "one mind" they both shared into a reality. That reality was the assurance that blacks did not control the urban center of the metropolitan area. [76]

Negotiations became complicated when more city and county officials entered the discussion. Kiepper and Burnett could not reach a compromise because both sides refused to compromise on the number of annexed residents. So, Richmond Mayor Phil J. Bagley and Chesterfield Board Member Frederick F. Dietsch entered the annexation discussions. Both Dietsch and Bagley represented the extremes of suburban and urban leadership. To Dietsch, any annexation of over 30,000 residents "was out of the question." If Chesterfield's leadership would cede Richmond the 50,000 white residents the council wanted, "the court would have to order it." Mayor Phil Bagley was determined to annex 50,000 white suburbanites to prevent "the city from going to the niggers," politically and demographically. Bagley foreshadowed the future annexation by proclaiming that "as long as I am the Mayor of the City of Richmond, the niggers won't take over this town…[because] niggers are not qualified to run the city." Dietsch's and Bagley's stances only complicated discussions between the two sides, forcing the state's hand in doing what they both could not: maintain a white majority in Richmond.[77]

Fed up with the annexation stalemate, state powers intervened to force an urban-suburban solution. The annexation trial resumed on September 24, 1968, with both sides farther away from a solution. After Chesterfield Attorney Frederick T. Grey and Richmond Planning Director A. Howe Todd finished 1968 in a stalemated court battle, Governor Mills

---

[76] Plaintiff's Exhibit 32-Melvin W. Burnett Notes, *City of Richmond, Virginia v. United States of America*, No. 74-201, U.S. Supreme Court (1974), Appendix, Vol I, pp. 142-149; Interview with Wayland Rennie; and Interview with John V. Moeser, January 5, 2016.

[77] *Curtis Holt, Sr., v. City of Richmond*, September 20, 1971, pp. 154-156; and Phil J. Bagley, Jr., "Response to Civil Rights Commission Regarding Richmond-Chesterfield Annexation," in U.S. Civil Rights Commission, *The Voting Rights Act: Ten Years After*, January, 1975, 454.

E. Godwin called a special General Assembly session in April of 1969. In this special session, the Assembly proposed and passed an amendment to expand city borders to the Assembly's liking in any direction it saw fit, effective January 1, 1970. The bill was only voided if a land deal was brokered before the January 1 deadline. Godwin's measure took political power away from both urban and suburban leaders. Now the state decided if and how Richmond should grow, as well as Chesterfield's sociopolitical aftermath.[78]

Suburban leadership was convinced Godwin's bill was a racially motivated measure to maintain white leadership in Richmond. The General Assembly, as well as "the City of Richmond is only interested in one thing, white votes," said Chesterfield Delegate George Jones. Instead of the state handling Richmond's affairs, Jones argued suburbanites should "appoint the city council if they cannot manage the City of Richmond and they need help from us." Jones finished his speech on the House floor by mentioning "there is a group in Richmond that would like to continue the stranglehold control that they have over the city." This group was the city's affluent white class, and its stranglehold was reassured through "keep[ing] more registered white voters than Negro voters." Despite stating the obvious, Governor Godwin, with Assembly members, put both Richmond and Chesterfield leadership on notice that either they ensure Richmond remained white or the state would do it for them.[79]

Urban and suburban leadership responded to Godwin's bill by settling on the city's territorial expansion. On May 15, 1969, Mayor Phil Bagley and County Board Member Irvin Horner met and agreed to Chesterfield relinquishing twenty-three square miles of its

---

[78] *Richmond News Leader*, September 30, 1968; *Richmond Times Dispatch*, October 3, 1968; and State of Virginia, General Assembly, Proceedings and Debates of the Virginia House of Delegates pertaining to Amendment of the Constitution, Extra Session 1969, 517-520.
[79] *Proceedings and Debates* (House), 528.

northeast border to Richmond, which included 44,000 residents (43,781 white), for $34 million. Despite dissenting votes from Richmond's Henry Marsh III, Howard Carwile, James Carpenter, and two Chesterfield Board Members, both groups agreed to what would be called the Horner-Bagley line. This agreement ensured that the annexation was effective on January 1, 1970, nullifying the General Assembly's annexation amendment.[80]

Black opposition to the effects of annexation came in the form of welfare protest. The annexation price put public programs under financial strain. The city charter forbade the council from borrowing money to annex land, therefore, the $34 million came directly out of the city budget. One of the departments impacted most by city-wide cutbacks was the welfare office. On October 1, 1969, the city enacted its welfare department budget cut, which was planned almost a year prior to accommodate a future annexation purchase. Included in the budget cut was the council's vote to "not increase welfare payments for clothes, food, and furniture," all of which became more expensive as downtown businesses relocated to the suburbs. The budget cut not only slashed entitlement payment almost in half, it reduced the number of residents who could enroll and stay on the program. With annexation, "the city bank account was under a strain," forcing the council to save money wherever they could.[81]

Black residents contested the council's handling of welfare within the city budget. After being told by Welfare Chief Herbert G. Ross that the council's "instructions were to cut costs in his department by $1 million…and that he could not accede to another

---

[80] *Curtis Holt, Sr., v. City of Richmond*, 141-142; State of Virginia, General Assembly, Proceedings and Debates of the Senate of Virginia pertaining to Amendment of the Constitution, Extra Session 1969, 318; *Richmond Times Dispatch,* February 12, 1969; and *Richmond Times Dispatch*, June 17, 1969. Although there were three votes against the annexation, the annexation was proposed by the city manager and city attorney. Therefore, a majority was only needed to pass the measure. Only council-sponsored legislation could be voted down with three dissenting votes.
[81] "Welfare Chief Repeats Ruling," *Richmond News Leader*, October 14, 1969.

demand," black mothers, led by Miss Louretta Johnson and the National Welfare Rights Organization, gathered outside of City Hall and the Safety, Health, and Welfare office in protest. That night, black residents "packed out" the city council meeting over the welfare issue. "Uniformed and plain clothes policemen stood to enforce Mayor Phil Bagley's rule against applause," as tensions were high between black residents and white leaders. After councilmen Marsh, Carwile, and Carpenter requested putting city welfare program under federal compliance for grant purposes was denied by all six Richmond Forward councilmen, loud "rumbles of discontent" sprang "from the predominantly Negro crowd." One spectator encouraged Mayor Bagley to "sleep well," knowing his administration was arguably the most disfavored by black Richmonders in city history. Black discontent with white leadership spilled out of City Hall and into the community, as law enforcement had trouble policing black Richmond.[82]

Negative police-black encounters following the annexation reflected annexation hostility between urban blacks and white leaders. Reports of violent encounters between white police officers and black citizens became more frequent as the January 1, deadline approached. One hundred and twenty black Richmonders went to City Hall in late October to support twenty-one blacks who testified against the Richmond Police Department. Residents used an incident, in which a black man was detained by white officers for no legal reason, as a forum to publicize their complaints. Citizens claimed the police regularly displayed "discourtesy, indifference" to "pickpocketing money from them." White officers responded to urban black complaints with violent threats. Statements like "I'll blow your brains out" reminded blacks that questioning the large police precence in their

---

[82] *Richmond Times Dispatch*, October 14, 1969.

neighborhood could be fatal. Councilman Carwile believed this trend was a "city problem," as complaints dominated city council discussions. "A big handle of red-necked, unreconstructed Dixiecrats and bigots" consistently punished anyone from the "majority community," who would become the minority soon enough. The excessive police force appeared to be a physical reminder that whites were taking their city back on January 1, 1970. "The atmosphere is so built up" from the annexation that it was very difficult for "the victim of police brutality to have anybody on their side."[83]

White leadership minimized the obvious community-council problems that arose from the annexation. City manager Alan Kiepper addressed Carwile and urban blacks by proposing an increase in police patrol over black neighborhoods. Carwile's "civilian police review" board request "discredit[ed] the police," according to City Manager Kiepper. City Manager Alan Kiepper begged the council to release funds for police overtime hours. Since Richmond's street crime "mostly involves blacks," increased patrol made sense, as police-black encounters worsened. The measure was passed with three dissenting votes from the usual suspects, Marsh, Carwile, and Carpenter. This increased surveillance ensured that newly annexed Chesterfield suburbanites felt safe knowing that black neighborhoods were "properly" patrolled and controlled by white law enforcement. White control extended to law enforcement, as black residents continued to show discontent over the recent annexation decision.[84]

---

[83] *Richmond Times Dispatch*, September 11, 1969.
[84] *Richmond Times Dispatch*, October 1, 1969; *Richmond Times Dispatch*, September 24, 1969; and *Richmond Times-Dispatch*, September 30, 1969. Because Alan Kiepper was the City Manager and not a councilman, his proposal, like the annexation, needed a majority vote to pass. The Crusade minority with Marsh, Carwile, and Carpenter could only vote down council proposed measures.

Like working-class blacks, the annexation caused suburbanites much discomfort. Chesterfield residents petitioned to appeal the annexation, as it was a point of dissension between suburban residents and their leadership. While suburban leaders were interested in maintaining Richmond's white majority, the truth is most suburbanites could not care less because real estate markets and county lines protected them from Civil Rights Era race problems. Chesterfield residents, under the leadership of dissenting Board Member L. Paul Byrne, encouraged Crusade president Wilmer Wilson, to sue the city council for violating Section V of the Voting Rights Act of 1965 (VRA), given that the annexation switched the black voting majority to a minority. Black leaders refused to support any litigation based on the VRA because the white influx stabilized the urban economy. After receiving no support from Richmond's black leadership, Chesterfield residents petitioned the Virginia Supreme Court of Appeals on their own. The appeal was heard on November 20, 1969, and cartupuled the annexation. Chesterfield residents filed one more appeal on December 19, 1969, but the Virginia Supreme Court rejected it once again. As the year 1969 drew to a close, it was clear that the annexed residents were going to be Richmond residents on January 1, 1970.[85]

The 1969 annexation allowed white city planners to temporarily control black Civil Rights Era gains in electoral politics and urban policy. Marsh and Carwile's urban redevelopment opposition, along with the 1968 election, confirmed that urban and suburban leaders needed to control the political destabilization caused by the breakdown

---

[85] *Richmond News Leader*, September 16, 1969; Supreme Court of Appeals, *Dearborn Civic and Recreation Association, v. City of Richmond*, Petition for Appeal, November 7, 1969; *Richmond Times Dispatch*, December 20, 1969; and *Richmond News Leader*, November 26, 1969. Section V of the VRA specifically prohibited any annexation that racially changed the voting majority of the annexing locality. This was the basis for the Holt lawsuits in 1971-77.

of Jim Crow. Although Richmond and Chesterfield experienced backlash over the annexation, its true effects would be felt in the 1970 election and the subsequent school desegregation crisis.

