

**INDIANA UNIVERSITY PRESS**

"Tough on Conduct:" Punitive Leadership in Urban Public Schools, A Case Study of Angry Principal Dr. Roy A. West, 1986—1991

Author(s): Marvin T. Chiles

Source: *Spectrum: A Journal on Black Men* , Fall 2020, Vol. 8, No. 1 (Fall 2020), pp. 55–85

Published by: Indiana University Press

Stable URL: https://www.jstor.org/stable/10.2979/spectrum.8.1.04

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2979/spectrum.8.1.04?seq=1&cid=pdf-
reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Indiana University Press* is collaborating with JSTOR to digitize, preserve and extend access to
*Spectrum: A Journal on Black Men*

# "Tough on Conduct:" Punitive Leadership in Urban Public Schools, A Case Study of *Angry Principal* Dr. Roy A. West, 1986–1991

## Marvin T. Chiles

ABSTRACT: This article examines the troubled career of Black inner-city principal Dr. Roy Alexander West from Richmond, Virginia. In conjunction with recently organized school board minutes, personal interviews, newspapers accounts, court cases, and archival collections, the article argues that Black public school administrators struggled among themselves over the use of proactive, tough-on-crime discipline during the 1980s; a time when urban schools shifted their focus from integration to educational reform. This article challenges the scholarly consensus by Hinton (2016), Sudler (2017), Simmons (2017), and Agyapong (2018) that the school-to-prison pipeline evolved into a fixed network where underfunded public schools worked hand-in-hand with police, courts, and legislators to criminalize and incarcerate Black children. The urban Black educational crisis in the 1980s should be studied by urban, African American, and education scholars because it reflects how punishing Black children became a vital part of America's response to the poverty, crime, and de facto segregation caused by the failures of the modern Civil Rights Movement.

*Spectrum,* 8(1), 55–85. Copyright © 2020 Trustees of Indiana University and The Ohio State University. doi: 10.2979/spectrum.8.1.04

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Between 1982 and 1989, Dr. Roy Alexander West was both the Mayor of Richmond, Virginia, and a principal in Richmond Public Schools (RPS). The conservative, punitively minded educator spent most of his career blurring the lines between education and politics to improve the quality of RPS's overwhelmingly Black and underperforming school district. West's main tactic was bestowing power in the principal's office and implementing tough-on-crime policies to curb delinquent behavior. This effort landed him in court in 1987 and later out of a job in 1991. West's story should be remembered because it sheds light on the conundrum Black educators faced back then, and now, with providing Black youth with quality schooling as *Brown v. Board* and forced busing failed to provide educational equality between Blacks and Whites.

In telling the story of Roy West's battles with RPS, this article informs the growing scholarship about the school-to-prison pipeline after the modern Civil Rights Movement (1954–1968). Historians Fortner (2015) and Foreman (2017) argue that middle-class Blacks and Whites championed punitive anti-crime legislation to clean up urban areas after the violent civil rights protests of the 1960s. The unintended consequence was, as argued by Simmons (2017), the Black prison diaspora: a legal system that evolved from slavery and Jim Crow to pipeline Black children into local jails, private prisons, and state penitentiaries. In spite of their different approaches, historians who study mass incarceration agree that the politics of punishment defined Black urban life in the 1980s. In the process, they portray the school-to-prison pipeline as a fixed network where underfunded public schools worked hand-in-hand with police, the courts, and legislators to criminalize Black children (Gottschalk, 2006, 2014; McLennan, 2008; Agyapong, 2018; Sudler, 2017; Hinton, 2016; Alexander, 2010; Simmons, 2017).

West's story shows that the transformation of majority Black urban schools from "particularly chaotic, if not themselves crime producing," to anti-crime institutions was contested (Arum, 2003, p. 2). While there was a tough on crime consensus among legislators, judges, police, and middle America in the 1980s, urban public-school administrators were unsure about how to implement punitive disciplinary measures. This unsureness came from the growing politicization and bureaucratization of urban school districts, which made meaningful reform nearly impossible. Black leaders like Roy West believed principals had the moral authority to uplift Black youth through punitive anti-crime measures. West's agenda ran afoul with the very litigious students' right movement—a multiracial, loose coalition of students, parents, and lawyers who sued school districts to ensure that students maintained their most basic Constitutional rights while being punished. West's unsuccessful case against six Black students in 1987 compelled the all-Black school board in Richmond, like those elsewhere, to minimize the disciplinary powers of

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

principals by the early 1990s. While scholastic underachievement and crime persisted, Black educational leadership turned discipline policy into a holistic mechanism to keep Black children in school instead of kicking them out and criminalizing them.

### "AN IMPORTANT HISTORICAL FIGURE IN RICHMOND'S HISTORY"

Upon his death, Roy Alexander West was heralded by a political rival to be "an important historical figure in Richmond's history" (Lohmann, 2019). However, no one could have predicted that upon his birth on January 15, 1930. He and his younger brother Ira (who later became a successful mathematician for the federal government) were raised in Richmond's under-class Washington Park neighborhood (R. West, 1930, 1950). West's father Leroy Alexander was a janitor who, with the exception of witnessing his sons be married in 1950 and 1957, was not present in his children's lives (R. West, 1950; Lohmann, 2019). West was always reluctant to recount his upbringing; chances are that was because of his father (Lohmann, 2019). There is reason to suspect that Leroy may have been physically and or emotionally abusive to his family. However, the documentary record is not definitive on this matter. What is known is that West's mother, Blanche Estelle Melton, was so eager to leave her husband that she deserted him for 16 years, and upon being divorced, she refused to accept alimony and child support. Melton instead transitioned from housewife to domestic laborer and worked multiple unskilled jobs to support her sons (L. West, 1943).

West grew up in Jim Crow Richmond: a time when every facet of life was divided along an unyielding color line. Public schools were, since their founding, separate and unequal (Vaughn, 1974; Barkley, 1994; Moore, 1975; Heinemann, 2007; Wallerstein, 2007). The labor and housing market was, like the schools, separate and unequal as well (Chiles, 2020). West's home in Washington Park did not have running water or electricity, as was the case for many poor Black Richmond households before the 1950s (Silver, 1984). However, West never let poverty suppress his talent, an attribute he developed at the behest of his mother (Lohmann, 2019). Two years after graduating high school, West married Helen Louise Hubbard—the wife he would have until her death in 1998—and moved her into the two-bedroom, one-bathroom home he shared with his mother and brother. They later had two children, Debra and Malone, while West worked as a postal clerk to pay his way through Virginia Union University. Upon obtaining a bachelor's degree in 1956, West became an RPS teacher and moved his family into a nicer four-bedroom house in the middle-class Ginter Park area (R. West, 1951).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

He taught at the all-Black Armstrong High School for ten years (1959–1969) before completing his master's degree at New York University in 1963. Shortly after, RPS promoted West to the head of their food services. He also taught night classes at Union until he earned a doctorate in education from George Washington University in 1976. Upon receiving his final degree, West was promoted again; but this time to a highly sought-after principalship at John Marshall High School. At the time, John Marshall was Richmond's recently desegregated flagship institution, nicknamed "The People's University" because its "prestige was unequaled by any other public high school in the state" (Calihan, 1992, pp. 126–128; Miller, 1976; Lazarus, 2019).

West may have seen his new job, and the position of principal more broadly, as a pillar of stability. However, as documented in Rousmaniere (2013), the principalship is a rank, title, and responsibility that has been remade by societal changes outside of schools. Principals in the early American Republic autonomously led public schools with the support of local communities who valued learning for learning's sake. As the nation entered the late nineteenth and early twentieth century, social reformers—otherwise known as Progressives—changed public schools according to parental "demands for individual, economic, and social development of students" (Fenske, 1997, p. 8). This change meant that principals were no longer the chief arbiters of student learning: they were administrative officers who managed teachers and students. As school systems grew by the mid-twentieth century, principals became, according to Rousmaniere, "the most complex and contradictory figure in the pantheon of educational leadership" (p. 2). While managing teachers and students, they were also building managers; advocates for change who buttressed the educational establishment; employees who acted as employers; politicians outside of school; and judges, juries, and executioners inside of school. Those who occupied this enigmatic position "led from the middle" by accommodating communal demands and implementing top-down curricular agendas.

West assumed his post when principals were the middlemen between the school board and teaching faculty. However, West was an "old school" principal that, as Fenske (1997) describes, "adopted an intellectual purpose for education …. [who] conveyed a sense of a pure education, uncorrupted by others, less decorous, purposes" (p. 7). West focused on implementing a system where, as he later stated, "quality education would derive from hard work." This meant curbing grade inflation, implementing a "comprehensive curriculum, with stipulated standards of mastery," strengthening the gifted programs, and closely supervising the "teaching and learning process" ("Interview with Roy West," 1989). In spite of the changes within the profession, West believed that a principal was, first and foremost, in charge of learning. This rebellion was a part of a tradition where Black principals possessed

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

more autonomy than their White counterparts because of Jim Crow segregation and general White apathy for Black education.

Some Black principals used their autonomy to convert the learning process into an act of resistance against racial discrimination, as was the case with Ethel Overby. In 1933, when West was three years old, RPS hired Overby to be Richmond's first Black principal. Overby was like West in that she was born into poverty. Her father was a janitor who had been born a slave and her mother was a domestic servant (Randolph, 2010). Overby (1975) also admired her mother, whom she often lauded for industriousness: "She worked—oh, how she worked! I do not know what would have become of us if she had not worked," Overby once reminisced (pp. 11–35). As an elementary school principal for over 50 years, Overby made civics the foundation of her school's curriculum. She also extended this agenda beyond the schoolhouse by cofounding a voting organization and teaching voter registration classes to help elect Black Richmond leaders to political office throughout the 1960s and 1970s (Overby, n.d.).

