

"A Period of Misunderstanding"

Author(s): MARVIN T. CHILES

Source: *The Virginia Magazine of History and Biography*, 2021, Vol. 129, No. 3 (2021), pp. 244–278

Published by: Virginia Historical Society

Stable URL: https://www.jstor.org/stable/10.2307/27041492

**REFERENCES**
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/10.2307/27041492?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Virginia Historical Society* is collaborating with JSTOR to digitize, preserve and extend access to *The Virginia Magazine of History and Biography*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms



This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

MARVIN T. CHILES

# "A Period of Misunderstanding"

## Reforming Jim Crow in Richmond, Virginia, 1930–1954

O n Sunday, 23 May 1954, attorney Oliver Hill and dentist Jesse Tinsley spent most of their day in a crowded Atlanta airport. It was not until 1:30 a.m. that they were allowed to board a plane back home to Richmond, Virginia. The two-hour trip gave them something that they had not had in weeks, a chance to rest and anticipate what would confront them after weeks of travel. Hours after landing, Virginia governor Thomas Stanley summoned both men to the Executive Mansion. He praised them for helping overturn *Plessy* v. *Ferguson* less than a week before. However, Governor Stanley followed his half-hearted congratulations by commanding both men to "just let it ride" and not pursue school desegregation in Richmond. Their rejection represented the black South's final answer to the century-long race question. From this moment forward, black leaders worked exclusively to end racial inequality and not ally with white liberals to reform its most blatant indignities.[1]

A wise man named Dr. Gordon Blaine Hancock predicted that this would happen; not the meeting, but the end of interracial efforts to reform Jim Crow. The esteemed minister, theologian, and race leader used an opinion-editorial to explain that following World War I, optimistic black and white leaders formed interracial committees to help "the white man understand the Negro and the Negro understand the white man." But in the process, both sides created "a period of misunderstanding" where "the Negro misunderstood the southern white man in that he proposed that full citizenship was just around the corner." Southern white leaders also assumed that "the Negro would be indefinitely satisfied in a situation where he was rushed to the front in times of war and to the rear in times of peace."[2]

*Marvin T. Chiles is Assistant Professor of African American History at Old Dominion University.*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

The "Gloomy Dean," as Hancock was often called for his pessimism, rightfully predicted that this misunderstanding would come crashing down, and indeed it did after the *Brown* v. *Board of Education* decision. "The white man [now] understands the Negro and the Negro understands the white man," he wrote. Black Americans knew that when whites said "not now" on racial equality, it "was a smooth way of saying no, never." Whites also knew that "the Negro cannot be bullied into abject submission to second class citizenship" with limited reform efforts. Hancock, a black conservative who long believed that black and white southerners could fix their race problem without outside interference, pondered if black people were willing to pay the steep price for this understanding, given that "matters may have to become worse in order to become better" in the years following the unanimous 9-0 decision.[3]

Hancock was a child of Jim Crow, a time defined by scholars as the seventy-five-year period of codified racial segregation, political disenfranchisement, and the societal othering of black southerners between the 1880s and 1950s. Like some of Jim Crow's children, Hancock dared to understand and reform this peculiar institution. The forgotten alternatives of Reconstruction predated him. The social movements of the 1960s were, as a biographer later surmised, too radical for him. Hancock was like many southern reformers in that he had limited perceptions of racial progress. The color line was all he knew. Hence, Hancock and other southern liberals worked within the confines of racial segregation to perfect Jim Crow—a system they would later learn to be imperfectible.

Historians disagree on whether Jim Crow reforms aided or hindered the successive modern civil rights movement (1954–68). Some see the improvements in black education and political mobilization as critical turning points in southern history. These improvements helped future reformers clamor for a South without racial discrimination, leading to the eventual repeal of Jim Crow laws. Others judge the era by its limitations, seeing white liberal support for racial segregation—a system that was inherently unequal and shrouded in white supremacy—as a hindrance to the region's social progress. Historians mostly agree, however, that Jim Crow was a watershed moment for southern political thought, and not just the crystallization of white supremacy. Efforts to perfect race relations during Jim Crow showed the sys-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

tem's fluidity, ultimately creating an internal war to end segregation. The modern civil rights movement did not end a solid political and social system. It emerged from an unstable institution that consistently succumbed to its most flagrant contradictions.[4]

This article shows that mid-twentieth century Richmond contributes to the voluminous literature on Jim Crow's internal demise. In the process, it argues that the struggle to reform Jim Crow between the Great Depression and the *Brown* decision ultimately compelled white and black reformers in Richmond to abandon interracial cooperation and, with it, Jim Crow altogether. Richmond's struggles with civil rights reform after *Brown* are linked to its longer history of managed race relations between 1930 and 1954. These relations are critical to Virginia's civil rights historiography, which is largely written in resistance to the black freedom struggle—before the 1990s—being relegated to the outskirts of the commonwealth's history. Recent scholars have meticulously closed that gap in the last three decades, arguing that Virginia was in line with the white South's struggle to maintain racial inequality during the mid-twentieth century. This article contributes to this flowering field as well by connecting the political and legal difficulties of Virginia's modern civil rights movement to failed reform efforts in Jim Crow Richmond.[5]

AT THE DAWN OF THE TWENTIETH CENTURY, Richmond culturally and economically transitioned to a New South city. Although Atlanta, Memphis, and Birmingham led the region's economic recovery after the Civil War, Richmond, too, saw economic prosperity in industry, banking, real estate, and retail. At the foundation of this growth was a conscious effort to place black southerners back in the social doldrums created by slavery and removed by the Civil War and Reconstruction. This new social system—created by city government and the business community and backed by the state legislature—was Jim Crow, a stream of laws to enforce the custom of racial segregation and political disenfranchisement. Forced separation and black political impotence had become so integral to New South Richmond that a black minister once coined the former Confederate capital as "Down Where The South Begins." This reality compelled black business leaders to become activists. In 1904, former city councilman and *Richmond Planet* edi-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

tor John Mitchell, Jr., led an unpopular and unsuccessful boycott against segregated streetcars. Six years later, Mitchell challenged residential segregation by relocating his bank to a white middle-class neighborhood. The editor even ran for governor on an all-black slate after Republicans lily-whited their state convention. These failed efforts compelled the editor to fund an interracial legal committee to challenge the constitutionality of Jim Crow laws. After eighteen years of trial and error, the committee partnered with the NAACP national office in New York City and won two cases that weakened the legal foundation of disenfranchisement and segregation in Richmond and the South by the fall of 1930.[6]

Mitchell was dead almost six years by the time his initial investment paid off. However, progress was halted by the legal committee's refusal to work with the NAACP any further. The committee felt that the national office—staffed with highly trained esquires from the northeast—disrespected lesser-trained southern attorneys. Evidence of the national office's perceived arrogance was often seen in its press releases. After one case, for example, the NAACP claimed that it was because of it that "Negroes in Richmond have been saved from being forced by law to live in Ghettoes." This separation was magnified by the Richmond NAACP's inability to maintain steady membership in the 1920s. Less than a month after the federal courts invalidated Richmond's Democratic Party ban on black primary voting, the national office sent its field secretary from Baltimore to awaken the Richmond branch from its "apathetic state." According to the field secretary, "National officers have several times offered to come to Richmond, but these visits have been declined." The rejections came after he contacted fifty-five civic organizations and more than 100 black middle-class residents for help. One black pastor reluctantly facilitated the secretary's membership drive in October 1930. After a week of recruiting, he only enlisted forty-seven new members to the local and national branches. Before departing for Norfolk, the secretary told the *Planet* that unless black Richmond found new energetic leaders, the activist spirit would "live awhile and die awhile as had been the case in the past."[7]

Dr. Gordon Blaine Hancock may have taken offense to that proclamation. By the fall of 1930, he was a renowned minister, scholar, and black race leader living in Richmond. Hancock was also one of the black Richmonders

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

who refused to help the NAACP secretary. The South Carolina native had come to Richmond nine years before to accept a professorship at Virginia Union College (now Virginia Union University) and a pastorship at Moore Street Baptist Church. His arrival was part of a wave of academics infiltrating southern universities and urban areas to expand their intellectual life. Colleges once dedicated to industrial training, agriculture, and divinity were transforming into universities specializing in the liberal arts. This intellectual growth was not equally shared between the races. Southern state governments and northern philanthropic foundations ensured that historically black colleges and universities lagged financially behind their white counterparts. White public and private universities had better-trained faculty, more research money, larger departments, and closer access to political power brokers. This disparity helped white universities and scholars maintain their educational supremacy. However, it also allowed black academics like Hancock to convert their investigation of black life and race relations into a unique form of activism that did not fall in line with the NAACP's agenda.[8]

