IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                    plaintiff,

          versus                3:21CR42

KEITH RODNEY MOORE,

                    defendant,


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


Day II (pages 152 - 345)


July 19, 2022

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


Erik Sean Siebert, Esq.

Shea Matthew Gibbons, Esq.

Assistant United States Attorneys

for the United States




Laura Jill Koenig, Esq.

Amy L. Austin, Esq.

**Assistant Public Defenders**

**for the defendant**

The defendant in his own proper person

1          THE CLERK:  Case number 3:21 CR 42.

2          United States versus Keith Rodney Moore.

3          Mr. Erik Seibert and Mr. Shea Gibbons represent

4     the United States.

5          Ms Laura Koenig and Ms Amy Austin represent the

6     defendant.

7          Are counsel ready to proceed?

8          MS KOENIG:  Defense is ready, Your Honor.

9          MR. SIEBERT:  United States is ready, Your Honor.

10          THE COURT:  All right.

11          MS KOENIG:  Good morning, Your Honor.  Before we

12     start with the evidence in the case I wanted to bring

13     to The Court's attention an issue that has been brewing

14     between the parties for the last several days.

15          As I think the Government is essentially asking us

16     to raise this with The Court, which is fine.

17          So on Friday afternoon, this past Friday, July 15,

18     the Government disclosed to the defense a report a

19     report that is dated July 15th, 2022.  One of the

20     signatures indicates July 13 or it could be 15th, I

21     can't read it.  But on July 15 of 2022 the Government

22     disclosed a report by Agent Josh Valot, who is a

23     special agent, I believe with the ATF.  That report

24     details a review of the traffic stop data that we had

25     provided to the Government, and indicates that there

1    are counts of certain numbers of stops that the

2    Government believed happened outside of the City of

3    Richmond, as well as instances that the Government

4    thought appeared to be duplicate records in the

5    information.  That report had no identification of

6    which line items or which control numbers the

7    Government believed were erroneous.  And so over the

8    weekend we had Dr. Coston check Dr. Coston's work

9    specifically for the locations that the Government

10   perceived to be outside the City of Richmond.  During

11   that discussion with Dr. Coston Dr. Coston indicated to

12   us that before Dr. Coston had run the analysis in

13   January, December and January of this past year, that

14   Dr. Coston had taken the data that the Federal Public

15   Defender office had provided, which was both the raw

16   data that the Richmond Police Department had sent us,

17   as well as the Geocodio accuracies that the intern at

18   the Federal Public Defender office had done, and

19   corrected the items that were below a .6 accuracy.

20       But what Dr. Coston found in plotting all of that

21   data is that there were additional instances of stops

22   that were outside of the City of Richmond.  So

23   Dr. Coston as Dr. Coston testified yesterday had gone

24   through and manually checked each one of those stops as

25   it related to the street information that was provided

1    in the location column in defense exhibit 14.

2    Dr. Coston had done that prior.  We don't know exactly

3    the date.  We tried to figure that out last night.  But

4    it was definitely prior to January 9 of 2002.

5        I did not learn that Dr. Coston had taken that

6    additional step until we started drilling down this

7    weekend once we had a report that said that the

8    Government had made these findings.  Certainly the

9    Government in its motion limine, which is ECF 70, had

10   reported these but never provided any substance, any

11   reports that indicated that they had done further

12   analysis.  Nothing in their expert report indicates

13   that the expert had found these alleged discrepancies,

14   alleged discrepancies or information.  And so

15   Dr. Coston's report in defense exhibit two reports that

16   Dr. Coston had excluded 82 stops as being outside of

17   the City of Richmond.  When Dr. Coston this past

18   weekend had verified to see if that was accurate

19   Dr. Coston found that there were 81 stops that were

20   excluded.  Once we did that verification I provided it

21   to the Government.  That is how Dr. Coston testified

22   yesterday to explain the process of when Dr. Coston did

23   these corrections.  And Dr. Coston testified yesterday

24   that Dr. Coston had excluded 81 of the stops as being

25   outside of the City of Richmond.

1          Also, the Government provided between 9:00 and

2     10:00 p.m. last night for the first time a list of

3     control numbers that the Government believed were

4     duplicate entries.  I provided data about an hour later

5     to Dr. Coston.  Dr. Coston by 7:00 a.m. this morning

6     was able to review that, and may be in a position to

7     say that some of those, or potentially many of them, or

8     nearly all of them, may be duplicate records.

9          What Dr. Coston was able to determine as of, you

10    know, between last night and this morning is that

11    76.8 percent of the alleged duplicates were from black

12    drivers, and 14.5 percent of the duplicates were white

13    drivers.

14         THE COURT:  That is almost the same percentage as

15    the number of stops.

16         MS KOENIG:  It is, Your Honor.  So it's very

17    possible that these alleged duplicates may have no

18    impact on Dr. Coston's findings.  But because it may

19    impact the sample size I believe for the accuracy of

20    Dr. Coston's report and the integrity of the data in

21    this case it would be important for Dr. Coston to be

22    able to run those numbers again, and the test again,

23    with these duplicates in mind.

24         So I indicated -- I discussed that with

25    Dr. Coston.  Because Dr. Coston is in this courtroom

1    today and has meetings scheduled all day tomorrow, the

2    earliest --

3         THE COURT:  This hearing is going to be done

4    today.  This part of it.

5         MS KOENIG:  So, what I am telling The Court is

6    that because the information that we have that we

7    received on the duplicates was given to us on Friday

8    afternoon Dr. Coston -- we didn't get the actual

9    duplicates that Government believed, or the line items

10   that the Government believed were duplicate -- I think

11   it is appropriate for Dr. Coston to submit a supplement

12   on whether or not these duplicates impact any of the

13   other findings.

14        THE COURT:  What do you have to say about that,

15   Mr. Gibbons?

16        MR. GIBBONS:  Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MR. GIBBONS:  The data was provided to the United

19   States on January 14th, 2022.  In that e-mail Ms Koenig

20   sent a first e-mail saying, I am going to send you all

21   two more e-mails as well.  One will contain the raw

22   data as we received it from the Richmond Police

23   Department; the other will contain the spread sheets as

24   prepared for final analysis.

25        True to word, we received two emails.  One

1    contained the raw data, one contained what we call

2    corrected data.   The Government used corrected data in

3    all of its analyses over the last six and a half

4    months.   Yesterday we found out that that was not

5    actually the data that Dr. Coston relied upon.

6    Yesterday was the first time we saw that data.   And

7    when --

8         THE COURT:   That was last night?

9         MR. GIBBONS:   That was yesterday morning, Your

10   Honor, at 8:00 a.m.   When I talked to Ms Koenig

11   yesterday morning, I said, what is the difference

12   between this data and the data we have?   And was told

13   the only difference is that the data in exhibit 14 had

14   the stops removed, the 81 stops separated out from the

15   data.

16        THE COURT:   Eighty-one --

17        MR. GIBBONS:   Outside of --

18        MS KOENIG:   -- potentially duplicate.

19        MR. GIBBONS:   -- outside Richmond.

20        THE COURT:   Eighty-one stops outside Richmond.

21   Okay.

22        MR. GIBBONS:   So on that assumption we did not

23   object to exhibit 14 on the basis that it contained

24   improvements or corrections that the United States had

25   no knowledge of.

1      Dr. Coston never apparently provided the final
2  data set to the defense until this weekend.  And the
3  Government never received it until yesterday morning.
4      We found out after the hearing last night, after
5  we went to double check some of the numbers how this
6  was a different data set than the Government had access
7  to the entire time.
8      Your Honor, we raised all of these concerns about
9  the stops outside Richmond and the duplicates in our
10  April 8 filing.  We did not identify control numbers,
11  but we raised the issue there.  We have concerns about
12  the forthrightness of Dr. Coston's report.  Dr. Coston
13  said in their report in talking about the location
14  data, I verified a random selection -- well, let me
15  read one more sentence.  I'm sorry, Mr. Court Reporter.
16      "For all locations with less than a .6 accuracy
17  score locations were checked and corrected by an intern
18  with the Public Defenders Office.  I verified a random
19  selection of these to insure accuracy and corrected
20  latitude and longitude, and found no discrepancies in
21  the corrections."
22      Dr. Coston did not disclose that they corrected a
23  minimum of 128 data entries.  Never disclosed that to
24  the Government at all, didn't put that in the report.
25      THE COURT:  What do you want me to do?

1      MR. GIBBONS:  We are in a difficult position, Your

2  Honor.  We agree to withdraw the location arguments we

3  made to Dr. Coston and in our report.  That took dozens

4  of hours to put together on the data that we had.

5      THE COURT:  The location arguments are that --

6  what location argument?

7      MR. GIBBONS:  The 209 stops located outside the

8  City of Richmond.  I think the parties are in agreement

9  that 81 of those are outside the City of Richmond.

10  These extra 128 we don't have time to run that

11  analysis, so we are just going to drop that argument,

12  Your Honor.

13      We do believe that the failure to disclose the

14  final data set is a Rule 16 violation, either by the

15  defense, if they didn't know Dr. Coston had a

16  additional data set, but we are in a difficult position

17  because we are talking with two different data sets

18  that are 99 percent similar, but have significant

19  differences.

20      THE COURT:  Well, if they are 99 percent similar

21  there is one percent difference.

22      MR. GIBBONS:  That is why we are a little bit spun

23  up about this issue, because we have done dozens and

24  literally hundreds of hours of work on the old data set

25  that we believed was the final one and now come to find

1    out yesterday it's a totally different data set.

2         THE COURT:  So what do you want me to do?

3         MR. GIBBONS:  I don't believe there is anything we

4    can do at this point, Your Honor.  We just wanted to

5    notify The Court that when we were kind of talking past

6    each other yesterday, Dr. Coston and I, it was a

7    misunderstanding about --

8         THE COURT:  I understand how it makes a little

9    more sense now.

10        MR. GIBBONS:  That is all we wanted to say, Your

11   Honor.

12        THE COURT:  Thank you.

13        All right.

14        Well, it looks like there is a minor difference in

15   the data Dr. Coston had, that the Government -- that

16   the defense had provided to the Government back in the

17   winter and the evidence that was presented yesterday.

18   But it appears to me that it's very minor.

19        So, let's hear from the Government.

20        MR. GIBBONS:  Government calls Dr. Michael Smith.

21        THE COURT:  All right.  Dr. Michael Smith, the

22   long-awaited Dr. Michael Smith.

23        Thank you for coming, sir.

24                      MICHAEL SMITH

25              AFFIRMED AND TESTIFIED AS FOLLOWS:

```
 1                    DIRECT EXAMINATION

 2    BY MR. GIBBONS:

 3    Q    Good morning, Dr. Smith.

 4    A    Good morning.

 5    Q    Please introduce yourself to The Court.

 6    A    I am Michael Smith, professor of criminology and

 7    criminal justice at the University of Texas in San

 8    Antonio.

 9    Q    Let's start with a little bit of your background

10    and history.  Did you formerly work as a Richmond

11    Police Department patrol officer?

12    A    I did.

13    Q    How long ago was that?

14    A    More than 30 years ago.  Late '80s.

15    Q    What effect does your work as a RPD patrol officer

16    35 years ago have on your scientific work today?

17    A    None whatsoever.

18    Q    You received a B S?

19    A    Yes.

20    Q    Where did you receive that bachelors from and

21    when?

22    A    Right here, Virginia Commonwealth University.

23    Q    Then you went on to receive your juries doctor; is

24    that correct?

25    A    I did.
```

1   Q    Where was that and when was that?

2   A    University of South Carolina in 1993.

3   Q    Then after that you received an additional degree,

4   correct?

5   A    That's correct.

6   Q    Tell us about that.

7   A    PhD Justice Studies from Arizona State University

8   that I obtained in 1996.

9   Q    You have been actively engaged in the field of

10  criminology and racial justice research since 1996?

11  A    Correct.  I have.

12  Q    Approximately how many published articles, how

13  many articles have you published on the topics of

14  criminology and racial disparity in policing?

15  A    I don't know.  I haven't counted them, but I would

16  say between 15 and 20, maybe, just on this particular

17  issue.

18  Q    How many total in the field of criminology

19  generally?

20  A    More than 50.

21  Q    In fact, you wrote one of the very first

22  peer-reviewed racial disparity papers; is that correct?

23  A    That's correct.

24  Q    Tell us about that.

25  A    That was an analysis from here, from Richmond.

1    The analysis was done probably in 1999.  I think the

2    paper came out in 2000.  To my knowledge it is the

3    first peer-revieweded paper in this field.

4    Q    How many times has that peer reviewed paper been

5    cited in the literature?

6    A    Close to 300 the last time I checked.

7    Q    Is it accurate to say that you were one of the

8    foremost authorities in the country on racial

9    disparities in policing?

10       MS KOENIG:  Objection.  Calls for something that

11   is speculation on the witness' behalf, and also not

12   appropriate vouching for the Government.

13       THE COURT:  Well, go ahead, toot your horn.  I

14   guess the answer will be yes.  You are not going to say

15   no, I am not an authority, are you?

16       THE WITNESS:  So I am not going to.  I think most

17   people in our field who work this area would agree that

18   I am one of the leading figures in the discipline.

19   Q    Let's talk about work with quantitative methods.

20   What is your familiarity with data collection

21   procedures?

22   A    I am very familiar with them.

23   Q    How long have you been performing quantitative

24   research in the field of criminal justice?

25   A    For more than 25 years.

1    Q    Does that include methods of data quality control?

2    A    Yes.

3    Q    How often do you use statistics in your research?

4    A    Regularly.  All the time.

5         THE COURT:  So, Dr. Smith, would you -- I

6    neglected to write this down.  You are -- what did you

7    get your PhD in at Arizona State?

8         THE WITNESS:  Justice studies.

9         THE COURT:  What does that entail?

10         THE WITNESS:  I am trained as a sociolegal

11    scholar.  So, it is the intersection of law and social

12    science's.

13         THE COURT:  Okay.

14         And what school are you in at UT San Antonio?

15         THE WITNESS:  That is the University of Texas at

16    San Antonio.

17         THE COURT:  I mean what --

18         THE WITNESS:  I am in the department of

19    criminology and criminal justice.

20         THE COURT:  Thank you.

21         THE WITNESS:  Yes, sir.

22    BY MR. GIBBONS:

23    Q    In fact are you chair of that department?

24    A    No, not any more.  I was the chair.

25    Q    Okay.

1    A    Back on faculty now.

2    Q    What is your level of experience performing

3    research with quantitative methods?

4    A    As I said, I have been doing it for more than 25

5    years.

6    Q    You talked about some illustrative examples of the

7    kind of work you do that involves quantitative methods?

8    A    Sure.  In this particular, with respect to this

9    particular issue in this case it is one of my primary

10   areas of research expertise.  As you mentioned earlier,

11   asked earlier, I published many papers on this

12   particular topic, on racial disparities in

13   police-civilian contacts.  All of them involved

14   statistical analysis going back to that very first

15   paper in 2000.

16   Q    Can you give a couple of examples of the types of

17   engagements that you do as an expert and as a

18   consultant?

19   A    Sure.

20        In the early 2000s I served as the United States

21   Department of Justice's special litigation section's

22   methodology expert in a series of consent decree cases

23   in the early 2000s.  I have served as parts, either

24   held or served as parts of teams that have examined

25   large-scale data sets and done these sorts of analyses

1    that are at issue in this case in many agencies.  Some

2    of the larger ones would include state level, state

3    police agencies in Arizona.  There is a highway patrol,

4    Washington State Patrol.  I did a major study with the

5    Miami Dade Police Department, with the Los Angeles

6    Police Department, with, most recently with the San

7    Jose Police Department in California.

8    Q    Does your work as an expert witness include

9    representing plaintiffs in civil rights lawsuits?

10   A    Now and then, yes.

11   Q    Tell us about that.

12   A    I am currently an expert in a case in the Southern

13   District of New York that involves allegations of

14   racial disparate treatment and targeting of Latino

15   motorists in Suffolk County, New York.  And I am the

16   designated expert for the plaintiff in that case.

17        THE COURT:  So, he asked you I think, do you don't

18   represent people.  You don't handle those as the

19   plaintiff's lawyer?

20        THE WITNESS:  No, sir.  I am an expert.

21        THE COURT:  As an expert, okay.

22        THE WITNESS:  Yes.

23   BY MR. GIBBONS:

24   Q    Dr. Smith, have you ever worked for the Government

25   in your capacity as a social scientist who studies

1    racial disparities in policing?

2    A    I mentioned that I have in the past served as a

3    consultant, an expert consultant to the USDOJ.  So in

4    that capacity I was paid for that work.  So, yes.

5         MR. GIBBONS:  Your Honor, I tender Dr. Smith as an

6    expert in racial disparities and law enforcement and

7    quantitative methods?

8         MS KOENIG:  No objection, Your Honor.

9         THE COURT:  Thank you.  He is recognized as an

10   expert.  You obviously have testified in litigation in

11   the past.

12        THE WITNESS:  I have.

13        THE COURT:  Have you had any cases that have gone

14   to trial, or all been settled?

15        THE WITNESS:  I had one -- I actually testify as

16   an expert relatively rarely.  I have in the past.  One

17   of those cases went to trial.  It wasn't a racial

18   disparity case, it was a use of force case.

19        THE COURT:  Thank you.

20   BY MR. GIBBONS:

21   Q    If we could pull up what has been marked a

22   Government's exhibit three.

23        This is your expert report, Dr. Smith?

24   A    Yes, it is.

25   Q    I believe this has already been admitted, Your

1    Honor.

2        THE COURT:  Right.

3    BY MR. GIBBONS:

4    Q    Exhibit four?

5        THE COURT:  His CV.  I have looked at it.

6        MR. GIBBONS:  Has that been that admitted already,

7    Your Honor?

8        THE COURT:  It is now.

9        MR. GIBBONS:  Great.

10       This is your CV, Dr. Smith?

11       THE WITNESS:  Yes.

12   BY MR. GIBBONS:

13   Q    Dr. Smith, as an expert in the field of racial

14   disparities in law enforcement have you reached

15   opinions in response to the opinions reached by

16   Dr. Coston?

17   A    Yes, I have.

18   Q    What are those opinions?

19   A    Well, the primary, I guess the primary conclusion

20   is that the analysis that Dr. Coston did cannot be

21   reliably relied upon to draw the conclusion that race

22   was a contributing factor to the decision-making that

23   occurred in this case.

24   Q    What are your opinions with regard to Dr. Coston's

25   quantitative methods?

1    A    The primary quantitative analysis that she

2    conducted, that Dr. Coston conducted, was discussed at

3    length yesterday.  The chi-square analysis.  It is a

4    well established sort of bivariate technique.

5         THE COURT:  A bivariate?

6         THE WITNESS:  Bivariate, two variables.  Race and

7    race and search.

8         Obviously that test is a statistical test that has

9    been around for, I don't know, a couple hundred years

10   probably, but it is used extensively in this field as a

11   stepping stone, a means to more involved and more

12   detailed analysis that typically follow that, what I

13   would consider an intermediate step in examining this

14   question of whether race had an influence on the

15   outcome or on the decision to stop.

16   Q    We will talk more about that in detail, but first

17   I want to talk about data collection and quality

18   control.  Are you familiar with state-wide efforts to

19   collect traffic stop data?

20   A    Yes, I am.

21   Q    How are you familiar?

22   A    As I said, I worked on analytic teams that

23   examined state-wide data collection, or the data

24   produced by state-wide data collection efforts in

25   Arizona and in the State of Washington.  As part of the

1    Arizona work, our team actually advised the Arizona

2    Highway Patrol on the fields and the process.  We

3    helped design the system that was in place.

4    Q     What are some of the common issues with state wide

5    efforts to collect traffic stop data?

6    A     Well, you know, there are, it is a fraught, it is

7    a fraught industry.  So what I mean by that is that we

8    have upward of 18,000 police departments in the United

9    States.  And they range from one person police

10   departments with a single police chief, up to the NYPD

11   with 35,000 police officers, and everything in between.

12        So when you are talking about trying to coordinate

13   data collection across an entire state, you are talking

14   even in small states of dozens or hundreds, and

15   sometimes, in some cases in larger states, thousands of

16   police departments, with varying sizes and

17   capabilities.  And you are trying to get them all on

18   the same page to collect the same data elements in the

19   same way in a consistent manner accurately.  And then

20   to enter them accurately into some system, some data

21   base, some interface that then can be, where the data

22   can be warehoused and eventually analyzed.

23        There are multiple opportunities throughout that

24   entire process for error to be introduced.  In my

25   experience it is very, very common that that is the

1    case across statewide efforts.  It is even common with

2    single agencies for them to struggle with, particularly

3    early on when data collection efforts are new to enter

4    the data correctly and accurately and reliably.

5    Q    What methods of data quality control do

6    researchers in the field of racial disparities use with

7    newly collected stop data?

8    A    So there are a wide variety of what I would term

9    data audit techniques that I use, that the teams that I

10   work on, typically use to understand the nature of the

11   data we are operating under.  In fact, we undertake

12   those data audits, those extensive data audits before

13   we begin to analyze the data in any substantive way.

14   And so, we check.  We check first of all for the

15   accuracy or in the completeness of each of the data

16   fields that are collected.  So, race, age, type of

17   stop, whether a search was conducted.  Each one of

18   these fields that may appear in the data we audit to

19   see how much of those data are missing, first of all.

20   That is one check that we undertake.  We do that across

21   all the fields.

22        Then we undertake an internal logic test or audit

23   to check to see whether or not variables that should be

24   related to one another in certain ways are in fact

25   related to each other in certain ways.

1        So, as an example, if the data collection regime

2   asks the police department to indicate whether a search

3   was conducted and whether contraband was found, then

4   you should not have any instances where contraband was

5   found but a search wasn't conducted because contraband

6   is a product of the search.

7        So we call these internal logic checks.

8        So we do that across all potential variables that

9   could interact in a way that you would expect, or not

10  expect to see whether or not those data align, to see

11  whether there are internal consistencies or

12  inconsistencies across data fields.

13  Q    Go ahead.

14  A    Then the final type of check that we prefer to do

15  is to check the data that is collected by the police

16  department against an external data source.  This is an

17  overall validity check.  It helps answer the question

18  whether the police are accurately entering the data

19  into the system, whether they are doing that, doing

20  that accurately.  And it helps us understand whether or

21  not there are systemic patterns of differences that one

22  might not expect.

23       So, as an example, it's often a question in these

24  kinds of data collection processes, it is often a

25  question from stakeholder groups or from the community,

1    there are lots of skeptics in the audience about

2    whether the police are really accurately entering

3    information, for example, on driver race.  You know,

4    the perception among some stakeholder groups of course

5    is that the police have every incentive not to enter

6    that data accurately.

7         So, an external audit would compare the stop data

8    that the police have entered into the system to some

9    external data source that should align with that stop

10   data.  For example, traffic citations.  So, in some

11   states traffic citations contain the race of the

12   driver.  The race of the driver is also entered into

13   the data collection system that is at issue.

14        We spent some time talking yesterday about control

15   numbers, and what we call case IDs, that is why they

16   are very important because they typically would, you

17   will be able to link a stop that has been cataloged in

18   the data collection system with the traffic, the

19   corresponding traffic citation that was issued in that

20   case to see whether or not the race that was indicated

21   on the traffic citation for the driver is the same as

22   the race that was indicated in the data collection

23   system.  An external audit check.  I do that in the way

24   that I just described with traffic citations.  You can

25   also, you know, in Miami Dade, for example, we took

1    random sample of drivers whose race ethnicity was

2    entered into the stop data system, and we obtained

3    their digital driver's license photos from DMV.  And we

4    had a panel of people review those driver's license

5    photos against the race and ethnicity indicator that

6    the officer provided in the data collection fields to

7    see whether or not there were obvious mismatches.

8    Officer indicates that the person is white when the

9    drivers license seems to indicate that they are

10   African-American, for example.

11        So that is another method that we use as an

12   overall check for validity.

13   Q    You talked about instances where there is missing

14   data in the traffic stop entry.  What is the data audit

15   standard for when a traffic stop entry contains one or

16   more cells of missing data?

