# Report to the Eastern District Court of Virginia

**Introduction to Report:**
Using newspaper accounts, court cases, archival collections, and peer-reviewed articles and monographs, this report makes the historical finding that in Richmond, Virginia, racial segregation has been systemically implemented to the detriment of black residents through public policy at the federal, state, and local levels. Byproducts of this are the separation of black and white people into distinct legal castes; unequal treatment under law inflicted upon black people; residential segregation of whites and blacks; endurance of systemic poverty among blacks; and historical animus between black residents and local law enforcement (Richmond Police Department—RPD). This report has been completed at the request of Judge John A. Gibney, Senior United States District Judge presiding over the *United States v. Keith Rodney Moore* case.

**Racial Segregation and Public Policy, 1865-Present:**

Founded in 1737 by businessman and slave owner William Byrd II, the City of Richmond was a commercial outpost for the Virginia Colony's black slave market. Between the 1660s and 1737, the Virginia Colony, then governed by the House of Burgesses, passed a series of laws defining black people as a slave race—a people who were to have no rights or privileges beyond the whims of their owners. Slavery was a life sentence of forced servitude for black Virginians. The only exception to this rule were free blacks who were privately manumitted by their owners. The Virginia Colony banned slaves from owning personal property, engaging in commerce, and congregating without the supervision of whites. No such laws were inflicted upon white people as a race, poor, rich, or in-between.[1] The American Revolution (1775-1783) compelled the House of Burgesses to make Richmond Virginia's capital in 1781. While the Revolution liberated the North American colonies from British tyranny, the segregation of white and black people into distinct racial castes under law still existed in Richmond, Virginia, and most of the nation.

    The New Republic (1783-1820) and Antebellum (1820-1865) years begot the expansion of racial segregation in Richmond. During these periods, racial segregation expanded beyond the legal racialization of peoples into distinct castes (free—white and unfree—black) and breached the realm of residence. As the city's black population (slave and free) grew to almost equal the white population, the Virginia Legislature—formerly House of Burgesses—instituted newer laws by 1806 requiring free blacks to either leave the Commonwealth within 6 months of their manumission, or be subject to rules (mainly white guardianship) where the ultimate punishment was re-enslavement.[2] By 1859, the

---

[1] William Waller Hening, ed., *The Statutes at large; Being a Collection of All the Laws of Virginia*, (Richmond, VA, 1810), 1-281; A. Leon Higginbotham, Jr., "Virginia Led the Way in Legal Oppression," *Washington Post*, May 21, 1978, https://www.washingtonpost.com/archive/opinions/1978/05/21/virginia-led-the-way-in-legal-oppression/664bcdf4-8aaf-475f-8ea7-eb597aee7ecd/; and Marie Tyler-McGraw, *At The Falls: Richmond, Virginia, and Its People*, (Chapel Hill: University of North Carolina Press, 1994), 38.

[2] Midori Takagi, *Rearing Wolves to Our Own Destruction: Slavery in Richmond, Virginia*, 1782-1865, (Charlottesville, VA: University of Virginia Press, 1999), 19-21; Benjamin Campbell, *Richmond's Unhealed History*, (Richmond, VA: Brandywine Publishers, Inc., 2012), 101; Tyler-McGraw, *At The Fall*, 64 and 108; and Gregg D. Kimball, *American City, Southern Place: A Cultural History of Antebellum Richmond*, (Athens, GA: University of Georgia Press, 2000), 129.

Richmond City Council passed its own "Ordinance Concerning Negroes," barring free and enslaved blacks from consorting with one another without 'proper' white supervision.[3] These new restrictions even impacted white non-slave owners. They were sometimes brought up on insurrection charges for consorting with slaves without the permission of their master, and for dealing with free blacks outside the purview of their legal white guardians.[4] Culture was downstream of law. Working-and-middle-class whites residentially segregated themselves from blacks by clustering in Union Hill and Fulton Hill in the East End, Oregon Hill in the Near West End, and Navy Hill just north of downtown. These whites used not-so-subtle tactics to keep upwardly mobile free blacks from moving near them, thus blacks congregated in the decrepit northern city limits of Jackson Ward and the backwater Shockoe Creek area of downtown.[5] By 1865, the legal division of people into racial castes evolved into a newer custom of racial segregation by residence.[6]

Between 1865 and 1930, white Richmond leadership (public and private) worked diligently to maintain residential segregation by race through newer laws that circumvented the legal changes brought about by Congressional Reconstruction (1865-1877). The Confederate defeat on April 9, 1865; Richmond's subsequent territorial expansion between 1867-1914; and the city not having any laws prohibiting blacks and whites from living near one another generated white desires to maintain existing residential segregated housing patterns through law, and not just custom.[7] Blacks who tried to relocate beyond their enclaves and oppose segregated mass transit to racially identifiable areas of town between 1865 and 1900 faced resistance from white residents. This white resistance compelled the city council and Virginia Legislature to legally segregate city transportation in 1906 and housing in 1911 and 1929.[8]

Residential and transportation segregation worked in tandem to help maintain the "racial integrity" of Richmond's black and white areas. When the Virginia Legislature considered forcibly segregating mass transit as early as 1901, the Virginia Passenger and Power Company (VPPC)—Richmond's streetcar provider since 1888—resisted, arguing that such laws would require the purchase of newer streetcars and laying of newer rail lines that served both races on separate sides of town. But that was the point. The Virginia Legislature's insistence on segregating transit services was a response to pressure from aspiring New South race-baiting white politicians, such as Richmond's John E. Epps, who entered electoral politics on the promise to help make Richmond a fully segregated city. VPPC segregated its services in 1904, and the state required it of all urban areas two years later. Segregated transit helped solidify segregated housing, as white streetcars served the

