**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 3:21-cr-42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES' RENEWED MOTION TO EXCLUDE DEFENSE EXPERT**

The United States of America respectfully renews its Motion to Exclude Defense Expert Dr. Marvin Chiles. Dr. Chiles' expert testimony about the history of Richmond is inadmissible under Federal Rule of Evidence 702 because it will not help the Court understand the relevant evidence or determine a fact at issue, nor is his opinion supported by the evidence he cites. Because Dr. Chiles' testimony is inadmissible under Rule 702, the Court should exclude his testimony without an additional hearing.

**I.  PROCEDURAL BACKGROUND**

The prior procedural history is thoroughly explained in the first motion to exclude Dr. Chiles. ECF 82. Since the filing of the first motion, the Court concluded that the defendant's initial expert disclosure did not meet the requirements of Fed. R. Crim. Pro. 16, and instructed the defendant to file a new disclosure by August 8, 2022. ECF 99. The defendant's updated expert disclosure, ECF 102-1, claims that Dr. Chiles will express two categories of opinions: those related to residential segregation, and those related to tensions between black residents and the Richmond Police Department (RPD). In both cases, Dr. Chiles begins in the 1700s, chronicles his view of Richmond's history, and ends in the mid-1980s.

In response, the United States renews its motion to exclude.

## II. LEGAL AUTHORITY

Federal Rule of Evidence 702, which sets forth the requirements for an expert to testify, allows the introduction of expert testimony if, in relevant part, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a); *see also U.S. v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (outlining the elements of Rule 702 and citing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

## III. ARGUMENT

### A. The Proffered Testimony is of "Little Probative Value"

The defendant is still attempting to satisfy his heavy burden of proving discriminatory effect and purpose—or "clear and intentional discrimination" by "clear evidence"[1]—by claiming that Richmond's distant political history is relevant to a traffic stop based on a fake temporary tag in 2020. The defendant was born in 1987, and there is nothing in Dr. Chiles' report that occurred in his lifetime. As the Court repeatedly stated during July 2022 evidentiary hearing, Richmond is simply a different place than it used to be, and long-ago wrongs do not indicate present-day racism by the officers who seized and searched the defendant in this case. Indeed, the Supreme Court has stated, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent."

---

[1] *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016); *United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014).

*McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Based on this precedent, the Fourth Circuit disallowed an attempt to prove racist intent in 1988 with facts from the Civil War, the 1880s, and the 1960s. *Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998) (unpublished).[2] If a gap from the 1960s to 1988 was insurmountable in *Watkins*, so too should the gap from the mid-1980s to 2020 demonstrate the insufficiency of Dr. Chiles' proposed testimony.

Another significant problem with Dr. Chiles' testimony is that much of the attributed racism is not due to Richmond city officials or RPD. For example, a close reading of Dr. Chiles' report reveals that the residential discrimination was significantly driven by private parties, including realtors and mortgage lenders, and Dr. Chiles is often ambiguous as to who performed discriminatory actions. In a case exclusively about alleged prejudice of Richmond police in 2020, the fact that a non-governmental official, at sometime, acted prejudicially does nothing to help the defendant meet his burden of proving that he was stopped "because of, not merely in spite of," his race, *Wayte v. United States,* 470 U.S. 598, 610 (1985) (cleaned up), especially after officers had already seen the same fake vehicle tag for the third time on the same shift.

Dr. Chiles also does nothing to account for any changes that have happened since the mid-1980s. Bygone topics like white flight and annexation receive extensive treatment, but more recent topics like whites returning to Richmond in the last 15 years garner barely a mention. This last point is significant because the defendant has long claimed that RPD created its police precincts in 1977 with "[t]hree of those precincts correspond[ing] to the nearly entirely black neighborhoods of Richmond," ECF 66 at 6, and that "the Richmond Police Department [is] effectively patrolling

---

[2] ("Watkins also proffers historical evidence for the proposition that juries in Danville act with racist intent. Among the facts cited by Watkins was that Danville was the capital of the Confederacy in the waning days of the Civil War, that many black citizens were assaulted in an effort by the Democrat Party to defeat the Readjuster-Republican coalition in the 1883 election, and that civil rights activists suffered at the hands of local officials in the 1960s. This history cannot support a challenge to a 1988 jury: 'unless historical evidence is reasonably contemporaneous with a challenged decision, it has little probative value.' *McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20 (1987).")

