IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Case No. 3:21cr42 |
| ) | |
| KEITH RODNEY MOORE, ) | |
| Defendant ) | |

**MR. MOORE'S RESPONSE GOVERNMENT'S RENEWED
TO MOTION TO EXCLUDE SECOND DEFENSE EXPERT**

Keith Moore, through counsel, responds as follows to the government's renewed motion to exclude the defense's expert, Dr. Marvin Chiles, *see* ECF No. 103:

**I.  Dr. Chiles's testimony is relevant under Federal Rule of Evidence 401 and admissible under Federal Rule of Evidence 702.**

The government has renewed its motion to exclude Dr. Marvin Chiles, an Assistant Professor of African American history at Old Dominion University with specialized knowledge in the history of racialized policing and residential segregation in Richmond, Virginia—*see* ECF No. 102, from testifying in this case, *see* ECF No. 103.  The government first argues that Dr. Chiles's testimony is not admissible under Federal Rule of Evidence 702.

The challenge that Mr. Moore has brought in this case is to the Richmond Police Department's selective enforcement of Virginia's traffic laws against black drivers in Richmond, Virginia—which violates the Equal Protection Clause.  *See* ECF Nos. 32, 66, 72, and 73.  As the parties and the Court have discussed before, the fact that the first, second, and fourth police precincts line up almost exactly with the black neighborhoods in Richmond, while the third police precinct lines up almost exactly with the white neighborhoods in Richmond is relevant to Mr. Moore's equal protection challenge.  *See, e.g.*, ECF No. 72 at 13-14.  That the city of Richmond

1

feels it needs to devote three quarters of its police precincts to policing the black neighborhoods of Richmond is highly relevant to the Richmond Police Department's selective enforcement of the traffic laws of Virginia against black drivers. As Mr. Moore set forth in ECF No. 72, "when you send police out to investigate crime, one can expect to see more traffic stops. Thus, deployment of police to high crime areas where minorities live will have the impact of overpolicing racial minorities. *See, e.g.*, Ex. K at 28 ("Simply put, minority drivers may be stopped, searched, arrested, and charged with a felony because they are more likely to drive in high crime areas where they reside and more vigorous law enforcement is a common practice.")." ECF No. 72 at 14.

During its work investigating the Richmond Police Department's selective enforcement of the traffic laws in Virginia against black drivers, the defense discovered that the Richmond Police Department decentralized its patrol functions and instituted a "Neighborhood Precinct Plan" in 1977. *See* City of Richmond, *History of the Richmond Police Department: 1900-1999*, https://www.rva.gov/police/department-history (last visited Mar. 8, 2022). Thus, on February 1, 2022, the defense submitted a FOIA request to the Richmond Police Department asking for:

> "1) all proposed maps and planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department;
>
> 2) a copy of the Neighborhood Precinct Plan from 1977; and
>
> 3) any amendments or modifications of the Neighborhood Precinct Plan from 1977."

*See* ECF No. 86-1. It was only when the Richmond Police Department failed to respond to this FOIA request—even to ask for more time to respond to the FOIA request—that the defense sought a subpoena from the Court for the same materials. *See, e.g.*, ECF No. 86-2 (ex parte motion to enforce subpoena duces tecum).

On May 27, 2022, in response to the Court's Order that the Richmond Police Department comply with the subpoena and file a document explaining why the Court should not hold Ms. Peters in contempt for failing to comply with the subpoena, the Richmond Police Department's Senior Assistant Attorney wrote a letter to the Court. The defense has provided a copy of this letter to the government. In the letter, the Senior Assistant reported that the Richmond Police Department does not have any documents responsive to the subpoena. *See* ECF No. 86-3. The police department did not maintain a copy of the Neighborhood Precinct Plan from 1977, any amendments or modifications thereto, or any planning and implementation documents relating to the designation of the boundaries for the four police precincts within the Richmond Police Department. *Id.* Rather, what the police department had were maps of the current police precincts that the defense has already submitted as evidence in this case, *see* 7/26/21 Exs. X-1, X-2, X-3, and X-4, and a history of the police department that includes a reference to the creation of the police precincts in 1977. The defense has also provided these documents to the government.

It was after learning that the Richmond Police Department had not kept any records that would assist the Court in more directly understanding the relationship between the racial segregation of Richmond's neighborhoods and the location of the police precincts that the defense contacted Dr. Chiles. Dr. Chiles's report clearly and thoroughly summarizes his findings:

> Using newspaper accounts, court cases, archival collections, and peer-reviewed articles and monographs, this report makes the historical finding that in Richmond, Virginia, racial segregation has been systemically implemented to the detriment of black residents through public policy at the federal, state, and local levels. Byproducts of this are the separation of black and white people into distinct legal castes; unequal treatment under law inflicted upon black people; residential segregation of whites and blacks; endurance of systemic poverty among blacks; and historical animus between black residents and local law enforcement.

ECF No. 102-1 at 1. That evidence is not only relevant, but critical to this Court's resolution of the selective enforcement challenge in this case.

The government's citation to *Watkins v. Angelone*, 133 F.3d 920 (4th Cir. 1998) (unpublished), does not indicate otherwise. In *Watkins*, the defendant had been convicted of capital murder and sentenced to death. For the first time on appeal challenging the district court's denial of his habeas challenge to his state court conviction, Mr. Watkins asked to present evidence he alleged "would support a finding of systematic discrimination and establish a prima facie case under both the Sixth and Fourteenth Amendments. This new evidence consists mainly of statistical data that purports to demonstrate a pattern of discriminatory sentencing of black capital defendants in Danville. The district court declined to review this evidence because it was not presented to the state court during the two evidentiary hearings it held on the venire discrimination claim." *Id*. at *5. It is not that the Fourth Circuit found that such historical evidence of racism could not be considered if presented in a timely fashion. Rather, the Fourth Circuit found that "Watkins cannot offer these new facts for the first time on federal collateral review, so we must decline to review that evidence here as well." *Id*. at *6 n.3. Mr. Moore is offering Dr. Chiles's testimony while this Court is still developing the trial record in this case. Thus, *Watkins* is inapposite.

As to the legal relevance of Dr. Chiles's testimony, as the defense has stated before and as the Supreme Court has made quite clear, because discriminatory intent is rarely explicit, evaluating whether discriminatory intent exists requires an expansive inquiry and permits courts to consider cumulatively different kinds of evidence—direct and circumstantial, statistical and anecdotal, as well as historical and contemporaneous evidence. Determining whether intent was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including: (1) the impact of the official action and whether it bears more heavily

4

on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the legislature's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. 429 U.S. at 266¬68; *United States v. Fordice*, 505 U.S. 717, 728 (1992) ("Our decisions establish that a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation."); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976) (discussing historical cases involving laws enacted with the purpose of racial discrimination); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1400-01 (2020) (discussing broader history of racially discriminatory law in constitutional challenge). Dr. Chiles's testimony is thus relevant.

The Court is, of course, free to determine what weight to assign to Dr. Chiles's testimony[1]. But, the Court should do so keeping in mind that the reason that we do not have the most direct evidence of how the police precincts came to be how they currently are is because the Richmond Police Department did not keep that information. Thus, the defense has to present more circumstantial evidence to demonstrate its point. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."); *Arlington Heights*, 429 U.S. at 266 (observing that determining whether intent was

---

[1] The government has tried to make much of a footnote in *McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987). In that footnote, the Supreme Court observed: "Of course, the 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S., at 267, 97 S.Ct., at 564. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." What the government appears perhaps to not appreciate is that the evidence Dr. Chiles has through his careful study of the history of the Richmond Police Department and the history of residential segregation in Richmond is the only evidence undersigned counsel is aware of since the police department did not keep the relevant records. This loss of evidence thus makes Dr. Chiles's circumstantial evidence much more probative than it might otherwise be.

discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (emphasis added).

## II. Dr. Chiles's report is a summary of his anticipated testimony, not a treatise.

The government next argues that Dr. Chiles's conclusions are not well-supported. *See* ECF No. 103 at 4-9. First, the government takes issue with Dr. Chiles's conclusion that "Richmond's racial history is largely defined by the maintenance of residential segregation and over-policing of black residents at the hands of RPD. This report seeks not to indict every white Richmonder, or RPD officer, as racist or bigoted. Rather, it argues that current issues with residential segregation and RPD-black animus exist within a historical ecosystem shaped by people and interests of a bygone era." *See* ECF No. 19-1 at 12. Dr. Chiles has reached this conclusion through years of careful study of African American history, and specifically how racism has shaped the city of Richmond and its police force.

For instance, while the government cites, *see* ECF No. 103 at 4, a line from the first sentence of one of Dr. Chiles's articles, *see* ECF No. 86-5 at 1, describing Richmond as a "city seeking to end its complicity with racism," the government's reliance on that phrase obfuscates Dr. Chiles's work in that article. In 2021, Dr. Chiles authored the article that the defense has produced to the government and the Court in ECF No. 86 entitled *"Here We Go Again": Race and Redevelopment in Downtown Richmond, Virginia, 1977-Present*. The Journal of Urban History, a peer-reviewed journal, chose to publish Dr. Chiles's work, which began as a part of his dissertation several years before. *See* ECF No. 86-5 at 27. And what the article goes on to explain is that modern Richmond has tried to separate from its racist past through public policy reform but has consistently failed to do so.

6

For example, Dr. Chiles describes in detail how historical revitalization plans failed to change the systemic racism that has defined Richmond since its inception. In the 1970s and 1980s, white business owners "wanted to use redevelopment—a tactic formerly used to reinforce white supremacy—as a mechanism for racial and economic healing." *Id.* at 8. Those efforts failed, in part because "Black Richmonders clamored for better city services and the political success of their newly elected city councilmembers. However, they did not believe that shoveling thinly stretched tax dollars to white developers satisfied those desires." *Id.* at 10. Disagreements about how to go about making effective changes led to efforts to redraw voting district boundaries and white councilmembers conducting "secret investigations with the hopes of ousting their black colleagues from office. While their efforts failed to unseat a single black councilmember, they helped further the racial divide at one of the most critical times in city history." *Id.* at 12. Later revitalization efforts fared no better: "Jackson Ward residents noticed that a large brick wall separated them from the Marketplace. This was no protective barrier from construction: it was a design separation between Jackson Ward and the growing Marketplace." *Id.* at 14.

Dr. Chiles's investigations revealed that Richmond's more recent revitalization attempts have fared no better. In December 2018, the city of Richmond announced a $1.5 billion revitalization project in Navy Hill. Richmond residents "learned that the wealthiest capitalists in Virginia crafted the Navy Hill Project and sold it to the majority black city council. Like Project One and the Sixth Street Marketplace, the council promised to allocate current (an undisclosed portion of the around $800 million in capital improvement surplus) and future tax revenue (an estimated $476 million) to sustain the 'financing district' until it turned a profit. If the project took the full thirty years to become solvent, the city would owe at least $600 million to its bondholders. Even worse, the projected revenue for the city would be less than the amount spent on maintaining

the project over the next twenty years." *Id.* at 17. And so, while Navy Hill ***had been*** a majority black middle-class neighborhood in the 1900s before it was bull-dozed to make way for Interstate-95, "instead of investing in its majority black (97%) and impoverished public school system, leaders in Richmond and elsewhere continue to court white corporations who have done next to nothing to improve the cemented patters of racial segregation and disparate levels of poverty." *Id.*

The point is that Dr. Chiles is extremely qualified because of his years of training and historical investigation to present evidence that makes patently clear the relationship between Richmond's overtly racist past and the discriminatory effects black Richmonders acutely feel today. The government's observation that one of Dr. Chiles's footnotes did not encompass every source Dr. Chiles is aware of in support of a particular statement mistakes not only the purpose of Dr. Chiles's report in this case—to ***summarize*** his anticipated testimony—but vastly underestimates the depth of Dr. Chiles's knowledge on the subjects at hand. For instance, if asked on the stand about the government's criticism of footnote 49 in ECF No. 102-1, Dr. Chiles would point the government to: the Table of Reported Offenses: 1976-1980, Second Street Area Richmond, 1980, Economic and Market Analysis, pp.1-10; A Commercial Revitalization Plan for Second Street Commercial Area, pp.3-7, 2nd Street Commercial Revitalization, 1981, Box 4, M303, Richmond Renaissance Papers; and "Jackson Ward," a paper presented at the Liaison Committee of Richmond Renaissance, Box 16, M283, Clarence Townes Papers, Virginia Commonwealth University—all of which Dr. Chiles has seen and reviewed with his own eyes and is quite qualified to rely on as an expert.

These documents, along with the information in footnote 49 of ECF No. 102-1, use Jackson Ward specifically to explain Richmond's 1980s crime problem as rooted in systemic black poverty; systemic black poverty rooted in systemic racial segregation; and most importantly, the

8

calls for more policing in the 1980s, which did in fact come.  These economic and crime reports were done to reverse white flight, which required the Richmond Police Department to commit both rhetoric and forces to anti-crime measures.  To argue that the reports are irrelevant because they do not mention policing specifically is like taking a piece out of a jigsaw puzzle and claiming that because the piece is not the entire puzzle, the puzzle does not exist.  And that is essentially the heart of the government's argument here: the government attempts this puzzle trick over and over to make the larger claim that past events have no connection to the present.  Dr. Chiles's work makes clear that that is just not so.

The government's second criticism of Dr. Chiles's work is that Dr. Chiles's report does not discuss criminal activity that the government alleges is disproportionately happening in the black precincts in Richmond.  *See* ECF No. 103 at 7-9.  In so arguing, the government relies on murder statistics in Richmond from 1999 to 2022 to justify why 77% of the drivers Richmond Police Department officers stopped in the five months before stopping Mr. Moore were black.  Given that 59% of the stops were for traffic violations and another 36% of the stops were for equipment violations, *see* ECF No. 66-1 at 6, Table 1, and that the government's own expert conceded at the earlier evidentiary hearing that there is no evidence that black people commit traffic offenses more than white people, the government's argument about murders in Richmond belies the truth.  The truth is that Richmond Police officers were in 2021, and have been for decades, selectively enforcing Virginia's traffic laws against black drivers in Richmond at such disproportionately high rates that this Court can infer discriminatory intent in such enforcement.

Richmond Police Department homicide detectives or even line patrol officers are not pulling black drivers over five times more than white drivers because they are trying to advance active homicide investigations.  They are not pulling black drivers over five times more than white

9

drivers because the Richmond Police Department sends more officers to the black parts of town than the white parts of town. We know that the Richmond Police Department pulls over black drivers far more often than white drivers even in the white part of town. *See* ECF No. 66-1 at 9, Figure 2. The truth is that the Richmond Police Department is pulling over black drivers five times more often than white drivers because those drivers are black. The history and expertise that Dr. Chiles has to share with this Court corroborate that.

## Conclusion

The Court should deny the government's motion. Dr. Chiles's testimony is the best evidence available, albeit circumstantial, of the relationship between the city of Richmond's history of racialized policing and the existing police precinct locations. It is relevant and must be considered by the Court in evaluating Mr. Moore's selective enforcement challenge.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org