IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 3:21-cr-42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |

**UNITED STATES' REPLY IN SUPPORT OF
RENEWED MOTION TO EXCLUDE DEFENSE EXPERT**

The United States of America respectfully files this reply in support of its Renewed Motion to Exclude Defense Expert Dr. Marvin Chiles. The Court should grant the motion to exclude the defendant's historical expert because his testimony is not relevant and probative to the defendant's attempted traffic stop in 2020, nor does it come close to meeting the defendant's burden of proof.

**I.   ARGUMENT**

As an initial matter, and despite the defendant's technical arguments about why this Court should ignore statements from the Supreme Court and the Fourth Circuit about the lack of relevance and probative value of decades-old historical evidence, the defendant's expert witness evidence is of no evidentiary value. Indeed, the statements the defendant urges the Court to ignore represent common sense and echo the Court's repeated statement that Richmond is a different place than it used to be, and merely restating old wrongs is not a blank check for dismissing present-day crimes. The relevant question before the Court is whether the attempted stop of the defendant on December 5, 2020 was the result of "clear and intentional discrimination." *Central Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (party asserting equal protection violation "must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Sylvia Dev. Corp. v.*

1

*Calvert Cnty., Md.*, 48 F.3d 810, 825 (4th Cir. 1995); *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Dr. Chiles' evidence by its very nature is ill-suited to answer this question.

One of the main reasons his testimony is ill-suited is that, according to his expert report, the connection between past racism and alleged present-day racism by RPD in general—much less the officers involved in this case in particular—is tenuous at best. For example, Dr. Chiles relies on decades-old revitalization efforts that have nothing to do with the officers in this case, political squabbles that do not involve these officers, moving patterns that do not involve these officers, and architectural choices to argue that the specific officers involved in the stop in this case in 2020 attempted a racially discriminatory traffic stop. But even for the past events that Dr. Chiles claims are discriminatory, there is at best a limited connection to city leaders or to RPD itself—much less the officers in this case. Neither city leaders nor RPD control residential moving patterns, and they were not involved in the construction of a brick wall between the Jackson Ward neighborhood and the Sixth Street Marketplace. *See* ECF 86-5 at 14 (the defendant failed to mention that the "wall was later torn down after discussions between Jackson Ward residents and Richmond Renaissance," the interracial nonprofit revitalization group behind the Sixth Street Marketplace project). The extreme distance between these events and the attempted stop of the defendant exemplifies the uselessness of Dr. Chiles' testimony.[1]

Nor should the limited evidentiary value of Dr. Chiles' testimony be ignored simply because RPD did not retain 45-year-old records the defendant claims would be helpful to his case. The defendant's assertion that documents related to 1977 precinct boundaries are instrumental to

---

[1] The same is true of attempts to link the failed Navy Hill project to any sort of discrimination by RPD. The defendant claims that the Navy Hill neighborhood was a majority-black neighborhood *over 100 years ago*, but fails to link the proposed project to discrimination of any kind, let alone by RPD. The defendant also fails to mention that project was rejected by seven of the nine members of the city council over Mayor Stoney's recommendation that the project continue. Kate Andrews, "Richmond's $1.5B Navy Hill Project is Dead" (Feb. 11, 2020), https://www.virginiabusiness.com/article/richmonds-1-5b-navy-hill-project-is-dead/.

his case simply assumes that 1977 precinct boundaries aligned with racial boundaries and have somehow continued to align with racial boundaries through to the present day despite significant shifts in the racial distribution of the residential population. There is no evidence of this in the record, and the defendant's arguments about the extra relevance of Dr. Chiles' testimony is based on the unproven assumption that whatever 45-year-old documents RPD allegedly failed to maintain support the defendant's argument.

In seeking to rely on historical evidence that the defendant fails completely to connect to the decisions of the officers in his case, the defendant invokes *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). In that case, in evaluating a legislative body's or zoning board's decisions, the Court noted that "[t]he historical background of the decision is one evidentiary source" of "invidious discriminatory purpose" when the historical background "reveals a series of official actions taken for invidious purposes." *Id*. at 266. But while this rule might support looking at these officers' prior actions to evaluate their intent behind their actions in this case or—possibly—other reasonably recent actions by other Richmond police officers, *Arlington Heights* cannot reasonably be stretched to allow the defendant to impute the motivations of others from decades ago, who have no connection to the officers in this case, to the officers' decisions in this case. The defendant's argument relies on inferences that are even worse than the guilt-by-association theory of culpability that has no home in American law, given that the officers in this case are not even associated with the long-ago decisions the defendant invokes. Defendant relies on an extraordinarily expansive notion of collective guilt that has no basis in law.

The defendant's burden in this case is very high, and the testimony of Dr. Chiles does not help the defendant meet this burden. The defendant must prove that the officers in this case "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in

spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (citing *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979)). The government has shown repeatedly that crime rates and calls for service are one of the key determinants for where police patrol, and that is the most likely explanation for whatever raw statistical disparity exists with regard to race and traffic stops.[2] The persistent failure of the defendant's experts to even consider the possibility that factors other than racism explain the raw disparity in whole or in part demonstrates the unreliability and the unhelpfulness to the Court of their testimony, and the defendant's inability to meet his heavy burden under *Armstrong*. *See United States v. Hare,* 820 F.3d 93, 99 (4th Cir. 2016) ("'absent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim.'") (quoting *United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996)); *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012) (defendant cannot tout "unexplained evidence of racial disparity" to prove "racial animus"); *Johnson v. Holmes*, 782 F. App'x 269, 281 (4th Cir. 2019) ("Crucially, in [*Armstrong*, *Hare*, and *Olvis*], the proffered statistics faltered because they said nothing about individuals of other races who committed the same crimes but were treated more favorably").

---

[2] The defendant keeps repeating that blacks are five times more likely to be pulled over than white drivers. *See, e.g.*, ECF 107 at 9-10. The defendant ignores Dr. Coston's admission during the evidentiary hearing that adjusting the date range for traffic stops to include more than just the first five months of flawed data collection significantly reduces the raw statistical disparity. According to the data publicly available on the Commonwealth of Virginia's site, simply adjusting end date for the time frame to June 30, 2021 instead of December 6, 2020 as Dr. Coston does, the raw statistical disparity significantly reduces—from 76% of stops being of black drivers, 15% of white drivers, and 8% unknown race—to 64% of stops being of black drivers, 24% of white drivers, and 6% unknown race. Virginia Open Data Portal, "Community Policing Act Data Collection," https://data.virginia.gov/stories/s/Virginia-Community-Policing-Act-Data-Collection/rden-cz3h/; *see also United States v. Raynor*, No. CRIM. 3:13MJ215, 2013 WL 5770529, at *8 (E.D. Va. Oct. 24, 2013) (Novak, M.J.) (rejecting an equal protection claim regarding a traffic stop in part because the defendant had "cherry-picked a statistical time frame to suit the conclusion that they wanted to reach—that Officer Purdy stopped vehicles due to the race of the driver."). That a simple adjustment to the timeframe to include more reliable data slashes the raw statistical disparity by nearly half demonstrates the fickle nature of the defendant's claimed raw disparity.

Because crime rates[3] and calls for service correlate so strongly with traffic stop data, it is simply incredible to believe that for decades African American and progressive city leaders (some of whom are prominent civil rights leaders), chiefs of police, and individual officers would consistently and intentionally choose policies "because of" their disparate impacts on African Americans. Dr. Chiles and the defendant argue that the racism of the 1960s endures in an unbreaking chain at least to December 5, 2020, but making that argument requires the complicity of generations of political and police leaders, which is absurd.

## Conclusion

The Court should exclude the testimony of Dr. Chiles because, in the words of the Supreme Court, historical evidence unconnected to the facts at issue is of "little probative value." There is no indication it is probative of the decision of Fourth Precinct officers to attempt a traffic stop on December 5, 2020, and the defendant's ill-fated attempt to prove intentional discrimination has lingered long enough. The Court should exclude the testimony of Dr. Chiles.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Shea Matthew Gibbons
Virginia Bar Number 83916
Erik Siebert
Virginia Bar Number 79057
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: 804-819-5400
Fax: 804-771-2316
Email: Shea.Gibbons@usdoj.gov

---

[3] In its previous filing, the government used murders as indicative of crime rates generally. ECF 103 at 7-9; *see also* ECF 70 at 16 (showing traffic stops correlate with other types of crime rates).