IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                    plaintiff,

         versus                3:21CR42

KEITH RODNEY MOORE,

                    defendant,



Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge



Motions hearing (continued)


October 28, 2022

Richmond, Virginia



GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


Shea Matthew Gibbons, Esq.

Erik Sean Siebert, Esq.

Assistant United States Attorneys

for the United States



Laura Jill Koenig, Esq.

Amy L. Austin, Esq.

Assistant Public Defenders

for the defendant

The defendant in his own proper person

1          THE CLERK:  Case number 3:21 CR 42.

2          The United States versus Keith Rodney Moore.

3          Mr. Shea Gibbons, Mr. Erik Siebert represent the

4     United States.

5          Ms Laura Koenig and Ms Amy Austin represent the

6     defendant.

7          Are counsel ready to proceed?

8          MR. GIBBONS:  United States is ready to proceed.

9          MS KOENIG:  Defense is ready, Your Honor.

10         THE COURT:  Good morning.

11         Say something in the microphone.

12         MR. GIBBONS:  Yes, Your Honor.

13         THE COURT:  Making sure both my speakers are

14    working.

15         THE CLERK:  They came and fixed it.

16         THE COURT:  We are here today for the continuation

17    of the case hearing on the motion to suppress in United

18    States versus Keith Rodney Moore.

19         Good afternoon Mr. Siebert, Mr. Gibbons, Ms

20    Koenig, and Ms Austin, and Mr. Moore.

21         Good to see all of you today.  I think where we

22    are is that you are prepared to call your next witness.

23         MS KOENIG:  I am, Your Honor.

24         THE COURT:  So there is a motion in limine or

25    Daubert motion on Dr. Chiles.  And the essential

1    element of the motion is that it is not very helpful to

2    The Court because Dr. Chiles is going to testify about

3    historic patterns in Richmond.  So what I will be

4    looking for -- and there is something to be said for

5    that position -- and one of the things that we are

6    looking for today would be evidence that he ties that

7    together.  I think in order to rule on the Daubert

8    motion I pretty much have to hear the testimony.  So I

9    will hear that and see what Dr. Chiles has to say and

10   what you have to say about tieing that into the present

11   situation in Richmond.

12        MS KOENIG:  Thank you, Your Honor.

13        Before we start with that with Dr. Chiles, we

14   have, each side has a hand full of a couple of

15   exhibits.

16        THE COURT:  Hand full of a couple exhibits.

17        MS KOENIG:  Hand full.  I corrected myself.  A

18   couple, not really a hand full.

19        THE COURT:  I'm sorry to hear your child is ill.

20        MS KOENIG:  He is not feeling great, so I don't

21   want to pass anything on to anybody else.

22        The Government has Government's six and seven that

23   should be before The Court.

24        THE COURT:  Okay.  So what we have here are

25   Government's exhibits six and seven.  I have actually

1    five, six and seven here.  Five looks like a real old

2    book of some kind.

3          MS KOENIG:  I understand that the Government will

4    be trying to introduce exhibit five through Dr. Chiles

5    on cross examination.

6          THE COURT:  All right.  Are six and seven coming

7    in without objection?

8          MS KOENIG:  Correct.

9          THE COURT:  Okay.  Mr. Gibbons, why don't you tell

10   me what -- Mr. Siebert, either one -- what six and

11   seven are here.

12         MR. GIBBONS:  Your Honor, these are maps that are

13   similar to those that we inserted into our motion to

14   exclude, our second motion to exclude Dr. Chiles.

15   These are maps that come from an open source web site

16   that is run by Lexis Nexis, and really what this is,

17   just, this is all of the homicides and manslaughters in

18   the City of Richmond.

19         THE COURT:  Okay.

20         MR. GIBBONS:  There is -- you can see the

21   precincts kind of outlined.  It is A little difficult

22   to see.  You will see better on the defense exhibits

23   that shows just the precincts.

24         Government's exhibit six, the dates for this are

25   January 1st, 2018.

1          THE COURT:   Through when?

2          MS KOENIG:   12/6/20, the day after the stop at

3     issue.

4          THE COURT:   Okay.

5          MR. GIBBONS:   And Government's exhibit seven is

6     1/1/99, 1999.   That is the first year for which data is

7     available from RPD.

8          THE COURT:   Okay.

9          MR. GIBBONS:   To 12/6/20 as well.

10         THE COURT:   Okay.

11         All right.   And what do these black dots show on

12    here?

13         MR. GIBBONS:   That is homicide or manslaughter.

14         THE COURT:   Okay.   Okay.

15         All right.   Thank you.

16         MR. GIBBONS:   That is all I have, Your Honor.

17         Thank you.

18         MS KOENIG:   Then, Your Honor, the parties are also

19    stipulating to defense exhibit 20, which should be

20    before Your Honor, which is the same underlayment of

21    the map that the Government has introduced in exhibit

22    six and seven, but without the dots.   It is labeled

23    with the various precinct numbers, three, four, one and

24    two.   Clockwise order.

25         THE COURT:   All right.

1      So, apparently there is no objection to exhibit

2  20.

3      MR. GIBBONS:  No, Your Honor.

4      THE COURT:  All right.

5      So I will admit then exhibits, Government's

6  exhibit six and seven and defense exhibit 20.  And then

7  I have here also defendant's exhibit 19 which I guess

8  will come in through the professor.

9      MS KOENIG:  It is, Your Honor.

10      THE COURT:  Okay.  All right.

11      Let's get the show on the road.

12      MS KOENIG:  At this point I am ready to call

13  Dr. Chiles.

14      THE COURT:  All right.

15      THE COURT:  Come on up, Dr. Chiles.

16                      MARVIN CHILES

17            AFFIRMED AND TESTIFIED AS FOLLOWS:

18                   DIRECT EXAMINATION

19  BY MS KOENIG:

20  Q    I do want to confirm that The Court still has the

21  binder of defendant's exhibit that we had provided to

22  The Court at the last hearing or last set of hearings.

23  That could go one through 18, and then have some copies

24  of previously admitted exhibits.

25      THE COURT:  All right.  I don't have those with me

1   but we can those.  I don't have it here with me, but we

2   will get him started while she is getting those.

3        MS KOENIG:  Absolutely, Your Honor.

4        THE COURT:  We can move ahead.

5   BY MS KOENIG:

6   Q    Can you state your name for the record, please?

7   A    Marvin Chiles.

8   Q    You can straighten that out.  It should catch you.

9   You are good.

10  A    Marvin Chile's.

11  Q    Very good.  Speak clearly.  Good to go?

12  A    Yes.

13  Q    Dr. Chiles, can you spell your name for the

14  record, please?

15  A    M-A-R-V-I-N   C-H-I-L-E-S.

16  Q    Dr. Chiles, do you hold a series of degrees?

17  A    Yes.

18  Q    Tell us about those.

19  A    I have a bachelors, a masters, and a PhD.

20  Q    The PhD is what specifically in.

21  A    African-American history.

22  Q    And where odd you get that from.?

23  A    University of Georgia.

24  Q    When?

25  A    2020.

```
 1    Q    What is your masters in?

 2    A    American history.

 3    Q    From where.

 4    A    James Madison.

 5    Q    When did you will get that?

 6    A    2016.

 7    Q    What is your current -- what do you do --

 8         THE COURT:  Let's go the whole way.  Where did you

 9   get your un-graduate?

10         THE WITNESS:  Liberty University.

11         THE COURT:  Liberty University.  Okay.

12   BY MS KOENIG:

13    Q    When did get that?

14    A    2014.

15         THE COURT:  And your major?

16         THE WITNESS:  Social science educations.

17         THE COURT:  Okay.  Great.  Thank you.

18   BY MS KOENIG:

19    Q    What do you to for work now.

20    A    Assistant Professor at Old Dominion University.

21    Q    Is that a tenure track position?

22    A    Yes.

23    Q    What are you an assistant professor in?

24    A    African-American history.

25    Q    Do you have a speciality research area?
```

1    A    Yes.  Race, politics in the 20th century, but
2    specifically in Richmond.  So I focus on that now.
3    Q    How long have you been studying history of race
4    and politics in Richmond?
5    A    Since 2014.
6    Q    Have you published articles that require
7    specialized knowledge on history of race and politics
8    in Richmond?
9    A    Absolutely.
10   Q    Are some of those articles listed in your CV?
11   A    Yes.
12        MS KOENIG:  Your Honor, we have submitted this as
13   a different exhibit nine, Dr. Chiles' CV.
14        THE COURT:  Okay.
15        MS KOENIG:  Move to admit it at this point.
16        THE COURT:  Well, all right.
17   BY MS KOENIG:
18   Q    Have you given presentations that required
19   specialized knowledge of race and history in Richmond?
20   A    Yes.
21   Q    Have you also taught courses at ODU that involve
22   the history of race and politics in Richmond?
23   A    Yes.
24   Q    Do you hold position of peer-reviewer of articles
25   that others published that require use of your

1    specialized knowledge of the history race and politics

2    in Richmond?

3    A    Yes.

4         MS KOENIG:  We move to qualify Dr. Chiles as an

5    expert in the area of history race and politics in

6    Richmond, Your Honor.

7         THE COURT:  All right.

8         MR. GIBBONS:  No objection, Your Honor.

9    BY MS KOENIG:

10   Q    Dr. Chiles, I want to show you -- and Ms Tuck, if

11   I could have access to pulling an exhibit up on the

12   screen, please.  And thank you.

13        THE COURT:  You are doing what?

14   Q    I just want to pull up an exhibit up on the screen

15   that has already been admitted.

16        I guess while we are waiting for that to be pulled

17   up, if you look in that white exhibit book in front of

18   you and flip to the tab that says R 2.  It is going to

19   be towards the very end?

20   A    Oh.

21        MS KOENIG:  Your Honor, this has already been

22   admitted at an earlier hearing in this case.  It was

23   previously identified as the racial dot map that the

24   University of Virginia's Weldon Cooper School for

25   Public Service generated using census data from 2010.

1          THE COURT:  Which exhibit is it?

2          MS KOENIG:  R 2, Your Honor, towards the end of

3     the exhibit book.  Here it is on the screen now.

4          THE COURT:  R 2.

5          MR. SIEBERT:  It is in the exhibit book, Your

6     Honor.

7          THE COURT:  What do you mean R 2?

8          MR. SIEBERT:  One through 18 is the beginning, and

9     then we have --

10         THE COURT:  Oh, okay.

11         Okay, what is Dr. Chiles' resume?

12         MS KOENIG:  It is defendant's exhibit nine, Your

13    Honor.

14         THE COURT:  Okay.  Thank you.  Go ahead.

15    BY MS KOENIG:

16    Q    Dr. Chiles, we can see blue dots in R 2 reflects

17    white people, right?

18    A    Yes.

19    Q    And we can see that the green dots in exhibit R 2

20    reflect black people, right?

21    A    Yes.

22    Q    I want to talk with you now about the history of

23    how those dots got to be where they are.

24         Let's start with where black persons lived in

25    comparison with white persons before slavery ended.

1    A    Before slavery ended, so the majority of free

2    black people in Richmond lived in what is now Jackson

3    Ward.  And also the Shockoe Slip area.  So those are

4    the two places that they lived.

5         The Jackson Ward area was seen as the outskirts,

6    or was the outskirts of Richmond just because the City

7    size was so small geographically.  And, yeah, that is

8    where they lived.

9         White people lived pretty much wherever they

10   wanted, but by and large working class, middle class

11   white people lived in the near west end or what is

12   today the near west end, Oregon Hill area, Carillon,

13   area.  And, yeah, right.  Live in the southern part of

14   Richmond, so, yes, they pretty much lived segregated

15   lives before slavery ended.

16        THE COURT:  And in those days the southern side of

17   the river was part of the City.

18        THE WITNESS:  No, no, not below the river towards

19   Manchester.  That was a different place.  That got

20   annexed later on.  But the southern end going westward.

21   So near the northern part where nowadays Jackson Ward

22   is, out going kind of east is where black people lived.

23   They were, they lived at, they lived in those places

24   primarily because of insurrection laws that had been

25   passed in the early 18 hundreds, really in response to

1    Gabriel's Rebellion.  And so whites were afraid, many
2    of them were afraid if they associated with free blacks
3    in any way, and slaves, in any that suggested that they
4    were, that they were warm to each other, that I could
5    be accused of helping to insight insurrection.
6         So, white and blacks primarily lived in separate
7    places in Richmond prior to slavery ending.
8    Q    Specifically had Virginia and the City of Richmond
9    passed laws in ordinances to order that?
10   A    Yes.
11   Q    Can you tell us about what the common said law in
12   1806?
13   A    Yes.  So they passed, they passed laws to, one
14   organize police forces, or what do you call them, not
15   necessarily, law enforcement in general.  That was to
16   surveil free slaves and slaves and to just insure that
17   they did not travel throughout the areas without
18   supervision.
19        And, yeah, the Commonwealth of Virginia did.  And
20   Richmond itself as a city, they did it later on.  But
21   the point was to make sure that black people couldn't
22   roam around free without supervision of whites.
23   Q    Did the Richmond City council also pass an
24   ordinance concerning Negroes?
25   A    Yes.

1   Q    Is that what you were referring to --

2   A    Yes.

3   Q    -- when you said that you were, they were barred

4   from moving freely?

5   A    Yes.

6   Q    After the civil war ended in 1865 what started

7   happening in the City of Richmond?

8   A    So immediately after, for one, there was a bumper

9   crop of free people, obviously slavery no longer

10  exists, so local police in Richmond began to crack down

11  on free black mobility.  So they just started arresting

12  black people indiscriminately, throwing them in what

13  was then called Negro Bullpens, which were just open

14  air cells.  People could like walk by and throw stuff

15  at them and taunt them.  And the point was to kind of

16  let former slaves know, hey, just because you are free

17  legally, you are not free actually.

18       It got to the point to where blacks, blacks in

19  Richmond wrote letters to President Andrew Johnson

20  actually asking for him to intervene.  And surprisingly

21  he did.  And kind of ended that practice of just

22  indiscriminately incarcerating free black people for

23  just things like not moving off of the sidewalk when

24  white walk by or not referring to a white person by,

25  you know, Mr. or Mrs. and things like that.

1        So, yes, that happened in the immediate aftermath

2    of the civil war in Richmond.  So, yes.  Hope that

3    makes sense.

4    Q    Did the City also start annexing territory?

5    A    Yes.  Yes.

6    Q    Before we get too far, I want to who you what is

7    marked as defendant's exhibit 19.  Do you recognize

8    what is in defendant's exhibit 19?

9    A    Yes.

10   Q    Can you tell us briefly what this is?

11   A    Yes.

12        So, sorry, this is a map of Richmond as a City and

13   how it grows going into 20th century, and annexations

14   they used to grow.

15   Q    Did you personally prepare this map?

16   A    No.

17   Q    Have you reviewed it for its accuracy in terms of

18   the knowledge that you have about the annexation?

19   A    Yes.  Every map I have seen of Richmond, all of

20   the annexation maps all look like this.

21   Q    So is it a fair and accurate representation of

22   what the various annexations looked like over time in

23   Richmond.

24   A    Yes.

25        MR. SIEBERT:  I move to admit defendant's exhibit

1    19.

2           MR. GIBBONS:   No objection.

3           THE COURT:   Admitted.

4    BY MS KOENIG:

5    Q    So let's talk about annex.  Where did the City

6    start annexing territory initially?

7    A     Initially, just surrounding -- sorry -- so

8    initially just surrounding the City.  So right and

9    left, right, and left and right, east and west, rather.

10   And then they began to expand and further in a circle

11   in essence around the City.  That is because the

12   population continued to grow after the civil war.  More

13   people are moving to Richmond, black and white.  So,

14   yes, the annexing s much territory as possible just to

15   accommodate for the population growth.

16   Q    After the civil war did the City of Richmond and

17   the State of Virginia continue to enact laws to enforce

18   racial segregation and say where black people could

19   live or not live?

20   A    Yes.  So that's one of the biggest issues where

21   the City is growing at that time period was that people

22   were concerned with the races mixing in any way that

23   could suggest equality.  And also it was seen as

24   improper for cities to not have more organized growth.

25          So by the early 20th century the Commonwealth of

1    Virginia, as well as the City -- and it wasn't just
2    Richmond in Virginia, it was other places as well --
3    began to pass laws and ordinances to restrict the races
4    from interacting in certain spaces.  So where they
5    could live, where they could travel, where they could
6    go.  If they did have to share space how they could
7    share that space.  So blacks would have this side,
8    whites that would have this side, et cetera, et cetera.
9    Q    In 1911 -- well before the State and the City
10   started segregating residences more formally, was there
11   a segregation of transits?
12   A    Yes.  Segregation of transit, it was more, it was
13   more, it was more so allowed private carriers or
14   carriers that provided public services to do it.  In --
15   by 1904 they allowed them to do.  So they say, hey, we
16   are encouraging you to begin to segregate because this
17   is something that other states are doing, other
18   localities are doing.  And a lot of push back was, a
19   lot of push back with respect from whites and blacks,
20   mostly black people because the segregation would mean
21   they would get worse services.
22        But by 1906 it was mandatory.  So if you provided
23   rail cars or street car access you would have to have
24   it on a segregated basis.  So separate cars.  And then
25   different cars and tracks would go to different sides

1    of town.  To just kind of reinforce that, hey, although

2    slavery is no longer here, segregation will be here to

3    replace it.

4    Q    So let's talk about where in the City of Richmond

5    that played out.  Where did the black cars for transit

6    go in the City of Richmond?

7    A    Mainly down town.  Down town to the Shockoe Slip

8    area because that is where black people lived.  Yes.

9    So mainly down town.  What we now see as downtown.  And

10   going kind of towards the Jackson Ward area.  Because

11   that is where black people lived, and they worked in

12   the interior in the core of the City.

13        And the white cars would go out to what is now

14   like the far west end, not as far as it is today, but

15   the furthest that was west end.  Because that was a

16   newly expanded suburban area.  Same thing with parts of

17   north side.  Up near the Ginter Park area which were

18   numerous suburban street car, or considered to be

19   street car type of areas.  So, yes, that is where they

20   would go.

21   Q    Were blacks allowed to ride on white cars?

22   A    Only if they worked for white families.  Or if

23   they had like special passes of some sort.  So hey, I

24   am going to go to to this neighborhood or this business

25   on this side of town to go work for this firm or this

1    family.  Usually the maids of wealthy white people

2    would get a pass.

3         Also, sometimes workers who would go to work for

4    white businesses in other parts of town, like

5    construction, and things like that.  But by and large

6    no, for leisure you are not getting on the white car to

7    go out to the west end.  That is just not going to

8    happen.

9    Q    By 1911 was there an official segregation law on

10   the books that then officially segregated residential

11   areas in the City of Richmond?

12   A    Yes.

13   Q    Tell us about that.

14   A    So that law came about as a result of middle class

15   black people, one in particular, simply buying property

16   in white neighborhoods.  And before some black people

17   would buy property in white neighborhoods and rent them

18   out to white people.  So no harm, no foul, right.

19   However, by the time we get to the the 1910s some,

20   thinking of one in particular, bought property in white

21   neighborhoods, and they began to put black renters

22   there.

23        And then also that same person tried to establish

24   a business in a white neighborhood.  And there was a

25   push back, John Mitchell is who I am referring to, the

1    newspaper editor, and as a result of that the

2    segregation ordinance, City council brought that into

3    play and eventually enacted it.  And the goal was to

4    make sure that blacks and whites resided exclusively in

5    neighborhoods that were already, already a majority of

6    that race, or pre-determined to be a majority of that

7    race.  So this neighborhood, for instance, was majority

8    white for the last 40 years.  No black person could

9    not -- could not live there.

10        Same thing for whites.  Excuse me.  Whites going

11   into black neighborhoods.  If this neighborhood was

12   black in the last 40 or 50 years whites couldn't just

13   go and live there.  They could buy property there.

14   That they could not stop, City Council could not stop,

15   but they could not live there.

16   Q    Was that law challenged as unconstitutional?

17   A    Yes.

18   Q    Was that in the City, Hopkins versus the City of

19   Richmond case?

20   A    Yes.

21   Q    Tell us that case.

22   A    So it was a black woman who was, a black woman and

23   a white man who were arrested for violating that rule

24   because they shared space in the same house in a white

25   part of town.  I suspect that they might have been

1    lovers, but they claim they were just room mates.

2    Needless to say a black attorney and a white attorney

3    teamed up to challenge that law on the grounds that it

4    violated the 14th amendment.

5         And they lost.  And because they lost that case --

6    and then they lost not just here locally, they also,

7    when they appealed, and because of that the NAACP got

8    involved, which was kind of an upstart organization at

9    the time.  And when they did get involved eventually

10   they were able to overturn how the segregation in

11   Richmond from a legal standpoint by late 1920s early

12   1930s.

13   Q    Did the Supreme Court specifically outlaw the

14   practice that Virginia and Richmond had enacted in

15   Buchanan versus Royal in 1917?

16   A    Yes.

17   Q    But did that stop Richmond and Virginia from

18   trying to continue segregating residences?

19   A    No, not at all.

20   Q    You talked about 1920s, 1930s.  Is that the case

21   that we are talk about, Benjamin Deem's case?

22   A    Yes.

23        So Benjamin Deems was, I believe, an insurance

24   agent.  Don't quote me on that.  But he was hired,

25   excuse me, wasn't hired, he was approached by attorneys

1    who tried to overturn segregation originally with

2    Hopkins versus Richmond.  They told him to buy a home

3    in a white neighborhood.  And then to occupy it.  That

4    is what he did.  Of course, he was slapped, not

5    slapped, but arrested, fined, and that is when he

6    challenged it in court and eventually he won.  So, yes,

7    it was challenged by Benjamin Deems who, again, did it

8    on purpose.  The goal was to try to get the law taken

9    off the books.

10   Q    Have you talked about these -- have you written

11   about these events?

12   A    Yes.

13   Q    Specifically, did you write about these events in

14   your article called Down Where the South Begins?

15   A    Yes.

16   Q    Flip in the exhibit book to defendant's exhibit

17   ten, which is going to be halfway through.

18   A    Got it.

19   Q    Do you recognize what is in defendant's exhibits

20   ten as an article Down Where the South Begins?

21   A    Yes.

22        MR. SIEBERT:  Judge, I move to admit defendant's

23   exhibit ten.

24        MR. GIBBONS:  No objection; however, we have an

25   ongoing objection to relevance.  We hope we get to the

 1    recent history quickly, Your Honor.

 2          THE COURT:  Well, I share your hope.

 3    BY MS KOENIG:

 4    Q    What other steps did the City of Richmond, aside

 5    from laws and ordinances, take to enforce residential

 6    segregation in the 1930s 1940s?

 7    A    Yes, a few things.  It was for one, a newer

 8    emphasis on city planning.  So The Greater Richmond

 9    Plan and later would be the master plan, these were

10    City plans that were adopted by the City council, then

11    eventually later the Housing Authority, Richmond

12    Housing Authority, which would come about in the 1930s.

13    And their goal was to better organize the City of

14    Richmond like other cities throughout the country.  So

15    they did this through two things.  One of the main

16    objectives of that was to remove black people from the

17    core of the City.  Remove them from downtown area and

18    reserve that space for business interests, and also

19    wealthy white occupancy.

20    Q    Where did black families get removed to?

21    A    So, yeah, by the World War II era, that would be

22    the east end, so Housing Project Development.  That

23    started originally in the 1930s, at lease the idea of

24    it started 1930s.  And it got off the ground by the

25    1940s.  But the Federal Government coming in, and also

1    providing funds and the Richmond Housing Authority,

2    would be the ones who were organizing it on behalf of

3    the City.  And yeah, they began to house working class

4    black families, working with under class black families

5    as a response, as a direct result of urban renewal,

6    right. so part of removing people from the core of the

7    City, poor people from the core of the City.  Something

8    would have to replace them.  Of course it would be

9    business, of course it would be wealthy white

10   occupancy.  Another thing would be interstates and

11   highways, these are pathways that could connect middle

12   class people who lived further out in the county or

13   moving further out in the counties.  Deprived them of

14   access to downtown areas.

15   Q    So black are being moved to the east end of the

16   City.

17   A    Yes.

18   Q    Whites moved to the west end and suburbs?

19   A    Well, so, they are not being moved per se they are

20   being encouraged to go elsewhere, primarily the

21   suburbs, through plans like block busting.

22   Q    Let's talk about what that, how they were being

23   encouraged.  Were there advertisements that were

24   helpful in that process?

25   A    Yes.  So newspapers in Richmond, only a few

1    newspapers.  There was one major black newspaper, and

2    two major white newspaper.  They would print different

3    housing advertisements based upon the neighborhoods.

4    So white neighborhoods, white -- vacant available homes

5    in white neighborhoods would be printed in those

6    newspapers.  And the other would be posted in black

7    newspapers.

8    Q    At the time Richmond had a black newspaper and had

9    some white newspapers, right?

10   A    Yes.

11   Q    So advertisements for white houses in white

12   neighborhoods were posted only in the white newspaper?

13   A    Yes.

14   Q    And the reverse was for black homes in black

15   neighborhoods posted in the black newspaper?

16   A    Yes.

17        I'm sorry.  Go ahead.

18   Q    That is okay.

19        Was there a payment, like real estate agents

20   compensated to do things like that?

21   A    Yes.  So black real estate agents actually worked

22   with white agents to do things like this, for instance.

23   If an area opened up, or let's say a group of real

24   estate guys, we are talking lenders, we are talking

25   people on the ground, they want to fill up parts of

1    Chesterfield and Henrico which were filling up with

2    suburban housing and suburban residency.  They would

3    try to encourage whites to relocate out of the City.

4    So they, white real estate agents would pay black ones

5    to send black families in white neighborhoods they

6    wanted to transition.  That is what block busting is.

7    So when they sent them there white people would be

8    alarmed.  Oh my God, blacks are moving in.  And when

9    that happened for sale signs would go up, and whites

10   would leave.  And many of them would relocate to

11   Chesterfield and an Henrico, Chesterfield and Henrico

12   primarily.  Some would move into south side of, the

13   south side of Richmond.  But most would go directly to

14   the suburban counties.  And filling those vacant homes

15   in those formally white neighborhoods would be

16   middle -- first, middle class black families and

17   eventually working class black families.

18        THE COURT:  Let's see if I have got this straight.

19        The real estate agents would cooperate with each

20   other to sell houses in predominantly white

21   neighborhoods to black people hoping that the white

22   people would move out?

23        THE WITNESS:  Yes.

24        THE COURT:  And that was a way of developing the

25   suburbs.  And then I guess they also made money by

1    selling the houses in white neighborhoods to black

2    people?

3          THE WITNESS:  Yes.  It was seen as everyone wins.

4    Right.

5          THE COURT:  Yes.

6    BY MS KOENIG:

7    Q     Did the Federal Government also participate

8    through process of red lining?

9    A     Yes.

10   Q     Tell us briefly what red lining is.

11   A     Briefly the Federal Housing Authority, which was

12   part of, which is a part of the Federal Government, it

13   was a department created by the Federal Government to

14   bring the housing industry back in, and one of the ways

15   was to provide insurance for mortgage loans.

16         THE COURT:  To recover from the depression?

17         THE WITNESS:  Yes.

18         THE COURT:  And then the arrival of people back

19   from World War II.

20         THE WITNESS:  Yes.  Yes.

21         So one of the ways that the FHA would insure homes

22   was that they needed, they needed to know which

23   neighborhoods or what area of a residential area were

24   safer to insure and those that were not.  So they

25   worked with local housing authorities to determine

1    which neighborhoods were safe to invest in, which were

2    ones were not.  And there is a box written on this,

3    actually, and other historians that have talked about

4    it.  But in urban areas throughout the south, Richmond

5    being one of them, every single black neighborhood was

6    listed as do not invest in, so don't.  So mortgage

7    activity in those neighborhoods were next to nil.

8         Whereas white neighborhoods and mixed, what would

9    be considered then would be mixed neighborhoods, so

10   like 20 percent black people lived there and it was

11   mostly white folks would get the majority of the

12   mortgage activity.

13        THE COURT:  They would get mortgage insurance --

14        THE WITNESS:  Yes.

15        THE COURT:  -- which allowed the lenders --

16        THE WITNESS:  Yes.

17        THE COURT:  -- to make the loans for that area.

18        THE WITNESS:  Yes.

19        THE COURT:  Otherwise they wouldn't take the risk

20   in an area without mortgage insurance.

21        THE WITNESS:  Yes.

22        THE COURT:  You said something earlier that I

23   chronologically didn't grasp.  You said that part of

24   the removal of African-Americans from white, from the

25   then predominantly African-American neighborhoods,

1    housing projects, was done by the location of highways.

2    I had understood that the bulk of that, at least in

3    Richmond, occurred when they ran interstate 95 through

4    the heart of the African-American community.

5         THE WITNESS:  That was one of them.

6         THE COURT:  Which was later then seemed like you

7    had chronologically placed that in earlier testimony.

8         THE WITNESS:  Yeah, so when people talk about,

9    what is it, interstate 95 and things like that in

10   Richmond, that is kind of the poster child for black

11   removal.

12        THE COURT:  What were the earlier roads?

13        THE WITNESS:  Earlier roads?  I could not tell you

14   the earlier roads.  I do know that the Richmond, that

15   the Richmond Housing Authority worked with the Federal

16   Government in 1930s to try to get blacks out of the

17   core of the City.  So it wasn't necessarily the roads

18   were the number one thing.  It was thee needs to be

19   more, needs to be more segregation in the City to

20   protect; one, the core of the City; and also to

21   maintain the racial integ -- it was called the racial

22   integrity of the City tie.  And so --

23        THE COURT:  What were the buildings that went up?

24   Tell me what went up in Richmond that occurred after

25   blacks folks were sort of herded into housing projects.

1    Are you talking about Thalhimers, Miller and Rhoads, or

2    what are you talking -- what was it?  I haven't -- I am

3    pretty familiar with Richmond.

4         THE WITNESS:  Right.

5         THE COURT:  And I am having trouble figuring out

6    for myself what it was that they built when they

7    displaced all the African-Americans.

8         THE WITNESS:  Yeah.  For some places it was roads,

9    others -- well, so, let's say downtown expressway, that

10   was one.  I 95 --

11        THE COURT:  That didn't happen until the '70s.

12        THE WITNESS:  Sorry.  Late '60s, early '70s.

13        THE COURT:  It just opened up when I moved here.

14        THE WITNESS:  Right.

15        And also, I mean, gosh, I could not tell you the

16   name of the buildings that were put up in place of

17   blacks being moved out of the core of the City, but the

18   fact is they were.  The goal was to open up the

19   downtown area to -- for better organization, better

20   business, organization of business, business buildings

21   being built.

22        THE COURT:  All right.

23        So, again you are kind of losing me here.  Well,

24   like, take for instance where the -- I mean, Jackson

25   Ward continues to be a neighborhood.

1          THE WITNESS:  Yes.

2          Smaller than it was, but yes.

3          THE COURT:  So where did -- what part of it went

4    away?  Is it like where the coliseum is and all that?

5          THE WITNESS:  Yes.  That didn't come into play

6    until '68 I believe when that was built.  It was

7    starting early '60s.  But, yes, a lot of that was taken

8    away because of the highways in the 1950s.  And slum

9    clearance.  But, yes, again, the agenda was to remove

10   poor blacks from the core of the City.

11         THE COURT:  All right.  Go ahead.

12   BY MS KOENIG:

13   Q    That's okay.

14         And are we also talking about the Shockoe Slip

15   area that is now fully a business district?

16   A    Yes.

17   Q    And that entire district was vacated over the

18   decades?

19   A    Yes.

20         THE COURT:  I mean I used to work down there.  All

21   that stuff goes back to the civil war.

22         THE WITNESS:  Right.

23         THE COURT:  So where did people live down there?

24         THE WITNESS:  Where?  They lived right along the

25   river down there.  That is where they lived.  So like

1   in shanties, not like organized neighborhoods.

2         THE COURT:  Those houses are no longer there.

3         THE WITNESS:  Absolutely not.

4         THE COURT:  As near as I cana tell there is not --

5   no houses were built to replace them.

6         THE WITNESS:  Not at all.

7         THE COURT:  Okay.

8   BY MS KOENIG:

9   Q    So, after World War II what -- was there a master

10  plan that was created?  Mentioned that earlier and I

11  want to talk more about that with you now.

12  A    Yes.  So the master plan again was to, the master

13  plan, it was a plan created by, I forgot the City

14  Planner's name, but went and shopped it around to

15  various cities.

16  Q    In your report you referred to him as Harlan

17  Bartholomew.

18  A    That is the guy's name.  And so shopped it around.

19  Richmond was one of the ones that adopted it.  So the

20  plan was to increase urban real estate value, and to

21  again maintain the, quote unquote, integrity of the

22  City through it's City core.

23        And the best way was to maintain racial

24  segregation and residency.  And so the plan was how do

25  you begin to get people from the core of the City out

1    to the outskirts of the City, because by the time

2    that that master pan was adopted Jackson Ward was no

3    longer on the outside of the City, it was center of

4    City now.  So there needs to be a way to get people

5    from the downtown area, or near the downtown area and

6    get them closer to the periphery of the City.  So that

7    is where essentially you get the emphasis on, okay,

8    let's get poor black people out to the east end,

9    because that was a largely un -- I mean super under

10   developed area at that time.

11   Q    Was the goal to merge Richmond with Henrico and

12   Chesterfield County?

13   A    Yes.  Sort of create a larger metropolitan area.

14   So cities throughout the post World War II had combined

15   City and suburb into one locality; Chicago, Cook

16   County, Davidson, you name it.  And so the best -- the

17   goal was to have your, what Lassiter calls island

18   suburbs pay for the urban core.  So you have suburban

19   rings on the outskirts, outskirts, like further out and

20   as you get closer to the City you have organized

21   patterns of segregated neighborhoods and black

22   neighborhoods and white neighborhoods.  But the further

23   out you go around suburbs, that is where the wealthy

24   people would live, and then some in City core as well.

25   And they would basically pay for the metropolitan

1   growth, the need for new roads, schools, you name it.

2   But the only way that could happen is if you had more

3   racial segregation, because that maintained

4   neighborhood integrity.  Because the neighborhoods that

5   were all white had higher property values than those

6   that did not because those were the ones that FHA and

7   other entities would invest, would invest not just

8   mortgages but mortgage insurance and they were

9   considered to be better risk for lending.

10          THE COURT:  Isn't it also a fact that when you are

11   doing planning one of the things you try to plan for

12   are areas that don't require public services.  So, for

13   instance, that is why you have industrial parks.

14          THE WITNESS:  Yes.

15          THE COURT:  Industrial parks are places that

16   provide jobs, and places where people live, that have

17   highly valued property, pay a lot of property tax, but

18   does not demand services other than really water and

19   sewer, sewage for the plants.

20          THE WITNESS:  Yes.

21          THE COURT:  And that is far more productive in

22   paying for the way the City works than having

23   residential neighborhoods.  Residential neighborhoods,

24   whether black, white, or anything else, demand immense

25   numbers of services.  Schools, for instance.

1          THE WITNESS:  Yes.

2          THE COURT:  So I don't see -- I don't get what you

3     are saying about how maintaining white neighborhoods

4     allowed the expansion of the City.  I think, as I read

5     it one of the main errors of the 1970 zero annexation

6     of the City is the City took predominantly residential

7     areas and had to provide services to them without a

8     concomitant expansion of the non-service demanding tax

9     base.

10         THE WITNESS:  That is correct.

11         THE COURT:  So they did it to get white voters.

12    But it backfired on them.

13         THE WITNESS:  Yes.  That is two different things.

14         When I say master plan, when I talk about master

15    plan from the '40s, '40s going into the '50s, all that

16    stuff was baked into the project.  It wasn't

17    exclusively, hey, let's all focus on race.  Race was

18    part of the grand plan to create --

19         THE COURT:  Richmond tried to remain segregated as

20    long as it could.

21         THE WITNESS:  Yes.

22         THE COURT:  When I came here in '76 it was a

23    highly, highly segregated City.  And pretty much

24    remained so.  But, obviously it was supported by the

25    Government for many years.

1          Go ahead.

2     BY MS KOENIG:

3     Q     So what the matter plan was an idea to merge

4     Richmond and Henrico and Chesterfield?

5     A     Yes.

6     Q     In part to maintain a white majority by making the

7     City white population larger?

8     A     Yes.  A hundred percent.

9     Q     When talking about moving from one location to

10    another, was it the idea was that a lot of folks, white

11    folks, that lived in the suburbs would come work in the

12    City and then travel back to where they lived at the

13    end of the day?

14    A     Yes, yes.

15          THE COURT:  When you say merged into one city --

16          THE WITNESS:  Yes.

17          THE COURT:  -- do you mean actually do away with

18    the --

19          THE WITNESS:  Jurisdictional boundaries, yes.

20          THE COURT:  So it would be like what they did with

21    the Charlotte.

22          THE WITNESS:  Mecklenberg.  Absolutely.

23          THE COURT:  But, so the idea was that eventually

24    most or all of Henrico, and most or all of northern

25    Chesterfield would become part of the City of Richmond.

```
 1          THE WITNESS:  Yes, absolutely.  Richmond tried,
 2   their first attempt to do that was with Henrico County
 3   in 1960s, I want to say 1961, 1962.  I could be wrong
 4   on the years.  But they attempted a merger; however,
 5   Henrico County voters by and large voted against it.
 6   And ever since, ever since then and also they reached
 7   out to Chesterfield County leadership.  They were not
 8   responsive.  Ever since then it was, okay, we are going
 9   to see you in annexation court and just bite off chunks
10   of your counties as much as we can until we get what we
11   want, and that is a major metropolitan area.  So the
12   goal was to get rid of jurisdiction lines and make what
13   is now Richmond, Henrico and Chesterfield into one
14   larger city.  That was the plan.
15   Q    And so --
16          THE COURT:  That was not, that was not a purely
17   Richmond factor.
18          THE WITNESS:  No.  No.  Sorry.
19          THE COURT:  You no longer have Princess Anne
20   County.
21          THE WITNESS:  That happened a little bit later.
22   Those two localities, Princess Anne County and, God,
23   Virginia Beach City, they merged willingly.  Like that
24   was kind of a marriage.
25          THE COURT:  I thought most of those Chesapeake and
```

1    South Norfolk and Suffolk and Nansemond County, and I

2    guess to a certain extent Newport News and Denbigh

3    County?

4         THE WITNESS:  Newport News.  Oh, it was Warwick

5    County.

6         THE COURT:  Warwick County.

7         THE WITNESS:  Yes.

8         THE COURT:  They merged voluntarily so their kids

9    wouldn't have to go to City schools.  And they would

10   have, maintain a white majority voting.

11        THE WITNESS:  Yes, by and large, yes.  So, yes.

12        In the Tidewater you have got a lot more willing

13   mergers.  In the Richmond area you didn't.  The same

14   thing in northern Virginia, places like Fairfax County,

15   to be exact, they were just not on board with merging

16   with Alexandria and other cities that wanted to take

17   parts of them, or take all them if not parts.

18        THE COURT:  But in Tidewater they shut out Norfolk

19   and Portsmouth.

20        THE WITNESS:  Yes, a hundred percent.

21        THE COURT:  To a certain extent Hampton.

22        THE WITNESS:  Have you read my book?

23        THE COURT:  No, it will shock you, but you talk

24   about history I know about.

25        THE WITNESS:  Fair enough.  Fair enough.

1        But, no, you are a hundred percent correct.  Like,

2    that is spot on.

3    BY MS KOENIG:

4    Q    And so when we are talking --

5        THE COURT:  Could we just take judicial notice of

6    this stuff and move on?

7        MS KOENIG:  We are about to move on, Your Honor.

8    BY MS KOENIG:

9    Q    So when we look at -- let's go back to defendant's

10   exhibit 19, which is still on the screen here.  We see

11   this dark color that is south, primarily south of the

12   river, James River?

13   A    Yes.

14   Q    And that seems to be indicated on the map,

15   that that is the area that was annexed by the City of

16   Richmond in 1970s?

17   A    Yes.

18   Q    Tell us about that annexation.  What was the

19   racial make up of this area in that dark sort of

20   burgundy color?

21   A    Historians say between 95 and 97 percent white was

22   what the demographics of that area were at the time.

23   And around, between 43 and 45,000 people lived

24   residentially, so, yes, majority white, and majority

25   suburban.

1    Q    Once that happened in the '70s in Richmond are

2    there things that are happening in the City about

3    school segregation?

4    A    Yes.  The City of Richmond tried to backdoor their

5    way into a metropolitan area by combining the schools.

6    Because that was the only way they were going to

7    fulfill the mandate in Brown One and Brown Two.  So it

8    kind of served their interests both ways.  So for one

9    they get to finally live up to school deseg -- school

10   integration as opposed to desegregation.  And also they

11   could combine public service, a public service between

12   Richmond, Chesterfield and Henrico.  And that could at

13   least set the precedent for eventually getting that

14   metropolitan area they wanted.  But it blew up in their

15   faces.

16   Q    What do you mean it blew up in their face?

17   A    Chesterfield and Henrico challenged in court, in a

18   few years, and the Fourth Circuit Court of Appeals and

19   eventually the Supreme Court -- well, the Supreme Court

20   was a deadlock -- but the Fourth Circuit Court of

21   Appeals ruled against Richmond trying to use the

22   courts, the federal courts to do their bidding.  And

23   the idea that came to, that resonated to the top was

24   the Dillon Rule, right.  So that localities cannot use

25   the courts to try to bully other jurisdictions into

1    doing what they want them to do.  Jurisdiction has only

2    as many rights as the state government, that the state

3    government gives them, because they are subsidiaries of

4    the state government.

5    Q    And when you say the Dillon rule, it is

6    D-I-L-L-O-N rule, right?

7    A    Yes.

8    Q    That is the law that the legislature passed?

9    A    Well, no, it wasn't a law that they passed, it was

10   a, it was a, it was a court decision that was at least

11   1868, so old, so long ago, but it was an idea that

12   was -- that was the main idea that the federal, Fourth

13   Circuit of Appeals used.

14        THE COURT:  The Dillon rule says --

15        MS KOENIG:  I'm sorry.  I misspoke, Your Honor.

16        THE COURT:  -- local governments have only those

17   powers expressly given to them by the legislature --

18        THE WITNESS:  Yes.

19        THE COURT:  -- or necessarily implied.

20   BY MS KOENIG:

21   Q    And that is what Judge Merhige relied on and

22   Fourth Circuit relied on to tamp down this plan, right,

23   that Richmond wanted to --

24   A    Well, Judge Merhige in Richmond's favor.  The

25   Fourth Circuit Court of Appeals ruled against them and

1    it was the Dillon rule that they brought up as, hey,

2    Richmond, you only have as much power as the state

3    gives you.  You can't just use the federal courts to

4    bully your way into Chesterfield and Henrico using

5    schools.  When Richmond appealed to the Supreme Court

6    they lost.  Not lost, but it was a deadlock, one voter

7    abstaining, and that was Justice Powell, who was a

8    Richmond native and served on the school board, served

9    as a superintendent of schools here.

10        THE COURT:  Not the superintendent of schools.  He

11   was chairman of the school board.

12        THE WITNESS:  Okay, that's fine, chairman of the

13   school board, yes.  So he abstained and it was a

14   deadlock and at that point the case was closed.

15   BY MS KOENIG:

16   Q    And you wrote about all of this in your 2016

17   masters thesis, right?

18   A    Yes.

19        THE COURT:  What is this book you are talking

20   about?  I don't see a published on your curriculum

21   vitae.

22        THE WITNESS:  So I have a book that is under

23   contract with the University of Virginia --

24        THE COURT:  Courage to Change?

25        THE WITNESS:  Yes.

```
 1          THE COURT:  Okay.  All right.

 2     BY MS KOENIG:

 3     Q    So if you can flip to defendant's exhibit 11.

 4          Do you recognize defendant's exhibit 11 as your

 5     masters thesis?

 6     A    Yes.  So long ago.

 7          MS KOENIG:  I move to admit this as defense

 8     exhibit 11.

 9          MR. GIBBONS:  No objection, Your Honor.  Same

10     relevance objection.

11          THE COURT:  It is kind of hearsay.  But I assume

12     he is going to explain this is all true --

13          MS KOENIG:  Right.

14          THE COURT:  -- and sort of give us the executive

15     summary.

16     BY MS KOENIG:

17     Q    Before you wrote your masters thesis, Dr. Chiles,

18     you did a fair amount of research, right?

19     A    Yes.

20     Q    Interviewing folks, looking at original sources,

21     things like that?

22     A    Yes.

23     Q    Did a lot of investigation before you wrote this

24     thesis?

25     A    Yes.  Absolutely.
```

1   Q    What you put in this thesis is the result of your

2   research and findings of your research?

3   A    Yes.

4   Q    Let's talk about 1977 and the City of Richmond.

5        THE COURT:  Are we going to relate this to law

6   enforcement at some point?

7        MS KOENIG:  We are.  We are getting very close.

8        THE COURT:  Let's get even closer.

9   BY MS KOENIG:

10  Q    In 1977, Your Honor -- I'm sorry, Dr. Chiles --

11  was there a change about the leadership of the City of

12  Richmond?

13  A    Yes.

14       So the leadership as in the City Council was

15  majority black for the first time ever in history.

16  Five black, four white members, nine in sum.

17  Q    What happened as a result of the there being a

18  black majority for the first time ever on the City

19  council in Richmond?

20  A    Yes.  So black majority came in, came into power

21  into a city that was financially hamstrung.  Suburban

22  flight had just completely decimated its tax base.  Had

23  been doing it for decades up until that point.  But the

24  chickens were slowly coming home to roost on that.  And

25  they needed to find a way to, needed to find a way to

1    attract suburbanites back to the City.  Not just as

2    consumers and workers -- they were already doing

3    that -- but workers more so than consumers.  But they

4    needed to bring them back as residents.  They tried

5    various urban revitalization plans, the building of a

6    downtown mall, business parks to attract to come back

7    from the suburbs, and to come from out of town.  One of

8    the issues they ran into was crime.  As something

9    people cited, business leaders more specifically, cited

10   that was like one of the number one issues why they

11   would not invest in Richmond's quote unquote, rebuild

12   when black leadership came into power, so, yes, that

13   was the issue.

14   Q    So you talked about the revitalization project.

15   And I think you mentioned Project One?

16   A    Yes.

17        THE COURT:  Didn't mention it yet.  Referred to

18   it, but he didn't mention it.

19   BY MS KOENIG:

20   Q    Tell us what Project One was.

21   A    It was a City-sponsored endeavor in which they and

22   also a non-profit business coalition which was

23   Richmond, Jesus Christ, Downtown Development Unlimited,

24   DDU.  They came together with the City Council to build

25   business infrastructure downtown, so office buildings,

1    parking decks, things like that.  And the goal was to

2    attract industry back.  One --

3          THE COURT:  Richmond Metropolitan Authority is

4    what you are talking about.

5          THE WITNESS:  Sorry.

6          THE COURT:  Talking about the Richmond

7    Metropolitan Authority.

8          THE WITNESS:  No.

9          THE COURT:  Build parking decks and all that?

10         THE WITNESS:  No.  I'm talking about Downtown

11   Development Unlimited.  So it was chaired by Andrew

12   Brent, attorney here.  And it was a bunch of

13   businessmen who ran it, non-profit group, and their

14   goal was to attract industry back, and the best way to

15   do it was to get the City to invest in building new

16   business infrastructure.

17   BY MS KOENIG:

18   Q    So the feedback that they were getting is, we

19   don't want to invest in the City, it is too crime

20   ridden.

21   A    So from them, not specifically.  It was from the

22   people who, Richmond Renaissance, who built the

23   Downtown Mall.  That came along in the mid 1980s.  So

24   by the mid 1980s they, as in Richmond Renaissance and

25   the City, they are doing surveys of various

1    neighborhoods.  And just to kind of get to understand

2    what they looked like, what is the demographics, and

3    also talking to business leaders.  And in some of these

4    surveys they are saying, I mean flat out, hey, crime is

5    biggest issue here.  If you want to get more

6    investment, you have to tamp down on the crime problem.

7    Q    So what did the City do to do that?

8    A    They began creating task force, various task

9    forces that were designed to target high crime areas,

10   or what they think were high crime areas.  So, yes, the

11   City police, they would try to hire more officers and

12   to create various departments for them, various groups

13   that would go into high crime areas, mostly the housing

14   projects in the east end.  And they would set up shop

15   there, sit there try to catch people doing hand-to-hand

16   deals.  Also try to do drug raids.  There was what they

17   were targeting mainly drugs and guns is what they were

18   after.

19   Q    Did that project have a name?

20   A    God.  Yes, it did.  What is the name?  I'm sorry.

21   I'm blanking on it right now.

22   Q    Was it called the SNAP Program?

23   A    SNAP, Strategic Neighborhood Something Something

24   Something.  Yes, but that was one of many.  They had

25   various other programs, other programs, but that was

1    the one that City Manager Robert Bobb, that was the one

2    he promoted the most.

3    Q    Did that effectively start militarizing the

4    Richmond Police Department on certain neighborhoods in

5    Richmond?

6    A    It didn't start it.  It didn't start militarizing.

7    It more so cemented it.  Militarization started in the

8    1960s with the threat, or let of fear riots coming to

9    Richmond in the aftermath of Martin Luther King dieing.

10   That is when the police really started to get tactical

11   training, started to get anti-riot gear.  They were

12   being prepared by City, being funded by City

13   leadership, prepared by police leadership to focus on

14   anti-riot things.  So that is when the militarization

15   really started with police.  But by the time we get to

16   the 1980s they are taking, they are focusing

17   exclusively on black neighborhoods.

18        Again, I mean, I guess you could you stay

19   militarizing, you know, doing raids.

20        THE COURT:  I am not sure what you mean by

21   militarizing.

22        THE WITNESS:  So body armor was, they are getting

23   more, what you call it, not military grade gear, but

24   their gear is not just a uniform, a gun, and badge.  It

25   is a hard helmet, it is what do you call it --

1         THE COURT:  Body armor?

2         THE WITNESS:  Yeah, body armor and things of that

3    nature.

4         Yes, so they are getting that stuff started in

5    1960s.

6         Now, how often they were using it, I don't know.

7    But they started getting it in the 1960s, that I do

8    know.  And by the 1980s the police are targeting, are

9    targeting crime what is the high crime areas.

10        As a result of the City manager setting out his

11   agenda said, hey, we need to tamp down on crime because

12   it is hurting investment in Richmond.

13        THE COURT:  So, and high crime areas happen to be

14   predominantly African-American --

15        THE WITNESS:  Yes.

16        THE COURT:  -- is that correct?

17        THE WITNESS:  Yes.  Yes.

18        MS KOENIG:  So --

19        THE COURT:  Tell me what, how they identified

20   African-American areas as high crime areas.

21        THE WITNESS:  How they identify them?

22        THE COURT:  Yes.

23        THE WITNESS:  1980s they did neighborhood surveys.

24   They went through, they went through, again, checking

25   to see where people lived, where did they work, how --

1    where did they work, how much they made, things like

2    that.  Also, I mean, I would assume they would have

3    some internal data.  Again, I cannot confirm this, but

4    I would assume that the police back then had some

5    internal data to which areas were high crime and which

6    areas weren't.

7         I would assume that they had that information.

8         THE COURT:  You don't know that?

9         THE WITNESS:  I don't know.  I don't know from

10   that time period where they got, say, or said, okay, we

11   know these five neighborhoods have the, are engaged the

12   most in drug dealing.  Like, I don't know how they

13   would come to that conclusion.  I would assume they

14   would get that information from officers on the ground.

15   They would have some sort of internal --

16   BY MS KOENIG:

17   Q    We won't ask you to assume, Dr. Chiles --

18   A    I'm sorry.

19   Q    That's okay.

20        THE COURT:  Here is the thing.

21        It's an interesting question that you raise that

22   they were targeting high crime areas.  And one of the

23   ways they identify high crime areas was through asking

24   public's opinion.

25        THE WITNESS:  Yes.

1          THE COURT:  I will tell you, I live in the area
2     that was an annexed in the 1970s.
3          I am a white person.  I lived in what was not
4     exclusively, but predominantly, a white area.  And many
5     of my neighbors were pretty well angered about being
6     annexed from Chesterfield County into the City.  And
7     they felt that there was, they were now opened up to
8     all kinds of crime.  And I will tell you that their
9     feelings were based on absolutely zero empirical data.
10    Just what they believed.  They said, well, I live in an
11    area with a lot of African-American people, I don't
12    know if they used must less polite terms, and there is
13    going to be crime everywhere.  But I don't know whether
14    that was an accurate presumption or not.  And neither
15    do you, apparently, because you assumed that they had
16    data that shows that there was more crime in black
17    areas than white.
18         THE WITNESS:  I like to think that I am rational
19    in some way.
20         THE COURT:  Well, you are rational, but, I mean,
21    why do you think that?
22    BY MS KOENIG:
23    Q    So, Dr. Chiles --
24         THE COURT:  Tell me, why do you think that?  Why
25    do you think -- do you believe there was more crime in

1    black areas of town than white areas of town?

2         THE WITNESS:  When?  In 1980s?

3         THE COURT:  Yes.

4         THE WITNESS:  Probably.

5         THE COURT:  Why is that?

6         THE WITNESS:  Poverty.  So history has

7    consequences.  That is something that we don't like to

8    admit nowadays.  So when people have been segregated,

9    confined, given, or provided, or given, yes, given an

10   inferior education that doesn't allow them to compete

11   in a traditional economy like everyone else, the result

12   is that crime is typically higher in those areas.

13   Again, you don't have to have a PhD from Harvard to

14   know that.

15        THE COURT:  Or even from Georgia.

16        THE WITNESS:  Or from Georgia.  A little step

17   down, right, but yes.

18        THE COURT:  Not at all.

19        THE WITNESS:  So when you have, so, yes, when you

20   have that happening for generations, literally

21   generations that happens, what is it, crime is going to

22   be the natural result, especially disproportionate to

23   the rest of the City.  So, of course, these things are

24   going to happen, more crime, more, higher crime area

25   than say the far west end because people in the east

1    end have systemic poverty going against them for so

2    long.  So that is what I would say to answer that

3    question.

4    BY MS KOENIG:

5    Q    Do you see, did you see, Dr. Chiles, the long-term

6    impact of removing blacks from certain parts of town

7    and denying them the access to gain mortgages?  Did we

8    see that impact play out in the data that you found in

9    the 1970s and 1980s?

10   A    Yes.  Yes.  Absolutely.  There is definitely a

11   connection between the two.

12   Q    What did you -- what does the data say about

13   mortgage activity in black areas and white areas in

14   Richmond in the 1980s?

15   A    Black areas had next to none.  They had close to

16   zero mortgage activity whereas white areas had all of

17   it, nearly all of it.  We are talking in the 80 percent

18   range of mortgage activity in the Richmond area.

19        So, it wasn't until the mid, the early to mid '80s

20   that local groups in Richmond stopped, real estate

21   community -- so we are talking about mortgage lenders,

22   real estate firms, those who were represented on the

23   board of realtors for much of the 20th century -- to

24   stop engaging in that behavior.  And they used the

25   Community Reinvestment Act as a way to do it.  So

1    basically threatening to get the Federal Government to

2    pull bank charters and bank mergers, because those

3    firms had been engaging red lining and block busting

4    illegally throughout 29th Century.

5    Q    And last year did you publish an article that

6    detailed all of your research and findings on those

7    more recent topics we have been talking about?

8    A    Some of them, yes.

9    Q    If you can look at defendant's exhibit 12.

10        Do you recognize that article that you have

11   entitled Here We Go Again as the article from 2021?

12   A    Yes.

13   Q    Is that article the publication of, as you said,

14   some of your findings, not maybe the complete

15   recitation, but some of your findings that we have just

16   discussed on the topics that we are happening in

17   Richmond from 1977 until closer to now?

18   A    Yes.

19        MS KOENIG:  I move to admit defendant's exhibit

20   12.

21        MR. GIBBONS:  No specific objection, but same

22   relevance objection, Your Honor.

23        THE COURT:  All right.  Admitted.

24   BY MS KOENIG:

25   Q    I want to bring your attention back to exhibit R

1    2.   That is on the screen.

2         You can look at it.  A little fuzzy in terms of

3    color on The Court's monitor.  But, where we see these

4    areas of green, and where we see the areas of blue, in

5    your knowledge, with your knowledge of the history of

6    residential segregation in Richmond based on race, is

7    it by happenstance that green dots are where they are

8    and blue dots are where they are?

9    A    No.

10   Q    What is it the cause of?

11   A    Again, the tide of history.  So, again, black

12   people were, one pushed to the outside of the City,

13   talking pre-slavery, or pre-end-of-slavery,

14   post-slavery, blacks had been pushed again by local

15   Government and private, and the private real estate

16   industry as well, out to the east end.  The blacks who

17   could avoid such fate, especially between 1950s and

18   1970s, began moving to the north side.  Those who were

19   more middle class, basically less affluent were moving

20   to the south side.  Just as an affordable housing

21   option because of urban renewal plans.  From much of

22   that we see that that is still the case today.  Again,

23   but, no, there is no, this is not by happenstance that

24   blacks and whites live segregated in Richmond.  And

25   where they live, I mean because if you look at the

1   historical patterns, that is where black people were

2   forced to live in the past.  So surprise, surprise,

3   black people are still living in there in abundance

4   today.

5        Other things that we haven't discussed, and I did

6   not put in the report about education or the lack

7   thereof, access to the tech-based or soft-skills based

8   economy, all those things play a factor.  But by and

9   large blacks and whites were basically forced or coaxed

10  to live in separate sides of the City from the past to

11  the present.  And the result of that is in the present.

12  Q    I want to talk with you now about the Richmond

13  Police Department and its history of conflict with the

14  back population of Richmond specifically.

15       Briefly move to the historical aspect.

16  A    Got you.

17  Q    After the revolutionary war what happened with the

18  Richmond Police Department?

19  A    Richmond Police Department was effectively turned

20  into a group by the citizenry here in Richmond on

21  focusing on free blacks and focusing on slaves to

22  prevent them from starting insurrections.  So there was

23  a huge fear in the early 1800s of slave insurrections.

24  A lot of that came from the history of revolution.

25  Other slave rebellions that happened throughout the

1    country.  And so the police were effectively turned on

2    to them.  Whereas prior to the revolution police in

3    Richmond, their focus was not on black people hardly at

4    all.  There were hardly any free black people right

5    before the revolution.  And also, slaves were seen as

6    the problem of their master, they were not the problem

7    of people around them necessarily.  So police would

8    focus more on horse thieves, and pig thieves and, you

9    know, Indian nations that would come through.

10        But, yes.  So after the revolutionary war police

11   started targeting blacks in Richmond.

12   Q    What happened with policing in Richmond after the

13   civil war ended?

14   A    After the civil war, I said it before, they began

15   to target black people because; one, they were free;

16   and there was a general anxiety about what that freedom

17   meant.  You know, were they going to completely flout

18   tradition and just, again, not to speak to whites the

19   way they were supposed to, were they going to up and

20   move to white areas.  Like, what's going to happen.  So

21   police in Richmond, again, they doubled down more so on

22   their enforcement of black people because again, there

23   is more free black people available than there were

24   before.

25   Q    Did the Richmond Police Department ever -- was it

1    ever accused of voter supression?

2    A     Yes.  Police Department in the late 1800s, so this

3    is just around the time of Jim Crow, disfranchisement

4    law, segregation, being formalized.  State

5    legislatures, city councils, in places of that nature,

6    voting was really important.  So black Richmonders --

7    again this is happening throughout the country,

8    Richmond is no no exception -- black Richmonders tried

9    their best to vote people into office, local, at the

10   local and state level who would not support Jim Crow

11   legislation, would not support disenfranchisement,

12   segregation.  And in some cases -- John Mitchell

13   documented this throughout his struggles in the late

14   1800s about black people going to the polls and being

15   chased away by angry white Democratic mobs.  In some

16   cases police were out there to help them to do the

17   deed, to basically prevent them from putting their

18   ballot in the ballot box.  So, yes.  Yes, I will just

19   leave it there.

20   Q     When the Richmond Police Department started

21   arresting white people was there a significant outcry

22   about that?

23   A     Yes.  So when they increased their arrest of white

24   people -- they always arrested white people, but by the

25   progressive era, so we are talking 20th century, the

1    police department in Richmond began to focus more on

2    things like on drug abuse, prostitution, alcoholism.

3    Again, this is something that is not unique to

4    Richmond.  When the police department did focus on,

5    focus on incar - excuse me -- focus on those illicit

6    activities, citizens in Richmond got mad.  They got mad

7    because they did not want police to target white

8    people.  They wanted them to focus, refocus on black

9    people.  They even threatened to like not fund the

10   police department.  They wanted public officials to

11   stop funding the police in the early 20th century

12   because their focus shifted slightly away from black

13   people.

14   Q    All right.

15        When the Richmond Police Department started

16   focusing on arresting whites and away from arresting

17   blacks, whites started vocally calling for defunding

18   the police?

19   A    Yes.

20   Q    What happened as a result of that public outcry?

21   A    The police -- well, one, changing of

22   administration at the City Council level; and then two,

23   the police began to refocus again back on the, yes,

24   they began to refocus back on who they were supposed to

25   be patrolling and surveilling.

1   Q    Did this, did you read a dissertation by Lewis --

2   I can't, I don't know how to pronounce his last name

3   but it is spelled C-E-I -- about this?

4   A    Yes.

5   Q    His dissertation, there are only two dissertations

6   that I have ever found that have, that have talked

7   about Richmond Police and race relations.  And that one

8   is by far the most comprehensive.  And that is where I

9   am getting this information.

10  Q    For the record, that is already in this record in

11  this case as exhibit Z to ECF number 86.

12       THE COURT:  All right.

13       MR. SIEBERT:  Your Honor, I would object to that

14  being admitted.  He didn't draft it, he didn't write

15  it, he didn't check any of the sources on that.  How

16  could that be admitted as evidence?

17       MS KOENIG:  I wasn't seeking to admit it as

18  evidence in the case.  Just referring that that is the

19  dissertation that has already been in record.  It is

20  the same one I have posted before.

21       THE COURT:  Let me just ask you.

22       This dissertation by Mr. Cei or Cei, Cei or Cei,

23  is that the kind of data on which historians typically

24  rely to reach conclusions about what happened in

25  history?

1        THE WITNESS:  Yes.  So, historians work with what

2   they have, like in any other set of scholars.  So,

3   Mr. Cei or Cei, he had access to data that I don't have

4   access to.  I mean, he had police records from, you

5   know, the civil war period, post-civil-war period.  I

6   am assuming, and I believe that I -- I am not

7   assuming -- but I read in the dissertation that he got

8   access to those while completing the dissertation in

9   the '70s.  Where that information is today I do not

10   know.  But historians have to work with what they have.

11   So that is a vetted project.  Again, he earned a PhD on

12   it.  So there have been some level of validation that

13   the work was accurate for the most part.  So yes, the

14   short answer is yes.  Historians rely on what we have.

15   Q    Is Mr. Cei's dissertation the kind of information

16   and evidence that you would rely on as a historian?

17   A    Yes.

18        THE COURT:  I don't think the question is whether

19   he would rely on it.  The question is whether it is the

20   kind of thing that experts in his area typically rely

21   on.

22   BY MS KOENIG:

23   Q    And as a historian and expert in the history of

24   race and politics in Richmond is Mr. Cei's dissertation

25   the kind of evidence that one in that position, an

1  expert in your position, would rely on?

2  A    Yes.  If I am doing anything related to Richmond,

3  and both Richmond Police and race, and I am trying to

4  get it published, or I am teaching it, right, like I

5  have to rely on what I have.  So, yes, I would rely on

6  that dissertation.

7       MS KOENIG:  I think then we have met the criteria

8  under Federal Rule of Evidence, I think it is 702, for

9  admission.

10      I neglected to bring my cheat sheet.

11      703, Your Honor.  The basis of an expert's opinion

12  testimony, if experts in a particular field would

13  reasonably rely on these kinds of facts or data in

14  forming an opinion on the subject, they need not be

15  admissible for the opinion to be admissible.  But the

16  fact or data that would otherwise be admissible, the

17  proponent of the opinion may disclose them, if that

18  would aid the trier of fact in finding that

19  information.

20      THE COURT:  All right.  Well, you still have not

21  tried to put in Mr. or Dr. Cei's dissertation, but your

22  witness can rely on it.

23      MS KOENIG:  Thank you, Your Honor.

24 BY MS KOENIG:

25 Q    Dr. Chiles, was there a long resistence within the

1    Richmond Police Department to hiring black police

2    officers?

3    A     Yes.

4    Q     And did -- was there in the 1960's a proposal to

5    the Richmond Police, to the City of Richmond, to create

6    a police board?

7    A     Yes.

8    Q     Tell us about that.

9    A     So this is something that can be, that can be and

10   has been validated using media sources at the time, so

11   you don't just have to take Dr. Cei's dissertation at

12   the word on this issue.  So, for one, black residents

13   had been complaining to local leaders, black leaders,

14   and also to City Government to a lesser extent about

15   things like police brutality and just mistreatment by

16   police officers since the early 20th century.  Nothing

17   had come of it.  By the 1960's black residents, they

18   proposed the City Council adopt a police review board.

19   This board would be, would hold citizens, it would hold

20   police officers, and the goal was to try to vet police

21   brutality, or just issues between residents, black

22   residents and cops.  It was to kind of see where there

23   could be a middle ground.  Was there a truth to it, was

24   there no truth at all?  The City Council at the time

25   was very resistent to it.  They were resistant to it

 1    primarily because the police department was a hundred
 2    percent in resistence to it.  Was every cop against it?
 3    Probably not.  But at the united front publicly there
 4    was no traction for it at all.  They were not, they did
 5    not want citizen oversight.  They didn't want that
 6    citizen oversight because that citizen oversight would
 7    be majority black.  Because those are the people who
 8    were doing it.  And also the City was trending blacker
 9    throughout the '60's as well.  So it wouldn't be just a
10    bunch of people from the white west end on the police
11    review board, it would be people from Church Hill on
12    the police review board.  And they wanted no part of
13    that.
14    Q    We talked about how when the City was becoming
15    blacker.
16    A    Yes.
17    Q    Certain parts of the City becoming a hundred
18    percent blacker?
19    A    Yes, absolutely.
20    Q    Did that in many ways relate to the housing
21    project in various parts of the City?
22    A    Yes, a hundred percent.
23    Q    Were residence of those housing projects almost
24    exclusively black?
25    A    Almost exclusively, yes.

1    Q     In the 1980s when we talk about the SNAP task

2    force --

3    A     Yes.

4    Q     -- what effectively happened with the Richmond

5    Police as it relates to the housing projects

6    themselves.

7    A     They targeted them.  Because those were seen as

8    places where the majority of crime happened.  So again,

9    you know, you would have cops who would post up on

10   corners and trying to catch people doing hand-to-hand

11   deals.  Try to -- people doing, what is it, selling

12   guns and drugs mainly is basically what that was.

13   Q     So is that the time when you start to see that

14   what is happening at the housing projects is the

15   Richmond Police Department just surveilling them?

16        THE COURT:  Doing what?

17        MS KOENIG:  Just surveilling the housing projects,

18   not responding to active calls, but sitting there

19   waiting, watching.

20        THE WITNESS:  Yes.

21   BY MS KOENIG:

22   Q     Did these things change when the Richmond Police

23   Department began hiring black officers?

24   A     No, not at all.

25   Q     You have written in your report a quote that came

1    I think from Mr. Cei's dissertation that said, that a

2    black police captain discussing the Richmond Police

3    Department culture in the late 1980s said, we have a

4    black mayor, a black city manager --

5          MR. GIBBONS:  Objection.  Hearsay.

6          THE COURT:  What is the question?

7          MS KOENIG:  That this quote is coming from

8    Mr. Cei's -- Dr. Chiles has just testified that after

9    Richmond started --

10         THE COURT:  What was the question?

11         MS KOENIG:  The question is, is this in part what

12   he was relying on, this information from Mr. Cei's

13   report in giving that expert testimony.

14         THE COURT:  All right.

15   BY MS KOENIG:

16   Q    A black assistant city manager and many high

17   ranking black public officials, yet it seems very

18   little has changed?

19   A    Yes.  So, yes.  Yes.

20         THE COURT:  Let me just ask you this.

21         Here is what the other side is going to say, and

22   there is some logic to this.  A lot of logic maybe.

23         If there is a lot of crime in black areas, why

24   shouldn't they send a lot of police there?

25         THE WITNESS:  I can't answer that.  I can only

1    answer, only say what the past is telling us.

2         THE COURT:  The past is telling us -- what you

3    told me so far is that there were -- is that for

4    reasons that aren't very good the government and the

5    business community forced African-Americans to move

6    into predominantly -- into almost exclusively racially

7    segregated areas.

8         THE WITNESS:  Yes.

9         THE COURT:  You told me that in your judgment

10   those areas for reasons of history, poverty, lack of

11   education and the like, were breeding grounds for

12   crime.

13        THE WITNESS:  Yes.

14        THE COURT:  And then you have told me that in

15   order to make people think Richmond was safer they

16   assigned police officers to go there.  Well, whatever

17   their motive was, what is wrong with sending police

18   officers to an area that has a lot of crime?

19        THE WITNESS:  I can't -- I don't -- I don't have

20   an opinion on that.

21        THE COURT:  Okay.

22        Why don't you tell me what is wrong that.

23        MS KOENIG:  Do you want me to answer that now,

24   Your Honor?

25        THE COURT:  Yes, answer that now.  That is really

1   the question the case is about.  I accept that based on

2   what he says this stop that we have in this case, and

3   the way the precincts are set up in the City places a

4   lot of police officers in predominantly

5   African-American areas.  And your witness has said that

6   for a lot of reasons those areas have higher crime

7   rates than other, than white areas.  So --

8          MS KOENIG:  I think what we are finding, Judge,

9   Your Honor, is that this -- so the pattern that we see

10  in the green dots and the blue dots in defense exhibit

11  R 2 is not by happenstance.  It's not by happenstance

12  and not separated from race that black people in the

13  City of Richmond, many of them, in fact perhaps the

14  majority of them, are forced into poverty and then kept

15  into poverty because of their race.  They are then

16  moved from the areas in which they might have been able

17  to claim a property ownership because roads and other

18  buildings, they were deemed to be unsightly, right,

19  need to be moved out of the area, slumps need to be

20  cleared, lose any access to the ability to gain wealth

21  that they have, they are not allowed to get mortgages,

22  and so they are moved to housing projects where they

23  are renters, and so what do you think is going to

24  happen?  Right?  What do we think is going to happen

25  when we do that?  I am not in any way submitting that

1   there are statistics that show that crime is only

2   happening in the areas of the housing projects.  It is

3   just that what happens from Dr. Chiles's testimony is

4   we know that the Richmond Police Department just starts

5   setting up in the housing projects.

6           THE COURT:  Okay.  Here is the thing.

7           But, that -- there is an abhorrent history in

8   Richmond and in Virginia and maybe in our nation at

9   large, of segregation which has both social and

10  educational and economic complexes or effects.  And it

11  results in a substantial, a substantially higher crime

12  rate in black areas than in white areas.  That seems to

13  be what your witness is testifying to.

14          So, you know, there are people in those areas that

15  are not criminals.  And they deserve to live in an area

16  where there is not a lot of crime --

17          MS KOENIG:  And I think --

18          THE COURT:  -- and they send police officers in

19  there.

20          MS KOENIG:  Fair enough.  I think so where this is

21  moving, Your Honor, is that where crime area -- if you

22  are here talking about like the possession of a gun and

23  the police targeting someone who has got the gun and

24  they happen to be black, I think that would be a very

25  different scenario than what are facing now, because we

1    are looking at traffic stops --

2         THE COURT:  Well, that is the other aspect of it.

3    It seems to me, you know --

4         MS KOENIG:  -- because the Government's map

5    showing homicide and manslaughter areas --

6         THE COURT:  That may be true with people making

7    left turns.

8         MS KOENIG:  It doesn't.  When you look at, when

9    you compare those maps to the figures in defense

10   exhibit 2, which is Dr. Costin's report, showing the

11   clusters of black drivers that are stopped throughout

12   the City of Richmond, and the heat map, there are

13   several areas that would not in any way explain just

14   because there are some violent crimes happening in one

15   part of town, why huge amounts of people, black people,

16   are being stopped in traffic stops on border areas

17   where white neighborhoods abut black neighborhoods.

18   That doesn't explain that.  There is no --

19        THE COURT:  I don't think Mr. Moore's stop was in

20   a border area, was it?

21        MS KOENIG:  Well, no, but we are talking about

22   patterns of enforcement, Your Honor, that is what we

23   are talking about here.

24        THE COURT:  What do you say about this?  Police

25   officers are trained to give people tickets when they

1    see violations of the law.  If you for a legitimate
2    reason send a lot of police officers into a high crime
3    area, they are going to see a lot of traffic
4    violations.  And then they are going to stop people.  I
5    mean, is that -- you have got to prove two things;
6    intent and effect.
7         MS KOENIG:  Right.
8         THE COURT:  And it is clear to me from the
9    evidence in this case that there is two sets of traffic
10   laws.  One for black people, and one for white people.
11        MS KOENIG:  Yes.
12        THE COURT:  And people, you know, white people
13   forget to renew their license plates all the time.  But
14   they don't get stopped for it.
15        MS KOENIG:  Right.
16        THE COURT:  But that is because, might that not be
17   because they are driving in areas in which there is a
18   lower rate of crime, and therefore there are fewer
19   police officers?
20        MS KOENIG:  I think that is where we get, that
21   where the evidence of where the stops are happening is
22   so important.  Because we saw from defense exhibit 2
23   that when we have -- first we have no evidence at all
24   that white drivers are less likely to commit traffic
25   infractions than black drivers.  Both Dr. Costin said

1    that and Dr. Smith, the Government's expert, didn't

2    disagree with that.  He indicated that he had no

3    evidence to that effect.

4        So if we operate on that presumption, which we

5    have to, because that is the evidence in this case,

6    that white drivers and black drivers are presumed to

7    commit traffic infractions at roughly the same rate,

8    and then we look at the blunt statistics that

9    77 percent of all people that the Richmond Police

10   Department stop are black drivers, and then we look at

11   even if we are saying, okay, fine, there is some

12   activities that happens and maybe that explains a

13   little bit more that maybe because there is more

14   surveillance in certain areas, it doesn't explain why

15   more black drivers are stopped in the white part of

16   town.  But it just doesn't.  There is no way to get

17   around that but to look through the lens of race.

18       THE COURT:  I understand what you are saying.  I

19   have been sitting up here for 12 years with, you know,

20   dozens if not hundreds of young African-American men

21   who get stopped for stuff that happens all the time in

22   white areas, without a concomitant number of arrests.

23   I'm sorry to disturb your testimony.  Go ahead.  Sounds

24   like --

25       MS KOENIG:  I am pretty much done.

1        THE COURT:  You are pretty much done?

2        MS KOENIG:  On my direct examination of Dr.

3   Chiles.

4        THE COURT:  How is he going to tie this into

5   current police activity?

6   BY MS KOENIG:

7   Q    Dr. Chiles is a historian, Your Honor.  So,

8   Dr. Chiles, do you have, when -- let's do this.

9        When you, over the course of your research did you

10   contact the Richmond Police Department trying to get

11   ahold of crime statistics?

12   A    Yes.  Years ago.  Not just crime statistics, but

13   correspondences from say the police department and City

14   Council and things that, things of that nature.  So

15   just general police records that are available to the,

16   to historians and researchers, yes.

17   Q    Did that include more recent time frames than what

18   we have talked about today?

19   A    Absolutely.

20   Q    Were you able to obtain such information?

21   A    No.

22   Q    Did anybody give you a reason as to why you

23   couldn't obtain such information?

24   A    Yes.  I was told, and I do not have the officer's

25   name, but I was told that the Richmond Police

1    Department are not required to keep data of that sort.

2    So they don't, or at least didn't.  And I was told to

3    contact the state archives to see if they have

4    anything.  So I did and the State Archives had nothing

5    either.  Yes.  That --

6        THE COURT:  What were you asking them for?

7        THE WITNESS:  Just any police records that could

8    be available to researchers from the 1980s, 1990s,

9    early 2000s to -- because that is what I focus on in my

10   own research that I publish.  I was told we don't have

11   any of that data.

12       THE COURT:  You don't have any records about like

13   the number of people they arrest?  Is that what you

14   ever saying?

15       THE WITNESS:  That is what I was told, yes.

16       I don't have -- we don't have that data, and we

17   are not required to keep it.  So you should probably

18   contact the State Archives.  So I did, and I struck out

19   there as well.

20       THE COURT:  Okay.

21   BY MS KOENIG:

22   Q    And so was your ability then to find more recent

23   data is very limited because of that?

24   A    Yes.  It definitely dissuaded me.  I was, I am

25   not -- this is -- I am not going to pursue this, this

1    specifically as a topic any further.  So I didn't.

2    Q    Going back again to defendant's exhibit R 2 and to

3    our discussion about the history of race relations in

4    the Richmond Police Department.  Are you able to draw

5    any conclusion or tell us what your summary essentially

6    of what your knowledge tells us about residential

7    segregation in Richmond succinctly, and the over

8    policing of black residents by Richmond Police

9    Department.

10   A    Yes.  So they were a hundred percent connected and

11   they are connected in some this way.  Black Richmonders

12   throughout history have had negative interactions with

13   Richmond-based institutions, whether that is the City

14   council, police -- the police are just an extension of

15   that -- because of segregation, because of forced

16   segregation, and also past patterns of just discontent

17   between the police department and black people.  There

18   has been a historical discontent between them.  And I

19   don't believe that that just ends when a black police

20   chief is sworn in, I believe in 1989, first black

21   police chief, or black officers were hired.

22   Institutions develop character over time.  They develop

23   patterns of behavior and that doesn't stop the second

24   that a new person is brought in or some new people are

25   brought in.  Also relationships --

1        THE COURT:  I am not sure that his area of

2   expertise goes this far.

3        MS KOENIG:  Thank you, Dr. Chiles.  The Government

4   may have some questions for you?

5        THE COURT:  We need to take a recess.

6                     (Recess was taken)

7        All right.  Let's wait until Mr. Moore gets back

8   in.

9        Come back up to the stand, sir, Dr. Chiles.

10                     CROSS EXAMINATION

11       THE COURT:  All right.  Cross examination,

12  Mr. Gibbons?

13  BY MR. GIBBONS:

14  Q    Good morning, Dr. Chiles.

15  A    Good morning.

16  Q    You wrote last year in your Here We Go Again

17  article "That Richmond is 'a City seeking to end its

18  complicity with American racism,'" didn't you?

19  A    Yes.

20  Q    And Richmond has changed quite a bit in the last

21  fifty years?

22  A    Yes.

23  Q    And in fact it is becoming far less segregated,

24  maybe let me rephrase that, far less racist?

25  A    Yes.

1   Q    And significant progress has been made, especially

2   since 1977 when African-Americans were more fully

3   involved in City Government?

4   A    Progress as in what?

5   Q    Racial progress.

6   A    As in what exactly?  Like, I mean, I want to

7   answer the question.

8   Q    Sure.  Well being of African-Americans in

9   Richmond.

10  A    In like what?

11  Q    I will move on.

12  A    Thank you.

13  Q    And over the course of the last 50 years the

14  distribution of where people live in Richmond,

15  specifically races living in Richmond has changed

16  significantly?

17  A    Yes.

18  Q    So, before the 1960s blacks were concentrated in

19  the City's core in the east end?

20  A    Yes.

21  Q    And since then blacks predominantly in the

22  northern part of City center, eastern part of the City

23  center and the southern part of the City center,

24  correct?

25  A    Say that last part again. I am sorry.

1   Q    Blacks have now been dispersed --

2   A    Yes.  Sorry, I'm sorry, yes.

3   Q    -- into the north, east and south parts of

4   Richmond; is that correct?

5   A    Yes.

6        THE COURT:  Well, I think he testified that

7   dispersal of blacks to this area occurred over time.

8        MR. GIBBONS:  Yes, Your Honor.

9        THE COURT:  Okay.

10  BY MR. GIBBONS:

11  Q    In fact, you wrote in your masters thesis that the

12  percentage Richmond population fell below 15 percent in

13  the 1990s?

14  A    Population.

15       THE COURT:  Of what?

16       MR. GIBBONS:  White people in Richmond, Your

17  Honor.

18       THE COURT:  Well, fell below 15?

19       MR. GIBBONS:  Fifteen percent.

20  BY MR. GIBBONS:

21  Q    Let's look at your thesis at page 117.

22       THE COURT:  What number is that?

23       MR. GIBBONS:  I don't know what the defendant's

24  exhibit number is.

25       MS KOENIG:  It is exhibit number --

1          THE COURT:  I can't hear you.

2          MS KOENIG:  Sorry.

3          THE COURT:  Is that 11?

4          MR. GIBBONS:  Yes, Your Honor, defendant's exhibit

5     11.

6          THE WITNESS:  Is it 115?

7          MR. GIBBONS:  117, I'm sorry.  Looking at last two

8     lines of page 117.

9          THE WITNESS:  Yes, I guess I did.

10         THE COURT:  Well, what you meant to say was

11    45 percent, isn't that right?

12         THE WITNESS:  Yes.  Yes.  I mean --

13         THE COURT:  That is a typographical error.  Cross

14    examination is more useful than that.

15         MR. GIBBONS:  Sure, Your Honor.  So just to be

16    clear you your masters thesis says, as of 2014 whites

17    made up 44 percent of City residents.  This rise from

18    below 15 percent in the 1990s?

19         THE COURT:  It is a typographical error.  He

20    obviously meant to say 45 percent.  Move on.

21    BY MR. GIBBONS:

22    Q    So what was the percentage of blacks?

23         THE COURT:  Let's move on.

24         MR. GIBBONS:  I'm sorry, Your Honor.  I just

25    wasn't sure what the percentage is.

1          THE COURT:  Well, he meant to say below

2     45 percent; is that right, Dr. Chiles?

3          THE WITNESS:  Yes.  So there is one thing I don't

4     have the, what do you call it, the census data in front

5     of me, so I can't say definitively.

6     BY MR. GIBBONS:

7     Q    So if it was 44 percent in 2014, and that was a

8     rise from what it was in 1990s, I'm trying to

9     understand what it was in the 1889s.

10    A    I don't have that information directly in front of

11    me.

12    Q    Okay.

13         But since 2010 there has been a gentrification

14    movement of whites moving back into the City of

15    Richmond?

16    A    Yes.  Absolutely.

17    Q    That wouldn't have been reflected in defendant's

18    exhibit R 2 that relied on the census data from 2010?

19    A    It should have been reflected.  It should have

20    been yes.

21    Q    So when you talk in your expert report on page

22    four about a gentrification movement of 2010s, that

23    would reflect gentrification from 2010 to 2020?

24    A    Roughly speaking, yes.

25    Q    Is that gentrification movement occurring up until

1    2022?

2    A    Yes.  Absolutely.

3    Q    So census data from 2010 wouldn't reflect a

4    significant influx of white residents that occurred

5    from 2010 to 2022?

6    A    I guess it depends on when it is collected.

7    Q    As whites have moved back into Richmond that has

8    changed the distribution of whites in the City of

9    Richmond?

10   A    Yes, absolutely.

11   Q    So if RPD was trying to align precinct boundaries

12   with where the defendant races congregate would be

13   somewhat of a moving target; is that correct?

14   A    Say that question again.  I am sorry.

15   Q    If RPD was trying to align precinct boundaries

16   with racial residential boundaries it would be a moving

17   target because the demographics of Richmond are

18   constantly changing?

19   A    Not constantly changing enough, no.  Again, since

20   the '70s, I mean you can look at the map, it says 2010

21   map, which was previously shown, the majority of black

22   people still live in the same areas that they did

23   prior, right?  So, yes, there is some dispersement,

24   there are some blacks who have moved to the suburbs,

25   there are some blacks who have moved to the west end,

1    but by and large these areas are still identifiably

2    that of same race.

3    Q    Again, there has been a significant influx of

4    white since 2010 not reflected in the census data that

5    would change those boundaries?

6    A    Yes, significant influx of whites, but that

7    doesn't change the -- that has not, at least from the

8    data that we have.  I believe that the dot map data for

9    2020 hasn't been released.  I tried to get it for my

10   book and I can't secure it from anyone.  But, again,

11   the amount of white distribution throughout the City

12   has not changed the racial integrity of the City at

13   all, at least based upon where the majority of the

14   races of people live.

15   Q    You don't have an idea what precinct boundaries

16   looked like in 1977?

17   A    In 1977, no, I do not.

18   Q    You don't have any idea what changes, if at all,

19   have been made to the precinct boundaries since '77 to

20   the present?

21   A    I have seen precinct boundary maps that were shown

22   to me at a previous date.  I don't have -- I can't map

23   it out for you, but I have seen it.

24   Q    The current precinct maps?

25   A    Yes.

1    Q    The historical precinct map you have no idea?

2    A    The historical precinct maps, I have not looked at

3    those, no.

4    Q    So you don't know one way or the other if the

5    precinct boundaries in the past have tracked racial

6    boundaries?

7    A    I can't speak to that at all, no.

8    Q    You don't have any evidence that Richmond has ever

9    changed a precinct boundary in response to shifting

10   racial demographics in Richmond?

11   A    Police precinct map, no.

12   Q    And RPD is not involved in residential

13   segregation; is that correct?

14   A    As far as actually segregating people, no, they

15   are not actually segregating anyone.

16   Q    And they haven't been for a very long time, if at

17   all?

18   A    Since -- no, they are not.  They are not, you

19   know, there is no Jim Crow laws for them to enforce on

20   the books, if that is what you are asking.  Then, no.

21   Q    So just to make the point, so whatever racial

22   segregation that exists within Richmond isn't a choice

23   of individuals, market forces, real estate market, and

24   decision by policy makers external to RPD.

25   A    To a large extent yes.

1    Q    You are not familiar with Richmond City crime

2    rates, are you?

3    A    I have seen crime data from the '80s.  I secured

4    some from the state, state police department in 2015,

5    2016, sorry, secured some.  I have seen it, but I am

6    not familiar with it.  I can't spit out facts for you,

7    no.

8    Q    And wouldn't know one way or another if RPD is

9    deploying its police report in response to crime rates

10   and calls for services?

11   A    No.

12        I don't have access so that either.

13   Q    I want to talk to you about a quote in your

14   report.  You wrote -- let me get the page number here.

15        This is pages 11 and 12 in your report.

16        MS KOENIG:  If I could approach and show him a

17   copy of the report.

18        THE COURT:  Go get it from her.

19        THE WITNESS:  Yes.

20   BY MR. GIBBONS:

21   Q    So the last few words of page 11 and going to page

22   12?

23   A    Yes.

24   Q    You wrote, "With plans to repopulate the City with

25   monied whites in view of the suburban sprawl in the

1    post World War II period the new police strategy as

2    dictated by black political leaders insure that it will

3    'that that' it will not take long for the neighborhoods

4    to recognize the increased police presence and more

5    aggressive enforcement" in the City's blackest area.

6    Is that what you wrote?

7    A    Yes, I wrote this.

8    Q    So just to be clear, you interpret the effort to

9    increase crime enforcement in high crime areas as an

10   attempt to repopulate the City with monied whites?

11   A    Yes, I do equate the two.  In the 1980s

12   specifically because, with the downtown redevelopment

13   plans, the revitalization plans, the Sixth Street

14   Market Place, that is the one that had the most

15   activity on the crime front, business leaders were

16   responding to the City and to non profit organizations,

17   Richmond Renaissance being one, crime is a problem in

18   Richmond.  And that, that, these reports that are at

19   VCU today, you can go look at them, those complaints

20   about crime correlate directly with urban

21   revitalization in the 1980s.  So I would say that is

22   not by happenstance.  That more crime enforcement

23   happens in black neighborhoods just as the City is

24   desperately trying, one building, new infrastructure to

25   recruit whites suburbanites back to the City, to be

1    residents and more so consumers.

2    Q    Sure.  And you didn't consider the possibility at

3    all that crime enforcement is increasing in these high

4    crime areas so that the minority is living in those

5    areas aren't deprived of the benefit of law

6    enforcement?

7    A    I didn't rule that out, no.

8    Q    You didn't even consider that.  You didn't put

9    that in your expert report?

10   A    No, the report, the report, the report that I

11   wrote, it was designed to investigate is there a

12   connection between racial segregation and the

13   relationship between black people and the police

14   department.  So, based upon what I got, that is what I

15   put in the report.

16   Q    So that alternate explanation for the phenomenon

17   that is occurring wasn't within what you are were

18   trying to say in the report, so you didn't include it?

19   A    Not trying to say, but more so making the

20   connection between what is the relationship

21   historically between black people in Richmond and

22   segregation and the police.  Is there a connection

23   between the three?  Between the three.  And this is the

24   connection that I found.  Wasn't that I was trying to

25   say this, it was, this is what the evidence showed,

1    revealed itself to be.

2         THE COURT:  I don't think it's an alternate

3    explanation.  An additional reason.

4    BY MR. GIBBONS:

5    Q    Okay.

6    A    I go back to the report, again on page 12, a few

7    lines down.  You wrote, "This late 20th century

8    development" and my parenthetical is increased

9    policing, "was tied directly to RPD history of being

10   sicked on black people as Richmonders, both new and

11   old, long understood this to be their primary function

12   above all else."

13        Did I read that correctly?

14   A    I'm sorry.  You said page 12?

15   Q    Yes.

16   A    Is that in the conclusion?

17   Q    The second to the last sentence before the

18   conclusion.

19        Starting with "This late 20th century

20   development?"

21   A    Yes, I see it.  Got it.  What about it?

22   Q    So you state that new and old Richmonders have

23   long understood the primary purposes of RPD to be

24   sicked on black people.  Is that correct?

25   A    Yes.

1    Q    Who are these new and old Richmonders who

2    understand this?

3    A    The ones that were reflected in Dr. Cei's

4    dissertation, as well as the Richmonders who lived in

5    the mid to late '20th century, the ones who were

6    calling for more policing in the 1980s.  And again,

7    like I said, Richmonders in Dr. Cei's dissertation who

8    were, who were, who lived during the 1700 and 1800's,

9    so that is who I considered new and old.

10            THE COURT:  So say that again.

11            You say that people, new and old people both

12   considered the purpose of the police to be essentially

13   hassle African-American people; is that what you are

14   saying?

15            THE WITNESS:  Yes.  That is what I saw in

16   Dr. Cei's report.

17            THE COURT:  Do you think that is true?  That that

18   is what people see the purpose of police are?

19            THE WITNESS:  Today?

20            THE COURT:  Well --

21            THE WITNESS:  Or back then?

22            THE COURT:  Well, I can only speak as somebody who

23   lived through that entire era.  Do you think that that

24   is a widely held belief that police exist to make life

25   difficult for African-American people?

1        THE WITNESS:  Well, no, that is not their primary

2    function.  I don't think that is what people back

3    then -- people, so, because, again, this is a lot of

4    time we are talking about, about back then.  Police

5    were designed to protect and serve, right.  However, in

6    Richmond, at least in Dr. Cei's dissertation and other

7    newspaper sources, and some archival sources I was able

8    to look at, at the Virginia Museum of History and

9    Culture showed that there was an understanding that

10   police were to work to surveil black areas, were to

11   surveil black people, like -- again, I am not coming to

12   that conclusion independently.  Someone else came to

13   that conclusion looking at more data than I had access

14   to.  So, that is why I said it.

15   BY MR. GIBBONS:

16   Q    Dr. Cei's dissertation was published in 1975?

17   A    Yes.  I believe it covered years all the way up

18   until right around the year that he defended it.

19   Q    So 1737 to 1974?

20   A    Yes.  There you go.

21   Q    How about the last 45 years?  New and old

22   Richmonders believed that RPD'S primary purpose is to

23   be sicked on black people in the last 45 years?

24   A    Well, based upon what I saw in the '70s through,

25   excuse me, the late '60s into the 80's, a lot of those

1    mentalities didn't necessarily go away.  At least at

2    that time period.  I can't speak to right now in the

3    present.  I can't speak to even the '90s because I

4    didn't write about it because I don't have the data to

5    write about it, so I don't feel comfortable speaking as

6    an authority on it.

7    Q    Sure.  The defendant was born in 1987.

8    A    Okay.

9    Q    Anything in his life time that speaks to that

10   point?  Do you have any sources or data from the

11   defendant's entire lifetime?

12   A    Beyond 1989 I don't have anything.  That is why I

13   didn't write about it.

14   Q    That is true not just for this one specific point.

15   That is true of your testimony generally, since 1989

16   you really can't point to any data to demonstrate some

17   kind of racial impact of policing or problems you are

18   discussing.

19   A    No.

20        THE COURT:  Well, is there a phenomenon that once

21   people start to do something they pretty much keep

22   doing it?

23        THE WITNESS:  Instructional character, yes.  Right

24   before recess I was getting to that.  Institutions are

25   made up of people.  People have habits.  And

1    institutions develop a character, develop a pattern of

2    behavior and a pattern of doing things.  Again, that

3    doesn't stop just because one -- more people come in.

4    Think about the 1977 election when black leaders get

5    elected to run the City.  Their mentality about running

6    the City in large part was the same as the old.  We

7    need to recruit white suburbanites back to the City.

8    The previous administrations had done it through

9    annexation, done it through building malls along the

10   perimeter City.  But the point is the agenda was still

11   the same in large part.  So that is because that

12   institution, that being City council, it developed a

13   character over time.  That even though there are new

14   people in that role, or in that position, it is still

15   active in that, so active the way it acted years

16   before.  Not all the way through.  But in many ways

17   they still did it.  So institutional character, yes,

18   that is a thing.

19        THE COURT:  And when people come and join an

20   institution the customs and mores of that instruction

21   that they learned they learn from people who were there

22   before them.

23        THE WITNESS:  Yes, absolutely.

24        THE COURT:  So, if there was a sense that we need

25   to clean up crime in black communities, focus our

1   efforts there, that is a belief that is passed down

2   from captains to lieutenants to sergeants and new

3   patrol officers.

4        THE WITNESS:  I would assume so.

5        THE COURT:  Well, don't assume anything.  I am

6   asking if that is your opinion.

7        THE WITNESS:  Yes, that is my opinion, yes.  I am

8   not sure that that is a historical opinion.

9        MR. GIBBONS:  I was going to say, Your Honor, it

10  seems more of an intuition that some kind learned or

11  trained observation.

12       THE COURT:  I tried a bunch of discrimination

13  cases in my life, and there is a phenomenon of

14  discrimination cases, called "similar-to-me" phenomenon

15  in which institutions that have presumably unbiased

16  ways of hiring people wind up hiring the same people

17  over, and over and over again because the people who

18  run them are most comfortable having people who are

19  just like them, and bringing along people just like

20  them to run the institution.  So it doesn't change as

21  dramatically as perhaps the written policy might

22  dictate.

23       MR. GIBBONS:  I think that is rebutted, Your

24  Honor, by the massive change in City and police

25  leadership from 1977 to the present.

1        THE COURT:  Well, only, it's only rebutted to the

2    extent that the police leadership, police leadership

3    may not think we ought run black people out of Richmond

4    like the old police, like the old City police.  But if

5    the police leadership continues to have the feeling we

6    need to send massive numbers of police into black

7    areas, that is a belief that could be passed along.  It

8    may well be that they have, they can look at the amount

9    of crime in black areas and decided, you know, there is

10   people over here who deserve to live here without

11   living in an area that is highly criminal.  And they

12   say, send police officers over there.  But I don't have

13   any evidence about why the police are sent anywhere in

14   the City right now.

15       Maybe I will at some point.  But I don't right

16   now.

17       MR. GIBBONS:  Well --

18       THE COURT:  I would have thought you would have

19   called the police officer, somebody from the police

20   department that would have said, here is why we have a

21   lot of police over there where this poor fellow got

22   arrested.

23       MR. GIBBONS:  I think Dr. Smith testified about

24   that extensively, Your Honor.

25       THE COURT:  Dr. Smith didn't testify to anything

1    about that.  Dr. Smith's main point of testimony is

2    that you can't believe any of the numbers.

3         MR. GIBBONS:  He also testified extensively that

4    it is a common practice of law enforcement nation wide

5    to send police where the crime is.

6         THE COURT:  Well, but he didn't say anything about

7    Richmond.  All right.  Go ahead.  I just -- I am -- I

8    was puzzled why we don't have the precinct, whoever

9    makes -- probably wouldn't be good idea to call the

10   police chief given what happened to him -- but I am

11   just surprised that you all didn't call somebody who

12   said, here is why we have all of these police officers

13   over there.  Because there are innocent people who live

14   over there, and people that are trying to turn north

15   side, Highland Park into a nice area.  And the police

16   are over there to help those people.  But I don't have

17   that.

18        MR. GIBBONS:  We thought we had adequately covered

19   that ground with Dr. Smith.

20        THE COURT:  Maybe you did.  I will have to go back

21   and read all that.

22        MR. GIBBONS:  Your Honor, that is why we put in

23   these maps.  Dr. Smith indicated to us privately that

24   we put these citations in our brief and our motion to

25   exclude Dr. Chiles, that these murder and homicide, and

1   manslaughter rates are really a decent proxy for crime

2   rates generally.  And that's why we put in the maps to

3   show where crime is occurring in Richmond.

4        THE WITNESS:  I understand that is where crime is

5   occurring, but I don't understand -- go ahead.  Doesn't

6   seem to me that what happened to this gentleman over

7   here was related to manslaughters in north side.

8        MR. GIBBONS:  Well, we can get into that in

9   argument.

10       THE COURT:  I expect we will hear a lot about

11   that.

12   BY MR. GIBBONS:

13   Q    Right.

14       So, Dr. Chiles, I want to go back to your report

15   another line in your report, page 11th, the first full

16   paragraph, the second sentence starting with "this

17   plan, however."  Opinion page 11th, full paragraph

18   beyond that sentence.

19   A    I see it.

20   Q    You wrote in your report, "This plan, however,

21   relied heavily on explicit calls from City businessmen

22   for RPD to increase policing of black neighborhoods."

23   Did I say that correctly?

24   A    Yes, you did.

25   Q    And this plan you are referring to is kind of a

1    development plan; is that correct?

2    A    Yes, there were several plans or surveys that were

3    taken throughout this time of various areas where City

4    businessmen were interested in investing in residence

5    -- not residence, excuse me -- properties, business

6    properties adjacent to downtown malls.  So, yes.  There

7    were several plans that came up during this time period

8    and, yes, so that is what I was referring to.

9    Q    You talk about explicit calls from City

10   businessmen for RPD to increase their policing of black

11   neighborhoods?

12   A    Yes.

13   Q    And in support of that proposition you cite some

14   census records from Jackson Ward; is that correct?

15   A    Yes.

16   Q    Note 49?

17   A    Yes.

18   Q    If we could pull up Government 5 G, or excuse me,

19   Government's exhibit 5.

20        Dr. Chiles, just looking through these records, is

21   this --

22        THE COURT:  That is this blue thing?

23        MR. GIBBONS:  Yes, Your Honor.

24        THE COURT:  Okay.  Thank you.

25   BY MR. GIBBONS:

1   Q    Is this the source you cited, summary file 3 G?

2   A    Yes.

3        THE COURT:  Hold on.  What are we looking at?

4   What page on this?

5        MR. GIBBONS:  Just generally, Your Honor.  We are

6   just looking through it so far.

7        THE COURT:  Okay.

8   BY MR. GIBBONS:

9   Q    And Government's exhibit 5 shows various figures

10  about Jackson Ward.  So that includes telephone

11  availability, the type of heating fuel used in homes,

12  and the type of transportation residents take to work?

13  A    Yes.

14  Q    And this is the main source you cited to support

15  your quote, "Explicit calls from City businessmen for

16  RPD to increase their policing of black neighborhoods,"

17  is that correct?

18  A    Yes.

19       THE COURT:  I'm sorry.  I am looking at this

20  exhibit.  Where does it say something about police

21  business people calling?

22       MR. GIBBONS:  That is my question, Your Honor.

23       THE WITNESS:  Yes.  So I responded.  When I did

24  get your comment back on the report initially, I did

25  respond saying, hey, this is not one of the sources I

1    should have put in, I actually did put in -- I

2    submitted other sources to validate that.  So I pulled

3    this directly from, or these sets of sources directly

4    from my book, a project that I was working on at the

5    time, and this report was also compiled in around two

6    weeks time, so I think two or two and a half weeks

7    time, there was a mistake with submitting this in the

8    footnotes as opposed to other reports about crime in

9    Jackson Ward and business leaders saying we need more

10   patrolling and policing there.  So that was a mistake.

11   Q    So this is a pretty provocative claim, I believe,

12   in your report and you clearly don't have any evidence

13   to support that claim?

14   A    I said that, I submitted that, and I said that,

15   and sent that into her immediately after I got your

16   response.  I did give that source material up.  I don't

17   have it in front of me right now, but I did send that

18   in.

19        THE COURT:  So what he said was, you pointed out

20   to him that this doesn't support what he says, so he

21   sent in additional evidence.

22        MR. GIBBONS:  I haven't seen any additional

23   evidence, Your Honor.

24        THE COURT:  He said he cited it to you in some

25   sort of letter or something.

1        MS KOENIG:  This is in ECF number 107 and page

2    eight.  This is --

3        THE COURT:  All right.  Well, okay.  You can point

4    that out.

5        MS KOENIG:  I will do that.

6    BY MR. GIBBONS:

7    Q    Dr. Chiles, since 1977 there has been pretty

8    significant representation of African-Americans within

9    City Government?

10   A    Absolutely.

11   Q    And the chief of police, not currently, but on

12   December 5 of 2020 was African-American, correct?

13   A    Yes.

14   Q    Is it your testimony that all or nearly all of

15   City leaders since 1977 have intended to discriminate

16   against African-Americans?

17   A    Have intended to discriminate?  Professionally I

18   can't speak to that.  Personally I would assume no.

19   Q    Is it your testimony that Henry Marsh intended to

20   discriminate against African-Americans during his

21   involvement with Richmond City leadership?

22   A    No, he did not.

23   Q    Is it your testimony Doug Wilder intended to

24   discriminate against African-Americans during his

25   tenure in Richmond City leadership?

1        THE COURT:  I think it is difficult for anyone to

2    speculate about the intention of politicians, in

3    particular the one you just mentioned.

4    BY MR. GIBBONS:

5    Q    Same question for Tim Kaine?

6    A    Intention, no.  I do not think they intended to

7    discriminate against black people.  No, I do not.

8        THE COURT:  I just don't -- intent is an element

9    of the case, you are absolutely right about that.  I am

10   not sure that the mayors of the City of Richmond are

11   the people that -- it is hard to speculate about what

12   they intended because, as we all know, politicians have

13   many motives.

14       MR. GIBBONS:  To lay the foundation, Your Honor,

15   there needs to be a connection between what happened

16   long past, the recent past, and 2020.

17       THE COURT:  I see your point.  The question is

18   whether the police officers who were working when this

19   gentleman was arrested, the police department at that

20   time was a weapon of oppression.  That is really what

21   they are saying.

22       I mean, I think that is a tough burden to carry.

23   BY MR. GIBBONS:

24   Q    Dr. Chiles, are you aware that RPD has issued

25   several general orders that apply to all police

1    officers that forbid discrimination on basis of race?

2         THE WITNESS:  I know that now.  I didn't know that

3    prior to today.  No, I did not.

4    Q    And are you aware --

5         THE COURT:  Well, you know, I understand that

6    orders are entered.  I used to represent a lot of

7    police departments.  And I know that orders don't tell

8    the whole story.  I presided over a lot of

9    discrimination cases of companies that have anti

10   discrimination policies that really don't get followed.

11   You are absolutely right, there is a paper trail that

12   says we are not going to discriminate.  That, I don't

13   think that -- that is an element, but not the whole

14   story.  And I think -- and I don't think you are

15   implying that.

16        MR. GIBBONS:  Correct.

17        No further questions.

18        THE COURT:  Okay.  Thank you.

19        Do you have any brief redirect?

20                    REDIRECT EXAMINATION

21   BY MS KOENIG:

22   Q    Briefly, Your Honor.

23        Dr. Chiles on direct or cross examination you were

24   asked about gentrification of Richmond since 2010.

25   A    Yes.

1    Q     When talking about gentrification and whites

2    moving into the City, are their specific areas that you

3    have in mind?

4    A     Yes.  From what I understand the south side areas,

5    Blackwell area, also Church Hill.  South Church Hill

6    northward.  Those are places where whites are moving

7    in, or have moved in in significant numbers.

8          So these are places that come to mind immediately.

9    Also, some around the north side area near Virginia

10   Union.  But those are just places that have come up in

11   the research I have done for my book projects where

12   gentrification not only has happened but is currently

13   happening.

14   Q     When you were doing your research in the '70s

15   about the Richmond Police Department and including

16   looking into trying to get information from the

17   Richmond Police Department, never came across any

18   precinct plans or anything like that, right?

19   A     No.

20   Q     And in terms of asking about the other sources

21   that you, that Mr. Gibbons was just asking about, that

22   you provided to me once we reviewed the second motion

23   in limine to exclude your testimony --

24   A     Yes.

25   Q     -- as it relates to the footnote that Mr. Gibbons

1    referred to in your report --

2    A    Yes

3    A    -- you gave --

4    A    Yes.

5    Q    -- you gave to me a number of citations, right?

6    A    Um hum.

7    Q    Is that a "yes?"

8    A    Yes.

9    Q    And --

10   A    I'm sorry.

11        MS KOENIG:   Your Honor, this is page, or ECF 107

12   page eight.

13        So, for instance, you indicated specifically the

14   table of reported offenses 1976 to 1980, 2nd Street

15   area, Richmond 1980, and all of those sources that are

16   listed in that filing, those came directly from you,

17   right?

18   A    Yes.

19   Q    Okay.

20        When we are talking about the evidence that you

21   came across in the past of when the Richmond Police

22   Department did start targeting whites for crimes, I

23   think you mentioned like prostitution and alcohol

24   violations, drug violations, when whites were targeted

25   by the Richmond Police Department, what was the

1    response?

2    A     They didn't like it.  They did not like it and

3    actually wanted to scale back on police funding and

4    supporting for the police.  This happened again during

5    the, around the turn of the century in the middle of

6    the progressive era, at least as indicated by Dr. Cei's

7    dissertation.

8    Q     That is what happened, right --

9    A     Yes.

10   Q     -- the outcry resulted?

11   A     Yes.

12   Q     No further questions, Your Honor.

13         Thank you.

14         THE COURT:  All right.

15         May this witness be excused?

16         MS KOENIG:  One moment.  He may.

17         THE COURT:  Do you have any need to keep him,

18   Mr. Gibbons?

19         MR. GIBBONS:  No, Your Honor.

20         THE COURT:  All right.

21         Dr. Chiles, thank you very much for coming today.

22   Very interesting to hear you.  And you are going back

23   to Old Dominion today?

24         THE WITNESS:  Yes, sir, I am.

25         THE COURT:  Teaching a class today?

1       THE WITNESS:  I canceled class.  They got off

2   lucky, but I didn't.

3       THE COURT:  Well, good for them.

4       Well, have a safe trip, and thank you very much

5   for coming.

6       THE WITNESS:  Thank you very much.

7       THE COURT:  Do you have any other witnesses?

8       MS KOENIG:  I have none, Your Honor.

9       THE WITNESS:  Does the Government have any

10  witnesses.

11      MR. GIBBONS:  No, Your Honor.

12      THE COURT:  Okay.  I had gotten some sort of a

13  word from someone that you were going to have a witness

14  today?

15      MR. GIBBONS:  Well, Your Honor, we weren't sure if

16  the maps would be stipulated to.

17      THE COURT:  Okay.

18      MR. GIBBONS:  So we had the Special Agent on hand

19  to testify if a situation came in.  We don't need him.

20      THE COURT:  All right.  Thank you.  All right.

21      Well, then all the evidence is in.

22      MS KOENIG:  Yes.

23              (The witness stood aside)

24      THE COURT:  So, here is what I would like you to

25  spell out for me, Ms Koenig.

1        As I read the cases you have got to prove two

2    things.  One is the discriminatory intent.  And one is

3    the discriminatory effect.  And so what you have got to

4    prove is that the way the police department works in

5    Richmond is set up with the intent to discriminate

6    against blacks.  And as I read Judge Moon's opinion in

7    the Johnson case he says, and there doesn't seem to

8    have been challenged on appeal, that the percentages

9    then show that there is discriminatory intent.

10        MS KOENIG:  It's not just Judge Moon, Your Honor.

11   So I think first going to the prong about the

12   discriminatory effect, I do not think that that prong

13   should be reasonably in dispute.

14        THE COURT:  Okay.  Let's deal with intent first.

15        MS KOENIG:  I bring that up, Your Honor, because

16   there are many many many cases that I cite in the

17   pleadings, and several of those are Arlington Heights,

18   International Board of --

19        THE COURT:  I understand.

20        MS KOENIG:  Many many cases indicate that blunt

21   statistical evidence of racially disparate impact may

22   be sufficient to prove discriminatory intent of an

23   equal protection claim.

24        THE COURT:  So we have got the -- that is your

25   evidence of the intent, and then the effect are things

1    like, it seems to me like you are relying pretty much

2    on the same evidence to show the effect.

3         MS KOENIG:   That is why I want to go through the

4    statistical evidence first, Your Honor.  We know that

5    77 percent of all of the Richmond Police Departments

6    traffic stops from July 1st of 2020 through December 6,

7    2020 were of black drivers, which means black drivers

8    are 5.13 times more likely to be stopped than white

9    drivers.  We know that it is statistically significant

10   that black drivers are going to be arrested and

11   searched more often than expected by chance than white

12   drivers.  And those findings are consistent with the

13   Virginia Department of Criminal Justice Services own

14   findings.  As well as what RTAP found of the Richmond

15   Police Department data in 2017 and 2018.  That

16   specifically found that 75 percent of all people that

17   the Richmond Police Department arrested during traffic

18   stops were black.  Meaning that black drivers were

19   30.7 percent more likely to be arrested as a result of

20   a traffic offense than a white driver.

21        And that was consistent with Dr. Smith's, the

22   Government's own expert's report of data analysis from

23   2000.  So all the evidence that we have from the last

24   20 years, 20 some years, indicates that black drivers

25   will be stopped by the Richmond Police Department at

1    egregious rates well and above what their percentages

2    in the population.

3        THE COURT:  Okay.  Let me ask you this question.

4    Suppose Mr. Moore instead of just doing -- what was --

5    did stop him because of a --

6        MS KOENIG:  Temporary tag.

7        THE COURT:  -- temporary tag?  Suppose instead of

8    that he had been driving down Brookland Park Boulevard

9    at 80 miles an hour and they stopped him for that.

10   Would you be arguing in that case that because he is

11   black and they arrested a disproportionate number of

12   black people that I should toss out -- I should say

13   that that stop was unlawful?

14       MS KOENIG:  So it's not that -- so, Your Honor, I

15   think the thing is that we have, as I mentioned

16   earlier, we have no evidence whatsoever that white

17   drivers commit less traffic infractions than black

18   drivers.  I will fully admit that I could be that white

19   driver driving 80 miles an hour on the interstate,

20   right, and no one pulls me over.  No one.  I am a white

21   driver with a car seat in the back.  Ha ha.  I am not

22   the target population for the Richmonder Police

23   Department to pull over.

24       THE COURT:  Well, you know, assume for a second he

25   committed some sort of egregious violation and was

1    pulled over for that.  And that it wasn't just a bad

2    license plate violation.  Suppose it was some sort of a

3    really bad violation and they pulled him over.

4         Would I be able to toss out his arrest that arose

5    out of that because the police are unfair to black

6    people?

7         MS KOENIG:  Your Honor, I think this argument is

8    the strongest when we are talking about relatively

9    minor traffic infractions.

10        THE COURT:  Your argument?

11        MS KOENIG:  Yes.

12        THE COURT:  I agree with that.

13        MS KOENIG:  So I am not -- I don't have -- I can't

14   say at what point in the future I might ultimately say

15   something, but at this point, Your Honor, I think the

16   evidence is strongest for this type of a challenge when

17   we are talking about relatively minor traffic

18   infractions.

19        THE COURT:  Okay.

20        MS KOENIG:  And so in terms of -- I think that the

21   discriminatory effect on how traffic laws are being

22   enforced against black drivers in the City of Richmond

23   is apparent.  And not just apparent but blatantly

24   apparent.  I think the discriminatory effect category

25   or element is satisfied.

1        When we get to the discriminatory purpose, as

2    numerous cases have indicated it is not easy, you know,

3    it is, I can't, I couldn't find a case in which we have

4    a member of the law enforcement agency that is being

5    challenged that comes in and says, oh, yes, that is

6    right, oh, we are discriminating against people.

7        THE COURT:  So what you need to find is a law

8    enforcement officer who has been terminated, who has

9    been given the order.  That is how these kind of things

10   get proved.

11       MS KOENIG:  Well, it doesn't have to be --

12       THE COURT:  You have a Quisling in their ranks.

13       MS KOENIG:  But that is not what we have, what we

14   have to rely on here, Your Honor.  When we are looking

15   at, you know, the Iron Workers Local 86 case from the

16   Ninth Circuit that I cited, which has since the passage

17   of the Civil Rights Act of 1964 courts have frequently

18   relied upon statistical evidence to prove a violation.

19   And that is because in many cases the only avenue

20   available of, or only available avenue of proof is the

21   use of racial statistics to show what is happening.

22       THE COURT:  Well, that is because people are smart

23   enough not to say go arrest more blacks.

24       MS KOENIG:  We are not back in the 1960's where it

25   was freewheeling able to say whatever they wanted,

1    right?  People get charged with things like that.

2    People get found to be in violation.  And what we are

3    talking about is a civil rights problem of a different

4    magnitude.  Right.  So we have blunt statistical

5    evidence that is well sufficient in this case to show

6    that we have met our burden under Arlington Heights to

7    show that there is a discriminatory purpose.  We also

8    have extensive history about how residential

9    segregation came to be in Richmond.  And it is not when

10   you line up the map, when you compare Government's

11   exhibit, I mean defendant's exhibits 20 to defense

12   exhibit R 2, white part is precinct three.  Two, four,

13   one are the black parts of town.  We heard today, and

14   in Dr. Chiles's report, and in the articles that he has

15   written, that we have explicit and long-term evidence

16   of racial animosity as to why people are living in

17   those areas.  When we look at the Mission Team, Fourth

18   Precinct Focus Mission team has testified on July 26 of

19   2021 at pages 23 and 24 of the transcript, they are not

20   out to do traffic enforcement.  Their job is to try to

21   get guns and drugs off the street.  But they are using

22   minor traffic violations to pull over black drivers to

23   search for evidence or serious criminal activity.

24        THE COURT:  But the Supreme Court says they can

25   use minor traffic violations to do that.  You and I may

1      disagree with that, but they can't use to add the

2      additional factor in of race.

3           MS KOENIG:  So interestingly enough, when we look

4      at the case in which the Supreme Court said that that

5      is allowable, there was nothing like the body of

6      evidence in that case that is before this court.  But,

7      what we have in this case is we have months and months

8      and months of evidence, and years and years and years

9      of evidence, showing that what the Richmond Police

10     Department does is pull over black drivers.  And we

11     also know where these stops are happening is incredibly

12     important.  We have clusters of black drivers that are

13     stopped all over the City.  But clusters of white

14     drivers are only happening in the third precinct.  And

15     then we have the clusters of black driver stops that

16     are happening where the black and white parts of town

17     meet together.  It is so incredibly telling.  Why is

18     that happening?  We have proffered an explanation that

19     that it is policing the borders.  And we don't have any

20     other evidence to indicate that is not the case.

21          THE COURT:  Well, you do.  I mean, they have all

22     of these police officers in the sections of town that

23     Mr. Gibbons pointed out to us are where all the

24     homicides are happening.

25          MS KOENIG:  Some of the homicides are happening,

1    yes, Your Honor.

2          THE COURT:  You can look at the map.  It's not

3    just some of them.  You know, you don't have a lot of

4    homicides in Windsor Farms.

5          MS KOENIG:  That is why it is so important I think

6    to look at Government's six and seven as it relates to

7    the figures that are in defendant's exhibit two, which

8    is Dr. Costin's report.  Specifically, when you are

9    looking at figure two and you see that -- that there

10   are many clusters of black drivers that are stopped in

11   the third precinct in white neighborhoods.  Why?  If

12   the police are not over-patrolling those areas because

13   there is no homicide happening, why do we have that

14   happening?  When you look at the area where the

15   clusters are in the fourth precinct, which is where

16   Mr. Moore was stopped, and we see that there are huge

17   cluster areas, those are not in the same areas where

18   these murders are happening.

19         We have these cluster maps that show us that where

20   the clusters are often happening sometimes it is in

21   areas that the murders are happening, absolutely, but

22   how do we explain the ones that aren't but for race?

23         THE COURT:  Go ahead.

24         MS KOENIG:  What we also have is, we have I think

25   what the Government is doing is running from the

1    obvious answer.  What Dr. Smith tried to do was

2    basically say that in no circumstance would he ever

3    advise a law enforcement agency that they were acting

4    in a biased manner.  But if he found evidence of

5    statistical disparities he might advise them they need

6    to to some training to let their officers know that

7    they need to start treating people of different races

8    more equally.

9        So, the burden is initially on us, the defense, to

10   show that the discriminatory purpose was a motivating

11   factor.  Here the evidence is so explicit in terms of

12   the statistical evidence when we line that evidence up

13   with how the precincts are mapped out, and we compare

14   that to the racial, residential racial segregation in

15   Richmond.  So the burden then shifts to show the same

16   decision would have resulted even had the impressible

17   purpose not been considered.  And the Government hasn't

18   done a single thing to show that.

19       So at this point, Your Honor, I believe that you

20   have to rule for us.  The question I know The Court

21   asked us to consider at the end of the last hearing was

22   what would an appropriate remedy be if The Court were

23   to make such a finding?  I believe that The Court,

24   because it's not written in stone, the Supreme Court

25   has left the question open in Armstrong.  Several

```
 1    circuits have weighed in.  Some circuits find dismissal
 2    of the indictment is appropriate.  Other circuits and
 3    other district courts with have found that suppression
 4    of the evidence is the appropriate remedy.  If The
 5    Court feels that a more creative remedy is appropriate,
 6    we are happy to consider that.  But the remedy has to
 7    be within the context of this case.
 8         THE COURT:  Right.
 9         MS KOENIG:  So that is where we are.  I think that
10    the -- we have met our burden, and that The Court
11    should so find.
12         THE COURT:  Okay.  Thank you.  It would be a
13    different story if somebody brought a 1983 case.
14         MS KOENIG:  Correct.
15         THE COURT:  Then I can enter an injunction.
16         MS KOENIG:  Correct.  That is not an appropriate
17    remedy in this case.
18         THE COURT:  I can't do that here.  You would have
19    thought somebody would have done that by now.  Maybe
20    somebody will try to figure that out.
21         MR. GIBBONS:  So, Your Honor, let me just start
22    before I respond to these points and get into my
23    argument, just review the facts very briefly.
24         So within a four-hour period the Focus Mission
25    Team sees three cars with the exact same license plate
```

1    number.  They pull over the first, I believe it was for

2    a defective headlight.  See that the registration

3    doesn't match the car.  Give that person a warning and

4    tell them to fix the headlight.  Let them on their way.

5    There is no search of the car as the defense has

6    repeatedly claims, there is absolutely no search of

7    that car.

8         THE COURT:  Well, they looked in it.

9         MR. GIBBONS:  But not a fourth amendment search.

10        Second stop an hour later.  They see a second car

11   with a broken window.  Same exact license plate.

12   Pulled it over.  The mom says she broke the window to

13   get into her car.  She locked her kid in the car.  Same

14   license plate.  Conduct is weird.  Gave her a warning.

15   No search.  Sent her on her way.

16        Two hours later they see Mr. Moore, same exact

17   license plate.  And they know it doesn't belong to his

18   car based on the two prior interactions within four

19   hours.  They attempt to initiate a traffic stop.  He

20   flees.  Goes through three stop signs at a high rate of

21   speed.  Crashes his car into the curb and then flees on

22   foot.  They find the firearm.

23        So, that is the background.  And when Ms Koenig

24   says the Government has not done a single thing to

25   rebut this legitimate law enforcement purpose.  I mean

1   that is it.  The police officers see a traffic

2   violation.  And if there is not just probable cause,

3   they know that there is something wrong with this tag

4   one way or another.

5      Attempt to issue a traffic stop, and here we are.

6      To start with, and just to reiterate, Your Honor,

7   we have pending motions to exclude on both Dr. Costin

8   and on Dr. Chiles.  And let me talk about why that is

9   the case, and why neither of those data or their

10  conclusions of their testimony are reliable properly

11  before The Court.

12     THE COURT:  Well, I think the Johnston case says I

13  can rely on the data, doesn't it?

14     MR. GIBBONS:  If the data is reliable.  But we --

15     THE COURT:  Yes.  Let me just say his explanation

16  of the data being unreliable was hog wash.

17     MR. GIBBONS:  Dr. Smith's explanation?

18     THE COURT:  Yes.  Dr. Smith was simply afraid to

19  testify that the emperor has no clothes.

20     MR. GIBBONS:  Talking about the Community Policing

21  Act data or other data, Your Honor?

22     THE COURT:  Yes.  I Community Policing Act data.

23  You remember he says they couldn't tell what race they

24  were.  You know, I may have been born during the day,

25  but it wasn't yesterday.

1        MR. GIBBONS:  Well, the point we are trying to

2   make, Your Honor --

3        THE COURT:  Well, I believe it was yesterday since

4   it was my birthday.  It was yesterday seventy-one years

5   ago.

6        MR. GIBBONS:  The point we are trying to make,

7   Your Honor, is that comparing census records which are

8   self -- race is self identified and traffic stop where

9   race is identified by the police officer, it is just

10  apples and oranges.  I think that is what Dr. Smith is

11  trying to say.

12       THE COURT:  But he says they couldn't tell when

13  they were issuing a ticket what race the people were.

14  He couldn't be sure about it.  We have all -- I have

15  had -- Mr. Seibert has brought me a hundred cases where

16  they have identified the race of people, and they don't

17  seem to get it wrong.

18       MR. GIBBONS:  Your Honor, it is somewhere -- I

19  would have to look at the data again -- but somewhere

20  between seven and ten percent of that data there is an

21  unknown race checked in the Community Policing Act data

22  for Richmond.  So there is some uncertainty, I think

23  there is some hesitation on RPD officers to make

24  decisions in close calls.  And I think that is what

25  Dr. Smith was trying to say.

1          THE COURT:  Well, go ahead.

2          MR. GIBBONS:  We talked about, Your Honor, and we

3     called Kevin Turner, who works at Virginia State

4     Police, and Jim McDonough who works for Virginia

5     Department of Criminal Services, they talked about the

6     rush time line of the Community Policing Act and how

7     quickly this was rolled out, and how haphazard the data

8     collection in those first six months, which is the

9     first five months of data is the data that the defense

10    is relying on to prove that there is some kind of

11    unexplained statistical disparity.  We talked about

12    just that the pitfalls and unreliability of data.

13         THE COURT:  Well, you are going to have go far to

14    persuade me that 77 percent of the people who are

15    arrested were not black.

16         MR. GIBBONS:  Well, the 77 percent of the data

17    collected, that is what data shows.

18         THE COURT:  Data collected, you are right.

19         MR. GIBBONS:  But, Your Honor, we talked about

20    this and Dr. Costin admitted this during cross

21    examination, if you shift the time line to include the

22    first full year of that data instead of picking five

23    months of the most unreliable data the disparity

24    drops -- let me get this right -- the percentage of

25    blacks that were stopped drops from 77 percent to

1    68 percent; and the percentage of whites that were

2    stopped increases from 14 to 24 percent.  So if you

3    include, if you don't cherry pick the date range then

4    the disparity actually drops in half.  And if you

5    include the entire --

6        THE COURT:  Well, still a pretty big disparity.

7        MR. GIBBONS:  It is.  And this is where we get to

8    where the Fourth Circuit has repeatedly said some kind

9    of unexplained statistical disparity without more is

10   insufficient as a matter of law.

11       THE COURT:  So what the explanation for this?

12       MR. GIBBONS:  I think a partial explanation, and

13   that one we know is occurring, is police deployment

14   pattern.  That police are being deployed to higher

15   crime areas, which tend to be minority neighborhoods.

16   Now, there is no evidence, again the burden is on the

17   defense to explain these statistical disparities, there

18   is no evidence as to --

19       THE COURT:  Wait a minute.  You told me that that

20   is how these precincts were set up?

21       MR. GIBBONS:  There is no evidence in the record

22   as to how the precincts were set up.

23       THE COURT:  How they assign the police officers to

24   go out to those areas?

25       MR. GIBBONS:  There is no evidence, Your Honor.

1    But Dr. Smith repeatedly testified police go where the

2    crime is.

3         THE COURT:  Well, okay.

4         MR. GIBBONS:  We have these maps that show the

5    crime is disproportionately in these minority

6    neighborhoods.

7         THE COURT:  I understand what you are saying, and

8    that is the thing that has always bothered me about

9    this case.  I mean there are two sides to the coin

10   here.  Side one is I have been sitting here for 12

11   years, and I have never had a young white guy come in

12   who has got stopped or making an illegal left turn and

13   they found drugs in his car.  Never happened.  But, you

14   know, side two is you know people in those communities

15   deserve to live in an area that is safe and to have the

16   police try to find guns.

17        MR. GIBBONS:  Right, Your Honor.

18        If could I skip ahead.  I was going to talk about

19   this later, but the Ninth Circuit in this, United

20   States versus Turner case, and this is at 104 3d 1180,

21   and the cite is 1185, this is a Ninth Circuit case from

22   1897.  The defense in that case made a very similar

23   argument.  If the police set up some kind of traffic

24   stop sting operation in Beverly Hills versus south

25   central LA they are going to get different people

1    because they don't patrol in Beverly Hills and they do

2    patrol in south central LA.  That there is some kind of

3    over policing, there is going to be some kind of

4    discriminatory impacts or disparities because they

5    police in south central L A.  The Ninth Circuit pretty

6    conclusively said that is not discriminatory effect as

7    a matter of law.  In fact, they said the defendant's

8    hypothetical, Beverly Hills versus south central LA, is

9    an argument that the minorities of the inner city of

10   Las Angeles must be denied the protection of law

11   enforcement by the Federal Government because the

12   likely subjects are likely to be minorities living in

13   that area.  So it can't be the case that enforcing the

14   law in predominantly minority areas is a violation of

15   the Constitution if those minority populations happen

16   to be high crime areas.  The Ninth Circuit has plainly

17   said that is not sufficient as a matter of law.

18        So all that we have here is some kind of

19   unexplained statistical disparity.  We don't know how

20   much of it is related to policing, how much is related

21   to race, if at all.  We just have this unexplained

22   statistical disparity.  And the Fourth Circuit in

23   multiple cases, in fact in Hair, Venable, and Orvis

24   have said that unexplained statistical disparity is

25   insufficient as a matter of law.

1        THE COURT:  Well, I think the explanation is sort
2    of the opposite of why Willie Sutton robed banks.  The
3    police go where criminals are because that is where you
4    catch criminals.
5        MR. GIBBONS:  Right.  But Dr. Costin admitted on
6    the stand that none of her work could be interpreted as
7    causation, didn't intend to make any causative
8    arguments.  That is one of the key weaknesses of the
9    defense case.  They have done nothing to explain this
10   statistical disparity when in fact the law requires
11   them to do that.  So we don't know one way or the other
12   what is the cause of this naked statistical disparity.
13   And the defense hasn't put anything in besides
14   proffering of lawyer testimony that the police are
15   enforcing racial boundaries, which there is no evidence
16   of that in the record besides assertions of counsel.
17       So, again, on that point the unexplained
18   statistical disparity, or prohibition on that is the
19   sole evidence of effect and intent, is intended to meet
20   Armstrong's requirement that the defense produce a
21   similarly situated defendant.  And there has been no
22   attempt to do that, and the only evidence of that is
23   this unexplained statistical disparity.
24       THE COURT:  Well, can you address a different
25   question for me?  And it's one I addressed to Ms

1    Koenig.

2         Let's just assume for a second that I find that

3    there is a disparity and intent, but the police see a

4    crime happening.  Is the remedy for that to toss out

5    the charge?  I mean, suppose the guy was driving down

6    Brookland Park Boulevard at 80 miles an hour.  And

7    police caught him.  Yet he happened to be a black

8    person and the police were looking for black people.

9    Should I toss out that indictment?  I assume they are

10   going to say no.  And can you tell me why?

11        MR. GIBBONS:  Well, Your Honor, I think she has a

12   legal test correct.  It is a burden-shifting argument

13   similar to a Batson challenge.  They make a prima facie

14   case -- and we don't think that is met here -- and the

15   burden shifts to the Government to assert legitimate

16   non-discriminatory reasons.  And The Court balances

17   those explanations.

18        To that point, Your Honor, The Court, the Fourth

19   Circuit said in Mason that "Where there exists an

20   objectively reasonable basis for the officer's conduct

21   after rigorous challenge it is even less likely that an

22   Armstrong claim would get off the ground."

23        And then a little bit later, "Officers cannot just

24   cease enforcement efforts where there is an objective

25   reason to believe that there has been a violation of

1    the law."

2         An that is exactly what happened here.  The police

3    see this fake tag that they have seen three times now

4    in the last four hours, the same officers, same shift.

5    Are they supposed to just let this walk because of the

6    defendant's race?  I think the answer is no.  That they

7    are required to enforce the law, and in fact that is

8    exactly what they did in this instance.  And I believe

9    answers The Court's question.

10        Let me switch gears, Your Honor.

11        THE COURT:  Sure.  Go ahead.  Take your time.

12        MR. GIBBONS:  Another important piece here, Your

13   Honor, another failure of the defense's case and their

14   burden is the Supreme Court in McClusky said that the

15   party bringing the equal protection claim must show

16   discriminatory purpose in his case.  There has been

17   absolutely no evidence to that effect.  There has been

18   no evidence connecting unexplained statistical

19   disparities to the stop on December 5 of 2020, or

20   historical prejudice that occurred many decades ago.

21        THE COURT:  Well, I agree with you about

22   annexation and all that stuff that happened back in the

23   '70s.  But if I find that there is still a pattern of

24   racially-biased enforcement, are you saying that there

25   is no evidence that the stop of this gentleman was

1    because of that?

2         MR. GIBBONS:  Yes, Your Honor.  There is no

3    evidence of that.  The four officers that were involved

4    in that stop were here.  They testified.  They gave --

5    this was over a year ago -- they were cross-examined,

6    and there is no evidence of any kind of racial

7    prejudice or anything that some kind of over policing,

8    which we have already addressed, but over policing by

9    itself is not a Constitutional violation.  That that

10   somehow touched this stop on December 5, 2020.

11        In fact -- this is another one of Your Honor's

12   questions from the last, from the last hearing.  You

13   asked about mixed motives or what happens if there is

14   kind of awareness of discriminatory impact.  Or, excuse

15   me, of disparate impact.  And that is not enough under

16   Supreme Court case law under.

17        THE COURT:  You have to have intent, too.

18        MR. GIBBONS:  Right.  You have to not just be

19   aware there is an impact or disparate impact, you have

20   to intend that disparate impact to take place.

21        THE WITNESS:  In this particular case.

22        MR. GIBBONS:  In this particular case.  There is

23   just no evidence of that.  There is no evidence that

24   Henry Marsh and Doug Wilder, Tim Kaine, they are

25   involved in the through line from '89 to 2020.  And it

1    is just inconceivable they would permit, not only

2    permit this but intend this to to take place or allow

3    it to take place within RPD.

4         THE COURT:  Well, there is not even any evidence

5    that Mayor Stoney intended.

6         MR. GIBBONS:  That is one of the weaknesses of the

7    defense case.  There has to be connection to this case,

8    has to be connection that there was intent in this

9    case, and there is simply no evidence of that beyond

10   unexplained statistical disparity.

11        THE COURT:  Right.

12        MR. GIBBONS:  And just, the implications of the

13   defense's argument is massive.  If it's the case that a

14   simple unexplained statistical disparity is enough to

15   get an indictment dismissed without further evidence or

16   connection to this case, then any traffic stop in the

17   City of Richmond is ineligible to proceed to

18   indictment.  Because if there is an unexplained

19   statistical disparity here then no indictment can

20   result from any traffic stops.  And not just here in

21   Richmond, we heard from Dr. McDonough that Richmond's

22   unexplained statistical disparity in the DCJS report is

23   about middle of the road in the Commonwealth.  So this,

24   that the logical import of this argument extends not

25   just to Richmond, but throughout the Commonwealth.

1      That maybe zero traffic stops in the City or in the

2      Commonwealth of Virginia are eligible to be proceed to

3      indictment based on the defenses theory.

4            THE COURT:  Or even to give them a ticket.

5            MR. GIBBONS:  Give them a ticket, right.

6            And not just the Commonwealth of Virginia, but if

7      you take Dr. Smith at his word that this is really a

8      national problem that goes back decades, really no

9      traffic stops, or no enforcement can occur where some

10     kind of disparate impact has been identified or some

11     kind of unexplained disparity is present.

12           THE COURT:  So, what is wrong with that result if

13     everybody, if all the stops, if there is a national or

14     state-wide or City-wide practice of stopping

15     African-American people, why should they be allowed to

16     indict them?  Although, the other problem with the

17     whole case is that you are asking me to decide

18     sociological questions that are not legal ones, or

19     maybe they are or maybe they aren't.  They say they are

20     legal questions.  I think you think they are

21     sociological.

22           MR. GIBBONS:  This is really, as Dr. Smith

23     acknowledged on the stand, this is a problem that goes

24     back decades and centuries.  And the idea that

25     dismissing the indictment would solve or even address

1    these long-standing and thorny problems being addressed

2    throughout our political branches, that that would be

3    accomplished in one courtroom in Richmond is just --

4    making a ruling in this case, vis a vis, such a blunt

5    instrument for the massive blame that is before our

6    society.

7        Sorry, Your Honor.  A little scatter shot.

8        THE COURT:  Well, that is okay.  I keep asking you

9    questions.

10       MR. GIBBONS:  Your Honor, just to go back to

11   repeated Fourth Circuit law.  The Armstrong test has

12   been adopted in these types of cases, selective

13   enforcement cases, and the Fourth Circuit in Hair,

14   Mason, Ovis, Venable has created very, very high

15   standards for this type claim to get discovery about

16   and to succeed on.  And we believe that standard has

17   plainly not been met here, Your Honor.

18       One moment.

19       THE COURT:  Take your time.

20       MR. GIBBONS:  Nothing further.

21       THE COURT:  Thank you very much, Mr. Gibbons.

22   Good job.

23       MS KOENIG:  Your Honor, once the burden shifts to

24   the laws, the action defender, you have to show that

25   the same decision would have resulted even had race not

1    been considered.  I don't think that we have any

2    evidence here of that whatsoever.  So what we are

3    looking at is in terms of like the dates of the stop,

4    like when, as this court recognized, the numbers are

5    still incredibly high even if you look at the whole

6    year's worth of data, but the reason that we came and

7    stopped at December 6 of 2020 is because if I came in

8    with additional data beyond that everybody would be

9    screaming and yelling about the relevance of the date.

10        THE COURT:  Well, that is part, one of the

11   problems with being a lawyer.

12        MS KOENIG:  Ha ha ha.  So, but what we do know is

13   we do not have any evidence about the police deployment

14   patterns in this case.  We do not have -- but what we

15   do have is we have clear evidence about the traffic

16   enforcement in this case.  This is a selective

17   enforcement claim, not a selective prosecution claim.

18   And as I talked about several times in the briefing,

19   for example in ECF number 66 at page three, footnote

20   one, the standard is different.  We don't have to show

21   a similarly situated defendant when we are talking

22   about a selective enforcement claim as opposed to a

23   selective prosecution claim.  They are different than,

24   different considerations that are at play in a

25   selective prosecution claim which we have not brought

1   here.

2       But what we have is we have a pattern, right.  A

3   pattern and a practice that all comes together

4   especially when we look at the history that Dr. Chiles

5   testified about.

6       It's not that the police just happened to be in

7   high crime areas.  The City designed essentially those

8   places to be areas where you are going to stick blacks,

9   poor people who have been deprived of everything that

10  they otherwise would have been entitled to, and now we

11  are going to stop them over and over again for traffic

12  stops.  This is not by happenstance.  And Dr. Costin

13  testified that it is policing borders.  Not just me

14  standing up here saying that.  I wouldn't be able to

15  make that representation.  Dr. Costin testified to

16  that.  We can see it in the figures.  We can see it in

17  the evidence.  And I think that one thing that The

18  Court has to also look at is as it relates to this case

19  we know that what ultimately happened pretty quickly

20  within a matter of a few minutes, with the other two

21  people that were stopped for this same license plate

22  number, they were just let go, oh, no issue.

23      THE COURT:  Well, they had the good sense to not

24  run off.

25      MS KOENIG:  Again, we are talking about the

1   initial part, right.  Just the traffic enforcement part

2   of it.  Right.

3       So when we get to I think what I take from the

4   Government's argument, this parade is that let's just

5   keep on keeping on with what we have been doing all

6   these years.  Let's just keep over, over, over policing

7   the blacks.  Let's just let everybody do what they have

8   been doing before.  It is just so hard to fix it.  It

9   is so hard for us to try to do something that is going

10  to help make things more equal.  And that is exactly

11  what the equal protection clause is designed to do, is

12  to force change like it did in the '70s when the Fourth

13  Circuit didn't want to deal, or didn't want to let

14  Richmond just do what they had been doing all along

15  with continued segregation at that point.  When does it

16  stop?  I think it stops when we have evidence that

17  shows us that we are really more in parity with the

18  traffic stops that have happening.  If the ramification

19  is that someone gets pulled for a traffic stop and you

20  have got to find better reasons to try to cite them

21  with a crime, so be it.  Right.  So be it.

22      And so what we have in this case is we are not

23  just to just keep on keeping on.  We are asking The

24  Court to find enough is enough.

25      THE COURT:  All right.  Thank you.

1        Anything else, counsel, in this case?  Do you all

2    want to file more briefs in this case, or have you

3    exhausted your supply of ink?

4        MR. GIBBONS:  The government is happy with no

5    further briefing.  This has been going on for a very

6    long time.

7        THE COURT:  It has been going on for a long time,

8    hasn't it?

9        MS KOENIG:  Same here, Your Honor.

10        THE COURT:  All right.

11        Well, this is it.  A difficult case that raises a

12    lot of difficult questions.

13        Much and it is brings to the forefront something I

14    have been facing ever since I have been a judge, which

15    is why is it that we only have stops in cars with black

16    drivers?  And I just don't get it.

17        But it also brings to the front of how do we

18    protect the African-American community?  It is a tough

19    question.

20        Do you have anything further to add, Mr. Seibert?

21    I haven't heard from you yet.

22        MR. SIEBERT:  No, Your Honor.  I would just --

23        THE COURT:  Is that a VMI tie?

24        MR. SIEBERT:  My alma mater.

25        THE COURT:  Well, congratulations.

1          MR. SIEBERT:  I was going to add, Your Honor, just

2     I don't know if we covered this, but -- and I don't

3     want to open up anything if Ms. Koenig had to answer,

4     but the maps, right, I would encourage The Court to

5     overlay that on top of the maps --

6          THE COURT:  The crime maps.

7          MR. SIEBERT:  The crimes maps.  The murder and

8     manslaughter, I assume The Court would do to already,

9     but just overlay that across what Ms Koenig provided on

10    the traffic stops.  I think there is a correlation.

11    Police officers aren't walking the beat any more.  They

12    are all in motor vehicles.  So their main area is

13    driving around looking for cars.  I mean, that's how

14    they deter crime by presence.  Less likely crime to

15    occur when they are patrolling, right.  But I think

16    it's very telling.  I think, you know, Your Honor made

17    a comment about linking the redeployment or the

18    resource allocation.  I think this answers that

19    question.  That is the only thing I would add.

20         THE COURT:  Thank you, Mr. Siebert.

21         Ms Austin, do you have anything to add?

22         MS AUSTIN:  No, Your Honor.  Thank you.

23         THE WITNESS:  Okay.  Thank you.  All right.  Thank

24    you all very much.  And we will have to write an

25    opinion about this thing.

1        Thank you.

2        Good job, counsel on both sides.  I appreciate

3    your good work.

4        Let's adjourn

5

6                    HEARING ADJOURNED

7

8        THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

9

10                   GILBERT FRANK HALASZ, OCR

11                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## index

| Witness. | pg | ln |
|---|---|---|
| Chiles - direct | 8 | 12 |
| Chiles - cross | 78 | 11 |
| Chiles - redirect | 103 | 10 |