IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                          Criminal Action No. 3:21cr42

KEITH RODNEY MOORE,
            Defendant.

## **OPINION**

On December 5, 2020, four Richmond Police Department ("RPD") Fourth Precinct police officers tried to pull Keith Rodney Moore over in the Highland Park neighborhood of Richmond because his car had suspicious temporary tags. Instead of stopping, Moore drove away before abandoning his car and fleeing on foot. The officers pursued and caught him, and they took him into custody. Afterwards, the officers found a gun in the car Moore had abandoned. A grand jury ultimately indicted Moore for possessing a firearm and ammunition as a convicted felon.

Moore has moved to suppress evidence of both the gun the police officers found in his car and statements he made after they took him into custody. (ECF No. 17.) Moore's flight gave the police officers probable cause to arrest him, and the Court will therefore deny his motion to suppress evidence of the gun he abandoned in his vehicle. But because the officers asked Moore questions that were likely to elicit an incriminating response both before he received his *Miranda* warnings and after he invoked his right to remain silent, the Court will grant his motion to suppress those statements. The Court will deny his motion to suppress statements he made voluntarily after receiving his *Miranda* warnings but before he invoked his right to remain silent.

## I. FACTS[1]

On December 5, 2020, four police officers—Officers Dominic Colombo, Nakia Williams, Keegan Mills, and Sergeant Michael Spinos—tried to pull Moore over. They suspected that Moore's car had phony temporary tags because they had twice stopped cars with the same temporary tag number, 11134Y, earlier that night.[2]

The officers activated their cruisers' lights to indicate that Moore should pull over so they could further investigate his suspicious temporary tags. Instead of pulling over immediately, Moore drove away, ran multiple stops signs, and eventually stopped his car on a curb. He then got out of the car and ran from the police. When he fled, Moore left his car running and his driver's side door open. At least three of the officers saw a handgun on the floorboard in front of the driver's seat.

Meanwhile, Colombo and Spinos chased Moore on foot, and Williams and Mills pursued him in their cruiser. After Moore stopped running, the officers forced him to the ground and handcuffed him. Officers John Gilbert and Jakob Torres then arrived to assist the other officers and transport Moore.

In the first few minutes after they handcuffed him, the officers asked Moore basic questions, and Moore did not respond. Officer Gilbert then asked "[w]hat you running for, man?" (Hr'g Tr. 49:18–22, 147:13–17, July 26, 2021; Gov. Ex. 14, at 4:13.) Moore did not respond to that question either.

About ten minutes after the officers initiated the stop, Mills told Moore that he was under

---

[1] The exhibits cited in this section refer to those admitted at the suppression hearing.

[2] During the first stop, the officers pulled over a Black man who had the temporary tag number 11134Y. They ultimately ended that stop without a warning. During the second stop, the officers pulled over a Black woman who had the same temporary tag number. They let her go after interacting with her for less than two minutes.

2

arrest and performed a pat-down search incident to that arrest. During the search, Mills asked Moore questions related to the pat-down, such as whether Moore had anything on him, or items hidden in his underwear. Shortly thereafter, Moore's cousin arrived. Moore told her that the police pulled him over at the gas station. He also said, "I know a n****'s tellin' now, that shit's crazy." (Gov. Ex. 14, at 12:58–13:02.) Mills asked, "[t]elling on you about what though?" (*Id.* at 13:06–13:08.) Instead of answering Mills's question, Moore responded, "I'm talking to my people." (*Id.* at 13:08–13:10.)

Gilbert then placed Moore in the back of his police cruiser. After Gilbert drove Moore back to his car, Moore asked Gilbert if the police would have his car towed. Gilbert responded that Moore's car would probably be towed.

Spinos then spoke to Moore about Moore's car and the tags while Moore sat in the back of Gilbert's patrol car. After that conversation ended, Spinos told Williams to read Moore his *Miranda* rights. Immediately before Williams did so, Officer Torres asked Moore where he bought the car. Moore explained where he bought the car and how much he paid for it.

Williams then read Moore his *Miranda* rights. She paused after each sentence and asked Moore whether he understood his rights. He affirmed his understanding after each sentence. After she finished reading him his *Miranda* rights, Williams asked Moore if he wanted to have a conversation with her. Moore did not answer. Williams again asked if Moore wanted to answer any of her questions. Moore replied, "Just get me down to jail, man." (Gov. Ex. 12, at 19:28–30.) Williams said, "Alright, cool," and she walked away. (*Id.* at 19:30–33.)

Moore then engaged Spinos in a conversation about why the officers had pulled him over. Spinos asked Moore whether a car dealer gave him his temporary tags, and Moore told the officers that the Hanover County police did not say anything to him about his tags when they had

3

recently pulled him over for speeding. In response, Williams asked, "[i]f that's the case, then why didn't you just stop, if you knew that you had already been through this with another agency?" (*Id.* at 21:23–29.) Moore answered that he did not stop because he "had a whole iron in the car." (Hr'g Tr. 110:18–20, July 26, 2021.) Williams told him that the incident "could have been dealt with a different way." (Gov Ex. 12, at 21:40–42.) Moore then told her, "I am not talking to you. I'm done." (*Id.* at 21:45–47.)

A few minutes later, while they sat in Gilbert's patrol car, Moore asked Gilbert who had his phone and his girlfriend's wallet. After responding to Moore's questions, Gilbert asked, "[w]hat you run for today, man?" (Gov. Ex. 14, at 29:19–21.) Moore replied, "[y]'all know the deal man, when you got a gun in the car. Y'all know the deal." (*Id.* at 29:20–25.) Gilbert then asked Moore how clean his record was, and Moore responded that he did not have any gun charges. (*Id.* at 29:40–48.) Gilbert then asked Moore if he was a convicted felon, and Moore responded, "[y]es, sir." (*Id.* at 29:49–29:53.) Gilbert then asked Moore, "[y]ou know you can't have a gun, right?" (*Id.* at 29:58–30:02.) Moore answered in the affirmative. (*Id.* at 30:02–04; Hr'g Tr. 153:18–20, July 26, 2021.) The officers detained Moore, and, on May 4, 2021, the grand jury returned a one-count indictment against Moore for his unlawful possession of a firearm as a convicted felon.

## II. DISCUSSION

Moore has moved to suppress evidence of both the gun the police officers found in his car and statements he made after they took him into custody.

### *A. The Gun*

Moore argues that the police violated his "Fourth Amendment right to remain free of unreasonable seizures when they pulled [him] over to investigate a temporary dealer tag." (ECF

No. 17, at 3.) He further argues that "[s]imply having temporary tags on a car is not a reasonable basis for a traffic stop" and asks the Court to "suppress all evidence that the police obtained after initiating the traffic stop in violation of" his Fourth Amendment rights. (*Id.* at 4.)

Here, Moore's temporary tags had the same number as those of two other drivers the officers had stopped that night. Suspecting that Moore had phony temporary tags, the officers pulled him over. *See* Va. Code § 46.2-612(B)(1) (prohibiting a person from displaying "fictitious" tags). Because the officers suspected Moore had violated a traffic law, the officers "[were] legally justified in stopping" Moore's vehicle. *United States v. Hassan El*, 5 F.3d 726, 729–30 (4th Cir. 1993) ("[W]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment."). The officers, therefore, did not violate Moore's Fourth Amendment rights by trying to pull him over.

Additionally, the officers did not "seize" Moore until he stopped running and the officers took him into custody.[3] By that time, Moore had committed multiple crimes for which the police could arrest him. *See, e.g.*, Va. Code. § 46.2-817(A) (making it illegal to disregard a law enforcement officer's signal to stop one's car). And he had abandoned his car and gun, losing any reasonable expectation of privacy in that property. *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property."); *see United States v. Hopkins*, 568 F. App'x 214, 216 (4th Cir. 2014) ("When Hopkins fled from the police, he

---

[3] *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) ("[A] seizure 'requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.' . . . A defendant who flees the police in response to an assertion of authority has not been seized." (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991))).

5

abandoned the car, thereby forfeiting any privacy interest in the car or its contents.").[4] Thus, the officers' seizure of Moore's gun did not violate the Fourth Amendment.

### B. Moore's Statements to RPD

Moore argues that the police violated his "Fifth Amendment right to remain silent by interrogating him both before and after *Miranda* warnings and after he invoked his right to remain silent." (ECF No. 17, at 5.) Specifically, he seeks to suppress:

> (1) everything [he] said pre-*Miranda* . . . because [the] officers had not read him his rights; (2) everything [he] said post-*Miranda* . . . because [the] police continued to interrogate him after he invoked his right to remain silent; and (3) everything [he] said post-*Miranda* . . . because [the] officers engaged in a prohibited two-step interrogation technique that effectively rendered his post-*Miranda* statements involuntary.

(ECF No. 22, at 9; ECF No. 17, at 5–7.)

#### *1. Pre-*Miranda *Statements*[5]

Generally, the government cannot use pre-*Miranda* statements a defendant makes during a custodial interrogation in its case-in-chief. *See Leshuk*, 65 F.3d at 1108. "'Interrogation' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Accordingly, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional

---

[4] *See also United States v. Stover*, 808 F.3d 991, 1000–01 (4th Cir. 2015) ("Since [the defendant] did not accede to police authority until confronted by an armed officer in front of [his car], the gun he discarded prior to that time was not the fruit of the seizure, but rather, like the cocaine in *Hodari D.*, was abandoned."); *id.* at 1001 ("[W]hen an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply.").

[5] Though the government has "determined that it would seek admission of only two sets of Moore's pre-*Miranda* utterances: his statements to his cousin who arrived on the scene . . . and his statements and questions to the officers regarding what would happen to his Chrysler 300," the Court addresses each statement Moore seeks to exclude. (ECF No. 22, at 10.)

equivalent." *Id.* at 300–01. In other words, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

As an initial matter, the Fifth Amendment does not bar the voluntary statements Moore made to the police, including the comments he made to his cousin, before the officers read him his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). Nor does it bar responses to questions or statements normally attendant to arrest, such as questions about whether Moore had anything on him or statements explaining why the police arrested him. *See Innis*, 446 U.S. at 301. Further, Moore responded to questions from the police that were *not* "reasonably likely to elicit an incriminating response," *id.*, such as questions about the price of his car.

The police officers asked several questions, though, that they "should [have] know[n] [were] reasonably likely to elicit an incriminating response" from Moore. *See id.* This includes Gilbert's question, "[w]hat you running for man," and Torres's question about "where [Moore] got his car." (Hr'g Tr. 97:5–24, 147:13–15, July 26, 2021.) Moore answered only Torres's question. Even though Moore provided an innocent answer to Torres's question, the Fifth Amendment bars the admission of his response in the government's case-in-chief because the question could reasonably have led to an incriminating response, such as an admission that Moore stole the car. *Innis*, 446 U.S. at 300–01 ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. . . . '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to

7

any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."). The Court, therefore, will suppress Moore's response to Torres's question.

### 2. *Post*-Miranda *Statements*

"To invoke the right to remain silent . . . and thereby cut off questioning, the suspect's invocation must be 'unambiguous.'" *United States v. Abdallah*, 911 F.3d 201, 210 (4th Cir. 2018) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010)). "An invocation is unambiguous when a 'reasonable police officer under the circumstances would have understood' the suspect intended to invoke his Fifth Amendment rights." *Id.* (quoting *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011)). After an individual invokes his right to remain silent, "[o]fficers cannot fail to scrupulously honor a suspect's request in the hope that the suspect will subsequently waive that failure." *Id.* at 216.

Moore argues that he "invoked his right not to speak with the officers" shortly after Williams read him his *Miranda* rights by telling Williams, "I'm not talking to you. I'm done." (ECF No. 32, at 13; Hr'g Tr. 126:11–15, July 26, 2021.) The Court agrees that Moore unambiguously invoked his right to remain silent with these statements and, as such, will bar the government from introducing any statements Moore made after he invoked this right. This includes Moore's statements to Officer Gilbert about his status as a convicted felon and his understanding that he could not own a gun.

8

### 3. *Constitutionality of the Officers' Interrogation Technique*[6]

Moore also argues that the officers violated *Seibert* by deliberately employing a two-step interrogation technique whereby they used Moore's pre-*Miranda* statements to elicit the same information after he received his *Miranda* warnings.[7] (ECF No. 17, at 6–7.) *Seibert* only applies, however, when the police *deliberately* use the question-first strategy. *Mashburn*, 406 F.3d at 309 (citing *Seibert*, 542 U.S. at 521 (Kennedy, J., concurring)). In cases where police do not deliberately use the question-first strategy, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985). The Court, therefore, must first determine whether the officers' "failure to convey *Miranda* warnings to [Moore] was deliberate or intentional." *Mashburn*, 406 F.3d at 309.

Moore argues that the officers deliberately engaged in a two-step procedure, as demonstrated by the fact that Moore's pre-and post-*Miranda* statements all took place within the span of approximately thirty minutes, the questions involved the same police officers, and "the contents of the two interrogations overlapped nearly completely." (ECF No. 17, at 6.) But *Seibert* applies only when police officers "*intentionally* delayed delivering *Miranda* warnings to provoke [a defendant's] admissions." *United States v. Dorsey*, 744 F. App'x 130, 134 (4th Cir. 2018) (emphasis added). Indeed, "[w]ithout a showing of the officer's subterfuge, the mere fact that [a defendant] made pre-*Miranda* statements and post-*Miranda* statements does not render

---

[6] Because the Court will exclude any statements Moore made after invoking his *Miranda* rights, the Court evaluates under *Missouri v. Seibert*, 542 U.S. 600 (2004), only those statements Moore made after Williams's administered Moore's *Miranda* rights and before Moore invoked his right to remain silent. This includes Moore's statements to Spinos about his tags and his ticket in Hanover County.

[7] Courts refer to this as a "question-first" strategy. *See United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (citing *Missouri v. Seibert*, 542 U.S. 600, 615 (2004)).

his post-*Miranda* statements involuntary and inadmissible." *Id.*

The record does not support a finding that the officers intentionally or deliberately undermined *Miranda*. Rather, the evidence indicates that the officers confronted a fluid situation that evolved within minutes, from an effort to make a traffic stop, to a pursuit of a fleeing suspect and an investigation into an illegal weapon. *See United States v. Davis*, 645 F. Supp. 2d 541, 554 (W.D.N.C. 2009) (finding no evidence that the police deliberately delayed giving *Miranda* warnings during a traffic stop). Without any evidence that the officers deliberately used the "question-first" strategy, the Court must consider whether Moore "knowingly and voluntarily" made his warned admissions under *Elstad*. 470 U.S. at 309.

Here, Moore voluntarily reengaged with the officers after he received and acknowledged that he understood his *Miranda* rights. (*See* Hr'g Tr. 109:16–18, July 26, 2021; Gov. Ex. 12, at 19:50–20:06.) Moore, who started asking questions to and engaging in a conversation with Spinos less than one minute after receiving his *Miranda* warnings, cites no evidence of police coercion. Moore thus "made a rational and intelligent choice . . . to waive . . . his rights" when he initiated a conversation with the police officers. *Elstad*, 470 U.S. at 314.[8] Given the lack of evidence that the officers deliberately undermined the *Miranda* requirements and the evidence that Moore decided to reengage with the officers despite understanding his right not to do so, the Court will deny Moore's motion to suppress statements he made *after* Williams read him his *Miranda* rights but *before* Moore invoked his right to remain silent. *See id.* at 384 ("Where the

---

[8] *See also Berghuis*, 560 U.S. at 385 ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

10

prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

## VI. CONCLUSION

For the foregoing reasons, the Court will grant Moore's motion to suppress his pre-*Miranda* statement regarding from where he purchased his car and statements he made after invoking his *Miranda* rights. The Court will deny his motion to suppress in all other respects. (ECF No. 17.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 13 November ~~October~~ 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge