IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 3:21cr42 |
| | ) |
| KEITH RODNEY MOORE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Motion of the United States to Reconsider**
**And Memorandum in Support**

While this Court's decision to dismiss the indictment against a felon with an illegal gun was undoubtedly motivated by good intentions, the United States respectfully requests that it reconsider its finding that the Richmond Police Department (RPD) violated his Constitutional rights by selectively stopping his vehicle based on his race.  First, the Court acknowledged that there was *no evidence whatsoever* that the officers who stopped the defendant were motivated in any way by his race or even that the stop for temporary tags was inappropriate.  Yet the Court concluded that Black drivers are stopped more frequently than White drivers, and, therefore, that RPD had orchestrated an intentionally discriminatory campaign to stop more Black drivers.  The Court should reconsider the absence of evidence in the record to support this sweeping conclusion, which substitutes statistics for the realities of policing and ignores the Government's expert.  The United States provided ample evidence that RPD focuses its limited resources on the most violent areas of the City – whatever the races of their residents – in an effort to prevent crime and protect the public.  The Court also did not fully consider that its opinion might result in the unintended consequence that RPD (and other police departments) will change their

1

focused strategies, which appear to be working, and deploy resources in a less efficient manner for fear of being accused of racial animus.

\* \* \*

Although the United States disagrees with the Court's findings on both analytical prongs, the second step of the equal-protection analysis is in most need of reconsideration. Mr. Moore had to show that RPD's traffic stops "w[ere] motivated by discriminatory intent." Mem. Op. at 17 (*citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977)). The Court found "no evidence" that the four individual officers who stopped Mr. Moore on December 5, 2020, acted with "invidious or bad faith." Mem. Op. at 21. Instead, as the Court recognized, the stop was fully justified by a traffic violation: "RPD officers pulled Moore over for having suspicious temporary tags after stopping two other individuals the same night whose cars had the *same* exact temporary tag number." *Id.* n.21 (emphasis added). And when RPD attempted to pull over Mr. Moore's car, he drove away, ran multiple stop signs, wrecked his car on the curb, jumped out, and attempted to flee on foot. ECF No. 124 at 2. Officers apprehended Mr. Moore two blocks later and found an illegal handgun on the floorboard in the front seat of the vehicle he was driving. *Id.*

Notwithstanding these findings, the Court determined that Mr. Moore satisfied his burden as to discriminatory intent by attributing a discriminatory animus *to the entire police department*. Cobbling together centuries-old history of the City of Richmond and a limited dataset of less than six months showing RPD traffic stops more frequently involve Black drivers, the Court inferred that RPD has orchestrated a law enforcement strategy targeting Black drivers. Mem. Op. at 23–24. But the record lacks *any* evidence of discriminatory decisionmaking at *any* level

2

of RPD. There are no RPD policies, memoranda, or even text messages in the record[1] to suggest that any member of RPD made any effort to discriminate against Black drivers.[2]

Likewise, the discriminatory history relied upon by the Court, as offered by the defense's own historical expert, runs from 150 years ago until 40 years prior to Mr. Moore's traffic stop. ECF No. 110 at 91. This dated history, which the Court unfairly imputed on the modern day RPD, ignores the defense's own expert's acknowledgement that Richmond has undergone significant changes in the last fifty years. ECF 110 at 77. To be clear, the criminal justice system is not perfect and police misconduct "erodes the community trust necessary for effective policing." Attorney General Merrick B. Garland, Remarks on Civil Rights Violations by the Louisville Metro Police Dep't (Mar. 8, 2023) (available at justice.gov). But the Court's ruling could seemingly hold every police department in the country liable for discriminatory practices.

This matter was litigated extensively over more than two and a half years. The United States filed seven briefs and the Court held five substantive hearings with witness testimony and argument. Yet the Court's opinion ignores virtually all the evidence presented by the United States. The Court references the defendant's two experts throughout its opinion, but it does not even mention the United States's expert, Dr. Michael Smith, a professor of criminology and criminal justice at the University of Texas in San Antonio. Dr. Smith, a national expert on racial disparities in policing with 25 years of experience, disputed the statistical methods used and

---

[1] The United States was surprised to learn from the defendant's expert disclosure that the Court had granted *ex parte* subpoenas for discovery to RPD, as it was unaware that the Court had made the requisite findings. *See* ECF No. 82 at 4 n.3. "The standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for proving the claim itself." *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) (internal citation omitted).

[2] According to a May 2023 article in the *Richmond Times-Dispatch*, RPD's force is comprised of approximately 35% Black police officers. Sean McGoey, *Richmond-area Police Departments trying to thread the recruiting needle*, Richmond Times-Dispatch (May 22, 2023).

conclusions reached by the defendant's experts. ECF No. 101 at 20. Dr. Smith informed the Court that traffic stops involve multiple variables and that the defendant's experts' opinions lacked support. He explained that "a disparity in the number of stops does not justify a conclusion that there is biased policing."[3] ECF No. 101 at 50, 225. The Court's opinion ignores this countervailing evidence. Put simply, as the Court acknowledges in principle: correlation is not causation. Mem. Op. 22 n.21.

Finally, the Court's decision may well unravel the progress RPD has made in reducing violent crime in Richmond. Violent crime disproportionately occurs in—and affects the residents of—the First, Second, and Fourth Precincts, which have a high percentage of Black residents and, in some instances, a majority. ECF No. 103 at 7-8. Although the Court forecast "a never-ending cycle," in which officers would find more crime in predominantly Black neighborhoods simply by having a greater presence there, ECF No. 101 at 214, the Court failed to consider the evidence that RPD allocates its limited police resources to the areas of the city reporting the greatest number of violent crimes. *See* ECF No. 33 (testimony about Focus Mission Team's efforts to prevent serious crimes); ECF No. 70 at 16. As a result, traffic stops, an ordinary method of law enforcement, often correlate with the racial composition of the enforcement area. ECF No. 70 at 16. But there is simply no evidence in the record that RPD selects enforcement areas *because of* the race of their residents. *Cf. McCleskey v. Kemp*, 481 U.S. 279, 298 (1987).

At the same time, violent crime in the City decreased by 7% from 2022 to 2023 and has been on a steady decline over the last seven years. *See* Marysa Tuttle, *Richmond Police Chief*

---

[3] The United States also presented evidence that the Virginia Department of Criminal Justice Services has found the same about traffic stop data: "[a]lthough this analysis identified disparities in traffic stop rates related to race/ethnicity, it does not allow us to determine or measure specific reasons for these disparities." ECF No. 70 at 3.

4

*provides 2023 crime data for car thefts, shootings in end-of-year*, WRIC-ABC News (Jan. 25, 2024).

Policing today is a thankless and dangerous profession. And while this Court may have been well-intentioned, the practical effect of this opinion may well be to discourage RPD (and others) from actively policing the most violent areas of our City. *See United States v. Curry*, 965 F.3d 313, 346 (4th Cir. 2020) (Wilkinson, J., dissenting) (warning against "the risk" that "impenetrable and impractical legal regimes will drive police officers from disadvantaged communities—a situation that comes with dire consequences, not only for the wellbeing of our most vulnerable fellow citizens, but for society as a whole"). To require RPD to equally divide its resources across the City, regardless of an area's crime rate, would have the harmful consequence of reducing public safety by diverting resources from our most dangerous neighborhoods, places where law-abiding Richmonders want to live, work, and watch their children play in peace. *Cf.* Sean McGoey, *Jury Convicts 2 in Gilpin Court shooting that killed 15-year-old bystander*, Richmond Times-Dispatch (June 22, 2023).

The United States respectfully requests that the Court reconsider the scope and outcome of its decision.

Respectfully submitted,

By: */s/ Jessica D. Aber*
Jessica D. Aber
United States Attorney
Virginia Bar No. 72680
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Va. 23219
Phone: 804-819-5400
Email: jessica.d.aber@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2024, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

*Jessica D. Aber*
Jessica D. Aber
United States Attorney