IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.   ) | Case No. 3:21cr42 |
| ) | |
| **KEITH RODNEY MOORE,** ) | |
| Defendant ) | |

### MR. MOORE'S OPPOSITION TO THE GOVERNMENT'S MOTION TO RECONSIDER THE COURT'S FINAL ORDER

Keith Moore, through counsel, opposes as follows the government's motion, *see* ECF No. 128, asking the Court to reconsider its opinion and decision dismissing the indictment against Mr. Moore because the Richmond Police Department selectively enforced Virginia's traffic laws against Black drivers, *see* ECF Nos. 126 and 127, including Mr. Moore. The Court should deny the government's motion.

I. **The government fails to provide a valid basis for reconsideration of the Court's detailed and well-supported opinion.**

As an initial matter, the government's motion to reconsider fails to address the strict legal standard governing whether this Court can, let alone should, reconsider its decision dismissing Mr. Moore's indictment. *See, e.g.*, *United States v. Clenney*, No. 1:09CR135, 2009 WL 10677501, at *3 n.1 (E.D. Va. July 15, 2009) (observing that proponent of motion to reconsider did "not set forth the appropriate standard governing a motion for reconsideration, nor has [it] argued that [it] has satisfied any such standard.").

Motions to reconsider final decisions in criminal cases generally are available only in very limited circumstances. *See Pacific Ins. v. American Nat. Fire Ins.*, 148 F.3d 396, 403 (4th Cir. 1998) (observing that reconsideration is an "extraordinary remedy which should be used

1

sparingly.") (quoting 11 Wright et al., Federal Practice and Procedure § 2810.1, at 124 (2d ed. 1995); *United States v. Cintron*, 724 F.3d 32, 36 n.5 (1st Cir. 2013); *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010); *United States v. Young*, 260 F. Supp. 3d 530, 555 (E.D. Va. 2017); *United States v. Diaz-Martinez*, 3:18cr97, 2019 WL 2305151, at *1 (E.D. Va. May 30, 2019).

In particular, a motion to reconsider cannot simply repackage arguments that have already been considered and rejected by the Court. *See, e.g.*, *United States v. Danielczyk*, 917 F. Supp. 2d 573, 576 (E.D. Va. 2013) ("A party's mere disagreement with the court's ruling does not warrant a Rule 59(e) motion, and such motions should not be used 'to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance.'") (quoting *Pac. Ins.*, 148 F.3d at 403); *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000) (observing reconsideration motion cannot be used to "repackage familiar arguments to test whether the Court will change its mind"); *cf. Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003) (noting that "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment."). In this case, the government has merely restated arguments it made previously, and thus fails to provide a valid basis for reconsideration of the Court's detailed and considered judgment.

## II. The Court's decision was well-supported by the evidence in this case.

The government urges the Court to reconsider its decision because of an "absence of evidence in the record" to support the Court's conclusion. *See* ECF No. 128 at 1. But the government's motion ignores appalling evidence that the Richmond Police Department is discriminating against Black drivers, and has done so *for years*.

2

Expert testimony from Dr. Coston established that 77% of the drivers the Richmond Police Department pulled over in the six months leading up to Mr. Moore's arrest in this case were Black, compared to the 14.6% of drivers pulled over who were White. Black drivers were thus 5.13 times more likely to be stopped in Richmond than White drivers. *See* July 18, 2022 Tr. at 56-57. The data further revealed a statistically significant relationship between the driver's race and the outcome of the traffic stop; Black drivers were ticketed (rather than warned), searched, and arrested more often than White drivers than one would expect if left to chance. *Id.* at 57-66.

Dr. Coston's results mirrored what Virginia's Department of Criminal Justice Services found in analyzing the same data for the Richmond Police Department that Dr. Coston reviewed. *See* ECF No. 72-1 at 40, 59-60. Dr. Coston's results also reflected what the government's own expert found when analyzing similar data that the Richmond Police Department gathered in 2000. *See* ECF No. 72-2 at 9. Because of the absence of evidence that Black drivers in Richmond committed more traffic infractions than White drivers, *see* July 18, 2022 Tr. at 54; July 19, 2022 Tr. at 233, these statistics made "abundantly clear the disparate impact of traffic stops on Black drivers in Richmond." ECF No. 126 at 20.

In its motion to reconsider, the government laments that the Court did not cite the government's expert testimony in its opinion. *See* ECF No. 128 at 3. But the weight afforded by the Court to the expert testimony it received does not provide a valid basis for reconsideration. *See Thompson v. Afamasaga*, 2019 WL 1290856, at *2 (D. Haw. Mar. 20, 2019) ("In large part, Plaintiff simply disagrees with the court's rulings, including credibility determinations, which is not a sufficient basis for reconsideration . . . ."). Moreover, in the context of Federal Rule of Evidence 702, expert opinion is subject to exclusion if it is substantially grounded in the expert's

3

"subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

The Court made clear during Dr. Smith's testimony that it was not credible for multiple reasons. Indeed, Dr. Smith never reviewed the data that Dr. Coston analyzed; he did not review or ask for "contextual" data that he thought critical to his opinion in this case; and he had no explanation for why more White drivers were not pulled over in areas of Richmond where they worked as Dr. Smith would have expected. Most importantly, Dr. Smith testified he would never find that racial bias played a causal role in a pattern of policing, even if the statistics showed that police pulled over 90, or even 100, percent Black drivers compared to White drivers. July 19, 2022 Tr. at 226-29, 237-38, 251.

The problem with Dr. Smith's testimony is that he essentially conceded that his hypothesis—that racial bias played no role in policing in Richmond—was not subject to challenge *regardless* of the statistical evidence. That refusal to consider whether his theory was false contradicts the essence of reliable expert testimony. *See, e.g., Daubert*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry"). After Dr. Smith admitted that he would never find that racial bias played a causal role in a pattern of policing no matter what the statistical data showed, the Court understandably questioned Dr. Smith's value as an expert in determining whether racial bias was a factor in police action. *See* July 19, 2022 Tr. at 251-54. It is no surprise that Dr. Smith's testimony was entirely unpersuasive.

The government also recycles its argument that Dr. Chiles' testimony was simply historical and thus irrelevant to the present day. As when it made this assertion the first time, the

4

government's argument ignores the contemporary impacts from historical discrimination that, in particular, created the deeply racially segregated nature of Richmond's residential neighborhoods. *See, e.g.*, McGuireWoods Zoning and Segregation Work Group, *Zoning and Segregation in Virginia: Part 1* (Feb. 2021), filed as ECF No. 66-3 at 2 ("In many localities, neighborhoods are more racially segregated today than they were 50 years ago. . . .  In combination with other discriminatory laws and governmental actions, zoning segregated Virginia communities."); ECF No. 66-4 at 2-3 ("Redlining the construction of public housing and the location of public housing, highway construction, urban renewal, and economic development projects destroyed or bisected Richmond's black neighborhoods, displacing thousands of low income African-Americans, and squeezing them into East End Richmond, where most of the public housing has been located. Today [in 2015], Richmond is more segregated than ever."); ECF No. 102-1 at 7 ("While upwardly-mobile blacks can and have taken advantage of federal law and grassroots activism to live wherever their money can afford them, the majority of working-class and underclass blacks remain in racially homogenous enclaves in Richmond.").

      The racial dot maps that Mr. Moore introduced demonstrate, commensurate with the personal experience of those living in Richmond, that the vast majority of White people living in Richmond live in the Richmond Police Department's third precinct, while Black people living in Richmond live in the Richmond Police Department's first, second, and fourth precincts. *See* July 26, 2021 Motions Hr'g Exs. R-1, R-2, X-1, X-2, X-3, X-4.  Dr. Chiles's evidence explained the racially discriminatory history behind that segregation. *See* Oct. 28, 2022 Tr. 12-55.  As Dr. Chiles summarized, "by and large Blacks and Whites were basically forced or coaxed to live in separate sides of the City from the past to the present.  And the result of that is in the present." *Id.* at 57.

Further, Dr. Chiles testified that after the Revolutionary War, policing in Richmond focused on targeting Black people living and working in Richmond. *Id.* at 58. In the twentieth century, when policing began to focus on criminal activities such as drug abuse, prostitution, and alcoholism—including crimes committed by White citizens, the White citizens of Richmond threatened to defund the police department. *Id.* at 60. The Richmond Police Department's focus then turned back again to Black people in Richmond, including posting police patrol units to just watch Black citizens living in public housing projects. *Id.* at 60, 65-66. Moreover, hiring Black police officers did not impact the police department's focus on Black citizens in Richmond. *Id.* at 66.

The government did not counter this well-documented evidence in any way because it cannot. The history of over-policing Black communities in this country is intimately bound together with racial prejudice and discrimination. *See* Khalil Gibran Muhammad, <u>The Condemnation of Blackness: Race, Crime, and the Making of Modern Urban America</u> 5-10 (2010). Indeed, over a century of disproportionate enforcement resulted in higher crime rates which were then used as an "objective" basis to justify greater enforcement and stiffer punishments imposed on Black people. *Id.* at 234 ("Since the 1890s, disproportionately high crimes rates among blacks have been the starting point and linchpin of modern discourse on black criminality.").

In contrast to the eighteen exhibits that the defense introduced into evidence over the course of three days of hearings (in addition to the many attachments to briefings submitted over the course of this litigation), the government introduced four exhibits: Dr. Smith's report in this case, a list of duplicate traffic data, and two maps. *See* ECF Nos. 96, 98, and 109. The two maps showed the locations of murders and manslaughters in Richmond from 1999 through the day of Mr. Moore's arrest in this case. *See* Oct. 28, 2022 Tr. at 5-6. The government presented no evidence

6

tying murder and manslaughter rates to committing traffic violations. Further, and critically, the government presented no evidence at all purporting to explain why more Black drivers were stopped than White drivers in the White parts of Richmond, where the violent crime rate was lower.

Through expert testimony, Mr. Moore plainly demonstrated that the Richmond Police Department's selective enforcement of Virginia's traffic laws has a discriminatory effect on Black drivers. Regarding discriminatory purpose, the Court correctly found that through Dr. Coston's and Dr. Chiles's testimony, "Moore successfully present[ed] evidence of the first two factors: (1) 'evidence of a 'consistent pattern' of actions' by RPD that 'disparately impacts' Black drivers in Richmond; and (2) the 'history of discrimination' by RPD and in Richmond itself." ECF No. 28 at 22 (quoting *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016)). Contrary to the government's argument, the Court's findings were well supported by both the evidence in this case and applicable law. The Court should deny the government's motion asking the Court to reconsider its well-considered and well-supported decision.

### III. The government's argument that the Richmond Police Department must be able to continue to discriminately stop Black drivers in order to fight violent crime in Richmond is unjustified and offensive.

The government's motion for reconsideration repeats the argument that if the Richmond Police Department cannot disproportionately stop Black drivers in Richmond for traffic offenses, it will "unravel the progress RPD has made in reducing violent crime in Richmond." ECF No. 128 at 4. *See also* Oct. 28, 2022 Tr. at 135; ECF No. 103 at 6-9; ECF No. 108 at 5. Similar rationales based upon "objective" measures of "black crime statistics" have long been used as a tool "to support discriminatory public policies" in this country. Muhammad, *supra*, at 8. Setting aside for a moment that the government provided no evidence beyond two data maps to justify its

7

argument that selectively enforcing traffic laws against Black drivers in Richmond diminishes violent crime in Richmond, the government's argument about violent crime, as Judge Gregory opined in his concurrence in *United States v. Curry*, "contributes to the volumes of work gifted by others who felt obliged to bear their burden to save minority or disadvantaged communities from themselves." 965 F.3d 313, 331-32 (4th Cir. 2020). Judge Gregory further explained that such an argument:

> insists on a Hobson's choice for these communities [of color]: decide between their constitutional rights against unwarranted searches and seizures or forgo governmental protection that is readily afforded to other communities. But those inclined to shrug their shoulders at citizens who wave their Constitutions in the air during uncertainty must not forget "[h]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 635 (Marshall, J., dissenting); *cf. Korematsu v. United States*, 323 U.S. 214 (1944). Indeed, it is in moments of insecurity that our constitutional bells ring the loudest.

965 F.3d at 333. "Predictive policing is merely a covert effort to attempt to justify racial profiling." *Id.* at 344 (Thacker, J., concurring). Nothing "prevents the police from using, in good faith with constitutional principles, smart policies to identify where crimes may occur and accordingly dispatching officers to those neighborhoods. But it is how they, upon arrival, engage with the people in those neighborhoods that is important here." *Id.* at 334 (Gregory, J., concurring).

The facts in this case provide just such an example of how the police engaged with Black drivers in harassing and offensive ways. On the night of December 5, 2020, the Fourth Precinct's Focus Mission Team was out on the streets of the Fourth Precinct looking to get guns and drugs off the street. *See* July 26, 2021 Tr. at 23-24. To do that, the officers used minor traffic violations to pull over drivers to search their cars for evidence of more serious, actually criminal, offenses. *Id.* at 24. Before encountering Mr. Moore, the Focus Mission Team officers pulled over a Black male driver who did not have his headlights on. *See* July 26, 2021 Motions Hr'g at 68. The body

8

camera footage of that traffic stop shows the police engaging with two Black citizens in the car who were simply out Christmas shopping for their kids. *See* July 26, 2021 Motions Hr'g Ex. U-3 at 00:00:38. Several police officers surrounded the car, using their flashlights to peek through the windows to look at the interior of the car. *See* July 26, 2021 Tr. at 35. On another traffic stop that night, the police officers pulled over a young Black woman with a baby in the backseat who had been at a friend's house to pick up Pampers. *See* July 26, 2021 Motions Hr'g Ex. V-3 at 00:00:50. The police pulled her over for driving with an expired temporary tag. *Id.* at 85-86. The Court itself observed that one of the officers was "vigorously" looking with his flashlight into the interior of the car. *Id.* at 39. Imagine the outcry in Richmond that would have occurred had the police used these tactics on White drivers at Willow Lawn and its surrounding neighborhoods?

    The government's argument urges the Court to adopt what the Fourth Circuit has expressly condemned: a pass for policing tactics that reserve for "only for a certain race or class of people" the constitutional protections that **everyone** in the United States is entitled to. *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013) ("To conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept carte blanche the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion."); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment"). As this Court found, there is no evidence that "modern criminology demonstrates that picking on motorists somehow makes cities safer." ECF No. 126 at 24. There is a "long history of Black and brown communities feeling unsafe in police presence," *Curry*, 965 F.3d at 332 (Gregory, J., concurring),

9

and there is no basis at all for the Court to reconsider its decision finding that "Black drivers have a problem in Richmond, Virginia," ECF No. 126 at 1.

## CONCLUSION

The Court should deny the government's motion to reconsider its decision dismissing Mr. Moore's indictment.

Respectfully submitted,
KEITH RODNEY MOORE

By: _____/s/_____
Laura Koenig
Va. Bar No. 86840
Counsel for Defendant
Office of the Federal Public Defender
701 E Broad Street, Suite 3600
Richmond, VA 23219-1884
Ph. (804) 565-0881
Fax (804) 648-5033
laura_koenig@fd.org

Amy L. Austin
Va. Bar No. 46579
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0880
amy_austin@fd.org

Geremy C. Kamens
Va. Bar No. 41596
Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
(703) 600-0880 (fax)
Geremy_Kamens@fd.org