IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                                        Plaintiff,

        versus                                3:21 CR 042

KEITH RODNEY MOORE,

                                        Defendant


Before:  HONORABLE JOHN A. GIBNEY, JR.
          United States District Judge


September 15, 2021

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


Kevin Spencer Elliker, Esq.
Assistant United States Attorney
For the United States



Laura Jill Koenig, Esq.
For the defendant
The Defendant
In his own proper person

1        THE CLERK:  Case number 3:21 CR 42.

2        The United States Keith Rodney Moore.

3        Mr. Kevin Elliker represents the United States and Ms

4    Laura Koenig represents the defendant.

5        Are counsel ready to proceed?

6        MR. ELLIKER:  United States is ready, Your Honor.

7        Good morning.

8        MS KOENIG:  The defense is ready, Your Honor.

9        THE COURT:  All right.

10       So we are here today on a re-argument, I guess, or

11   continued argument, of the motion to suppress in this

12   case.

13       We are also here because Mr. Moore's motion to

14   suppress turned into a motion to dismiss the indictment on

15   the grounds of discriminatory prosecution.

16       Ms Koenig, I thought Mr. Moore was out on bond.

17       MS KOENIG:  He is in this case, Your Honor.

18       THE COURT:  What?

19       MS KOENIG:  He is in this case.  Actually being held

20   on a different case in a different jurisdiction at this

21   moment.

22       THE COURT:  Sorry.  Say that again.

23       MS KOENIG:  Actually being held on a different case

24   in a different jurisdiction at this moment.

25       THE COURT:  Oh.

1          Well, that is unfortunate.

2          Okay.  So, let me just sort of tell you how I look at

3    this.

4          I think the law with respect to the stop, the fourth

5    amendment law, doesn't look too good from your side of the

6    fence.  The Supreme Court made it pretty clear that

7    pre-textual stops are acceptable.

8          I think the pre-Miranda statement, the government has

9    some problems with those.

10          But, unfortunately, Mr. Moore, who I must say seems

11    like a, you know, a pretty sociable guy in the things that

12    I saw, started talking after he was Mirandized.  I believe

13    the -- I haven't decided on this yet, but I believe he

14    waived his right to remain silent as to post-Miranda

15    statements.

16          Where I -- where I have trouble with this case is

17    with the motion to dismiss the indictment, which really

18    hasn't -- which has been been briefed more or less as --

19    this is not a criticism of you -- as an after thought to

20    the motion to suppress.

21          I will tell you the questions that I have about it.

22    And they are evidentiary questions.

23          I think if I were to decide it on the evidentiary

24    record that we have now, as I think Mr. Elliker pointed

25    out in his brief, there are some problems from the defense

1   side.

2        But here are the things that I have been thinking

3   about, because I spent a lot of time thinking about this

4   case since we were here before.

5        What is the relevant universe of stops, of police

6   activity in Richmond?  Does it include -- does it include

7   Windsor Farms?  Because there don't to be so many of these

8   kinds of stops there.  I say that anecdotally because, you

9   know, I have been sitting up here now for ten years

10  looking at these cases and I have never had a case with a

11  white driver.  Never in ten years.  But I have had a lot

12  of cases where young African-American men get stopped by

13  the police in Richmond and elsewhere for traffic offenses.

14  And they, of course, wind up having a gun or drugs.  And

15  they get indicted.  And that is how they wind up before

16  me.

17       So, in addition to my experience on the bench I have

18  my experience in real life, which is that I live in

19  Richmond, I have lived in the Richmond area.  And I drive

20  home through the City of Richmond, and I drive home

21  through a predominantly suburban sort of an area on Forest

22  Hill Avenue and out towards Bon Air.  I don't ever see any

23  of this happening.  Where I live is not by any stretch of

24  the imagination anything like Windsor Farms, which for the

25  sake of the record I will note is a very wealthy white

1    area.

2        And when I drive in other places in the City I

3    frequently see stops with young African-American men

4    standing outside their cars.

5        And I just think it is an intolerable situation.  It

6    is intolerable that the City puts up with it.

7        I recognize that there is an argument on the other

8    side, which is, that the City, the police are stopping

9    people in places where crime occurs.  And I also recognize

10   that the people who live in those areas have a right to

11   live without crime.  They have a right to feel safe in

12   their homes, as I do in mine.

13       All that is not really illegal as far as Mr. Moore is

14   concerned.  It is a sociological observation.

15       But, I wonder whether the correct universe to review

16   is all four precincts in the City.  And I wonder whether

17   the statistical evidence that you have provided me is in

18   its own right probative of what you want to show.  I

19   understand you offered me these statistics that show the

20   overwhelming majority of people who get stopped over there

21   in the fourth precinct are African-American drivers.

22       But at one time I did some work representing the

23   Commonwealth of Virginia in voting, redistricting.  This a

24   long time ago.  And one of the things that we looked at

25   was the statistical significance.  And what I found

1    through looking at that is that numbers that appear

2    overwhelming to a casual observer may be the result of

3    something other than intentional discrimination or

4    prejudice.

5        So they had statistician to take a look at this kind

6    of evidence to determine whether it is statistically

7    significant, which I am not expert in this, but at a base

8    level what I think it shows, or intended to show, is that

9    this is not just the result of happenstance.

10        And I think that analysis requires an analysis of

11    what the relevant universe is.  Does it include the entire

12    City?  So what you have presented to me is evidence that

13    in what is a predominantly African-American part of the

14    City.  Most of the people who are getting stopped are

15    African-American.  But I also know, because I have driven

16    through this very area myself, that Caucasian people drive

17    through there, and I don't know whether they get stopped

18    or not in the same percentages as other drivers.

19        Have you thought about consulting with a statistician

20    about this?

21        MS KOENIG:  So, Your Honor, I appreciate all The

22    Court's comments.  I think that The Court is absolutely

23    correct in that as I represented to The Court on page 170

24    and 171 of the transcript of the July 26 hearing the

25    evidence that I obtained and presented to The Court at

1    that hearing, the bulk of it I got mere days before that

2    hearing.  I spent the weekend digesting that data trying

3    to figure out what it meant.  Around that same time is

4    when I learned about the community policing act, and that

5    there was this data base that was publicly available.  And

6    that is where we had gotten the statistics that Mr. Hush

7    testified to.

8         To the extent that the Government's issue with my

9    filing this claim post-hearing is really that he wants a

10   chance to present evidence about this.  I am happy to have

11   that hearing, Your Honor.  I think a full-fledged

12   evidentiary hearing about what is happening in the City of

13   Richmond in terms of racialized policing is warranted and

14   would help this Court decide all of those questions that

15   The Court just raised.

16        In terms of the universe, I think The Court is right.

17   I mean especially knowing what we know now about the

18   make-up of the precincts in terms of the residents in the

19   City of Richmond, it was shocking to me.  At the beginning

20   of the case I knew from the University of Virginia dot map

21   that the neighborhood we were talking about was made up

22   almost entirely of black citizens.  But when I looked at

23   the broader scope of the dot map, once I had found the

24   precinct map, and it lined up that three of the four

25   precincts in Richmond are in black neighborhoods, and only

1    one of them is in white neighborhoods, predominantly white

2    neighborhoods.  I don't know that in the City of Richmond

3    we would be able to distinguish the equal protection claim

4    without looking at the broader scope of the evidence

5    because of that.  If the neighborhoods were more

6    integrated, perhaps that is something that could be done.

7    But they are not.

8        So I guess to the extent that The Court's question is

9    what is the universe of data that we were looking for, I

10   do believe at this point that it is the broader city

11   because of the segregated nature of where people in the

12   city of Richmond live.

13       I think that, I mean, the statistics that we have

14   already found are immensely troubling.  That the City

15   make-up of Richmond is less than half percent, less than

16   half of the population is black citizens; less than half

17   the white population is white citizens; but just under

18   group.  Yet only 15 percent of the traffic stops in

19   Richmond are made up of white citizens.  And I think

20   common sense tells us, I mean, I am not committing traffic

21   violations all the time.  I am a very white person.  I

22   have yet once to be pulled over in the City of Richmond or

23   any of the surrounding counties for that matter.

24       THE COURT:  That may change.

25       MS KOENIG:  Fair enough.

1          THE COURT:  I don't think that is true.

2          I have been impressed with the honesty and integrity

3     of the police.  That is a cynical sense of humor and is

4     not an accurate reflection of the police department.

5          MS KOENIG:  I take it as that, Your Honor.

6          But I do think we find ourselves in the position that

7     Judge Hamilton was finding himself in when he was looking

8     at the City of Milwaukee, I believe, in the case, in the

9     Johnson case in the Seventh Circuit.  That is to say if

10     this was actually happening to white citizens of Richmond

11     there would be an uproar, and we would have heard about

12     it, and we would know about it.  So I think on the record

13     that The Court has before it The Court certainly has

14     grounds to find that it is a meritorious claim,

15     particularly given the holding in the Forth, which is that

16     Sixth Circuit case that recognizes if the statistics are

17     severe enough that a discriminatory effect can raise an

18     inference of discriminatory intent.  But, again, if

19     Mr. Elliker's issue with how this claim was raised is that

20     he didn't have a fair opportunity to present evidence on

21     it, I am happy to have a full-blown hearing.

22          THE COURT:  Well, I think he didn't.  I think you

23     didn't either.  You know, they say figures don't lie, but

24     liars figure.  And I think that is what a more fulsome

25     examination of the statistical data will do for us.  But I

1    think in order to -- I am going to give you a chance to

2    put on some evidence in the course of a hearing, but I

3    think you need to have someone who is skilled at

4    statistical analysis to look at this and tell us whether

5    it actually means anything.  You know, if what I have done

6    in cases like that in the past is I have gone down to VCU

7    and found an expert and asked them if they would do it for

8    free.

9         MS KOENIG:  Sure.  I am sure I can find someone that

10   would be very well qualified, Your Honor, for free or not.

11   We would figure that out.

12        THE COURT:  I think, you know --

13        MS KOENIG:  I do, if The Court is so inclined, I do

14   have an argument about the other questions The Court had

15   asked on the other two claims if The Court wants me to

16   briefly address those.  I think I have laid it out in the

17   papers.

18        THE COURT:  I think you have, too.  But if you want

19   to say something, go ahead.

20        MS KOENIG:  The only thing I wanted to point out that

21   maybe is not as elucidated as clearly as it could be in

22   the papers on the fourth amendment claim, Your Honor, is

23   that Hodari dealt with a situation in which someone is

24   walking away, actually running away from a police officer.

25   So the question in that case is, if the police officer

1    doesn't have any justification, but gives -- to stop the

2    individual -- but orders them to stop and they continue

3    fleeing, at that point are they seized?  And I think what

4    separates this situation from that situation is that we

5    have -- in that situation if someone is ordered on foot by

6    the police officers to stop and they don't think there is

7    justification, no harm, no foul, they can walk, run away.

8    There is nothing the police could do about it.  But in

9    this case because of Virginia's law about eluding, that as

10   soon as the cop turns the lights on if you ignore that and

11   you keep driving, it doesn't matter whether there is a

12   justification or not.  You meet the definition of the

13   crime of eluding.  So I do think that that separates from

14   that point.

15        In terms of the government's reference to the Smith

16   case from the Fourth Circuit, my position is that that is

17   dicta in that case because in that case the person had

18   already -- the court spent the majority of the time

19   talking about whether it is reasonable to suspect that

20   someone is evading a roadblock because they turn off

21   before they get to the roadblock.

22        And then the defendant argued in that case that he

23   was then blocked in, and he couldn't go anywhere else, so

24   at that point that the cop turns his lights on and blocks

25   him in, that that is when he is seized.

1        The Court in a footnote, certainly not essential to

2    The Court's holding in that case, cites Hodari for that

3    point.

4        But I don't think that is -- certainly not the

5    argument that -- that The Court did not analyze the

6    argument that we have presented here, that the traffic

7    stop must be valid from its inception.

8        In terms of the Fifth Amendment question, Your Honor,

9    the only point I will make to The Court that I haven't

10   made in the papers already is that the questions that

11   Mr. Moore is asking are not related to the substance of

12   what he is accused of until he is specifically questioned

13   about it by the police.  He is asking, where is my wallet?

14   What is going to happen with my car?  When do I get to get

15   out of here?  Can you give this to my girl friend?  You

16   know, those kinds of transactional, I would say, questions

17   about what is going to happen next to him.  He is not in

18   any way from my understanding of the videos and the

19   evidence indicating an initiation of questioning about the

20   offense.

21       Thank you, Your Honor.

22       THE COURT:  So, Mr. Elliker, I will hear from you on

23   this.

24       I know that you have pointed out accurately that the

25   motion to dismiss is a little behind the schedule that I

1    outlined.  But -- and there is really no excuse for it

2    other than, I guess, she didn't get the data quickly.

3        But I am going to allow it to go forward.

4        MR. ELLIKER:  Understood, Judge.

5        I thought it was relevant to at least raise because I

6    thought it was a way to close the loop on the objections I

7    raised on relevance at the suppression hearing, bringing

8    in the evidence that I think in retrospect was obviously

9    brought in to support an argument that hadn't actually

10   been fronted to The Court or to The United States yet.

11   But in any event --

12       THE COURT:  So, what do you think about -- I think

13   you are in pretty good shape on most of the suppression,

14   pre-Miranda statements, which really aren't, I don't think

15   too critical to your case.

16       MR. ELLIKER:  Well, on that point, not to stand in

17   the way of progress, I think in the response I think I

18   tried to make clear that the only pre-Miranda statements

19   that we argued were not suppressible were his voluntary

20   utterances to other individuals, not any responses he gave

21   to any questions by the officers.

22       THE COURT:  What do you think about my musings about

23   the statistical evidence in this case?

24       MR. ELLIKER:  Well, Judge, you said something that I

25   agree with, which was that it is not really legal

1    argument.  I think that that is actually relevant to the

2    legal standard outlined for these kinds of claims from the

3    Supreme Court's Armstrong decision.

4         Courts, including the Fourth Circuit, have emphasized

5    that for these kinds of discriminatory enforcement or

6    discriminatory prosecution claims it is necessarily a high

7    burden.  That is what the Fourth Circuit indicated in

8    Venable.  And in Mason, another Fourth Circuit decision

9    cited in the briefs, I believe they are actually citing

10   back to Armstrong calling it a demanding and rigorous

11   burden.  And the justification given for that is that in

12   essence a defendant is raising a constitutional argument

13   to combat what may otherwise be a policy-making decision

14   by law enforcement executives in the jurisdiction by which

15   I mean, it seems to me that at the bottom the thrust of

16   the defendant's argument is the use of the Focused Mission

17   Team in the fourth precinct, predominantly

18   African-American precinct, is objectionable because of the

19   resulting apparent, according to these statistics offered

20   by the defendant, racial disparity in outcomes.

21        I understand Your Honor's point about not being able

22   to really adequately understand on the record what the

23   statistical significance of those outcomes really are in

24   the City of Richmond given the division of the precincts.

25   And Ms Koenig has indicated that because of the de facto

1    historical residential segregation of the City, and the

2    way the precincts fall, it may not be helpful to narrow

3    down to only the fourth precinct to look at outcomes

4    statistically.  But I think that what it comes down to,

5    Judge, is it really is trying to create an equal

6    protection argument to combat what otherwise is a

7    policy-making- decision of the City of Richmond in terms

8    of how to police certain areas.  And that is something

9    that is left to the discretion of the Executive.

10        THE COURT:  Well, that is an interesting argument.

11   You know, Judge Brown in Washington, D C says that in

12   ruling on, you remember Joe Arpaio, the Sheriff in

13   Arizona --

14        MR. ELLIKER:  I do, Judge.  I am nervous to be

15   associated that.

16        THE COURT:  No, you are not associated with it.

17        She said that under our system of Federal Courts

18   there are vast areas of executive actions that are

19   essentially unreviewable.  You are saying that how they

20   assign officers might be one of those.  Or the strategy of

21   policing might be.

22        MR. ELLIKER:  I wouldn't go so far as to say it is

23   unreviewable, Judge.  I would just emphasize that grasping

24   for evidence that may or may not show, or get over that

25   hurdle, I think exemplifies the difficulty of trying to

1    examine these kinds of decisions.  I think --

2         THE COURT:  But didn't you say in your papers that

3    they have got to show that, I guess, these officers had

4    discriminatory intent in stopping Mr. Moore?  How could

5    you ever possibly show that without essentially reviewing

6    statistical evidence to demonstrate that is part of a

7    pattern and practice?

8         MR. ELLIKER:  I think that is just the point, that

9    you can't use statistical evidence to point that out.

10        THE COURT:  How else would you prove it?

11        MR. ELLIKER:  I think statistical evidence, Judge, to

12   the extent it is relevant goes towards, I guess it could

13   raise an inference at the end of the day, but to bring

14   things back to where the legal standard is on these

15   claims, there is a two-part test outlined in Armstrong and

16   adopted by the Fourth Circuit for cases -- for an argument

17   like this, I should say -- that the defendant has to show

18   this clear evidence; first, that is similarly-situated

19   individuals of a different race were treated differently;

20   second, that the decision to enforce the law as to this

21   defendant was, quote, invidious or in bad faith.

22        THE COURT:  See, that is the thing.  Unless you have

23   some sort of a quisling in the police department who says,

24   yes, we decided we would go out and prosecute

25   African-Americans, you will never have evidence to satisfy

1    number two.  You could probably get past number one, the

2    first point you raise, with statistical evidence.  You

3    know, I am not sure you would ever prove number two.

4         How would you prove number two?

5         MR. ELLIKER:  Well, Judge, I think in the Fourth

6    Circuit case that goes through the best discussion of

7    these separate, of the factors separately is the Venable

8    decision, which is from 2012 written by Judge Dunkin.  And

9    in it she explains that in essence that first part of the

10   test is really about is there a discriminatory effect that

11   is discernible comparing similarly-situated drivers or

12   defendants.

13        The second part goes towards showing discriminatory

14   intent, invidious or bad faith.  What the Fourth Circuit

15   has said, I think, perhaps unhelpfully, is saying what is

16   not enough as opposed to saying what is enough.

17        THE COURT:  You are clearly the smartest law clerk I

18   ever had -- with the exception of my current clerk --

19   could you explain to me, give me an example of what would

20   prove this?  Interestingly, this is called counter-factual

21   analysis, and it is a principle that comes up in physics

22   lessons.

23        MR. ELLIKER:  Judge, I think if you did have

24   situations where there was evidence of comments made by

25   police officers with respect to a particular defendant, or

1    if there were evidence about potentially -- and again

2    emphasizing counter-factual, Judge -- if there were

3    evidence of a departmental policy, even an informal one

4    having to do with targeting particular kinds of defendants

5    based on their race, which, not for nothing, I might nod

6    towards the former sheriff in Arizona on that, but I

7    certainly don't think that is evidence here.  And what the

8    Fourth Circuit --

9         THE COURT:  None of that.

10        MR. ELLIKER:  And what Judge Dunkin had said is with

11   respect to, because we were talking about statistics, and

12   there is this concern about statistical relevance, Judge,

13   Judge Dunkin wrote in Venable, having to do with

14   discriminatory intent the government must be more -- this

15   a quote from that opinion at page 903 -- the government

16   must be more than aware that a prosecutorial policy may

17   result in the prosecution of one group more than another

18   because discriminatory intent implies that the government

19   selected or reaffirmed a particular course of action at

20   least in part because of, not merely in spite of, its

21   adverse effects on an identifiable group.

22        THE COURT:  Okay.

23        It is difficult burden.

24        MR. ELLIKER:  So the only reason I started by, I

25   hesitate to lead any argument with policy, discussions of

1  policy considerations, but I think that is really what

2  this boils down to is the justification for why it is that

3  that burden is so high is that what could appear to be, as

4  you said, without having clear statistical analysis what

5  could appear to be numbers that jump off the page, may

6  otherwise be explained by a race-neutral policy

7  justification --

8       THE COURT:  Right.

9       MR. ELLIKER:  -- such as crime rates in particular

10 areas.

11      THE COURT:  Right.

12      And I don't mean to say with respect to invidious

13 intent towards Mr. Moore in particular.  I have observed a

14 whole lot of the interactions between the police that

15 evening.  I thought, you know, the police essentially

16 treated him with great respect, treated him nicely.  So I

17 didn't see it from -- I said videotape earlier -- dating

18 myself -- from the recoding.

19      All right.  Okay.  Thank you, Mr. Elliker.

20      Here is what we are going to do.

21      I will set a status conference in this case.  I am

22 just trying to figure out what I have going on.

23      How about the 18th at 9:00 o'clock.  Will you still

24 be around then?

25      MR. ELLIKER:  No, Judge, but someone from the United

1    States will be.

2         THE COURT:  Okay.

3         The 18th at 9:00 o'clock, a conference call.

4         MS KOENIG:  What date?

5         THE COURT:  October 18.

6         MS KOENIG:  Okay.

7         THE COURT:  Ms Koenig, at that time I hope that you

8    will have -- I am not expecting you to have all the

9    statistical stuff done by then, but I will expect you to

10   have an outline of where you expect to go.  And then we

11   will be able to set a briefing schedule on this.

12        Mr. Elliker or his -- the United States will have an

13   opportunity once they see your evidence to pull together

14   whatever that statistical data they think is necessary.

15        All right.

16        MS KOENIG:  Yes, sir.

17        THE COURT:  Okay.

18        Anything else?

19        MR. ELLIKER:  No, Your Honor.  Thank you.

20        MS KOENIG:  Not from the defendant.

21        THE COURT:  Thank you very much.

22        Mr. Moore, sorry we didn't resolve this today, but we

23   will try to get it right.

24        And I wish you well.

25        Mr. Moore, on the 18th we are going to have a

1    telephone call with the lawyers to discuss procedural

2    matters.  And you will not need to be present for that.

3         Okay?

4         THE DEFENDANT:  Yes, sir.

5         THE COURT:  All right.

6         Thank you all very.

7         Let's recess.

8              HEARING ADJOURNED.

9

10        THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

11

12             GILBERT FRANK HALASZ

13             Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25