**1970 Election**

The 1969 North Chesterfield annexation, which took effect on January 1, 1970, complicated urban politics. Overnight, Richmond not only expanded its southwestern border by twenty-three square miles, its white population increased from 108,398 to 143,857, now fifty-two pecent. Although white politicians saw the annexation as the means to retain urban political power, the annexed residents had different political objectives, making them a wild card in the 1970 election. White elites, black elites, and annexed suburban leaders, all had interconnected interests that complicated their political dealing with each other. Despite establishing their own political platform, the annexed suburban electorate largely aligned with Richmond's white leadership. However, the results of this election created conflict in the school desegregation saga, which amplified when annexed suburbanites came face-to-face with the Civil Rights Era changes Chesterfield County previously protected them from, which was school desegregation.[86]

The annexed citizens wasted no time in politically mobilizing for the 1970 councilmanic election. Instead of supporting Richmond Forward, suburbanites formed their own political organization called the Team of Progress (TOP). Under the leadership of George Jones and Robert Tuttle, both of whom represented Chesterfield in the Virginia House Delegates and were in the unique position of competing within urban politics for

---

[86] U.S. Bureau of the Census, Richmond and Chesterfield, Virginia, 1970 .

the first time, the TOP began 1970 by seeking alliances, hoping to get an upper hand on Richmond's established white and black political power structures.[87]

Suburban leadership's first round of negotiations began with the possibility of a biracial political alliance. On January 23 1970, TOP members Robert T. Fitzgerald, Roger Griffin, and Ronald Livingston, met with Crusade founder Dr. William Thornton about forming a political coalition in the upcoming election. The proposed alliance would combine the newly annexed white and urban black voting minorities. The coalition could have possibly unseated annexation leaders like Councilman James Wheat Jr., Mayor Phil Bagley, Councilman Thomas Bliley, Councilman Nathan Forb, Councilwoman Nell B. Pusey, and Councilman Morrill Crowe. After a few hours of discussion, Dr. Thornton rejected the alliance because he felt the Crusade would not "benefit from a formal alliance" with the TOP. Some suspected the proposed alliance would reduced the role black professionals had in electoral politics, given that "the Crusade…was seldom on equal footing" with white leaders, even within the city council. This proposed alliance was not about two powers coming together, but about one power (annexed leadership) attempting to use the other power (black professionals) to establish themselves as urban political figures.[88]

With no intentions of fighting a three-way electoral battle, TOP leaders sought an alliance with Richmond Forward. After failing to see eye-to-eye with Dr. Thornton, TOP leadership met with current Richmond Forward councilmen Nathan Forbes and Thomas

---

[87] Plaintiff Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*.
[88] Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*; and Moeser and Dennis, *Politics of Annexation*, 134-140. The testimony included details about a Richmond Forward merger with the Crusade however, Crusade leadership felt both that making the three-sided political affair two-sided, via a formal alliance, would result in black professionals losing their grip on urban political influence. Once white leaders garnered black leadership's official support, it was hard to remove it.

Bliley, offering to electorally achieve what the annexation sought out do: to keep Richmond's city council majority white. "I don't want to see Richmond become an all-black city…fear of the city going black relates very much to the present school crisis we have," said future councilman and RF candidate Henry L. Valentine to TOP leaders. After various meetings, the TOP split into two factions. Those who felt Richmond Forward intended to use annexed votes to retain power, while not excluding them from the economic and race issues the city faced, formed Richmond United (RU). Others who saw Richmond Forward as the only means of obtaining political influence joined the TOP/Richmond Forward coalition under the TOP umbrella.[89]

This was the first election since 1962 that featured two white voter organizations with conflicting electoral interests. RU represented suburban annexed whites who endorsed any candidate that opposed the 1969 annexation. Its support ranged from Crusade incumbents Henry Marsh III, James Carpenter, and Howard Carwile, to new candidates like Robert Shiro and Oats McCullen. TOP encompassed two groups: suburban whites who supported urban white leadership and wealthy whites from Richmond Forward. TOP endorsed pro-annexation leadership like Thomas Bliley and Nathan Forb, as well as "the new white guys" such as Metropolitan National Bank President William Daniel and real estate developer and chemical engineer Dr. Wayland Rennie.[90]

The Crusade used the split white vote to nominate another biracial slate, while introducing new working-class community leaders to the councilmanic platform. While endorsing the incumbent trifecta of Marsh, Carwile, and Carpenter, the Crusade nominated

---

[89] Exhibit #33, *Curtis Holt, Sr., v. City of Richmond*. TOP also met with William Daniel, president of National Bank. He was a huge political patron in the city and a supporter of the former Richmond Forward.
[90] Interview with Wayland Rennie, July 17, 2015; and *Richmond Times Dispatch*, April 30 and April 12, 1970.

black working-class leaders like Walter T. Kenny and Curtis Holt. Postal worker and national vice-president of the American Postal Workers Union, Kenny ran his campaign on improving public schools and the black community's involvement in urban politics. Head of the Creighton Court Civic Association (voter registration), Curtis Holt was an East End community organizer who worked with Crusade leadership throughout the 1960s to keep their electoral connection with the working poor. Neither Kenny or Holt won council seats, however Holt's defeat germinated with the 1969 annexation to bring about 1977 majority black city council.[91]

The 1970 election proved that the diverse interests, derived from the 1969 annexation, prevented black and suburban leadership from gaining control over the city council. TOP helped elect six of the nine councilmen with the fifty-eight percent white majority. None of the annexed citizens' candidates, as well as the Crusade's working-class black candidates, won a council seat. The Crusade and RU helped reelect the same three councilmen in 1970 that the Crusade did alone in 1968: Carwile, Marsh, and Carpenter. Despite "many whites in the newly annexed area show[ing] their resentment having been acquired by the city" through not allying with Richmond Forward, they did not have nearly enough votes to secure their own councilmanic majority. The RU-Crusade support for Marsh, Carwile, and Carpenter resonated in all three receiving the highest overall votes. If a suburban white-urban black political partnership happened on January 23, 1970, the annexed citizens and black leadership would have controlled the 1970 city council.

---

[91] *Richmond News Leader*, May 27, 1970.

However, RU and the Crusade's inability to ally resulted in affluent whites securing a sizable councilmanic majority once again, thanks in part to the 1969 annexation.[92]

The stunted urban black political growth set the stage for Richmond's school desegregation crisis. Annexed residents did not enter the city as neutral observers in councilmanic politics or social life. Like urban blacks, annexed suburbanites had their own vision of post-Jim Crow Richmond. Suburbanites wanted protective municipal separation from the growing black population. Hence, they formed their own voter organization, only supporting leaders who wished to de-annex them back into the suburbs. After losing their bid for political influence, annexed suburbanites sought to make Civil Rights Era Richmond difficult for white leaders to control. Suburban resistance to the annexation culminated in their own form of "Massive Resistance" to school desegregation, which sped up urban black ascendancy to the city council.

**Busing**

Prior to the 1970 busing decree, three events complicated the political drama caused by Richmond's unstable post-Jim Crow political environment. First, segregationist Judge John Butzner stepped down, and was replaced with Judge Robert Merhige. Second, the Supreme Court ruled Freedom of Choice, or de facto segregation, unconstitutional. Third, the annexation of 1969 placed over 10,000 suburban white students within Richmond City Public Schools. White suburban and black urban resistance to busing was a piece in the metropolitan areas' multifaceted relationship with race and space. The fulfillment of *Brown*, by 1970, shattered the remnants of Richmond's "Separate City" model. Judge Merhige ensured Richmond's generational physically segregated public school system

---

[92] Councilmanic Election, June 10, 1970, New City Results; *Richmond Times Dispatch*, June 10, 1970; and *Richmond Afro American*, June 13, 1970.

ended. This Jim Crow breakdown caused upheaval, as neither majority (working-class blacks and suburban whites) wished to participate in redefining their relationship to each other through education reform. The educational drama between 1968 and 1970 complicated Richmond's racial transition because annexed white dissenters fought school desegregation with school re-segregation, forcing Judge Merhige to consolidate metropolitan politics into a unitary body through its school system by 1971.

Judge Robert Mehrige's history with forced integration all but guaranteed that white and black students would be forcibly integrated. Federal Judge John Butzner, the man who ruled Freedom of Choice constitutional, stepped down and was replaced with Judge Robert Merhige in 1968. Because Judge Merhige spent much of 1967 and 1968 desegregating Southern Virginia school systems, most notably using busing and city-county consolidation in Emporia City, many saw him as a liberal judge. However, unlike some of his contemporaries, Merhige "was not one to be interested in deeply theoretical notions about statutory interpretation or constitutional interpretation;" however he encountered the law with "a sense of human dignity" according to law professor Mary Tate. To law professor and former collegue Ron Bacigal, Merhige often saw "what was right and was what the law as one in the same," when it came to Civil Rights legislation. Therefore, when Merhige enforced *Brown* through busing, he did so with the understanding that it was not only lawful, but that it was also what he felt was morally right.[93]

The defeat of Freedom of Choice put Judge Robert Merhige into contact with Richmond's public schools. The last leg of legal de facto segregation died thirty miles

---

[93] Ronald J. Bacigal, *May It Please The Court*: *A Biography of Judge Robert Merhige Jr* (University Press of America: Lanham, Maryland,1992), 52-56; Interview with Mary Tate, May 16, 2015; and Interview with Ron Bacigal, May 15, 2015.

southeast of Richmond. On May 15, 1968, the Supreme Court ruled all Freedom of Choice plans to be in violation of *Brown* in the *Green v. County School Board of New Kent* case. In New Kent County, similar to Richmond, the majority of whites and blacks used Freedom of Choice to stay in segregated schools. Therefore, resident NAACP member Charles C. Green used the County's Freedom of Choice Plan to prove that its offspring, de facto segregation, was in violation of *Brown* because it produced a racially identifiable school system. Serving as the Federal Judge in Richmond, Judge Mehrige helped to create another desegregation plan for city schools. Having earned an unfavorable reputation in the famous Greenville County School consolidation, Judge Merhige received threatening, sympathetic, and desperate letters from whites hoping he would not use busing or consolidation to racially balance Richmond's public schools.[94]

White Richmonders' hate letters revealed their collective fear of Judge Merhige removing yet another remnant of the city's Jim Crow culture: racially segregated public schools. Hate mail, later named "Kook Files," often revolved around the harm of bi-racial contact between white and black students. Most of the harm stemmed from sex. One mother begged Judge Merhige to spare Richmond public school system from desegregation because she feared "the type of Negro" children who came from parents who refused "to get married" and "keep having children with every Dick and Jane that comes along." The white mother's criticism of the black family structure and sexual promiscuity reflected her deeply rooted notion of blacks being too uncivilized to share the same classrooms with white students. Some whites took their dehumanizing sexual stereotypes to the extreme by

---

[94] *Green v. School Board of New Kent County*, 390 U.S. 430; Bacigal, *May It Please The Court*, 54; and J.W. Davenport to Judge Robert Mehrige, April 3, 1968 Kook Files *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 10, Muse Law Library, University of Richmond.

calling black boys "wired-haired cannibals" who loved nothing more than to rape young white women. Another parent went as far as to accuse Judge Merhige and his wife of having sexual relations with "niggers." While most letters warranted the name Kook Files, some parents expressed general concern for their children's wellbeing. One mother claimed she was forced to pick up a second job to pay for private school because she feared her children being mistreated by the black students who hated white people. Through these letters and many more received by School Board President Virginia Crockford, white Richmonders revealed their deeply rooted fears and hatred associated with the breakdown of Jim Crow. These racial fears were tested when they were faced with forced integration.[95]

Seeing Freedom of Choice as the last leg of Richmond's school segregation, the local NAACP struck what looked like the final blow against school segregation: *Bradley v. Richmond School Board*. The timing for this lawsuit was key to its longevity and impact. Had this lawsuit been filed before 1968, chances are it would have not been as effective. Not until after the annexation took place, which added over 10,000 white students to the sixty-eight percent black school district, did the NAACP reopen the 1962 lawsuit on March 10, 1970. The appointment of Judge Merhige, the illegality of Freedom of Choice, and the increased white student body, made the *Bradley v. Richmond City School Board* suit more likely to achieve racial integration in public schools.[96]

Political issues made this version of *Bradley* more powerful than the 1962 suit. The council's white majority understood that they could not successfully fight integration any

---

[95] Aldia S. Carter to Judge Robert Mehrige, May 13, 1969; Anonymous Parent to Judge Robert Mehrige, March 2, 1969; Mrs. Evelyn Field Griffin to Judge Robert Mehrige, May 2, 1969; William C. Lenio to Judge Robert Merhige, August 1, 1970; Black & White Gazelle to Judge Robert Merhige, Oct 3, 1970, *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 10, Muse Law Library, University of Richmond.
[96] *Bradley v. Richmond School Board*, 462 F. 2d. 1. Caroline Bradley and ten other parents sued the Richmond School Board for maintaining racially identifiable schools.

longer. The 1962 *Bradley* suit came before Freedom of Choice, when statewide tokenism was at its strongest. The 1970 *Bradley* suit came during intensified political drama over the annexation and the council's inability to institute Freedom of Choice. Financially, the council could not afford another lengthy fight against school desegregation. The over one million dollars in legal debt from the annexation, and Crusade councilmen Marsh, Carpenter, and Carwile blocking all council proposed measures to borrow money, kept the city's legal budget to a minimum. If public schools were to survive, they needed federal funding which hinged upon federal compliance with desegregation. With city council approval, the Richmond School Board asked the U.S. Department of Health, Education, and Welfare (HEW) to devise desegregation plans that not only brought the city in compliance with *Brown*, but enable the Richmond Public School systems to receive much needed federal funds.[97]

It was clear to Judge Merhige that ending school segregation meant breaking the geographic barrier that sustained it: space. By the summer of 1970, the biggest obstacle preventing Richmond public schools from federal compliance was segregated housing. So, Judge Mehrige allowed the HEW and the Urban Team to present methods for school desegregation. The Urban Team and HEW decided that Richmond's public schools would never be in compliance unless the white suburbs were forced to participate in a metropolitan busing scheme. Public schools resided within neighborhood boundaries, most of which were racially segregated. This made mobility the issue, as blacks who wished to send their children to white schools could not access public or private transportation to white neighborhoods. White families, even those who lived in predominantly black areas,

---

[97] *Richmond Times Dispatch*, June 20, June 28, and July 10, 1970.

refused to send their children to schools with predominately black students and black faculty. To Merhige, the solution was simple. Removing spatial barriers meant utilizing busing.[98]

Judge Merhige refused to accept any desegregation plan that did not fully utilize mass transportation to break the spatial barrier Jim Crow created. Distance and cost both factored into the equation. Most black residents lived in Richmond's East End and Northside. Urban whites lived in the West End and Southside of the city. This meant any approved busing scheme had to be implemented across the sixty-three square mile city. HEW's desegregation proposal, Plan I, included busing in all neighborhoods except the all-black East End and all-white suburban annexed Southside. Since Plan I left two huge sectors of the city untouched, providing residential safe zones, Judge Merhige rejected Plan I. Plan II, devised by the city council and school board, allowed for complete cross-town busing of every neighborhood, yet it relied exclusively on federal funds. Judge Merhige rejected Plan II because it levied no financial responsibly on the same city that blatantly disobeyed the law. As a compromise, Judge Merhige accepted Plan III on August 7, 1970. It was a temporary plan that bused mainly East End and Northside blacks to Southside schools.[99]

Suburban whites felt victimized and protested what they felt was a violation of their consumer rights. Annexed residents formed the Citizens Against Busing (CAB) coalition

---

[98] Urban Team Study on Northside Schools, "Richmond School Board Grant Proposal" to the U.S. Department of Health, Education, and Welfare, June 1970, *Bradley v. Richmond School Board*, Mehrige Collection Series, Box 18 Folder 9, Muse Law Library, University of Richmond. Plan III was approved only because Judge Merhige wanted to integrate city schools before the 1970-71 school year. He gave HEW and the school board six months to develop an "adequate" plan, yet each plan either cost the city too much money, or did not integrate city schools to Judge Merhige's liking. For more information, see *Bradley v. Richmond School Board*, 380.
[99] *Bradley v. Richmond School Board*, 462 F. 2d. 23; and Christopher Silver and John V. Moser, *Separate City, 9.*

under the leadership of Chesterfield preacher John Book. CAB petitioned Governor Linwood Holt to issue a state ordinance repealing Judge Merhige's busing plan. However, state and local support for busing was evident as Governor Holt and TOP councilman Mayor Thomas J. Bliley, who both vehemently opposed busing, asked annexed citizens to "obey the law and cooperate." The CAB organized drive-ins around Capital Square and Richmond Arena, protesting the "the combining of all races by force" in public schools. Annexed residents' victimization was best explained by one mother who mentioned that "before I was occupied by the City of Richmond, I was relatively happy and had no serious problems." Suburbanites "flee to the suburbs and so avoid the problems" of the city. "The Problems" being Jim Crow's demise. CAB's message was clear.  Annexed suburbanites wanted residential, political, and educational separation from Richmond's white elites and black residents. The annexation and Judge Merhige's busing ruling violated their Civil Rights Era agenda, making suburbanites "second-class citizens" to the same blacks who were just a few years before, legally second-class citizens.[100]

Suburban protest turned into massive resistance at the beginning of the 1970-71 school year. On the first day of school, suburban parents illegally withheld over 5,000 children from Richmond's Public Schools' busing plan. Few white dissenters, mostly in the West End, legally removed their children from Richmond Public Schools, like Judge Merhige who reassigned his own son to preparatory school. As historian Matthew Lassiter noted, the majority of white dissention came from the annexed Southside. Stories of Southside families renting additional apartments and using fake addresses in Chesterfield

---

[100] Mary Pantele to Virginia Crockford, April 23, 1970; Paul T. Bassett to L.D. Adams Sept. 10, 1970; and T. Stevens Daugherty to Thomas  J. Bliley, Aug. 20, 1970,  *Virginia Crockford Papers*, Box 2, James Cabell Branch Library, Virginia Commonwealth University*; and Richmond Times Dispatch*, Sept. 14, 1970.

and Henrico to avoid busing ran rampant throughout the local media. The protest impacted Richmond Public Schools, as by November of 1970, the fifty-eight percent black student majority expanded to seventy percent in half of a semester.[101]

Working-class blacks resisted citywide busing as well. Black Richmonders withheld 800 children from public schools in defiance of the busing order. "We want neighborhood schools the same as white folk" said black parent and *News Leader* reporter Al Johnson. Black mother Mrs. Shirley Martin told the *Wall Street Journal* that black Richmonders accepted busing, "but we don't like it." Mrs. Martin later raised the question of "why can't my kids go to school near my house?" Many of the busing assignments put black students in white schools, instead of the other way around. Urban blacks did not want their children "to be bused all over the place" to protect white students from going into black neighborhood schools. Although the school board and the city council saw forced busing as in "the mutual interest of the entire metropolitan area," on this and the annexation, urban blacks aligned with suburban whites in opposition. This working-class black and suburban white resistance was bigger than race. Rather, as historian Robert Pratt alluded to, their defiance highlighted a "natural fear of the unknown" world Civil Rights Era changes were creating. The breakdown of Jim Crow scared the working-class black and suburban white majority, forcing them to react in utter defiance.[102]

Because of white and black defiance, Judge Merhige consolidated Richmond's race-centered political crisis through education. By December of 1970, busing became

---

[101] *Richmond News Leader*, September 2, 1970; and *Richmond News Leader*, November 21, 1970.
[102] *Wall Street Journal*, Tuesday November 23, 1971; A. Prescott Rowe to Virginia Crockford, Mayor Thomas Bliley and Howard Carwile, November 19, 1970, *Virginia Crockford Papers*, Box 4, James Cabell Branch Library, Virginia Commonwealth University; and Robert Pratt, *The Color of Their Skin*: *Education and Race in Richmond, Virginia*, 1954-89 (Charlottesville: Unversity of Virginia Press, 1992), 63.

socially and economically unfeasible. Judge Merhige's busing order left a $600,000 transportation bill on the city budget, along with the outstanding legal fees from the annexation trial. In light of the recent failure, the local NAACP, headed by Henry Marsh, encouraged the *Bradley* plaintiffs to request a consolidated school system with Henrico and Chesterfield County. Since Chesterfield and Henrico served as safe zones against Judge Merhige's busing order, including both localities in *Bradley* would bring about the fullest execution of *Brown*. After the *Bradley* plaintiffs requested it on December 14, 1970, the Richmond School Board and City Council asked that both Henrico and Chesterfield be brought into the *Bradley* suit, which Judge Merhige granted..[103]

The aftermath of the busing failure, in light of the 1969 annexation, set the stage for two federal court battles that entrenched the city's sociopolitical stability throughout the 1970s. Failed cross-town busing did not end Civil Rights Era changes in Richmond. Rather, it encouraged Judge Merhige to further complicate Richmond's political landscape. Richmond's past sins of delaying *Brown* haunted the newly annexed suburbanites, who had no intentions of helping the *Bradley* plaintiffs bring about the fulfillment of Civil Rights education reform. The educational battle encompassed the city's overall political battle about the outlook of Richmond as the racially separate city became destabilized.

---

[103] Interview with Wayland Rennie; "Motion for Joinder," Nov. 4, 1970, 90a-98a, "Amended Complaint," Dec. 14, 1970; *Bradley v. Richmond School Board*, Motion to Rescue: box 18, folder 9 Muse Law Library: University of Richmond Special Collections *Robert Merhige, Jr. Papers*; and Pratt, *Color of Their Skin*, 90-97. The Richmond area experienced a massive private school movement during the school desegregation period. In surrounding counties, private school tuition dropped as more white families sent their children to them. In many cases, there were waiting lists for enrollment. Emporia residents raised over $250,000 to form a private school to defy Judge Merhige's consolidation order in 1970. Brunswick County actively recruited white families to fill older private schools, or start new ones. Some of the private school children received state tuition grants to attend these private schools. For more information on this, see *Richmond Times Dispatch*, "School Plans Progressing in Dinwiddie" and "Brunswick Academy Announces New Student Enrolment Period;" Claude S. Fox to Judge Robert Mehrige, Jan, 1968; "Richmond, Norfolk Troubled Over New Issue Of Busing," *Richmond Associated Press*: *Danville Bee* (July 9, 1970); and James L. Doherty to *Richmond Times Dispatch*, August 6, 1970.

**Conclusion**

Black leadership's 1960-66 political strength was minimized during the Middle Years of 1967-70. However, urban white leadership's thwarting of black political power only complicated Richmond's political landscape. The city's racial transition originally encompassed white and black leadership vying for control over post-Jim Crow Richmond. After the 1969 annexation, Richmond's political battle became the metropolitan areas' war over the racial and political outlook of the capital city. As annexed residents were dragged into Richmond's urban crisis, they maintained their own agenda of suburban separation apart from white and black leadership. The final stage of this transition represented the end of elite white control over city politics. Working-class black and suburban white attacks on white leaders inevitably forced affluent whites to vacate any chance of preventing Richmond from becoming a black city council.

Chapter 3: The Beginning of the End 1971-1977

The final stage of Richmond's Civil Rights Era racial transition happened between 1971 and 1977. The *Bradley* and *Holt* trials ended elite white control of the city council and public education. During these years, elite white control of the city became more susceptible to challenges from urban blacks and suburban whites. Every political group, whether it be middle-class blacks, working-class blacks, or middle-class whites, had varying interpretations for how Civil Rights Era Richmond should operate. Circumstances created strange political bedfellows that ultimately eroded the political power away from urban white leaders by the end of both *Bradley* in 1974 and *Holt* in 1977.[104]

Although Richmond received a black majority city council by 1977, black politics were far from monolithic. Through *Bradley* and *Holt*, both working and middle-class black leaders fought separate issues for separate reasons, bringing about a similar outcome: a black-majority city, majority black council, and a black mayor. While black professionals supported *Bradley* and school desegregation, working-class black leadership supported *Holt* and de-annexation. Both black constituencies had their own visions for Civil Rights Richmond, and their separate fights placed them at odds with each other, as suburban and elite white interests used this black class breakdown for their own agendas as well. Although the city was about "ninety percent divided," in that "there were few social organizations that were integrated," social conflict over school desegregation and the 1969

---

[104] Interview with Benjamin Campbell, January 6, 2016; and Interview with Isaiah Hilliard, May 16, 2015.

annexation integrated Richmond's political environment so much that white elites followed suburbanites by politically vacating Richmond by 1977, creating the black majority city.[105]

**Bradley**

Judge Merhige's busing experiment furthered the city's racial divide. By January of 1971, just six months after city-wide busing was approved, the black public school population rose to seventy percent after being lowered below sixty percent by the annexation. White and black urban residents separately opposed integrated schools. Black parents withheld their children from integrated schools, while white parents relocated to the suburbs. An anonymous black women noted, in an interview with Robert Pratt, that by Christmas of 1970, her West End neighborhood switched from 90% white to 90% black once busing was approved in August of 1970. School Board president Virginia Crockford mentioned that once Judge Merhige's busing order was implemented, white families fled the Richmond PTA's and neighborhoods in "droves." White flight ranged from black students victimizing white children on school buses, to the disapproval of the school board's support for busing. The defiance, by both sides, illuminated that the majority of Richmonders were not willing or ready to defy the Jim Crow culture they grew up in.[106]

The hypocrisy shown by black and white leadership may have fueled much of the defiance to busing. Despite Governor Linwood Holton sending his children to desegregated public schools, some black and white professionals, with the financial means, sent their children to private schools the minute busing was adopted. "The upper-class black kids left instantly when those children came in," according to former Councilman Wayland Rennie.

---

[105] Interview with Wayland Rennie, July 15, 2015.
[106] Robert A. Pratt, *The Color Of Their Skin: Education And Race In Richmond, Virginia, 1954-89* (Charlottesville: University Press of Virginia, 1992), 63-64.

"Even the Urban League president [Randolph C. Kendell] sent his children to private school "the minute those children came in." Those children being "the [black] children from the [East End] housing projects." Although some white Richmonders "wished [they] had a realistic sense to do it," before busing took place, many within white leadership enrolled their children in private school afterward. Most white councilmen sent their children to private schools while working almost every day on peacefully implementing public school integration. This hypocrisy did not go unquestioned as Judge Merhige had to answer to the public about sending his son, Mark Merhige, to St. Christopher's, an all-white preparatory school. "When I'm on the bench, I'm on the bench… and when I'm at home, I'm just a father. Mark attends a private school because that's where I think he can get a better education, and I make no apologies for it." While it is tough to sufficiently assess the complete social impact of black and white leadership's private school choices, busing protest surely had more to do with hypocrisy from urban leadership, as many of their children never experienced public school integration.[107]

Judge Merhige and urban white leaders agreed on using suburbanites to achieve their separate agendas, thus they developed *Bradley* by including Henrico and Chesterfield into the suit. All things considered, the recent cross-town busing failure had less to do with black and white leadership sending their children to private school and more to do with municipal borders undermining Judge Merhige's order. Judge Merhige proposed a metropolitan consolidation back in June of 1970, given his familiarity with it in Greenville and Brunswick Counties. In Richmond,"bus-dodging and white flight to the suburbs…[left] consolidation as the only course for true integration." Thinking similarly

---

[107] Interview with Wayland Rennie, July 17, 2015; and Ronald J. Bacigal, *May It Please The Court*: *A Biography of Judge Robert Merhige Jr* (University Press of America: Lanham, Maryland,1992), 68.

to Judge Merhige, the Richmond School Board and city council blamed suburbanites for the busing disaster. "School division boundaries created and maintained by the cooperative efforts of local and central state officials" create[d] racially identifiable schools and Richmond's biracial community, according to city attorneys. Richmond's white leaders and Judge Merhige shared a similar taste for involving suburbanites into urban politics. While Judge Merhige cared about desegregating schools, white leadership used *Bradley*, like the 1961 merger, 1964 annexation attempt, and 1969 annexation to convert suburbanites into controllable political currency that benefited elite white control over Richmond.[108]

Suburban leadership immediately recognized the quasi-partnership between affluent whites and Judge Merhige. After Judge Merhige included both Henrico and Chesterfield in the *Bradley* case, both counties filed requests for the removal of Judge Merhige. Both county attorneys reasoned that Judge Merhige included the suburbs in Richmond's busing crisis because of "a personal bias or pre-justice either against" suburban leaders. Judge Merhige's dislike for suburbanites became clear, according to the removal request, when he wrote: "if free citizens exercised their right to move from a troubled community to one that offers peace, then the trouble they fled should be packed up and sent to them." The partnership conspiracy became apparent when Judge Merhige wrote a letter to the *Bradley* attorneys "in which he suggested that it might be appropriate for the defendant school board to discuss with the appropriate officer the contiguous counties as to the feasibility or possibility of consolidation of school districts," according to Chesterfield attorneys. This letter was twofold, because it suggested Judge Merhige's

---

[108] *Bradley v. Richmond School Board*, 324 F. Supp. 396, 401 E.D. Va. 1971; Bacigal, *May It Please the Court*, 66; and *Bradley v. Richmond School Board* 400, 840-850.

sympathy with urban leaders, while suggesting a partnership between the plaintiffs and himself. Despite the evidence, the removal request was denied, forcing suburban leadership to fight the very real Merhige-*Bradley* attorney coalition that appeared before their very eyes.[109]

Suburban leadership's inability to remove Judge Merhige or themselves from the lawsuit allowed the council and Judge Merhige to use suburban resistence for political gains. Judge Merhige approved the unitary school system in April of 1971, and on January 5, 1972, he approved an inter-jurisdictional busing plan effective for the 1972-1973 academic school year. Judge Merhige single-handedly broke "the product of private racism" which were the municipal boundaries that allowed suburban whites to disobey his busing order. This consolidation cemented Judge Merhige's legacy, as Matthew Lassiter suggested, because successfully removing Jim Crow from the Confederate capital's school systems made *Bradley* "the most important school desegregation landmark since *Brown*." Simultaneously, suburban leaders were ordered to "establish a cooperative school operation with Richmond." Richmond's white leadership successfully linked the suburbs and city through Judge Merhige's order, as according to the ruling, Chesterfield and Henrico leaders were required to cooperate with Richmond leadership politically, instead of merely negotiating with them.[110]

The national media weighed in on Judge Merhige's decision. *U.S. World News* supported Judge Merhige's decision. With consolidation, "there is no point of whites moving out of the city," said William L. Taylor Director of the Center for National Policy

---

[109] Matthew D. Lassiter, *The Silent Majority: Suburban Politics In The Sunbelt South* (Princeton, N.J: Princeton University Press, 2006), 120; *Bradley v. Richmond School Board*.
[110] *Bradley v. Richmond School Board*, 834-875, 338, 61.

Review at Catholic University. He, along with NAACP Legal Defense Councilor Jack Greenburg, supported Judge Merhige's landmark decision because consolidation went "far beyond the desegregation of a large city school system," it established the judicial precedent of de facto segregation being unconstitutional. To Taylor and Greenburg, the "predominantly white school system[s] in…surrounding counties [were] the result of discriminatory actions by both the state and local governments" of Jim Crow Virginia. Thus, they supported Judge Merhige's consolidation, as it was the only way to implement *Brown* in the Confederate capital.[111]

Judge Merhige gained support from the most unlikely of Richmond residents. There were three categories of local support for consolidation: those who believed in the vitality of public schools, those wished to prevent white flight, and those who wished to fix Richmond's longstanding racial divide. Public school advocates, or the Citizens for Exceptional Public Schools (CEPS), endorsed the "smooth transition" from separate to unitary school districts because they believed in public education. Enemies of white flight backed consolidation because they belived it would protect their "wonderful capital city from becoming a ghetto city [because of] white citizens rush[ing] to the counties to avoid desegregation." The minority of Judge Merhige supporters saw the larger implications of the unitary school district. Robert Benzia used his hometown of Princeton, New Jersey, to shed light on school consolidation. "We still have our social problems" in Princeton, but it is because of school consolidation that "people no longer think in terms of segregated schools." Judge Merhige's supporters were not united on much besides the consolidation results. Unifying the school districts kept schools open, deterred white flight, and ensured

---

[111] "Mixing City, Suburban Schools: Key Ruling by a U.S. Court," *U.S. News World Report*, January 24, 1972, 29.

that racial conflict did not result in racial separation. Perhaps the disjointedness of Judge Merhige's supporters, as Lassiter noted, ensured that local support "struggled to gain traction." Nevertheless, Judge Merhige's decision united the most unlikely of people, all of whom felt that political consolidation was the only way to achieve their various visions for Civil Rights Era Richmond.[112]

Support for consolidation did not outweigh the majority of opposition from fear. The Citizens Against Busing (CAB), West End Concerned Parents and Friends, and the East End PTA, openly opposed metropolitan consolidated busing. Some referred to Judge Merhige's ruling as communism and a violation of civil rights, while others lamented that neighborhood schools protected their "different socioeconomic values" from the blacks who would be bused into their neighborhood. "I'll go to jail if I have to; I'll move to the Algannies if I have to; I'll move to South Africa, I'm tired of living by minority rule," declaired one Chesterfield father. One Henrico mother claimed that busing enabled "group[s] of young hoodlums… [who were] roving bands of non-students and dropouts" from black neighborhoods to victimize white children. White opposition, regardless of location, was very real and it prevented any legitimate chance of Judge Merhige implementing his January ruling.[113]

[112] "Miracle Worker Campaign Report," March 7, 1971; CEPS Newsletter; Mrs. Murray Lowenstein to Crockford, Nov. 18, 1970; Fred Batmen, "Spotlight on Social Studies," Office of the Supervisor of History at Richmond Public Schools, Vol III, No. 9 May 1971; and Robert Benzia to Richard T. Schartzchild, Jan. 14th 1972, *Virginia Crockford Papers*, Box 4 Folder 3 James Cabell Branch Library, Virginia Commonwealth University; and Lassiter, *Silent Majority*, 123.
[113] *Richmond Times Dispatch*, July 17, 18, and 16, 1970-1971; *Richmond News Leader*, November 21, 1970; John A. Gunn to Transportation Selection School Board Offices City of Richmond, Virginia Crockford, and J.D. Adams, October 14, 1970; Raymond M. Richeson to Virginia Crockford, May 6, 1970, *Virginia Crockford Papers*, Box 2 Folder 7 James Cabell Branch Library, Virginia Commonwealth University; and Lassiter, *Silent Majority*, 150.

White opposition materialized into legal and illegal acts of resistance. Suburban and urban white dissenters held a 108 mile motorcade, of over 4,000 people, to Washington DC in protest of the recent federal ruling. Urban and suburban whites shouted "Save Our Freedom" at acting Attorney General Richard G. Kleindienst to reverse the order of "two-thirds-black city school system to merge with two largely white suburban county systems, through more busing." Chesterfield Board of Supervisors Irvin Horner led several rallies in the annexed suburb under the moniker "The Peoples Revolt." "Richmond can rot in hell" said one Henrico resident while supporting the anti-busing rally. County residents did not stop at civil protest. Judge Mehrige's life was repeatedly threatened through phone calls and residential vandalism. Threats increased so much that Judge Merhige sent his family away while federal marshals surveillanced his home twenty four hours a day.[114]

Law Professor Philip B. Kurland white resentment to argue against the merits of Judge Merhige's consolidation in the U.S. Court of Appeals. On April 10, 1972, the United States Court of Appeals, headed by Judge Clement F. Haynsworth, Jr., heard Chesterfield and Henrico's case against Judge Mehrige's assessment that Henrico's and Chesterfield's borders were "newly drawn" and "racially motivated," creating racially segregated schooling. Special Counsel Philip B. Kurland, who represented both Chesterfield and Henrico Counties, argued that Judge Merhige's ruling was a "logical fallacy," as county lines were established well before public schools. Despite private property owners

---

[114] *Richmond News Leader*, January 19, 1972; Kook Files, University of Richmond Special Collections; Merhige Collection Series, Box18 Folder 6, US Dist. Court, East VA (Rich) MISC School Desegregation Interview with Professor Mary Tate, May 20, 2015; "Busing Protest," *Richmond Associated Press*: *Danville Bee* (February 19, 1972), James Madison University Newspaper Archives; 4; and "Anti-Busing Test First," *Richmond Associated Press*: *Danville Bee* (March 29, 1972), James Madison University Newspaper Archives 4A. The Judge's dog was shot and killed. People threatened him that his son would not make it to adulthood if he did not reverse the ruling. For more information on the severity of the death threats he received, see the Kook Files at the University of Richmond Law Library.

instituting de facto segregation, the counties themselves had no racist policies limiting the influx of black citizens. Kurland argued that Judge Merhige's consolidation was in fact institutionalized racism. Labeled "white supremacy in the classroom," Kurkland maintained that Judge Mehrige's ruling assumed that "black children are to excel academically" only in the presence of a white majority. Instead of attacking the overall significance of Judge Merhige's ruling, that being the removal of racially segregated education through suburban-urban cooperation, Kurkland used racist notions of black inferiority to oppose the legality of consolidation.[115]

The Appeals Court agreed with suburban leadership. The U.S. Court of Appeals overturned the consolidation with a vote of five to one on June 5, 1972. According to the court, Judge Merhige had no legal justification for "realistically plac[ing] on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond." The "little action, if any, the counties may have seen to have taken to keep blacks out," was not enough to force them to form an unwanted union with Richmond city. The court suggested that if Judge Merhige wanted to reverse Richmond's long history of segregation, he should use something other than schooling. "A school case, like a vehicle, can carry only a limited amount of baggage," in that there were real limits to Civil Rights social change, and Judge Merhige's ruling exceeded them. Using unitary schools to break "the cycle of poverty and the policy of containing blacks within urban ghettos" would not be done through forcing urban and suburban leadership to share similar school systems.[116]

---

[115] *Bradley v. Richmond*, 59, 462 (1972)
[116] *Richmond Times-Dispatch*, August 25, 1972; and *Bradley v. Richmond School Board*, 324 F. Supp. 1058, 1066 (4th Cir. 1973).

Judge Merhige and the *Bradley* attorneys' last hopes for an urban/suburban unified school system were ravished by the Supreme Court.  The *Bradley* attorneys appealed the Court of Appeals decision, only to have the Supreme Court not levy a ruling on the consolidation. The four-to-four stalemate was caused by former School Board President, Supreme Court Justice Lewis F. Powell, Jr., recusing himself from the case. Many suggested, like Reverend Benjamin Campbell, that "it wouldn't have mattered if he had not excused himself." Justice Powell, Jr.'s record as the School Board President, and his personal racial bias, did not lead any to suggest that he would have ruled in favor of the *Bradley* plaintiffs. Although the stalemate upheld the Fourth Circuit Court of Appeals decision, *Bradley* did not die in Richmond, it died in Detroit. *Milliken v. Bradley*, which resembled *Bradley v. Richmond*, struck down any constitutional justification for federal city-suburb school consolidation. Justice Powell, Jr. did not recuse himself from this case, as he levied the deciding vote making it five-to-four against consolidation. With the Supreme Court removing constitutional protection from Judge Merhige's ruling, Richmond schools continued cross-town busing, which did little more than send black children to black schools until 1986.[117]

After the Supreme Court secured suburban borders from any forced political coalition with the city, white residents and their school-aged children, poured out of Richmond. Between 1970 and 1974, Richmond's white school population dropped from thirty-five percent to just twenty-five percent, reflecting a 7,782 white student decrease in just eight semesters. The integration process black professionals started in 1960, came to fruition by 1974; however, it did not look necessarily as they envisioned it. Although there

---

[117] *Bradley v. Richmond School Board*, 889; and *Milliken v. Bradley*, 418 U.S. 717 94 S Ct. 300.

were three black school board members, and by 1976 Richmond's first black superintendent Richard C. Hunter assumed office, the school system was devoid of any real racial integration. From 1970 to 1986, when cross-town busing was removed, Richmond's white student population dwindled to just thirteen percent of the overall population. The black middle-class effort, beginning in 1960, did not reform urban education, as much as it forced whites to covertly seek other means of separation. While some affluent blacks sent their children to private and suburban public schools, most had to deal with the de facto segregated school system that *Warren* and both *Bradley* cases created.[118]

**Holt**

The results of *Curtis Holt v. City of Richmond* marked the end of the Civil Rights Era in Richmond. This seven-year case produced strange political bedfellows, who made alliances across racial boundaries, seeking similar results for different reasons. Working-class black leader Curtis Holt wanted to infiltrate the city council, something previously reserved for black professionals. However, the annexation, he believed, prevented him and other working-class leadership from winning the 1970 councilmanic election. Holt's attempt to infiltrate urban leadership, highlighted long-standing class issues within black Richmond. Middle-class blacks wanted electoral support from men like Curtis Holt; however, black professionals blocked Holt from traditional channels of political power because he was mildly educated, he was a man of little financial means, and for some "he wasn't in the right church" according to author Benjamin Hill.

---

[118] Table, "An Educational and Socioeconomic Comparison of Students in Richmond, Henrico, Chesterfield" and "Racial Composition of Richmond Public Schools," Pratt, *Color of Their Skin*, 92-93.

Like *Bradley*, *Holt* v. *City of Richmond* began with Curtis Holt's discontent over the 1969 annexation. Most Crusade candidates had little chance at electoral success in the 1970 election. The most doubtful of the Crusade nominees was Curtis Holt. Unlike fellow candidate Walter T. Kenny, working-class black postal worker with middle-class and Democratic Party ties, Curtis Holt was mildly educated, unemployed, and had few political connections to white or black leadership. Out of all the 1970 candidates, Holt finished seventeenth out of twenty-eight. From the perspective of black leaders, white leaders, or annexed residents, Holt's campaign was a failure from the beginning. His lack of formal education showed as he often "said peoples instead of people…black leadership was embarrassed of Holt." Even historian John Moeser suggested that removing the 47,000 annexed white votes, all eight of the additional candidates, and distributing the remaining votes among the twenty one remaining candidates, "it is highly doubtful that Holt would have been among the top nine candidates." However, Curtis Holt believed the 1969 annexation ruined his councilmanic bid, thus he attacked it in court.[119]

Curtis Holt's ability to serve both working and middle-class black agendas began his political ascendancy. Despite low economic and educational status, Holt was a conduit between black leadership and their working-class voters. After a construction accident rendered him permanently disabled, Holt became a resident of the Creighton Court Housing Projects in the 1950s. After his accident, Holt entered politics by gaining the trust of both black middle and working classes. For working-class blacks, Holt appeared as the man of the people. After the city council refused to put a traffic light in front of Creighton Court Housing Projects, on Nine Mile Road, Curtis Holt spent every weekday afternoon

---

[119] 1970 Councilmanic Election Results; Moeser and Dennis, *Politics of Annexation*, 143; and Interview with John Moeser, January 5, 2016.

directing traffic so black children could safely get off the school bus. Holt used his display of communal leadership to unite working-class blacks into the Grassroots Coalition. In this coalition, Holt helped register East End black voters for the Crusade to use throughout the 1960s. In one election, his organization helped register over 3,000 voters alone. Holt's community efforts, and mobilization tactics, made him an important man in the black community by 1970.[120]

The class differences illuminated by the 1969 annexation, forced Holt to split from black leaders. Holt wished to sue the city council immediately following the 1970 council election however, the local NAACP refused to take up his case. "They gave me the runaround…they're all so busy…some didn't even return my phone calls," said Holt. This only affirmed his and other blacks' suspicions that "the power structure is only using middle-class blacks to continue to isolate the grassroots blacks in order to keep the city running in the hands of the power structure." Holt's opposition to annexation brought out the class disparities that the Crusade was able to bypass in the mid-1960s. Moreover, working-class blacks supported Holt, as the lawsuit separated him from Crusade leadership. "What I can't understand is what makes a black politician think that once he is elected to office, all he has to do is just sit back and wait until his people elect him again and again," argued one Holt supporter. She highlighted how opposition to annexation made black class relations complex because "some of them [middle-class blacks], a poor black person cannot even present a problem to, because if they have ever had their problem they don't have it now." Because Holt refused to drop his case against the city, for what he felt

---

[120] Interview with Reverend Benjamin Campbell, January 6, 2016. Holt also started the Creighton Court Civic Association in 1958, which organized the grievances of public housing tenants into petitions for the Richmond Redevelopment Authority to address. This, along with his community service, made him a well-know, but not well-liked, community leader in Richmond.

was an illegal annexation, he and black leadership grew apart. This alianed Holt from the same black leadership he helped gain power throughout the 1960s.[121]

Holt's split from Crusade leadership exposed deeper divides in Richmond's black community. Richmond's black community often "imitated white class divisions, but with "greater anxiety," according to author Benjamin Hill. Richmond, more than any other city in Virginia, had rigid class systems. Poor and middle-class whites in Richmond's Southside and wealthy West End whites had little to nothing in common, other than being white. Richmond's black community had class issues however, Jim Crow Era racism united them because middle-class blacks lived amongst their working-class counterparts. As Jim Crow fell, through voting rights and school desegregation, class disparity became more visible. Black professionals were able to buy homes during urban redevelopment, whereas poor blacks could not. Middle-class blacks attended white public and private schools, whereas working-class black children did not. As the black middle-class gained urban leadership positions, such as Urban League President, City Councilman, Housing Committee Member, Vice Mayor, and State Senator, its racial connection to the working-class became weaker and more vulnerable to class division.[122]

Rejection from black leadership, forced working-class leader Curtis Holt to align with annexed whites. In late 1970, Curtis Holt brought his case to Cabell Venable. The young white lawyer, who successfully defended the KKK just a few months prior, agreed to take the case to trial because this landmark case could, and ultimately did, propel his

---

[121] Frankel, Glenn, "Curtis Holt: Working Class Hero," *The Richmond Mercury* 2 (June 5, 1974), 10; and Jeroline E. Russell, Editorial "She Cites Reasons For Backing Holt," *Richmond Times Dispatch* June 2, 1970.
[122] Interview with John Moeser, January 5, 2016; Campbell, *Richmond Unhealed History*, (Brandylane Publishers, Inc., 2011), 130; and Interview with Benjamin Campbell, January 6, 2016. The Urban League President I am referring to is Randolph C. Kenny. Henry Marsh, Oliver Hill, Winfred Mundle, and B.A. Cephas were all middle-class blacks who were city councilmen. Both Marsh and Mundle served as Vice Mayor in the late 1960s, with attorney Douglass Wilder serving as a state senator in 1969.

legal career. Both Holt and annexed suburbanites shared similar interests. While Holt saw de-annexation as the means to acquire a city council seat, annexed residents saw de-annexation as the means to return to Chesterfield. Because helping Holt could ultimately bring about a mutually beneficial result, suburban neighborhood organizations paid Holt's legal fees. "We recognize the expense of litigation and are prepared to underwrite the cost…stating on behalf of the Councils, we want de-annexation," declaired Arthur R. Cloey, head of two South Richmond suburban civic associations. Cabell and the suburban patrons supporting Holt's case represented a political union between annexed whites and the black working-class leader. It was this strange partnership that fought tooth and nail to reverse the 1969 annexation.[123]

Curtis Holt used Civil Rights legislation as a tool against the city council's annexation. On February 24, 1971, Curtis Holt sued Richmond City in federal court over the 1969 annexation. Using *Perkins v. Matthews* as a precedent, Holt's attorney requested the annulment of the 1969 annexation, an immediate election following the ruling, and the removal of Richmond's right to annex. To Holt, the annexation's influx of 47,000 white voters violated his Fourteenth and Fifteenth amendment rights protected under Section I of both amendments. Holt's use of recent Civil Rights legislation illuminated his vision for post-Jim Crow Richmond. To Holt, post-Jim Crow Richmond was to have a black majority with working-class leadership within the council. No longer was power to be held by

---

[123] *Richmond Times Dispatch*, May 12, 1976; *Richmond Times-Dispatch,* October 18, 1972; *Richmond News Leader*, May 4, 1971; and Moeser and Dennis, *Politics of Annexation*, 149. It was discovered, during the federal testimonies in 1976 that Cabell's legal fees were paid by the Broad Rock Council of Civic Associations.

affluent whites or black professional leadership. Rather, men such as he should assume leadership in a majority black city.[124]

Holt's case brought about a complex hybrid legal battle within two different locations. Because *Holt* included possible civil rights violations, the annexation was discussed on two fronts. In Washington, DC, the United States District Court of the District of Columbia was given the authority, under the VRA, to federally approve any annexation that placed the previous racial voting majority into the voting minority. Because the city council never submitted the annexation to the Washington Court for federal approval, the Justice Department, headed by Acting Assistant Attorney General David L. Normal, was charged with investigating the annexation and rendering its opinion to the Washington court. In Richmond, Judge Robert Merhige headed the *Holt* case. Judge Merhige was to rule on *Holt* based on the federal approval or disapproval of the 1969 annexation. Although Holt's case was being argued in Richmond, the Justice Department's assessment, and the Washington court's annexation decision, determined whether Curtis Holt won or lost his class-action suit.[125]

The Justice Department's initial reaction to the annexation empowered Curtis Holt's case against the city. On May 7, 1971, Assistant U.S. Attorney General David L. Norman objected to the 1969 annexation because the city council neglected to seek federal

---

[124] 1965 Voting Rights Act, Section 5, sec. 42 USC sec 1973C; *Perkins v. Matthews*, 400 U.S. 379, 380-394; *Perking v. Matthews* (1970) was a Supreme Court that places all municipal annexations under the Voting Rights Act of 1965. Every annexation had to be approved by the Justice Department to ensure that the previous voting racial majority was not turned into a voting minority by the annexation.

[125] The Justice Department headed all Civil Rights cases dealing with municipal governments. Section V of the Voting Rights Act of 1965 brought all annexations that removed previous majorities to the minority voting constituency under federal jurisdiction. Richmond's city council never sought federal approval for the annexation. Therefore, the Justice Department decided whether it should stand or not. Holt's case was technically being fought in Richmond, however, much of what happened in Richmond was being decided in DC.

approval in 1969. Despite City Attorney Conrad B. Maddox Jr. requesting federal approval for the annexation based on its economic benefits, Holt's attorney and annexed leaders Ronald Livingston and Roger Griffin argued that the annexation was used by the city council to disenfranchise urban blacks. Norman's disapproval should have come as no surprise, given that Norman, unlike most President Richard Nixon supporters, was known for his sympathies for Civil Rights violations. This initial decision changed the game in Richmond. Holt's case like his 1970 councilmanic candidacy, was seen originally as a failure waiting to happen. However, Norman's federal objection to the annexation breathed life into Holt's case, because federal disapproval could have led to Judge Merhige ruling in Curtis Holt's favor.[126]

Both the Justice Department and Judge Robert Merhige aided black and white leadership interest by refusing to de-annex the suburbs. After the city council voted seven-to-two on implementing ward-style voting, the Justice Department found "no basis for withdrawing" their original objection. However, the annexation objection focused on voting, in that the new ward plans did not negate the obvious voting change the 1969 annexation caused. Norman's second objection did not mean the Washington Court would de-annex South Richmond, because Norman and the Washington Court favored "nonracially drawn councilmanic districts" not de-annexation. Similarly, on November 23, 1971, Judge Merhige ruled in favor of Holt by acknowledging the annexation violated his Fourteenth and Fifteenth amendment rights. However, Judge Merhige, like Norman, refused to de-annex South Richmond. Both Curtis Holt and city officials received half of

---

[126] *Holt v. City of Richmond*, 286-288; *Richmond Times Dispatch*, May 14, 1971; and *Richmond Times Dispatch*, June 2, 1971.

what they wanted. Curtis Holt's attorney proved city officials used their authority to strip working-class blacks of their civil rights as city officials kept annexed territories.[127]

The U.S. District Court of the District of Columbia's ruling on Petersburg, Virginia's, annexation case foreshadowed its decision on Richmond. On October 18, 1972, the Washington Court approved Petersburg City's annexation of Prince George County if "a ward system of electing its city councilmen" was implemented to reverse the new white majority from diluting the previous black majority vote. Like Richmond, Petersburg's white leadership annexed a small portion of Prince George County, bringing in over nine thousand white voters to dilute the black vote from fifty-six percent to forty-seven percent. This ruling set the precedent for Richmond's city council, as the Washington Court made it clear that Richmond's annexation, for that matter any race-based annexation could stand if the voting style was changed. As Richmond's case was moved up the docket, City Attorney Conrad Mattox and *Holt* Attorney Cabell Venable, as well as suburban leader Melvin Burnett understood that the continuous refusal to de-annex meant the annexation was more than likely going to stand.[128]

Seeing Petersburg's case as the example, Curtis Holt and his attorney believed city official's proactive voting changes hurt the possibility for de-annexation. After much

---

[127] *Richmond News Leader*, July 9, 1971; and Bart Barnes, "David L. Norman Dies at 70," February 8, 1995. Apart of Judge Merhige's ruling was that the city council host special elections in January of 1972, however that portion of the ruling was appealed by city officials and upheld by the appeals court and the Supreme Court in December on December 6, 1971. Both Holt and the city council appealed Judge Merhige's decision in the court of appeals, which deadlocked the *Holt* case. Curtis Holt appealed the refusal to de-annex based upon the annexation violating civil rights, and city officials appealed Judge Merhige's findings that the annexation was racially motivated, which could have allowed the Washington court to de-annex South Richmond. Also, city council elections were suspended by the Supreme Court until Holt and the annexation case was officially resolved. Therefore, the 1970 council remained in office until 1977. For more information, see *Holt v. City of Richmond*, 877.

[128] *Richmond Times Dispatch*, September 29, 1971; *Richmond Times-Dispatch*, November 23, 1971; and *City of Petersburg v. United States. 345 F. Supp. 1344 1021 (1972).*

infighting about the minutia of the ward proposals, on August 25, 1973, the city council, with Justice Department and Washington Court's Chief Justice Skelly Wright's approval, changed to ward-style voting. Richmond was divided into nine wards: four black wards (East End and Northside), four white wards (West End and Southside), and one swing vote or mixed ward (core). Holt and annexed residents lividly rejected the voting change as they believed the council was "us[ing] blacks as absolute fools." Changing the voting strategy put city official's one step closer to receiving federal approval on annexation. Rather, Curtis Holt and his attorney called for "black-white cooperation in the de-annexation case" because the "the voting rights of black citizens" were only restored if they were the city's majority. Despite Holt and Venable's opposition, the measure was passed and helped signal the end of Holt's case against the city.[129]

Despite the short gains made by the city council, *Holt* and the annexation wore down Richmond's white leadership. After U.S. Magistrate Lawrence Margolis recommended the Washington and Richmond Court's de-annex the suburbs, the Washington court issued a "no decision" on the annexation's constitutionality, and Holt's attorney filed two subsequent lawsuits against the city in the local court; three city councilmen resigned. The three exiting councilmen, William Daniel, Howard Carwile, and James Carpenter, all felt the city's legal troubles were too much to handle, while running their own day-to-day affairs. Many believed that if the six remaining councilmen selected Curtis Holt, the city's legal issues would end. Despite strong evidence supporting this suggestion, not one councilman placed his name into consideration. Instead, they chose two Team of Progress (TOP) supporters, Julius Johnson and Raymond Royall, along with

---

[129] *Richmond News Leader*, October 26, 1973; *Richmond Times-Dispatch*, August 24, 1973; Interview with Wayland Rennie; and "The Crusade Decision," *Richmond Afro-American*, 1973.

Crusade supporter Willie Dell. This move reflected the collective efforts of middle-class black and white elites to oppose Holt and his suburban patrons.[130]

With the resignation of three councilmen, white leadership began a series of strategies preparing Richmond for its impending black leadership. The end was so close "they could smell it," as white leaders systematically removed themselves and their business interest to the suburbs. First, the council allowed Amtrak to move to Henrico County. Although "federal legislation said it had to stay in town," the council allowed Amtrak to build a suburban station on Staples Mill Road, signaling its transition to the suburbs. This removed income from city coffers. The city council set up the Marymount Park Foundation to allocate tax revenue to pay for its upkeep because they felt whenever "the black folks took over, they wouldn't know how to take care of it." The white council, through the Downtown Development Unlimited, set up a "bond reserve fund of about nine million a year out of its operating budget" to pay the city's bond holders for infrastructural upkeep. White councilmen approved the creation of magnet schools that worked with Virginia Commonwealth University, University of Richmond, and Virginia Union University, to stimulate Richmond's failing public education system. These measures were only a few in a series of ventures taken by white leadership to prepare the city for life without them.[131]

In the midst of white leadership's transition out of the city, the Washington Court affirmed the legitimacy of the annexation. After the Supreme Court heard and ruled in favor of City Attorney Mattox's appeal to Margolis's de-annexation recommendation, in

---

[130] *Richmond Times-Dispatch* February 4, 1974; *Richmond News Leader*, February 4, 1974; and *City of Richmond v. United States, United States District Court of District of Columbia.*
[131] Pratt, *Color of Their Skin*, 94; and Interview with Benjamin Campbell, January 6, 2016.

October of 1975, the Washington Court allowed city officials to retain the annexation if they could show "verifiable economic or administrative benefits" from the acquisition. City officials argued that Holt's solution would financially bankrupt the city. De-annexation meant "rendering Richmond a vast ghetto...giving up $435 million worth of taxable property." Likewise, the Crusade submitted an editorial to convince black residents that de-annexation only benefitted "white citizens in the annexed area...If black voters can obtain significant power in an expanded city, they will be able to direct city government so as to benefit both blacks and whites," removing the financial troubles "within its old boundaries." Holt's attorney addressed the black and white elite partnership in the Washington Court. Cabell noted that urban blacks felt the financial burden of allocating public services to the suburbs. Venable also used race to argue that annexation support was "merely a second line defense of white supremacy and a first line defense of personally motivated black political bosses who insulate themselves in pocket boroughs." Venable reasoned that the annexation was nothing more than black and white elites trying to prevent working-class "men like Curtis Holt from obtaining office." Venable's class and race-centered argument against the annexation failed, as the federal court approved the annexation on August 9, 1976.[132]

The federal ruling solidified black and white urban leadership political victory over Holt and the annexed suburbanites. Despite Venable's objection to the federal court ruling, the annexation was rock solid by August 9, 1976. The publicity of Holt's class-action suit was not enough to reverse the secret deal made by Phil Bagley and Irvin Horner in May of

---

[132] Moeser and Dennis, *Politics of Annexation*, 177; *City of Richmond v. United States*, 334 Supp 1030; Interview with Wayland Rennie; "Closed Council Meet Irks Carwile and Holt," *Richmond Afro-American* July 11, 1970; and *City of Richmond v. United States*, 95 S Ct. 2298. *City of Richmond v. United States*, 95 S Ct. 1770.

1969. Curtis Holt and the annexed residents' Civil Rights Era political coalition ended in defeat. Both agendas aligned on de-annexation and both agendas died on de-annexation. Despite the new ward system and notoriety he gained from opposing urban leadership, Holt never became a city councilman. Although annexed residents went as far as not paying local taxes during the trials, their residency remained within city limits.[133]

Coming off of the *Holt* trials, Richmond was ripe for a racial shift in the city council. The first phase of Richmond's post-*Holt* black political takeover was done through education. In 1976, Richard C. Hunter became Richmond's first black school superintendent. With the 1977 election season heating up in December of 1976, it was a forgone conclusion that at least four blacks were winning council seats. The Justice Department forced the white city council to change from at-large to ward-style voting. Because blacks were the voting majority prior to the 1969 annexation, the new ward system placed more voting wards in black dominated districts. Four of the new nine districts were majority black, while one the swing district was over fifty percent black as well. After the Justice Department removed the ban on citywide elections on March 1, 1977, seven days later, Richmond elected its first majority black city council consisting of Crusade endorsees Henry Marsh III, Walter T. Kenney, Claudette McDaniel, Willie J. Dell, and "Bad Luck" Henry (Chuck) Richardson. The majority black council's first action, signaling the racial shift the city and its council experienced in the last seventeen years, was their election of Henry Marsh III as Richmond's first black mayor.

**Conclusion**

---

[133] *Richmond News Leader*, May 30, 1976.

The 1969 annexation, along with *Bradley* and *Holt*, simultaneously created political partnerships that would have never been dreamed of before 1970. While urban white officials worked with *Bradley* attorneys to desegregate city schools, annexed suburbanites and working-class blacks partnered in their objection to integrated schools. Likewise, black and white leadership collectively opposed Curtis Holt's bid for urban power, while suburbanites, with attorney Cabell Venable, financially supported Holt's political agenda to get their neighborhoods de-annexed from the city. The annexation, which tied both *Bradley* and *Holt* together, illuminated why race alone cannot explain Civil Rights Era Richmond. Complex political battles, secret dealings, and class-centered interest all influenced constituencies within both races to make allies where they could to achieve their desired result. A man like Curtis Holt, who was "shrewd and intelligent" was little more than an "embarrassment" to black leadership, yet he gained political support for his case across racial lines. White leadership, who wanted to maintain power over Richmond, aligned with black leaders, whom the opposed in urban elections, when challenged by their suburban neighbors. Race can not alone explain Richmond's Civil Rights Era urban politics.

The truth is race, class, and geography culminated to create this complex Civil Rights Era drama. The use of race, class, and geography as political currency had limits however understanding how those limits intersect to create uncommon alliances, dictated the framework for understanding Civil Rights Era Richmond. Furthermore, as school desegregation and urban politics created Richmond's black identity, the complex, agonizing, and controversial issues raised in the process will forever be the legacy left by Richmond's Civil Rights Era.

## Epilogue: Post-Civil Rights Richmond

In the first two weeks after the 1977 councilmanic election, Marsh redefined the office of mayor. Marsh wanted to be the face of the city, rather than the figurehead elected by his friends on the city council. To establish his mayoral presence, Marsh removed the white city manager and replaced him with lesser known black bureaucrat Manual Deese. Before the 1977 election, the white majority council selected William J. Leidinger as city manager, hoping he would maintain affluent white business interest in City Hall. Marsh's first course of action was requesting that City Manager Leidinger resign immediately. After the Richmond Business Community threatened to pull its support from Marsh, he and the four black councilmen all voted to remove Leidinger from office. This move by Marsh not only, as Moeser suggested, cemented the councilmanic power shift, it created a whole new battle between black councilmanic leadership and white business interest, a battle that black leaders ultimately lost.[134]

**The 1980s: Richmond Goes Broke**

First on council's agenda was rebuilding Richmond's economy. After the council removed Leidinger from his duties, the five black councilmen focused on easing white anxiety over the power shift. Henry Marsh III, like other black councilmen, received numerous death threats to his office and home. White hostility to the black council made every day "a battle" that was "just downright cut-throat." The best way to ease white discontent was through redevelopment, something white residents and leadership favored throughout the 1960s and 70s. This redevelopment, however, included a revival of large retail stores in the downtown shopping district. The idea depended on large local retail

---

[134] *Richmond News Leader*, August 15, 1978.

chains, Thalhimer's and Miller & Rhodes, to anchor retail flight back to downtown Richmond. This plan, called Project One, was approved by the black majority council and former mayor Thomas Bliley, who represented what was left of Richmond's white business leaders.[135]

The black council's economic redevelopment strategy failed. Although Phillip Morris, the city's largest private sector employer, created 1,800 new jobs by 1980, many white business leaders refused to work with the black council. In 1981, the Hilton Corporation announced its plans to build a new hotel in the same business zone as Project One. If the hotel was built, it spelled the end of Project One's biggest projected moneymakers, the hotel. To thwart The Hilton Corporation's clear attempt to derail the black council's version of urban redevelopment, the council developed and "passed a specific ordinance" preventing Hilton's hotel construction. Eventually, the city council was sued and settled out of court, allowing Hilton to build its hotel. This move created a storm that the council could not control. Not only did it expose how the black council would use its power to achieve a self-serving end, it reminded residents that blacks controlled the council, but whites controlled the economic fate of the city.[136]

The Hilton controversy highlighted the rivalry between black and white leaders. Despite Justin Moore, head of Richmond's only electric company (VEPCO) helping to fund the Sixth Street Marketplace in 1985, affluent white leaders relocated their businesses to the suburbs. Men like Miller & Rhoads Department Store owner Thomas P. Bryan Jr., Universal Leaf Tobacco president Howard Cone, and head of First and Merchants National Bank Bruce Nolte all moved their business interests into Henrico and Chesterfield or sold

[135] Campbell, *Richmond's Unhealed History*, (Brandylane Publishers, Inc., 2011), 177-178.
[136] Campbell, *Richmond's Unhealed History*, 180.

their businesses on the open market. In the midst of relocating, all of the men, with former City Manager William Leidinger, fought every zoning proposal and land deal with Henrico and Chesterfield Marsh and fellow council members suggested. While it appeared as political strife between former and new urban leadership, it is clear that post-Civil Rights Era political strife brought out Jim Crow Era racial tensions. Oliver Hill, former black city councilmen, suggested that "the real issue" was that "the Richmond newspapers and white citizens generally," have "unending resistance" to the reality of Richmond's black controlled city council.[137]

Race and space defined Richmond's black leaders' poor working relationship with suburban leaders. Just as affluent whites battled with suburban leaders in the 1960s and 1970s, post-Civil Rights Era black leaders fell victim to the same city-county political dichotomy. In the 1980s, suburbia attracted yet another constituency away from the city's tax base: the black middle-class. Racial and class unity had limits, as middle-class blacks fled the city in search of the same suburban class-centred suburban lifestyle the silent majority chased throughout the 1960s and 1970s. As the urban housing market sunk and city schools became more impoverished, black porfesionals it "became about where you can buy a house or what school district you could afford to live in," according to author Benjamin Campbell. It became clear that the black middle-class exacerbated its economic, political, and social potential in Richmond. As Chesterfield and Henrico gained a stronge black tax base, both leaderships refused to work with urban leadership on cooperative public projects like rebuilding schools, shared roads, maintaining public parks, and creating consolidated prison systems. In all, the urban-suburban political strife only intensified

---

[137] *Richmond Times Dispatch,* June 24, 1981.

when black leadership assumed the city council, as suburban economic power incentivized its leaders to not cooperate with black city officials.[138]

State and federal powers ensured Richmond remained poverty-stricken under black leadership. By 1985, annexation laws, business relocation, and middle-class (black and white) flight depleted city coffers. City debt tripled that of Chesterfield and Henrico, as both counties were in their second stage of deindustrialized economic growth. Decreased revenue prevented city councilmen from obtaining bonding capacity to rebuild dated infrastructure and maintain municipal jobs. Although the city had a bond reserve fund of about nine million dollars, it was not enough to take out new loans and pay bondholders from the 1969 annexation, redevelopment projects from the mid-1960s, and the Sixth Street Marketplace in 1985. After the General Assembly refused to help, City Manager Manual Deese secured private funding for new bonding capacity however, bondholders only released funds to pay the city's previous bond holders. This created a cycle of long-term debt, preventing any chance of economic stability. Adding insult to injury, the General Assembly and the Federal Highway Administration co-funded circumvential highways around Richmond. These highways, I-295 and Virginia State Route 288 cost over 1.1 billion dollars and eliminated "the center city as a necessity" for suburbanites and corporate business interest. As state and federal powers hindered Richmond's economic development, the city fell deeper into economic poverty.[139]

**The 1990s: Drugs and City Hall**

---

[138] Interview with Benjamin Campbell, January 6, 2016; Matthew Lassiter, *Silent Majortiy*: *Suburban Politics in the Subelt South* (Princeton University Press: 2006), 294; Campbell, *Richmond's Unhealed History*, 180; Robert Pratt, The *Color of Their Skin: Education and Rce in Richmond, Virginia, 1954-89* (Charlottesville: University of Virginia Press, 1992), 94-95.

[139] John V. Moeser and Rutledhge M. Dennis, *The Politics of Annexation: Oligarchic Power in a Southern City (Shenckman Publishing Co.: 1982)*, 187-188; Interview with John Moeser, January 5, 2016; Campbell, *Richmond's Unhealed History*, 195; and Interview with Benjamin Campbell, January 6, 2016.

Throughout the 1990s, political corruption became the hallmark of Richmond's city council. Henry (Chuck) Richardson, resigned in 1995 after being convicted of running an elaborate heroin operation out of the city council. Although Richardson fancied himself a "public relations consultant and real estate agent," FBI investigations proved he was a lifelong heroin dealer and user who became a prominent member Richmond's black elite without having a legal occupation. Richardson used his council seat to give municipal contracts to fellow drug dealers who laundered money through legitimate businesses. What made this resignation peculiar was the support Richardson received from the same community who knew of his illegal activities. Not only was Richardson a known heroin dealer, he was reelected four times after having "annual brushes with the law" over cocaine, heroin, and drunken driving charges. "He was our Robin Hood…they won't let a good man serve us" said thirty-year-old single mother Karen Williams who, like many black Richmonders, saw Richardson as a man of the people, rather than the urban slum lord the 1960s white media predicted would come to fruition with black leadership. Despite publicly swearing off drugs, after a 1988 cocaine incident landed him in drug rehab, Richardson landed back in jail several times, all while having the longest tenure on the council by 1996.[140]

Richardson's reputation and antics only tarnished the legacy of the 1977 power shift. Throughout the 1990s, Councilman Richardson earned the name "Bad Luck Chuck," as his run-ins with law enforcement placed a negative image upon himself and the black city council. Richardson's last straw came on April 8, 2004, when police sergeant Anthony Franklin uncovered a marijuana lab, crack cocaine, and boxes of syringes at Richardson's

---

[140] "Richmond Official Quits After Drug Charges," *New York Times*, September 19, 1995.

home during a drug sweep. Although Richardson was acquitted because his son, Karl Richardson, confessed to running the marijuana and crack cocaine business, Chuck's checkered past suggest he was always the brains of the operation. Chuck's life was defined by drugs. Whether selling or using, Chuck was known throughout the city for his leadership over Richmond's criminal underworld. As the council's influence spiraled into obscurity, Chuck Richardson's reputation became the symbol of corruption under which the black city council was remembered.[141]

Many believed that Chuck Richardson's demise, along with the image of black councilmanic leaderships, was no coincidence. Men like Henry Marsh, Howard Carwile, James Carpenter, and Walter T. Kenny, all left urban politics for state politics, national politics, or retirement by 1992. Although these men were remembered as Civil Rights Era leaders, they relied on men like Chuck Richardson to mobilize the working-class black voters that the black intelligencia lost touch with. As Civil Rights Era leaders transcended urban politics, some believe Richardson became expendable. Urban blacks believe Chuck's misfortune was "revenge by the establishment" who had no use for a man with his checkered past. White and black leaders knew who Chuck was before his 1980s and 1990s legal troubles, however, it was not until after his allies left city politics did he become a constant target by police. This could be speculation, yet the mood amongst thirty-to-sixty-year-old blacks who remember Chuck is that he "stepped into a trap" once black politicians did not need neighborhood crime bosses to mobilize black voters anymore.[142]

**The 2000s: Public School Failure**

---

[141] "Bad Luck Chuck," *Style Weekly*, October 30, 2012.
[142] "Richmond Official Quits After Drug Charges," *New York Times*, September 19, 1995.

The early 2000s were defined by economic and racial re-segregation impacting public education. Public schools reflected how economic flight, black middle-class flight, and non-cooperation from surrounding counties impacted Richmond. After 1986, the city council removed cross-town busing and implemented school zones. This allowed West End whites to attend public school without fearing black influx. To keep the brightest black pupils from attending private schools, the council invested in charter schools, such as Open High School, Richmond Community, and Franklin Military Academy. Although these helped retain the brightest of the plus eighty-five percent black public school population, by 2010, state financial aid decreased due to low state test scores labeling Richmond schools as "failing" institutions not worth investment.  This resonated in Governor Robert McDonell 2011 removal of more than 5 million dollars from the city's public school budget, making Richmond 10% of the state's public education budget cut.[143]

**Today: My Experiences**

Just as Virginia Union University (VUU) inspired Richmond white-to-black transition in the 1960s, Virginia Commonwealth University (VCU) is the backbone of black-to-white gentrification. In the 1960s, VUU affiliates like Dr. William Thornton, Raymond Hilton, and Henry Marsh inspired the social unrest leading to Richmond's black powershift. Today, VCU is undoing the Civil Rights Era racial transition through structural gentrification. As new libraries, educational buildings, condos, downtown businesses, athletic centers, and shopping malls are replacing old black business and residential districts. This gentrification is increasing Richmond's white population. As of 2014, whites made up 44% of city residents. This rise from below 15% in the 90s came undoubtedly

---

[143] Aid for Public Education: 2011-2012, *Summary of Governor's Proposed Amendments* to the 2011-2012 Budget.

from increased VCU enrollment and the capital investment VCU expansion inspired. Once the hotbed for white flight, Richmond is becoming one of the most sought after residential and business destinations for whites in the metropolitan area.[144]

Growing up in the Richmond metropolitan area gave me a nuanced understanding of the racial system the transition created. Richmond's racism is structural: with education and economics ensuring blacks have limited access to upward social mobility. While structural and systematic, race has its limits. Middle and upper-class black Richmonders survive structural racism by understanding and navigating around the racially coded barriers that blur the sources of black poverty. For example, high test scores in all-black public schools, or attending majority white private schools gives blacks access to universities, connections, job skills, and occupations that are not otherwise available. Blacks who access these tools understand that working with whites is the only way to convert their skills into wealth. Black business owners run their day-to-day affairs in black neighborhoods, yet the majority live in white suburbs and send their children to white private or public schools. The black community cannot create its own collective wealth because their middle-class professionals nor municipal government will invest into them as a whole. Rather, whoever can ascend from poverty, usually does so at the expense of the blacks surrounding them.

Race is more of an issue now than it has ever been in the metropolitan area because it highlights insecurities over the results of the Civil Rights Era. Race in the metropolitian area cannot be addressed by either blacks or whites because racial discrimination was never resolved by Jim Crows' demise. Despite VCU, the Virginia Historical Society, and the

---

[144] U.S. Bureau of the Census, City of Richmond, Virginia, 2014.

University of Richmond (UR) numerous efforts to make race a part of the metropolitan history, most whites rather not discuss the topic. Parents of West End Richmond's Glenn Allen High School complained that lessons about race are nothing more than using "white guilt" as a divisive topic. Race can only be divisive if it illuminates an active problem, yet this is accepted by white residents. Matthew Lassiter's assessment of white collar racial innocence and suburban exclusion from race issues still exist today in the metropolitan area. It is difficult for whites to accept that their middle and upper-class lives exist at the expense of the blacks who were economically trapped in a decrepit inner-city just over fifty years ago.[145]

In all, the Civil Rights Era hindered Richmond's social growth. With Civil Rights legislation, Richmond had the potential to send shockwaves throughout the nation by being the first southern city to remove racial discrimination and discourse. The only way for the post-racial society to exist was through blacks and whites refusing to use race in the political, economic, educational, and social arena. Instead, both blacks and whites used race to obtain political power in the post-Jim Crow world. My own family refuse to let go of race when they were some of the middle-class blacks to flee to Chesterfield after the 1977 election. Why didn't the Civil Rights Era produce a racially blind Richmond? Because blacks and whites retained Jim Crow Era racial norms where the Civil Rights movement was felt the most. This created one of the most racially charged times in city history, as economics, education, and politics all centered on racial uncertainty. Nevertheless, blacks gained municipal control in Richmond, but it drove racial fears and

---

[145] "Henrico County's Censorship: Kids, it's OK to be Ignorant," *Shout Out JMU*, February 17, 2016.

uncertainty past the point of reconciliation. This is why the Civil Rights Era failed to bring about a post-racial society in Richmond, Virginia.

Bibliography

**Primary**

*Bradley v. Richmond School Board*. 416 U.S. 696-99 (1962).

*Bradley v. Richmond School Board*. 325 F. Supp. 834 (ED Va.. 1972).

*City of Petersburg v. United States*. 345 F. Supp. 1344 1021 (1972).

*City of Richmond, Virginia v. United States of America. 95 S. Ct. 2296 (1975).*

*Charter of the City of Richmond, Virginia*, Section 7.02.

*Code of Virginia* Section 15.1-1044.

*Curtis Holt, Sr. v. City of Richmond*, No. 151-71 R. (U.S. District Court of the Eastern
District of Virginia) 1971.

*Green v. County School Board of New Kent,* 391 U.S. 430 (1968).

Howard H. Carwile Papers (1940-1979), M 294 Box 1-12, James Branch Cabell Library,
Virginia Commonwealth University.

Interview with Benjamin Campbell, January 6, 2016

Interview with Isaiah Hilliard, May 18, 2015.

Interview with John Moeser, January 5, 2016.

Interview with Leroy Chiles, May 18, 2015.

Interview with Mary Tate, May 15, 2015.

Interview with Ron Bacigal, May 12, 2015.

Interview Wayland Rennie, June 18, 2015.

*Richmond Afro American* 1960-77.

*Richmond News Leader* 1960-78.

*Richmond Times-Dispatch* 1960-81.

State of Virginia, General Assembly, *Proceedings and Debates of the Virginia House of
Delegates pertaining to Amendment of the Constitution*, Extra Session 1969.

Richmond Annexation Files, August 27, 1983, M 183 Box 1-14 James Cabell Library,
Virginia Commonwealth University.

Richmond Crusade for Voters Archives, M 306 Box 1 James Branch Cabell Library,
Virginia Commonwealth University.

Richmond First Archives, M238 Box 1-5, James Branch Cabell Library, Virginia Commonwealth University.

U.S. Bureau of the Census, Richmond, Virginia, Chesterfield County, Virginia, and Henrico County, Virginia 1950-1980.

U.S. Civil Rights Commission, *The Voting Rights Act: Ten Years After*, January, 1975.

Virginia Crockford Papers, Box 1-4, James Cabell Branch Library, Virginia Commonwealth University.

*Warden v. Richmond School Board* 6 Race Relations Law Reporter 1025 (ED Va. 1961).

**Secondary:**

Kusmer, Kenneth L, and Joe W. Trotter, ed. *African American Urban History Since WWII*. University of Chicago Press, 2009.

Bacigal, Ronald J. *May It Please The Court*: *A Biography of Judge Robert Merhige Jr*. Lanham, Maryland: University Press of America, 1992.

Bain, Chester W. *A Body Incorporate: The Evolution of City-County Separation in Virginia* Charlottesville: University of Virginia, 1967, 26.

Barnes, Bart. "David L. Norman Dies at 70," *Washington Post*. February 8, 1995.

Barnes, Annie S. *The Black Middle Class Family: A Study Of Black Subsociety, Neighborhood, And Home In Interaction*. Bristol, Indiania: Wyndham Hall Press, 1985.

Campbell, Benjamin. *Richmond Unhealed History*. Brandylane Publishers, Inc., 2011.

Cashin, Sheryll. *Place Not Race: A New Vision of Opportunity in America*. Boston, Mass: Beacon Press, 2014.

Cohen, Lizabeth. A Consumers' Republic: *The Politics of Massive Consumption in Postwar America*, New York: Vintage Books, 2004.

Cowie, Jefferson R., and Joseph Heathcott. *Beyond The Ruins: The Meanings Of Deindustrialization*. Ithaca: ILR Press, 2003.

Dabney, Virginius. *Richmond: The Story of a City*. New York: Doubleday, 1967.

Darden, Joe T., Richard Child Hill, June Thomas, and Richard Thomas. *Detroit: Race and Uneven Development*. Temple University Press, 1987.

Dennis, Rutledge. "Socialization and Racism: The White Experience," Benjamin P. Bowser and Raymond G. Hunt, *The Impact of Racism on White Americans.* Beverly Hills: Sage Publications, 1981.

Dickinson, A.J. "Myth and Manipulation: The Story of the Crusade for Voters in Richmond Virginia," *Scholar of the House Paper*, Yale University, 1967.

Holton, Dwight Carter. "The Richmond Black Community Prior to 1956 and the Birth of the Richmond Crusade for Voters," M.A. Thesis, Virginia Commonwealth University.

Eisinger, Peter K. *The Politics of Displacement: Racial and Ethnic Transition in Three American Cities*. London, Academic Press, 1980.

Formisano, Ronald P. *Boston Against Busing: Race, Class, And Ethnicity In The 1960s And 1970s*. Chapel Hill: University of North Carolina Press, 2004.

Frymer, Paul. *Black and Blue: African Americans, the Labor Movement, and the Decline of the Democratic Party*. Princeton University Press, 2008.

Green, Laurie B. *Battling the Plantation Mentality: Memphis and the Black Freedom Struggle*. University of North Carolina Press, 2007.

Goldfield, David R. *Black, White and Southern Race Relations and Southern Culture 1940 to Present*. Baton Rouge:Louisiana State University Press, 1989.

Goldschmid, Marcel L. *Black Americans and White Racism*: *Theory and Racism*, New York: Holt, 1970.

Hammock, Allan Statton. "The Leadership Factor in Black Politics: The Case of Richmond, Virginia," Ph.D. Dissertation, University of Virginia, 1972.

Hamilton, Donna Cooper, and Charles Hamilton. *The Duel Agenda: Race and Social Welfare Policies of Civil Rights Organizations*. Columbia University Press, 1997.

Hornsby, Alton. *Black Power In Dixie: A Political History Of African Americans In Atlanta*. Gainesville: University Press of Florida, 2009.

Sartain, James A. and R.M. Dennis. "Richmond, Virginia: Massive Resistance without Violence," *Community Politics and Educational Change*, ed. Charles V. Willie and Susan L. Greenblatt. New York: Longman Publishers, 1981.

Wilkerson III, J. Harvie, *Harry Byrd and the Changing Face of Virginia Politics, 1945-1966*. Charlottesville: University of Virginia Press, 1968.

Trotter Jr., Joe William. *Coal, Class, and Color: Black in Southern West Virginia 1915-32*. University of Illinois Press, 1990.

Kruse, Kevin M, and Thomas J. Sugrue, *The New Suburban History*. University of Chicago Press, 2005.

Kruse, Kevin Michael. *White Flight: Atlanta And The Making Of Modern Conservatism*: Princeton, N.J: Princeton University Press, 2005.

Lassiter, Matthew D. *The Silent Majority: Suburban Politics In The Sunbelt South*. Princeton University Press, 2006.

Leinwand, Gerald. *The Negro In The City*. New York: Washington Square Press, 1968.

Metlaf, George R. *From Little Rock To Boston: The History of School Desegregation*. Westport, Connecticut, 1983.

Moeser, John V., and Rutledge M. Dennis. *The Politics Of Annexation: Oligarchic Power In A Southern City*. Cambridge, MA: Schenkman Pub. Co., 1982.

Mumford, Kevin. *Newark*: *A History of Race, Rights, and Riots in America*. NYU Press, 2007.

Jones, Murel M. Jr. "The Impact of Annexation-Related City Council Reappointment on Black Political Influence: The Cities of Richmond and Petersburg," Ph.D. Dissertation, Howard University, 1977.

Perry, James Oliver. "An Analysis of the Negro Influence in Richmond's 1966 Councilmanic Election," M.A. Thesis, University of Richmond, 1968.

Roland, Charles P. *The Improbable Era*. Lexington: The University Press of Kentucky, 1975.

Silver, Christopher. "Impediment to Greatness: The Failure of City County Consolidation in the 1960s," Ph.D. Dissertation, University of North Carolina at Chapel Hill, 1981.

Silver, Christopher. "The Planning Function and the Politics of Reform: Richmond, Virginia's Charter Revision of 1918 and 1948," M.A. Thesis, Virginia Commonwealth University, 1980.

Stein, Judith. *Pivotal Decade: How The United States Traded Factories For Finance In The Seventies*. New Haven: Yale University Press, 2010.

Sugrue, Thomas J. *The Origins of the Urban Crisis: Race and Inequality In Post War Detroit*. Princeton University Press, 2005.

Teaford, John C. *The American Suburb: The Basics*. New York:  Routledge, 2008.

Temple, David, G. *Merger Politics: Local Government Consolidation in Tidewater Virginia*. Charlottesville: University of Virginia 1972, 1.

Pratt, Robert A. *The Color of Their Skin: Education and Race in Richmond, Virginia 1954-89*. Charlottesville: University Press of Virginia, 1992.

V.O. Key, Jr. *Southern Politics*. New York: Vintage Books, 1959.

Watras, Joseph. *Politics, Race and Schools: Racial Integration*. *1954-1994*. New York: Garland Publishing, 1997.

Wright, Gavin. *Sharing the Prize: The Economics of the Civil Rights Revolution in the American South*. Harvard University Press, 2013.