West's bright career took an unexpected turn in June 1980 when he publicly criticized the most powerful Black man in Richmond, Mayor Henry Marsh, III (Campbell, 1980). Marsh was Richmond's first Black chief executive, a nationally known civil rights attorney, longtime city councilman, NAACP member, and head of the city's Black political establishment (Harris, 1980). Throughout his 14-year tenure in city hall, Marsh ushered Black political rule into Richmond by helping to appoint several Blacks to key positions of power. As principal of the city's newly integrated flagship school, West undoubtedly benefited from such patronage. Marsh's accomplishments came with tremendous White resistance. In response, Black leaders created and obeyed an unwritten code to never make their disagreements available for public consumption (Dr. Rutledge Dennis, interview, July 26, 2019). In 1979, West ignored the unspoken race rules and publicly criticized Marsh's plan to consolidate Richmond's seven high schools onto three campuses. This decision cost him the highly coveted job at John Marshall. While his tenure protected him from being fired, the school board demoted West to the principalship of Albert Hill Middle School. West later lamented his decision because it strengthened the bridge between public education and the nastier sides of city politics ("Interview with Roy West," 1989). In speaking with several Richmonders for this project, it was clear that West was not alone in disagreeing with Marsh on the direction of urban education. Nevertheless, West's very public demotion reflected the realities of the day: principals were both educators and bureaucrats. The demotion also foreshadowed West's complicated relationship with fellow Black leaders and his struggles to be an autonomous figure within a hierarchical public-school system.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

West may have expected some protection from his superintendent, Dr. Richard C. Hunter. Superintendent was, and still is, the highest appointed office in RPS. The school board hired superintendents for a five-year term with the option for renewal. Prior to Hunter's tenure, RPS renewed most superintendent contracts regardless of their performance. Only 11 people—all White males—served as RPS superintendents between 1869 and 1976 (Calihan, 1992). Almost all of them out-lasted the school boards that appointed them, making the superintendent position the most stable job in RPS history. Richard Hunter was the first Black person to ever hold the position in Richmond, thanks to Henry Marsh (Reverend Dr. Benjamin Campbell, interview, March 10, 2019). Hunter carried out Marsh's will by recommending the demotion of West. That political reality did not make West feel any better about the move. "[Hunter] did me wrong, and I will never forget and forgive him for that," West later said in an interview (Lohmann, 2019). His refusal to forgive and forget turned into political savvy. West won a city council seat and the mayorship from Marsh two years after his demotion (Squires, 1982a). Although he levied no public threats, West used back channels to inform Hunter—a man he believed to be a mere pawn in the chess game against him—that he had no place in RPS's future. "I'm not vindictive. I just get even, that's all, so you don't do it again. I'm just protecting my flanks. I think that's par for the course," West said after Hunter resigned from his post (Lohmann, 2019).

### "LACK OF DISCIPLINE IN OUR SCHOOLS"

Roy West was in a peculiar situation upon entering City Hall in 1982. As mayor, he worked from 5PM until 8PM every day to manage a city of about 200,000 people—almost 50% Black and 50% White—that had been in the throes of an urban crisis for the last two decades (Reverend Benjamin Campbell, interview, May 12, 2019; Squires, 1982b; "A Policy of Economic and Human Resources," 1967). While Richmond never experienced the urban riots of the 1960s, suburban sprawl surrounding Chesterfield and Henrico counties made basic city services (infrastructure and schools) too costly; a fate that befell several localities nationwide (Cyna, 2019; "Uneasy Peace," 1966; "Black Power," 1966; "Cleveland, N.Y.," 1966; "Dr. Thomas H. Henderson to Mr. J. C. Wheat," 1967; "Family Income," 1968; "Increase in welfare costs," 1968; "Foster care & aid," 1968; "Changes in Richmond's Population," 1968; "Table 4," 1968; "Family Income by Race," 1968). Even worse, race relations inside the city had not improved very much since the removal of de jure segregation. A local White minister once said of 1980s Richmond: "We live in a divided city. Two very different points of view. Two very different experiences. Two very different attitudes. And these differences split most deeply along racial lines" ("Notes for Talk," 1981).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Race relations in Richmond were, by all estimations, at an all-time low in the early 1980s. The dismantling of Jim Crow exacerbated racial segregation on all fronts, exposing that Richmonders were deeply divided in body and mind. White and Black Richmonders wanted racial harmony. However, issues involving the city's limited resources sharpened the color line in neighborhoods, schools, churches, and social clubs. In general, White Richmonders wanted to cut taxes and divest and decenter city politics from everyday life. This meant cutting the citywide budget and defunding city services, public education being one of them (Moeser & Rutledge, 1982; Drake & Holsworth, 1996; Randolph & Tate, 2003; Hayter, 2017; "Taxpayers' Group Proposals Seen Harmful"). Black leaders and residents saw a strong city government as essential to fixing the city's past, shaping its present, and preparing for its future. The Black community encouraged city government to increase taxes and the salaries of city workers, improve public services, and add newer programs to local schools ("Tensions in the Richmond Community," 1981; "Racism/Racial Polarization Program," 1981; "Tensions in the Richmond Community, Announcements," 1981; "Racial Tensions Workshops," 1981; Miller, 1976, 1981; Harris, 1980).

The divide between White and Black often played out in the debate between big government and small government. "Whites perceive blacks to be anti-business [and] anti-compromise," an internal city government survey said. The survey further concluded that Whites felt that Blacks were uncritically "injecting [the] consciousness of race into everything." The Black community did not completely disagree with this criticism. They believed that a strong city government would undo policies and practices that made racial discrimination part of everyday Richmond life. Blacks did not inject race into anything: they wanted to fix how race operated within everything. The Black and White divide over city government perpetuated, as a local urban studies professor claimed in 1981, "the growing distrust between blacks and whites in the city of Richmond." He went on to accurately assess that, "What happens here generally reflects tension throughout the city and, at the same time, contributes to the racial division of the city" ("Tensions in the Richmond Community," 1980; "Council Shares Blame for Racial Strife," 1981; "Notes for Talk," 1981). While the racial divide about city government was largely ideological, the racial divide in general came from the clear understanding that "some of the [White] attitudes and mindsets were not in step with the law," a longtime Black minister once said austerely about 1980s Richmond (Sylvester Turner, interview, March 13, 2019).

White flight during the previous decade lied at the heart of racial tensions. As Black leadership entered city hall, White people fled Richmond and traded their urban identity for a suburban one, personifying the Richmond Realty Company

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

advertisement that, "We are as proud of the fact as we are of the city that we're named for. But over 25 years, things change" (Smith, 2004; Moore, 1982; "The Model Code for the School Community," 1983). That change was drastic, as Chesterfield and Henrico provided White Richmonders with things they could not have in the inner city: safe distance from the Black urban poor, affordable housing with spacious yards, shopping centers only accessible by those with private forms of transportation, uncongested streets, numerous parks and playgrounds, and the illusion that everyone around them shared similar socioeconomic values ("Business Directory," 1980; "The Development of a County," 1982; "Why Brandermill Is the Best Community," 1983). The counties had smaller populations than Richmond individually. But combined, they almost equaled Richmond's population and more than doubled its economic wealth ("State of the City Report," 1983). In terms of race, both the anecdotal and documentary evidence shows that 1980s Richmond was defined by Whites physically, economically, and psychologically distancing themselves from the Black inner city (Reverend Dr. Benjamin Campbell, interview, March 14, 2019).

In searching for the American dream, Whites left Richmond in an urban nightmare. Many within the White business community all but abandoned the inner city. As Richmond transitioned into a municipality of the Black poor, and its violent and drug crime rates rose to alarming heights (Squires, 1982a; Federal Bureau of Investigation, 1980–1989). With the exception of a handful of middle- and upper-class neighborhoods, Richmond was a city where, as one business owner regrettably said, "They [White people] think they'll get mugged or raped" ("A Tale of Two Marketplaces," 1986). Even a prominent Black leader complained that it was hard to conduct business downtown when "little old [White] ladies see [Black] street people waiting for lunch and think all those street people are lustful criminals" ("S. Buford Scott to Clarence L. Townes, Jr.," 1983). Many empty downtown storefronts and surrounding residential areas became open-air drug, prostitution, and gambling markets run by local kingpins Euguene, Reginald, and Herbert "Huck" Johnson and Carlton, Leonidas, Rodney, and Ronalyn "Mug" Brown ("Table 1, Reported Offenses: 1976–1980," 1980). The open racketeering left one visiting minister lamenting that, "Many of these communities have become dumping grounds for drugs, alcohol, and every conceivable crime" since he last visited Richmond a decade prior ("Dr. Leon Sullivan," 1984). Protecting the very aboveground underworld were coldhearted hitmen named Russell "Block" Gray and Lindwood, James, and Anthony Briley. They killed so many people in public and private that their names—still to this day—generate tragic memories for many lifelong residents (Grim, 1980; "Judge Convicts James Briley," 1980; Sundquist, 1985; J. Williams, 1990a, 1990b). Upon entering City Hall, Roy West did not inherit a

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

sleepy southern town like those before him. He got "Crime City"—a place that led the state and nation in almost every vital crime category from the 1980s until the early 2000s (Uniform Crime Statistics, 1980–2000).

Mayor West was not shy about his stance on urban crime. "We have declared war [on crime] …. in the City of Richmond," he responded in a CSPAN interview about the city having America's third highest murder rate (R. West, 1985). During West's mayoral tenure (1982–1988), he opposed fellow Black leaders and expanded Richmond's police force into various anti-crime task forces, targeting housing projects and other areas known for Black-on-Black violence (Minutes of the City Council of the City of Richmond, 1985–1987, p. 399; "Report of the Department of Corrections," 1987). West often professed he wanted "longer sentences without parole, less plea bargaining, and expanding the type of crimes for which the death penalty may be given" This stance made him unpopular with many local Blacks, leading one dissenter to tell the media that, "West's statements were not representative of the [Black] community." In front of many of those dissenters, West once retorted emphatically: "We cannot rationalize or explain it away. The issue is not capital punishment. It is black-on-black genocide" ("Mayor West," 1985). While his tough on crime stance alienated him from the Black political establishment, some of whom openly participated in the criminal underworld, West lobbied the Virginia Legislature to pass punitive laws that, by the mid-1990s, made Virginia one of the largest carceral states in America (Wilder, 1989, 1992; "Final Report of the 1989 Commission," 1990).

West was more than a mayor: he was a principal who worked from 7:30ᴀᴍ to 3:30ᴘᴍ Monday through Friday to fix the fractured schools that were around 90% Black and, as one historian noted, "almost as poor as they are black" (Pratt, 1992 p. 90). Officials in states such as North Carolina and New Jersey became outliers in working to consolidate urban and suburban schools throughout the 1980s and 1990s. Virginians did no such thing and remained within the American mainstream (Cyna, 2019). By the time West became Albert Hill's principal, about 75% of RPS's children qualified for free and reduced lunch. This percentage crept up into the 90s by the middle of the decade. Student poverty was coupled with the fact that RPS struggled to keep schools open during the 1980s. RPS consolidated some schools (mainly high schools) while others that were 100% White during the days of legal segregation became 100% Black decades later (Ryan, 2010).

Underachievement defined RPS's Black students. "We have accepted the fact that our enrollment is predominantly black, but they are still students, and they can learn," a former RPS administrator once said about the 1980s (Pratt, 1992, p. 91). RPS students could learn, and they did; just at a slower pace than their suburban and private school counterparts who scored higher in math, reading, and the hard

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

sciences. This paralleled a national trend. Education scholars noted in the late 1980s that suburban sprawl created two school systems: one poor and one rich. Poor school systems "communicate low expectations and aspirations for their students … putting us at risk of creating a permanent [urban] underclass" (Clark & Picard, 1989, p. 5; Cyna, 2019, pp. 37–40). This was even more true in Richmond, where the legacy of Jim Crow, Massive Resistance, court-ordered busing, and segregationist academies—who openly touted their educational superiority—facilitated the demise of RPS. Richmond's public-school population shrunk from almost 50,000 in 1970 to about 27,000 (3,500 White) by 1990 (Calihan, 1992). More importantly, the counties had exclusive private and highly ranked public schools whose resources all but ensured their students' admission to top-ranked local and out-of-state colleges and universities. While private school figures are not accessible to researchers, Chesterfield's (34,000) and Henrico's (36,000) public school populations swelled to around 70,000 during the 1980s ("The Development of a County," 1982). These developments proved beyond a shadow of doubt that, in the words of a headmaster of a local preparatory school, "schools do reflect society" (Cramer, 1981). Richmond area schools then, and many would argue now, reflected that White Richmonders would never support racially equitable schooling.

White Richmond's abandonment of inner-city schools was a part of a national re-segregation of public schools by legislators, the courts, and everyday people during the 1980s (Kruse, 2007; Nelson, 2007; Walsh, 2018; Lassiter, 2007; Amsterdam, 2017; K'Meyer, 2013). However, Black Richmond's response was everything but typical. On one end, leaders, like Blacks throughout the nation, filled faculty and administrative roles with the confidence that they could fix city schools without White oversight (Cecelski, 1994; Rasmussen, 2017; Danns, 2003; Anderson & Pickering, 1986; Ralph, 1993; Perlstein, 2004; Countryman, 2006). RPS's successful campaign to end the same court-ordered busing plans that Black leaders of the previous generation had asked for—as was done just one-hour east in the majority Black city of Norfolk, Virginia—reflected this sentiment (Eaton & Meldrum, 1997). On the other hand, Black school officers optimistically planned to reform RPS for White migration back to the inner city (Dougherity, 2004). Roy West worked closely with the RPS school board on recruiting White families back in spite of nearly 1,000 students (mostly White and middle-class Black) fleeing the district every year since 1970 (Pratt, 1992). They first allowed Black and White parents to opt out of cross-town busing. This did little to slow down the exodus. Next, they conducted a series of studies to see how they could generate an inward migration of middle-class and affluent White students. While academic performance was important, parents told RPS bureaucrats both privately and publicly that, "Among the top concerns of the public is lack of discipline in our schools" ("Interview with

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Roy West," 1989). This made sense given that RPS outpaced its suburban neighbors in discipline issues (ranging from simple demerits to expulsions) throughout the 1980s (Pratt, 1992).

An internal investigation confirmed initial speculation that "the greatest concerns about the student population are their level of academic achievement and student discipline" (Richmond School Board, 1985–1986). The consultant went on to say that, "The poorest composite ranking of all RPS characteristics was given to the public image of the school division…. The major concern over the next five years is…. anxiety over the potential for reduced funding as a result of white flight [and]…. serious problems, according to the community, are perceived discipline problems" (Richmond School Board, 1985–1986, p. 327). The "perceived discipline problems" stemmed largely from the failures of school integration a decade prior. Fights between Black and White students were so frequent that White families who originally refused to abandon RPS left anyway (Dr. Edward Peeples, interview, June 24, 2019; Robert Corcoran, interview, March 11, 2019; Reverend Benjamin Campbell, interview, March 12, 2019; University of Richmond, 2019). Other White families, through word of mouth, heard about the level of violence in RPS from fellow White teachers and administrators. Quantifying the accuracy of such rumors is difficult because the Federal Educational Rights and Privacy Act of 1974 protects students' records from public inquiry. Student discipline only becomes public knowledge through published reports by the school board, an appeal of punishment by guardians, or a lawsuit. Still, student names and offenses are often kept secret. Nevertheless, White perceptions were RPS's realities. Or as West stated, "The lack of discipline is a problem in Richmond, just as it is in all public schools today" ("Interview with Roy West," August 28, 1989).

The perception, and in many cases reality, of discipline issues became a call to action for RPS officials. From 1983 to 1985, they published "The Model Code for the School Community Students Rights and Responsibilities" in local newspapers and magazines to show the school board's dedication to making RPS a better place to learn ("The Model Code," 1983). West used his platform as mayor to make the school discipline issue a citywide anti-crime initiative. His "two-pronged approach" was to "be tough on those who commit the crimes by imposing serious sentences and install better programs in the schools that will challenge youths and steer them away from crime…. We can do it. We (the school system) are not committed enough. We don't have enough vision," he said in an interview (Cummings, 1988). To West, it was clear that school discipline was crucial to maintaining social order. As a principal and the mayor, West compelled the school board to include him in "deal[ing] firmly and effectively with the small percentage of students who create discipline problems" in the upcoming 1986–1987 school year (Richmond School

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Board, 1985–1986, p. 53). While this was done to improve the schools' functionality, RPS's image was always the most important goal. As West stated: "The respect of the public for a particular school depends, to a large extent, on the maintenance of an orderly environment" ("Interview with Roy West," 1989).

The student discipline issue in Richmond was a part of the national discussion on education reform. Since most teaching colleges did not instruct school officials on how to handle student misconduct prior to the 1980s, teachers, principals, and parents often worked together to dole out discipline on a school-by-school basis (Deitz & Hummel, 1978; Arum, 2003; Duke & Meckel, 1980; Blacker, 2000; Hampel, 1986; Kafka, 2009; Weinig, 2000). However, West's willingness to work with the RPS school board showed a national shift toward top-down, bureaucratic discipline mandated by school districts and carried out by principals. This change came largely from a landmark education report called "A Nation at Risk: The Imperative for Educational Reform," published by President Ronald Reagan's Secretary of Education, Terrel H. Bell. This report used the growing achievement gaps between American schools and their international counterparts to call for a national reinvestment and restructuring of public education (Shanker, 1985). The tragic tale of this report, as later discussed by the *Washington Post* (2018) and NPR (2018), was not what the report said and advocated for, rather, it was Reagan-era America's response to data that validated beliefs about Black inner-city schools blighting the reputation of American public education.

At the heart of "A Nation at Risk" was an indictment on the current methods of student discipline, the only issue taken up by the Reagan administration (Educational Research Service, 1984). In a separate report called "Disorder in Our Public Schools," the White House excoriated public school teachers and administrators across the country for their inability to curb student violence in their hallways and classrooms. Much of the criticism was levied at "schools serving students from disadvantaged neighborhoods," as "victimization rates are high in schools located in areas characterized by poverty, unemployment, and a high proportion of female-headed families; or in schools where large portions of the students are black" (Educational Research Service, 1984, p. 78). In fact, Black inner-city students represented almost 50% of all public-school suspensions by 1984. Many urban school districts took more control of student discipline, and some principals, like Roy West, had little issue with transition (Fenske, 1997). Some parents also supported stiffer penalties, as "people tend to believe that teachers have lost control over their students," an educational psychologist said after a Gallup Poll showed that Americans generally saw urban schools as cesspools of drugs and crime (Hollingsworth, Lufler, & Clune, 1984; Mirga, 1981). Inner-city school administrators even sought, and received, judicial authority to clean up their schools. With

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

the *New Jersey v. T.L.O* decision (1985), the federal courts empowered administrators (primarily principals) to implement school-wide searches and seizures. This decision reaffirmed the *Tinker v. Des Moines* (1969) case, which stripped students of many constitutional rights the minute they entered school property. While some parents and students expressed dismay over the decision, "Officials of teachers' and administrators' organizations said that the decision would give support to teachers and help guarantee a safe and orderly learning environment in schools," *Education Week* reported weeks after the 1985 decision (Currence, 1985).

On July 24, 1986, the Richmond School Board entered the boardroom on city hall's 17th floor—a room that is still used by school officials and researchers to this day—and crafted the Standards of Student Conduct. Dress code violators (students wearing lewd or provocative clothing), truants, profane speakers, gamblers, pornography connoisseurs, tobacco smokers, liquor drinkers, vandals, thieves, and cheaters would receive demerits and suspensions. Drug possessors and brawlers would be automatically expelled and escorted off of school premises by law enforcement. Roy West's influence is revealed in the clause that gave principals the right to implement "his-her own initiative" when executing searches and doling out punishment on school property (Richmond School Board, 1985–1986, pp. 82–86). Later, the school board told parents in a written statement that they uniformly "support the intent of legislation to strengthen present sanctions provided by law for those who violate any statues related to alcohol and drug abuse" (Richmond School Board, 1985–1986, pp. 147–154). In fact, West convinced school officials to lobby the Virginia Legislature to strengthen its anti-crime laws as it related to public schools. The new conduct policy represented a new day in RPS when the school board, led by the mayor/principal, became "Tough on Conduct" ("School Boards Gets Tough," 1986).

West took full advantage of the new rules at Albert Hill. Equipped with a new student conduct code and school board support, the tall, slender, and balding principal dictatorially patrolled the halls to root out what he called "The terrible Ds— disrespect, defiance, and disruptive conduct" ("Interview with Roy West," 1989). West orchestrated routine school-wide dress code checks and personal property searches. Student violators almost always received demerits at best and suspensions at worst (Richmond School Board, 1987–1988). Sometimes, West used the intercom system to humiliate the students he caught breaking the rules. When asked by the media if he ever issued lenient punishment, West retorted, "I always take the maximum…. If a child violates my prohibition … then I'm going to deal with them very firmly." He later added that this policy came from his belief that "a failure of discipline usually results in an uncontrollable school" ("Interview with Roy West," 1989).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Parents of the punished students asked for "an impartial investigation into school activities at Albert Hill School because the Mayor [sic] is not beyond the rules and regulations of the School Board" (Richmond School Board, 1987–1988, p. 177). However, there is no record that the board investigated West. This led many to suspect that "the school board is controlled by the mayor" (Richmond School Board, 1987–1988, p. 177). West did answer to the media for his supposed "reign of terror" at Albert Hill. "I'm very tight and firm, but fair. Friendly occasionally in dealing with students," but "there are three things that I come down on a child very hard on and that is defiance, disruption and disrespect." He even claimed that a Black parent removed their child from a renowned private school and enrolled them at Albert Hill because "she said she liked my style of organization, academics and discipline." West reasoned that his antics were needed in urban, Black school systems. "These kids are very street smart. They will know when you are trying to bend in their favor. Word then gets around that you are a softy." Most importantly, West felt that principals should ensure Black students left public school fully prepared to enter the wider world. When faced with Black parental resistance, he rhetorically asked them if they wanted him "to let your [Black] kids slip through the system undisciplined and untaught" while knowing that broader "society will not accept a black kid with an aberrant behavior" (Young, 1987a, p. B-2).

### "THE EDUCATIONAL ESTABLISHMENT CONTINUALLY DOES BATTLE WITH US"

Roy West's administrative style made him the most polarizing figure in Richmond during the 1980s. On one end, he confidently told the local media that "not a day passes that four or five people don't say that they think the city needs more principals like me" (Cummings, 1988). On the other hand, West was voted the most hated public official in Richmond ("Best and Worst Elected Official," 1988). This duality resembled that of famed angry principal and contemporary Dr. Joe Louis Clark from Patterson, New Jersey. The administrator had been a Patterson City Public School teacher and principal for over 20 years before reluctantly accepting the principalship at Eastside High School in May 1982. Before his arrival, the overwhelmingly Black and Latino school was, as he later states in his book about inner-city schools around the nation, "constant Bedlam. There are fights every day. There is widespread incompetence, wanton destruction of property, and constant vile language. Prostitution is rampant. Violence is extolled. Weapons are prized, and used. Drugs are king. The major role model for inner-city youth is the rich drug dealer. The main point of drug distribution is the school" (Clark & Picard, 1989, pp. 8–18). Eastside embodied this description. A reporter who once covered the heap

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

of criminal activity in Patterson schools stated that Eastside "was called a cauldron of terror and violence. Students carried guns and knives, and were routinely shot and stabbed. Drug deals were conducted in hallways. Teachers were threatened in the classrooms. Couples took turns making out in the restrooms, to the point of having sexual intercourse" (Rimer, 1988).

Upon arriving at Eastside, Clark carried a bullhorn and baseball bat to command students' respect. He hired straight-edged faculty and staff to enforce a dress code, assign tons of homework, suspend students for minor behavioral infractions, chain the doors to keep out neighborhood drug pushers, and dare anyone to leave—that included teachers—who did not like it. Clark's most famous tactic was mass suspensions and expulsions. During his first week in office, over 300 delinquent students who showed little academic promise were given first-class tickets out of Eastside (Page, 1988.) Clark's tenure improved students' test scores and drastically reduced the violence, sexual misconduct, and drug activity that Eastside was infamous for. Some Black parents and students who fled the Patterson school system eventually trickled back in because of Clark's work. However, Clark's reign at Eastside attracted criticism from faculty, parents, and educational specialists. They felt that Clark was well-meaning at best. At worst, he was a tyrant that would not be tolerated "if the students were not poor black children" (Mueller, 2007). Clark defied the school board's orders to ease the rules. When the school board tried to dismiss him, hundreds of supporting parents, students, and media outlets around the nation rallied to his defense. After almost a decade of investigations and lawsuits, Clarke resigned from his post, stating: "Either I go around constantly in fear of those vermin, which would render me ineffective, or I will go about my merry way" (Ferraro, 1987).

Although they did not know each other personally, Roy West's and Joe Clark's fates were linked by a tidal wave of resistance to autonomous principals who ruled with an iron fist. Both men gained the initial support of school officials. However, public pressure and a litany of students' rights lawsuits eventually took that away. Like Clark, West had a knack for turning novices into potential allies; and potential allies into certain enemies. An example of this was West's implementation of a rigorous admission policy to Albert Hill's chapter of the National Honor Society. He required students to pay higher than normal admission fees. Male students had to wear blue suits while female students needed pastel-colored dresses (Young, 1987b). Some parents approached West and suggested that he make his standards optional. After West rebuffed them, the disgruntled Black parents complained to the national headquarters and the school board that the "mandatory fees and dress requirements … are a hardship for some [Black] parents" (Richmond School Board, 1987–1988, p. 177). The National Honor Society headquarters demanded

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

West to end his rogue policies or RPS would lose its charter, a fate that no one in the struggling school system wanted.

West refused to abolish his rules. Dissenting parents asked the school board to fire West, "so that no child will again suffer because of one man's dogmatic, inflexible rules" (Richmond School Board, 1987–1988, p. 177). The school board, headed by a key West supporter, refused to punish or publicly criticize him. However, the new superintendent, Dr. Lois Harrison-Jones—the first Black woman to hold the office—compelled West to think about the best interest of the entire school system. She later told the local media during a phone interview that West would comply with the national headquarters (Campbell, 1987a). West originally called the news of the meeting "misinformation," but he complied with the original order and placed Albert Hill's chapter of the National Honor Society back in line with the rest of the nation (Campbell, 1987b).

West may have been pragmatic about the National Honor Society issue because he and his supporters faced an important lawsuit. On July 2, 1987, six Albert Hill students sued West, Superintendent Harrison-Jones, and other school officials for violating their civil rights with improper search and seizures during the 1986–1987 school year (*Burnham v. West*, 1987; Goode, 1987). Although mini-searches took place throughout the year, three school-wide searches in December 1986 and January and February 1987 were the crux of the lawsuit. During each search, West ordered teachers to rummage through students' backpacks, lockers, and other personal items. The goal of the searches was to find marijuana, markers used for graffiti, and other banned items that would allow West to punish the suspected students. The culprits (all six in the lawsuit) received suspensions, and they were not allowed to contest the evidence found in their possession (Richmond School Board, 1987–1988).

This lawsuit came amid a periphery movement for students' rights that became more mainstream by the mid-1980s (Arum, 2003). While school districts made student discipline more bureaucratic and more interpersonal, students and their families responded in-kind with systematic litigious attacks (Zirkel & Richardson, 1997). Historians chart the movement for students' rights back to the 1940s and 1950s when around 4,004 students sued their school districts for violating their civil rights with punishments ranging from suspensions to expulsion. This "legal entitlement" among school-aged students "produced skepticism about the legitimacy of school disciplinary practices," in the words of Arum (2003, pp. 6–20). Thanks in part to the modern Civil Rights Movement, the litigiousness increased in the 1960s, as 3,413 students filed similar suits in that decade alone. The nadir of the student's rights movement came in 1969, however, with the infamous *Tinker v. Des Moines* decision. This controversial rollback inspired school districts

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

to stiffen penalties for suspected lawbreakers and, adversely, a flood of successful litigation (around 12,000 cases) in the 1970s and 1980s (Tyack, James, & Benavot, 1987). During that time, public-interest law firms (backed by the Ford Foundation, Carnegie Corporation, Field Foundation, and Rockefeller Brothers Fund) began funding various legal attacks to ensure that students' rights were not compromised in the quest to reform public education (Arum, 2013; *Goss v. Lopez*, 1975; *Wood v. Strickland*, 1975; *Carey v. Piphus*, 1978; *Board of Education v. McCluskey*, 1982).

Richmond city attorneys warned the school board in October 1986 that the *Standards of Student Conduct* had "serious due process ramifications" because "what is stated as an appeal for the student is not an appeal but a review of the record" (Richmond School Board, 1985–1986, p. 122). One local attorney also warned the school board in December 1986 that his client would sue West if the "series of unlawful searches" continued. Parents of the suspended children later asked Superintendent Harrison-Jones to "set guidelines to ensure that searches at Hill are handled fairly, uniformly, and only under extreme circumstances" (Richmond School Board, 1987–1988, p. 177). The newly appointed bureaucrat refused to investigate West because, as the school board recorded, "She is impressed with the school's administrative leadership and believes that the majority of parents want the principal to remain there for his overall positive influence." The assessment was validated by over 100 parents named "Parents on West's Side" petitioning on his behalf because of his "standards of excellence and achievement for Albert Hill students" (Richmond School Board, 1987–1988, p. 203). As the lawsuit against West entered the federal courts, a politically connected parent "requested the immediate dismissal of the principal [West] or that he not be allowed to influence children in the school system until this matter is completely resolved" (Richmond School Board, 1987–1988, pp. 187–188). This request, too, was denied by Harrison-Jones (Young, 1987c).

As Harrison-Jones and other high-ranking school board officials stood at the center of a federal lawsuit, they removed their support from Roy West. They overturned his suspensions, and at Harrison-Jones's request, they transferred West from the Black middle-class Albert Hill Middle School to the Black underclass Mosby Middle School (now Martin Luther King Middle School) in Church Hill (Richmond School Board, 1987–1988; Kelly, 1987). On more than one occasion, the school board considered rotating principals (mainly West) every five years to cut down on parent complaints (Richmond School Board, 1987–1988). Rumors even swirled about Harrison-Jones planning to give West an administrative job in city hall and removing him as a principal altogether. This development compelled the six students to drop their suit against Harrison-Jones and other school RPS officers. West and a few supporting teachers refused to budge. They fought the case, and

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

the federal courts found them in violation of the Fourteenth Amendment, resulting in them paying the aggrieved party around $40,000 in legal fees (Campbell, 1987c; Goode, 1988a). The court decision reaffirmed the federal courts' new commitment to protecting the individual rights of students (Arum, 2003; Simmons, 2017; *Fishel v. Frederick County School Board*, 1988). West was not found at fault in disciplining the students. However, he did not conduct the searches in a constitutional manner, subjecting him to pay restitution to the aggrieved parties. This loss of support and the court decision became another watershed moment in RPS history; when the school board stripped principals of their autonomy in disciplining students. To West, this shift "contributed heavily to the demise of public education in Richmond" ("Interview with Roy West," 1989).

The school board's shift away from West came as the nation shifted away from punitive school discipline (Rubenstein, 1986; Henderson, 1985). After reviewing the recent spike in suspensions, expulsions, and lawsuits, educators saw, as one scholar states, "the need for a new conception of schooling that embodies a more appropriate curriculum, a greater emphasis on pastoral care and counseling, and a fundamental change of outlook in the way some teachers view their relationship to pupils, particularly with working-class adolescents" (Glasser, 1986, p. 36; Docking, 1987, pp. ix, 154). Theorists and supporting administrators helped mainstream the idea that strong teacher-student relationships should replace the *traditional* reliance on harsh discipline to create safe learning environments. Urban school administrators, many facing lawsuits and rising drop-out rates, began to listen and cut suspension and expulsion rates in half by 1989 (McDaniel, 1986). While West may not have known it at the time, this paradigm shift contributed to his demise in the courts and among his RPS colleagues. When asked about the vote of no-confidence from the school board and superintendent, West responded: "No comment … there's no need to contest anything in Richmond City Schools anymore" (McAllister, 1987). He later took to a local media outlet and criticized Albert Hill after his departure. "Just go to Hill now. I'll say no more. Go to Hill now. I don't want to criticize my colleagues, but just go and find out for yourself." His comments were in response to a news article about RPS's "image problem" after drugs and guns were regularly being found on school campuses (Epes & Cummings, 1988b; Richmond School Board, 1987–1988, p. 307).

After West's transfer, the school board took more control of student conduct issues. They granted most of the appealed suspensions and expulsions (around 50 in the 1987–1988 school year alone) that made their way to the 17th floor of city hall. The school board later revised the student conduct code. Principals had very little say in this more transparent process that made suspensions and expulsions very difficult to execute (Richmond School Board, 1989–1990). The appellants

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

were regularly readmitted or reassigned to other/alternative schools instead of being removed from RPS altogether (Richmond School Board, 1987–1988). While many saw this change as a direct attack against Roy West, Superintendent Harrison-Jones claimed, "It's important that the public realize the [school] board must assess all the circumstances surrounding a child's behavior—his background, his family situation, any handicaps or emotional deficits…. The board has to do what it feels is right, and I believe the board did the right thing" (Richmond School Board, 1987–1988). This new policy did not change RPS's reputation, as the local media continued reporting on the uptick in criminal activity on school campuses (Epes & Cummings, 1988a). This policy did, however, change how West ran his school.

Upon arriving at a middle school known for gun violence (with windows often riddled with bullet holes) and drug use, West fired teachers he deemed to be uncaring and incompetent, chained the doors to keep out drug pushers, and issued mass suspensions; a tactic that was no longer employed by principals and school districts across the nation (Duke & Meckel, 1980; Farmer, 1989a). The most notable mass suspension involved 40 frequently tardy students. To his dismay, and that of the few vocal Mosby parents, West's terminations and student punishments were overturned by the school board and Superintendent Harrison-Jones ("West Suspends," 1987; Goode, 1988b). "Those of us who pride ourselves on our success as school administrators take no pleasure in the fact that the educational establishment continually does battle with us," West told the local media in response. He was later angered when the school board denied his recommendation to expel two students for attacking a teacher with a knife ("Interview with Roy West," 1989). "I'm as angry as I can get," West said at what he called a "bleeding-heart approach" to urban education. "If we're not going to follow our own code (of conduct), then we might as well throw that book in the furnace." West continued: "To say to your teachers and principals that we are going to protect you and seek the severest penalty, and then not do it, doesn't make sense. If you strike a teacher, I think you've lost the right to attend Richmond Public Schools…. A kid who hits a teacher or waves a weapon in a threatening manner should be expelled." West, an often-seen participant in student conduct hearings, refused to attend anymore because, as he stated, "the [school] board is going soft" (Epes & Cummings, 1987).

Undoubtedly angry about the recent turn of events, West used his political clout to get even with yet another superintendent whom he felt betrayed him. First, West used his post as mayor to demand that Harrison-Jones resign ("Superintendent of Schools," 1987). She publicly retorted that "any school official who would [publicly] disagree with the board through the media is a disloyal administrator" (Young, 1987d). As West continued his criticism, the Black community supported

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

74

Harrison-Jones by opposing West for, once again, publicly disparaging Black leadership. This did not matter, as the public turmoil over student discipline compelled Harrison-Jones to reject her contract renewal in July 1988. "Education is not among the city's highest priorities…. You can't build a system that is plagued with constant controversy and upheaval and strife," she said (M. P. Williams, 1988). Her criticism resonated with parents who felt that the "reasons for her decision to leave" were the "insubordination of employees"; namely Roy West (Richmond School Board, 1987–1988, p. 338).

Harrison-Jones's resignation, while being a clear response to West, also spoke to the fiscal status of RPS. Not only were 1,000 middle and high school children annually fleeing the school system, but the city council began slashing the education budget (Epes & Cummings, 1988c). In May 1988, the school board warned the council that budget cuts "places [sic] all school programs and services at serious risk" (Richmond School Board, 1987–1988, p. 313). They were right. Under the new city budget, RPS would operate on nearly $12 million less than the previous year, causing hiring freezes, layoffs, and students to pay numerous athletic and academic fees that they could not afford (Richmond School Board, 1987–1988, pp. 322–323, 1989–1990). West went further in attacking the school board by supporting these cuts. He justified this advocacy, as he did with punitive discipline, by claiming that RPS's issues were moral and ethical, not fiscal (Winslow, 1988). "The notion here [in Richmond] is that such students need extra resources to bridge the education gap. That may be the case, but we can never simply fund excellence," he infamously said in support of the new budget ("Interview with Roy West," 1989). He went on to say that:

> The Richmond public schools have always had minority and economically disadvantaged students. What we have not always had, however, is the current dismal and shameful level of academic achievement. In contrast to the social babbling by social engineers who promenade in our midst, I do not hold to the contention that such facts—poverty and low-achievement—are synonymous. ("Interview with Roy West," 1989)

Parents and administrators were outraged by West's stance, as it appeared that he okayed White city leaders—whose children attended private school—turning their backs on RPS. As a Black mother told the board, "The black community must understand that Roy West, under white racist control, would be a total disaster for the effective education of black youth" ("Principal Appointed in King and Queen," 1988).

After Harrison-Jones left office, a new, more aggressive superintendent took her place. Dr. Albert Jones, Jr., assumed the office on a temporary basis in July 1989.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Two days after accepting the post, he informed Roy West, who was no longer mayor but still a city councilman, that his days in RPS were numbered ("A West Magnet," 1989). All he needed was an incident; and he found it less than a week after the 1989–1990 school year began. West violated the new student conduct code by firing a teacher who refused to chain the doors at Mosby Middle School (Farmer, 1989b). Jones delightedly called West in to his office and told him that, "You acted inappropriately in connection with the matter…. This was not the first instance in which you have been found to have exhibited poor judgment and unprofessional conduct." Jones further informed West that the fired teacher would be reinstated and that he would be transferred to an administrative job at the downtown magnet school. This appointment was quite sinister because Richmond had no downtown magnet schools. West's new post, which was not covered by tenure, was created before the new magnet school ever came into fruition. So, West could have been laid off or terminated without receiving his pension. West opposed Jones by mobilizing the few Mosby parents and media outlets on his side. The opinion editorials and public meetings saved his pension, but not his job (Farmer, 1989c; Richmond School Board, 1989–1990). On September 1, 1989, RPS officially removed West from his post and gave him a thankless desk position in city hall under the watchful eyes of the school board he disliked (Richmond School Board, 1989–1990).

### "HOW TO RUIN PUBLIC EDUCATION"

Just two years after Albert Jones reassigned Roy West, he was under investigation—and eventually fired—for using RPS money to support his private business ventures. Not surprisingly, West led the investigation after receiving confidential information about Jones's nefarious dealings. When asked about his role in taking down Jones, he responded: "I don't want to say anything at this time to upset the possibility and probability of Dr. Jones's leaving Richmond." The 61-year-old former principal did, later in that interview, announce his retirement after 32 years of service (Bradley, 1991). "While there are many valleys from which Richmond Public Schools must extricate itself, I am confident that, in spite of frustration and demoralization of our career educators in Richmond, we will not totally self-destruct," he pessimistically told the media in a written statement. West also retired from public life three years later. He spent his golden years writing editorials to the *Richmond Times-Dispatch* newspaper about the "wasteful and inept" RPS leadership turning city schools into what he called an "intellectual Sahara," where many Black students left without being fit for citizenship. Before his death in May 2019, West was rumored to have been writing a comprehensive account of his days in RPS entitled: "How to Ruin Public Education" (Stallsmith, 2019).

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

West never finished what this author assumes would have been an interesting tale about RPS. However, his pessimism about RPS's future was totally justified. Almost 100 jobs were lost to layoffs during the 1992–1993 school year. This number continued to climb until the early 2000s. Currently, 73% of school-aged children in Richmond (mostly working- and underclass Blacks and Latinos) attend RPS. Only 19 of the available 44 schools are accredited. Teacher and administrative turnover has reached an all-time high. The graduation and college attendance rates have sunk to an all-time low. Even lower is the morale among faculty and students. A recent retiree of RPS vividly recounts how the current state of affairs compelled him to forgo a hefty administrative salary and leave public education for good. He stated:

> This was just a couple of years ago, because I retired in [20]17. When I walked back into that building, after thirty or so years earlier, starting in there, recognizing what the atmosphere was like then and what it had turned to, I was so depressed. I was so depressed that I retired as soon as I could. What I had experienced when I first went into there—the light, the energy—it was, it was gone. (Sherman Curl, interview, December 20, 2019)

He went on to describe an atmosphere where students, almost exclusively Black and impoverished, used profanity against each other and teachers on a daily basis. "If you corrected a kid for the language they were using, you pretty much have to [physically] fight the child," he said. Although this administrator admires his former contemporary Roy West, he does not subscribe to West's pathology that RPS suffered at the hands of inept leadership. Rather, he blamed generational poverty for what he calls a "complete culture shift" in RPS. Many students do not care to learn, and their teachers, due to apathy or hopelessness, do not want to teach them. Some just bide their time until they have enough experience to apply for teaching jobs in Chesterfield and Henrico County. "The whole facility was a depressing experience for me. So I would just stay in my office because I don't like to see people dying. Those children were slowly dying. I didn't want to contribute to that. I didn't get into education for that. I got into education to give life, and what I saw [in RPS] was death" (Sherman Curl, interview, December 20, 2019). No one—from residents to the mayor himself—denies that RPS is a shell of its pre-*Brown v. Board* self; and given its position in the capital, it is easily the worst school system in the Commonwealth of Virginia (Stoney, 2019).

Today, most Richmonders have no clue who Roy West was. However, they live with his efforts to use discipline as a foundation of educational reform. The current *Student Code of Responsible Ethics* balances punishment and mercy, systematizing a shared responsibility between students, parents, and faculty to make RPS

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

a safe place to learn (Richmond Public Schools, 2019–2020). Punishment is used to reform the student and recycle them back into the school system and not to isolate them. These policies are a part of a national consensus that discipline should be less punitive and hierarchically administrative and more communal and nurturing (Blad, 2019). One would be hard-pressed to find an inner-city school system that seeks to weed-out troubled students. While discipline issues have not greatly improved since the 1980s, recycling students into alternative schools is more commonly used than long-term suspensions and expulsions.

If this article has done nothing else, it shows that men like Roy West, the tough on crime era, and the students' rights movement needs more scholarly inquiry by urban, educational, and African American historians. This article began as an inquiry about an interesting man who, as a principal and mayor, lived an interesting life during an interesting time. As the research evolved, I found that this story was bigger than RPS and Roy West. It illuminates a nation in the trenches of an existential crisis in the decades following civil rights protests. Leaders like West provided a solution that challenged the contemporary thought about how school systems should function and influence civil society. In the end, West, like many of his contemporaries who have yet to be written about, met his demise while trying to make urban education a beacon of light in the dimmest of times.

## REFERENCES

Agyapong, T. E. (2018). *The criminalization of Black children: Race, gender, and delinquency in Chicago's juvenile justice system, 1899–1945*. University of North Carolina Press.

Alexander, M. (2010). *The new Jim Crow: Mass incarceration in the age of colorblindness*. The New Press.

Amsterdam, D. (2017). Toward the resegregation of southern schools: African American suburbanization and historical erasure in *Freeman v. Pitts. History of Education Quarterly, 57*(4), 451–479.

Anderson, A. B., & Pickering, G. W. (1986). *Confronting the color line: The broken promise of the civil rights movement*. University of Georgia Press.

A policy of economic and human resources. (1967, July 31). Speech delivered at the Annual Convention of National League Cities in Boston, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41, James C. Wheat, Jr., Papers. Virginia Museum of History and Culture.

Arum, R. (2003). *Judging school discipline: The crisis of moral authority*. Harvard University Press.

A Tale of Two Marketplaces. (1986, June 15–27). *The Urban Reporter*, Box 21, M283, Clarence L. Townes Papers, Virginia Commonwealth University.

A West magnet. (1989, August 14). *Richmond Times-Dispatch*, A14.

Barkley, E. B. (1994). *Uncle Ned's children: Negotiating community and freedom in post-emancipation Richmond, Virginia* [Unpublished doctoral dissertation]. Kent State University.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Best and worst elected official. (1988, July–August). *Richmond Surroundings Magazine*, 28–34.

Blacker, D. (2000). Proceduralism and the Orthodox backlash against students' rights. *American Journal of Education, 108*(4), 318–355.

Black Power: What the term means to Richmonders. (1966, July 30). *Richmond Afro-American*, 1–2.

Blad, E. (2019, May 8). Student discipline: Discipline in schools. *Education Week, 32*, 4.

Board of Education v. McCluskey, 458 U.S. 966. (1982).

Bradley, Paul. (1991, March 2). Dr. West's post might be eliminated, sources say. *Richmond Times-Dispatch*, 17.

Business directory for Henrico and Chesterfield County. (1980). *Richmond Surroundings Magazine*, 5–90.

Callihan, S. L. (1992). *A mini history of the Richmond Public Schools, 1869–1992*.

Campbell, T. (1980, June 19). Opponents of West's transfer to seek board hearing today. *Richmond Times-Dispatch*, 30.

Campbell, T. (1987a, June 4). Superintendent says West must follow rules. *Richmond Times-Dispatch*, B1.

Campbell, T. (1987b, June 5). West to yield on honor society induction rules. *Richmond Times-Dispatch*, B1.

Campbell, T. (1987c, December 29). U.S. judge rules that two searches West ordered at school—were illegal. *Richmond Times-Dispatch*, A1.

Carey v. Piphus, 435 U.S. 247. (1978).

Cecelski, D. S. (1994). *Along freedom road: Hyde County, North Carolina, and the fate of Black schools in the South*. University of North Carolina Press.

Changes in Richmond's Population, 1950–1967. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Chiles, M. T. (2020). "Down where the South begins": Black activism before the modern civil rights movement, 1899–1930. *Journal of African American History, 105*(1), 56–82.

Clarence L. Townes, Jr., Papers, M 293, Box 21. Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University.

Cleveland, N.Y. hardest hit by wave of wave of violent unrest. (1966, July 30). *Richmond Afro-American*, 1–2.

Council shares blame for racial strife, panel says. (1981, April 28). *Richmond News Leader*, found in clipping form, Box 11, M240, George Stevenson Kemp Papers, Virginia Commonwealth University.

Countryman, M. (2006). *Up South: Civil rights and Black power in Philadelphia*. University of Pennsylvania Press.

Cramer, Paul. (1981). A view of education today. *Richmond Surroundings Magazine*, 11.

Cummings, J. (1988, June 5). West, Law have dealt with issues, not egos … so far. *Richmond Times-Dispatch*, 17.

Currence, C. (1985, January 23). Court upholds "reasonable" searches of students. *Education Week*. https://www.edweek.org/ew/articles/1985/01/23/05070036.h04.html

Cyna, E. (2019). Equalizing resources vs. retaining Black political power: Paradoxes of an urban-suburban school district merger in Durham, North Carolina, 1958–1996. *History of Education Quarterly, 59*(1), 35–64.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Danns, D. (2003). *Something better for our children: Black organizing in Chicago public schools, 1963–1971*. Routledge.

Deitz, S. M., & Hummel, J. (1978). *Discipline in the schools: A guide to reducing misbehavior*. Educational Technology Publications.

The development of a county: Chesterfield's Past Present, & Future. (1982). *Richmond Surroundings Magazine*, 93.

Docking, J. W. (1987). *Control and discipline in schools: Perspectives and approaches*. Harper & Row.

Doulas L. Wilder Papers. (1984–1994). Box 21. Series XI. Virginia Union University.

Dr. Leon Sullivan, Opening Speech at the Moral Re-Armament Conference Unity in Diversity. (1984, November 16–18). Folder 1984, File Cabinet #1, Initiative of Change Archives.

Dr. Thomas H. Henderson to Mr. J. C. Wheat. (1967, August 11). Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), Box 41, James C. Wheat, Jr., Papers. Virginia Museum of History and Culture.

Drake, W. A., & Holsworth, R. D. (1996). *Affirmative action and the stalled quest for Black progress*. University of Illinois Press.

Duke, D. L., & Meckel, A. M. (1980). *Managing student behavior problems*. Teachers College, Columbia University Press.

Eaton, S., & Meldrum, C. (1997). Broken promises: Resegregation in Norfolk, Virginia. In G. Orfield (Ed.), *Dismantling desegregation: The quiet reversal of Brown V. Board of Education* (pp. 115–142). New Press.

Epes, C., & Cummings, J. (1987, November 5). School board action in discipline cases questioned. *Richmond Timed-Dispatch*, 21.

Epes, C., & Cummings, J. (1988a, March 2). Board affirms policy on weapons in city schools. *Richmond Times-Dispatch*, 13.

Epes, C., & Cummings, J. (1988b, May 4). West's quotes rankle parents. *Richmond Times-Dispatch*, 17.

Epes, C., & Cummings, J. (1988c, October 5). City student count continues. *Richmond Times-Dispatch*, 26.

Family income by race in city of Richmond (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Family income comparison for Richmond City-Henrico County. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Farmer, R. (1989a, April 13). Board won't scold West about doors. *Richmond Times-Dispatch*, B1.

Farmer, R. (1989b, August 2). School board reproves West. *Richmond Times-Dispatch*, B1.

Farmer, R. (1989c, August 28). West defends actions as hearing on fate nears. *Richmond Times-Dispatch*, A1.

Federal Bureau of Investigation. (1980–1989). Crime data explorer. https://crime-data-explorer.fr.cloud.gov

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Fenske, N. R. (1997). *A history of American public high schools, 1890–1990*. Edwin Mellon Press.

Ferraro, T. (1987, December 27). Tough N.J. principal who saved school from "thugs" balks at school restraints. Los Angeles Times, 1.

Final Report of the 1989 Commission on Prison and Jail Overcrowding. (1990). House Document no. 46, Regular Session of the General assembly of Virginia, p. 1.

Fishel v. Frederick County School Board, 11 Va. Cir. 283. (1988).

Foster care & aid to dependent children, number served and cost 1960 & 1967. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

General Assembly of the Commonwealth of Virginia Archives, Richmond, Virginia.

Glasser, W. (1986). Discipline is not the problem: Control theory in the classroom. *The Education Digest, 51*(9), 241–246.

Grim, M. (1980, January 13). Lindwood Briley convicted, gets 5 life terms. *Richmond Times-Dispatch*, A1–A2.

Goode, R. (1987, September 29). Plaintiffs must give full names in West lawsuit. *Richmond Times-Dispatch*, A1.

Goode, R. (1988a, April 5). Ex-pupils awarded legal fees in West search case. *Richmond Times-Dispatch*, A13.

Goode, R. (1988b, May 26). Substitute teacher says dress led to firing by West. *Richmond Times-Dispatch*, 17.

Goss v. Lopez, 419 U.S. 565. (1975).

Gottschalk, M. (2006). *The prison and the gallows: The politics of mass incarceration in America*. Cambridge University Press.

Gottschalk, M. (2014). *The prison state and the lockdown of American politics*. Princeton University Press.

Gregory, S. (1998). *Black corona: Race and the politics of place in an urban community*. Princeton University Press.

Hampel, R. (1986). *The last little citadel: American high schools since 1940*. Houghton Mifflin Company.

Harris, R. (1980, June). Richmond: Former Confederate capital finally falls to Blacks. *Ebony Magazine*, 44–53.

Hayter, J. M. (2017). *The dream is lost: Voting rights and the politics of race in Richmond, Virginia*. University of Kentucky Press.

Heinemann, R. L. (2007). *Old Dominion, New commonwealth: A history of Virginia, 1607–2007*. University of Virginia Press.

Henderson, D. H. (1985, July). The Constitutional rights of probationary teachers: Improper assessment may be costly to school boards. *Journal of Law and Education, 14*(3), 510–13.

Hirsch, A. R. (1983). *Making the second ghetto: Race and housing in Chicago, 1940–1960*. University of Chicago Press.

Hinton, E. (2016). *From the war on poverty to the war on crime: The making of mass incarceration in America*. Harvard University Press.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Hollingsworth, E. J., Lufler, H. S., Jr., & Clune, W. H., III. (1984). *School discipline: Order and autonomy*. Praeger Publishers.

Hurwitz, H. L. (1988). *The last angry principal*. Halcyon House.

Increase in welfare costs city of Richmond, 1950–1968. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Interview with Roy West—"I make no apology for my no-nonsense approach." (1989, August 28) *Richmond Times-Dispatch*, A11.

Judge Convicts James Briley. (1980, October 29). *Richmond Times-Dispatch*, B4.

Kafka, J. (2009). Shifting authority: Teachers' role in the bureaucratization of school discipline in postwar Los Angeles. *History of Education Quarterly, 49*(3), 323–346.

Kelly, D. (1987, August 19). Harrison-Jones transfers West to Mosby school. *Richmond Times-Dispatch*, A1.

K'Meyer, T. E. (2013). *From Brown to Meredith: The long struggle for school desegregation in Louisville, Kentucky, 1954–2007*. University of North Carolina Press.

Kruse, K. M. (2007). *White flight: Atlanta and the making of modern conservatism*. Princeton University Press.

Lassiter, M. D. (2007). *The silent majority: Suburban politics in the sunbelt South*. Princeton University Press.

Lazarus, J. M. (2019, May 31). Dr. Roy A. West, former Richmond mayor, educator, dies at 89. *Richmond Free Press*. http://richmondfreepress.com/news/2019/may/31/dr-roy -west-former-richmond-mayor-educator-dies-89/

Leroy A. West. Virginia Department of Health; Richmond, Virginia; Virginia Divorce Records, 1918–2014. Certificate no. 1943005634. Ancestry.com.

Lewis, E. (1993). *In their own interests: Race, class and power in twentieth-century Norfolk, Virginia*. University of California Press.

Lohmann, B. (2019, May 26). Roy A. West, an outspoken figure who rose from childhood poverty to be mayor of Richmond, has died. *Richmond Times-Dispatch*, 11Z.

Mayor West wants more use of electric chair. (1985, August 3). *Richmond Afro-American*, 1.

McAllister, R. (1987, August 19). Immune from suit, West, others say. *Richmond Times-Dispatch*, A3.

McDaniel, T. R. (1986). A primer on classroom discipline: Principles old and new. *Phi Delta Kappan, 68*(1), 63–67.

McLennan, R. (2008). *The crisis of imprisonment: Protest, politics, and the making of the American penal state, 1776–1941*. Cambridge University Press.

Miller, B. (1976, June 18). School board clears personnel shifts. *Richmond Times-Dispatch*, 1, 7.

Miller, B. (1981, September 21). Political clout seen as start. *Richmond Times-Dispatch*, A1, A6.

Mirga, T. (1981, October 26). Discipline: Is it really as serious a problem as the public thinks? *Education Week*. https://www.edweek.org/ew/articles/1981/10/26/01080017.h01 .html

The model code for the school community rights and responsibilities. (1983). *Richmond Surroundings Magazine*, 23.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Moeser, J. V., & Dennis, R. B. (1982). *Politics of annexation: Oligarchic power in a southern city*. Schenkman Publishing Company.

Moore, J. T. (1975). Black militancy in readjuster Virginia, 1879–1883. *Journal of Southern History, 41*(2), 167–186.

Moore, S. (1982). The development of Henrico: Growth into the 1980s. *Richmond Surroundings Magazine*.

Nelson, A. R. (2005). *The elusive ideal: Equal educational opportunity and the federal role in Boston's public schools, 1950–1985*. University of Chicago Press.

Notes for talk to Richmond First Club (1981, February 26). Race Relations in Richmond, 1980–1984, Box 11, M240, George Stevenson Kemp Papers, Virginia Commonwealth University, Richmond, Virginia.

Overby, E T. (n.d.). The crusade for voters in retrospect: An organizational history. Richmond Crusade for Voter collection, Collection # M 306, Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University, Richmond, Virginia.

Overby, E. T. (1975). *It is better to light a candle than to curse the darkness: The autobiographical notes of Ethel T. Overby*. n.p.

Page, C. (1988, January 5). A drill sergeant in the hallways. *Chicago Tribune*, 5.

Perlstein, D. (2004). *Justice, justice: School politics and the eclipse of liberalism*. Peter Lang.

Pratt, R. A. (1992). *The color of their skin: Education and race in Richmond, Virginia, 1954–89*. University of Virginia Press.

Principal appointed in King and Queen. (1988, July 20). *Richmond Times-Dispatch*, A1.

Racial tensions workshops, researching and publishing housing patterns in Richmond. (1979). Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Racism/Racial polarization program. (1982, January 25). Annual Meeting of the Richmond Urban Institute, January 25, 1982, Annual/Semi-Annual Meetings, 1980–1983, 1985. Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Ralph, J. R. (1993). *Northern protest: Martin Luther King, Jr., Chicago, and the civil rights movement*. Harvard University Press.

Randolph, A. L. W. (2010). It is better to light a candle than to curse the darkness: Ethel Thompson Overby and democratic schooling in Richmond, Virginia, 1910–1958. *Educational Studies, 48*(3), 220–243.

Randolph, L. A., & Tate, G. T. (2003). *Rights for a season: The politics of race, class, and gender in Richmond, Virginia*. University of Tennessee Press.

Rasmussen, C. (2017). Creating segregation in the era of integration: School consolidation and local control in New Brunswick, New Jersey, 1965–1976. *History of Education Quarterly, 57*(4), 480–514.

Report of the Department of Corrections: Studying the use of wiretaps in the Virginia Correctional System. (1987). Senate Document No. 10, Regular Session of the General Assembly of Virginia, p. 1.

Richmond Annexation Files. M 183. Box 3. Special Collections and Archives, James Branch Cabell Library, Virginia Commonwealth University Richmond, Virginia.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Richmond Public Schools. (2019–2020). *Student code of responsible ethics*. https://
www.rvaschools.net/site/handlers/filedownload.ashx?moduleinstanceid=1269
&dataid=26629&FileName=SCORE%202019-2020%20-%20ENGLISH.pdf

Richmond School Board. (1985–1986). Meeting minutes.

Richmond School Board. (1987–1988). Meeting minutes.

Richmond School Board. (1989–1990). Meeting minutes.

Richmond Renaissance Inc. Archives. M 303. Box 4. Special Collections and Archives, James
Branch Cabell Library, Virginia Commonwealth University.

Rimer, S. (1988, January 14). Patterson principal: A man of extreme. *New York Times*, B1.

Rubinstein, R. E. (1986). Do schools discipline students too much? *The Phi Delta Kappan,
67*(8), 614–615.

Ryan, J. (2010). *Five miles away, a world apart: One city, two schools, and the story of educational
opportunity in modern America*. Oxford University Press.

Rousmaniere, K. (2013). *The principal's office: A social history of the American school principal*.
State University of New York Press.

S. Buford Scott to Clarence L. Townes, Jr. (1983, January 13). Richmond Renaissance:
Correspondences, Notes, Misc, Box 16, M283, Clarence Townes Papers, Virginia
Commonwealth University.

School board gets tough on conduct. (1986, August 2). *Richmond Afro-American*, 1–2.

Shanker, A. (1985). The reform reports: Reactions from the front lines. *Education and Urban
Society, 17*(2), 215–222.

Silver, C. (1984). *Twentieth-Century Richmond: Planning, politics, and race*. University of
Tennessee Press.

Simmons, L. (2017). *The prison school: Educational inequality and school discipline in the age of
mass incarceration*. University of California Press.

Smith, S. S. (2004). *Boom for whom?: Education, desegregation, and development in Charlotte*.
State University of New York Press.

Squires, P. C. (1982a, June 5). Mrs. Ritchie top spender. *Richmond Times-Dispatch*, B1.

Squires, P. C. (1982b, July 8). West foresees no problem holding down two jobs. *Richmond
Times-Dispatch*, B1, B7.

Stallsmith. P. (2019, May 29). Editorial: Roy A. West, eternal correspondent. *Richmond
Times-Dispatch*, 10A.

State of the city report. (1983). Richmond, Virginia, Department of Community
Development Division of Comprehensive Planning, found in Second Street Business
District Revitalization, Box 4, M303, Richmond Renaissance Papers, Virginia
Commonwealth University.

Stoney, Levar. (2019, April 7). How can we best meet RVA's needs. *Richmond Times-Dispatch*,
E1.

Sudler, C. (2017). *Presumed criminal: Black youth and the justice system in postwar New York
City*. New York University Press.

Sugrue, T. (1996). *Origins of the urban crisis: Race and inequality in postwar Detroit*. Princeton
University Press.

Sundquist, E. (1985, April 19). Night of brutality ended Briley gang's spree. *Richmond Times-
Dispatch*, A6.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

Superintendent of schools transfers West, he in turn calls for her resignation. (1987, August 29). *Richmond Afro-American*, 1.

Table 1, Reported offenses: 1976–1980, Second Street study area Richmond, Virginia, 1980, Economic and market analysis, 1–10, 2nd Street commercial revitalization, 1981, Box 4, M303, Richmond Renaissance Papers, Virginia Commonwealth University.

Table 4—Family income for Richmond City, Metropolitan area less Richmond, and Metropolitan area. (1968, February 26). Tables found in a packet from George R. Talcott, Boundary Expansion Coordinator of Chesterfield County to Mr. Nathan Forb, Councilman for the City of Richmond, Exhibit Px.14, 1968, Annex, Box 3, M183, Annexation Files, Virginia Commonwealth University.

Taxpayers' group proposals seen harmful. (1981, October 16). *Richmond News Leader*, article found in clipping form in Richmond Independent Taxpayers Association, Second Referendum, 1979–1981, Box 12, M240, George Stevenson Kemp Papers. Virginia Commonwealth University, Richmond, Virginia.

Tensions in the Richmond community. (1980, August). Tensions in the Richmond community, drafts, questionnaires, 1980–1981, Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Tensions in the Richmond communities, announcements. (1982–1983). Box 1 and 16, M258, Richmond Urban Institute Papers, Virginia Commonwealth University.

Thomas, J. M. (2013). *Redevelopment and race: Planning a finer city in postwar Detroit*. Wayne State University Press.

Thompson, H. A. (2003). Making a second urban history. *Journal of Urban History, 29*(3), 291–297.

Trotter, J. (2007). *Black Milwaukee: The making of an industrial proletariat, 1915–45*. University of Illinois Press

Tyack, D., James, T., & Benavot, A. (1987). *Law and the shaping of public education, 1785–1954*. University of Wisconsin Press.

Uneasy peace grips six ghettos. (1966, July 30). *Richmond Afro-American*, 1–2.

University of Richmond. (2019). *Growing up in civil rights Richmond: A community remembers*. https://museums.richmond.edu/_KP4_assets/actions/get/calendar/print.php?eventid=15570&informationid=casDataMuseumExhibition%2Cstartdate%3A2019-02-21%2Cenddate%3A2019-05-10&ssl=true&

Vaughn, W. P. (1974). *Schools for all: The Blacks and public education in the South, 1865–1877*. Lexington.

Wallerstein, P. (2007). *Cradle of America: A history of Virginia*. University of Kansas Press.

Walsh, C. (2018). *Racial taxation: Schools, segregation, and taxpayer citizenship, 1869–1973*. University of North Carolina Press.

Weinig, K. (2000, June 14). The 10 worst educational disasters of the twentieth century: A traditionalist's list. *Education Week*, 31.

West, R. A. (1930, January 15). Birth certificate. Virginia Department of Health; Richmond, Virginia; Virginia, Births, 1864–2016. Ancestry.com.

West, R. A. (1950, November 21). Marriage certificate. Virginia Department of Health; Richmond, Virginia; Virginia, Marriages, 1936–2014; Roll: 101168923. Ancestry.com.

West, R. A. (1951). Richmond, Virginia, City directory, 1951. Online database. Ancestry.com.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms

West, R. A. (1985, October 21). Interview with Carl Rutan. *CSPAN*. https://www.c-span.org/video/?49805-1/crime-statistics

West suspends 40 pupils at Mosby for tardiness. (1987, November 18). *Richmond Times-Dispatch*, 17.

When Trinity says "college preparatory," we are not just talking. (1982). *Richmond Surroundings Magazine*, 8.

Why Brandermill is the best community in America, from a child's point of view. (1983). Brandermill Realty Ad, *Richmond Surroundings Magazine*, 10.

Williams, J. (1990a, April 13). Freedom sweet, Gray declares—sweatsuit replaces prison-issue clothes. *Richmond Times-Dispatch*, A1.

Williams, J. (1990b, August 30). Gray comes full circle, is convicted. *Richmond Times-Dispatch*, A1.

Williams, M. P. (1988, July 11). Superintendent couldn't win fight with board, she thought. *Richmond Times-Dispatch*, A1.

Winslow, O. (1988, August 1). 650 discuss crisis in schools. *Richmond Times-Dispatch*, A1.

Wood v. Strickland, 420 U.S. 308. (1975).

Young, M. R. (1987a, May 17). West defends his policies at school as "fair, firm." *Richmond Times-Dispatch*, B1–B2.

Young, M. R. (1987b, May 23). West has till Tuesday on honor society stand. *Richmond Times-Dispatch*, B-1.

Young, M. R. (1987c, June 18). West controversy dealt with, Hassell says. *Richmond Times-Dispatch*, B7.

Young. M. R. (1987d, November 6). Criticism by West held inappropriate. *Richmond Times-Dispatch*, A1.

Zirkel, P. A., & Richardson, S. (1997, January). The "explosion" in educational litigation: An update. *Education Law Reporter*, 341–351.

MARVIN T. CHILES (mchiles@odu.edu) is an Assistant Professor of African American History at Old Dominion University in Norfolk, Virginia. His research focuses on racial reconciliation in the Modern South, with specific interest on Richmond, Virginia. Chiles holds a PhD in American History from the University of Georgia.

This content downloaded from
128.82.240.186 on Fri, 20 Nov 2020 16:25:50 UTC
All use subject to https://about.jstor.org/terms