In short, Hancock did not assist the NAACP secretary because he was doing race work of his own. As a pastor and academic, he represented black Richmond on the Commission on Interracial Cooperation. This group of about 7,000 white and black reformers (mainly ministers, academics, and social workers spread throughout the South) operated on the intellectual fringe of American liberalism. They had grown leery of the region's reputation for violence, political corruption, and racism. Therefore, the commission openly denounced lynching, spoke against blatant political corruption, and promoted interracial harmony. However, it did not seek to end racial segregation. The commission's southern white members believed the South needed forced separation to maintain racial harmony. But that separation should be controlled by whites who would, with black support, gradually improve black social, economic, and political conditions. Southern black reformers like Gordon Hancock were realists who operated within this continuum. To improve the black condition under Jim Crow, they advocated for self-reliance and white paternalism. Hancock often espoused that black southerners ought to make themselves "worthy" of equality through education, economics, sobriety, and cultural refinement. In the process, he

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

appealed to white liberal egos by compelling them to uphold—as much as they were willing—the equal portion of *separate but equal.*[9]

Weeks after meeting with the NAACP field secretary, Hancock helped organize an interracial meeting at Richmond's St. Paul's Episcopal Church, known at the time as the "Cathedral of the Confederacy." He selected Tuskegee Institute president and Booker T. Washington's heir Dr. Robert Moton as the keynote speaker. Hancock saw the Tuskegee men broadly, and Moton in particular, as exemplars of black southern leadership. Their alliance with white liberals and conservatives alike "rendered the race and the nation a great service," he once opined. At the interracial meeting, Moton espoused the southern black accommodationist stance: "The law requires that the Negro shall receive separate, but equal accommodations." Moton, a man that Hancock once praised for gaining "the respect of both the right and left wings of Negro thought," was scolded by the pro-NAACP *Planet.* "The Interracial Commission keeps but little company with the NAACP," an opinion-editorial stated, criticizing Moton and Hancock. Moton's speech and subsequent backlash in the black community revealed the emerging dichotomy in southern black political thought. Because NAACP court victories helped black southerners see the prospect of racial integration, men like Hancock were under tremendous pressure to reform Jim Crow.[10]

The NAACP field secretary from Baltimore also contacted a dentist named Dr. Jesse M. Tinsley. The Martinsville, Virginia, native came to Richmond in 1930 after completing his training at Meharry Medical College. Tinsley's activism started a year later when he became the NAACP's Richmond branch president. Chances are that seminars at the Francis J. Torrance School of Race Relations sparked his interest in race politics. Started at Virginia Union University by Gordon Hancock, the Torrance School was the first in the nation dedicated solely to creating "better race relations." Hence, the social sciences courses were opened to all, not just Virginia Union students. Other black and white southern universities later replicated this school's structure and purpose. Hancock taught that as members of "the race furthest down" on the social ladder, blacks had to work with white liberals to obtain racial equality within the confines of segregation. This message was sometimes usurped by more radical sentiments. A white liberal donor, and Hancock's close friend, Lucy Randolph Mason

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

often spoke at Torrance School gatherings. "I do not agree that the Negro race is the one farthest down," Mason once said in opposition to Hancock. She, like a few others, believed that full equality between the races should not be hindered by segregation.[11]

Hancock also undermined his own message by popularizing the "Double-Duty-Dollar" concept in 1933. During the darkest days of the Great Depression, Hancock told his Torrance School pupils they should not spend money at establishments that refused to hire or equally serve black patrons. Tinsley and more than 100 of his newest branch members (mostly Virginia Union students) converted Hancock's message into a movement against Jim Crow employment in Richmond. On 10 March 1934, they protested and boycotted the Atlantic & Pacific Department Store (A&P) for accepting black clientele while refusing to hire black clerks. From morning until night, black protesters chanted Hancock's message: "Don't Buy Where You Can't Work, This Store Does Not Employ Colored Clerks." The man who championed this cause neither envisioned, nor condoned, blacks protesting in the streets. "If every one of our protests were heeded, our lack of unity would still unfit us for the full estate of citizenship," Hancock once said critically. He separated from Tinsley by holding symposiums to end the protests and work toward "more and better segregation." To Hancock's disappointment, Tinsley continued following orders from the national NAACP office by putting Richmond in line with branches in Washington, D.C., Baltimore, Newark, Chicago, and Harlem who protested their respective A&Ps as well.[12]

Tinsley quickly learned the limitations of direct-action protest. Throughout the spring and summer of 1934, the *Planet* reported that there was "no weakening of the picket lines." However, Tinsley recounted that many black Richmonders "have not stop[ped] going in [to A&P] and will never." This was because A&P was one of the only downtown department stores to accept black clientele. Protest apathy also came from department store owners firing black employees who were known boycott supporters. One mass firing resulted in fifty black women (mostly cooks) losing their jobs on the same day. Tinsley responded by calling for a boycott of the department stores that fired black workers. However, black Richmonders, many of whom were middle class, refused to stop patronizing downtown

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

businesses. It became clear to Tinsley that black Richmonders "had gotten tired" of protesting by the end of the summer. "Richmond is the hardest place to get your people to do anything," the disappointed branch president told the national office secretary. Empathizing with Tinsley, the secretary contacted his liberal white friends in the A&P corporate offices in New York. Because of the overreliance on white southern dollars, A&P's corporate officers refused to intervene on behalf of black workers.[13]

The boycott ultimately failed to integrate the clerking staff at A&P. It did, however, further reveal black Richmond's political dichotomy. The Richmond branch of the NAACP and the Commission on Interracial Cooperation, more specifically Jesse Tinsley and Gordon Hancock, headed ideologically opposed movements to reform the peculiar institution of their generation. If one were to ask Hancock about the "the great[est] barrier to the Negro's further advance," he would have not mentioned Jim Crow. Rather, he saw that it "is in his [black people's] lack of internal cohesion." This black political division was valuable, however, because it assured that Richmond's activist spirit—a collective energy harnessed by the efforts of John Mitchell decades before—would not, as the NAACP field secretary previously warned, "live a while and die a while as had been the case in the past."[14]

THE FAILED BOYCOTT DID NOT STOP TINSLEY'S ACTIVISM. In fact, he was just getting started. Tinsley registered more than 2,000 members to the Richmond branch of the NAACP by October 1934. The next year, he helped create the Virginia State Conference of the NAACP. This collection of local NAACP chapters was designed to keep black activism alive and well throughout the Old Dominion. Tinsley's efforts resembled that of the late John Mitchell. The "Fighting Editor" never joined the NAACP because he felt that southern black leaders were largely responsible for fighting Jim Crow. His sense of regional independence was largely informed by his upbringing during Reconstruction, a time when southern black men used office-holding and economic separation to build their race. Mitchell was reared in a Jim Crowing South while Tinsley grew up in the Jim Crowed South. The dentist saw the NAACP's legal victories in Richmond and elsewhere as a sign that they could lead the next wave of the black freedom

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

struggle. However, Tinsley, in keeping with black Richmond's political tradition, remained largely independent of the NAACP national office, and events in the next decade widened that gap.[15]

Under Tinsley, the Richmond branch fell less in line with the national office's agenda for the Great Depression. The national NAACP lobbied for federal anti-lynching legislation and increasing black employment within New Deal programs. Black Richmonders, however, focused more on equalizing segregated education. To do this, they targeted the Richmond School Board, an all-white group that cared very little about black education. In February 1935, black parents requested the board build a new black secondary school. The old one—named after white Civil War general Samuel C. Armstrong—was built only thirteen years before. In fact, it was the first black high school built by the city. By 1935, more than 2,300 students crammed into the dilapidated building designed to hold 1,400. The school board insisted that it could not finance any large-scale building projects. This was a well-known falsehood, given that both all-white Albert Hill Middle School and John Marshall High School received elaborate front-door murals and new athletic fields in 1933 and 1934. Even the fiscally conservative mayor's office approved these multi-million-dollar renovation projects. Against the advice of local whites who sympathized with black people, black parents insisted that they receive a new secondary school. This insistence prompted J. H. Binford—school superintendent—to protect Richmond's separate and unequal education system through genteel reform. He ignored the school board's rejection and formally requested $400,000 in building funds from the mayor's office. Binford's wording was urgent, telling the mayor that he needed to help "relieve the congestion in several of the public schools . . . provided for Negro students." Unpersuaded by black Richmonders' concerns, the mayor rejected Binford's proposal within days of receiving it.[16]

"We have decided to take legal steps for a Junior High School," Tinsley later told the national office of the NAACP. The "we" were a small group of parents who wanted to use Armstrong as a test case for attacking Jim Crow schooling in the South. The "legal steps" were raising enough money to fund a federal lawsuit. Unfortunately for Tinsley, the national office did not feel that it was possible "to force the authorities to establish a junior high school

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

254 • Virginia Magazine



This photograph of the Moore Street School "Open Air" Class in 1916 displays some of the school conditions that black Richmond parents and educators protested against in the 1930s, one being the lack of insulation in facilities under the school board's authority. (*Courtesy of The Valentine*)

by legal action." The office made it clear that it appreciated Tinsley's organizational skills and enthusiasm. However, the NAACP was in no position to aid his cause. In 1935, the national office attacked Jim Crow schooling by petitioning against budgetary discrepancies. More specifically, it focused on equalizing salaries between white and black teachers. The national office referred Tinsley to the *Crisis* magazine exposé about fighting school segregation and told him, "If you follow this procedure and organize your political strength, you will get the high school and everything else you want."[17]

Luckily for the black parents, local white businessmen and the white press had gotten wind of a possible lawsuit. They felt that a federal judge might rule in the black parents' favor, given the severe dilapidation of black public school buildings. Binford worked with the business community to

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

help alleviate the situation. They decided to use underdeveloped commercial property to build a new high school. The city council followed by allocating $135,000 in Federal Emergency Administration of Public Works (FEAPW) funds to renovate other black schools. The stream of white support compelled the mayor's office to request $250,000 from the Works Progress Administration (WPA) and commission the building of a new black high school. Fellow Democrat and U.S. senator Harry Byrd not only supported Binford's efforts, but he also personally informed him of the WPA's approval. In November 1936, the board named the completed three-story red-brick and limestone building after the late Maggie Lena Walker, a nationally renowned black bank owner and race leader in Richmond.[18]

Even after the erection of Maggie Walker High School, the board faced tremendous difficulty with managing Jim Crow education. The next issue was not with parents, but with disgruntled black teachers who were fed up with receiving an average of 40 percent less salary than their white counterparts. Taking cues from the national office, Jesse Tinsley organized the teachers, many of whom were NAACP members, into the Richmond Teachers' Association (RTA) in November 1940. This group mimicked the existing Virginia Teachers Association, a group of black teachers (and some white) throughout the state who advocated for improvements to Virginia's sparsely funded, separate and unequal public school system. The bulk of these improvements involved facility maintenance/upgrades and general funding. In spite of the laundry list of requests that could have been made, RTA only petitioned the board to equalize salaries between white and black teachers with similar qualifications. The board, well aware of the budgetary discrepancies, ignored the initial petition.[19]

This rejection compelled Tinsley to hire local attorney and NAACP member Oliver White Hill to represent the RTA. Although born in Richmond in 1907, Hill attended primary and secondary school about four hours west in Roanoke, Virginia. After high school, he matriculated at Howard University, starred in two sports, and focused more on good times than good grades. By 1930, Hill secured admission to the newly expanded Howard Law School. The admittedly mediocre undergraduate finished second in his class at Howard and passed the Virginia bar exam. Hill moved back to Roanoke and became an NAACP operative by helping Jesse Tinsley

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

organize the mostly rural southwest region into the Virginia State Conference of the NAACP. Meager legal work in Roanoke, however, forced Hill to relocate to Richmond permanently. In the spring of 1941, Hill negotiated with Binford to help remedy the pay discrepancy issue out of court. Binford acted in good faith by helping Hill and Tinsley gain an audience with the board. The uncompromising board still rejected the petition. They reasoned that equalized salaries would lower the pay of white teachers instead of raising the pay of black teachers, something that no Richmonder, Virginian, or southerner would ever consider doing.[20]

The school board's rejection highlighted the difference between Tinsley and Hill, which was microcosmic black political thought at the time. Hill believed in compromising with the board, while Tinsley did not. RTA members were also split, not evenly, along this same line. Against Tinsley's wishes, the more conservative-minded RTA members voted to have Hill offer a five-year plan to equalize the salaries in June 1941. The board rejected it and counteroffered with an eight-to-twelve-year equalization plan. In the fall, Hill and the RTA offered the five-year plan one last time before the board refused to negotiate any further. The rejection forced the RTA to follow Tinsley and its more radical faction. On 25 November 1941, the RTA drafted another petition. This time, it was on behalf of Antoinette E. Bowler, a teacher at Dunbar School. She came from a prominent and well-respected black Richmond family. Her father was J. Andrew Bowler, the minister and educator who helped create the city's first black-controlled schools after the Civil War. J. Andrew was so revered by local whites that seven years after this controversy, the city council erected a school in his honor. His daughter Antoinette must have felt secure about her family's favored status among local whites. Knowing that her job would undoubtedly be on the line, she volunteered to be the petitioner and instructed Hill and Tinsley to tell Binford that if the board refused to accept her petition, she would file it in federal court.[21]

The RTA had tremendous liberal white support. The most notable was *Richmond News Leader* editor Douglas Southall Freeman. The famous author and local oligarch not only kept in contact with the NAACP national office throughout the controversy, but he also published strong editorials in the RTA's favor. "Pay ought to be equalized. That is law and that is equali-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

ty," he once stated bluntly. Like Binford, Freeman understood the legal nightmare of maintaining Jim Crow laws. He told Binford that "Richmond will lose the case quickly" if they opposed the petition. He was no integrationist. However, Freeman, like Binford, felt that segregation must be maintained through paternal relations between black and white leadership. The board did not keep with Virginia's tradition of genteel paternalism. On 13 December 1941, it flatly refused to acknowledge the petition. Bowler and Hill wasted little time filing the *Bowler* v. *Richmond* petition in federal court a week later. They also asked the NAACP national office to help litigate the case. The week before Christmas, Binford organized the board for a special session. Within a matter of minutes, it voted to adopt the RTA's original five-year equalization plan. The board stipulated, however, that Bowler had to withdraw her petition from the federal court.[22]

Two days before New Year's Eve, Binford urged Bowler, Hill, and Tinsley to withdraw the petition. "The plan adopted by the board is identical with the plan which was acceptable to your organization prior to the filing of the suit," he said. Binford knew that black progress in Richmond relied on the friendly relationship between its black and the white citizens who would deal with them. "In your campaign for equalization you had the active help of an influential group of Richmond's leading [white] citizens— men who on many occasions have shown their interest in your problem," Binford reminded them. Thus, he opined, "These men, in my opinion, are anxious for you to settle the case out of court." The national office felt the same way. Bowler recounted in a personal letter to Tinsley that the national office told her "the white papers would not support us" and "it would create bad race relations" if she did not drop the petition. This suggestion was justified by legal rationale. After learning that the school board's current deal was previously submitted by the RTA, the national office refused to litigate the case, arguing that it would "appear to be unreasonable" to any federal judge to ask for immediate equalization.[23]

Bowler—a woman who had risked her career and family reputation— was, like other RTA members, disappointed with the national office's decision. "The longer I wait the more disgusted I have become," Bowler wrote to Tinsley. Even the branch president acknowledged the damage that had been done between black Richmond and the NAACP. "I believe it is an

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

unwarranted compromise on the part of the legal staff and it will forever be scored as a black mark against the NAACP in Richmond," he told the national office. Hill reluctantly agreed with the national office and convinced Bowler and Tinsley to drop the petition. On 13 May 1942, city attorneys submitted a decree to implement a five-year equalization plan without contest from Bowler or the RTA. The success of Maggie Walker High School, the failed promise of *Bowler*, and the refusal of the national office to help litigate them both showed the limitations of black resistance during the Great Depression. Black leaders and white liberals reformed some Jim Crow educational customs. Yet, even the most "radical" reformers had to work with white liberals and accept gradual over immediate change.[24]

As America mobilized for World War II, Jim Crow became its most pressing domestic issue. Black and white citizens both experienced the harsh economic conditions of the Great Depression. They did not, however, share the spoils of the war that followed. "The greatest problems seemed to be in finding enough workers to fill the available jobs" during the war, said the Richmond Chamber of Commerce. This was partly true. Virginia's economy boomed from defense industries flooding cities where Richmond's economic and cultural influence was felt the most: Roanoke, Danville, and Lynchburg to the west, Fredericksburg to the north, and Newport News to the east. As men went to these cities in search of work, white contractors refused to hire skilled black labor. These men, like the parents and teachers in Richmond, needed someone to press the issue. They found that someone in the "Dean of the Negro Press," newspaper editor Plummer Bernard Young.[25]

He was born in 1884 to a newspaper editor and a schoolteacher. In 1910, Young moved to Norfolk from Littleton, North Carolina, to follow in his father's footsteps and publish *The Norfolk Journal and Guide*. During his fifty-year career, the *Journal and Guide* became one of the most influential black media outlets in the South. It featured numerous opinion-editorials on race matters, many of which Gordon Hancock contributed. Together, Young and Hancock served on the Commission on Interracial Cooperation. Young alone served on the board of visitors at several black universities, including Howard University in 1934, Virginia State College in 1935, and

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms



These photographs show the C. F. Sauers Company's Christmas party in 1939 (above) and New Year's Eve Party in 1940 (below). Both images display Richmond's inconsistent use of the color line in the mid-twentieth century. Although employees of both races were given separate parties, some blacks attended the white party as servants. Though this inconsistency reinforced the racial caste system, black Richmond activists used flexibility like this to undo Jim Crow segregation. (*Virginia Museum of History & Culture, 1999.250.102* [above] *and 1999.250.101* [below])



This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

Hampton Institute in 1940. By 1942, however, the longtime black accommodationist had grown weary of Jim Crow. "Negroes feel—and they have the right to feel—that this is no time to surrender their legal rights as American citizens." Therefore, when other black accommodationists told their brethren to leave civil rights out of the war, Young blasted them as "misleaders and false prophets." He believed, "It is worse to try to conceal facts and to preach false doctrines to people on the assumption that they will be fooled into acting normally in the face of abnormal conditions."[26]

Young took it upon himself to go "all out in specifying by irrefutable facts and figures the special discriminations" blacks experienced in labor yards. His editorials often had surveys about the disparity between black and white employment. He once reported, "Hundreds of carpenters, bricklayers, roofers, and other skilled members of the building trades are at work on the



Plummer Bernard Young, Sr. (*New Journal and Guide*)

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

construction . . . but there is understood to be only one Negro among them." In many cities where black labor was in abundance, Virginia's Employment Office paid whites to travel from other states to work. Young used his newspaper to help black laborers protest this practice. Even with Young's editorial support, their concerns went largely unaddressed.[27]

"The [*Richmond*] *Times-Dispatch* has been delaying further comment on the discrimination practiced on defense projects in Virginia against skilled Negroes," Young said. The target of his criticism was fellow editor and southern white liberal Virginius Dabney, a man whose lineage is as well known in Virginia as his personal legacy. The Charlottesville, Virginia, native descended from a prominent family (filled with planters, professors, and doctors) who accepted their racial and economic privilege while criticizing its negative impact on those less fortunate. Upon becoming a journalist in the 1920s, Dabney opposed poll taxes and supported federal anti-lynching legislation. He even backed free speech rights for communists and collective bargaining rights for skilled and unskilled workers. However, the Virginia oligarch remained loyal to the color line. Although known for his sympathy toward black Americans, Dabney believed that segregation was foundational to southern society. Hence, even the most radical reform efforts, he believed, should uphold the hypocrisy of *separate but equal*.[28]

Dabney's reluctance to oppose "the complete wiping out of racial differentiation overnight," as he called it, should not have surprised anyone. It did, however, leave outspoken southern black leaders like Plummer Young disenchanted with southern white liberals. Black criticism eventually compelled Dabney to support publicly equal pay for black labor. Still, his reluctance to support equal employment opportunities for both black and white citizens exemplified that southern white liberals were the blind leading the sighted. As Young most eloquently stated about Dabney, "We are still in the wilderness of social, political, and economic maladjustment; and our friends in the majority race—for whom Mr. Dabney is a frank and truthful spokesman—do not know how we are coming out."[29]

Black accommodationists felt the glass ceiling that white reformers like Virginius Dabney refused to acknowledge. "We can depend upon them [white liberals] up to a certain point," Young once told his readers. That point was racial equality; a point of no return, a line they would not cross.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

262 • Virginia Magazine



Gordon Blaine Hancock. (*Virginia Union University Archives and Special Collections Library*)

Young's friend Gordon Hancock was ready to make a similar ideological leap. On 3 July 1942, Hancock received a copy of an editorial that would later be published in the *Planet*-turned-*Richmond Afro-American*. In it, a black Richmonder spoke against Hancock for not criticizing "Virginius Dabney of the *Richmond Times-Dispatch*, who says that colored people must remain inferior during the war and after it is over." This was one of many letters Hancock received about his affiliation with white liberals. However, it was these types of criticism, at this time, that compelled Hancock to make an uncomfortable choice that forever changed race politics in the South.[30]

Hancock ended black accommodationism in its traditional sense. He got "a few representative Negroes [to] come together and formulate a statement setting forth what they wanted in the postwar South." Most of the invitees, even W. E. B. DuBois, came to Virginia Union's campus for the secret

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

meeting in the fall of 1942. After electing Hancock as director and Young as the chairman of this all-black conference, they drafted the Articles of Cooperation: a set of resolutions declaring that black southern leaders would not support any policies that did not promote full racial equality in the post-war years. These articles included equalizing public school spending, skilled and unskilled wages, farmers' subsidies, and all public services between the races. "The Negro has paid the full price of citizenship in the South and nation, and the Negro wants to enjoy the full access of his citizenship, no more no less," Hancock later stated firmly. A few weeks later, hundreds of black leaders joined the Richmond group 150 miles south for the official announcement in Durham, North Carolina. Hancock told the conference, "Should our demands be denied by the white South, we can still appeal to the conscious of the nation; and failing here, we can appeal to the Supreme Court of History, the Great White Throne of the Future." It was here where southern black leaders—many of whom normally disagreed with the NAACP's legal methods—proclaimed that if white liberals did not work toward equality, they would use the legal system to their advantage. Racial equality now became the center, and not the periphery, of interracial cooperation in the South. Hancock made what later became the *Southern Manifesto* in the Bull City. However, he perfected it in Richmond, a place he once stated, "Where the South began."[31]

In the days following Hancock's seminal address, Young told him, "Our Manifesto seems to be turning out to be another shot at Concord that was heard around the world. You really started something, brother." On 8 April 1943, Dabney and other southern white reformers organized a similar all-white conference in Atlanta. "Their statement is so frank and courageous . . . we gladly agree to cooperate," one of them told a fellow southern black leader. Most southern white liberals, however, wanted to dismiss the *Manifesto* and interracial cooperation entirely. One privately complained, "Not one of the earlier leaders that were considered liberal is willing to go along" with equalizing segregation. Dabney used editorials to gain grassroots support for Hancock. Privately, he told his acquaintances something to the effect of, "There was a real crisis. . . . Whatever else we may have to neglect, I think this is one cause we must not desert." Dabney believed that southern white liberals needed to "get along with the Negro leadership of this best

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

type" before black sentiments shifted heavily toward more radical voices. On the day of the Atlanta Conference, white liberal leaders, regardless of where they stood on the issue, came to a consensus and supported Hancock's *Manifesto*.[32]

A month later, the Durham and Atlanta conferences met in Richmond to complete the race conference trinity. The affair produced *The Richmond Statement*, a biracial agreement that, as Dabney told the audience, "urge[d] the general adaptation of the Durham statement" throughout the South. "We should not permit the Interracial Commission to take us over, by any means," Young later told Hancock. He left this celebratory event unconvinced that white leaders intended to push for racial equality. Rather, he felt that they were stalling, keeping black southerners from going to the federal courts. Other black delegates disagreed with Young. The Richmond meeting ended with the dismantling of the Commission on Interracial Cooperation and the creation of the Southern Council on Race Relations, headquartered in Atlanta. The symbolism behind the move to Atlanta—the home of the all-white conference—foreshadowed white leaders further stalling black freedom movements. Understanding this to be the case, Young warned his colleagues that if they were to work with white liberals, they "ought not go to Atlanta as we went to Richmond."[33]

BLACK LEADERS AND WHITE LIBERALS were not the only ones remaking southern race relations. Two black women named Sarah Pettaway and Lavinia Wilder did their part as well. This was not what they wanted to do, however. They just wanted to go shopping in downtown Richmond. As the two women left their homes and approached a segregated trolley car, they noticed that the black section was filled to capacity. They looked for open seats, yet there were none to be had. Both women became restless and sat in the whites-only section. "What are you trying to pull!" the white conductor aggressively exclaimed. His stern voice, as well as the glaring white passengers, compelled Pettaway and Wilder to walk to the back of the trolley without hesitation. As they openly voiced their displeasure with moving, a nearby police officer arrested them both for disorderly conduct. This incident was one of the first tests for white leaders after *The Richmond Statement*. The same thing happened a few years later with black attorney and NAACP

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

member Samuel W. Tucker. He, like Pettaway and Wilder, forced white Richmonders to maintain the delicate balance between racial harmony and the law and order of Jim Crow—a task that Circuit Court judge Carleton Jewett had mastered. In 1943, he fined both women only $2.50 for disorderly conduct. Although Tucker had federal law on his side with the *Morgan* v. *Virginia* decision of 1946, Judge Jewett levied a similar petty fine against him for the same reason.[34]

As attitudes about race changed from the 1930s to the 1940s, Richmond's white leaders readdressed the race question. Their answer was not full equality, but rather more of the same: root out "unnecessary" inequalities. Virginius Dabney led this mission by compelling the Richmond School Board to hold interracial seminars and encourage the combination of black and white parent/teacher associations. White churches also joined this new era of cooperation. Grace Covenant and St. Paul's desegregated their congregations, allowing white ministers to preach sermons that were open to "all races, colors, and creeds." White and black YWCA leaders hosted integrated charity dinners and youth conferences at Richmond's two largest segregated high schools. Even the city library opened its doors to both black and white patrons without segregating its services. Racial harmony hit an all-time high in the former Confederate capital, leading a black college president to see Richmond as proof that the city, state, and region was "on the edge of democracy."[35]

The next two years proved that the president was partially correct. Richmond, like other southern cities, had a long history of black disenfranchisement. Even those who could, and sometimes did, navigate the compulsory taxes and literacy requirements had "no interest in playing a political game which they stood no chance of winning." By 1943, less than 4,000 of Virginia's 33,406 black voters bothered to fill out a ballot. About 1,000 of them lived in Richmond. Both Oliver Hill and Jesse Tinsley understood that they could use this more progressive white liberal sentiment to their advantage. So, in the spring of 1947, they mobilized the "Get Out the Vote" campaign to register black voters. They marketed the drive as a biracial effort to help white liberals replace Richmond's forty-eight-member bicameral council with a more efficient nine-member unicameral council system. The city charter vote, along with Hill's failed campaign for the General Assembly

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

266 • Virginia Magazine

in August 1947, increased Richmond's black vote from 6,347 to more than 11,000 by June 1948. For his efforts with the charter change, white power brokers rallied at least 3,000 white voters to help Hill become a part of the inaugural nine-member group in City Hall. In the process, he also became the South's first black city councilman in the twentieth century.[36]

In a front-page article entitled, "Meet Richmond's New City Fathers After Hours," the *Times-Dispatch* showed Hill and the other councilmen socializing with their families at home. Although Hill was the only black councilman, his image differed very little from his white colleagues. This portrayal of black leadership being equal to white leadership reflected the climax of Jim Crow reform. Richmond was seminal in that whites used



From left to right: Photograph of Calvin Hopkins, Lester Banks, and "Puss" Owens of the "Getting out the Vote" campaign of 1947. (*Virginia Union University Archives and Special Collections Library*)

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 25 of 36 PageID# 1045

the black ballot to promote interracial harmony and political progress in an effort to maintain Jim Crow. This development compelled outsiders to take notice. The *Times-Dispatch* reprinted the *Norfolk-Virginian Pilot*'s assessment of the "evolutionary development in southern politics. . . . The overcoming of this [racial] barrier in Richmond by a highly-qualified representative of the Negro people (necessary with strong white support) . . . should be welcomed. . . . What has happened in Richmond will make it easier for the same thing to happen in . . . other cities."[37]

OLIVER HILL'S PATH TO RICHMOND CITY HALL should have sparked a wave of southern blacks winning elected offices. After all, he proved that the new form of biracialism, although used by whites to maintain the status quo, could yield tangible progress toward ending racial discrimination. However, national developments assured that Hill remained the lone beneficiary of this peculiar period. In 1948, President Harry S. Truman issued Executive Orders 9980 and 9981, ending legally segregated federal workforces and armed services. Truman went further by becoming the first president to support civil rights legislation openly at the federal level. The backlash from southern legislators and white liberal newspaper editors prompted a long-overdue break between black leaders and white liberals. *Afro-American* editor Carl Murphy echoed Gordon Hancock's *Manifesto*, saying that if southern white liberals resisted federal civil rights legislation, "We colored people can get along with it too, until we can, through the courts, compel the states to desist from every form of race discrimination." Black leaders understood that in spite of the progress white liberals made, paternalism was still baked into the southern political body. "You boast about the fact that the southern press has favored the equality of teachers' salaries in Virginia." Yet, "whenever colored people have earned decisions in the courts guaranteeing them" civil rights, they came primarily "through fights which we ourselves have initiated," said Murphy. The editor's words illuminated something that white liberals could not deny. The postwar years would not be defined by the races working toward equality, as promised in *The Richmond Statement* five years earlier. Rather, the twilight years of Jim Crow, or the "period of misunderstanding," was nearing its abrupt end.[38]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

Murphy and Dabney both edited Richmond's largest black and white newspapers. However, Dabney did not directly address Murphy's criticisms. Instead, Dabney responded to longtime acquaintance Gordon Hancock's assessment that white liberals displayed "a very discouraging outlook for the Negroes who have made much of interracialism such as I have through many years." Days after Dabney published an anti-Truman opinion-editorial, Hancock responded in the *Negro Associated Press*. Dabney argued that federal civil rights legislation infringed upon states' rights. Hancock retorted, "Aside from the right to eternally subjugate Negroes, the states' rights fight has no meaning, absolutely none." He further pointed out that white liberals opposed Truman "for no other apparent reason than that he advocated civil rights for Negroes." Dabney admitted to being "considerably hurt" by Hancock's words. He asked Hancock "if you really mean the things you say in your letter. . . . It is difficult for me to believe so." Dabney's warm letter received a cold response from Hancock. He noted that because white liberals "utterly refused to say that they would do themselves what they refused to let Truman do for them," he and other black leaders remained unconvinced that interracialism would survive much longer.[39]

The pro/anti-Truman debate exposed the birth of the modern civil rights era. It was now, after years of calculated gradual reforms, that black Americans in general saw the federal government as, in the words of Gordon Hancock, the "Great White Throne of the Future." Oliver Hill was still in office during this turmoil. He remembered, "After I got elected there was a whole lot of 8-1 or 7-2 votes" in the city council. During his brief two-year stint, he was outvoted on most, if not all, of his initiatives to desegregate or equalize public facilities. Truman's stance hurt black politics in Virginia and the South more broadly. Although black voter registration increased significantly after 1948, and black candidates ran for several local and statewide offices, none were elected. In many cases, the margin of defeat grew with every subsequent election. This convinced Hill that, as he would later state about his electoral chances after *Brown* v. *Board of Education*, "I could not, for the next decade, have been elected dog catcher." Upon his defeat in the 1950 city council election, Hill redirected his energies toward a larger, more impactful project. Before accepting a position on President Truman's Committee on Government Contracts Compliance, he helped the NAACP

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

Case 3:21-cr-00042-JAG   Document 86-8   Filed 07/06/22   Page 27 of 36 PageID# 1047



NAACP lawyer and Richmond City Councilman Oliver White Hill (at left) speaking with fellow councilmen, John Davenport and J. Randolph Ruffin, in April 1949. (*Richmond Times-Dispatch Collection, The Valentine*)

national office form a multistate class action lawsuit against school segregation, the famous *Brown* v. *Board of Education* case.[40]

As *Brown* entered its final stages, Tinsley aided Hill by making it a vital part of black Richmond's political future. Tinsley wanted to raise $50,000 from the Virginia State Conference of the NAACP for the Legal Defense Fund. As the epicenter for Virginia's NAACP activity, Tinsley wanted the Richmond branch to raise more than $10,000 alone. At one fundraiser aptly named the Freedom Fund Cabaret Dance, he helped raise $1,783. Tinsley also worked with the *Afro-American* to increase NAACP fundraising advertisements. Almost every edition of the *Afro-American* between October 1953 and May 1954 used the slogan "Dollar or More to Open the Door" in con-

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

junction with articles detailing where the donations could be sent and how other branches out-performed Richmond in their support for *Brown*. Tinsley also organized outside of bourgeois institutions. He went to various housing projects and reminded the black underclass that desegregated schools would provide their children with a quality education. In spite of these efforts, Tinsley fell well short of his initial goal. On 12 December 1953, he presented Oliver Hill with a check for $5,100—which was the most raised by any individual branch in Virginia—at the NAACP conference in Fredericksburg, Virginia. Wherever black Richmonders were, whatever they did, and regardless of their social standing, Tinsley did all he could to assure the fight for school integration became an intimate part of their future as city residents.[41]

White liberals greeted this newer political wave with preemptive policies. While Tinsley was mobilizing black Richmond in favor of school integration, a more moderate Richmond School Board selected black businessman Booker T. Bradshaw to be the first black board member since Reconstruction. This selection was all the more special because Bradshaw succeeded his great-grandfather, who last served from 1882 until 1884. The board continued this token appeasement by securing Bradshaw's "special advisement" on building a new Armstrong High School in September 1953. Bradshaw also oversaw $11,000 worth of improvements to the all-black Navy Hill Middle School in 1954. According to the superintendent, the board orchestrated these changes to improve "the quality of human relationships" in light of the pending *Brown* decision. Gordon Hancock, however, read "between the lines," as was the name of his widely read editorials. "The segregationist is a shrewd manipulator, resourceful and ingenious," he told his readers. What many saw as steps toward racial progress were, in Hancock's opinion, another form of acidic accommodation. He believed that the board relocated Armstrong High School outside of the city's core to begin an intricate "zoning system" and prevent school integration after *Brown*. Recent scholars who study school desegregation in Virginia later proved Hancock's assertion—at the time a borderline conspiracy theory—to be correct. To the aging Hancock, the board confirmed what he had learned in his many years of race work: southern white liberals were only interested in reforms that maintained racial discrimination.[42]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

The white media did not share the board's sense of urgency. Richmonders who looked to the *News-Leader* or the *Times-Dispatch* for coverage of the *Brown* case were disappointed. Although the *Afro-American* covered it step by step until the decision, neither white newspaper focused on it until May 1954. In the 1 January 1954 edition of the *News-Leader*, editor James Kilpatrick—the infamous bullhorn of Massive Resistance—listed a series of events entitled, "Predictions of Things to Come Here at Home and Abroad." Of all of the issues he addressed, school desegregation was not one of them. Kilpatrick's actions suggest the majority of white Richmond did not know or care about black Richmond's support for *Brown*. This benign neglect came to a screeching halt on 17 May 1954, when the Supreme Court ruled unanimously that segregated schools were unconstitutional. Although the *Times-Dispatch* and the *News-Leader* pondered about how state leaders would deal with integration in Virginia's predominantly black counties, they seldom mentioned how it would impact Richmond. As historians have noted, white Richmonders were more than prepared for the legal loopholing needed to stall school desegregation than other places. This preparation came not from Massive Resistance, but from a two-generation-long tradition of gradual changes to Jim Crow. Post-1954 Richmond is defined by the city's ability to maintain its separate and unequal school system despite judicial mandates. This legacy can be seen largely in the city's currently underfunded and overwhelmingly black public schools. If this article has done nothing else, it shows that the issues Richmond and the region faced after *Brown* came from decades of corrosive reform efforts. Therefore, when Governor Thomas Stanley issued his "calls for cool heads" in May 1954, he did not need to mention Richmond. Here, the heads were the coolest of them all.[43]

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

## NOTES

1.   Oliver W. Hill, *The Big Bang: Brown vs. Board of Education and Beyond: The Autobiography of Oliver W. Hill, Sr.* (Winter Park, Fla., 2000), 170.

2.   "Interracial Tensions Interpreted," Clipping and Writings, Race Relations, box 2, Gordon Blaine Hancock Papers, Duke University, Durham, North Carolina (cited hereafter as Hancock Papers); "The Interracial Commission Comes of Age," Commission of Interracial Cooperation history, Southern Regional Council, 1938–1943, Hancock Papers; J. Douglas Smith, *Managing White Supremacy: Race, Politics, and Citizenship in Jim Crow Virginia* (Chapel Hill, 2002), 46.

3.   "Interracial Tensions Interpreted," Hancock Papers.

4.   "The Tragedy of Interracial Understanding," Clippings and Writings, Race Relations, box 2, Hancock Papers; Smith, *Managing White Supremacy*, 8–9, 17; Clayton McClure Brooks, *The Uplift Generation: Cooperation Across the Color Line in Early Twentieth Century Virginia* (Charlottesville, 2017); Morton Sosna, *In Search of the Silent South: Southern Liberals and the Race Issue* (New York, 1977); John Egerton, *Speak Now Against the Day: The Generation Before the Civil Rights Movement in the South* (Chapel Hill, 1994); David L. Chappell, *Inside Agitators: White Southerners in the Civil Rights Movement* (Baltimore, 1994); Peter Wallenstein, *Blue Laws and Black Codes: Conflict, Courts, and Change in Twentieth-Century Virginia* (Charlottesville, 2004); Kimberley Johnson, *Reforming Jim Crow: Southern Politics and State in the Age Before Brown* (New York, 2010); Mark Ellis, *Race Harmony and Black Progress: Jack Woofter and the Interracial Cooperation Movement* (Bloomington, Ind., 2013); Leslie Brown, *Upbuilding Black Durham: Gender, Class and Black Community in the Jim Crow South* (Chapel Hill, 2008), 310–30; Elizabeth Gritter, *River of Hope: Black Politics and The Memphis Freedom Movement, 1865–1964* (Lexington, Ky., 2014), 5–10. This article agrees with J. Douglas Smith's assertion that Jim Crow laws did not settle the race question in Virginia after World War I.

5.   Robert A. Pratt, *The Color of Their Skin: Race and Education in Richmond, Virginia, 1954–89* (Charlottesville, 1993); Matthew Lassiter and Andrew B. Lewis, *The Moderate's Dilemma: Massive Resistance to School Desegregation in Virginia* (Charlottesville, 1998); Wallenstein, *Blue Laws and Black Codes*; Jason Ward, "A Richmond Institution: Earnest Sevier Cox, Racial Propaganda, and White Resistance to the Civil Rights Movement," *Virginia Magazine of History and Biography* 116 (2008): 262–93; Jill Ogline Titus, *Brown's Battleground: Segregationists and the Struggle for Justice in Prince Edward County, Virginia* (Chapel Hill, 2011), 63–130; William P. Hustwit, *James J. Kilpatrick: Salesman for Segregation* (Chapel Hill, 2013); Edward H. Peeples, *Scalawag: A White Southerner's Journey through Segregation to Human Rights Activism* (Charlottesville, 2014); Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia* (Charlottesville, 2016); Julian Maxwell Hayter, *The Dream is Lost: Voting Rights and the Politics of Race in Richmond, Virginia* (Lexington, Ky., 2017); Margaret Edds, *We Faced the Dawn: Oliver Hill, Spottswood Robinson, and the Legal Team That Dismantled Jim Crow* (Charlottesville, 2018).

6.   Marvin Chiles, "Down Where the South Begins: Black Richmond Activism Before the Modern Civil Rights Movement, 1899–1930," *Journal of African American History* 105 (2020): 56–82; "John Mitchell, Jr., Laid Down His Pen, December 3, 1929," *Richmond Planet*, 4 Jan. 1930, 4; Ann Field Alexander, *Race Man: The Rise and Fall of the "Fighting Editor," John*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

*Mitchell, Jr.* (Charlottesville, 2002); "Charter Application for Richmond, Virginia," 25 Feb. 1917, folder 1, box I:D68, National Association for the Advancement of Colored People Papers, Library of Congress, Washington, D.C. (cited hereafter as NAACP Papers); *West* v. *Bliley*, District Court, Eastern District of Virginia, 83 F. (2d) 177 No. 795, 5 June 1929; *City of Richmond* v. *J. B. Deans*, Circuit Court of Appeals Fourth Circuit, 14 Jan. 1930, No. 2900.

7.   William Pickens to Maud E. Mundin, 4 Nov. 1927, folder 14, box I:G201, NAACP Papers; List of Organizations in Richmond, Va., and "The NAACP Comes of Age," Ad to Richmond Organizations, 4 Apr. 1930, folder 14, box I:G210, NAACP Papers; Richmond Negro Physicians, Attorneys, Community and Civic Employees, Bankers, Post Office Clerks, Fraternalists and Associations, Tailors, Miscellaneous Business, Real Estate Dealers, and Insurance, Address List of Richmond Teachers, Funeral Directors, and Barbers, Richmond Negro Clergymen, 4–9 Oct. 1930, folder 17, box I:G210, NAACP Papers; "William Pickens To Speak Here," *Richmond Planet*, 11 Oct. 1930, 1; "NAACP Organized In Response to Pickens' Speech," *Richmond Planet*, 16 Oct. 1930, 1, 4. For a complete list of the hundreds of black Richmond professionals Pickens reached out to, see folder 17, box 1:G210, NAACP Papers.

8.   "Who's Who in Colored America," 236, Informational Folder, Correspondences, 1929–1969, box 1, Hancock Papers; Johnson, *Reforming Jim Crow*, 34–36; "A Century of Service to Education and Religion, Virginia Union University, 1865–1965," *Virginia Union Bulletin*, Continental Issue, vol. LXV, no. 5, June 1965, 1–107; Miles Mark Fisher, *Virginia Union University and Some of Her Achievements* (Richmond, 1924).

9.   Raymond Gavins, "Gordon Blaine Hancock: An Appraisal," *New South*, Autumn 1970, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers; Johnson, *Reforming Jim Crow*, 21–62.

10.   "Race Relation Session to be Held Tuesday," *Richmond Times-Dispatch*, 24 Oct. 1930, 1; "Dr. Robert Russa Moton," *Norfolk Journal and Guide*, 5 May 1934; "To Address Race Relations Body," *Richmond Planet*, 25 Oct. 1930, 1; Smith, *Managing White Supremacy*, 46; "Negro Leader Says Race Well Treated in U.S.," *Richmond Times-Dispatch*, 29 Oct. 1930, 1; "Noted Leader Says White People Unfair To Negroes in U.S.," *Richmond Planet*, 1 Nov. 1930, 1; "A Humane Trinity For Negro Welfare," *Richmond Planet*, 1 Nov. 1930, 4.

11.  1910 U.S. Census, Baltimore Ward 9, Baltimore (Independent City), Md., ED 0125, National Archives; 1930 U.S. Census, Richmond (Independent City), Va., ED 0060, National Archives; Jesse Monroe Tinsley, "World War I Draft Registration Card, 1917–1918," Records of the Selective Service, National Archives; Jesse Monroe Tinsley, "World War II Draft Registration Cards, 1942," Records of the Selective Service System, 1926–1975, National Archives; Edds, *We Face the Dawn*, 26–80; Andrew Buni, *Negro in Virginia Politics, 1902–1965* (Charlottesville, 1967), 122–23; Gavins, "Gordon Blaine Hancock: An Appraisal," 39; "Annual Catalog 1930–31," Virginia Union University, 52, https://www.google.com/books/edition/Annual_Catalogue/ArJGAQAAMAAJ?hl=en&gbpv=1&dq=Annual+Catalog+1931+virginia+union&pg=RA5-PP3&printsec=frontcover (accessed 25 May 2021); Hancock Speech at the Francis J. Torrance School of Race Relations in Virginia Union University, Richmond, Virginia, 27 Jan. 1932, box 1, Hancock Papers; Gordon B. Hancock to Lucy R. Mason, 2 July 1932, box 1, Hancock Papers; Lucy R. Mason to Gordon B. Hancock, 6 Mar. 1932, box 1, Hancock Papers.

12.   Gilbert Ware, "The New Negro Alliance: Don't Buy Where You Can't Work," *Negro History*

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

*Bulletin* 49 (Fall 1986): 3–8; "500 Pickets Pledge Years' Vigil, Picket Chain Stores in Snowstorm; Race Refuses to Buy From A&P," *Richmond Planet*, 17 Mar. 1934, 1; Karen Jane Ferguson, *Black Politics in New Deal Atlanta* (Chapel Hill, 2002), 143–44; "Protest Plus," opinion-editorial by Gordon Blaine Hancock, *Norfolk Journal and Guide*, 14 Apr. 1934, box 2, Hancock Papers; "Profs Hancock and Moore Talk on Segregation," *Richmond Planet*, 29 Apr. 1934, 1.

13.  Roy Wilkins to Dr. J. M. Tinsley, 20 Apr. 1934; Dr. J. M. Tinsley to Roy Wilkins, 25 Apr. 1934; Roy Wilkins to Dr. J. M. Tinsley, 27 Apr. 1934; Rosa E. Walton to John A. Hartford, 18 May 1934; Dr. J. M. Tinsley to Walter White, 8 June 1934; Walter White to John A. Hartford, 21 June 1934; Walter White to Dr. J. M. Tinsley, 21 June 1934; Walter White to Dr. J. M. Tinsley, 27 June 1934; and John A. Hartford to Walter White, 22 June 1934, all in folder 1, Richmond, Va., January to June 1934, box I:G211, NAACP Papers.

14.  "Local Pickets Gain Confidence as A&P Places Colored Clerks in Newark Stores," *Richmond Planet*, 24 Mar. 1934, 1; "Many Boys and Girls Secure Jobs," ibid., 24 Mar. 1934, 1; "Dr. C. C. Scott's Great Sermon Before 2,000 Gives New Energy To Campaign For A&P Clerks," ibid., 14 Apr. 1934, 1; "Baltimore Promotes Colored A&P Clerks," ibid., 14 Apr. 1934, 3; "Mass Meetings Muster New Strength For A&P 'Clerks' Picket Lines," ibid., 21 Apr. 1934, 1; "Profs Hancock and Moore Talk on Segregation," ibid., 29 Apr. 1934, 1; "Campaign for Colored Clerk Jobs in Chain Grows," ibid., 29 Apr. 1934, 1; "New Moves Underway In A&P Battle," ibid., 5 May 1934, 1; "Pickets to Stay In 'Clerks' Fight," ibid., 12 May 1934, 1; "State's Stand on Colored Clerks Heartens Pickets," ibid., 19 May 1934, 1; "Torchlight Parade and Mass Meeting For 'Buy Where You Can Work' Drive," ibid., 23 June 1934, 1; "Parade Meet Feature 'Buy Work' Drive," ibid., 30 June 1934, 1; "Greatest Ever! Verdicts For 'Buy-Work' Parade Here," ibid., 7 July 1934, 1. The protests continued until 1935. For more media coverage, see the *Richmond Planet*, July through December 1934.

15.  "Branch News," *The Crisis*, 19 Feb. 1939, 56–57; Walter White to Dr. J. M. Tinsley, 8 Nov. 1934; Dr. J. M. Tinsley to Walter White, 10 Nov. 1934; and Membership Report, Branch Richmond, 2 Nov. 1934, all in folder 2, Richmond, Va., September–December 1934, box I:G211, NAACP Papers.

16.  "Contribution to the Anti-Lynching Fund, Richmond, Va., Branch," 1 Dec. 1934; Dr. J. M. Tinsley to Roy Wilkins, 15 Apr. 1935, both in folder 3, Richmond, Va., January–December 1935, box I:G211, NAACP Papers; "Armstrong PTA Meets Tuesday," *Richmond Planet*, 5 Jan. 1935, 1; "School Board Not Moved By Armstrong Congestion," *Richmond Planet*, 16 Feb. 1935, 1; Minutes of the Richmond City School Board, 21 Feb. 1935, 265–75, Richmond City Public School Archives, Richmond. For more on the NAACP's agenda for the 1930s, see folders 1–10, box I:G211, NAACP Papers.

17.  Dr. J. M. Tinsley to Dr. Charles H. Houston, 2 Jan. 1936; Dr. J. M. Tinsley to Dr. Charles H. Houston, 14 Jan. 1936; and Special Counsel to Dr. J. M. Tinsley, 7 Feb. 1936, all in folder 4, Richmond Va., January–September 1936, box I:G211, NAACP Papers. Although Tinsley and the national office both used the term "Junior High School," they were both referring to what is currently considered to be a high school.

18.  "Endorse Supt. Binford's Plan For Public School Improvement," *Richmond Planet*, 1 June 1935, 1; Letter from Jones & Robbins, Inc., "Offering Imperial Tobacco Co. Property for Site of New Negro High School"; Letter from E. M. Furman, "Requesting Location of the New Negro

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

High School on Church Hill," both in Minutes of the Richmond School Board, 13 Oct. 1936, 280–81; A Joint Resolution: Accepting the Offer of the United States of America to the City of Richmond to Aid By Way of Grant in Financing the Construction of an Addition to George Mason School in the City of Richmond, *Ordinances and Resolution of the City Council of the City of Richmond*, 18 Oct. 1935, 173–75, Richmond City Public School Archives; Maggie L. Walker Application for the National Register of Historic Places, 13 Aug. 1998, 3–13, National Archives; "Supt. Binford Pushes High School Loan," *Richmond Planet*, 22 Aug. 1936, 1; "Opening of Building Honors Great Race Leader," *Richmond Times-Dispatch*, 4 Sept. 1938, 1, 12; "Mayor, School Heads Dedicate Maggie L. Walker High School," *Richmond Times-Dispatch*, 9 Sept. 1938, 1; "Naming The High School," *Richmond Planet*, 21 Nov. 1936, 4; Minutes of the Richmond School Board, 9 June–30 Aug. 1935, 201–39; *Joint Resolution*, "Mayor of the City of Richmond Applies for Grant for Construction and Equipment of Negro High School," Minutes of the City Council of Richmond, *Journal of the Board of Aldermen*, 24 July 1936, both in Richmond City Public School Archives. For more on white business leaders offering to sell their vacant property at a discounted rate to supply the city with a building site for the new high school, see Minutes of the Richmond School Board, August 1935–December 1936, Richmond City Public School Archives.

19.  Dr. J. M. Tinsley to Thurgood Marshall, 23 Oct. 1941; Summary of Bowler Petition and Events Leading Up to It, enclosed in a letter from Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941, both in folder 7, Box I:B208, NAACP Papers; Alfred K. Talbot, "The Virginia Teachers Association: Establishment and Background," *Journal of Negro History Bulletin*, vol. 45, no. 1, January–February–March 1982, 8–10.

20.  Edds, *We Face the Dawn*, 17–72; Summary of Bowler Petition and Events Leading Up to It, enclosed in a letter from Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941.

21.  Oliver Hill to Dr. Leon Ransom and Thurgood Marshall, 30 Aug. 1941; Dr. J. M. Tinsley to Thurgood Marshall, 18 Oct. 1941; and Thurgood Marshall to "Peanuts" [Oliver W. Hill], 19 Dec. 1941, all in folder 7, box I:B208, NAACP Papers; "Antoinette E. Bowler," 1930 U.S. Census, Richmond (Independent City), ED:0057; Memorandum to The Legal Committee Richmond Branch NAACP, 14 Nov. 1941, folder 7, box I:B208, NAACP Papers.

22.  Walter White to Douglas S. Freeman, 3 Dec. 1941, folder 7, box I:B208, NAACP Papers; "Negroes Plea for Salary Rises Turned Down by School board Over Opposition Woman," *Richmond Times-Dispatch*, 7 Nov. 1941, folder 7, box I:B208, NAACP Papers; "Negro Teachers Will Sue," *Richmond News Leader*, 26 Nov. 1941, folder 7, box I:B208, NAACP Papers; Douglas S. Freeman to Mr. Walter White, 6 Dec. 1941, folder 7, box I:B208, NAACP Papers; Oliver W. Hill to Thurgood Marshall, 26 Dec. 1941, folder 7, box I:B208, NAACP Papers; "Copy of The December 27th Vote To Approve 5-Year Plan," enclosed in a letter from Charles E. Bentley to J. H. Binford, 12 Jan. 1942, folder 7, box I:B208, NAACP Papers.

23.  J. H. Binford to Richmond Teachers' Association, 29 Dec. 1941; Oliver Hill to Leon A. Ransom, 30 Dec. 1941; Oliver W. Hill to Thurgood Marshall and Leon Ransom, 5 Jan. 1942; and Thurgood Marshall to Dr. J. M. Tinsley, enclosed in a Memo from Thurgood Marshall to Walter White and Roy Wilkins 17 Feb. 1942, all in folder 7, box I:B208, NAACP Papers.

24.  Thurgood Marshall to *Richmond Afro-American*, 16 Feb. 1942; Antoinette E. Bowler to Walter White, 20 Feb. 1942; Milton L. Randolph to Walter White, 23 Feb. 1941; Dr. J. M.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

Tinsley to Walter White, 11 May 1942; John P. McGuire, Jr., to Oliver W. Hill, 30 Mar. 1942; and Final Judgement of *Bowler* v. *Richmond*, 13 May 1942, all in folder 7, box I:B208, NAACP Papers.

25.  James K. Sanford, ed., *Richmond: Her Triumphs, Tragedies, and Growth* (Richmond, 1975), 175; Plummer B. Young, Sr., Biographical Sketch, 1962, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers.

26.  Plummer B. Young, Sr., Biographical Sketch, 1962, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers; Smith, *Managing White Supremacy*, 63; "Misleaders and False Prophets," *Norfolk Journal and Guide*, 2 May 1942, box 2, Hancock Papers.

27.  "Negroes and Our Defenses II," 22 Mar. 1941, Miscellaneous and Other Writings, 1937–1970, box 2, Hancock Papers.

28.  Howard F. McMains, "Richard Heath Dabney: A Virginian in Indiana, 1886–1889," *Indiana Magazine of History* 82 (1986): 334–57; Erika J. Pribanic-Smith, "Turning Right or Standing Still? Virginius Dabney and the New Deal in Virginia, 1930–1942," *American Journalism* 28 (Winter 2011): 97–123; Egerton, *Speak Against the Day*, 137–39; Sosna, *In Search of the Silent South*, 122–31.

29.  "Negroes and Our Defenses," *Norfolk Journal and Guide*, 25 Jan. 1941; "Negroes And Our Defenses III," ibid., 22 Mar. 1941; "The Negroes and the War," *Richmond Times-Dispatch*, 26 Apr. 1942; Smith, *Managing White Supremacy*, 275; Nancy Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races on Common Carriers in the State of Virginia," *Phelps-Stokes Fellowship Papers* 17 (1950), 51–71; "Negroes and the War," *Norfolk Journal and Guide*, 9 May 1942; "A Book About the New South," *Norfolk Journal and Guide*, 28 Mar. 1942; "Clouds Over The South," *Norfolk Journal and Guide*, 15 Aug. 1942.

30.  *Norfolk Journal and Guide*, 28 Mar. 1942; "Is Hancock A Stooge for Etheredge and Dabney," letter from the *Richmond Afro-American* to Dr. Gordon Blaine Hancock, 4 June 1942, box 2, Hancock Papers.

31.  Dr. Gordon Blaine Hancock to Dr. W. E. B. DuBois, 12 Sept. 1942, Southern Regional Council, 1938–1943, Hancock Papers; "Statement of Purpose," Southern Conference on Race Relations, 20 Oct. 1942, Southern Regional Council, 1938–1943, box 1, Hancock Papers.

32.  Dr. Gordon Blaine Hancock to Jessie Daniel Ames, 24 Oct. 1942; Jackson Davis to Dr. Gordon Blaine Hancock, 18 Dec. 1942; Plummer B. Young to Dr. Gordon Blaine Hancock, 18 Dec. 1942; Jessie Daniel Ames to Dr. Gordon Blaine Hancock, 27 Oct. 1942; Plummer Young to Civilian Aide to the Secretary of War, 6 Jan. 1943; Plummer Young to Dr. Gordon Blaine Hancock, 2 Mar. 1943; Virginius Dabney to Dr. Gordon Blaine Hancock, 15 May 1943; Howard Odum to Dr. Jackson Davis, 19 June 1943; and Howard Odum to Dr. Gordon Blaine Hancock, 22 June 1943, all in box 2, Hancock Papers; Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races," 53. Sociologist Howard Odum was, like Dabney, fascinated with the race question in the South. In the midst of Dr. Hancock's call for southern blacks to lead interracial cooperatives, Odum published *Race and Rumors of Race: Challenge to American Crisis*. This was a sociological analysis of white perceptions about black activism during the interwar period. He concludes that southern whites, both liberal and conservative, feared an outbreak of violence by "bad niggers" who were fed up with segregation.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

33.  *The Richmond Statement*, 16 June 1943, The Commission on Interracial Cooperation, Inc., Southern Regional Council, 1938–1943; and Plummer Young to Dr. Gordon Blaine Hancock, 30 June 1943, both in box 2, Hancock Papers.

34.  "Plan Appeal on Jim Crow Fines," *Richmond Afro-American*, 6 Mar. 1943, 3; "Supreme Court to Review Va. Bus Segregation Case," ibid., 26 Jan. 1946, 1, 21; "Trailways Bus Company Denied Right to Seat Passengers in Violation of Law," ibid., 25 Jan. 1947, 1, 4.

35.  "Willet to Meet Geo. Mason P-TA," *Richmond Afro-American*, 11 Jan. 1947, 1; "Teachers' Pay Raised, Principals Equalized," ibid., 1 Feb. 1947, 1–2; "Interracial Services Set for Word Day of Prayer," ibid., 22 Feb. 1947, 2; Armstrong, "The Study of an Attempt Made in 1943 to Abolish Segregation of the Races," 51–53; "Races Dine Together In The Capital of The Confederacy," ibid., 22 Mar. 1947, 13; "City Library Opens Its Doors to All Citizens," ibid., 31 May 1947, 1–2; Smith, *Managing White Supremacy*, 8.

36.  Gloster B. Current to Dr. J. M. Tinsley, 25 Sept. 1947, folder 3, box I:C209, NAACP Papers; "Council Meets On Tuesday," *Richmond Afro-American*, 12 Apr. 1947, 20; "Leaders, Citizens Back Unicameral Council," ibid., 8 Mar. 1947, 1, 3; "More Power to Vote Drive," ibid., 31 May 1947, 3; "Civic Council Drive Adds Thousands to Voting Lists," ibid., 10 May 1947, 1–12; "More Power to Vote Drive" and "Tax Blitz Adds 3,000: 6,230 In Richmond Set to Vote Next Election," ibid., 31 May 1947, 3; "Citizens Association Sets Tuesday For Annual Parley," ibid., 21 Feb. 1948, 7; Buni, *Negro in Virginia Politics*, 88–147.

37.  "Oliver W. Hill Elected to Council by 9,097 Votes," *Richmond Afro-American*, 12 June 1948, 1-2; "He's Richmond's First Councilman in Sixty Long Years," ibid., 19 June 1948, 1–2; Buni, *Negro in Virginia Politics*, 158; Hill, *Big Bang*, 219–30; Gritter, *River of Hope*, 184; John V. Moeser and Rutledge M. Dennis, *The Politics of Annexation: Oligarchic Power in a Southern City* (Cambridge, Mass., 1982), 33; "Meet Richmond's New City Fathers After Hours," *Richmond Times-Dispatch*, 14 June 1948, 1; "Richmond Makes History," *Richmond Times-Dispatch*, 14 June 1948, 8.

38.  "An Open Letter to Mr. Dabney," *Richmond Afro-American*, 22 May 1948, 2.

39.  "Probable Results of The Truman Sweep," *Richmond Times-Dispatch*, 4 Nov. 1948; Virginius Dabney to Dr. Gordon Blaine Hancock, 9 Nov. 1948; Dr. Gordon Blaine Hancock to Virginius Dabney, 15 Nov. 1948, Southern Regional Council, 1945–1970, both Hancock Papers.

40.  Hill, *Big Bang*, 148–53; Buni, *Negro in Virginia Politics*, 165–68.

41.  "School Cases Postponed," *Richmond Afro-American*, 8 Aug. 1953, 1–2; "Virginia NAACP Seeks $50,000," ibid., 8 Aug. 1953, 11; "NAACP Plans Meet in Creighton Court," ibid., 29 Aug. 1953, 1; "Freedom Fund Cabaret Dance at Mosque Oct.17," ibid., 19 Sept. 1953; "Where to Send Your NAACP Contribution," ibid., 19 Sept. 1953; "Panel Member Says Too Many Uncle Toms Leading Race," ibid., 19 Sept. 1953; "From Virginia Conference: NAACP Legal Fund Gets $5,100 Check," ibid., 12 Dec. 1953, 19; "City Council Is Stunned: Lawyer Asks Repeal of Segregation Laws," ibid., 13 Feb. 1954, 1. For more on Tinsley's fundraising activities, see folder 4, box I:C209, NAACP Papers.

42.  "Bradshaw Ok'd for School Board Post," *Richmond Afro-American*, 22 Aug. 1954; "Mrs. E. Bradshaw's Ancestor Last Man on School Board," ibid., 22 Aug. 1954; Resolution No. 53-R51-44, Minutes of the Richmond School Board, 31 Aug. 1953; Minutes of the Richmond School

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms

278 • Virginia Magazine

Board, 28 June 1954; "Teachers Hold Joint Meeting," *Richmond Afro-American*, 5 Sept. 1953, 6; "Willet Meets with Bradshaw," *Richmond Afro-American*, 29 Aug. 1953, 1; Robert A. Pratt, *Color of Their Skin: School Desegregation in Richmond, Virginia, 1954–89* (Charlottesville, 1992), xi; Dr. Gordon Blaine Hancock, "Segregation's Two Allies," a Between the Lines Editorial for the *Associated Negro Press*, 15 Nov. 1953, Clipping and Other Writing, Hancock Papers.

43. "The South Awaits Supreme Court's Decision," *Richmond Afro-American*, 16 Jan. 1954, 1; "Predictions of Things to Come Here at Home and Abroad," *Richmond News-Leader*, 2 Jan. 1954, 8; *Richmond Times-Dispatch*, January to 18 May 1954; Buni, *Negro in Virginia Politics*, 176; *Richmond Times-Dispatch*, 18 May 1954. For more black Richmond media coverage of *Brown*, see the *Richmond Afro-American* from January 1953 to May 1954.

This content downloaded from
68.131.104.124 on Thu, 26 Aug 2021 20:11:47 UTC
All use subject to https://about.jstor.org/terms