17   A    Well, we typically like the agencies that we work

18   with, like to see less than a five percent missing data

19   rate in every field.  Often times, particularly early

20   on in the data collection process, if it is a new

21   system, or a new, you know, a new mandate, never been

22   in place before, you will see large percentages of

23   missing data.  And then through the process of

24   engagement with the agency that I worked with over the

25   years we work with them to help them get better to

1    collect their data more accurately so that those

2    missing data percentages shrink.

3         Again, we hope -- there are certain rules of thumb

4    is less than five percent missing data.  Obviously the

5    smaller the better, but five percent is sort of the max

6    that we really wouldn't want to be able to see any

7    given data field.

8    Q    When you identify missing data when you go to

9    perform your analysis, what do you do with that data?

10   A    Well, if there is a case, when I say case, let's

11   say a traffic stop, that contains a missing piece of

12   information so the race of the driver isn't there,

13   there is a field, mandatory field that says you are

14   supposed to indicate whether a search was or was not

15   conducted and that is missing.  So if a single record,

16   single case, a single traffic stop has any piece of

17   missing information in it, then we exclude that case

18   from the analysis.

19        THE COURT:  Wait a second.  Suppose you were

20   checking to see race and they had forgotten to put in

21   gender.  You would exclude, still exclude that?

22        THE WITNESS:  Yes.

23        THE COURT:  Why is that?

24        THE WITNESS:  So that is, that is just a careful

25   data management practice that most experienced social

1    scientists follow.

2         THE COURT:  Well, but I don't understand how it

3    affects the validity of the racial data if they haven't

4    written down the gender.

5         THE WITNESS:  There was some discussion yesterday

6    about the idea that if a traffic, if a single record of

7    data contains missing information it at least raises

8    the question about whether there are other fields that

9    may not be accurately represented.  And so, granted, it

10   is a conservative approach to eliminate that data in

11   entire record, but that is the approach that most

12   social scientists that I am familiar with will take

13   with missing data.  And that is how I treat missing

14   data.

15        THE COURT:  I just don't understand if you are

16   concerned about race and there is -- I don't understand

17   why, why that --

18        THE WITNESS:  Well --

19        THE COURT:  -- why that says, well, we are going

20   to ignore those.

21        THE WITNESS:  Because often times, Your Honor,

22   race ends up being analyzed in conjunction with other

23   variables in that data set.  So if other variables that

24   interact with race are missing, then that would affect

25   the outcome of the analysis.

1      THE COURT:  So if you weren't checking for other

2    variables, then it wouldn't -- for instance if you were

3    looking to see whether there was an unusual number of

4    African-American women who were stopped, if we weren't

5    worried whether they were women, the identification

6    wouldn't affect that, would it?

7      THE WITNESS:  Probably not.  But in the analysis

8    that we typically do there are multiple interaction

9    effects that we examine.  It is almost never the case

10   that we would simply look at a variable in isolation

11   and not part of a larger set of analyses.  There is

12   more than one variable would be considered either in a

13   bivariate analysis like was conducted here, or in a

14   regression model.  So, again, the more conservative

15   approach is simply to eliminate any case that has

16   missing data in it it.

17   BY MR. GIBBONS:

18   Q    How do researchers in the field of racial

19   disparity research deal with duplicate data?

20   A    You have to diagnosis why -- first of all you have

21   to diagnosis what you are looking at.  Do you really

22   have truly duplicate cases?  If you truly have

23   duplicate cases, then it raises real questions about

24   why that is.  There is, you know, throws the data

25   collection process itself into question.

1         If the system is not designed to have duplicate

2    records in it, and it has duplicate records in it, then

3    that is a real problem, a real concern.  Obviously you

4    would eliminate those, but more fundamentally you would

5    be concerned that there is something wrong in the way

6    that the data were collected.

7         THE COURT:  So your concern that this, as with the

8    exclusion of things missing one of the cells, is

9    essentially that what you are worried about is that

10   there are overall sloppy collection techniques?

11        THE WITNESS:  That is part of the concern, Your

12   Honor, yes.

13        THE COURT:  What is the rest of it?

14        THE WITNESS:  Well, as I mentioned earlier, a

15   missing cell in and of itself, if that cell weren't of

16   concern to the analysis would probably be trivial.  But

17   because we interact so many of these variables with

18   each other, then it becomes non trivial or potentially

19   non trivial.

20        THE COURT:  So it has a statistical significance

21   in the way you run the statistical program.

22        THE WITNESS:  It could.

23        THE COURT:  But, I mean, like your main concern is

24   that these folks are doing that sloppy job gathering

25   the data.

1          THE WITNESS:  Statistically true of the larger,

2     the more missing data that there is the greater the

3     concern.  In cases of true duplicate records when there

4     shouldn't be duplicate records -- there are instances

5     you would expect to see duplicate records.  For

6     example, some traffic stop data collection regimes

7     collect data on everyone in the vehicle.  Driver and

8     passengers, for example.  So, the single traffic stop

9     which has the, which has an appropriate RMS system,

10    records management system, or CAD system, computer

11    aided system, would assign a unique ID number.  You

12    might expect to see multiple entries for that unique ID

13    number associated with the driver and let's say a

14    passenger, or a driver and two passengers, you know.

15    So you would see duplicate records under the same case

16    ID, but involving different individuals in the vehicle.

17    But when you have a data collection process where the

18    only information being collected is on the driver, you

19    might say, and you have duplicate records that appear

20    to be the same driver who has entries for him or her

21    more than once, then that is a systemic problem that is

22    of concern.

23    BY MR. GIBBONS:

24    Q    And if a researcher in the field of racial

25    disparity research happens to be stuck with wrong data

1    for one reason or another, what does that researcher do

2    about it?

3    A     Well, it depends how poor it is.  You know, there

4    is degrees of these things.  On some level the data may

5    be so poor that, you know, a reputable social scientist

6    would look and say these data are --

7          MS KOENIG:  I am going to object to that, they are

8    missing.  Testifying about what other people would do.

9    He can testify what he would do.

10         THE COURT:  I think what he is testifying is about

11   what the standard is in the field and tying this into

12   Dr. Coston's analysis of the data that he received.

13   And what he is saying, what I suspect he is going to

14   eventually say is Dr. Coston's methodology doesn't

15   comply with the standard in the field, and that it is

16   therefore unreliable so under Daubert I should not

17   consider it.

18         I think that is where we are going.

19         MR. GIBBONS:  Yes, Your Honor.

20         THE COURT:  So, what was the question?  The

21   question -- he was talking about there are degrees of

22   inaccuracies.  And what was the question about?

23         MR. GIBBONS:  The question was, if a researcher is

24   --

25         THE COURT:  What do you?

1        MR. GIBBONS:  What are, what do you do with it?

2        THE WITNESS:  I mentioned sort of a rule of thumb

3    of five percent, you know, missing data standard for

4    example.  It if it is under five percent then, of

5    course, as I said, we eliminate any case that is

6    missing a piece of information.  But, you know, I would

7    continue to proceed ahead to analyze those data.  If

8    the data were missing a larger percentage of

9    information, then at some point I believe, again

10   certainly myself and other researchers that I work with

11   regularly in this field -- would be concerned about

12   analyzing the data at all.

13       THE COURT:  So there is a degree of inaccuracy

14   above which you simply decide, well, this data is not

15   an appropriate subject of statistical investigation, is

16   that right?

17       THE WITNESS:  Yes, sir, Your Honor.

18       Usually there is conversation that is involved.

19   Often times, as I say, it's a continuum, right?  So

20   often times you will have data that falls above the

21   five percent threshold that we would like to see, but

22   nothing like, you know, not missing fifty percent of

23   the data.  So maybe 20 percent, let's say, my example.

24   Typically a conversation involved with the

25   stakeholders.  Sometimes that may be the City or the

1    police department.  Sometimes that might be, you know,

2    whoever commissioned the study or the analysis.  If it

3    is a federal grant you might have to have a

4    conversation with the granting agency.  But typically

5    there is a conversation that looks something like, hey,

6    we have taken a look at these data, we have audited the

7    data, we are missing 25 percent of the fields across

8    the data set.  We can proceed with the analysis, but

9    understand that that degree of missing data could

10   influence the outcome.  So depending on how that

11   conversation goes, we may or may not proceed.  If we do

12   proceed then we typically caveat the findings pretty

13   heavily in terms of what can be legitimately concluded

14   based upon them.

15        THE COURT:  Well, if the data is not reliable why

16   would you as reputable social scientist provide that to

17   your client who is presumably going to do something

18   with it?

19        THE WITNESS:  Because, you know, the primary

20   stakeholders' opinion matters, you know.  And they, you

21   know, have a voice and they should have a voice.  So

22   once the information is accurately presented to them

23   about what the data audit has revealed, and if it

24   reveals significant problems and they wish to proceed

25   with the analysis, then we would proceed.  But, again,

1    we will do that with full recognition on the part of

2    everyone that the data are missing significant pieces

3    of information or are otherwise unreliable, and

4    therefore the results have to be taken with a very

5    large grain of salt.

6        THE COURT:  So you would tell them, we will

7    proceed, you have got to understand you are getting a

8    Yugo and not a Mercedes?

9        THE WITNESS:  Yes, sir.

10   BY MR. GIBBONS:

11   Q    Dr. Smith, we talked about data collection

12   procedures and collecting the data.

13       Now I would like to go to the next step, which is

14   benchmarking.  Specifically with reference to racial

15   disparity research.  What is the main problem that

16   researchers face in benchmarking?

17   A    Well, the problem with benchmarking, we call that

18   the benchmarking problem.  The basic idea is that it is

19   relatively easy, we have been talking here this morning

20   about collecting data and the difficulties and the

21   complexities of that, which is all true, yet when the

22   processes mature enough and has sort of passed that,

23   you know, that five percent missing data reliability

24   check box and, you know, internal validity checks are,

25   you know, aligning and so forth, we would have fairly

1    high degree of confidence the data are being collected

2    appropriately.  So, then ascertaining the race, for

3    example, or ethnicity of the driver as indicated by the

4    officers when they make traffic stops is sort of

5    relatively easy, you know.  The cops are required to

6    enter this information.  They enter that information

7    reliably, and so we know that over a period of time

8    they have made X number of traffic stops and some

9    percentage of them are of white drivers and some

10   percentage African-American driers or Spanish drivers

11   and so forth.  So that is administrative data that sort

12   of serves as a foundation of the analysis.

13        But knowing that a percentage of -- that the

14   percentage of a population of stops is comprised of

15   some percentage of whites, blacks, Hispanics and Asian,

16   for example, is meaningless unless you can compare that

17   to a meaningful population.  That's in the, that is the

18   heart of the benchmarking problem.  So identifying what

19   that -- that meaningful population should be an

20   estimate, a reliable estimate, of the people who are at

21   risk or available to be stopped in that jurisdiction.

22        That is the definition of what a benchmark, good

23   benchmark, should be.

24        THE COURT:  Let me see if I understand correctly.

25        You said, I think, a second ago, ascertaining the

1    race is the easy part.

2          THE WITNESS:  Yes.

3          THE COURT:  Because you can know how to identify

4    people's race.

5          But the difficult thing is comparing that to a

6    meaningful population of the people who are essentially

7    available to be stopped.

8          THE WITNESS:  That's correct, Your Honor.

9          THE COURT:  In this case, that would be the

10   motoring public during the relevant time period.

11         THE WITNESS:  That is exactly right.

12         THE COURT:  So if there are -- if there are a

13   hundred thousand drivers motoring in a particular area,

14   and you would need to know -- let's back up a second.

15         I am trying to see how the plays out.

16         Well, let's just look at our case here.

17         If, well, 77 percent of the people are stopped by

18   the police are African-American, would you, would it be

19   important to know whether 77 percent of the people who

20   were driving around are also African-American, in which

21   case it would not be surprising that 77 percent of

22   people stopped are African-American?

23         THE WITNESS:  That's right, Your Honor.

24         THE COURT:  But in contrast, if ten percent of the

25   people who are driving around are African-American and

1    77 people, or percent of the people who were stopped

2    are African-American, that would be a more meaningful

3    statistic in terms finding some sort of discrimination.

4          THE WITNESS:  Correct.

5          THE COURT:  And okay.

6          Now, how do I make -- I may be getting ahead of

7    myself here.  I apologize.

8          How do you decide what kind of -- how do you

9    determine a disparity for motor vehicle stops,

10   benchmark for motor vehicle stops?  I take it you are

11   doing this in this Suffolk County case you are working

12   on?

13         THE WITNESS:  Actually, we are not.

14         THE COURT:  Why are you not?

15         THE WITNESS:  Because we don't have the data.

16         THE COURT:  So what are you going to testify

17   about?  Are you going to be the Dr. Coston in that

18   case, that was consulted by some statistician from a

19   university?

20         THE WITNESS:  Well, so the benchmark question is

21   the key in the -- if the -- if the question at issue is

22   whether the police are disproportionately targeting

23   minority drivers, then the only way to answer that

24   question is if you have an estimate of the population

25   of persons who are available to be stopped and the

1    racial composition of those people.

2         THE COURT:  Right.

3         THE WITNESS:  We estimate that -- there have been

4    a variety of ways that have been attempted over the

5    years, and there is kind of three main ones that sort

6    of surfaced in the peer-reviewed literature over the

7    last 20 years, I would say, of ways to do that.

8         One is direct field observation.  Some might

9    consider that the gold standard of benchmarking.  That

10   literally means you put a research assistants typically

11   on street corners making observations of drivers.  More

12   sophisticated ways of doing that involve actually

13   looking at traffic violations as well.  So, I did an

14   observation study once in Miami Dade County, for

15   example, where we measured not only systematically the

16   perceived race and ethnicity of people passing by in

17   vehicles at selected intersections, but we also looked

18   at traffic violations at those selected intersections.

19   So we had researchers with radar guns looking at speed.

20   We looked at red light violations.  And we looked at

21   controlled intersections like stop sign violations as

22   well.  So there is a range of ways that you can do it.

23   But basically the idea is you are putting people out on

24   the roadways actually making observations of who is

25   driving and who is committing traffic violations at

1    certain places.  It's an excellent way to estimate who

2    is out there driving and who is out there violating

3    traffic laws.  The problem with it is very time

4    consuming and expensive to do.  So there haven't been

5    that many of those kinds of studies done.  Primarily

6    because of the time and expense that is involved.  That

7    is one technique, though.

8         Another technique that has again emerged I think

9    in the scientific literature was mentioned yesterday,

10   veil of darkness approach.  It is actually, it is

11   useful and doesn't require an external benchmark.  It's

12   an analysis of the stops themselves based on the time

13   of the day.  Now, there is some significant assumptions

14   built into that recently, for example, been called into

15   question.

16        But the basic idea with veil of darkness approach

17   is that the researcher compares stops of drivers by

18   different races during the day to stops of those

19   drivers of different races at night.  They use, we use

20   natural variation in daylight and daylight savings time

21   to do that type analysis.  So, for example, at

22   5:00 p.m. in December it is dark in a lot of places in

23   the country.  At 5:00 p.m. on July 1st it is broad

24   daylight in a lot of places.  So, the veil of darkness

25   uses that natural variation in daylight and in daylight

1    savings time to look at windows of stops that are

2    sometimes at night in full darkness, and sometimes at

3    day, in the day, depending on the time of the year, to

4    see whether or not those daytime and nighttime stops

5    vary by the race or ethnicity of the driver.  So the

6    basic picture here is that if you assume, and this is

7    one of the assumptions, the untested assumptions of the

8    veil of darkness approach.  But if you assume that

9    officers, that it is more difficult to ascertain the

10   race and ethnicity of the driver prior to the stop when

11   it's dark outside, if you make that assumption then the

12   nighttime set of stops represent a less biased estimate

13   of traffic stop behavior because presumably the

14   officers can't tell who they are stopping until they

15   walk up to the car.  And you compare that the stops

16   that are made during the day of that same racial group.

17   And if you see higher rates of stops of minorities, for

18   example, during the day compared to the percentage of

19   minorities who are stopped at night, then that is some

20   indication that there may be a biased mechanism

21   involved that.

22       I have done that analysis a number of times myself

23   and reported it in the peer-reviewed literature.  So it

24   is an accepted technique, Your Honor, to estimate the

25   benchmark, a benchmark of drivers compared stops.

1          The other technique that has appeared a number of

2     times in the literature is use of traffic crash data to

3     estimate the population of persons at risk for being

4     stopped.

5          So this technique was developed in the early

6     2000s.  I was actually part of the team that pioneered

7     this technique.

8          It has been replicated a number of times now in

9     the peer-reviewed literature as well.  So the idea and

10    this comes from traffic safety literature going all the

11    way back to the '50s.  The idea is that when people are

12    victims of traffic crashes, meaning they are not at

13    fault, they were just run into, that over time and over

14    a large enough sample of those not at fault drivers in

15    crashes that population provides a reliable estimate of

16    who is actually out there driving available to be run

17    into if you will look at it that way.

18         So, if 40 percent of your not-at-fault traffic

19    crash victims are African-American then that gives you

20    a pretty good idea that about holder groups percent of

21    your drivers are African-American.

22         So, this analysis then compares the percentage of

23    people who are not-at-fault drivers in two vehicle

24    crashes by race against, that is the benchmark, against

25    which police stops by race are compared.

1       So that is a long answer to the question, Your

2   Honor, but those are the three main techniques I think

3   emerged in the peer-reviewed literature in the last 20

4   years.

5       THE COURT:  Okay.  See if I have it correctly.

6   Three ways to do this.  One is to count noses.  Two

7   is -- three is to look at crashes.  And two is veil of

8   darkness.

9       THE WITNESS:  Yes.

10      THE COURT:  Okay.

11      THE WITNESS:  There are a few others that have

12  been attempted.  Looking at red light cameras, for

13  example, things like that.

14      THE COURT:  All right.  Go ahead.

15  BY MR. GIBBONS:

16  Q   You are doing my job for me, Your Honor.

17      THE COURT:  Well, no, I am not.  I am fouling up

18  your case for you, probably.  You wouldn't be alone.

19  BY MR. GIBBONS:

20  Q   Dr. Smith, census data was used, especially

21  initially, or is used as a benchmark.  Talk about the

22  advantages and disadvantages of using census data as

23  benchmark.

24  A   Census data is what I have termed a first

25  generation benchmark.  It was the earliest type

1    benchmarking that people in the field did.

2          THE COURT:   In a traffic stop.

3          THE WITNESS:   In traffic stop analysis.

4          So first generation benchmark.  We did this around

5    2000 in a few years on either side of it primarily.

6    Frankly, because the science had not evolved beyond

7    that.

8          When I did that first paper in Richmond in 2000,

9    for example, there was no peer-reviewed literature.

10   There was some agency reports, expert witness reports a

11   little bit that had been done.  But there was no

12   literature base, no scientific base to draw upon when

13   trying to figure out how do we, what do we compare

14   against the percentage of drivers who have been stopped

15   by the police who have given us, given race or

16   ethnicity.

17         So, you know, an easy way, and in some ways sort

18   of an intuitive way, is to say, let's just look at the

19   census data, look at, you know, who resides in a

20   particular jurisdiction and compare those racial

21   composition of who lives there to the composition of

22   who is stopped.

23         So, that is the first generation, sort of set of

24   analyses that were done using census data as a

25   benchmark.

1          We were pretty quickly, even then, for example,

2     look at my Richmond paper from 22 years ago, there is

3     some recognition, you know, some recognition that we at

4     least ought to look at the sort of age-adjusted

5     population, look at people who are 16 and older, for

6     example.  If you have to be 16 to get a driver's

7     license we thought then at least we ought to be looking

8     at the population that is 16 and older in a given

9     jurisdiction to at least rule out, you know, the three

10    year olds who can't drive a car.  So that is what we

11    did.

12         When I say we, this is literally what I did in the

13    early, in the early 2000s, but what other researchers

14    did in a number of other papers that were published in

15    those days.

16         It pretty quickly evolved, though, to the point

17    where we began to recognize that the census population

18    is really a poor benchmark.  It as poor estimate for

19    actually who is driving in a population.  That is

20    really what we care about.  We need to compare apples

21    to apples.  If we are comparing police stops we need to

22    be comparing that to who is available to be stopped.

23    Which means you have to be driving to be available to

24    be stopped.  You can't just be living there.

25         So, there were some many comparative studies that

1   began to look at how do we, if we can estimate the

2   population using one of these techniques I just

3   mentioned, and we compare it to the census population,

4   we begin to see big divergences.  In some places

5   significant divergences.  So you can think about, you

6   know, any given large urban area that has suburbs.  We

7   have large numbers of people, at least pre COVID, who

8   commuted to work every day.  Those suburbs often look

9   very different from a race and ethnicity standpoint

10  than the residential population of the City being the

11  core, the urban core of the city where the stops are

12  occurring.  So research began to uncover that.  We

13  began to realize, hey, using the census as an estimate

14  for who is driving is really not good science.  And so,

15  you know, people who work in this area regularly,

16  analysts like me, who work in this area regularly,

17  stopped using the census as a benchmark at some point

18  around, you know, 2005 to 2010 primarily.

19  Q    How well does census data account for factors such

20  as police deployment patterns, or potential driving

21  differences among racial groups?

22  A    Well, it doesn't account for those at all.  So the

23  answer is, it doesn't account for them at all.

24  Q    Despite the movement away from census data and

25  racial disparity research, do you still occasionally

1    see census data being used in articles?

2    A    You know, I have not seen census data used as a

3    benchmark in the peer-reviewed literature, and I would

4    review a lot of these papers.  I want to say in the

5    last five to seven years I have not seen that.

6         Now, some people will submit papers using the

7    census benchmark.  Reviewers typically reject those for

8    the reasons I just articulated.  I can't say there has

9    not been a paper that used census as benchmark against

10   traffic stops, but it has certainly fallen out of

11   regular use in favor among experienced social

12   scientists who work in this field.

13   Q    Yesterday defense talked about a New York stop and

14   frisk article that relied on census data.  Why is that

15   comparison inapt?

16   A    So, a stop and frisk analysis compares the racial

17   composition of people stopped and frisked by the

18   police.  That is analogous to the traffic stop data

19   that the police collect.  In that case it seems, and

20   again, I haven't read than paper, but at least from the

21   representation in the courtroom yesterday, to the

22   census population of people who live in particular

23   areas of New York.

24        MS KOENIG:  I think I just heard -- objection, I

25   just heard Dr. Smith say he had not read the paper.  I

 1    don't know that it as appropriate for him to comment on
 2    something he hasn't read.
 3         THE COURT:  Well, I think what he is commenting on
 4    is not so much the paper but on how you benchmark stop
 5    and frisk to something else.
 6         Is that fair to say, Mr. Gibbons?
 7         MR. SIEBERT:  I can rephrase the question.  I
 8    think it will help.
 9         THE COURT:  Rephrase.
10    BY MR. GIBBONS:
11    Q    Dr. Smith, what population of citizens does the
12    New York stop and frisk study analyze?
13         THE COURT:  He doesn't know.  He hasn't read it.
14         THE WITNESS:  There have been many studies that
15    have been done of NYPD stop and frisk practices, some
16    of which have used some version of the census, not
17    necessarily as a benchmark, but as part of the analysis
18    that is done.
19    Q    In particular that article that was referenced
20    yesterday, did that concern pedestrian stops?
21    A    Stop and frisk study, it concerns pedestrians, not
22    drivers.
23    Q    What is the difference between pedestrian
24    benchmarks and driving benchmarks?
25    A    Well, again, benchmark the science of benchmark,

1    benchmarking is about trying to identify the best

2    estimate that we have of who is driving in a

3    population.  Who is available to be stopped if it is a

4    traffic stop study.  Or in a pedestrian stop study, it

5    is trying to define the best estimate of who is

6    available to be are stopped on the street as a

7    pedestrian by the police.

8         And some would argue that census data is a better

9    estimate, closer estimate for pedestrian stop studies

10   than it would be for traffic stop studies because it is

11   a representation of who lives and circulating on foot,

12   presumably, in an area, particularly in an urban area.

13   Q    I would like to talk now about the reasons that

14   motorists be stopped by the police.  What are the risk

15   factors that would lead to a traffic stop from the

16   motorists' perspective?

17   A    Number one factor is how you drive.  So, violating

18   behavior is a significant risk factor.  The type of

19   vehicle that is driven.  So, traffic codes across the

20   country have lots of provisions that regulate the

21   condition of the vehicle that are citable if the

22   vehicle doesn't meet those conditions.  So that is a

23   risk factor for stops by the police.

24        The deployment or the concentration of police

25   officers in certain places in proximity to large

1    numbers of drivers matters.  So it's not uncommon to

2    see a cluster of traffic stops, for example, along

3    major thoroughfares because they carry not only higher

4    volume of, they carry high volume of cars, but they

5    also carry higher volumes of cops who are out there

6    looking for people who are violating traffic laws.

7         So that can matter.

8         Those are a few.  The main ones.

9    Q    Speaking across the nation, does it appear that

10   there is a raw statistical racial disparity in who

11   police stop?

12   A    So it's not uncommon for the traffic stop

13   literature to uncover racial disparities in traffic

14   stops even applying the appropriate benchmarks that I

15   mentioned.

16   Q    What can a researcher determine about whether bias

17   is an issue in that particular traffic stop when they

18   discover a raw statistical disparity?

19        THE COURT:  Are you asking if whether you can

20   conclude that a particular stop is based upon racial

21   bias?  Is that what you are asking from overall

22   statistics?

23        MR. GIBBONS:  Or or how inference is made given

24   the raw statistical few disparities in question, Your

25   Honor.

1          THE COURT:  Whether they are not with regard to a
2     particular stop, but with regard to a pattern of stops?
3          MR. GIBBONS:  Yes, Your Honor.
4          THE COURT:  Okay.
5          So the question is, from a statistical, or from a
6     numerical disparity of stops what can you conclude
7     about whether there is an overall problem, I guess?
8          THE WITNESS:  I understand the question, Your
9     Honor.
10         The crux of the issue in a lot of these cases.  So
11    I will say this.  Careful social scientists that work
12    routinely with these kinds of data and do these kinds
13    of analyses do not purport to reach conclusions about
14    discrimination or potential discrimination based
15    upon -- based on the findings of disparity in traffic
16    stops.
17    BY MR. GIBBONS:
18    Q    I would --
19         THE COURT:  What you are saying is that a
20    disparity in the number of stops does not justify a
21    conclusion that there is biased policing; is that
22    correct?
23         THE WITNESS:  That's correct.  And that is because
24    there are -- for a number of reasons.  First of all, it
25    is, you know, benchmarking is, as we have just been

1    discussing, is an inexact science in and of itself.

2    Every benchmark as its limitations.  Some are worse

3    than others and have been largely discarded by the

4    scientific community.  Even the ones that remain

5    standing are estimates, right.  Who is driving out

6    there on any given day.  That is one problem or one

7    reason why careful researchers don't make claims about

8    discrimination based on estimates of bias -- of

9    disparity.

10        And then in the other reason is for, going back to

11   the previous question, that there are typically a host

12   of factors that can cause racially disparity results in

13   traffic stops.  Many of which have nothing, logically

14   nothing to do with potential bias decision making by

15   the police.  And some of those variables are often

16   times not well measured.  We don't have them in the

17   data, or they are -- they can't otherwise be measured

18   or controlled.  And so, you know, you are left with

19   some often times, back to the question you just asked,

20   you are often times left with disparities in traffic

21   stop study findings.  That is probably more common than

22   not across the literature.  But what you typically

23   won't find, in the peer-reviewed scientific literature

24   any way, are claims that those disparities mean that

25   the police are out there targeting people because of

1    their race.

2         THE COURT:  So then unfortunately, or fortunately,

3    depending how you look it, our country has come a long

4    way from the days of Sheriff Bull Connor down in

5    Alabama or Georgia, wherever he was, saying that he is

6    going to treat African-American people badly.  People

7    just don't say that any more.  How do you prove that

8    there is bias in policing without a smoking gun,

9    somebody saying, let's go arrest all the

10   African-Americans?

11        THE WITNESS:  Well, from a social science

12   standpoint, good social scientists don't make claims

13   that, we say, go beyond your data.  You know you have

14   to be humble in this field and recognize that you are a

15   social scientist, you are not working inside a

16   laboratory.  You are not a physicist or chemist who can

17   control the environment.  You are working with real

18   world data that is often messy.  And where a whole host

19   of real world factors can impact the results that you

20   are interested in analyzing.

21        So, what you have to be very careful of is

22   getting, not making claims that get out ahead of your

23   data where you say things that the data cannot support

24   from a scientific standpoint. So, you know, it is

25   proceedings like this and people like yourself and the

1    attorneys that ultimately have to decide, you know,

2    based on legal standards what equals discrimination or

3    what doesn't.  It is people like me that can only help

4    inform you that there are limits to what we can say and

5    not say about that ultimate question.

6        THE COURT:  Well, but I have got to make the

7    decision in this case.  And I guess there will are

8    probably other judges out there that that need to make

9    similar decisions in similar cases.  And going beyond

10   me, there are political leaders who need to make

11   similar decisions for moral grounds.  You don't want a

12   society that allows that.

13       But what are telling me is that a simple disparity

14   doesn't justify my making a decision that there is

15   biased policing.  So what do I need on top of that if,

16   assuming once again that I am not going to have police

17   officers saying let's go arrest all the

18   African-Americans, or whatever.

19       THE WITNESS:  Well, sometimes there is direct

20   evidence of that.  There is text messages, there is MDT

21   messages, there is radio chatter that provide direct

22   evidence of potential bias on the part of officers.

23   But absent that smoking gun, you know, a high quality

24   racial disparity analysis of traffic stops, for

25   example, looks at a variety of the dimensions across

1    the data.  From the initial stop decision, the initial

2    disparities potentially and who is stopped, to a

3    variety of post-stop outcome, some of which Dr. Coston

4    spoke to in his report.

5         But, in a much more in depth and more

6    sophisticated way that considers not just two variable

7    together, but multiple variable, multiple inputs where

8    we take account for and control for as many of the

9    known variables that are the variables that are known

10   to influence the outcome where we control for those in

11   a multivariate progression model typically.  And then

12   if you have a situation where you have multiple

13   indicators that align so there are disparities in the

14   traffic stop data itself applying the best available

15   benchmarks that we have for estimating the driving

16   population, and you have disparities in post-stop

17   outcomes, after taking into account all of the relevant

18   variables that potentially could influence those

19   outcomes, when those factors align.  Then as a social

20   scientist and as a police researcher who is often times

21   asked this question by policymakers, I get closer to

22   being able to be comfortable in saying you have a

23   problem.

24   BY MR. GIBBONS:

25   Q    Dr. Smith, you talked about the importance of

1    controlling for other variable in order to determine if

2    this initial statistical disparity actually means there

3    is bias present.  Can you offer an example of where

4    there existed statistical disparity after controlling

5    for that disparity disappeared?

6    A     Yes.  Let's take arrest as an example.

7          So it's not uncommon in the peer-reviewed

8    literature to find, for there to be findings in these

9    kinds of post-stop analyses that minorities,

10   African-American and/or Hispanics, are arrested more

11   often than whites.  That is a common finding.

12         And if do just a basic bivariate analysis you

13   cross, you know, the outcome, arrest, no arrest, with

14   race, you know, black or white, you often times find

15   disparity.  That is what I alluded to earlier as an

16   intermediate stop in the analysis.  That, you know, the

17   better quality studies that either I have done or I am

18   aware of don't stop there.  They go on to engage in

19   regression analysis where we look at a variety of

20   independent variables or factors that may contribute to

21   that arrest outcome; that are known from either the

22   theoretical literature or from the empirical literature

23   to predict that outcome, and we control for those,

24   statistically a regression equation, so that we can

25   isolate the effect of race by itself independently of

1    those other factors.

2         So I mentioned that at one point in my career I

3    worked -- I did, I was part of the analysis team that

4    analyzed the data from the Los Angeles Police

5    Department during the time that it was under a consent

6    decree with the United States Department of Justice for

7    potentially biased policing, among other things.

8         So, the team that I was a part of, and I was the

9    chief methodologist for that team, were hired by the

10   City of Los Angeles to analyze its data in response to

11   the requirement that it do that from the consent

12   decree.  So we analyzed nearly a million records, more

13   than a million as I recall now, traffic stops in Los

14   Angeles over a period of years.

15        And one of the findings initially, one of the

16   bivariate findings was exactly what I said.  That

17   minority, minority drivers in L A are more likely to be

18   arrested by the LAPD than non minority drivers.  When

19   we controlled for the appropriate variables in the

20   regression equations those disparities disappeared.

21        The variable that made the most difference, there

22   were a couple, but the one that made the most

23   difference was controlling for whether the driver had a

24   warrant on file when he or she was stopped.  So, if the

25   police stop a driver and they run that individual's

1    information through NCIC or the state level equivalent

2    and the driver comes back with a warrant for that

3    individual's arrest, that is virtually a non

4    discretionary arrest on the part of the officer.  The

5    officer will always, almost always make that arrest.

6    So if you have one racial group with more warrants on

7    file than another racial group and you don't control

8    for that then you will reach a spurious conclusion

9    based on the bivariate analysis that you have just run

10   that African-American drivers or Hispanic drivers are

11   more likely to be arrested.

12        THE COURT:  Well, arrest.  There are a lot of

13   things that come into play in a multicultural society.

14   So for instance in my neighborhood if you wanted to

15   arrest young men, if you wanted to stop young men

16   between 18 and 24 you could just drive around in your

17   police car and eventually you would see dozens of

18   little cars with no mufflers.  You would -- all of

19   those people, everybody that drives them commit some

20   sort of offense sooner or later.  And you just follow

21   that car and you would stop it you could arrest

22   77 percent of the people that you wanted to between the

23   ages of 18 and 24.  That kind of cultural bias exists

24   in, I am sure, in African-American drivers as well.

25   You can identify -- you can use proxies for race and

1    identify people.

2           Do you agree with that?

3           THE WITNESS:  Yes.

4           THE COURT:  So how do you -- and yet that would

5    come through in your regression analysis as, well, you

6    stopped somebody because the car had no muffler, or

7    stopped somebody because they didn't signal a turn.

8    How do you deal with that?

9           THE WITNESS:  So, thank you.  A good question.

10          So, I mean you do that in regression model by

11   controlling for the reason for the stop and the

12   seriousness of the offense.  So those are the proxies

13   that you have just identified.  So you control for

14   equipment violation stops, for example.  If the outcome

15   of interest is was the person arrested, or were they

16   given a ticket, you control for the reason for the stop

17   and you control for the seriousness of the offense.  So

18   it matters, for example, if someone is stopped for

19   going five miles an hour over the speed limit there is

20   a qualitative difference between that and someone who

21   is driving 25 miles over an hour over the speed limit.

22   So ideally you want to control for those two factors

23   when you predict whether race in those factors

24   continues to predict the outcome of interest, whether

25   it is a ticket or physical arrest or search.

1        So, what we have done over the years, 20 years of

2    science, is we have gotten better at this, and we have

3    been able to through, this is how science proceeds,

4    right, in any field?  You know, when I did that first

5    paper in 2000 there was virtually no literature, no

6    road map.  Now there is.  There is a detailed road map

7    of the kinds of things that you should consider and

8    control for in a regression model when attempting to

9    predict what the coming outcome of interest may be.

10        There is very voluminous scientific literature on

11    that now that emerged in the last 25 years.  So that is

12    what we do, Your Honor.  The best studies have those

13    data, and they control for those proxies, as you put

14    it, before reaching a conclusion that there are

15    disparities or no disparities in the outcome of

16    interest.

17        THE COURT:  All right.  Go ahead.

18    BY MR. GIBBONS:

19    Q    So am I understanding that answer correctly to say

20    that if race was the true reason for the stop and there

21    was a pre-textual reason for the stop that was offered,

22    over a time using a sophisticated regression model that

23    evidence of the racial bias would emerge from that

24    regression model?

25    A    You could, you know, when you have the correct

1    variables in a model -- again this goes back to the

2    earlier question -- you can begin to rule out

3    alternative hypotheses for the disparity in the outcome

4    that you see.  That is basically the whole exercise.

5    It's not enough from a causation standpoint to say two

6    variables or correlated with one another.  That is just

7    step one in the causation stream.

8         What is also needed is, and what is crucial, is to

9    to be able to rule out that there are not other

10   variables that are also causing the outcome.  We call

11   that, you know, exogenous or spuriousness.  You have to

12   be able to, in order to reach the conclusion that A

13   causes B you have to know that A and B are correlated.

14   You have to know that A preceded B in time.  A occurred

15   before B.

16        And you have to know that there are not other,

17   these other variables that may also be at work, like

18   for existing warrants on file, for example, that aren't

19   being considered, or you have to consider those and

20   control for them in order to reach the calculation that

21   A caused B.

22        THE COURT:  All right.

23        Are we a good spot to stop?

24        MR. GIBBONS:  I was just going to suggest that.

25        THE COURT:  When we get back I hope we will focus

1    in on Dr. Coston's study specifically.

2         MR. GIBBONS:  We have bounced around.  I will try

3    to narrow it down.

4         THE COURT:  I apologize for causing that.  All

5    right, let's take a break.  Thank you.

6                        (A recess was taken)

7         THE COURT:  All right.

8         Resume your questioning of Dr. Smith.

9    BY MR. GIBBONS:

10   Q    Dr. Smith, I would like to very briefly talk about

11   police deployment matters and then turn to Dr. Coston's

12   analysis.  How do police typically deploy patrol

13   officers?

14   A    In most urban areas this is done based on two

15   factors, crime and calls for service.

16   Q    What do criminal justice researchers know about

17   the incidental ratio effect of these police employment

18   patterns?

19   A    Well, the reality in the United States is that

20   race and crime calls for service are often correlated.

21   Q    And then how do you do criminal justice

22   researchers view the instances of race versus crime and

23   calls for service in --

24        THE COURT:  When you say they are correlated, tell

25   me what you mean by that in terms of African-Americans.

1           THE WITNESS:  So, if the police in most urban

2    areas in the United States are deploying officers based

3    on the crime and calls for service in particular

4    precincts or areas of the city, those areas of the

5    city, it is not uncommon for those areas of the city to

6    also be disproportionally populated with minority

7    citizens.  And so the end result then often times is

8    that there is a higher concentration of police officers

9    in minority communities than there are in majority

10   white communities.

11          THE COURT:  So here is the thing that I find

12   interesting about all this.

13          You could probably, do you know of an area of

14   Richmond called Windsor Farms?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  You could probably drive around

17   Windsor Farms at 70 miles an hour and never see a

18   police officer because it's all full of rich people,

19   and I don't imagine there is much crime, or if there is

20   everybody has their own burglar alarm.  Contrast that

21   with Highland Park.  If you drove 70 miles an hour

22   through Highland Park you would be stopped in a heart

23   beat because there are police everywhere over there.

24   So my question is this.  The fact that there is police

25   everywhere means there is more arrests.  So it feeds

1    itself in this sort of a never-ending cycle with, if it

2    is legitimate -- and I am not saying it's not -- to

3    send police where the crimes are.  Where you send more

4    police you find more crime.

5         THE WITNESS:  Well, I would actually dispute that.

6    Crime is a social fact that is out there.  I think when

7    you send more police to a neighborhood and you give

8    them, than in another neighborhood, and you give them

9    the mission to go find crime, then they will do that.

10   And they will make more arrests.  But arrests are not a

11   measure of crime.  Arrests are a measure of police

12   activity.  Crime is a social phenomena that occurs with

13   or without the police being present.

14        Now, we know from the social experiment that the

15   country has just gone through that what happens when

16   police disengage, or when, and when police departments

17   are at half their strength, there is a long history of

18   that, but most recently there is certainly a

19   correlation between violent crime, for example, and

20   lack of police.  But, police don't cause crime.  Police

21   uncover crime.  And the arrests are a measure of police

22   activity, they are not a measure of crime.

23        THE COURT:  Okay.

24        So a measure of police activity.  And if you send

25   police to where there is more crime there is more

1    police activity and therefore more arrests?

2           THE WITNESS:  Yes.

3           THE COURT:  So if you send police to areas that

4    are -- if we are correct in assuming that there is more

5    crime in African-American areas of town, and you send

6    more police there, there will be more traffic stops

7    there.  It is inevitable.

8           THE WITNESS:  Yes.  So that is a --

9           THE COURT:  So the question then is whether that

10   is a sign of bias or a sign of responding to a

11   social need.

12          THE WITNESS:  Yes, sir, but -- that's right, but

13   what it also tells us is that that is why the census

14   can't be used as a benchmark for traffic stops.

15          THE COURT:  Right.  But what that -- but if the

16   City assigns more police officers to Highland Park, I

17   mean, two results that come from that.  People in

18   Highland Park, which is a predominantly

19   African-American area, deserve to have lives that are

20   free of crime.  They deserve to live in a safe

21   community.  So they send police over there.  But they

22   also deserve not to get an inordinate number of

23   tickets.

24          THE WITNESS:  This is the great debate going on

25   right now in the wake of George Floyd is exactly this

1    issue.  How do you deploy police officers from a policy

2    perspective to control increasing levels of violent

3    crime while at the same time not over-policing a

4    community, particularly a community of color since

5    violent crime tends to be concentrated where poverty

6    exists, and poverty tends to be correlated with race.

7         THE COURT:  There is an interesting book called

8    Locking Up Our Own.  It deals with the phenomenon,

9    among other things, of mandatory sentencing, and how

10   those things come about from purposes that are good to

11   results that are bad.  And I don't know how you

12   separate that out.

13        Well, I'm sorry.  Go ahead.

14   BY MR. GIBBONS:

15   Q    That is the work of a social scientist is to

16   separate out the different effects of police deployment

17   patterns underlying crime rates, calls for service and

18   also race?

19   A    To the extent that we can, absolutely.

20   Q    What can a researcher say about individual stops

21   with a city-wide statistical analysis?

22   A    Can you rephrase that question?

23   Q    Can anything be said about individual stops using

24   a city-wide statistical analysis?

25   A    I think if I could extrapolate on your question,

1   if you are asking me can we conclude that there is

2   racial discrimination in an individual stop based on

3   aggregate analysis the answer is no.

4   Q    Turn now to Dr. Coston's analysis specifically

5   with regard to the mapping techniques.  How would you

6   describe how Dr. Coston visualized whether traffic

7   disparities are caused by race as opposed to other

8   causes?

9   A    Well, you know, Dr. Coston overlaid the incidents

10  of traffic stops on a map that included some

11  color-coded indicators for where people lived by race

12  in Richmond.

13  Q    What is the distinction between Dr. Coston's use

14  of heat mapping versus census data?

15  A    The census data is the underlay, underlay of the

16  map.  It is -- that is the racial characteristics of

17  the neighborhoods are driven by the American Community

18  Survey that he used.

19  Q    What are the problems with Dr. Coston's use of

20  heat mapping to determine whether there are racial

21  disparities in policing?

22  A    Because it is essentially using data as your

23  benchmark for traffic stops.  We talked at length this

24  morning, that is not appropriate, not an appropriate

25  benchmark to use residential census data as a

1    comparator against traffic stops.

2    Q    How does Dr. Coston rely on the definition of

3    "predominant populations of minorities" in conducting

4    this heat mapping analysis?

5    A    I don't really know the answer to that question.

6    Q    Why don't you know?

7    A    It's not really clearly defined in his report what

8    the racial percentage composition is in each of the

9    color coded regions on that map.

10   Q    Does Dr. Coston consider whether racial

11   disparities are caused by any other factor other than

12   race?

13   A    Well, not in that analysis, because it is just a

14   simply bivariate analysis.

15        THE COURT:  But does heat map look at -- go ahead.

16   I am sorry.

17   BY MR. GIBBONS:

18   Q    What does the failure of Dr. Coston to determine

19   an appropriate benchmark mean about the ability to make

20   inferences about racial bias?

21   A    You can not make inferences about racial bias in

22   traffic stops when you compare it to the census,

23   residential census population of a region.  That is

24   inappropriate to do.

25   Q    You were present for Dr. Coston's testimony

1    yesterday, correct?

2    A    Yes, I was.

3    Q    And you were present Dr. Coston's criticism of

4    your 2001 or 2000 paper using the RPD data.  How do you

5    respond to those criticisms?

6    A    I didn't really hear it as a criticism.  He raised

7    the question of why in one of the regression models or

8    pointed out that in one of the regression models I had

9    used race as the dependent variable in one of the

10   models.  You will hear criticism, but I did hear him

11   say that is not typically done.  And I would agree with

12   him, that is not typically done.

13   Q    And knowing what you know now would you perform

14   that same research and statistical design the same way

15   you did way back in 2000?

16   A    Probably not, but again, there was no road map

17   back then, right.  And we were developing the science

18   as we went along.  And also, I would say also, there is

19   many examples in the published literature of

20   researchers using race as a dependent variable.  It is

21   not mathematically wrong to do that.  Kroger and

22   Ridgeway's seminal article on, that appeared in the

23   Journal of the American Statistical Association, for

24   example, on which it was founded the whole science of

25   veil of darkness used race as a dependent variable in

1    his regression equation.

2    Q    What conclusions can be drawn from Coston's use of

3    chi-square analysis?

4    A    You can conclude the two variables are related to

5    one another, that they are correlated.  There is an

6    association between them.

7    Q    What conclusion does --

8         THE COURT:  Wait a second.  Let's put that in

9    English.  What can you conclude?

10        THE WITNESS:  That the two variables are related.

11        THE COURT:  Two variables are African-American

12   people getting stopped.

13        THE WITNESS:  Well, the chi-square analysis had to

14   do with outcomes, like arrests or citations

15   or warnings, for example --

16        THE COURT:  Well, didn't he also look at just

17   plain stops?

18        THE WITNESS:  Not using chi-square.

19        THE COURT:  Okay.

20   BY MR. GIBBONS:

21   Q    What conclusions about causation can be reached

22   from the chi-square analysis?

23   A    There are no conclusions that can be reached

24   reliably.

25   Q    What is the statistical technique, very briefly,

1    called Cramer V?

2    A     It just a test for the strength of the

3    relationship in a chi-square model.

4    Q     What conclusions about causation can be drawn from

5    the use of Cramer V?

6    A     Same answer.  None.

7          THE COURT:  What if it was a higher degree of

8    correlation?  What if 90 percent of the traffic stops

9    were African-American?  Could you reach a conclusion

10   based on that?

11         THE WITNESS:  No.  Not when the -- so, just to be

12   clear, the chi-square analysis Dr. Coston performed,

13   the analysis from what I can tell was done

14   appropriately.  He talked, or Dr. Coston talked about

15   the underlying assumptions that are required for each

16   of these statistical tests, and that is exactly right,

17   there are a number of those.  He talked about the

18   minimum cell values and such, and the fact chi-square

19   is appropriate when you have two variables, race and

20   arrests, or race and search, that are categorical in

21   nature.  Either you are black or you are white, you

22   were searched or you weren't.  That is four-by-four or

23   two by two table, four cells.

24         So, you know, that is all appropriate to do that

25   sort of preliminary analysis to see whether or not

1    there is -- is there anything going on?  Is there a

2    relationship between race and arrests at all?  We have

3    got to start somewhere.  So one place --

4         THE COURT:  What if all the people who were

5    arrested were African-American?  What would you

6    conclude from that?

7         THE WITNESS:  I would concluded nothing unless I

8    knew that --

9         THE COURT:  Okay.  Thank you.  That is all I need.

10   Thank you.

11   BY MR. GIBBONS:

12   Q    Just to follow up on that question, do you need to

13   know the appropriate benchmark before you could make

14   any conclusions about the raw statistical disparity,

15   correct?

16   A    In the case of stops, yes.  In the case of an

17   arrest outcome, for example, you would need to know the

18   factors other than race and arrest that were driving

19   that outcome.  And there could be none.  But you

20   wouldn't know that unless you controlled for them in a

21   multi variate model, or there could be legitimate ones,

22   like a hundred percent of the African-Americans that

23   were arrested had pre-existing warrants on file and

24   therefore every one of them were arrested.  But you

25   wouldn't know that based simply on a chi-square

1   analysis with race and arrest.

2   Q     Is it generally accepted in the field of racial

3   disparity research to make inferences of bias based

4   solely on the chi-square test?

5   A     No.

6   Q     Is it generally accepted in the field of racial

7   disparity research for researchers to ignore the

8   presence of concinnity variables?

9   A     No.

10  Q     Is ignoring the presence of concinnity variables a

11  reliable method of conducting scientific research in

12  the field of racial disparity research?

13  A     No, it is not.

14  Q     Is it appropriate for Dr. Coston to make

15  conclusions about race affecting stops based on the

16  available data that they used?

17  A     No, it's not.

18  Q     Same question, but for arrests?

19  A     No, that is not appropriate.  Without controlling

20  for these other factors that also impact the arrest

21  outcome.

22  Q     Same question then for searches?

23  A     Same answer.  We haven't talked much about

24  searches.  But just as with arrests there are a number

25  of known factors that contribute to search outcomes.

1    For example, if someone is arrested, physically,

2    custodially arrested, they will almost always be

3    searched.  So unless you parse out of your data

4    searches based on arrest then you will reach a

5    potentially reach a spurious conclusion that race and

6    search are inappropriately, or discriminatorily related

7    when in fact they would simply be a function of the

8    fact that more persons of one race were arrested and

9    therefore searched than persons of another race.  So we

10   always control for the nature of the search, the type

11   of search that was conducted when we do search

12   analysis.  And that wasn't done in this case.

13   Q    Specifically with respect to Dr. Coston are you

14   familiar with the scientific literature about racial

15   disparities?

16   A    I am.

17   Q    There is a community of researchers within the

18   field of racial disparities?

19   A    In police outcomes, yes, that's correct.

20   Q    How long have you been a part of that research

21   community?

22   A    From its inception.  For more than 20 years.

23   Q    Are you familiar with Dr. Coston as a member this

24   research community and racial disparities?

25   A    No, I am not.

1   Q    Ever heard of Dr. Coston before you were retained

2   in this case?

3   A    I have not.

4   Q    Have you ever read an article in which Dr. Coston

5   has written by about racial disparities?

6   A    Not that I recall, no.

7   Q    Based on your experience in the field of racial

8   disparity research, what are, again, your general

9   opinions on Dr. Coston's analysis?

10  A    The ultimate conclusions that he reaches at the

11  end of his report, which are that race influenced the

12  decision to stop and the outcomes that resulted from

13  that stop, cannot be reached with the data that he had

14  available to him and the analysis that he performed.

15  Q    No further questions, Your Honor.

16       THE COURT:  All right.

17       Cross examination?

18                      CROSS EXAMINATION

19       MS KOENIG:  Just a minute to set up here, Dr.

20  Smith.

21       THE COURT:  Take your time.

22       And the reason you can't reach that conclusion is

23  because he didn't count all the other variables you

24  would look at in a regression analysis?

25       THE WITNESS:  That's correct, Your Honor.  Which

1    we know empirically affect the outcomes.

2           THE COURT:  All right.

3    BY MS KOENIG:

4    Q    Okay.

5           Still morning.  Good morning, Dr. Smith.

6           Let's talk about the data in this case.

7           Did the Government provide you the spread sheets

8    of the raw data in the case?

9    A    No.

10   Q    So you have not looked at any of the data

11   underlying Dr. Coston's opinion?

12   A    I have not.

13   Q    You said you were retained, right?

14   A    Yes, ma'am.

15   Q    How much are you being paid?

16   A    $450 an hour.

17   Q    How many hours have you worked on the case so far?

18   A    I don't know, but I billed around $6,000 prior to

19   this trip.

20   Q    Okay.

21          THE COURT:  How much per hour?

22          THE WITNESS:  450.

23   BY MS KOENIG:

24   Q    You talked about that you had been, you have been

25   trained to do chi-square analysis?

1    A    I have.

2    Q    You talked about using chi-square analysis as a

3    stepping stone, right?

4         I an see you shaking your head.  You have got to

5    say yes or nor.

6    A    Sorry.  Yes.

7    Q    That is okay.  You have to make a record.

8         So, when you said that the stepping stone, like if

9    you have an indication of statically significant

10   evidence of disparities, or that there are measurably

11   worse outcomes for particular races, you could use

12   chi-square analysis and then you would go get more

13   data, right?

14   A    Yes, or you would -- you may have that data, so --

15   Q    Or you would look at the data you already have or

16   you could use that to go get more?

17   A    Do further analysis with data you already have or

18   if you didn't have that data you would ideally attempt

19   to try to find additional data that would allow you to

20   do more sophisticated analysis.

21   Q    Like individual reports for each stop, right?

22   A    Well, that is typically not how you get data from

23   police agencies.  You don't typically get individual

24   reports of stops.

25   Q    What would you get?

```
 1    A     You would get data files, you might call raw data.
 2    That would include fields, the fields of interest that
 3    would inform the analysis that you did.
 4    Q     That wold presume that the police kept that data,
 5    right?
 6    A     Absolutely.
 7    Q     Do you know if in this case that the Richmond
 8    Police Department provided any of that more contextual
 9    data?
10    A     I do not know.
11    Q     Did ask you for it?
12    A     I did not.
13    Q     One of the main critiques of Dr. Coston's report
14    that you have is that Dr. Coston did not evaluate other
15    variable, such as whether the driver had an outstanding
16    warrant, the reason for the search and driver behavior,
17    demeanor, right?
18    A     Yes.
19    Q     And did you have any data on how many drivers in
20    this sample had outstanding warrants?
21    A     No.
22    Q     Did you ask for it?
23    A     No.
24    Q     Did you have any data on the reasons for searches
25    in this sample?
```

```
 1   A     No.

 2   Q     Did ask you for that data?

 3   A     No.

 4   Q     Did you have any data on driver behavior or

 5   demeanor of the drivers in this sample?

 6   A     No.

 7   Q     Did you ask for it?

 8   A     No.

 9   Q     Okay.

10         Let's talk a bit about the 2001 study.  If you

11   look in the folder in front of you and turn to

12   defendant's exhibit seven.

13   A     Sorry.  Did you say seven?

14   Q     Seven, yes.

15         THE COURT:  Do you have the book?

16         MS KOENIG:  Yes, he does, Your Honor.

17         THE WITNESS:  I am there.

18   BY MS KOENIG:

19   Q     You talked a couple of different dates and I want

20   to make sure we are all talking about the same thing.

21   Early on in your testimony today you said that your

22   1999 paper that came out in 2000 was one of the few

23   peer reviewed articles on racial disparity; is that

24   right?

25   A     Actually 2001.
```

1    Q    I wanted to make sure we were looking at the --

2    the article you are referring to is the same.

3    A    It is the same paper.

4    Q    Okay.  We can't talk over each other.

5         So, when the article that you are looking at in

6    defense exhibit seven, that is the same article you

7    were referring to?

8    A    Yes.

9    Q    Okay.

10        So in that article, the study that you did was

11   based on six weeks of data from February to March of

12   2000 right?

13   A    Yes.

14   Q    That data was collected with the cooperation of

15   the Richmond Police Department, right?

16   A    They collected the data and provide it to me.

17   Q    But you helped to kind of set it up, right?

18   A    Actually didn't.  I was not involved in the

19   decisions about what type of data collection to collect

20   or what fields to collect.  I wasn't involved in that.

21   Q    Okay.  Then when the information was being

22   collected supervisors from the Richmond Police

23   Department had had meetings with their line officers

24   about the data collection, right?

25   A    I presume that is true.

1    Q    Well, we don't have to presume, right?  We can

2    look at your article.  So let's look at defendant's

3    exhibit seven.  Specifically look at page, Page ten and

4    11.

5    A    Okay.

6    Q    When looking at the bottom of page ten going on to

7    11, you said in your report, right, that in this case

8    the Richmond Police Department made a good faith effort

9    to assure officers that the information reported would

10   not be used against them for disciplinary purposes,

11   right?

12   A    Yes.

13   Q    In fact, the chief of police and the department

14   attorney met with all patrol roll calls before the

15   study began to explain its purpose and allay any fear

16   that the data would be collected or that the data

17   collected would be used to target individuals for

18   punishment --

19   A    Correct.

20   Q    -- is that right?

21   A    Yes, that's correct.

22   Q    All right.

23        Despite all that, right, the officers knew they

24   were being monitored.  And there was 64 percent

25   compliance rate, right?

1    A     Yes, I believe that is correct.

2    Q     And surely the supervisors from the Richmond

3    Police Department given that the police department's

4    chain of command could have enforced compliance, right?

5    A     Well, to the extent police departments are

6    paramilitary organizations and, you know, there are

7    orders that come down and the people who are below

8    those that give the orders are, you know, normally

9    expected to follow them.  It doesn't always mean that

10   they do, but certainly that is how the organization is

11   to function if it is functioning optimally.

12   Q     All right.

13         Let's talk about a couple of things that you have

14   noted in your report from 2011.  On page 11 you talk

15   about whether there is an expectation black drivers

16   commit more traffic infractions that white drivers and

17   vice versa, right?

18   A     Okay.  Yes.

19   Q     And you specifically noted that although it is

20   possible that minorities commit more traffic

21   infractions per capita than white, thus helping to

22   explain the higher minority stop rate, this possibility

23   appears unlikely.  Right?

24   A     Yes.  So let's talk a little bit it yesterday.

25   There is some research that has been done on this

1    question, limited, some after this article came out,

2    too, by the way, that looked at that specific question

3    and found some evidence that there are differences in

4    the way racial groups violate traffic laws.  So, it is,

5    I would characterize that research as sort of mixed bag

6    at that point.

7    Q    You don't have any information showing that the

8    drivers in Richmond in 2020, the black drivers

9    committed more traffic infractions than white drivers,

10   right?

11   A    I do not have that information.

12   Q    Let's talk about direct field observations.  Have

13   you ever conducted a direct field observation study?

14   A    Well, yes, I helped oversee one.

15   Q    How many?

16   A    One.

17   Q    When was that?

18   A    In the early 2000's in Miami Dade County, Florida.

19   Q    How long did that take?

20   A    The actual field observation portion, probably

21   several months.

22   Q    How much did it cost?

23   A    I am not trying to avoid the question, I just

24   don't know how much.  I can hazard a guess.  Maybe

25   $30,000.

1    Q     Okay.

2          You have indicated, I think you testified on

3    direct examination, that because of the cost and amount

4    of time that it takes to do direct observation only a

5    few studies, relatively few studies have used direct

6    observation, right?

7    A     That is right.

8    Q     All right.

9          All right.  Veil of darkness benchmark.  Let's

10   turn to that.  You need to know what time of day the

11   stop is made, right?

12   A     Yes.

13   Q     Are you aware that the defense asked for that data

14   and the Richmond Police Department did not provide it

15   in this case?

16   A     I heard that yesterday.  I was not aware until

17   yesterday.

18   Q     Did you ask for that data in this case?

19   A     I did not.

20   Q     Talk about the crash data benchmark.  You

21   explained that a little bit on direct examination.  Do

22   you have the crash data report for Richmond from July

23   2020 to December of '20?

24   A     I do not.

25   Q     Did ask you for that data?

1   A    No.

2        THE COURT:  Why didn't you look into all that?

3   That would have helped to do a pretty decent study that

4   night help the Richmond Police and help The Court and

5   help everybody.

6        THE WITNESS:  Just beyond the scope of my

7   engagement with the Government.  My engagement revolved

8   around the methods that Dr. Coston used and the

9   problems with it.

10        THE COURT:  So you were hired essentially to poke

11   holes in the defendant's theory, not to poke holes, but

12   to point out problems with it and not no come up with

13   an analysis of data yourself.

14        THE WITNESS:  That's correct, Your Honor.

15   BY MS KOENIG:

16   Q    Dr. Smith, you would agree that cluster maps and

17   heat maps can be a useful technique for visualizing the

18   spatial distribution of events in a city?

19   A    I would agree.

20   Q    And you have criticized Dr. Coston's overlay of

21   black drivers over the racial composition of Richmond

22   neighborhoods as merely a rudimentary type of census

23   based benchmarking?

24   A    Right.

25   Q    Did you hear Dr. Coston testify yesterday that

1    there was not a benchmarking that was used in that

2    analysis, it was simply a visual representation?

3    A    I heard him say that, or Dr. Coston say that, yes.

4    Q    You talked a little bit with the Government about

5    what it means to be predominantly a specific

6    neighborhood?

7    A    Yes.

8    Q    Look at -- I would like to put this up on the

9    screen, please, defendant's exhibit R 2 that had

10   previously been admitted at an earlier hearing.

11        So, Dr. Smith, you heard yesterday, right, that

12   the University of Virginia racial dot map for the

13   country is based on the 2010 census data?

14   A    Okay.  Yes.

15   Q    Did you know that before you came yesterday?

16   A    No.  I have never seen this before yesterday.

17   Q    Okay.  So, when you are looking at this map you

18   can see that the black residents are in green, right?

19   A    Yes.

20   Q    And that the white residents are in blue, right?

21   A    Yes.

22   Q    So when I look at the neighborhood in Richmond

23   it's not really that areas are predominantly one race

24   or another, right, it is almost that a neighborhood is

25   entirely black or entirely white according to this

1    information, right?

2    A     In some cases that is true.  In some neighborhoods

3    that is true.

4    Q     All right.

5          So you don't use the University of Virginia Racial

6    dot map in any of your other work that you have ever

7    done?

8    A     No.

9    Q     Let's talk about your report, which is

10   Government's exhibit two.  Do you have that in front of

11   you?  It's not in that folder.  We can pull it up.

12         Do you have copy of your report with you?

13   A     No, I don't.

14   Q     If we could switch to the other screen, by chance.

15   Thank you.

16         Let's turn to page four, please.  Dr. Smith's

17   report.

18         Dr. Smith, do you remember writing in your report

19   that one might logically expect, for example, that

20   clusters of stops of black drivers might occur in such

21   transitional zones as black drivers commuting from

22   where they live, may live, to where they may work along

23   major thoroughfares?

24   A     I do remember writing that, yes.

25   Q     Are you aware that many white people in Richmond

1    that live south of the river and in west end of town

2    travel to downtown to work?

3    A    I would presume that is true.

4    Q    So if we use the same kind of assumption that you

5    just made about black drivers, wouldn't you expect to

6    see clusters of white drivers in areas where they work,

7    such as the first precinct?

8    A    Yes, that is why traffic information is necessary

9    to benchmark against stops.

10   Q    Yet we have no clusters of stops of white drivers

11   outside a hand full of clusters in the third precinct,

12   right?

13   A    I don't -- I don't know.  I mean, I would have

14   to --

15   Q    We can look at Dr. Coston's report.  If we could

16   switch back to that.

17        Let's look at figure two of Dr. Coston's report.

18        We don't see any cluster of white drivers outside

19   of the third precinct in Richmond, right?

20   A    Part of the problem I am having is precinct

21   numbers.

22   Q    Okay.  It has been a little while since you were a

23   police officer?

24   A    The precincts were numbered differently then, too.

25   Q    So if we have the third precinct is the large

1    precinct that covers the area that says Stratford

2    Hills?

3    A    Yes, far left of the map.  Right.

4    Q    Yes, that is third?

5    A    Yes.

6    Q    All right.

7         So we don't see any clusters of white drivers

8    outside of a hand full of small ones in the first

9    precinct, right?

10   A    So I see three clusters of white drivers in the

11   third precinct.  And that is why what I see.  And they

12   are smaller, which you would expect because there are

13   fewer stops of whites than there were of

14   African-Americans.

15   Q    All right.

16   A    So the dots are smaller.

17   Q    So when we talk about deployment patterns in the

18   City, looking at a map of the precincts that are out

19   laid, do you have any information as to why Richmond

20   Police Department has three of its police precincts in

21   the black areas of town and just one in the white area

22   of town?

23   A    I don't know why.  I can --

24   Q    I won't ask you to speculate.  You don't have any

25   information, is that right?

1   A     No, I don't.

2   Q     All right.

3         Let's also look -- in your report you indicated --

4   and this is on pages four and five of your report -- if

5   we could go back, Ms Dandridge and Ms Tuck, please.

6         Pages four and five of your report, going from the

7   bottom of pages four and five, you talked about how

8   there may be some other explanation as to why arrests

9   may be higher for certain drivers than others, right?

10  A     Yes.

11  Q     And one of the examples that you gave was if drunk

12  drivers were involved because drunk drivers would be

13  more likely to be arrested than somebody like a

14  speeder, right?

15  A     Correct.

16  Q     Okay.  So do you have any information about how

17  many drunk driving stops were in this sample?

18  A     I do not.

19  Q     Let's look at -- and switch back to me if that is

20  okay -- let's look at defendant's exhibit 14, which is

21  the raw data in this case.

22        So Dr. Smith, I want to show you what we see at

23  the top in column J, not column J, column Q.  Do you

24  see it says specific violation about column Q -- in

25  column Q?

1    A    Yes.

2    Q    You see there is a series of numbers that are

3    listed below there?

4    A    Yes.

5    Q    Now, Dr. Smith you have a law license, right?

6    A    I do.

7    Q    You have been admitted to practice in Virginia

8    since 1998, right?

9    A    Yes.

10   Q    And you have been admitted to practice in the

11   Fourth Circuit since that same time, right?

12   A    Yes.

13   Q    Before you were admitted to practice in Virginia

14   you had to take the bar exam, right?

15   A    Sure did.

16   Q    And before you took the bar exam you had to learn

17   sufficient information about Virginia code, right?

18   A    Sure.  Yes.  I am familiar with 46 Code of

19   Virginia.

20   Q    Okay.  Also title 18.2 of the criminal code of

21   Virginia, right?

22   A    Yes.

23   Q    Great.  You know that Virginia code section 18.2

24   dash 270 and 18.2 dash 266, those are the drunk driving

25   codes for Virginia?

1   A    I don't recall the exact statute subsections of

2   the statute.  I will take your word that is true.

3   Q    All right.

4        So how many violations for drunk driving are

5   listed in the stops in this sample?

6   A    I don't know that.

7   Q    But would it surprise you to find there are just

8   ten violations for drunk driving listed?

9   A    No, I guess I wouldn't.  Not surprise me.

10  Q    For the record I will put on control numbers 150,

11  151, 152, 944, 1046, 1168, 1387, 1388, 1652, and 2551.

12  So, that information if we were to look at it, would it

13  surprise you to find that there are six black drivers

14  in that information, two white drivers, one Asian

15  driver, and a person of unknown race?

16  A    Would it surprise me?

17  Q    If that is what the data showed.

18  A    No.

19  Q    Okay.

20       One black man issued a warning, and all others

21  were arrested.  Would that surprise you?

22  A    No.

23  Q    So, if we have a total of seven arrests then, five

24  torr black drivers and two for white drivers, right,

25  and Dr. Coston reported a total of 164 arrest that are

1    made, did you run an analysis to see if those seven

2    arrests for drunk driving impacted the overall analysis

3    of Dr. Coston's findings?

4         MR. GIBBONS:  Objection, Your Honor.

5         THE COURT:  I can't hear you.

6         MR. GIBBONS:  Objection.  This whole line of

7    questioning, he said he hasn't reviewed any of this

8    data.

9         THE COURT:  Well, we hasn't reviewed any of the

10   data, that is true, but go ahead.  Overruled.

11   BY MS KOENIG:

12   Q    You didn't run any analysis to see if the drunk

13   driving arrests impacted the findings, right?

14   A    No.

15   Q    Right.  And fair to say drivers with outstanding

16   warrants are more likely to be arrested, right?

17   A    Yes.

18   Q    Did the Government provide you any information

19   about how many individuals in the sample were arrested

20   based on outstanding warrants?

21   A    No.

22   Q    Did ask you for that data?

23   A    No.

24   Q    Without that data you can't quantify whether or

25   not that has any impact on your overall finding in this

1   case, right?

2   A    In this particular case, no.

3   Q    You also said that researchers must control for no

4   discretion searches, like inventory searches?

5   A    Correct.

6   Q    An inventory searchers generally have to be

7   conducted pursuant to specific department policy,

8   right?

9   A    Yes.

10  Q    Not only are you a trained lawyer, but a former

11  Richmond Police officer, right?

12  A    Yes.

13  Q    Were you a police department officer anywhere else

14  besides Richmond?

15  A    Fairfax.

16  Q    How long were you an officer in Fairfax?

17  A    About two years.  Little over two years.

18  Q    How long were you an officer in Richmond?

19  A    A little under two years.

20  Q    Okay.

21       So, you know generally because of your work and

22  experience that generally a car has to be impounded

23  before an officer can do an inventory search, right?

24  A    Yes.

25  Q    In the traffic stop, that is going to happen most

1    of the time when the driver is arrested and nobody

2    comes to up the car, right?

3    A     Sorry.  Can you rephrase that more, or ask it

4    again?

5    Q     Most of the time when an officer is going to

6    impound a car it is when somebody, the driver is

7    arrested and nobody else can come pick up the car,

8    right?

9    A     That is often the case, yes.

10   Q     Do you have any data about how many cars in this

11   sample were searched pursuant to inventory searches?

12   A     I do not.

13   Q     Did you ask for it?

14   A     No.

15   Q     You talked also about, in your report about a 2015

16   case from North Carolina, right?

17   A     Yes.

18   Q     The Johnson case, right?

19   A     Yes.

20   Q     The Johnson case involved, involved an agreement

21   between the local county sheriff's office and the

22   federal government to allow the local county to enforce

23   immigration laws, right?

24   A     I believe that is right.

25   Q     That's what we call 287 G agreement, right?

1   A     Correct.

2   Q     So, the Department of Justice brought a case

3   against that particular county in North Carolina,

4   right?

5   A     Yes.

6         THE COURT:  Alamance County?

7         MS KOENIG:  It is, Your Honor.

8   BY MS KOENIG:

9   Q     Alleging that that particular county had engaged

10  in discriminatory practices?

11  A     Right.

12  Q     In that case the expert, the Government had

13  experts and respondents or the defendants had experts,

14  too, right?

15  A     Yes.

16  Q     And the experts involved, you know, offered

17  competing analyses, right?

18  A     Yes.

19  Q     And the judge in that case, in that case found

20  that the Government in that case, the plaintiff, right,

21  the Government, the Department of Justice, their expert

22  had had access to data that would have controlled for

23  certain variables, right?

24  A     I don't recall that level of specificity in terms

25  of the facts of the case.

1  Q    Do you recall then that the judge in that case

2  found it very significant in the judge's findings that

3  because the Government, the plaintiff's expert, had had

4  access to that data but simply failed to analyze it,

5  that that was a very significant piece of the judge's

6  ruling?

7  A    I don't recall that from the opinion.

8  Q    All right.

9       On direct examination you talked about, in your

10  conservative practice in analyzing data fields if you

11  have an entry that any piece of the data is missing you

12  simply omit that entry altogether?

13  A    Yes.

14  Q    Is that a common practice in other fields, like

15  the medical field, when they are analyzing large

16  volumes of data?

17  A    I would say a common data management practice in

18  any sort of statistical analysis regardless of

19  discipline.

20  Q    Including market research?

21  A    If it is done by academics.  I can't speak for

22  what industry does.

23  Q    Including survey data, social survey data?

24  A    Again, if it is done by academics.

25  Q    Do you have any percentages of the missing amounts

1   of data in this case?

2   A    I do not.

3   Q    Did ask you for that?

4   A    No.

5   Q    Do you need benchmarking to analyze whether people

6   are treated differently after they are stopped?

7   A    No.

8   Q    Is it feasible to control for every possible

9   variable?

10  A    No, not feasible to control for every possible

11  variable.

12  Q    You talked on direct examination that you have

13  done, you know, examinations of large scale data sets

14  in agencies around the country.  Did you ever do any of

15  those in context of a criminal case?

16  A    No.

17  Q    You talked a little bit more, when talking about

18  state-wide analyses of data, right, like the Virginia

19  Community Policing Act, I think you said that you were

20  familiar with that?

21  A    Generally, yes.

22  Q    All right.

23       So the Virginia Community Police Act was designed

24  to collect data to see if there is evidence of racial

25  profiling, right?

1    A      Presumably, yes.

2    Q      They ask, not only requires the collection of

3    data, but it requires the analysis of the data right?

4    A      Yes.

5    Q      So when you were talking about state-wide

6    collections of data and how it can be difficult, you

7    talked about disparities among different police

8    departments and different resources that they may have

9    access to?

10   A      Yes.

11   Q      The Richmond Police Department is not a

12   mom-and-pop police department?

13   A      That's correct.

14   Q      When you are talking about Dr. Coston's report you

15   made a lot about whether or not causation can be in

16   inferred -- and you can look at defendant's exhibits

17   two here if it helps refresh your recollection,

18   specifically the last page before the references.  The

19   last paragraph of the conclusion section.

20   A      Yes.

21   Q      Do you recall then that Dr. Coston said, while

22   this report cannot say whether a specific traffic stop

23   was the result of racial bias or racial profiling, this

24   report does conclude that race is a significant factor

25   in the decision to stop a driver, whether a person or

1    vehicle is searched, the outcome of the stop, and the

2    location where stops occur, right?

3    A     I recall that sentence, yes.

4    Q     Are you taking issue with that?  Do you think that

5    is not true?

6    A     Yes, I take issue with that.

7    Q     All right.

8          I will follow up on a series of questions the

9    Judge was asking you.  If all of the drivers, if the

10   data showed in this case that 90 percent of the drivers

11   that were stopped were black, and ten percent were

12   white, that would not be significant, that would not be

13   a significant factor in the decision that race played a

14   significant factor in the decision to stop a driver?

15   A     Not without knowledge of who is driving and

16   available to be stopped.

17         THE COURT:  Without knowledge of what?

18         THE WITNESS:  Who is actually driving on the

19   street and who is available to be stopped.

20   BY MS KOENIG:

21   Q     If the evidence in this case had shown that it was

22   90 percent of the arrests were black individuals after

23   a traffic stop and ten percent were white, would you

24   also say that is not a significant -- that race does

25   not play a significant, a factor in whether to arrest

1   someone?

2   A    By itself that statistic is not helpful.

3   Q    If you were to see data that said that 90 percent

4   of the people in the cars were searched were black, and

5   only ten percent white, again you find that not

6   significant?

7   A    By itself.  Correct.

8   Q    So let's talk about that.

9        So, you talked about how you have done several of

10   these studies.  And I think I heard you say, but I want

11   to make sure I heard properly, that you have, you would

12   never find, you as careful researcher would never find

13   that racial bias played a causal role in a pattern of

14   policing?

15   A    That's correct.

16   Q    Never?

17   A    Social scientist.  No.

18   Q    You don't think any social scientist would ever

19   say that?

20   A    I am sure some would.  I would not.

21   Q    All right.

22        So you have never said that then, right?

23   A    No, I have not.

24        THE COURT:  Well, so then if you don't reach a

25   conclusion like that, when you get hired by a locality

1    to help them out, of what assistance are you?

2         THE WITNESS:  Well, Your Honor, I hope we are a

3    lot.

4         THE COURT:  I mean, you obviously have a lot of

5    knowledge in this area.  But if they are trying to

6    figure out whether bias is a factor and how their

7    police officers do things, and you are never willing to

8    make that conclusion, even if a hundred percent of the

9    arrests are of African-Americans --

10        THE WITNESS:  Well, earlier --

11        THE COURT:  -- how does that help them?

12        THE WITNESS:  Sorry.

13        THE COURT:  Go ahead.

14        THE WITNESS:  Earlier I spoke about the

15   convergence or the alignment of findings with respect

16   to the various multiple kinds of analyses that go into

17   a major study of the type that we are sort of talking

18   about.

19        And the extent to which those observed

20   disparities, after controlling for appropriate factors

21   that might explain them, when those observed

22   disparities remain, we call those unexplained,

23   unexplained disparities, meaning we have controlled for

24   all -- all relevant variables available in the analysis

25   and there remains disparities, and if those disparities

1    align across multiple indicators, so, you see it in

2    stops, you see it in arrests, and you see it in

3    searches and so forth, I testified earlier that that

4    begins to suggest to me that you have a problem.  You,

5    the police department, has a problem.

6         THE COURT:  And the problem is bias.

7         THE WITNESS:  The problem is potential bias of one

8    kind or another.  You know, that doesn't necessarily

9    mean racial animus, but it could be a variety of things

10   that are probably not healthy.  So, I worked on

11   projects where I certainly found evidence of that sort

12   of alignment across multiple indicators controlling for

13   all the appropriate variables.  And I worked on

14   projects that, where we didn't find that sort of

15   alignment, right.

16        THE COURT:  So then what do these localities do

17   after they get your analysis?  They do training to make

18   sure that the police officers follow proper procedure?

19        THE WITNESS:  So typically our reports will

20   include a series of recommendations.  Depending on the

21   findings, of course.  It is not uncommon for those

22   recommendations to include training; not uncommon for

23   those recommendations to include better data

24   collection, because there are, it is often the case

25   that, particularly if the agency developed its data

1    collection regime without the assistance of people like
2    me, that they will, they won't be capturing the kind of
3    information that they need to be capturing in order to
4    answer more definitively the question that you asked.
5    So a lot of times the recommendation is you need better
6    data and here is how to collect it better.  Here are
7    the fields that you need collect, or here is the
8    process you need to put in place.  So there are often,
9    again, a series of recommendations that follow the
10   findings.
11          THE COURT:  Thank you.
12   BY MS KOENIG:
13   Q    All right.
14          So when you are making those recommendations, you
15   talked about training and making recommendations for
16   training that would often include training about how to
17   treat people of different races more equally, right?
18   A    Yes, I think that is fair, yes.
19   Q    And I want to talk to you about how on earth we
20   would control for some of the factors that may exist in
21   Richmond.  How do we control for the fact that
22   neighborhoods have been segregated in Richmond for over
23   150 years?
24   A    Well, it is not a matter of controlling for
25   something like that.  I think the issue is

1    understanding that distribution, well, maybe that isn't

2    fair.  So we might actually control for that.

3    Q    How would you do that?

4    A    So you would have, you would get block level --

5    depending on what your unit of analysis is, you may get

6    block census data, for example.

7    Q    And you would use census data to do that?

8    A    Or neighborhood control.  Right.  To understand

9    the racial composition of the neighborhood and how that

10   may influence the outcome of interest, as one of a

11   number of factors.

12   Q    How would you control for three quarters of the

13   police precincts being devoted to black parts of town,

14   and just one being devoted to a white part of town?

15   A    That is potentially a deployment issue.  And so

16   you control for that in a number of ways.  One way is

17   to examine each of them independently of the others.

18   Another way is to actually, if you had actual

19   deployment data, so you knew, for example, how many

20   officers were deployed in each of these precincts and

21   when, then you could potentially directly control for

22   deployment.

23   Q    How would you control for black people having

24   potentially more arrest warrants out for them because

25   of the long systemic over criminalization of black

1    individuals in the City?  You can't, right?

2    A    Well, just, that is not a control variable, right,

3    that you would include in a model like that.

4    Q    Just a moment, Your Honor.

5         THE COURT:  Sure.  Take your time.

6    BY MS KOENIG:

7    Q    One of the variables that you talked about on

8    direct examination that you would try to control for is

9    the driver's demeanor and the behavior of the driver,

10   right?

11   A    Ideally, yes.

12   Q    How do you do that?  How you find that data?

13   A    Typically that is self reported data from the

14   police it exists.

15   Q    Ever go back and look at body camera?

16   A    Well, that is increasingly being done.  It's not

17   on a regular practice, I would say, right now in the

18   field.

19   Q    No further questions, Your Honor.

20        THE COURT:  All right.  Redirect?

21                    REDIRECT EXAMINATION

22   BY MR. GIBBONS:

23   Q    Dr. Smith, is it the case that because statistical

24   analysis is the best that could be done with the

25   available data that it makes that analysis accurate or

1    reliable?

2    A     No, that is not the case.

3    Q     Despite Dr. Coston's disclaimer that they are not

4    using census data to determine if bias exists, you

5    disagree; is that correct?

6    A     I disagree, yes.

7    Q     Could you explain that, please?

8    A     So, the heat maps, focus on the heat maps for a

9    moment.  I think the primary conclusion from the heat

10   maps is that stops, this is what I heard, not only what

11   I read, but heard in testimony yesterday is that stops,

12   cluster stops of African-Americans or black drivers

13   cluster along racial boundaries between black and white

14   areas.  And that they cluster in white areas.  And that

15   there are no concomitant clusters of white stops in

16   black neighborhoods.  So, the underlying conclusion

17   then is that theres is bias, or that race influenced

18   the decision of the police to stop in these areas.  And

19   I think Dr. Coston says that directly.

20         Without information about who is driving in those

21   areas you can't reach the calculation that race had an

22   influence on the outcome here, in this case traffic

23   stops.  It may hypothetically be the case that there

24   are no or very few white drivers in black neighborhoods

25   in Richmond, for example.  In which case there are no

1    or very few white drivers available to be stopped in

2    those neighborhoods.  That is why the benchmarking

3    question is so key in reaching conclusions about

4    potential bias in the initial decision to stop.

5    Q    That would explain, for example, the clusters of

6    white drivers in third precinct and in the other

7    precincts?

8    A    Yes.

9    Q    What is your view of the fit between data that

10   Dr. Coston relies upon and the conclusions that

11   Dr. Coston reaches?

12   A    I think Dr. Coston, with all due respect to a

13   colleague, an academic colleague, I tink Dr. Coston's

14   conclusions go beyond his data, beyond Dr. Coston's

15   data.

16   Q    No further questions.

17        THE COURT:  All right.  May this witness be

18   excused?

19        MR. GIBBONS:  I believe so, Your Honor.

20        THE COURT:  All right.

21        Dr. Smith, thank you very much for joining us.  I

22   appreciate it.  Headed back to Texas today?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Well, have a safe trip.

25        THE WITNESS:  Thank you, sir.

```
 1                      (Witness stood aside)

 2            THE COURT:  All right:  It is high noon.

 3            Why don't we take a lunch break and come back at

 4      12:45.

 5            You can go ahead.  Before we do that, let me ask

 6      you, do you have any idea how much evidence you have

 7      this afternoon?

 8            MR. GIBBONS:  We have three witnesses, and they

 9      will be much briefer.

10            THE COURT:  Well, that ills good to know.

11            MR. GIBBONS:  We estimate 2:00, 2:45?  2:30.

12            THE COURT:  That is perfect.  We will see then you

13      then at 12:45.

14            MS KOENIG:  You meant 12:45, not start at 2:45.

15            THE COURT:  Oh, did I say 2:45?  Thank you very

16      much.

17            Recess court.

18                      (A recess was taken)

19            THE COURT:  All right, good afternoon, everyone.

20            We are ready for your first your witness,

21      Mr. Seibert.

22            MR. SIEBERT:  Yes, Your Honor.  The United States

23      calls Keon Turner to the stand.

24                            KEON TURNER

25               AFFIRMED AND TESTIFIED AS FOLLOWS:
```

1                      DIRECT EXAMINATION

2          THE COURT:  All right, Ms Turner, thank you for

3    coming.  You can take off the mask or keep it on when

4    on the witness stand.  But please be sure to just speak

5    directly into the microphone and that will help me.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you.

8    BY MR. SIEBERT:

9    Q     Thank you.

10         Ms Turner, can you spell your first and last name

11   for the court reporter?

12   A     Keon, K-E-O-N, last name Turner, T-U-R-N-E-R.

13   Q     Ms Turner, how are you employed?

14   A     I am employed by the Virginia State Police.

15   Q     As a civilian?

16   A     As a civilian, yes.

17   Q     How long have been with the Virginia State Police?

18   A     Since October of 2008, so going on 14 years.

19   Q     What is your job at the Virginia State Police?

20   A     Manager of the data analysis team, which I --

21   don't know if you want me to go into detail -- we

22   manage data collection, such as crime reports, use of

23   force, the Community Policing Act.  Manage the

24   repository for that information.

25   Q     All right.  So is it fair to say you are

1    essentially the supervisor over the group at VSP,

2    Virginia State Police, that is in charge of collecting

3    all the data for the state-wide Community Policing Act?

4    A    That's correct.

5    Q    What is the Community Policing Act just very

6    quickly.

7    A    Well, the Virginia Policing Act came about with

8    house bill 1250. it is an act that initially --

9         THE COURT:  You need to slow down there.

10        THE WITNESS:  Sorry.

11        THE COURT:  Thank you.

12        THE WITNESS:  It was enacted on July 1 of 2020

13   based on house bill 1250.  It is an act that requires

14   that all traffic stops record certain data as listed in

15   the Community Policing Act, including reason for stop,

16   race, ethnicity, date of stop, location, and the result

17   of the stop.

18   Q    So as part of that VSP job with the Community

19   Policing Act, you were entrusted with one, coming up

20   with the criteria and standards for the state-wide

21   collection effort; is that fair?

22   A    Correct.

23   Q    Also in charge of serving as a repository for all

24   that data?

25   A    Correct.

1    Q     Correct?

2          And then you also are in charge of somewhat

3    quality control, and before you send it to another

4    agency of the State?

5    A     That is correct.

6    Q     What is that other agency?

7    A     Department of Criminal Justice Services, DCJS.

8    Q     So at times when you were reviewing data you have

9    to make decisions on whether the data is rejected back

10   to the local agency, or accepted?

11   A     Yes.  So when we receive the files, we initially

12   created a technical specification which laid out the

13   values that were allowed so that we could process it

14   through our data warehouse to aggregate the information

15   that we would then send to DCJS.  If that data was

16   invalid, we would reject it, and if it was valid we

17   would accept it.

18   Q     When did you first become aware of these

19   requirements that as supervisor of the DART team that

20   you were supposed to implement?  Approximately when?

21   A     We had about eight weeks to set this up.  It was

22   during COVID, so it was March 2020 where the

23   legislation was proposed, and we found out that it may

24   be signed.  It was not signed until April.  We had to

25   create that technical specification I spoke of in time

1    to disseminate to agencies.

2         The first tech spec went out in May of 2020, and

3    we should have started receiving data July 1 of 2020.

4    Q    How would you describe I guess the planning phase

5    or the phase right before the execution of July 1st

6    from VSP standpoint?

7    A    Extremely hectic.  Of course this was during

8    COVID.  We also didn't have all staff in the office.

9    Also there was civil unrest going on.  We had limited

10   staff as well.  This was an unfunded mandate, so we

11   were not given any additional finances to start this

12   data collection.  And we also had to get this set up

13   for nearly 400 agencies in the State.

14        THE COURT:  By 400, you mean Police departments?

15        THE WITNESS:  Police departments and sheriff's

16   offices.

17        THE COURT:  Right.

18   BY MR. SIEBERT:

19   Q    Was there anyone hired to assist the DART team

20   with this collection effort for Community Policing?

21   A    No.  My current analyst was there, and she was

22   typically with crime reporting.  She assisted.  There

23   was no position created at that time.  So it was just

24   herself and myself.

25   Q    As part of the planning phase your job and VSP's

1    job was to reach out to these local law enforcement

2    agencies and kind of let them know what was going to

3    happen, that there was criteria that they needed to

4    start collecting; is that correct?

5    A    That is correct.

6    Q    And the criteria that was established was directly

7    from the legislature, the Community Police Act.  You

8    didn't get to make up what you wanted.

9    A    Correct.  It was line-by-line verbatim from the

10   statute.

11   Q    When you reached out to these local law

12   enforcement, what was their response?

13   A    Stress.

14   Q    Why stress?

15   A    It was a very quick turn around to get data.  Also

16   we were not able to hold any type of training.  Most

17   people were stretched pretty thin during that time, and

18   especially again because it was COVID and civil unrest.

19   Q    All right.

20        I think you might have answered this, but in your

21   opinion was this sufficient time to plan, implement

22   this roll out?

23   A    Absolutely not.

24   Q    So, you mentioned some resource issues for the law

25   enforcement that needed to collect this data.  Did you

1   have any issues for both -- were these issues for both

2   big and small departments?

3   A     Yes.

4   Q     And can you describe both?

5   A     Typically with your small departments they may not

6   be fully electronic.  They may not have what is called

7   a CAD, or computer aided dispatch, in their vehicles.

8   So capturing this information at the time of stop

9   becomes a little more tedious.  They may have to

10  capture it manually by handwriting, and then have it

11  aggregated at their agency through a records personnel,

12  who will then send that information to us.

13        Just about 70 percent of law enforcement agencies

14  in Virginia have about 50 or less personnel.  So, with

15  also having COVID and other issues going on at that

16  time, they had limited manpower.  So they were doing

17  all this with limited manpower.

18        On the other side for your larger agencies they

19  may have CAD systems that can capture this

20  automatically or electronically, excuse me, but

21  typically that requires getting your technical

22  specifications to your vendor and taking anywhere from

23  six months to a year to have that module recruited in

24  their system.

25        THE COURT:  So you are telling me that all of the

1   local agencies have their own purchase of computer

2   programs?

3       THE WITNESS:  Correct.  We are not able to define

4   or guide agencies into what software to purchase.

5   There are about 20 different vendors, if not more,

6   operating in Virginia at any one time.

7   BY MR. SIEBERT:

8   Q    All right.

9       Let's go back to the criteria that was established

10  one second.  Since the first six months initial roll

11  out phase of the Community Policing Act has the

12  criteria subsequently changed multiple times?

13  A    Yes.

14  Q    Can you tell The Court about that?

15  A    It has changed multiple times for various reasons.

16  There was additional legislation in Senate bill 530

17  that required additional type of stops to be collected.

18  So it went beyond traffic stops.  And, also, now record

19  stop and frisk.  And it also recorded any involuntary

20  detention.  So it expanded significantly.  With that we

21  had to add additional parameters for the data

22  collection.  Once we started noticing issues we were

23  not able to tie those specific incidents back, so we

24  added in what is called a record ID.  So that we could

25  ID each stop as opposed to getting an aggregate of

1    information that we couldn't follow.

2    Q    So a record ID would be like an infinite number to

3    a particular case or for a law enforcement agency?

4    A    Correct.

5    Q    But that did not exist in July 2020 to December of

6    2020?

7    A    Correct.  Didn't exist until July of 2021.

8    Q    Now, under these new changes the Virginia State

9    Police actually is going to have regulatory authority

10   to update and change their criteria as needed, is that

11   correct?

12   A    That's correct.

13   Q    Okay.  But they did not have that authority back

14   in July of 2020 to December?

15   A    We did not.  We were limited to explicitly what

16   was stated in the --

17        THE COURT:  So they changed the statute?

18        THE WITNESS:  Yes.

19   BY MR. SIEBERT:

20   Q    Why did they change that?

21   A    They changed it based on recommendations from both

22   VS and DCJS.

23   Q    Let me stop you there.  Were these recommendations

24   coming directly from you?

25   A    Yes.

1   Q     All right.  Go ahead.

2         The changes, and why did they adopt this new

3   system of regulatory authority?

4   A     It was discussed with myself and my analyst and

5   with DCJS personnel what we could do to make it better.

6   We found a lot of issues but we weren't able to tie

7   those issues directly back to a stop.  So that was

8   creation of the record ID.  When we were reviewing the

9   files that we received we noted that there would be

10  information we deemed being duplicate, would be the

11  same race, set, date.  There were also additional

12  issues such as quality control issues where we would

13  have missing information or not using the correct

14  value.  And as a way to support quality control we

15  needed a record ID so we could notify that agency that

16  this particular incident has invalid values or missing

17  data.  Prior to that change we could only reject the

18  entire file back to agency and say we couldn't accept

19  it.

20  Q     So the agency basically after being rejected would

21  have to come up on their own somehow to fill in missing

22  data or change the wrong data?

23  A     Correct.

24  Q     All right.

25        So let's talk about the data collection and

1   submissions you received in this July 2020 to December

2   of 2020 period.  Did you receive law enforcement

3   submissions during that time period?

4   A    Yes.

5   Q    Do you specifically hear, receive submissions from

6   Richmond Police Department?

7   A    Yes.

8   Q    How often were these submissions in that first six

9   months?

10  A    So the initial quarter was received all at one

11  time.  It was received by the due date.  So that would

12  be July 1 through September 30.  We received on

13  October 14th.  However, it had a lot of invalid values.

14  It had to be rejected.  And then ultimately we received

15  it again corrected.  We then received the October data

16  in November, and we received the November data in

17  December.  We did not receive the December data, and we

18  had to reach out to them to let them know we are

19  missing.

20       THE COURT:  Reach out to whom?

21       THE WITNESS:  Yes.

22       THE COURT:  Who did you reach out to?

23       THE WITNESS:  We reached out to Lt. Beasley.

24       THE COURT:  At where?

25       THE WITNESS:  Richmond P. D.

1    BY MR. SIEBERT:

2    Q    So you didn't receive the December 2020 data, so

3    you reached out.  When did you actually receive the

4    December 2020 data?

5    A    We did not receive it until July 14.  There were

6    still quality control issues, but they were quickly

7    fixed, and it was returned on July 15.

8         THE COURT:  What were the quality control issues?

9         THE WITNESS:  There were several issues.  Things

10   such as you using "Caucasian" instead of "white."  Or

11   using "African-American" or "A" instead of "black"

12   where we had specific values that should have been used

13   such as "W" for "white" or "B" for "black" or "A" for

14   "Asian."  So when we were receiving that information

15   and it doesn't meet the technical specs we can't inject

16   it into the data warehouse.

17        Other issues were things like missing statute

18   code.  Instead of having the actual statute code it

19   would say "failure to yield" or, you know, another type

20   of infraction.  And we actually needed the code section

21   itself to ingest it.

22   Q    So overall, how would you characterize these law

23   enforcement submissions during the first phase?

24   A    Initially, extremely poor.  And it was to be

25   expected.

1   Q    Does that go for Richmond Police as well?  I know

2   I have talked about law enforcement generally.  Is that

3   fair for Richmond Police as well?

4   A    Yes.

5   Q    The reason you say it is poor is all of the

6   reasons you just listed about incomplete reporting, is

7   that right?

8   A    That's correct.

9   Q    And inconsistent reporting.

10  A    Yes.

11  Q    Did see any problem with duplicative data?

12  A    Yes.  Typically if a person is given more than one

13  citation we had notified agencies to only send over the

14  most egregious offense, and agencies would send over

15  every single citation that that person received.  That

16  was an on-going issue.

17  Q    So, your job Virginia State Police when you

18  collected this data was to send back.  You never

19  discarded data?

20  A    No.

21       Either accept or reject.

22  Q    Okay.

23       Is Richmond Police now currently up to date in

24  terms of their submission?

25  A    Yes.

1   Q     The gap we already talked about from December data

2   to July data, was it, is that the longest gap that was

3   missing?

4   A     Yes.

5   Q     Did you drill down on why there was problems with

6   the Richmond data?

7   A     It was typically the same problem with several

8   agencies.

9   Q     Well, stop there.  Was there internal and external

10  issues that were having an effect on the data

11  collection efforts --

12  A     Yes.

13  Q     -- of RPD?

14  A     Yes.

15  Q     What were those?

16  A     Initially we received data from a lieutenant who

17  had either retired or was promoted but no longer in

18  charge of it, which caused the longest gap.  But also

19  during that time period of course it is 2020 so we are

20  talking about a reduction of manpower, state-wide and

21  specifically in Richmond during civil unrest and, of

22  course, during COVID.  Those are the two major issues

23  that affected it.

24  Q     Was there also leadership issues at RPD that you

25  are aware of?

1    A     Yes, they had a lot of turnover, which is how we

2    ended up, we being the contact initially was Lieutenant

3    Beasley, and then it moved to Mr. Renne.

4    Q     So is the step of the process is for you to send

5    data to DCJS?

6    A     That's correct.

7    Q     That's the Department of Criminal Justice

8    Services?

9    A     Yes.

10   Q     What do they do?

11   A     So at that point they take the aggregated data,

12   and they are required to create a report.  That report

13   is then disseminated to the Governor, the General

14   Assembly, and the Commonwealth Attorney.

15   Q     Okay.

16         As we already talked about, you are part of the

17   process of recommending further changes to make better

18   data collection efforts across the state?

19   A     Correct.

20         MR. SIEBERT:  One second, Your Honor.

21         THE COURT:  Take your time.

22         MR. SIEBERT:  No further questions.

23         THE COURT:  All right.  Cross examination.

24                       CROSS EXAMINATION

25   BY MS AUSTIN:

1    Q    Good afternoon, Ms Turner.

2         THE COURT:  Do you work on Midlothian Turnpike?

3         THE WITNESS:  I do.

4    BY MS AUSTIN:

5    Q    The Government Attorney asked you questions about

6    Richmond Police Department submission of their data

7    under the Community Policing Act from July '20 until

8    December '20?

9    A    Um hum.

10   Q    You said that it was a while, the December 20

11   report was somewhat delayed?

12   A    Yes.

13   Q    But isn't it true that by September 30th of 2021

14   Virginia State Police and you had received all the

15   months from July '20 to December '20?

16   A    Yes.

17   Q    And you have received those from the Richmond

18   Police Department and looked at it and either accepted

19   it or rejected it?

20   A    Yes.

21   Q    If you rejected it because there were mistakes; is

22   that right?

23   A    Invalid values.  I wouldn't know if they were

24   mistakes, because I am not familiar with the stops

25   themselves.

1    Q     Invalid values.  I am glad you made that point.

2    Meaning the Community Policing Act had a very strict

3    protocol for reporting data?

4    A     Right.

5    Q     If the police officer reported that data but used

6    the wrong terminology, you had to send it back?

7    A     Wrong data value, yes.

8    Q     Okay.  Then did you send it back for the purpose

9    of Richmond Police Department correcting that?

10   A     Yes.

11   Q     And then when they would re-submit it you again

12   had to make that decision whether you rejected it or

13   accepted it, correct?

14   A     Correct.

15   Q     Okay.

16         At some point you had accepted all the months from

17   July '20 to December '20?

18   A     Yes.

19         THE COURT:  When did you do that?

20         THE WITNESS:  July 15th would have been when we

21   received that December file, so speaking from that time

22   period, July 1 of 2020 to December 31 of 2020, all six

23   of those months were accepted by July 15th of 2021.

24         THE COURT:  Okay.

25   BY MS AUSTIN:

1   Q    You talked about how you are the, correct me if I

2   get terminology wrong, the Data Collection Manager at

3   Virginia State Police?

4   A    Right.  Management Data Analysis and Reporting.

5   Q    Okay.  In addition to data collection, gathering

6   data law enforcement agencies for the Community

7   Policing Act, what other purposes do you gather

8   information from law enforcement?

9   A    Information is gathered when there is a use of

10  force.  Information is gathered when there is a crime

11  that has been reported to law enforcement.  That would

12  also include hate crimes, or what is known as LEOK, law

13  enforcement officer killed or assaulted.  And we also

14  manage the reported management system for Virginia

15  State Police, as well as the evidence management

16  system.

17  Q    When up say the records management system for the

18  Virginia State Police?

19  A    Case management.

20  Q    Case management.  So that deals strictly with the

21  Virginia State Police?

22  A    Yes.

23  Q    You were receiving information from local law

24  enforcement agencies on use of force?

25  A    Um hum.

1   Q    And how long had you been receiving that

2   information?

3   A    That was based on statutory requirement that came

4   about in 2015.  Officer involved shooting.  It was

5   elevated to use of force based on FBI requirement

6   during 2019.

7   Q    In that, when those provisions were passed and

8   that information had to be collected, did you work with

9   local law enforcement agencies at that time to make

10  sure they complied with protocol?

11  A    Yes.

12  Q    Okay.

13       So, this wasn't a new occurrence when the

14  Community Policing Act was passed that, well now there

15  is more information that law enforcement agencies have

16  to submit to you, correct?

17  A    Yes.

18  Q    And you had been in contact with local law

19  enforcement agencies over the years prior to passing of

20  the CPA in getting them to report correctly data

21  required by statute?

22  A    Yes.

23  Q    And that include the Richmond Police Department,

24  correct?

25  A    Yes.

1   Q    When you talk about small law enforcement agencies
2   that might not be on line and have individual, I think
3   you called them CAD?
4   A    Um hum.
5   Q    That is the computer in vehicle.
6        Richmond Police Department is not considered one
7   of those small law enforcement agencies?
8   A    No.
9   Q    They are an agency that has the CAD in every
10  vehicle?
11  A    Correct.
12  Q    Okay.
13       You had been working with someone prior to passage
14  of the CPA, you had been working with someone at
15  Richmond Police Department whose responsibility it was
16  to pass data on to you?
17  A    Yes.
18       Much smaller data collection, but yes.
19  Q    And you said throughout, after the passage of the
20  Community Policing Act there were changes to the
21  legislation as to what needed to be collected?
22  A    Yes.
23  Q    And when those changes happened you than passed
24  those on to law enforcement agencies?
25  A    Correct.

1   Q     Do you know when those changes, what changes you

2   referenced in your direct examination, what changes

3   were those?

4   A     The changes that occurred on July 1 were based on,

5   like I said, Senate bill 1530.

6   Q     July 1 what year?

7   A     2021.

8   Q     So let me stop you right there.  That is the first

9   change that was made, it was July of 2021?

10  A     Yes.

11  Q     Okay.

12        When you were in the process of sending

13  information back to a law enforcement agency saying

14  corrections need to be made, and then sent back to you,

15  you reviewed it one more time, of course, correct?

16  A     Um hum.

17  Q     Yes?

18  A     Yes.

19  Q     If it was accurate and complied with the statute

20  you then did what with that information?

21  A     That was forwarded to DCJS.

22  Q     Okay.  So the Richmond Police Department reports

23  to you from July 2020 to December 20.  Were all of

24  those reports forwarded to the Department of Criminal

25  Justice Services?

1   A     Yes, those particular six months would have been

2   received sometime in July of 2021.  We would have sent

3   it off in July.

4   Q     You sent it off because they were reviewed and

5   accepted?

6   A     Yes.

7   Q     One moment, Your Honor.

8         THE COURT:  Take your time.

9         MS KOENIG:  No further questions.

10        THE COURT:  Redirect?

11                    REDIRECT EXAMINATION

12        MR. SIEBERT:  Very briefly.

13        THE COURT:  Sure.

14   BY MR. SIEBERT:

15   Q     So just to be clear, VSP has no way to know the

16   information receiving from individual departments is

17   accurate?

18   A     That is correct.  We can only say that the data as

19   it is sent is either valid or invalid.

20   Q     But there is no way to know if every officer on

21   the street is actually complying with the CPA --

22   A     That is correct.

23   Q     -- or filling it out correctly?

24   A     That is correct.

25   Q     And you accept the accuracy of the data as you

1   receive it?

2   A     Yes.  We are only a repository.

3   Q     Going back to this December 2020 data set.  It was

4   received by Virginia State Police, but the importance

5   of it, I guess for today, is that it didn't make the

6   March cutoff; is that correct?

7   A     That's correct.

8   Q     And tell The Court about this March cutoff.

9   A     It would be legislation was written that a report

10  needed to be created by July 1 of the following year.

11  Which would have been July 1 of 2021.  That did not

12  provide enough time for agencies to submit data, and

13  for DCJS to review that data.  So DCJS and VSP, myself,

14  we discussed a cutoff date.  It was decided that the

15  first three months of the collection would make it into

16  the report.  So that would have been all data submitted

17  by April 15 of 2021.  The last month of Richmond was

18  December 2020 of RPD was not received until July.  It

19  would not have been included in the report.

20  Q     But other law enforcement agencies across the

21  state did have their December data included?

22  A     Yes.

23  Q     Now, just real brief.  You mentioned on cross

24  examination about other data collection efforts that

25  you have been involved in and VSP has been involved in?

1    A    Yes.

2    Q    How would you rate the level of stress or -- I

3    don't think that is the right word, the easiness of

4    putting this together for the Community Policing Act as

5    compared to the other data collection efforts you were

6    involved in?

7    A    Well, to provide some context.  Speaking

8    specifically to use of force data, typically there is a

9    pilot, there is a trial period where we collect that

10   information.  The technical specifications are sent

11   out.  And we were able to train agencies prior to

12   requesting the data.  So looking at use of force data,

13   we had about three years before we actually started

14   collecting that data correctly.  And that is because we

15   did have the time.  Using Community Policing Act we had

16   eight weeks.

17   Q    There was no pilot program period where you just

18   ignored the data, you immediately had to start using it

19   and collecting it?

20   A    Correct.

21        MR. SIEBERT:  No further questions, Your Honor.

22        THE COURT:  Okay.  Thank.

23        May she be excused?

24        MR. SIEBERT:  From the Government, yes, sir.

25        MS KOENIG:  Yes, Your Honor.

1          THE COURT:  Thank you very much for coming, ma'am.

2          THE WITNESS:  No problem.

3          THE COURT:  Have a good rest of the day.  Thank.

4          THE WITNESS:  Thank you.

5                    (Witness stood aside)

6          MR. SIEBERT:  United States calls Jim McDonough,

7     Your Honor.

8          THE COURT:  All right.

9          MR. SIEBERT:  I will go get him outside.

10         THE COURT:  All right.

11                    JAMES McDONOUGH

12              AFFIRMED AND TESTIFIED AS FOLLOWS:

13                    DIRECT EXAMINATION

14         THE COURT:  Thank you, sir.  Thank are for coming

15    today.  I appreciate it.

16         While you are testifying you are free to keep your

17    mask on or off, whichever you are more comfortable

18    with.  If you keep it on you need to speak loud and

19    right into to the microphone.

20         THE WITNESS:  I will.

21         THE COURT:  Whichever you want.  Makes no

22    difference to me.

23         THE WITNESS:  Yes, sir.

24    BY MR. SIEBERT:

25    Q    All right.

1        Mr. McDonough, state your first and last name and

2   spell it for the court reporter.

3   A    James McDonough.  I work for the Virginia

4   Department of Criminal Justice Services.

5   Q    Can you spell the last name for the court

6   reporter?

7   A    M-c-D-O-N-O-U-G-H.

8   Q    How long have you been with the Department of

9   Criminal Justice Services?

10  A    Thirty-two years.

11  Q    Just give the Judge a quick background that is

12  relevant to your current job.

13  A    Yes, sir.

14       I am the director of the Criminal Justice Research

15  Center at the Department of Criminal Justice Services.

16  I have been with that group for 32 years.  I have my

17  training in experimental psychology.  I have a PhD that

18  primarily focused on how you design and conduct

19  experiments.  I also have president and vice-president

20  of the Justice Research Statistics Association, which

21  is a national network of the state criminal justice

22  statistical analysis centers in all of the states in

23  the U.S.

24  Q    What is your exact job, and what do you do as the

25  director of criminal research center, or the manager

1    for criminal Research Center at DCJS?

2    A     We have a staff of five.  I oversee the assignment

3    of research studies that we are given by the Governor,

4    the Secretary, the legislature.  Essentiality I assign

5    the work, I quality control the work.  I review the

6    work that our analysts do and the reports that they

7    write.  And basically just provide oversight in terms

8    of seeing that it is done correctly.

9    Q     As part of your portfolio you are in charge of the

10   Community Policing Act for DCJS; is that right?

11   A     Yes.

12   Q     Obviously you are familiar with the Community

13   Placing Act?

14   A     Yes.

15   Q     Just generally what is it, real quick?

16   A     It is a law that was passed in 2020 that requires

17   local law enforcement agencies when they make traffic

18   stops to collect data on the circumstances of the stop,

19   including the demographics of the drivers involved,

20   report that data to the state police repository.  And

21   we in turn at DCJS are required to receive that data

22   from state police, analyze it, and write an annual

23   report on the interpretation of the data.

24   Q     Are you familiar with when the Virginia Policing

25   Act went into effect in Virginia?

1    A     It went into effect on July 1st of 2020.

2    Q     You became aware of prior to its passing and

3    passing, that the act was coming and you started

4    preparing for that; is that fair?

5    A     Yes.  Prior to its passage we were aware the bill

6    had been introduced, so we started doing some

7    preliminary work, looking at how those types of data

8    collection efforts had been tried in the past and how

9    they went.

10   Q     Were you provided any funding to fulfill the goals

11   of the Community Policing Act?  When I say you,

12   obviously, DCJS.

13   A     We were provided funding to hire someone to work

14   on the project, but we didn't receive the money to hire

15   that person until several weeks before the first report

16   was actually due.

17   Q     That was the first report that was due in July of

18   2021?

19         So during the phase of July when it first went

20   into implementation, until December of 2020, you did

21   not have an individual funded for this Community

22   Policing Act?

23   A     No, we did not have a person funded and dedicated

24   to that.

25   Q     But you had, obviously, people working on it?

1   A    Yes.  Myself and one of our other statistical

2   analysts did most of that work.

3   Q    So how would you describe, I guess, the initial

4   phase of the planning phase of this in terms of DCJS?

5   A    The planning phase was first of all just trying to

6   find out anything we could in the scientific literature

7   about how those types of studies had been attempted

8   before.  And we also began to receive some preliminary

9   data from state police to look at so we could see what

10  kind of data were coming in, and start assessing how

11  well we thought it was and what we might be able to do

12  with it.

13  Q    In your estimation did DCJS and yourself have

14  sufficient time to plan for this roll out in July of

15  2020?

16  A    No.  It was a very rushed process.

17  Q    Was the scale of the project also significant in

18  how you had to deal with?

19  A    Yes.  It's one of the largest projects that we

20  have had in my experience working.

21  Q    Did you receive any training, or staff receive any

22  training, how to deal with implementing the Community

23  Policing Act?

24  A    No.

25  Q    During this initial phase, July of 2020 to

1   December of 2020, did you start receiving submissions

2   as required by law from Virginia State police?

3   A     Yes, we did.

4   Q     And when?  Do you know rifle when started

5   receiving that data?

6   A     We started receiving some very, very early data in

7   January of 2020, and then it kind of dribbled in.

8   Q     You mean January of 2021?  I'm sorry.

9   A     Twenty-one, I'm sorry, yes.

10  Q     Okay.

11        I cut you off.

12  A     Then it sort of dribbled in between then and May

13  of 2021 when we received the final set of data that we

14  actually used for our report.

15  Q     How would you characterize these law enforcement

16  submissions, the quality of them?

17  A     The quality was very shoddy.  There was -- there

18  were a lot of missing reports, agencies that had not

19  gotten up to speed yet on collecting and reporting it.

20  The data that we did receive, it frequently had missing

21  values in what was supposed to be reported.  There were

22  values that were not valid values, for what should be

23  reported.  So it was very shoddy and preliminary.

24  Q     When you received data that either be incomplete

25  or missing fields, or incorrect, what did you do with

1    that?

2    A     Typically when we saw those type of things we

3    would exclude those records from our analysis.

4    Q     So if you had a traffic stop that was, say, on

5    August 8, 2021 and it had every field in there except

6    for gender, would that be something you discard?

7    A     Yes, we would exclude a record if any of the

8    values that were required to be there were not.

9    Q     Why would you do that if you are looking for,

10   presumably the Virginia Policing Act is about racial

11   bias and racial bias in policing, why would you exclude

12   gender if that is only field missing?

13   A     Generally we wanted to work with only what we

14   thought was the most clean complete data we had.  And

15   in our experience when you have problems with one part

16   of a record it is probably more likely that there may

17   be other problems.  And we didn't want to get into

18   excluding records because one would be missing this

19   field and one would be missing just that field, and

20   having to make decisions about which ones to throw out.

21   We think the cleanest way to make the data the best it

22   would be is if there were any problems with the record

23   we would just exclude it.

24         THE COURT:  Let me ask you.  Did Dr. Coston rely

25   on data from DCJS?

1          MR. SIEBERT:  I think the --

2          THE COURT:  I don't think he did.

3          MR. SIEBERT:  The defense has argued the Virginia

4    Policing Act data is further evidence of -- maybe Dr.

5    Coston didn't, but I think their supplemental argument

6    is that the Community Policing Act also shows a

7    disparity.

8          THE COURT:  All right.  Okay.

9          MR. SIEBERT:  I think the Community Policing Act

10   is a separate body of data.

11         THE COURT:  Go ahead.  That is fine.  Okay.

12   BY MR. SIEBERT:

13   Q    So was this a surprise to you that in the first

14   six months that you had to discard data?

15   A    No.  For a project of this size in our experience

16   it's not at all uncommon that you run into this these

17   start up issues.

18   Q    All right.

19         So, did you, were you able to run statistical

20   analysis, or your shop, the body that you supervise

21   individuals, able to run any statistical analysis on

22   this data?

23   A    We ran just descriptive statistics to say these

24   are what the numbers are.  We were not able to run any

25   type of test of sophistical significance given the low

1    quality of the data.

2    Q    So DCJS's opinion is essentially, and you as a

3    supervisor, the data was so poor that you received

4    during this first six-month period you didn't even

5    attempt statistical analysis of any significance?

6    A    No.  Did not.

7    Q    Is it fair to say your report does not have any

8    statistical validity or significance in any anything

9    you have collected?

10   A    Yes.  It is purely descriptive, it is not a

11   statistical analysis.

12   Q    Okay.

13        Were you able to, based on the strength of the

14   data, make any conclusions about, like a benchmarking

15   standard for driving population in some place like the

16   City of Richmond?

17   A    Not any type of a valid benchmark, no.

18   Q    We are going to get into that in a second.

19        Let's talk about the DCJS annual report.  Can you

20   tell The Court very briefly what that is?

21   A    It is a report that DCJS is required to do

22   annually where we will look at the prior years data

23   collected by state police, analyze it, and then by

24   July 1 of each year produce a report with the results

25   of that analysis.

1   Q    You drafted this report?

2   A    Yes.

3   Q    You supervised and approved its final, I guess,

4   send-off to your higher up officials?

5   A    Yes.

6   Q    Where did -- who did this report go to?

7   A    The report goes to the Governor, the General

8   Assembly, and the State Attorney General.

9        MR. SIEBERT:  I believe the defense has already

10  introduced this.  I was going to pull up certain pages

11  of the report.  But, is it fair that I just provide

12  this to the witness?

13       THE COURT:  Give it to him.

14       MR. SIEBERT:  Marked as Government's exhibit one,

15  but the same thing as --

16       THE COURT:  All right.  Already admitted.

17       MS KOENIG:  For the record, defendant's exhibit

18  six, so it is clear what we are talking about.

19  BY MR. SIEBERT:

20  Q    So, just looking at that, you recognize what that

21  is, right?

22  A    Yes, sir.  This the report that we produced.

23  Q    Okay.

24       So before we get to the report, I just want to

25  deal with some quick threshold questions.  What were

1   your, what is the key take away from this report, or

2   the key take away from this report.

3   A    The key take away of this report is that we did

4   find that given the measure we used there were

5   instances where drivers of a given race were stopped at

6   a higher rate than their percentage of the population.

7   But given the quality of data, the lack of a valid

8   benchmark and ultimately a range of other issues, we

9   could not draw any conclusions at all regarding whether

10  or not racial bias, or bias based policing, played any

11  role in these disparities that we found.

12       THE COURT:  When you say a racial group over

13  represented, you are talking about African-Americans?

14       THE WITNESS:  Yes.

15       THE COURT:  Thank you.

16  BY MR. SIEBERT:

17  Q    You guys created what is reflected in the report

18  called "disparity index," is that right?

19  A    Yes.

20  Q    Give The Court in layman's terms what a disparity

21  index is.

22  A    Okay.

23       The disparity index is where we took the

24  percentage of each racial group that was represented in

25  the traffic stops for a given locality, and we compared

1    that to the percentage of the, each racial group's make

2    up of the population in that locality.  The driving age

3    population.  So we had something to compare the traffic

4    stop percentage to give us at least a very early going

5    in sense of how those things fall out.

6    Q    Okay.  So the disparity index does not show racial

7    bias, just says disparity?

8    A    Correct.

9    Q    In terms of getting this number explain how you

10   get to like one point O disparity.  What is that?

11   A    Essentially, if, for example, if 45 percent of the

12   traffic stops in a locality were African-Americans and

13   45 percent of the driving age population in that

14   locality were African-Americans, that would be a

15   disparity induction of one, meaning they are equal,

16   there is no sign of a disparity between the two.

17   Q    Okay.  One-on-one comparison is one point O?

18   A    Yes.

19   Q    The -- what was City of Richmond from the July

20   1st, 2021 report disparity index?

21   A    Disparity index 1.6.

22   Q    How --

23        THE COURT:  What does that mean?

24        THE WITNESS:  What it meant was that driving

25   African-American drivers were stopped at a higher rate

1    than the rate of drivers -- African-American people,

2    African-Americans of driving age in the population of

3    the City of Richmond.

4         THE COURT:  So 1.6 times higher than with respect

5    to the percentage of the population, is that what you

6    are saying?

7         THE WITNESS:  Yes, although I wouldn't say it's

8    what we would expect, because we do not have a

9    benchmark to give us what we would consider to be an

10   accurate expected value.

11        THE COURT:  Well, aren't you effectively using the

12   population of African-Americans over the age of 16 as a

13   rough benchmark in this case?

14        THE WITNESS:  Yes, I would say very rough

15   benchmark.

16   BY MR. SIEBERT:

17   Q    That is why throughout the report, we will get to

18   it, you called this preliminary?

19   A    Yes.

20   Q    And are all over the report you talk about why you

21   can not show racial bias from the data or the disparity

22   index that you used?

23   A    Yes.

24   Q    What is the state average disparity index?

25   A    The state average is also 1.6.

McDonough - direct                                    296

1        THE COURT:  It it is interesting to me,

2  Mr. Seibert, all of these numbers show that a whole lot

3  more African-Americans get arrested than white people,

4  but nobody is willing to say, gee, there might be some

5  bias.

6        MR. SIEBERT:  Well, Judge, you want me, would you

7  like me to answer?

8        THE COURT:  I would like to hear what you think.

9  I have been listening to Dr. Miller testify and now

10  Mr. McDonough and I just don't -- it looks to me like

11  everybody sort of dodges the bullet on this.

12        MR. SIEBERT:  Well, one because these are all

13  preliminary studies, and in order to find racial bias

14  there would be rigorous testing because, Judge, we

15  haven't heard this yet, but I think my answer to you

16  would be the ramifications of making a finding about

17  racial discrimination in a case like this would have,

18  and it wasn't true, would have earthquaking, you know,

19  results.

20        THE COURT:  Well, might be some building shaking

21  then.

22        MR. SIEBERT:  Right.  But the point is, if it is

23  deemed properly based on evidence and you wrong about

24  it, imagine the study that Dr. Smith did in LA and that

25  the court improperly found, or he improperly found

1    based on weak statistical evidence the effect of that.

2    That is why the mayor, chief of police, in answer to,

3    you know, the population, that they don't want the

4    traffic stop they could make changes.  If this Court

5    does that essentially would make every traffic stop

6    involving an African-American, then the indictment

7    would be dismissed, right?

8         THE COURT:  Well, not necessarily.  I don't

9    know -- you are confusing -- well -- you are equating a

10   finding that there is bias with the remedy of dismissal

11   when in fact, for instance in this case, we have got

12   the gentleman driving around with a fake license plate

13   on and all that.  Maybe that gets stopped regardless of

14   bias.  This is -- these are very, very difficult

15   issues.

16        MR. SIEBERT:  I agree, Your Honor.  But it's not

17   our burden.  The burden of the defense.  If there is

18   racial disparity, that is a starting point.  This would

19   be a starting point for any real statistician to come

20   in here and dig in and look at all at variables.  There

21   is plenty of states doing that now.

22        THE COURT:  Dr. Coston agrees with that.

23        MR. SIEBERT:  I wasn't talking to Dr. Coston.  I

24   am just saying there is data collection efforts in I

25   think 40 states around the country to varying degrees.

1    Some are better than others.  If Virginia wants to be

2    serious about data collection, data collection efforts

3    they could start collecting better data and give this

4    individual an opportunity to make findings that are

5    more than just preliminary.

6         THE COURT:  Is it your contention that Virginia

7    still has an inadequate collection system going?

8         MR. SIEBERT:  I am not the expert in this field.

9    I think they still need to dig into -- Dr. Smith

10   provided many variables that need to be looked at that

11   weren't on this January, or the July 2020 to December

12   of 2021.

13        THE COURT:  Dr. Smith's testimony was essentially

14   that you don't have all the data.  And in particular

15   it's almost impossible to have a benchmark.  That is

16   pretty much what he said.  I suppose you could go look

17   at the crash data, you could possibly go look at the

18   veiled darkness data, whatever it is called, or you

19   could station people on every corner to count heads.

20   But, that is really a monstrous task.

21        MR. SIEBERT:  I think the reason this is

22   important, Judge, in my opinion, it's a starting point.

23   So now if a department is wide spread, that will at

24   least give the signal to start digging deeper.

25        THE COURT:  Well, all right.

1        MR. SIEBERT:  The other problem is if you have

2    individual rogue officers that are making the problem,

3    go after them.  This will help identify and narrow down

4    if there are certain parts of an area.  So there is bad

5    actors on the individual level.  I think certainly this

6    helps, you know, factor that in and have them dig

7    deeper.  But to say that the Richmond Police force is

8    designed, or their enforcement system to selectively

9    enforce African-Americans I think is a step too far.

10   That is all we have heard throughout today.

11       THE COURT:  You know, ultimately this may be

12   a political question.  Go ahead.  Sorry.

13       MR. SIEBERT:  Yes, Your Honor.

14       THE COURT:  You are doing good.

15   BY MR. SIEBERT:

16   Q    So there is a disparity in expert bias?

17   A    No.

18   Q    Is it fair to say there is multiple variables that

19   could explain this disparity?

20   A    Yes, that is why we were so cautious because we

21   are aware there are multiple other variables that could

22   explain why you could have a mismatch between the

23   percentage of drivers of any given race stopped and the

24   percentage of those, of driver-age in that racial group

25   within a locality.

1        THE COURT:  Here is the thing.  The last witness

2   said there were 400 police agencies in the state.

3   Isn't that what he said?

4        MR. SIEBERT:  Yes.

5        THE COURT:  And if you add them all together it is

6   still 1.6, a 1.6 disparity index.

7        THE WITNESS:  Yes, that's correct.

8        THE COURT:  Seems to me like that means there is a

9   problem in Virginia that needs to be addressed.  I mean

10  I just -- everybody says we need more data, we need

11  more data.  We have 400 contributors of data to this

12  thing which collectively, including places that are as

13  conservative as Brunswick County and as liberal as

14  Fairfax, they all when you add them all together comes

15  out to a disparity in stops.  I just don't understand

16  why everyone is so cautious about saying the Emperor

17  has no clothes on.

18       THE WITNESS:  If I could, Your Honor, I certainly

19  understand.

20       THE COURT:  That wasn't a fair question.  I

21  apologize.

22       THE WITNESS:  As researchers what we were trying

23  to do is determine to the extent to which we could or,

24  couldn't make that statement based on the data that we

25  have.  And we believe that there are many other factors

1    that contributed to that 1.6, whether it be Richmond or

2    the State that could be contributing to that that are

3    not based on race.  Race might be in there somewhere,

4    but we don't know.

5        THE COURT:  Over 400 agencies, whatever foul up in

6    the data there are, it still comes to 1.6, and so we

7    doubt that 1.6 is an accurate number?

8        THE WITNESS:  Yes, we still doubt that that is an

9    accurate number reflecting what we are trying to

10   measure.

11   BY MR. SIEBERT:

12   Q    Well, let me ask one follow-up question.  I mean

13   could police deployment patterns be a significant

14   factor that change a variable that could cause this

15   disparity index?

16   A    Yes.  If, for example, police patrols are heavier

17   or denser in a high-crime area that might be

18   predominantly minority in population, well, that could

19   skew these numbers to why we are getting more stops of

20   African-American drivers.

21   Q    Could calls for service that police are required

22   to respond to also be another variable that could

23   factor in, that could be, I guess, factor in to the

24   disparity index?

25   A    Yes.

1      THE COURT:  So is Pierre Redding in the Richmond

2   Police Department going to tell us something about

3   deployment patterns?

4      MR. SIEBERT:  No, Your Honor.  A data collection

5   individual that we have actually cut to move forward on

6   this faster.  We incorporated some of Ms Turner's

7   testimony.

8      THE COURT:  All right.

9   BY MR. SIEBERT:

10  Q    So in drafting, I guess, this report were you and

11  DCJS concerned certain officials could use the report

12  to claim it showed racial bias?

13  A    No.  We stated that the report should not be used

14  to do that.

15  Q    Right.  But is that why you put that in there

16  because you thought it could be misused by officials --

17  A    Yes.

18  Q    -- to say the disparity index proves racial bias?

19  A    Yes.

20     THE COURT:  Go ahead.  Feel free to lead him.

21  BY MR. SIEBERT:

22  Q    So, you document throughout this limitations that

23  we were going to get to of what your findings are?

24  A    Yes.

25  Q    And you already mentioned this, but one of the key

1    limitations was the benchmark problem?

2    A    Yes.

3    Q    And tell The Court what that is.

4    A    Again, it is to determine whether or not there is

5    bias you would have to have some measure of what those

6    numbers would look like if there were not bias.  And we

7    use that driver age population as that benchmark.  But

8    given that there are no reliable benchmarks to our

9    knowledge in any of the attempts to do this, we just

10   recognize it as a very crude preliminary start toward

11   trying to develop one.

12   Q    So your benchmarking was taking out anyone under

13   the age of 16 from the census data?

14   A    Assuming they are not drivers.

15   Q    Would you ever consider just using all the census

16   data?  Was that ever a consideration?

17   A    No, we did not, because given how much noise there

18   is already in this data we assumed that using this

19   chunk of the population that is highly unlikely to be

20   out there driving and subject to being stopped would

21   only make the data even noisier and of less quality.

22   Q    All right.

23        So let's go to, very quickly, can you bring up

24   Government's exhibit one, I guess.  Can you blow up the

25   bold area.  That paragraph.

1          THE COURT:  We are on Government's exhibit 1 A.

2    Q    Yes, Your Honor.

3          Can you read the bold there?

4    A    "The information presented in this report is

5    preliminary and should be interpreted with caution."

6    Q    This is the first page of your report?

7    A    Yes.

8    Q    Why are you saying that this is preliminary and

9    should be interpreted with caution?

10   A    We are saying that because it was very challenging

11   for the law enforcement agencies to begin collecting

12   and reporting this data many agencies had trouble

13   reporting it at all, or understanding exactly how it

14   was to be reported.  Of the data that were reported

15   there were various issues with the quality and the

16   completeness of the data.  And some smaller agencies

17   that did not have a lot of resources were not able to

18   report many stops at all, so few, or so few that it was

19   not possible to do any type of interpretation of the

20   data.

21   Q    Could we go to the next paragraph down?

22         There is another reason in mentioning that.  Tell

23   The Court about what the other limitations are.

24   A    Yes.  Another one of the limitations is that there

25   is no standard way right now for law enforcement

1    officers when they are making a stop to determine what

2    the race or ethnicity of the driver is.  There is no

3    indication of that on a driver's license or a D M V

4    record, so it was left up to the officer's discretion

5    to make that decision, or if they wished, to ask the

6    driver what their race or ethnicity was.

7    Q    All right.  Go to 1 D.  Go to the second

8    paragraph.  Just blow that whole paragraph up.

9         Yes.

10        Can you read the bold on that?

11   A    Yes.  "Although this analysis identified

12   disparities in traffic stop rates related to race,

13   ethnicity, it does not allow us to determine or measure

14   specific reasons for these disparities."

15   Q    All right.

16        So, that applies to every police department in the

17   country, in the state, is that right?

18   A    Yes.

19   Q    Including RPD?

20   A    Yes.

21   Q    All right.

22        To next paragraph down.  Sorry.  Keep up what you

23   just had.

24        Talks about the various factors that could help

25   explain why members of a given race may be stopped at

1    higher or lower rate.  What are those other factors?

2    A    Among them are different driving rates or patterns

3    by different racial groups.  Again, we don't know the

4    details to benchmark this.  We know these differences

5    exist, but some groups may be more likely or not to

6    drive than others at given locations based on

7    employment locations, whether or not they use public

8    transportation, different rate of policing in different

9    areas.  Again, high crime areas may have more police

10   presence, therefore more stops.  And individually you

11   see some cells may simply have different guidelines on

12   what discretion they give to their officers in when to

13   determine whether or not to make a stop.

14   Q    Okay.

15        Close that and go to the next paragraph down.  All

16   the way down to the recommendation paragraph.

17        THE COURT:  Hold on.  We are one.

18        MR. SIEBERT:  One B still, Your Honor.

19        THE COURT:  Okay.

20   BY MR. SIEBERT:

21   Q    So talks about major limitation of the study.

22   Could you tell The Court what that limitation was?

23   A    Sorry.  Could you repeat the question?

24   Q    Yes.

25        The first paragraph highlighted talks about the

1    major limitation of the study.  Tell The Court what

2    that major limitation was.  We touched on it a little

3    bit.

4    A    Yes, sir.  The major limitation is, again, the

5    benchmark problem.  We do not know what percentage of

6    any given racial group's driving, actual driving habits

7    or exposure to being stopped is.  That is what we need

8    to compare the actual number of stops to.

9    Q    All right.

10        Then the recommendation one, so this is a

11   recommendation that you are giving to state officials.

12   A    Yes.

13   Q    All right.  Tell The Court what is that

14   recommendation?

15   A    The first recommendation states the percentage and

16   DI's presented in this preliminary report should not be

17   interpreted to indicate that there are any individual

18   law enforcement agencies practicing bias based policing

19   given the limitations that we cite throughout the

20   study.  And therefore we recommend that these things be

21   used only to identify where there might be a potential

22   for it, but not to conclude that there is.

23   Q    All right.

24        You recommend that in the areas where there is a

25   disparity that requires further review and potentially

1    further action to either reduce or eliminate where

2    there is this disparity?

3    A    Yes.

4    Q    That is your recommendation to the General

5    Assembly, the Governor, the Commonwealth Attorney, and

6    the Virginia Attorney General?

7    A    Yes.

8    Q    All right.

9         We are not going through it, but later in the

10   report you give recommendations on what some other

11   studies that may be more accurate way to do this?

12   A    Yes.

13   Q    Just tell us quickly what those are.

14   A    Based on research we have seen done elsewhere

15   where they had more resources, time, whatever, breaking

16   out this type of data by whether or not the stop

17   occurred during daylight or darkness has been

18   recommended as a method.  The assumption being that in

19   the dark it may be less likely for a police officer to

20   discern the race of a driver prior to deciding whether

21   to stop.  We also recommended that if possible, if we

22   could obtain data on the race of drivers within a

23   locality that are involved in traffic accidents, that

24   would provide a better benchmark of how often are

25   different groups out there driving.  Because in those

McDonough - direct                               309

1    cases police officers don't have the discretion to

2    respond or not.  They are called.  So presumably any of

3    those disparities that might exist in traffic stops

4    would not be included there.  And that would give us a

5    better representation how many drivers in different

6    groups are actually on the road.

7    Q    Okay.  Briefly, one C.

8         And let's highlight the bold all the way down to

9    the recommendation.  Sorry.  The second paragraph all

10   the way down to the recommendation.  This is the final

11   portion of your report; is that right, page 67?

12   A    Yes.

13   Q    These are your final recommendations?

14   A    Yes.

15   Q    And you are touching on the same issues audited

16   before regarding disparity; is that right?

17   A    Yes, we are basically summarizing most of what we

18   talked about earlier in the report.

19   Q    Okay.  The recommendation is what we previously

20   just reviewed about disparity indexes?

21   A    Yes.

22   Q    Okay.

23        Just almost done here.  Were you able to determine

24   any methods to analyze or assess subjective motivation

25   for individual officers?

1   A     No.

2   Q     In this -- this annual DCJS report was released

3   when?

4   A     It was released July 1 of 2021.

5   Q     Okay.

6         And last question.  Does this report in any way

7   suggest there is racial bias about police officers for

8   any stop conducted in the Commonwealth of Virginia from

9   2020 to 2021?

10  A     No.

11        MR. SIEBERT:  No other questions, Your Honor.

12        THE COURT:  Thank you.

13        Cross examination?

14                    CROSS EXAMINATION

15  BY MS AUSTIN:

16  Q     Good afternoon, Mr. McDonough.  Did I pronounce

17  that correctly, McDonough?

18  A     That's correct.  Yes.

19  Q     Your work at the Department of Criminal Justice

20  Services you said is in research.  You are director of

21  the research center, right?

22  A     Yes.

23  Q     So for the last thirty some years, correct?

24  A     Yes.  Roughly thirty years, give or take a year.

25  Q     Okay.  That is fine.  Over 30?

1   A    Yes.

2   Q    We can agree on that.

3        And so has it been your role there at the Research

4   Center that you constantly analyze data coming in and

5   prepare reports?

6   A    Yes.

7   Q    Where does that data usually come from?

8   A    It comes from a variety of usually state agencies,

9   the Department of Corrections, the Virginia State

10  Police, the Supreme Court.  Various criminal justice

11  agencies in Virginia.

12  Q    Is that data transferred to your office usually by

13  means of a statute directing that you receive that

14  data?

15  A    No.  Most of it is not required by statute.  We

16  have very broad statutory requirement to analyze

17  criminal justice data.  But each one is not listed in

18  statute in terms of where it comes from.

19  Q    But analyzing data from different state agencies

20  is what your center does, --

21  A    Correct, yes.

22  Q    -- correct?

23       And so, when you stated you didn't have any

24  training on how to receive the data that was submitted

25  to you pursuant to the Community Policing Act your job

1    for the last 30 some years has been receiving data from

2    state agencies, correct?

3    A    Yes.

4    Q    And then analyzing that data?

5    A    Yes.

6    Q    And producing reports?

7    A    Yes.

8    Q    And you talked about when you started receiving

9    data under the Community Policing Act, that some of it

10   was shoddy, I think.  Did you say "shoddy?"

11   A    Yes.

12   Q    Okay.  And if found that to be the case you

13   discarded it or didn't use it; is that correct?

14   A    Yes, if we had the missing records or missing

15   values in records or values there were clearly not

16   within the range of what could be reported we would be

17   discard those.

18   Q    And do you -- is it your understanding that that

19   information went through quality control at Virginia

20   State Police before it came to you?

21   A    It went through some level of qualaity control,

22   yes.

23   Q    And then you performed another level of quality

24   control when you received it?

25   A    Yes.

1    Q    Yes?

2    A    Yes.

3    Q    Okay.

4         And then after that level of quality control at

5    the Department of Criminal Justice Services you then

6    set about with the help of your staff to analyze the

7    data?

8    A    Yes.

9    Q    And as a result of analyzing the data under the

10   Community Policing Act you had to submit a report by

11   July of 2021 that we have been referring to as

12   Government's exhibit one, correct?

13   A    Yes.

14   Q    Okay.

15   Q    And you and your staff analyzers, or sorry,

16   analysts, went through all of the data that was

17   received and produced a report that was published,

18   correct?

19   A    Yes.

20   Q    Okay.

21        What kind of quality control did you perform or

22   did this published report go through before it was

23   released?

24   A    It was viewed by our agency director.  It was

25   reviewed by the Secretary of Public Safety.  Those two

1    reviews took place before the report would be, was

2    officially published.

3    Q    So the official report had quality control before

4    published?

5    A    It had review.  I wouldn't say it was a, you know,

6    the same type of quality control we did where we get

7    into the details.  The higher level you go, they are

8    looking at in a more general sense, I guess, than the

9    hard core research people do.

10   Q    But at some point after the higher level review

11   occurred, it was published?

12   A    Yes.

13   Q    It was published in key findings and conclusions

14   were contained within the report, right?

15   A    Yes.

16   Q    Is it true that one of the findings is that the

17   Department of Criminal Justice Services staff was able

18   to identify differences in traffic stop rates for

19   persons in different racial ethnic groups?

20   A    Yes.

21   Q    And there were differences between driver racial

22   ethnic groups regarding the reasons the stop was made,

23   whether a search of an individual or the vehicle

24   occurred, and what action was taken toward the driver.

25   Is that a finding in the report?

1    A    Yes.

2    Q    Just to be clear, Richmond Police Department

3    submitted all the required data before this report was

4    produced, correct?

5    A    No.   That's not correct.   The data that we

6    received from the Richmond Police Department through

7    the Virginia State Police covered the period from July

8    1 of 2020 through November 30 of 2020.   The data that

9    we used in the report, the full report, contained data

10   that were submitted by agencies between July 1 of 2020

11   and March 31 of 2021.   So we received fewer months of

12   data from the Richmond P D than we received from many

13   of the other localities.

14   Q    But you went ahead and prepared the report based

15   on the data received from all law enforcement agencies?

16   A    Yes.

17   Q    So you didn't perceive that as a problem in

18   preparing your report?

19   A    No.   We stated in the report that one of our

20   caveats or concerns which was behind the reasons that

21   we were very cautious about interpretation is because

22   we knew that there were multiple agencies that reported

23   different time periods depending on how quickly they

24   were able to get their data collection going and up and

25   running and reported to state police.   That was an

1    issue throughout the state.

2         THE COURT:  Well, is it fair to say that you knew

3    you had imperfect data, but you did your best with what

4    you had?

5         THE WITNESS:  Yes, sir, that is a very concise way

6    of stating it.

7         THE COURT:  All right.

8    BY MS AUSTIN:

9    Q    Thank you, Your Honor.

10        Then doing the best with what you had you came to

11   a conclusion that an analysis of traffic stops

12   state-wide that black drivers were stopped at higher

13   rates than white drivers?

14   A    Yes.

15   Q    And black drivers who were stopped were searched

16   at higher rates than white drivers?

17   A    Yes.

18   Q    And you found that black drivers who were stopped

19   were arrested at higher rates than white drivers?

20   A    Yes.

21   Q    And you didn't state in your report the data we

22   received is just so bad our results are inconclusive?

23   A    We didn't state it in those words, but I believe

24   we essentially said that enough, multiple times.

25   Q    But you didn't say it when you stated black

1    drivers were stopped at higher rates than white

2    drivers.

3         You were able to conclude that.

4    A    We were able to conclude that the numbers that we

5    had showed that.  But what we said throughout the

6    report is that we know there are problems with those

7    numbers.

8         THE COURT:  Let me ask you.  Do you think that the

9    problem was the people couldn't tell whether the

10   drivers they stopped were black or white?

11        THE WITNESS:  We couldn't say that, sir.  In any

12   given situation we couldn't say that.  What we were

13   saying is that there was no standard, and law

14   enforcement officers typically are looking for a, you

15   know, some type of standard.  So we are not saying we

16   have any sense of like to what degree that may have

17   played a role, but we are saying we believe that it is

18   possible that is one of the things that could be

19   muddying the interpretation of the data.

20        THE COURT:  I will tell what.  You have been doing

21   this for 30 years, right?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Have you found in the Commonwealth of

24   Virginia a pattern of law enforcement officers who are

25   unable to tell the race of people that they stop?

1          THE WITNESS:  No, sir, I haven't.

2          THE COURT:  Okay.  That was a yes or no question.

3          THE WITNESS:  Yes.

4          THE COURT:  You haven't.

5          THE WITNESS:  We have not.

6          THE COURT:  Okay.  You know, I have been

7     practicing law since 1976.  I haven't seen that either.

8          Let's move on.

9     BY MS AUSTIN:

10    Q     Thank you, Your Honor.

11          You talked about the disparity index.  When you

12    began your discussion about the conclusions and

13    recommendations isn't it true that in your report you

14    stated that these figures should only be used to

15    identify where the numbers indicate certain ethnic

16    racial groups are being disproportionately stopped?

17    A     Yes, that is what we stated.

18    Q     Regarding the disparity index you stated that the

19    State had a 1.6 --

20    A     Yes.

21    Q     -- index.

22          Meaning if it is 1.1 to 1.9 it represents a

23    moderate over representation for a group.  And how

24    likely it is that a driver would be stopped; correct?

25    A     Correct.

 1   Q    Okay.

 2        So Richmond had an -- overall state index,

 3   disparity index is 1.6?

 4   A    Yes.

 5   Q    Meaning blacks, African-Americans, were

 6   disproportionately -- there was a disparate index to

 7   the stops regarding African-Americans?

 8   A    Yes.

 9   Q    Disproportionately high?

10   A    Yes.  Relative to their driver age percentage of

11   the population.

12   Q    Okay.

13        And then the state disability index is 1.6, but on

14   page 40 of your report -- well, on several pages of

15   your report in the table, this table 15 A, you break

16   down every single law enforcement agency and what the

17   black driver disparity index is; is that right?

18   A    For every locality that reported data to us, yes.

19   It did not every single locality law enforcement

20   agency.

21   Q    Okay.

22        And Richmond Police Department was 1.6 disparity

23   index, correct?

24   A    Yes.

25   Q    And as I understand it you have to submit a report

1    pursuant to the Community Policing Act every year?

2    A     Yes.

3    Q     And on July 1, correct?

4    A     Yes.

5    Q     You just recently submitted a report?

6    A     No.  We have not yet submitted a report for July 1

7    of this year, is that the question you are asking?

8    Q     Yes.

9    A     No, we are working on one, but we have not yet

10   submitted one.

11   Q     Isn't it mandated by statute that it be in by the

12   first of July of every year?

13   A     Yes, it is.  But it is also understood that

14   sometimes these reports get backed up because of work

15   issues, staffing, things like that.

16   Q     So you can't report, or can you report to us what

17   your findings were, or will be, in the July 2st, 2022

18   report?

19   A     We haven't finished it yet.

20         THE COURT:  Well, the questions this.  We know you

21   haven't put it in writing yet.  Do you know what the

22   answer, what the disparity index is going to be for

23   Richmond for African-American drivers in the report

24   that is forthcoming, whenever it gets done?

25         THE WITNESS:  Your Honor, I don't have that in

1   front of me what that number is.

2          THE COURT:  He doesn't know what it is.

3          MS AUSTIN:  Okay.

4          May I have one moment, Your Honor?

5          No further questions.

6          MR. SIEBERT:  No further questions.

7          THE WITNESS:  Thank you very much for coming, sir.

8          Good to have a servant of the Commonwealth here.

9   Thank you for coming.

10         THE WITNESS:  Thank you, sir.

11         THE COURT:  All right.  Call the next witness, if

12  any.

13         MR. GIBBONS:  Government calls Special Agent Josh

14  Valot.

15         THE COURT:  All right.

16                 (Witness stood aside)

17         MR. GIBBONS:  Our final witness, Your Honor.

18         THE COURT:  All right.  Thank you.

19                      JOSH VALOT

20         AFFIRMED AND TESTIFIED AS FOLLOWS:

21                  DIRECT EXAMINATION

22         THE COURT:  All right.

23         Now, when you testify you are welcome to keep your

24  mask on or take it off.

25         THE WITNESS:  Thank you.

1            THE COURT:  Is it V-A-L-O-T?

2            THE WITNESS:  Yes, it is, Your Honor.

3            THE COURT:  Okay.

4      BY MR. GIBBONS:

5      Q    Special Agent Valot, where are you employed?

6      A    Employed with the Bureau of Alcohol, Tobacco

7      Firearms and Explosives, ATF here in Richmond.

8      Q    Are you case agent for the case against Keith

9      Moore?

10     A    I am.

11     Q    As part of your work as case agent you reviewed a

12     spread sheet of data that was produced yesterday to the

13     Government by the defense?

14     A    I did.

15     Q    You analyzed that data at the request of the

16     prosecutors?

17     A    I did.

18     Q    What did that data represent?

19     A    The data represented traffic stops, information on

20     traffic stops from Richmond Police Department from

21     between July 1st of 2020 and December 6 of 2020.

22     Q    How many traffic stops are recorded for the

23     Richmond Police Department for this date range?

24     A    Of the information that we analyzed 2500 traffic

25     stops.

1   Q    I am going to show you what has been marked
2   Government's exhibit 1.
3        This has been admitted as defendant's exhibit six,
4   also Government's exhibit one.
5        The Court already heard all about the DCJS report.
6   We will skip that.  Are you familiar with page 17 of
7   DCJS report?
8   A    I am.
9   Q    What is contained on page 17 of that report?
10  A    On page 17 it includes a table that has a list of
11  records that were excluded from their analysis.
12  Q    That is Government's exhibit 1 D as page 17?
13       THE COURT:   Okay.  Trying to figure out what that
14  was.  1 D.  I have got it right here.
15  BY MR. GIBBONS:
16  Q    Zoom in on the table, please.
17       So these are exclusions for which reasons for
18  which DCJS excluded data from the statewide data; is
19  that correct?
20  A    That's correct.
21  Q    What are some of the reasons or criteria on which
22  DCJS excluded statewide data?
23  A    There was no age listed, no gender identified.
24  There is no listing of the action taken by the officer.
25  There is no mention of additional persons who were

 1   arrested.

 2   Q    To be clear, you are not talking about the

 3   suitability of those exclusions, you are just talking

 4   about what the numbers are for those exclusions in the

 5   data provided to the Government by the defense?

 6   A    That is correct.

 7        THE COURT:  I think what he was saying is these

 8   are the reasons given by DCJS for not included?

 9        MR. GIBBONS:  Yes.  The next, I was moving on to

10   the next question, Your Honor.  So he just identifying

11   which of the RPD stops, how many are excludable for

12   these reasons.

13        THE COURT:  Are all of these Richmond stops on

14   page 17?

15        MR. GIBBONS:  Page 17 is the criteria by which

16   DCJS has excluded.

17        THE COURT:  Okay.

18        MR. GIBBONS:  Then he is just going to give

19   numbers, RPD data.

20        THE COURT:  All right.

21   BY MR. GIBBONS:

22   Q    Go through each of these categories, if you will.

23        Did you for stops in which there was a missing

24   age?

25   A    I did.

```
 1   Q     How many missing-age entries were there in the RPD

 2   data?

 3   A     147 missing entries, or entries missing in age.

 4         THE COURT:  Missing age?

 5         THE WITNESS:  Correct.

 6         THE COURT:  Okay.

 7   BY MR. GIBBONS:

 8   Q     What about gender?

 9         THE COURT:  Is this case about age?

10         MR. GIBBONS:  No, sir.

11         THE COURT:  Okay.  Thank you.

12         MR. GIBBONS:  We are giving the numbers, Your

13   Honor.

14         THE COURT:  All right.

15   BY MR. GIBBONS:

16   Q     What about missing gender?

17   A     Six entries with no gender.

18   Q     What about a blank for "listed action taken as

19   result of the stop?"

20   A     There is five.

21   Q     What about stops that lacked entry for whether a

22   person was searched?

23   A     Two stops.

24   Q     What -- did you check for stops in which there was

25   no listed entry for whether a person was arrested?
```

1    A    Yes.   There is 249 entries that did not have

2    anything listed for that.

3    Q    Were there some traffic stop entries that were

4    missing multiple items of data such that it would be

5    excludable on separate grounds?

6    A    Yes, there were.

7    Q    So how many total stops were missing at least one

8    item out of the 2500 stops?

9    A    There 346 stops.

10   Q    Let's talk about duplicates and pull up

11   Government's exhibit 5.

12        Special Agent Valot, did you also determine

13   whether there were any duplicate traffic stops within

14   the RPD data?

15   A    Yes.

16   Q    Exhibit 5 is the report of duplicate traffic stops

17   within RPD data?

18   A    Yes, sir.

19   Q    Your Honor, we move to admit Government's exhibit

20   five.

21        MS KOENIG:   No objection, Your Honor.

22        THE COURT:   Admitted.

23   BY MR. GIBBONS:

24   Q    What did you determine, Special Agent Valot?

25   A    Determined that there appears to be that a total

1    of 311 entries, although there is only 142 traffic

2    stops, so, of the 142 unique traffic stops a number of

3    them were entered two times, three times or in a few

4    occasions four times.

5    Q    So let's walk through a few.  Scroll down to

6    control numbers 1579 through 1582.

7         THE COURT:  Well, that is not a lot a whole lot

8    more legible.  This is on exhibit five?

9         MR. SIEBERT:  Yes, Your Honor, we will make it

10   bigger.

11   Q    In the middle, Special Agent, do you see control

12   1579 through 1582?

13   A    Yes, sir.

14   Q    Can you explain why these four stops are

15   duplicates of each other?

16   A    So all four of these stops appear to be duplicates

17   of each other.  They have the same date, they have the

18   same location where the traffic stop occurred, the

19   longitude longitude listed is the same.  The race of

20   the driver is identical.  The age of the driver is

21   identical.

22        THE COURT:  Of all the data?

23   BY MR. GIBBONS:

24   Q    Let's look at two more sets.  1915 and 1925.

25        I will get you a page number, Your Honor.

```
 1          THE COURT:  All right.  All right.  So these also
 2   have all the same information.  So you conclude they
 3   were identical; is that correct?
 4          THE WITNESS:  They appear to be so, yes.
 5          THE COURT:  The same thing I take it would be true
 6   of 1936 and 1947; is that correct?
 7          THE WITNESS:  Yes, sir, that's correct.
 8   BY MR. GIBBONS:
 9   Q    Looking briefly at 1915 and 1925, what do you
10   notice about the latitude longitude of those two stops?
11   A    The latitude longitude, corrected latitude
12   longitude for the second listed stop is different than
13   it is for the first stop.
14   Q    So, one of the Federal Public Defender interns or
15   Dr. Coston corrected latitude longitude for one of
16   these but not the other?
17   A    That's correct.
18   Q    Were all of these 311 traffic stop entries perfect
19   duplicates?
20   A    No, they were not.
21   Q    Could you explain that, please?
22   A    Well, as we just discussed there is a few that had
23   the latitude longitude, which was a little bit
24   different.  There was two stops in which there was an
25   age listed in one of the stops and in the other stop
```

1    there was, the age there was not a value there, just

2    zero.  There was a few stops that were triple stops,

3    listed three times for the stop, and one of the

4    violations listed was different than the other.

5    Q    Special Agent Valot, to summarize the work that

6    you did, you determined that 346 traffic stop entries

7    in the RPD data met at least one of the criteria that

8    led DCJS to exclude that entry on the state-wide data?

9    A    Yes, sir.

10   Q    Determined that 311 traffic stop entries contained

11   duplicate data?

12   A    Yes.

13   Q    If you eliminate those duplicates to one entry and

14   excluded the other traffic stop entries 169 entries

15   should be excluded?

16   A    That's correct.

17        THE COURT:  How many would you exclude if you only

18   excluded the duplicates.

19        THE WITNESS:  169.

20   BY MR. GIBBONS:

21   Q    Special agent, 169 --

22        THE COURT:  So there were duplicates.

23        THE WITNESS:  That's correct.  Duplicate and

24   triple.

25        THE COURT:  Multiple entries of the same thing?

1        THE WITNESS:  Yes, sir.

2        THE COURT:  So, of those 169 you say, does that

3    include, are you excluding all of the entries under the

4    duplicates, or just if there are two of them, you

5    exclude one of them?

6        THE WITNESS:  That's correct.  One entry, one stop

7    and excluding the other.

8        THE COURT:  Okay.  Thank you.

9    BY MR. GIBBONS:

10   Q    So taking those two numbers together, Special

11   Agent Valot, 346 entries for data with missing or

12   invalid values, and 169 duplicates, how many total

13   traffic stops entries fall into one of these

14   categories?

15   A    507.

16   Q    507 out of the 2500 traffic stops contained

17   unreliable or missing data?

18   A    Correct.

19   Q    That is about 20 percent of the defense's data?

20   A    Correct.

21   Q    No further questions.

22       THE COURT:  Cross examination?

23                  CROSS EXAMINATION

24   BY MS KOENIG:

25   Q    Agent Valot, you are an officer with ATF, right?

```
 1    A    I am an agent, yes, ma'am.

 2    Q    Agent, I'm sorry.  You are not a data annalist,

 3    right?

 4    A    No.

 5    Q    Did you actually run the spreadsheets yourself?

 6    A    We ran them, myself and AUSA Gibbons ran them

 7    together.

 8    Q    You were observing Mr. Gibbons run the analysis,

 9    right, and then you made a report based on that?

10    A    We did that last night, yes, ma'am.

11    Q    Okay.  And you also wrote a report that is dated

12    July 15 of 2022, right?

13    A    Yes, ma'am.

14    Q    Last Friday?

15    A    Yes.

16    Q    In that report you talked about reviewing a

17    spreadsheet that the Government had provided you with

18    traffic stop data from July 1st of 2020 through

19    December 5 of 2020, right?

20    A    Yes, ma'am.

21    Q    When did you actually look at those spreadsheets?

22    Was it July 15?

23    A    No, ma'am.

24    Q    When was that?

25    A    It was, I looked at it several times in the week
```

1    leading up to writing that report.

2    Q    So starting July 8 or so?

3    A    Actually probably would have been, I believe that

4    it started at the end of, I think we received those

5    close to the end of June.  And I reviewed those

6    spreadsheets several times to make sure that I was

7    comfortable in running those queries.

8    Q    So that you received these spreadsheets the end of

9    June of 2022, right?

10   A    Yes, ma'am.

11   Q    And Mr. Gibbons or Mr. Seibert gave you specific

12   things that they wanted you to look for to verify some

13   facts and felt comfortable coming in here and

14   testifying to today, right?

15   A    Yes, ma'am.

16   Q    And so ultimately if we look at what you perceive,

17   or Mr. Gibbons or somebody perceived to be duplicate

18   entries, and we take out what may be non-unique

19   entires, we are eliminating 169 entries, right?

20   A    Yes, ma'am.

21   Q    All right.

22        You are certainly not trained in statistical

23   analysis, right?

24   A    No, I am not.

25   Q    No further questions.

1          THE COURT:  Thank you.  Redirect?

2                        REDIRECT EXAMINATION

3    BY MR. GIBBONS:

4    Q    The data values that you were looking for, is that

5    really a replication of what the Government raised in

6    its Daubert motion filed April 8 of 2022?

7    A    It is.

8    Q    Nothing further, Your Honor.

9          THE COURT:  All right.

10         Well, thank you for coming, sir.  I appreciate it.

11   Have a good rest of the day.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  Thank you.  Good to see you.

14                   (Witness stood aside)

15         THE COURT:  All right.  Does the Government rest?

16         MR. SIEBERT:  Yes, Your Honor.

17         THE COURT:  All right.

18         Now, the Government rests as to their part of

19   things.  We still have the potential other evidence.

20         MR. GIBBONS:  Yes, sir.

21         THE COURT:  They will be able to put on Dr. Chiles

22   if they deem it necessary.

23         MR. GIBBONS:  Yes, Your Honor.

24         THE COURT:  Now, do you have a rebuttal witness?

25         MS KOENIG:  I do, Your Honor.

1          THE COURT:  All right.  Let's hear your rebuttal

2     witness.

3          MS KOENIG:  I call Dr. Coston to the stand.

4          THE COURT:  All right.  Let's take a break before

5     we do Dr. Coston.  We are starting something new.

6                    (A recess was taken)

7                        ELI COSTON

8      RESUMED AND STAND AND TESTIFIED FURTHER AS FOLLOWS:

9                    DIRECT EXAMINATION

10    BY MS KOENIG:

11    Q    Doctor, I want to talk to you about two points.

12         So, we just heard you were in the courtroom when

13    Agent Valot testified?

14    A    Yes.

15    Q    You had reviewed Government's exhibit five, which

16    is the Government's exhibit that was believed to be

17    duplicate entries, right?

18    A    Yes, correct.

19    Q    Did you review that between last night and this

20    morning?

21    A    Yes.

22    Q    Is it possible that in fact they are correct that

23    there are out of these numbers 142 individual stops and

24    potentially 169 duplicates?

25    A    That is possible, yes.  There were two cases in

 1    which there was a different code section noted, but I

 2    wouldn't dispute their overall argument, no.

 3    Q    Okay.

 4         After receiving that data, and at some point

 5    today, did you go ahead and run all of the statistical

 6    analysis again without those 169 stops?

 7    A    Yes, I did.

 8    Q    I want to go through those with you.

 9         THE COURT:  Let me just ask, did it change the

10    result any?

11         THE WITNESS:  No, it does not change any of the

12    results.

13         THE COURT:  Any further questions?

14         MS KOENIG:  The last thing I wanted to talk about,

15    Dr. Coston, is that in our report on --

16         THE COURT:  Is that because 169 is just a

17    relatively small part of the sample?

18         THE WITNESS:  It could have impacts if there had

19    been a large difference in the racial proportionality

20    versus the rest of the sample, but that wasn't the

21    case.  Sometimes when a sample size decreases you don't

22    have enough cases to have the power to determine

23    differences, but, no, that wasn't a problem here.

24         THE COURT:  Thank you.

25    BY MS KOENIG:

1   Q    On page four of your report where it says

2   description of variables, there is a section that says

3   location.  In that paragraph you had described that you

4   had done spot checking, essentially for the corrections

5   that the intern from the Federal Public Defender had

6   done at geocodio data, right?

7   A    That is correct.

8   Q    Why did you specifically include mention of those

9   corrections in your report?

10  A    Because those were corrections that I myself had

11  done, or data cleaning that I engaged in.

12  Q    When you do a data study is it your normal

13  practice to do what you call data cleaning?

14  A    Yes, it is.

15  Q    In this case did you, how did that play out as it

16  relates to the location specifically?

17  A    So in regards to the location, again some of that

18  data was provided by an intern at the Public Defenders

19  Office, and I described how I verified that.  But I did

20  do additional data cleaning of my own.  Before I did my

21  analysis of the data you always run cross checks, you

22  know.  I also ran checks for the other variables in the

23  data set aside from geolocation data.  I also didn't

24  report that in my report because that is part of

25  typical data cleaning procedures, to look for problems

1    or issues in the data.

2    Q    When you had done this data cleaning did you

3    initially determine that there were 82 stops that fell

4    outside of the City of Richmond?

5    A    I believe it was 81 when I double checked, but

6    yes, in the report I noted 82.  But it was 81.

7    Q    After we saw Agent Valot's report -- I sent it to

8    you right?  From July 15 of 2022, this past week end,

9    did you go back and double check that?

10   A    Yes.

11   Q    You found that there were 81 stops outside of the

12   City of Richmond?

13   A    That's correct.

14   Q    That is what you testified to yesterday?

15   A    Yes.

16   Q    And the data cleaning that you did in terms of

17   manual correcting stops that happened outside of the

18   City of Richmond, did that happen before you began

19   drafting the report that you submitted in this case?

20   A    Yes.  That was prior to me finalizing my analyses

21   and that was all done in December and early January.

22   Q    Can you say with certainty it was done by at least

23   January 9 of 2020?

24   A    Yes, because that is when I submitted my initial

25   draft report.

1    Q    Why.  Right.  In reviewing Agent Valot's report

2    did we discuss this weekend, did you let defense know

3    for the first time that you had corrected more of the

4    stops in your initial data cleaning process?

5    A    Yes.

6    Q    And is that when we asked that you send us what

7    ultimately is in defendant's exhibit 14, the final

8    cleaned version of the data that you analyzed?

9    A    Yes.

10   Q    And you sent that to me, I think on Sunday

11   afternoon, July 17 of 2022?

12   A    I believe so, yes.

13   Q    Okay.  No further questions.

14        THE COURT:  All right.

15        Cross examination?

16                    CROSS EXAMINATION

17   BY MR. GIBBONS:

18   Q    Dr. Coston, these 311 potential duplicates, you

19   didn't notice these duplicates when you, before you ran

20   your analyses; is that correct?

21   A    That's correct.

22   Q    You didn't in fact do any determination or any

23   analysis of duplicates at all until this weekend.

24   A    I didn't do the analysis of duplicates.  I used

25   the Excel spreadsheet that was provided to me last

1   night.

2   Q    Didn't even look for duplicates even after the

3   Government raised the issue of over 300 duplicates on

4   April 8 of 2022?

5   A    I was not asked to do additional analysis at that

6   point in time, so, no, I did not.

7   Q    And you didn't mention on page four of the report

8   when you were talking about fixes you made to the

9   location in the data, you didn't mention that you had

10  on your own fixed at least 128 traffic stop entries

11  with regard to the location.

12  A    I didn't mention my own data cleaning, no.

13  Q    You didn't send the final data on which you relied

14  for your fillings to Ms Koenig until this weekend?

15  A    I don't believe I was asked for it prior to that

16  date.

17  Q    Nothing further, Your Honor.

18       THE COURT:  Thank you.  Follow up?

19       MS KOENIG:  Nothing else, Your Honor.

20       THE COURT:  Thank you.  You may be seated.  Thank

21  for coming back, Doctor.

22                    (Witness stood aside)

23       MS KOENIG:  And the defense has no other evidence

24  at this point, Your Honor.

25       THE COURT:  Unless we come back with Dr. Chiles.

1          MS KOENIG:  Right.  On this.

2          THE COURT:  You can't -- when we come back on this

3     you can't have anything other than Dr. Chiles, or if he

4     should die, some other.

5          MS KOENIG:  I appreciate that, Your Honor.

6          Does The Court want to set a hearing date now for

7     the next?

8          THE COURT:  Hold on a second.  All right.

9          Yes.  Well, I guess first -- what did I order

10    yesterday?

11         MS KOENIG:  Now that I am saying that.

12         THE COURT:  I told you to --

13         MS KOENIG:  Yes, we have Dr. Chiles' report.  We

14    have to provide Dr. Chiles' report to the Government by

15    August 8.

16         THE COURT:  Fourteen days.

17         MR. GIBBONS:  By August 22nd they are going to

18    respond whether or not they intend to call their own

19    expert, I believe.

20         THE COURT:  You remember.

21         MR. GIBBONS:  Yes, Your Honor.

22         MS KOENIG:  Perhaps, I guess it makes sense to set

23    a hearing once we know if the Government is going to

24    call a witness, and so we know that person's

25    availability.

1          THE COURT:  Contact chambers and we will set a
2    date after we know if the Government wants to call a
3    witness.  If they want to call a witness they have to
4    go find a witness, and I can't imagine Richmond is a --
5    they have a lot of historical interests.  I don't think
6    that should be a problem.  Then here are some questions
7    that we need to answer in this case.  And my
8    questions are couple in a couple of different areas.
9          And I guess the way I sort of thought about it for
10   myself is what if this is a mixed motive case?  That is
11   what we call it in employment law where, yes, they had
12   motive, but also a good motive.  So what if they were
13   trying to, if they had a strategy that was we will
14   fight crime.  That is certainly a legitimate interest
15   of the Government and no one would contend that that
16   was in any way improper.
17         And their strategy, what if they adopted strategic
18   measures, like assigning police here and there and that
19   sort of thing, knowing that the strategy will result in
20   the arrest or stopping or some adverse effect on a
21   disproportionate number of African-Americans, or
22   putting, to sort of put it in blunter terms, what if
23   these areas where they have identified hot spots and so
24   forth, what if the Government decided that, Richmond
25   Government, decided this is a place where we need to,

1    we need to devote our limited resources to fighting

2    crime because the people in this area deserve to have a

3    life where they can go out at night and stroll around

4    and all that sort of thing.

5        But they did that knowing that one effect of that

6    would be that many African-American people would get

7    arrested.  Does that mean -- is that the kind of bias

8    that the law forbids?  Does that in some way require

9    dismissal of the indictment?  But, you know, I think

10   you need to think about some of the things we talked

11   about here purely in hypothetical terms, employment,

12   strategy, the effect of a grat deal of crime.

13       That is one question that needs to be answered.

14       The second question that needs to be answered is

15   let's assume for a second that there is a pattern of

16   bias on behalf of the Richmond Police Department.  What

17   effect does that have on this case where you had -- I

18   remember the motion to suppress evidence in this case.

19   Correct me if I am wrong on this, but as I recall,

20   Mr. Moore was driving a car with one of these fake

21   dealer tags on it.  And as the police had stopped

22   several people on it, and had figured out that somebody

23   was making some money selling fake dealer tags, or

24   maybe the dealer was stealing cars -- you know, using

25   the same tag instead of buying new ones, I don't know.

1    But there was something wrong with the tag.

2        So we had evidence that they stopped a couple

3    other people and said, hey, these tags aren't any good,

4    you need to get some real tags for your car.  And then

5    they sent these people on their way.

6        But with Mr. Moore, as I recall, it was a little

7    different.  Mr. Moore didn't stop when the police got

8    behind him.  He drove away a little bit, eventually got

9    out of the car, and he ran down the road and eventually

10   he was caught by the police officers and brought back.

11       And then there were statements that he made to the

12   police at various times.  Okay.  So let's assume for a

13   second that Mr. Moore -- that bias strategy that the

14   City had resulted in Mr. Moore getting stopped.  Does

15   that mean we have to throw out the evidence in this

16   case?  That is really the question.  Well, not that we

17   have to throw out the evidence, does that mean we have

18   to throw out the case when you have somebody who does

19   this kind of stuff that sort of makes people, that

20   makes him a target for police activity?

21       And then we also need to ultimately address the

22   suppression issue.  As I recall, correct me if I am

23   wrong, Mr. Seibert, that issue was fully briefed,

24   wasn't it?

25       MR. SIEBERT:  I believe fully briefed and argued

1    with Mr. Elliker.

2        THE COURT:   This case has had a number of -- one

3    of the things this case has had more of than

4    prosecutors is law clerks.   Okay.   So we need to -- I

5    will need to address that at some point.   But I don't

6    think we need further briefing on the suppression

7    issue.

8        Okay.

9        All right.   So let me know what you decide to do

10   about Dr. Chiles' testimony.   And I urge the defendant

11   to think carefully about whether Dr. Chiles adds

12   anything to the evidence in this case.   Remembering

13   that the Richmond that existed a hundred years ago is a

14   different place than it is now.   You know, now it is an

15   area that has an African-American major, and one time

16   had a majority African-American City Council, and

17   African-American police officers, police chief.   So you

18   need to sort of think about how far along -- how long

19   the City has to suffer because of a racist past?   It is

20   clear that Richmond had a racist past.   And the

21   question is about the impact.   Think carefully about

22   that.

23       MR. SIEBERT:   I think the argument for the motion

24   to exclude the defense expert, Dr. Coston, could be

25   done at the later date as well.

1        THE COURT:  Do that in your brief in this case.

2    Okay?  I have read your brief.  Do you have anything to

3    add what is in there?

4        MR. GIBBONS:  Not really, Your Honor.

5        THE COURT:  Well, I will think about that.

6        I will let you will know whether I think I need

7    additional briefing.

8        I have spent a lot of time reading those briefs.

9    It is a Daubert issue.  Obviously if I exclude

10   Dr. Coston's testimony it pretty much shoots the

11   defense's claim in this case.  All right.  Anything

12   else, counsel?

13       MR. GIBBONS:  None from the United States.

14       MS KOENIG:  Not from defense.

15       THE COURT:  Thank you all very much.  We will

16   recess court for the day, or adjourn.  We are

17   adjourning court.  Thank you.

18                    HEARING ADJOURNED.

19       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

20                GILBERT FRANK HALASZ, RMR

21                 Official Court Reporter

22

23

24

25

1

2   Smith - direct                         163    25
    Smith - cross                          226    18
3   Smith - redirect                       257    21
    Turner - direct                        260    24
4   Turner - cross                         274    24
    Turner - redirect                      281    11
5   McDonough - direct                     284     5
    McDonough - cross                      311    14
6   Valot - Cross                          331    23
    Valot - redirect                       334     1
7   Coston - direct                        335     8
    Coston - cross                         339    17
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25