---

[3] Tyler-McGraw, *At The Falls,* 131.
[4] Takagi, *Rearing Wolves to Our Own Destruction*, 67.
[5] Tyler-McGraw, *At The Falls*, 114-5.
[6] Takagi, *Rearing Wolves to Our Own Destruction,* 38-9 and 96.
[7] Campbell, *Richmond's Unhealed History*, 142 and 167; and Christopher Silver, *Twentieth-Century Richmond: Planning, Politics, and Race*, (Knoxville, TN: University of Tennessee Press, 1984), 28.
[8] Marvin Chiles, "Down Where the South Begins: Black Richmond Activism before the Modern Civil Rights Movement, 1899-1930, *Journal of African American History*, Vol. 105, No.1, (Winter 2020): 66-82; T. B. Benson, "Segregation Ordinances," *Virginia Law Register*, New Series, Vol. 1, No. 5 (September 1915): 330-56; "Municipal Segregation Ordinances," *Virginia Law Review*, Vol. 3, No. 4 (January 1916): 304-9; and Benjamin Campbell, *Richmond's Unhealed History*, 143.

burgeoning white suburban frontier in the West End and Northside, while black streetcars served black neighborhoods around the downtown area.[9]

Legal activism made Richmond's residential segregation code legally untenable. Black Richmond attorney Joseph Roland Pollard, white attorney Alfred E. Cohen, along with funding from *Richmond Planet* Editor John Mitchell, Jr.,[10] and the National Association for the Advancement of Colored People in New York fueled two separate legal attacks against Richmond's segregated housing ordinance—*Hopkins v. Richmond* (1915) and *Deans v. Richmond* (1929). The latter resulted in local and federal court victories that ended Richmond's segregated housing ordinance after city officials insisted on keeping it after losing in the circuit courts in winter 1929.[11] This decision, along with cases throughout the nation—*Buchanan v. Warley* (1917), *Harmon v. Tyler* (1927), *Hurd v. Dodge* (1948), and *Shelley v. Kraemer* (1948)—combined to make residential segregation (via private restrictive covenants or government legislation) a violation of the Fourteenth Amendment, which protects individuals' rights to use their property (through use and sale) as they see fit. This did not, however, end racially segregated housing in Richmond or anywhere else for that matter.[12]

Richmond's real estate community (realtors and mortgage lenders) along with policymakers colluded to maintain racially segregated housing between the Great Depression (1929-1938) and post-World War II era (1945-1970). They did this by enacting what scholar Christopher Silver later detailed as the "Greater Richmond" form of city planning. Relying on the public-private partnership of industry and city government, the plan involved local white elites controlling Richmond real estate through creating and buttressing racially identifiable, class-defined enclaves throughout the city using federal public housing funds for the black poor and private enterprise for middle-and-upper-class black housing.[13] The intended result was to remove blacks in aggregate from the central city to make room for industry and upper-class white residency, as annexations between 1914-1942 shifted black neighborhoods, once located along Richmond's periphery, to the city's core.

This began in 1933, when the Richmond Chamber of Commerce, with support from the Richmond Real Estate Exchange, secured federal funds to begin building segregated public housing for blacks outside of the city's core.[14] This, along with the subsequent creation of a local housing authority in 1939, led to the construction of the all-black Gilpin Court in 1941, Hillside Court in 1952, Whitcomb and Fairfield Courts in 1958, and Mosby Court in 1962.[15] Adjacent to these developments were slumlords (representing the private

---

[9] August Meier and Elliott Rudwick, "Negro Boycotts of Segregated Streetcars in Virginia, 1904-1907," *Virginia Magazine of History and Biography*, Vol. 81, No. 4 (Oct., 1973), 479-487; Blair L.M. Kelley, *Right to Ride: Streetcar Boycotts and African American Citizenship in the Era of Plessy v. Ferguson*, (Chapel Hill: University of North Carolina Press, 2010), 117-64;
[10] The *Richmond Planet* was a black owned newspaper.
[11] Chiles, "Down Where the South Begins," 73-5; *Hopkins v. City of Richmond* 86 S. E. (1915) 139; and *City of Richmond v. Deans*, 37 F.2d 712 (4th Cir. 1930).
[12] *Buchanan v. Warley*, 245 US 60 38 S. Ct. 16 L. Ed (1917) 70–82; *Harmon v. Tyler*, 273 US 668, 47 S. Ct. 471, 71 L. Ed (1927), 831; "Unconstitutionality of Segregation Ordinances," *Yale Law Journal*, Vol. 27, No. 3. (January 1918): 393-7; *Hurd v. Hodge*, 334 U.S. 24, 68 S. Ct. 847; 92 L. Ed. 2d 1187, (1948); and Joe T. Darden, "Black Residential Segregation Since the 1948 *Shelley v. Kraemer* Decision," *Journal of Black Studies*, Vol. 25, No. 6, (July 1995): 680-91.
[13] Silver, *Twentieth-Century Richmond*, 57-156.
[14] Silver, *Twentieth-Century Richmond*, 131-41.
[15] Silver, *Twentieth-Century Richmond*, 149-54.

sector) who helped pack poor blacks who did not qualify for public housing into specific areas in the East End, Northside, and Southside. These areas remained majority black and poor until the gentrification movement in the 2010s.

Working and middle-class blacks were not spared from the Greater Richmond plan. In fact, the plan evolved because of them.

By 1945, white city leaders (private and public) subscribed to famed urban planner Harland Bartholomew's 1946 "Master Plan," which instructed city leaders across the nation to preserve the centrality of their inner cities through zoning policies.[16] A part of this "zoning" was designating where socially-mobile blacks could live. Aiding this was the creation of the Home Owners' Loan Corporation by the President Franklin D. Roosevelt administration in 1933. They classified urban neighborhoods across the country from best (A) to worst (D). Under this system, lending institutions could refuse mortgage loans to D areas. "Richmond's [D] areas were exclusively black; none housed whites." Furthermore, "neighborhoods were grade D simply because they were black," said Christopher Silver.[17] This policy was furthered by Title I and II of the Federal Housing Act of 1934, which blocked federal mortgage insurance for homes located in 'slum' regions. These 1930's housing policies incentivized local real estate barons to refuse black Richmonders mortgages and dissuade whites from living in neighborhoods near blacks, even as the city continued expanding through annexation in the 1940s.[18] In the 1950s, city leaders expanded their Greater Richmond plans further with the Main-to-the-James Development Strategy. Using federal highway funds issued through the President Dwight D. Eisenhower administration, later renewed through the President John F. Kennedy administration, city leaders cleared "slum" neighborhoods—in Richmond, code for black—through eminent domain for newer interstates, expressways, and highways to the expanding, ultra-white and affluent suburbs in Chesterfield and Henrico Counties.[19] This plan dislocated homeowning blacks from Idlewood and Carver in the Near West End and Fulton Hill in the East End.[20]

Helping to effectuate this plan was the local real estate community, who racially steered upwardly mobile blacks to the Northside and Southside, and then white Richmonders to the Chesterfield and Henrico suburbs. Long deemed by scholars as "blockbusting," white realtors convinced many middle-class white Northsiders to relocate to the crabgrass frontier. To speed up the process, they worked with black realtors to gin up interest in black home ownership in the Northside between the 1940s and 1970s. Some

---

[16] Silver, *Twentieth-Century Richmond*, 160-4.

[17] Silver, *Twentieth-Century Richmond*, 143.

[18] Campbell, *Richmond's Unhealed History*, 143-44; Silver, *Twentieth-Century Richmond*, 28; Tyler-McGraw, *At The Falls*, 113

[19] Ed Grimsley, "Downtown Virginia," 23-9, *The Commonwealth Magazine, The Magazine of Virginia*, Virginia Chamber of Commerce, Vol. XXXIV, No.5, May, 1967, James C. Wheat Papers, Virginia Museum of History and Culture, Richmond, Virginia; Richmond District," *The Virginia Road Builder*, April 26, 1965; Robert L. Horn, Executive Director to the Richmond Regional Planning Commission to the Richmond City Council, June 1, 1965, Folder 11, Mss1 W5603 b FA2, James C. Wheat Papers. and "Continuous Transportation Planning process Richmond Regional Area," Mss1 W5603b FA2, Series 1 Expressways (1 of 2), James C. Wheat Papers.

[20] Silver, *Twentieth-Century Richmond*, 213-30 and 317; "Idlewood Ave. Residents Urged To Pack City Hall" and "Marsh Leads Drive To Save Homes," *Richmond Afro-American*, November 19, 1966, 1, 2, and 18; "Marsh Questions $$ Angle," *Richmond Afro-American*, November 26, 1-2; "Idlewood Express Route is Again Criticized by Marsh," *Richmond Times-Dispatch*, November 28, 1966, 1-2; and "Mundle's Popularity Continues to Drop," *Richmond Afro-American*, December 31, 1966, 1-2.

examples involved white realtors allegedly paying black couples, or sometimes just two young well-kempt black people (male and female), to walk around in white neighborhoods to scare whites into moving. Another tactic was strategically placing ads for homes they wanted to sell to whites in white newspapers, and placing ads they wanted to sell to blacks in black newspapers. Black realtors were privy to this activity. In many cases, they helped white realtors for a slight fee. This practice was so rampant that black realtor Milton Randolph claimed in 1968 that it was undeniable that, "The Establishment [white Richmond leaders] has created controlled areas into which the Negroes are allowed to move."[21]

Racial segregation came to define the entire Richmond region by the late 1970s. Richmond's white political leadership wanted to maintain their white majority in lieu of suburban flight between the 1950s and early 1970s. Thus, the city council annexed 23 square miles, with around 45,000 white residents, from Chesterfield County on January 1, 1970. This annexation resulted from nearly two decades of failed merger attempts by Richmond to combine with Chesterfield and Henrico. In December 1970, Judge Robert Merhige enjoined the three localities into a lawsuit facing Richmond's (*Bradley v. Richmond*, 1970) refusal to integrate its public schools. Judge Merhige later ordered the three localities to form one unitary or combine public school district in 1971. Richmond white leaders desired this outcome because the courts could do for them what they could not do for themselves: merge with their ultra-white suburban neighbors through a taxpayer-funded government service. However, the Fourth Circuit Court of Appeals overturned the decision in June 1972 based on the famous Dillon Rule. Under this precedent established by John F. Dillon of Iowa in 1868, and adopted in Virginia as early as 1896, the Dillon Rule contends that local governments have only as much power as their state grants them, as they are subsidiaries of their state legislatures. Under this logic, neither Richmond nor the federal courts could force Richmond's suburban neighbors into interjurisdictional cooperation with Richmond; that power rested with the state. The subsequent U.S. Supreme Court's 4-4 tie, with Justice Lewis F. Powell abstaining, temporarily ended white Richmond leaders' hopes of a majority white and suburban metropolitan Richmond. Cementing this was the Virginia Legislature's perpetual moratorium on annexations, which is still in effect today. By the late 1970s, the Richmond areas was solidly segregated by residence.[22] With the Chesterfield and Henrico suburbs being protected from future mergers and annexations, real estate values rose, and Richmond's white real estate community helped white families relocate. Residentially, Richmond's inner city was identifiably black, working to middle class, while the suburban counties were identifiably white and middle to working class.

A combination of federal law and local activism helped curb systemic residential segregation between the 1960s and 1980s. Congress passed the Fair Housing Act of 1968 (FHA), Home Mortgage Disclosure Act of 1975 (HMDA), and Community Reinvestment

---

[21] Dr. James A. Sartain meeting with Milton Randolph, undated, Mss1S4772a, James A. Sartain Papers, Virginia Museum of History and Culture, Richmond, Virginia; and "Scare Tactics Cited In Area House Sales," *Richmond News Leader*, November 23, 1968, 9.

[22] Progress Report on Planning the Consolidation of the Richmond, Chesterfield, and Henrico School Divisions, April 7, 1972, Consolidation, 1961- 1972; "Reversal of the Richmond Busing Decision," Education Summary, June 23, 1972, 1-3, Busing 1970-1972; *Bradley v. Richmond* School Board, 834-75; CEPS Newsletter, January 1972, Box 2;"Reversal of the Richmond Busing Decision," Education Summary, June 23, 1972, Box 1, M283, Virginia Alden Crockford Papers, Virginia Commonwealth University, Richmond, Virginia.

Act of 1977 (CRA).[23] Combined, these laws prohibited the use of race to determine the financing, insuring, renting, purchase and sale of any dwelling by both private and public agencies (via FHA); outlawed racial zoning (otherwise known as redlining) by requiring federally-insured mortgage lenders—those covered under Federal Deposit Insurance Corporation and Federal Savings and Loan Insurance Corporation—to keep and make public record of every mortgage they approved (via HMDA); and required banking regulators to encourage real estate communities to invest mortgage and business loans in moderate and low-income urban areas (via CRA). Atop this triangle was the Federal Reserve System which provided the necessary forms for record, and should it be necessary, levied fines to ensure compliance.[24] Most importantly, any mortgage lender found in violation of the FHA, HMDA, and CRA were subject to fines, having their charters revoked, and being blocked from mergers with other compliant financial institutions.[25]

       Between 1978 and 1981, a grassroots organization named the Richmond Urban Institute (RUI) petitioned Congress to block the merger of Norfolk-based Virginia National Bank and First and Merchants Bank from Richmond, claiming that they flagrantly violated the FHA, HMDA, and CRA. Richmond's Federal Reserve Board heard RUI's evidence that showed that while Richmond was "about evenly divided between white and black," more than-80% of mortgage activity was in the majority white Far and Near West End and surrounding Chesterfield and Henrico suburbs. Nearly 3/4ths of Richmonders (all black) lived in areas with no mortgage activity at all. Majority black areas in the East End, Southside, and Northside had virtually no mortgage activity at all. Representatives from Richmond's Board of Realtors claimed that lenders merely met the market demands of the white middle and upper classes.[26] Yet the evidence was clear that,

---

[23] Nicholas Dragen Bloom, *Suburban Alchemy: 1960s New Towns and The Transformation of the American Dream*, (Columbus, OH: Ohio State University Press, 2001); Anny Forsyth, *Reforming Suburbia: The Planned Communities of Irvine, Columbia and the Woodlands*, (Berkley, CA: University of California Press, 2005); Ocean Howell, "The Merchant Crusaders: Eichler Homes and Fair Housing," *Pacific Historical Review*, Vol.85, No.3, (August 2016): 379-407; and "Proxmire Bill Would Require Lenders To Open Their Books on Mortgages: And Reveal Where Loans Are Made," *Washington Post*, April 26, 1975, E14.

[24] Proposed Neighborhood Assistance Act of 1979, Summary, Neighborhood Assistance Act, Box 26, M258, Richmond Urban Institute Papers; "Fed Issues Lender 'Redlining' Rules," *Washington Post*, June 2, 1976, E2; and Patricia A. McCoy, "The Home Mortgage Disclosure Act: A Synopsis and Recent Legislative History," *Journal of Real Estate Research*, Vol. 29, No. 4 (2007), 381-98.

[25] "To Stop Redlining," *New York Times*, June 14, 1976, 30; "Some Banks Accused of Ignoring U.S. Law on Mortgage Disclosure," *New York Times*, October 9, 1976, 22; "Mortgage Lenders Apply to Avoid Revealing Information on Redlining," *New York Times*, September 27, 1976, 19; "Urban Parley Acts To Halt Redlining and Blockbusting," *New York Times*, April 21, 1975, 23; "Redlining' by Lenders Is Called Cause of Old Communities' Decay," *New York Times*, May 26, 1975, 20; "Some Banks Accused of Ignoring U.S. Law on Mortgage Disclosure," *New York Times*, October 9, 1976, 22; "Washington & Business: Redlining Fight," *New York Times*, October 21, 1976, 67; "Mixed Results Seen for Loan Disclosures," *Washington Post*, March 5, 1977; and 'Redlining'--Byrne vs. Banks: 'Redlining," *New York Times*, January 28, 1978, NJ1; Rebecca F. Guy, Louis G. Pol and Randy E. Ryker, "Discrimination in Mortgage Lending: The Home Mortgage Disclosure Act," *Population Research and Policy Review* Vol. 1, No. 3, (October 1982): 283-96; "Redlining Data Is Criticized," *Atlanta Constitution*, June 18, 1976, 13D; and "S&Ls Change Lending Pattern Mortgage Lenders Putting More Cash in Once 'Redlined' Area of D.C.," *Washington Post*, October 3, 1976, 1.

[26] Missioner's Report, August 24, 1981, Co-Missioner, Benjamin Campbell Reports, 1980-1982, Box 3, M258, Richmond Urban Institute Papers; Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research Project Conducted by HOME of Richmond, Virginia, March 1980,

as RUI's comprehensive study found: "metropolitan Richmond contains two separate, distinct, and unequal sales housing markets—one for whites and another for blacks."[27] RUI's weaponization of federal law effectively ended racial steering by Richmond's real estate community by the mid-1980s.[28]

      Still, the vestiges of Richmond's history with racial segregation remains etched into the city's landscape and culture. While upwardly-mobile blacks can and have taken advantage of federal law and grassroots activism to live wherever their money can afford them, the majority of working-class and underclass blacks remain in racially homogenous enclaves in Richmond. A major reason is the skills mismatch which separates them from the growing biotech, medical, administrative, education, and managerial labor force that now dominates Richmond's middle class in ways that industrial manufacturing did decades ago. This skills mismatch is a product of segregated housing in the past. While the black middle class fled the city, beginning in the 1980s, working-and-underclass blacks remained trapped in Richmond's underperforming school district.[29] Furthermore,

---

Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Benjamin Campbell Testimony Before Representatives of the Federal Reserve Board, December 5, 1981, Federal Reserve Board, Housing Issue, 1981-1982, Box 12, M258, Richmond Urban Institute Papers.
[27] Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research project Conducted by HOME of Richmond, Virginia, March 1980, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Home's Marketing Program To Let Consumers Choose, December 1979, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Racial Steering by Real Estate Sales Agents in Metropolitan Richmond, Virginia, A Research project Conducted by HOME of Richmond, Virginia, March 1980, Housing Opportunities Made Equal, 1979-1980, Box 20, M258, Richmond Urban Institute Papers; Investment Patterns in Richmond, 1979, Published May 9, 1981, Home Mortgage Patterns in Richmond, 1979, Box 19, M258, Richmond Urban Institute Papers; Community Reinvestment Agreement, October 1, 1983, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; "Lenders Discover Advantages and New Market with Community Reinvestment Act," *Journal of Housing*, March 1980; "Community Groups and CRA: Case Studies of Action Strategies," *Neighborhood Revitalization Project*, Vol. 1, No.1, July 1980, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; and Community Reinvestment Act Statement of Community Services: Central Fidelity Bank, August 1, 1985, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers.
[28] "Average Income Necessary to Purchase an Average House in Richmond," undated chart made by RUI, Federal Reserve Board, Housing Issue, 1981-1982, Box 12, M258, Richmond Urban Institute Papers; Community Reinvestment Agreement, October 1, 1983, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers; Community Reinvestment Act Statement of Community Services: Central Fidelity Bank, August 1, 1985, Community Reinvestment Act, Box 19, M258, Richmond Urban Institute Papers.
[29] Julian Maxwell Hayter, "City Profile of Richmond, Virginia," *Thriving Cities*, University of Virginia Institute for Advanced Studies in Culture, 2015, https://static1.squarespace.com/static/5a0f45fad74cff16c9f6e45e/t/5b4fab87f950b72639899c00/1531947915667/City-Profile-Richmond.pdf; "Richmond, Virginia, Social Enterprise Feasibility Enterprise Analysis: Reducing Poverty and Building Community Wealth Through Social Enterprise," Final Report Submitted to the City of Richmond, June 2016, https://www.rva.gov/sites/default/files/2019-10/SocialEnterprise_6-16.pdf; John V. Moeser, Nina Mauney, Evelyn Jeong, and Emily Routman, "Unpacking the Census: 2017 Updates--Master Copy," Poverty in Metropolitan Richmond, Bonner Center for Civic Engagement, 2019, https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1038&context=poverty; Marvin T. Chiles, "Tough on Conduct: Punitive Leadership in Urban Public Schools, A Case Study of Angry Principal Dr. Roy A. West, 1986-1991*," Spectrum: A Journal on Black Men*, Fall 2020, Vol.8, No.1, 55-85; Genevieve Siegel-Hawley, Kendra Taylor, Kimberly Bridges, Erica Frankenberg, Andrene Castro, Shenita Williams & Sarah Haden, "School Segregation by Boundary Line in Virginia: Scope, Significance and State Policy Solutions," Center for Education and Civil Rights, November 2020, 7-10,

as Richmond continues to grow more multicultural and economically prosperous in the 21st century, racially segregated housing and its corollary effects remains an issue.

## Issues with Black Residents and Richmond Police, 1865-Present:

The Richmond Police Department (RPD) developed throughout the centuries to surveil and incarcerate black residents at the behest of white residents. Richmond police were not born in opposition to its black residents, rather the burdens of history pitted the two against one another.[30]

"Profoundly," said RPD historian Louis Cei in 1975, nothing "influenced the [Richmond Police] force's attitude and development" more than "the presence of the Negro."[31] That was not always so, as policing in Richmond began in the 1730s with Virginia's Colonial governors forcing white property holders to serve as night watch against Indian raiders and poor white thieves. In 1782, after the American Revolution, Richmond received both official city governance and a paid police force manned by white war veterans. The increased black (slave and free) population in Richmond compelled white residents to anoint RPD as the enforcement arm of white supremacy. After the failed Gabriel's Rebellion in 1800 and Nat Turner Rebellion in 1831, the Richmond city council, with help from the Virginia militia, expanded RPD from a skeleton night force to a tax-funded department who patrolled 24 hours a day.[32] Between 1800 and 1865, white residents only supported RPD funding and salary increases during panics over runaway slaves and black rebellions. Thus, blacks were the most harassed and arrested people by RPD between 1782 and 1865, most of which happened in black communities.[33] This time period is important because while RPD was not born as a racist institution per se, circumstances shaped them into an anti-black body with a strong anti-black identity. RPD officers were compelled to enforce a dual legal code, one for whites and another for blacks. Furthermore, the days of slavery revealed a crucial fact about RPD. That was, as Cei once claimed: "No matter how important crime control appeared, the true mission of the force revolved around suppressing the city's Negro population."[34]

The end of slavery only worsened the relationship between black Richmonders and RPD. With Confederate General Robert E. Lee's surrender in April 1865, white Richmonders (mainly the local white media) compelled RPD to control the new bumper crop of freed people through the passage and enforcement of vagrancy laws.[35] This, along

---

https://scholarscompass.vcu.edu/cgi/viewcontent.cgi?article=1013&context=edlp_pubs; and "Va. Education Disparities - Report: Virginia's High-Poverty Schools Don't Have Same Opportunities For Students," *Richmond Times-Dispatch*, October 31, 2017 2B.

[30] This report was done without primary source material from the Richmond Police Department. I have tried to secure information from them in the past, as recent as 2018, however I was told that they do not have archival material or collections that are available for research purposes.

[31] Louis Bernard Cei, "Law Enforcement in Richmond: A History of Police-Community Relations,"1737-1974, (PhD diss., Florida State University, 1975), 7.

[32] Tyler-McGraw, *At The Falls*, 64 and 80.

[33] Tyler-McGraw, *At The Falls,* 131.

[34] Cei, "Law Enforcement in Richmond," 2-43. Quote on p.43.

[35] *Richmond City Hustings Court Minute Book* 27, 127, (*Library of Virginia*, Richmond Virginia); Testimony of Albert Brooks, Alexander Davis, Stephen Jones, Wellington Booker, William Ferguson, and Bernard H. Roberts, Statements Relating to Abuses of Freedmen in Richmond," Records of the Assistant Commissioner for the State of Virginia Bureau of Refugees, Freedmen, and Abandoned Lands, 1865-1869, M1048, roll 59,  (*Library of Virginia*); and Testimony of Robert W. Johnson, Richard Cooper, and

with later laws stripping blacks of their Fifteenth Amendment voting rights for felony and petty larceny convictions, resulted in blacks being disproportionately arrested, publicly whipped (ended in 1881), and killed by RPD between 1865 and 1900. RPD was even accused of voter suppression, as they reportedly assaulted black men who wanted to vote in contested city elections in the 1890s.[36] Progressive Era (1890-1929) reforms on police malfeasance, as well as civilian crimes of drug distribution, alcohol consumption, and prostitution only strengthened RPD's Negrophobia, as black neighborhoods were primary targets for RPD enforcement. In fact, when RPD increased their focus on white crime, the white Richmond public openly called to defund them as retaliation.[37]

White desires for RPD to focus primarily on black people is best seen in the controversy over hiring a black police officer. In 1936, a cadre of respected black Richmond ministers called for then Mayor J. Fulmer Bright to hire black officers and assign them to black neighborhoods to ease animosity between RPD and black Richmonders.[38] "As long as I am Mayor of Richmond," Bright told the local media in response to the request, "there will be no Negroes on the police force."[39] He reasoned that whites would not support the hiring of black police because it was antithetical to everything they believed about policing in Richmond. To them, whites committed crimes, but blacks were criminals. This was the baseline understanding behind the popular support RPD received in the mid-20th century.

The post-World War II era bred more resentment between blacks and RPD. While this era saw the hiring of the city's first black policemen in 1946, RPD remained at odds with black residents, particularly in their enforcement of segregation law in opposition to protests (sit-ins) commonly attributed to the Modern Civil Rights Movement (1954-1968).[40]

---

Madison Carter, Statements Relating to Abuses of Freedmen in Richmond, Records of the Assistant Commissioner for the State of Virginia Bureau of Refugees, Freedmen, and Abandoned Lands, 1865-1869, M1048, roll 59, (*Library of Virginia*).

[36] "Jackson Ward Wholesale Robbery-Republicans Counted Out, Contest to Be Made," *Richmond Planet*, June 6, 1896, 1; "The Jackson Ward Robbery," *Richmond Planet*, May 26, 1900, 1; "The Election Today, Chairman Ellyson Says The Usual Democratic Victory," *Richmond Dispatch*, May 24, 1900, 1; "Jackson Ward Cases to be Reviewed," *Richmond Planet*, June 2, 1900, 1; "The Question of Jurisdiction,'
*Richmond Planet,* June 9, 1900, 1; "Judge Witt Takes His Time," *Richmond Planet*, June 16, 1900, 1; "To The Supreme Court, Mr. Royall Will Apply," *Richmond Planet*, June 26, 1900, 1; and "The Jackson Ward Cases," *Richmond Planet*, June 30, 1900, 1.

[37] Cei, "Law Enforcement in Richmond," 64-93, 138-248.

[38] "Richmond Crime Parley," *Richmond Times-Dispatch*, September 29, 1936, 4; and "City Pastors Seek Negro Policemen," *Richmond Times-Dispatch*, October 13, 1936, 1

[39] Quote in "Bright Firm in Opposing Negro Police," *Richmond Times-Dispatch*, October 15, 1936, 1; and "Richmond's Most Obstinate Man," *Richmond Magazine*, August 5, 2016, https://richmondmagazine.com/news/richmond-history/richmonds-most-obstinate-man/.

[40] Marvin T. Chiles, "A Period of Misunderstanding: Reforming Jim Crow in Richmond, Virginia, 1930-1954," Virginia Historical Society: *Virginia Magazine of History and Biography*, Vol. 129, No.3, (Fall 2021): 244-78; "Plan Appeal on Jim Crow Fines," *Richmond Afro-American*, March 6, 1943, 3; "Supreme Court to Review Va. Bus Segregation Case," *Richmond Afro-American*, January 26, 1946, 1, 21; "Trailways Bus Company Denied Right to Seat Passengers in Violation of Law," *Richmond Afro-American*, January, 25, 1947, 1, 4; "Who Is Now Defying The Law," *Richmond Times-Dispatch*, February 24, 1960, 14; "Store Is Picketed; Negroes Ask Boycott," *Richmond Times-Dispatch*, February 25, 1960, 1 and 3; "Negroes to Spread Boycott," *Richmond Times-Dispatch*, February 25, 1 and 4; "Anti-Trespass Laws Signed to Meet Sit-Down Protests," *Richmond Times-Dispatch*, February 26, 1960, 1; "Whites, Negroes Confer on Protests," *Richmond Times-Dispatch*, February 27, 1960, 2; "Judge Says 'This Is No Race Issue,' *Richmond Afro-American*, March 12, 1960, 1; "Va. U. Students to Appeal Fines," *Richmond Afro-American*, March 12, 1960,

Black Richmonders became more assertive in their demands for equal treatment from RPD in the 1960s, given the national criminal justice reforms created by U.S. Supreme Court decisions. *Gideon v. Wainwright* (1963) required states to provide the accused with legal counsel while being indicted.[41] The following year, *Escobedo v. Illinois* (1964) ensured that police suspects had the right to legal counsel during interrogations.[42] *Miranda v. Arizona* (1966) completed this trinity, as law enforcement were to remind suspects of their Fifth Amendment rights to recuse themselves from self-incrimination.[43]

With police tactics now under a national microscope, black Richmonders, undoubtedly inspired by the above and the on-going civil rights movement, led a call for a Police Review Board in summer 1966. As shaped by the Richmond NAACP, Urban League, Gilpin Court Civic Association, Creighton Court Civic Group, and others, the Police Review Board would have been a 9-member body (4 police officers chosen by the police chief and 5 citizens appointed by the city council) who would field, archive, and investigate complaints of police brutality. After that, they would recommend resolutions with the complainant or punishment for the accused officer. This was not an extraneous request, as police review boards had been in place in cities such as Minneapolis, Minnesota; Philadelphia, Pennsylvania; and New York City since the late 1950s, making it, at the time, a policy of common sense reform designed to instill and solidify public trust in police.

RPD leadership, the majority white city council, and the City Attorney's Office "unequivocally opposed" the board, citing that it would lower officer morale. Many black activists felt, however, that the board was rejected because it promised the "underprivileged" with oversight powers to correct the historic injustice inflicted upon them by RPD.[44] To be clear: RPD opposed this proposal in light of black leadership asking for better policing. "Negroes [in Richmond] want more police protection, not more police brutality," said John M. Brooks of the Richmond NAACP after RPD and elected officials in City Hall denied the proposal. RPD leadership reasoned that their opposition to the review board was grounded in empirical data, as between 1960 and 1966, they logged just 121 complaints after 322,000 arrests, with most of the complaints being from whites. Black leaders felt that this statistic reflected black fear of retaliation for reporting police brutality, as the local NAACP and other organizations fielded the complaints that would have become a part of the public record with the Police Review Board.[45]

RPD's refusal to support citizen oversight strengthened its anti-black identity, creating a divide that not even black political leadership could avoid between the 1970s and 1990s. In lieu of the failed Police Review Board movement of 1966, the mostly white city council militarized RPD—with the purchase of anti-riot weapons and training—in anticipation that the riots that engulfed other majority-black cities would touch down in

---

19; "Students Fined $20 Each," *Richmond Afro-American*, March 19, 1960, 1 and 16; "Sit-In Case Conviction Is Upheld," *Richmond Times-Dispatch*, April 25, 1961, 1 and 3; and "34 Students in Sit-Ins Plan Appeal," *Richmond Times-Dispatch*, April 26, 1961, 8.

[41] *Gideon v. Wainwright*, 372 US 335 (1963).
[42] *Escobedo v. Illinois,* 378 US 478 (1964).
[43] *Miranda v. Arizona,* 384 US 436 (1966).
[44] Quotes "Police Group Opposes Review Unit," *Richmond Times-Dispatch*, July 12, 1966, 2; and "City Attorney's Office Calls Police Review Board Illegal," *Richmond Times-Dispatch*, September 21, 1966, 2.
[45] "Council Kills Police Review Board Bill," *Richmond Times-Dispatch*, September 27, 1966, 1-2; and Cei, "Law Enforcement in Richmond," 37, 55-6, 132.

Richmond.[46] By the late 1970s and early 1980s, Richmond's political leadership was mostly black, and RPD had more black officers than ever before. Yet, as was said by a black police captain about RPD culture in the late 1980s: "We have a black mayor, a black city manager, a black assistant city manager, and many high ranking black public officials, yet it seems very little has changed."[47]

Between 1977 and 1990, city leadership and business leadership (mostly white) engaged in expansive downtown revitalization plans (Project One and Sixth Street Marketplace) to attract white suburban residents and out-of-town industry to Richmond.[48] This plan, however, relied heavily on explicit calls from city businessmen for RPD to increase their policing of black neighborhoods.[49] Delivering on this request were black city managers Emmanuel Deese, and later Robert C. Bobb in the mid-1980s. Richmond's "war on drugs" led to the first ever Narcotics Division created in 1984, the Select Neighborhood Action Patrol Division created in 1986, and the Drugs and Firearms Strike Force created in 1987. These divisions within RPD worked with the Richmond Redevelopment and Housing Authority to enact plans such as Operation Hot Spot, in which dozens of RPD officers exclusively patrolled, as was said in a *Richmond Times-Dispatch* editorial, "high-density, low-income areas—notably housing projects—that have been breeding grounds for crime."[50] With plans to repopulate the city with monied whites

---

[46] The Kiplinger Washington Letter, Circulated Privately to Businessmen, August 4, 1967, Mss1 W5603b FA2, Series 1, Racial Problems (1 of 2), 40, James C. Wheat, Jr., Papers; Council Crime Report, Conducted by Councilman Phil J. Bagley, B.A. Cephas, and Mayor Morrill M. Crowe, January 21, 1968, Mss1 W5603b FA2, Series 1, Racial Problems (1 of 2), 40, James C. Wheat, Jr., Papers; Frank R. Barnett, president of the National Strategy Information Center, Inc., to Mr. J.C. Wheat, Jr., J.C. Wheat and Co., Inc., February 21, 1968, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41; "The Negro Veteran, Urban Stability and The National Purpose," National Strategy Information Center Third Draft, February 14, 1968, 1, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41; "Urban Coalition Formed to Meet Crisis in Cities," United States Municipal News, Vol. 34, No.16, August 15, 1967, Mss1 W5603b FA2, Series 1, Racial Problems (2 of 2), 41; Director of Public Safety to City Manager, December 14, 1964, Folder 22, Mss1 W5603 b FA2, James C. Wheat, Jr., Papers; Meeting of School-Community Coordinators, April 16, 1968, Mss1S4772a, James A Sartain Papers; Cei, "Law Enforcement in Richmond," 235-48

[47] "Subtle Racism is Practiced in Richmond Force, Cop Claims," *Richmond Afro-American*, October 3, 1987.

[48] Marvin T. Chiles, "Here We Go Again: Race and Redevelopment in Downtown Richmond, 1977-Present" *Journal of Urban History*, https://journals.sagepub.com/doi/abs/10.1177/0096144221992374.

[49] Jackson Ward, Summary Tape File 3G, The Neighborhood Revitalization Division of the Department of Planning and Community Development, City of Richmond Neighborhood Statistics, November 1985, Box 5, M303, Richmond Renaissance Papers; For more on crime and perceptions of crime in Jackson Ward, see Table 1, Reported Offenses: 1976-1980, Second Street Study Area Richmond, Virginia, 1980, Economic and Market Analysis, 1-10; and A Commercial Revitalization Plan for the Second Street Commercial Area, 3-7, 2nd Street Commercial Revitalization, 1981, Box 4, M303, Richmond Renaissance Papers; Economic and Market Analysis: Second Street Commercial Revitalization Study, Richmond, Virginia, by John E. Scott and Associates, January 19, 1981, 2nd Street Commercial Revitalization, 1981, Box 4 and 5, M303, Richmond Renaissance Papers; Clarence L. Townes to Mr. Jeff Nowakowski, November 13, 1984, Media-Negative TV Reporting, 1984, Box 13, M303, Richmond Renaissance Papers; and "Candidates Blame News Media For Downtown's Image Problem," *Richmond Times-Dispatch*, April 5, 1990, 27.

[50] "Police Forming Narcotics Division," *Richmond Times-Dispatch*, February 18, 1984, B1; "Police Help Bobb Explain Concept of Overstaffing," *Richmond Times-Dispatch*, August 12, 1986; and Quote "SNAP! BAM! BOBB!" *Richmond Times-Dispatch*, August 15, 1986, 10; "Drug Dealer, Beware! City Declares 'War,' Expanding SNAP," *Richmond Afro-American*, December 17, 1988, 1; and "Drug War: Bobb Plans All-Out Fight," *Richmond Afro-American*, April 8, 1989; "Crackdown Promising, Police Say," *Richmond Times-Dispatch*, December 17, 1990, B-1.

in lieu of the suburban sprawl of the post-World War II period, the new police strategy, as dictated by black political leaders, ensured that "it will not take long for the neighborhoods to recognize the increased police presence and the more aggressive enforcement" in the city's blackest areas.[51] Increased policing of historically black and poor areas was often celebrated and encouraged by the white and black media, as well as by black and white Richmond leadership as a sign of progress. This late 20th century development was tied directly to RPD history of being sic'd on black people, as Richmonders, both new and old, long understood this to be their primary function above all else. This did not change with the appointment of Marty Tapscott to be the first black RPD chief in city history in 1989, or the increased number of black policemen along with him.[52]

**Conclusion**

Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD. This report seeks not to indict every white Richmonder, or RPD officer, as racist or bigoted. Rather, it argues that current issues with residential segregation and RPD-black animus exist within a historical ecosystem shaped by people and interests of a bygone era. Furthermore, to understand and find common ground in the present requires adherence to the knowable past.

---

[51] "City Manager Advocates SNAP To Reduce Crime in Richmond," *Richmond Afro-American*, August 16, 1986, 1.

[52] "Richmond Gets First Black Police Chief," *Richmond Afro-American*, June 8, 1989, 1; and "More Blacks Needed on Police Force," *Richmond Afro-American*, March 5, 1988, 1.