the boundaries of the white neighborhoods." *Id.* at 9. But the demographics and racial distribution of Richmond have changed so much since 1977, coincidentally the same year when African Americans achieved a majority on the City Council and the first black mayor began service,[3] that if the police were doing what the defendant claims they would constantly be altering precinct boundaries to track the latest movements of minorities. This is absurd. But Dr. Chiles' intentional omission of any recent history is telling. His omission supports that he could identify no evidence of recent RPD prejudice or that what evidence he could identify disproves the argument he is attempting to press with the Court. Each alternative is detrimental to the defendant's claim as he bears the heavy burden under *Armstrong* to prove an equal protection violation, and, of course, the further in the past Dr. Chiles' evidence is, the less relevant and probative it is. *McCleskey*, 481 U.S. at 298 n.20 ("unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value").

> B. Dr. Chiles' Conclusions are Not Well Supported and Fail to Even Consider Alternative Explanations

Even if the Court were to deem Dr. Chiles' decades-old historical support as "reasonably contemporaneous," his testimony would still fail under Rule 702 because his sources do not match his rhetoric and he wrongly ascribes all police enforcement to racism.

Very little of Dr. Chiles' proposed testimony post-dates 1977 and is thus not reflective of the new Richmond that is "seeking to end its complicity with American racism." Marvin T. Chiles, "Here We Go Again: Race and Redevelopment in Downtown Richmond, 1977-Present" Journal of Urban History (ECF 86-5 at 1). What little of his report that addresses events that occurred during or close to the defendant's lifetime is unsupported by the sources on which Dr. Chiles relies.

---

[3] ECF 102-1, Expert Report of Dr. Chiles ("By the late 1970s and early 1980s, Richmond's political leadership was mostly black, and RPD had more black officers than ever before.")

Moreover, although courts of appeals have not prohibited historians as experts, a historian still needs to rely on reliable methods and cannot reasonably purport to opine about the motivations of countless people, perform end run around the rules of evidence for proving facts about past events, and then use broad generalizations about the past to impugn the motives of officers whose conduct the expert has not even examined. "We have no doubt that a historian's 'specialized knowledge' could potentially aid a trier of fact in some cases," but "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events. And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135–36 (2d Cir. 2013).

To understand the import of this, it is helpful to appreciate the logical structure of Dr. Chiles' argument. To bridge the massive gap between the racism and prejudice of 50+ years ago to today, Dr. Chiles uses the example of downtown revitalization plans and supposed accompanying "explicit calls from city businessmen for RPD to increase their policing of black neighborhoods." ECF 102-1 at 11. He then argues that African American city leaders increased their policing of black neighborhoods around the same time as part of the "war on drugs" and as part of their "plans to repopulate the city with monied whites." *Id.* at 11-12. Thus, he claims, criminal enforcement in or around black neighborhoods "was tied directly to RPD history of being sic'd on black people, as Richmonders, both new and old, long understood this to be their primary function above all else." *Id.* at 12.

Dr. Chiles' evidence fails to support his accusations that Richmonders understood RPD's "primary function above all else" to be "sic'd on black people," that black political leaders had "plans to repopulate the city with monied whites," or that the alleged increased enforcement in the

5

1980s was in response to racist calls to rein in African Americans so that downtown revitalization projects could move forward.

Indeed, what few supporting citations Dr. Chiles includes are often wrong or misleading. For example, Dr. Chiles places great emphasis on the supposed "explicit calls from city businessmen for RPD to increase their policing of black neighborhoods" that black city leaders "deliver[ed] on." *Id.* at 11. When counsel for the United States spent several hours unearthing the supporting documents for this audacious claim from VCU Special Collections, the citation turned out to be nothing more than census statistics detailing residents' education, income, and method of heating their house. *See* Jackson Ward, Summary Tape File 3G, The Neighborhood Revitalization Division of the Department of Planning and Community Development, City of Richmond Neighborhood Statistics, November 1985, Box 5, M303, Richmond Renaissance Papers, as cited in ECF 102-1 at 11 n.49 (attached as Exhibit A). Dr. Chiles may attempt to claim this as a simple citation error, but it forms an unfortunate pattern of the defense experts claiming far more than the data support, and this alone casts substantial doubt on the viability of the defendant's historical expert. With or without supporting evidence for this claim, Dr. Chiles' testimony falls squarely within the Supreme Court's clear statement that expert testimony is inadmissible when "there is simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146.

Dr. Chiles' complete failure to consider other explanations, similar to Dr. Coston's failure to do so, further exemplifies the wide chasm between evidence and his opinion. While Dr. Chiles appears to attribute all enforcement of the law in black neighborhoods to racism reaching back centuries, another far more plausible explanation is that criminal activity is unfortunately disproportionately concentrated in Richmond's minority neighborhoods and RPD is attempting to

provide the crime protection that all Richmonders deserve with limited resources and officers.

As evidence that criminal activity is disproportionately occurring in the first, second, and fourth precincts—the precincts the defendant has repeatedly stated are primarily comprised of African Americans, the United States presents the locations of Richmond city murders, both since 1999 when crime data is first consistently available for Richmond and over the last several years.[4]



These data on murders are particularly instructive because homicides bear undeniable physical evidence that a crime was committed, and thus are both less likely to be biased and

---

[4] The short time constraints prohibited any expert analysis and/or mapping, but these public maps are published by LexisNexis, and are available at https://communitycrimemap.com/map. The data were filtered to show only homicides and manslaughters, the density map option was selected, and RPD's police precincts were overlaid. The date range for the first map is January 1, 1999 to August 16, 2022, the former of which is the first year for which crime data is consistently available from RPD. Richmond Police Department, Crime Incident Information Center, apps.richmondgov.com/applications/CrimeInfo. The date range for the second is January 1, 2018 to August 16, 2022. The data are reliable in that they closely correspond to the data that RPD itself publishes. For example, the LexisNexis site contains a record of 302 homicides for 2018 to the present, while the RPD crime data website shows 300. This minor discrepancy could be due to murders that occur within Richmond but are not within RPD's jurisdiction, such as murder investigations handled by the Virginia State Police.



more indicative of the presence of criminal activity.[5] Note that there is little variation in the general distribution of the murders over the last 20+ years; 89% of the murders in Richmond since January 1, 2018 occurred in precincts 1, 2, and 4.[6]

As noted by Dr. Smith, the government's expert and one of the foremost authorities in the country on racial disparities in law enforcement, police go where the crime is, and given the evidence above about where crime is occurring in Richmond, it is little surprise that the above maps bear a striking resemblance to Dr. Coston's map showing traffic stop locations in 2020. *See* ECF 66-1 at 9, Figure 1.

---

[5] Beck, A.J. & Blumstein, A. "Racial disproportionality in U.S. state prisons: Accounting for the effects of racial and ethnic differences in criminal involvement, arrests, sentencing, and time served." *Journal of Quantitative Criminology,* 34, 853-883 (2018); Loftin et al. "The accuracy of supplementary homicide reports rates for large U.S. cities. *Homicide Studies.*" 19, 6-27 (2015)..

[6] Richmond Police Department, Crime Incident Information Center, apps.richmondgov.com/applications/CrimeInfo.

It is not only the case that law enforcement want to stop crime because they are driven and motivated to do so, but city and police leaders are accountable to the public to address crime to make it safe for law-abiding citizens everyone to be safe in their homes and as they work, travel, and pursue recreation.

These maps, and an understanding of modern policing methods, completely undercuts Dr. Chiles' uninformed assertion that the law is enforced in African American neighborhoods only due to racism. Nor does this mean that a multitude of minority and progressive city leaders over the last several decades intended to discriminate against blacks in attempting to enforce the law, as Dr. Chiles and the defendant claim.

### Conclusion

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme Court, historical evidence is likely of "little probative value." Dr. Chiles also exaggerates the evidence in support of his claims, and many of his opinions are based on nothing more than his own *ipse dixit*. Dr. Chiles also fails to consider or address the more likely explanation for additional law enforcement in traditionally minority neighborhoods—that's where crimes are disproportionately being committed in Richmond, as evidenced by murders going back decades. Further, Dr. Chiles' historical evidence does nothing to show discriminatory effect or purpose in 2020, and his testimony bears no relevance given the facts and circumstances of the defendant's particular stop. For these reasons, the Court should exclude the testimony of Dr. Chiles.

                  Respectfully submitted,

                  JESSICA D. ABER
                  UNITED STATES ATTORNEY

By:          /s/
                  Shea Matthew Gibbons
                  Virginia Bar Number 83916

Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov